IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PIKE ELECTRIC CORPORATION and PIKE ELECTRIC, INC., <br><br>Plaintiffs, <br><br>v. <br><br>MICK DUBEA, <br><br>Defendant. | C.A. No. _____ |

## VERIFIED COMPLAINT

Upon personal knowledge as to their own actions and upon information and belief as to all other matters, Plaintiffs Pike Electric Corporation ("Pike Corp.") and Pike Electric, Inc. ("Pike Inc.") (collectively, "Pike") for their Complaint against Mick Dubea ("Dubea") allege as follows:

### SUMMARY OF THE ACTION

1.  This is an action against Dubea, the former Vice President of Pike's Western Region, for breach of contract, tortious interference with contract, tortious interference with business relations and misappropriation of trade secrets. In particular, Pike alleges that: (1) Dubea has breached, and is continuing to breach, his contractual obligation to refrain from competing against Pike and soliciting Pike's customers and employees for a period of five years following the date of his termination from Pike (the "Restricted Period"); (2) Dubea has breached, and is continuing to breach, his contractual obligation to refrain from disclosing Pike's confidential information; (3) Dubea has tortiously interfered, and continues to tortiously interfere, with Pike's employee agreements and business relations with its existing and

prospective customers; and (4) Dubea has misused, and continues to misuse, Pike's valuable trade secrets to jump-start a competing business. By breaching his obligations to Pike, Dubea has forfeited all consideration given to him by Pike for assuming those obligations. Moreover, Dubea's conduct has resulted in direct and irreparable harm to Pike, and Pike should be awarded monetary damages as partial compensation for its injuries. As Dubea's unlawful conduct is continuing, Pike also seeks injunctive relief and specific performance that will prevent Dubea's ongoing misconduct.

2. This action also seeks a declaratory judgment that any entitlement to future compensation that Dubea may claim as part of the consideration given to him in exchange for his employment with Pike has been forfeited under the contracts at issue.

## THE PARTIES

3. Pike Electric Corporation ("Pike Corp.") is a Delaware corporation with its principal place of business at 100 Pike Way, Mount Airy, North Carolina 27030.

4. Pike Electric, Inc. ("Pike Inc.") is a North Carolina corporation with its principal place of business at 100 Pike Way, Mount Airy, North Carolina 27030. Pike Inc. is the operational arm of Pike Corp. and a wholly-owned subsidiary of Pike Corp. Throughout, Pike Corp. and Pike Inc. will collectively be referred to as "Pike."

5. Upon information and belief, Dubea is a resident of the state of Texas and resides at 2570 Ashley Street, Beaumont, Texas, 77702.

## JURISDICTION AND VENUE

6. This is a civil action seeking a declaratory judgment, injunctive relief, specific performance and damages for breach of contract, tortious interference with contract, tortious interference with prospective business relations and misappropriation of trade secrets.

RLF1-2960179-1

7. The Court has subject matter jurisdiction over these claims on the basis of diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1), as plaintiffs and the defendant are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8. The Court has personal jurisdiction over the defendant because the parties agreed to submit any claims arising out of the contract at issue to the exclusive jurisdiction of the courts of the State of Delaware and the United States District Court for the District of Delaware.

9. Venue is proper in this District, because the parties agreed to waive any objection to the laying of venue of any action arising out of the contract of issue here (or the transactions contemplated thereby) in this District.

## NATURE OF PIKE'S BUSINESS

10. Pike provides electric distribution and transmission services to electrical utilities, cooperatives and municipalities across the eastern half of the United States. Its services include power line construction and maintenance, storm restoration, right-of-way maintenance and fiber-optic installation. Pike has been in business since 1945.

11. There is a limited supply of skilled workers that are capable of performing Pike's work, and Pike struggles to maintain an adequate supply of linemen and managers. Due in part to the recent hurricanes and storms across the United States, many companies in Pike's industry are currently experiencing shortages of qualified personnel, and Pike has spent an enormous amount of time and money in an effort to retain its skilled labor force. To mitigate against the risk of labor shortages, and to prevent its competitors from taking its employees, Pike has, from time to time, entered into employment agreements containing non-compete provisions with its management and with many of its key employees. Those contracts are necessary to

ensure that Pike has the labor force needed to operate its business and provide its customers with electric distribution and transmission services.

12. Most of Pike's customers assign work to it under revolving master service arrangements. Under those arrangements, Pike's customers generally have no contractual obligation to continue to assign work to Pike, but, based on long-standing business practices, Pike has a reasonable expectancy that many of them will continue to do so. Nevertheless, most of Pike's customer arrangements, including its master service arrangements, can be terminated on short notice. As a result, Pike is at risk of losing significant business in a short time if its competitors can convince its customers to change service providers.

13. Pike's business depends on its long standing relationships with its customers, its competitive and proprietary pricing models and its proven supply of qualified personnel. Any damage to Pike's relationship with its customers, any disclosure of its confidential pricing secrets and any disruption to its labor supply would cause immediate and irreparable damage to Pike.

### PIKE ACQUIRES RED SIMPSON

14. On July 1, 2004, Pike acquired all the outstanding shares of the common stock of a privately-held company called Red Simpson Inc. ("RSI"). At the time of the acquisition, RSI employed over 1,500 individuals, had customers throughout the South Central and Southwestern parts of the United States and was generally considered one of America's leading power line contractors.

15. The RSI acquisition was a good strategic fit for Pike because the companies operated similar businesses in similar geographic regions, but shared only four

mutual clients out of a base of nearly 150 customers. In effect, Pike purchased RSI's customers, and its employees' and executives' relationships with those customers, when it acquired RSI.

16. At the time Pike acquired RSI, Dubea was RSI's President for its Western Region, which covered nearly two-thirds of the total RSI workforce and accounted for a majority of the company's earnings. As a high ranking RSI executive that had worked with RSI for over 20 years, Dubea was privy to a significant amount of RSI's confidential business information. Moreover, Dubea was instrumental in the management, development and growth of RSI's business and goodwill. In particular, Dubea spearheaded many of RSI's important customer relationships, including its relationships with Texas Utilities, Entergy (West) and the city of San Antonio. Dubea also owned 39,327 shares of RSI common stock, which made him one of RSI's largest stockholders.

17. Pike's efforts to purchase RSI culminated in a Stock Purchase Agreement ("SPA") between the companies. (A copy of the SPA is attached as Exhibit C to the December 20, 2005 Declaration of Eric Pike ("Pike Decl.").) As one of the largest owners of RSI stock, Dubea was a party to the SPA. The negotiations around the SPA lasted several weeks and all parties had access to legal counsel and financial advisors. During the course of their negotiations, the parties had an opportunity to discuss the forum selection and choice of law clauses in the contract. Ultimately, the parties agreed that Delaware, Pike Corp.'s place of incorporation, would serve as the forum in the event of litigation. The parties also agreed that Delaware law would govern any dispute between the parties arising out of the contract.

18. The parties to the SPA recognized Dubea's integral role with RSI, and understood that his participation in the combined Pike-RSI enterprise would be critical to its success. In particular, Pike knew that its success in Texas and Louisiana would depend on RSI's

customer relationships in those areas, including the relationships cultivated by Dubea. Pike would not have purchased RSI if it would not have been able to receive the benefit of those relationships.

19.   In addition, because customers in the power line industry are not bound by long-term service contracts, Pike was concerned that it would be easy for RSI's senior management effectively to "opt out" of the merger by starting their own competing businesses and taking RSI's existing customers and employees with them. In particular, Pike wanted to ensure that Dubea came to work for the merged company, and did not use his existing relationships with the customers in RSI's Western District (which Dubea headed) to form a competing business after the closing.

20.   Consequently, the parties agreed in writing that Pike's purchase of RSI would be expressly conditioned upon the execution and delivery of an employment agreement containing non-compete provisions between Dubea and Pike (as well as similar agreements with several other key RSI employees) prior to the closing. Thus, the non-compete agreement between Dubea and Pike at issue in this litigation expressly arose out of the sale of RSI to Pike.

21.   It was in Dubea's financial interest to facilitate the closing of Pike's acquisition of RSI as he was ultimately paid over $8.2 million for his RSI stock. Dubea would not have been paid that money for his RSI stock had he not entered into an employment agreement with Pike (because Pike would not have agreed to purchase RSI under those circumstances).

## DUBEA'S EMPLOYMENT AGREEMENT WITH PIKE

22. Dubea not only received $8.2 million in cash from the acquisition, but on July 1, 2004, he also agreed to a generous written employment agreement with Pike Inc. (the "Employment Agreement").

23. Under the Employment Agreement, Dubea was hired as Pike's Vice President for its Western Region—substantially the same position he had held with RSI—and was given responsibility for all of Pike's operations in Oklahoma and Texas. Dubea reported directly to the CEO of Pike, and received a base salary of $330,000 per year. Dubea was also given the opportunity to purchase up to 21,479 Restricted Shares of Pike common stock on very favorable terms. Dubea in fact purchased over $1 million worth of Pike shares that are scheduled to vest on the second, third and fourth anniversaries of the closing and have a current market value of approximately $1.5 million. In addition, Dubea was paid a "Base Amount" of approximately $5 million (half shortly after the closing, and half on the first anniversary of the closing). Finally, the parties agreed that Dubea would receive a "Multiplier Amount" of over $6 million as part of the Employment Agreement that is scheduled to be paid out on the second, third and fourth anniversaries of the closing. But for his conduct in violation of the Employment Agreement, Dubea would have been set to receive the full $6 million from the Multiplier Amount by 2008. In sum, Dubea has already received approximately $13.2 million from Pike in connection with the RSI acquisition and the promises he made in the Employment Agreement, and he would be entitled to receive approximately $7.5 million more if not for his unlawful conduct as issue in this action.

24. In return for the valuable consideration he was to receive under the Employment Agreement, Dubea agreed to be bound by various restrictive covenants. Under §

- 7 -

5.02 of the Employment Agreement, Dubea acknowledges that Pike "would not have agreed to enter into the Stock Purchase Agreement . . . and that [Pike] would not have agreed to enter into this Agreement and make the payments hereunder, without [Dubea's] agreeing to enter into and honor [the restrictive covenants found in the Employment Agreement]."

25. The Employment Agreement explained the reasons for, and reasonableness of, the restrictive covenants:

> "**Employer's Interests.** [Dubea] acknowledges that RSI has expended substantial amounts of time, money and effort to develop business strategies, substantial customer relationships, supplier and vendor relationships, employee relationships, goodwill, business secrets, confidential information and intellectual property and to build an effective organization and that [Pike], as the sole shareholder of RSI after the Closing, has a legitimate business interest and right in protecting those assets as well as any similar assets that [Pike] may develop or obtain following the Closing. . . . [Dubea] agrees that the [following restrictions] are reasonable and necessary for the protection of such assets . . ."

26. Under Section 5.03 of the Employment Agreement, Dubea agreed to protect Pike's confidential information:

> "Section 5.03. <u>Non-Disclosure of Confidential Information.</u> [Dubea] acknowledges, that in the performance of his duties as an employee of RSI, [Dubea] has received, and may in the future as an employee of [Pike] be given access to, Confidential Information (as defined below). [Dubea] agrees that all Confidential Information has been, is and shall be the sole property of [Pike] or RSI, as the case may be, and that [Dubea] has no right, title, or interest therein. . . . [Dubea] shall not, directly or indirectly, disclose or cause to be disclosed, to any person or entity whatsoever, or utilize or, directly or indirectly, cause to be utilized, by any person or entity whatsoever, any Confidential Information acquired pursuant to [Dubea]'s employment with [Pike] or RSI (whether acquired prior to or subsequent to the execution of this Agreement) or otherwise."

27. The Employment Agreement signed by Dubea defined the confidential information that he was obligated to protect:

> "'Confidential Information' shall mean trade secrets and confidential or proprietary information, knowledge or data that is or will be used, developed, obtained or owned by [Pike], RSI or the Business relating to the business, operations, products or services of [Pike], RSI or the business, operations,

products or services of any customer thereof, including products, services, fees, pricing, designs, marketing plans, strategies, analyses, forecasts, formulas, drawings, photographs, reports, records, computer software (whether or not owned by, or designed for, [Pike], RSI or the Business), operating systems, applications, program listings, flow charts, manuals, documentation, data, databases, specifications, technology, inventions, developments, methods, improvements, techniques, devices, products, know-how, processes, financial data, customer, supplier and vendor lists, contact persons, cost information, executive information, regulatory matters, personnel matters, employee information, employee compensation, accounting and business methods, patents, trade secrets, copyrightable works and information with respect to any supplier, vendor, customer, employee or independent contractor of [Pike], RSI or the Business all similar and related information in whatever form . . ."

28. Dubea also agreed to refrain from competing with Pike and soliciting Pike's customers and employees during the Restricted Period:

"SECTION 5.07. Non-Competition. For the Restricted Period, [Dubea] shall not, and shall cause each of [Dubea]'s representatives, agents and affiliates not to, directly or indirectly:

(i) (A) engage in activity or business, or establish any new business, within the United States of America that is in competition, in whole or in part, with the Business or [Pike] . . .

(ii) (A) solicit any person or entity that is a customer (or prospective customer) of [Pike] or any of its affiliates to purchase any goods or services sold or performed by [Pike] or any of its affiliates from any person other than [Pike] or any of its affiliates or to reduce or refrain from doing any business with [Pike] or any of its affiliates, (B) solicit, recruit or hire any employee of [Pike] or any of its affiliates or any person who has worked for [Pike] or any of its affiliates, (C) solicit or encourage any employee of [Pike] or any of its affiliates to leave the employment of [Pike] or any of its affiliates or recommend to any person that such person employ or engage any employee of [Pike] or any of its affiliates . . . (E) assist any person or entity in any way to do, or attempt to do, anything prohibited by this clause (ii) . . .

(iii) serve as a director, officer, affiliate, employee, broker, independent contractor, consultant, agent, representative or advisor for any Competitor . . .

(iv) form, or acquire any equity ownership, voting or profit participation interest in, any Competitor . . .

For purposes of this Agreement, the term "Restricted Period" shall mean a period commencing on the date of the Closing and terminating five years from the date [Dubea] ceases to be an employee of [Pike] for any reason."

29. Dubea also explicitly agreed that Pike would be entitled to specific performance should he breach the terms of the contract, and that any breach by Dubea would enable Pike to cease making any payments or providing any benefits owed to Dubea under the terms of the Employment Agreement:

> "Section 5.10. <u>Specific Performance.</u> [Dubea] agrees that any breach by [Dubea] of any of the provisions of Section 5.03, 5.05, 5.06 and 5.07 shall cause irreparable harm to [Pike] that could not be adequately compensated by monetary damages and that, in the event of such a breach, [Dubea] shall waive the defense in any action for specific performance that a remedy at law would be adequate, and [Pike] shall be entitled to (a) specifically enforce such terms and provisions without the necessity of proving actual damages or posting any bond and (b) cease making any payments or providing any benefit (including by way of vesting of any Restricted Shares acquired pursuant to Section 2.03) otherwise required by this Agreement, in each case in addition to any other remedy to which [Pike] may be entitled at law or in equity."

30. Dubea also explicitly agreed in the Employment Agreement that "the rights and obligations of [Pike and Dubea] under the provision of [the Employment Agreement], including Articles V and VI, shall survive and remain binding and enforceable, notwithstanding any termination of [Dubea's] employment with [Pike] for any reason".

31. Dubea and Pike also agreed that the Employment Agreement would be governed by the laws of the State of Delaware and that any action arising out of the Employment Agreement would be submitted to the exclusive jurisdiction of the courts of the State of Delaware and the United States District Court for the District of Delaware.

### DUBEA BREACHES THE EMPLOYMENT AGREEMENT

32. Dubea's performance as Vice President, while adequate, did not meet Pike's high expectations. Therefore, on September 22, 2005, Pike terminated Dubea without cause. Under the Employment Agreement and the amendments thereto, because Pike terminated Dubea without cause, Dubea would remain eligible to receive payment of the Multiplier Amount

RLF1-2960179-1

and his Restricted Shares would continue to vest as scheduled. So long as he did not breach the restrictive covenants in the Employment Agreement, Dubea would have been entitled to receive over $7.5 million in cash and restricted stock from Pike during the years 2006 through 2008.

33. On October 5, 2005, Chad Dubea ("Chad"), Dubea's son and a then-current Pike employee, formed a company registered in Harlingen, Texas called T&D Solutions Ltd. ("T&D"). On information and belief, T&D was formed with Dubea's financial backing and support. Moreover, on information and belief, Chad is living with Dubea in Beaumont, Texas, and Dubea is providing advice and guidance in connection with T&D's business and helping to run the day-to-day operations of T&D out of their home.

34. Upon information and belief, T&D provides electric distribution and transmission services to electrical utilities, cooperatives and municipalities in Texas and Louisiana. Its services include power line construction and maintenance and storm restoration. It competes directly with Pike.

35. Chad, despite forming T&D on October 5, 2005, did not leave his job at Pike until October 21, 2005. Upon information and belief, T&D began soliciting the employment of Pike's personnel on or about October 21, 2005, having specifically waited until Pike's managers were busy attending an out of state meeting. Since that time, over fifty-five employees have left Pike and joined T&D. The following employees, at a minimum, left Pike for T&D in breach their employment agreements: Chuck Chaddrick, Tim Droddy, Clifton Droddy, Sammy Christian and Alex Graham. T&D, and Dubea, knew about the existence of those employment agreements, but nevertheless endeavored to cause the employees to breach those agreements. Tellingly, each employee that left Pike was a former RSI employee with a longstanding relationship with Dubea.

36.  Upon information and belief, T&D, with Dubea's assistance, also convinced the former controller for RSI, C.P.A. Corey Close, to leave Pike and join their ranks. When Close left Pike he sought permission to take his work computer with him. After assurances that he would not be working in the power line industry and that he would not disclose or use the confidential information on the computer, Pike acceded to Close's request. Close is now the CEO of T&D, and on information and belief, is using valuable confidential information gained as an employee of RSI and Pike and taken from his Pike computer in furtherance of T&D's competing business.

37.  Upon information and belief, T&D and Dubea have used and, unless enjoined, will continue to use Pike's confidential salary information, payroll data, and bonus information in its efforts to solicit Pike's employees. In particular, T&D is using its knowledge of Pike's employees' salaries to offer slightly more attractive compensation packages to convince those employees to leave Pike.

38.  Upon information and belief, T&D also began soliciting business from Pike's customers on or about October 21, 2005. Dubea used his pre-existing relationships with those customers, gained as head of RSI's Western Region and as Pike's VP in charge of its Western Region, in his attempts to steal those customers from Pike. T&D's efforts have been successful. To date, the following companies have taken at least some work from Pike and given it to T&D: Entergy (West), Beauregard Electric, Electric Cooperative, Sam Houston Electric Cooperative, Sharyland Development, and American Electric Power.

39.  Upon information and belief, T&D and Dubea have used and, unless enjoined, will continue to use Pike's confidential pricing information and customers lists and contacts in its effort to steal Pike's customers.

## IRREPARABLE HARM

40. Pike has been, and will continue to be, irreparably harmed by Dubea's misconduct. First, Pike would not have purchased RSI without the contractual guarantee that it would not have to compete with Dubea in Texas and Louisiana. It is now being forced to do so. Second, it is critical for Pike to foster and maintain the customer relationships it acquired when it purchased RSI. Dubea has intentionally, wrongfully and permanently undermined many of those relationships and, unless enjoined, will continue to do so. Third, Dubea continues to possess Pike's confidential information. Once disclosed, confidential information cannot be undisclosed, and the difficulty in measuring the damages caused by its dissemination makes it a prime example of an act causing irreparable injury. Through his connections with T&D, his competition with Pike, his solicitation of Pike's customers and employees, and his use and disclosure of Pike's confidential information, Dubea has caused and, unless enjoined, will continue to cause irreparable harm to Pike.

41. Moreover, in his employment agreement with Pike, Dubea acknowledged that "any breach by [Dubea] of any of the provisions of Section 5.03, 5.05, 5.06 and 5.07 shall cause irreparable harm to [Pike] that could not be adequately compensated by monetary damages and that, in the event of such a breach, [Dubea] shall waive the defense in any action for specific performance that a remedy at law would be adequate . . . ."

## COUNT I: BREACH OF CONTRACT: NON-DISCLOSURE CLAUSE

42. Pike repeats and alleges each allegation set forth in paragraphs 1 through 41 herein.

43. The Employment Agreement is a valid and enforceable contract existing between Pike Inc. and Dubea.

44. Pike Inc. has fully performed its obligations under the Employment Agreement.

45. Dubea has breached and, unless enjoined, will continue to breach, Section 5.03 of the Employment Agreement, concerning the protection of confidential information, by using and disclosing Pike's confidential information in furtherance of T&D's competing business.

46. Pike has incurred and will continue to incur damages as a result of Dubea's conduct.

### COUNT II: BREACH OF CONTRACT: NON-COMPETITION CLAUSE

47. Pike repeats and alleges each allegation set forth in paragraphs 1 through 41 herein.

48. The Employment Agreement is a valid and enforceable contract existing between Pike Inc. and Dubea. The non-compete provisions thereof are reasonable in duration, scope and purpose.

49. Pike Inc. has fully performed its obligations under the Employment Agreement.

50. Dubea has breached and, unless enjoined, will continue to breach Section 5.07 of the Employment Agreement, concerning restrictions on competition, by competing with Pike and soliciting Pike's customers and employees during the Restricted Period.

51. Pike has incurred and will continue to incur damages as a result.

### COUNT III: SPECIFIC PERFORMANCE

52. Pike repeats and alleges each allegation set forth in paragraphs 1 through 41 herein.

53. The Employment Agreement is a valid and enforceable contract existing between Pike Inc. and Dubea.

54. Pike Inc. has fully performed its obligations under the Employment Agreement.

55. The terms of the Employment Agreement are definite and certain.

56. Pike is entitled to specific performance of the Employment Agreement. Pike has no adequate remedy solely in law and, absent a grant of specific performance from the Court, Pike's rights under the Employment Agreement will be lost.

### COUNT IV: TORTIOUS INTERFERENCE WITH CONTRACT

57. Pike repeats and alleges each allegation set forth in paragraphs 1 through 41 herein.

58. Dubea knew of the existence of Pike Inc.'s employment agreements with various Pike employees, including, at a minimum, Chuck Chaddrick, Tim Droddy, Clifton Droddy, Sammy Christian and Alex Graham.

59. Pike Inc.'s employment agreements with its employees are valid and enforceable contracts.

60. Dubea intentionally, and without justification, caused the breach of Pike Inc.'s employment agreements with, at a minimum, Chuck Chaddrick, Tim Droddy, Clifton Droddy, Sammy Christian and Alex Graham.

61. Pike has suffered and will continue to suffer damages as a result.

### COUNT V: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

62. Pike repeats and alleges each allegation set forth in paragraphs 1 through 41 herein.

63. Pike had a reasonable and valid expectancy in the continued business of various customers, including, at a minimum, Entergy (West), Beauregard Electric Cooperative, Sam Houston Electric Cooperative, Sharyland Development, and American Electric Power.

64. Dubea knew that Pike had such an expectancy.

65. Dubea intentionally, wrongfully and without justification, interfered with Pike's reasonable and valid expectancy by participating in conduct designed to result, and which did result, in decisions by its customers to give business to T&D rather than to Pike.

66. Pike has suffered and will continue to suffer damages as a result.

### COUNT VI: MISAPPROPRIATION OF TRADE SECRETS

67. Pike repeats and alleges each allegation set forth in paragraphs 1 through 41 herein.

68. Pike possesses confidential information that derives independent economic value from not being generally known.

69. Pike took reasonable steps to maintain the secrecy of its confidential information.

70. Dubea learned Pike's confidential information during his employment with Pike, and expressly agreed to refrain from using or divulging that information.

71. Dubea improperly used and disclosed Pike's confidential information in furtherance of T&D's competing business.

72. Pike has suffered and will continue to suffer damages as a result.

### COUNT VII: DECLARATORY JUDGMENT

73. Pike repeats and alleges each allegation set forth in paragraphs 1 through 41 herein.

74. There is an actual, substantial and judiciable controversy between the parties, as set forth above.

75. Pike therefore seeks a declaration of its legal rights pursuant to 28 U.S.C. § 2201 (2005).

76. Specifically, Pike seeks a declaratory judgment that Dubea has breached his obligations to Pike pursuant to the Employment Agreement and that any entitlement to future compensation that Dubea may claim as part of the consideration given to him in exchange for his employment with Pike has been forfeited by such breach.

## PRAYER FOR RELIEF

WHEREFORE, Pike respectfully requests that this Court enter a judgment for compensatory and punitive damages in its favor, award preliminary and permanent injunctive relief, including specific performance of Dubea's obligations under the Employment Agreement, enter a declaratory judgment in its favor, and grant such other and further relief as this Court may deem just and proper, including costs, disbursements, pre and post judgment interest, and reasonable attorney's fees.

*[signature]*

William J. Wade (#704)
Wade@rlf.com
Alyssa M. Schwartz (#4351)
Schwartz@rlf.com
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
302-651-7700

OF COUNSEL:
Michael A. Paskin
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000

Attorneys for Plaintiffs Pike Electric Corporation and Pike Electric, Inc.

December 20, 2005

RLF1-2960179-1

## VERIFICATION

STATE OF NORTH CAROLINA )
                        ) ss.:
COUNTY OF SURRY         )

        J. ERIC PIKE, being duly sworn, deposes and says

    1.    I am the CEO of Pike Electric Corporation and, as such, am authorized to make this Verification.

    2.    I am familiar with the facts set forth in the Complaint, dated December 19, 2005. The facts stated in the Complaint are true and correct based upon my personal knowledge and belief and information supplied to me by individuals with knowledge of the topics referenced therein.

                                                          J. Eric Pike

Sworn to and subscribed
before me on this 16th
day of December, 2005.

_____
Notary Public
Commission expires 8/18/2006

