IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PIKE ELECTRIC CORPORATION and
PIKE ELECTRIC, INC.,

                                    Plaintiffs,    C.A. No. _____

                    v.

MICK DUBEA,

                                    Defendant.

## BRIEF IN SUPPORT OF PLAINTIFFS'
## MOTION FOR A PRELIMINARY INJUNCTION
## AND FOR EXPEDITED DISCOVERY

                                William J. Wade  (#704)
                                Wade@rlf.com
                                Alyssa M. Schwartz (#4351)
                                Schwartz@rlf.com
OF COUNSEL:                     Richards, Layton & Finger
Michael A. Paskin               One Rodney Square
Cravath, Swaine & Moore LLP     P.O. Box 551
Worldwide Plaza                 Wilmington, DE  19899
825 Eighth Avenue               (302) 651-7700
New York, NY 10019-7475
(212) 474-1000                  Attorneys for Plaintiffs Pike Electric
                                Corporation and Pike Electric, Inc.

December 20, 2005

# TABLE OF CONTENTS

Page

Table of Authorities ........................................................................................... ii

Nature and Stage of Proceedings ..........................................................................1

Summary of Argument ........................................................................................1

Statement of Facts...............................................................................................2

A.    Pike's Business. ........................................................................................2

B.    Pike Acquires Red Simpson..........................................................................3

C.    Dubea Enters Into An Employment Agreement With Pike. .......................................5

    1.    Dubea's departure from Pike and involvement in establishing a competing business, T&D Solutions................................................................9

    2.    T&D and Dubea solicit Pike employees........................................................10

    3.    T&D and Dubea solicit Pike's customers using the confidential information and goodwill that Dubea gained as a Pike executive. ...........11

D.    Pike Has Suffered Irreparable Harm Which Will Increase If Dubea Is Able To Continue To Engage In His Unlawful Conduct. ...............................................12

Argument ........................................................................................................12

A.    Preliminary Injunctive Relief Is Appropriate. ...................................................12

    1.    Pike is likely to succeed on the merits of its claims. ...................................13

    2.    Pike will suffer irreparable injury in the absence of preliminary injunctive relief. ..............................................................................19

    3.    The balance of harms favors Pike. ...........................................................21

    4.    Granting preliminary injunctive relief is in the public interest....................22

B.    Expedited Discovery Is Necessary...................................................................22

Conclusion. ....................................................................................................226

# TABLE OF AUTHORITIES

## CASES

All Pro Maids, Inc. v. Layton,
C.A. No. 058-N, 2004 WL 1878784 (Del. Ch. Aug. 10, 2004)...........................................16, 18, 19

Autonation, Inc. v. O'Brien,
347 F. Supp. 2d 1299 (S.D. Fla. 2004) ......................................................................................22

Avery Dennison Corp. v. Kitsonas,
118 F. Supp. 2d 848 (S.D. Ohio 2000) ......................................................................................22

BAE Sys. Aircraft Controls, Inc. v. Eclipse Aviation Corp.,
224 F.R.D. 581 (D. Del. 2004) ............................................................................................24, 25

BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.,
229 F.3d 254 (3d Cir. 2000).......................................................................................................19

Basicomputer Corp. v. Scott,
973 F.2d 507 (6th Cir. 1992) ......................................................................................................20

Ciena Corp. v. Jarrard,
203 F.3d 312 (4th Cir. 2000) ......................................................................................................14

Curtis 1000, Inc. v. Youngblade,
878 F. Supp. 1224 (N.D. Iowa 1995).............................................................................18, 20, 22

E.I. duPont de Nemours & Co. v. Am. Potash & Chem. Corp.,
200 A.2d 428 (Del. Ch. 1964)....................................................................................................13

Edudata Corp. v. Scientific Computers, Inc.,
599 F. Supp. 1084 (D. Minn. 1984)............................................................................................25

Ellsworth Assocs., Inc. v. United States,
917 F. Supp. 841 (D.D.C. 1996) ................................................................................................23

Ethypharm S.A. France v. Bentley Pharms., Inc.,
388 F. Supp. 2d 426 (D. Del. 2005)......................................................................................16, 18

FMC Corp. v. Varco Int'l, Inc.,
677 F.2d 500 (5th Cir. 1982) ...............................................................................................19, 20

Faw, Casson & Co. v. Cranston,
375 A.2d 463 (Del. Ch. 1977).........................................................................................14, 15, 17

Ferrero v. Assoc'd Materials Inc.,
923 F.2d 1441 (11th Cir. 1991) ..................................................................................................20

RLF1-2960369-1

Instant Air Freight Co. v. C.F. Air Freight, Inc.,
882 F.2d 797 (3d Cir. 1989)..................................................................................12

Irwin v. Leighton, Inc. v. W. M. Anderson Co.,
532 A.2d 983 (Del. Ch. 1987).........................................................................15, 18

JAK Prods., Inc. v. Wiza,
986 F.2d 1080 (7th Cir. 1993) ...............................................................................20

KOS Pharms., Inc. v. Andrx Corp.,
369 F.3d 700 (3d Cir. 2004)...................................................................................19

Knowles-Zeswitz Music, Inc. v. Cara,
260 A.2d 171 (Del. Ch. 1969).................................................................................14

Liveware Publ'g, Inc. v. Best Software, Inc.,
252 F. Supp. 2d 74 (D. Del. 2003) , aff'd, 125 Fed. Appx. 428 (3d Cir. 2005); A.........................17

Morgan Stanley DW Inc. v. Rothe,
150 F. Supp. 2d 67 (D.D.C. 2001)..........................................................................22

Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,
22 F.3d 546 (4th Cir. 1994) ...................................................................................20

Nat'l Bus. Servs., Inc. v. Wright,
2 F. Supp. 2d 701 (E.D. Pa. 1998) .........................................................................22

North Atlantic Instruments, Inc. v. Haber,
188 F.3d 38 (2d Cir. 1999)...............................................................................19, 20

Notaro v. Koch,
95 F.R.D. 403 (S.D.N.Y. 1982) .............................................................................23

Research & Trading Corp. v. Pfuhl,
C.A. No. 12527, 1992 WL 345465 (Del. Ch. Nov. 18, 1992)..................................14

Semitool, Inc. v. Tokyo Electron Am., Inc.,
208 F.R.D. 273 (N.D. Cal 2002)............................................................................24

Special Purpose Accounts Receivable Co-op Corp. v. Prime One Capital,
125 F. Supp. 2d 1093 (S.D. Fla. 2000) ..................................................................21

Total Care Physicians, P.A. v. O'Hara,
798 A.2d 1043 (Del. Super. Ct. 2001) ...................................................................17

Tristate Courier & Carriage, Inc. v. Berryman,
C.A. No. 20574-NC, 2004 WL 835886 (Del. Ch. Apr. 15, 2002).....................15, 17

True North Commc'ns, Inc. v. Publicis S.A.,
711 A.2d 34 (Del. Ch. 1997), aff'd, 705 A.2d 244 (Del. 1997) .......................................................19

Tull v. Turek,
147 A.2d 658 (Del. 1958) ...............................................................................................................15, 17

Twentieth Century Fox Film Corp. v. Mow Trading Corp.,
749 F. Supp. 473 (S.D.N.Y. 1990) .......................................................................................................24

United States v. Bell,
414 F.3d 474 (3d Cir. 2005)..................................................................................................................13

Upjohn Co. v. Riahom Corp.,
650 F. Supp. 485 (D. Del. 1986).............................................................................................................15

## STATUTES AND OTHER AUTHORITIES

Fed. R. Civ. P. 26 ..................................................................................................................................23

6 Del. C. 2001 ..................................................................................................................................14, 17

6 Del. C. 2002 ........................................................................................................................................13

6 Del. C. 2003 ........................................................................................................................................13

Kurt H. Decker,  Covenants Not to Compete, § 3.9 (2d ed. 1993) ...............................................14, 15

RLF1-2960369-1

Plaintiffs Pike Electric Corporation ("Pike Corp.") and Pike Electric, Inc. ("Pike Inc.")
(collectively "Pike") hereby submit their brief in support of their Motion for a Preliminary
Injunction and Expedited Discovery against Defendant Mick Dubea ("Dubea").

## Nature and Stage of Proceedings

On December 20, 2005, Pike sued Dubea, the former Vice President of Pike's Western
Region, for breach of contract, tortious interference with contract, tortious interference with
business relations and misappropriation of trade secrets. At that time, Pike filed a motion for
preliminary injunction and expedited discovery. This is Pike's brief in support thereof.

## Summary of Argument

Pike's Complaint against Dubea alleges that: (1) Dubea has breached, and is continuing
to breach, his contractual obligation to refrain from competing against Pike and soliciting Pike's
customers and employees for a period of five years following the date of his termination from
Pike (the "Restricted Period"); (2) Dubea has breached, and is continuing to breach, his
contractual obligation to refrain from disclosing Pike's confidential information; (3) Dubea has
tortiously interfered, and is continuing to tortiously interfere, with Pike's employee agreements
and business relations with its prospective customers; and, (4) Dubea has misused, and continues
to misuse, Pike's valuable trade secrets to help jump-start a competing business.

Dubea's conduct has resulted in direct and irreparable harm to Pike, and Pike should be
awarded preliminary injunctive relief to halt Dubea's ongoing misconduct. First, Pike is likely to
succeed on the merits of its claims against Dubea, as there is already powerful evidence that
Dubea breached his contractual obligations to Pike, tortiously interfered with Pike's contracts
and business relations, and stole Pike's valuable trade secrets; that proof will only be more
profound with some limited expedited discovery into Dubea's conduct. (See Argument § A.1
infra.) Second, Dubea's conduct has resulted in severe injury to Pike's customer relations and

business operations that cannot be remedied with monetary damages and that will continue to worsen absent preliminary injunctive relief. (See Argument § A.2 infra.) Third, the severe harm Pike would suffer absent a preliminary injunction far outweighs any inconvenience to Dubea from such an injunction, and granting the injunction would serve the public interest. (See Argument §§ A.3 & A.4 infra.) Finally, expedited discovery is the only way for Pike to learn the nature and extent Dubea's misconduct and the injury caused to Pike as a result, and then to prepare adequately for a preliminary injunction hearing. (See Argument § B infra.) For those reasons, and others discussed herein, Pike requests preliminary injunctive relief and, in conjunction with that request, permission to conduct certain limited discovery on an expedited basis.

**Statement of Facts**

**A.    Pike's Business.**

Pike Electric Corporation ("Pike Corp.") is a Delaware corporation. Pike Electric, Inc. ("Pike Inc."), incorporated in North Carolina, is the operational arm of Pike Corp. and a wholly-owned subsidiary of Pike Corp. Throughout, Pike Corp. and Pike Inc. will collectively be referred to as "Pike." (Declaration of Eric Pike ("Pike Decl.") ¶ 1.)

Pike provides electric distribution and transmission services to electrical utilities, cooperatives and municipalities across the eastern half of the United States. (Id. ¶ 2.) Its services include power line construction and maintenance, storm restoration, right-of-way maintenance and fiber-optic installation. (Id.) Pike has been in business since 1945. (Id.)

Pike has entered into employment agreements containing non-compete provisions with many of its valued employees, including skilled linemen and managers. (Id. ¶ 3.) Those contracts are necessary to ensure that Pike has the labor force needed to operate its business and provide its customers with electric distribution and transmission services. (Id.) Similarly, Pike's

- 2 -

operations, especially its customer relationships, require the constant long-term attention of senior management. (Id.) Accordingly, Pike has, from time to time, entered into employment agreements with its senior management to ensure that its customer relationships will not be unexpectedly disrupted. (Id.)

Pike's customers generally have no contractual obligation to assign work to Pike, but, based on long-standing business practices, Pike has a reasonable expectancy that many of them will continue to do so. (Id. ¶ 4.) Nevertheless, most of Pike's customer arrangements, including its master service arrangements, can be terminated on short notice. (Id.) As a result, Pike is at risk of losing significant business in a short time if its competitors can convince its customers to change service providers. (Id.)

Pike's business depends on its long standing relationships with its customers, its competitive and proprietary pricing models and its proven supply of qualified personnel. (Id. ¶ 5.) Any damage to Pike's relationship with its customers, any disclosure of its confidential pricing secrets and any disruption to its labor supply would cause immediate and irreparable damage to Pike. (Id.)

### B.    Pike Acquires Red Simpson.

On July 1, 2004, Pike acquired all the outstanding shares of the common stock of a privately-held company called Red Simpson Inc. ("RSI"). (Id. ¶ 6.) At the time of the acquisition, RSI employed over 1,500 individuals, had customers throughout the South Central and Southwestern parts of the United States and was generally considered one of America's leading power line contractors. (Id.)

The RSI acquisition was a good strategic fit for Pike because the companies operated similar businesses in similar geographic regions, but shared only four mutual clients out of a base

of nearly 150 customers. (Id. ¶ 7.) In effect, Pike purchased RSI's customers, and its

employees' and executives' relationships with those customers, when it acquired RSI. (Id.)

At the time Pike acquired RSI, Dubea was RSI's President for its Western Region, which

covered nearly two-thirds of the total RSI workforce and accounted for a majority of the

company's earnings. (Id. ¶ 8.) As a high ranking executive who had worked for RSI for over 20

years, Dubea was privy to a significant amount of RSI's confidential business information,

including pricing models and customer lists. (Id.) Moreover, Dubea was instrumental in the

management, development and growth of RSI's business and goodwill in the western region of

the United States. (Id.) In particular, Dubea spearheaded many of RSI's important customer

relationships, including its relationships with Texas Utilities, Entergy (West) and the City of San

Antonio. (Id.) Dubea also owned 39,327 shares of RSI common stock, which made him one of

RSI's largest stockholders. (Id.)

Pike's efforts to purchase RSI culminated in a Stock Purchase Agreement ("SPA")

between the companies. (A copy of the SPA is attached as Exhibit C to Pike Decl.) As one of

the largest owners of RSI stock, Dubea was a party to the SPA. (See Pike Decl., Exh. C at 1.)

The parties to the SPA recognized Dubea's integral role with RSI, and understood that his

participation in the combined Pike-RSI enterprise would be critical to its success. (Pike Decl. ¶

9.) In particular, Pike knew that its success in Texas and Louisiana would depend on RSI's

customer relationships in those areas, including the relationships cultivated by Dubea. (Id.) Pike

would not have purchased RSI if it would not have been able to receive the benefit of those

relationships. (Id.)

In addition, because customers in the power line industry are not bound by long-term

service contracts, Pike was concerned that it would be easy for RSI's senior management

- 4 -

effectively to "opt out" of the merger by starting their own competing businesses and taking RSI's existing customers and employees with them. (Id. ¶ 10.) In particular, Pike wanted to ensure that Dubea came to work for the merged company, and did not use his existing relationships with the customers in RSI's Western District (which Dubea headed) to form a competing business after the closing. (Id.)

Consequently, the parties agreed in writing that Pike's purchase of RSI would be expressly conditioned upon the execution and delivery of an employment agreement containing non-compete and non-disclosure of confidential information provisions between Dubea and Pike (as well as similar agreements with several other key RSI employees) prior to the closing. (See Pike Decl., Exh. C § 6.02(f).) Thus, the non-compete agreement between Dubea and Pike at issue in this litigation expressly arose out of the sale of RSI, including the shares of RSI held by Dubea and trusts established by Dubea, to Pike and was not a typical employer-employee non-compete contract.

It was in Dubea's financial interest to facilitate the closing of Pike's acquisition of RSI as he was ultimately paid over $8.2 million for his RSI stock. (Pike Decl. ¶ 11.) Dubea would not have been paid that money for his RSI stock had he not entered into an employment agreement with Pike (because Pike would not have agreed to purchase RSI under those circumstances). (Id.)

### C.    Dubea Enters Into An Employment Agreement With Pike.

Dubea not only received $8.2 million in cash from the acquisition, but on July 1, 2004, in keeping with the terms of the SPA, he also agreed to a generous written employment agreement with Pike Inc. (the "Employment Agreement"). (A copy of the Employment Agreement is attached hereto as Exhibit A to Pike Decl.)

Under the Employment Agreement, Dubea was hired as Pike's Vice President for its Western Region—substantially the same position he had held with RSI—and was given management responsibility for all of Pike's operations in Oklahoma and Texas. (See Pike Decl., Exh. A § 1.02.) Dubea reported directly to the CEO of Pike (id.), and received a base salary of $330,000 per year (id. § 2.01). Dubea was also given the opportunity to purchase up to 21,479 Restricted Shares of Pike common stock on very favorable terms. (See id. § 2.03.) Dubea, in fact, purchased over $1 million of Restricted Shares ("Restricted Shares") that are scheduled to vest on the second, third and fourth anniversaries of the closing and have a current market value of approximately $1.5 million. (Pike Decl. ¶ 13.) In addition, Dubea was paid a "Base Amount" of approximately $5 million (half shortly after the closing, and half on the first anniversary of the closing). (See Pike Decl., Exh. A § 2.02.) Finally, the parties agreed that Dubea would receive a "Multiplier Amount" of over $6 million that is scheduled to be paid out on the second, third and forth anniversaries of the closing. (See id.) But for his conduct in violation of the Employment Agreement, Dubea would thus have been set to receive the full $6 million from the Multiplier Amount by 2008. In sum, Dubea has already received approximately $13.2 million from Pike in connection with the RSI acquisition and the promises he made in the Employment Agreement, and he would be entitled to receive approximately $7.5 million more if not for his unlawful conduct at issue in this action.

In return for the valuable consideration he was to receive under the Employment Agreement, Dubea agreed to be bound by various restrictive covenants. (See Pike Decl., Exh. A § 5.02 ("[Dubea acknowledges that Pike] would not have agreed to enter into the Stock Purchase Agreement . . . and that [Pike] would not have agreed to enter into this Agreement and make the

- 6 -

payments hereunder, without [Dubea's] agreeing to enter into and to honor [the restrictive

covenants found in the Employment Agreement].").)

The Employment Agreement explained the reasons for, and reasonableness of, those

restrictive covenants:

> **"Employer's Interests.** [Dubea] acknowledges that RSI has expended
> substantial amounts of time, money and effort to develop business strategies,
> substantial customer relationships, supplier and vendor relationships, employee
> relationships, goodwill, business secrets, confidential information and intellectual
> property and to build an effective organization and that [Pike], as the sole
> shareholder of RSI after the Closing, has a legitimate business interest and right in
> protecting those assets as well as any similar assets that [Pike] may develop or
> obtain following the Closing. . . . [Dubea] acknowledges and agrees that the
> [following restrictions] are reasonable and necessary for the protection of such
> assets . . . ". (Id. § 5.01.)

Under Section 5.03 of the Employment Agreement, Dubea agreed to protect Pike's

confidential information:

> "SECTION 5.03.  Non-Disclosure of Confidential Information.  (a) [Dubea]
> acknowledges, that in the performance of his duties as an employee of RSI,
> [Dubea] has received, and may in the future as an employee of [Pike] be given
> access to, Confidential Information (as defined below).  (b) [Dubea] agrees that
> all Confidential Information has been, is and shall be the sole property of [Pike]
> or RSI, as the case may be, and that [Dubea] has no right, title, or interest
> therein. . . . (d) [Dubea] shall not, directly or indirectly, disclose or cause to be
> disclosed, to any person or entity whatsoever, or utilize or, directly or indirectly,
> cause to be utilized, by any person or entity whatsoever, any Confidential
> Information acquired pursuant to [Dubea]'s employment with [Pike] or RSI
> (whether acquired prior to or subsequent to the execution of this Agreement) or
> otherwise." (Id. § 5.03.)

The Employment Agreement signed by Dubea defined the confidential information that

he was obligated to protect:

> "'Confidential Information' shall mean trade secrets and confidential or
> proprietary information, knowledge or data that is or will be used, developed,
> obtained or owned by [Pike], RSI or the Business relating to the business,
> operations, products or services of [Pike], RSI or the Business, or the business,
> operations, products or services of any customer thereof, including products,
> services, fees, pricing, designs, marketing plans, strategies, analyses, forecasts,
> formulas, drawings, photographs, reports, records, computer software (whether or

not owned by, or designed for, [Pike], RSI or the Business), operating systems, applications, program listings, flow charts, manuals, documentation, data, databases, specifications, technology, inventions, developments, methods, improvements, techniques, devices, products, know-how, processes, financial data, customer, supplier and vendor lists, contact persons, cost information, executive information, regulatory matters, personnel matters, employee information, employee compensation, accounting and business methods, patents, trade secrets, copyrightable works and information with respect to any supplier, vendor, customer, employee or independent contractor of [Pike], RSI or the Business . . . and all similar and related information in whatever form . . . ". (Id. § 5.03(f).)

Dubea also agreed to refrain from competing with Pike and soliciting Pike's customers

and employees during the Restricted Period:

"SECTION 5.07. <u>Non-Competition.</u> (a) For the Restricted Period, [Dubea] shall not, and shall cause each of [Dubea]'s representatives, agents and affiliates not to, directly or indirectly:

(i) (A) engage in activity or business, or establish any new business, within the United States of America that is in competition, in whole or in part, with the Business or [Pike] . . .

(ii) (A) solicit any person or entity that is a customer (or prospective customer) of [Pike] or any of its affiliates to purchase any goods or services sold or performed by [Pike] or any of its affiliates from any person other than [Pike] or any of its affiliates or to reduce or refrain from doing any business with [Pike] or any of its affiliates, (B) solicit, recruit or hire any employee of [Pike] or any of its affiliates or any person who has worked for [Pike] or any of its affiliates, (C) solicit or encourage any employee of [Pike] or any of its affiliates to leave the employment of [Pike] or any of its affiliates or recommend to any person that such person employ or engage any employee of [Pike] or any of its affiliates . . . (E) assist any person or entity in any way to do, or attempt to do, anything prohibited by this clause (ii);

(iii) serve as a director, officer, affiliate, employee, broker, independent contractor, consultant, agent, representative or advisor for any Competitor . . .

(iv) form, or acquire any equity ownership, voting or profit participation interest in, any Competitor . . .

(b) For purposes of this Agreement, the term "<u>Restricted Period</u>" shall mean a period commencing on the date of the Closing and terminating five years from the date [Dubea] ceases to be an employee of [Pike] for any reason." (Id. § 5.07(a)(b).)

- 8 -

Dubea also explicitly agreed that Pike would be entitled to specific performance, including injunctive relief, should he breach the terms of the contract:

> "SECTION 5.10.  Specific Performance.  [Dubea] agrees that any breach by [Dubea] of any of the provisions of Section 5.03, 5.05, 5.06 and 5.07 shall cause irreparable harm to [Pike] that could not be adequately compensated by monetary damages and that, in the event of such a breach, [Dubea] shall waive the defense in any action for specific performance that a remedy at law would be adequate, and [Pike] shall be entitled to (a) specifically enforce such terms and provisions without the necessity of proving actual damages or posting any bond and (b) cease making any payments or providing any benefit (including by way of vesting of any Restricted Shares acquired pursuant to Section 2.03) otherwise required by this Agreement, in each case in addition to any other remedy to which [Pike] may be entitled at law or in equity".  (Id. § 5.10.)

Dubea also explicitly agreed in the Employment Agreement that "the rights and obligations of [Pike and Dubea] under the provisions of [the Employment Agreement], including Articles V and VI, shall survive and remain binding and enforceable, notwithstanding any termination of [Dubea's] employment with [Pike] for any reason".  (Id. § 6.08.)

### 1.    Dubea's departure from Pike and involvement in establishing a competing business, T&D Solutions.

Dubea's performance as Vice President, while adequate, did not meet Pike's high expectations.  Therefore, on September 22, 2005, Pike terminated Dubea without cause.  (Pike Decl. ¶ 14.)  Under the Employment Agreement and the amendments thereto, because Pike terminated Dubea without cause, Dubea would remain eligible to receive payment of the Multiplier Amount and his Restricted Shares would continue to vest as scheduled.  (See Pike Decl., Exh. A § 4.03.)  So long as he did not breach the restrictive covenants in the Employment Agreement, Dubea was entitled to receive over $7.5 million in cash and restricted stock from Pike during the years 2006 through 2008.

On October 5, 2005, Chad Dubea ("Chad"), Dubea's son and a then-current Pike employee, formed a company registered in Harlingen, Texas called T&D Solutions Ltd.

("T&D"). (Pike Decl. ¶ 15.) Through expedited discovery, Pike expects to prove that T&D was

formed with Dubea's financial backing, advice and support. (Id.) Pike also expects discovery to

show that Chad is living with Dubea in Beaumont, Texas, where Dubea is providing advice and

guidance in connection with T&D's business and helping to run the day-to-day operations of

T&D. (Id.)

Upon information and belief, T&D provides electric distribution and transmission

services to electrical utilities, cooperatives and municipalities in Texas and Louisiana. (Id. ¶ 16.)

Its services include power line construction and maintenance and storm restoration. (Id.) It

competes directly with Pike. (Id.)

### 2.     T&D and Dubea solicit Pike employees.

Chad, despite forming T&D on October 5, 2005, did not leave his job at Pike until

October 21, 2005. (Id. ¶ 17.) Upon information and belief, T&D began soliciting the

employment of Pike's personnel on October 21, 2005, having specifically waited until Pike's

managers were busy attending an out of state meeting. (Id.) Since that time, over fifty-five

employees have left Pike and joined T&D. (Id.) The following employees left Pike for T&D in

breach their employment agreements: Chuck Chaddrick, Tim Droddy, Clifton Droddy and

Sammy Christian. (Id.) Pike believes that T&D, and Dubea, knew about the existence of those

employment agreements, but nevertheless endeavored to cause those employees to breach their

agreements. (Id.) The remaining employees that left Pike to join T&D are skilled laborers that

have proven almost impossible to replace in the current market. (Id.) Tellingly, each employee

that left Pike was a former RSI employee with a longstanding relationship with Dubea. (Id.)

With discovery, Pike expects to learn the precise nature of Dubea's contacts with those

employees and determine the extent to which Dubea improperly procured them for T&D.

Upon information and belief, T&D, with Dubea's assistance, also convinced the former controller for RSI, C.P.A. Corey Close ("Close"), to leave Pike and join their ranks. (Id. ¶ 18.) When Close left Pike he sought permission to take his work computer with him. (Id.) After assurances that he would not be working in the power line industry and would not disclose or use the confidential information contained on the computer, Pike acceded to Close's request. (Id.) Close is now the CEO of T&D, and on information and belief, is using the valuable confidential information gained as an employee of RSI and Pike and taken from his Pike computer in furtherance of T&D's competing business.[1] (Id.)

### 3.    T&D and Dubea solicit Pike's customers using the confidential information and goodwill that Dubea gained as a Pike executive.

Upon information and belief, T&D also began soliciting business from Pike's customers on or about October 21, 2005. (Id. ¶ 19.) Dubea used his pre-existing relationships with those customers cultivated while at RSI and Pike, and the confidential information gained as head of RSI's Western Region and as Pike's VP in charge of its Western Region, in his attempts to lure those customers away from Pike. T&D's efforts have been successful. To date, the following companies have given at least some of their Pike work to T&D: Entergy (West), Beauregard Electric Cooperative, Sam Houston Electric Cooperative, Sharyland Development, and American Electric Power. (Id.) With discovery, Pike will learn exactly which of Pike's customers Dubea has solicited on T&D's behalf, and what confidential information Dubea has used in doing so.

---

[1] Pike is also pursuing a separate action against Close, Chad and T&D in McAllen, Texas, for tortious interference with contract, tortious interference with business relations and misappropriation of trade secrets.

**D.    Pike Has Suffered Irreparable Harm Which Will Increase If Dubea Is Able To Continue To Engage In His Unlawful Conduct.**

Pike has been, and will continue to be, irreparably harmed by Dubea's misconduct. First, Pike would not have purchased RSI without the contractual guarantee that it would not have to compete with RSI's employees, including Dubea, in Texas and Louisiana. It is now being forced to do so. Second, it is critical for Pike to foster and maintain the customer relationships it acquired when it purchased RSI. Dubea has intentionally, wrongfully and permanently undermined many of those relationships. Third, once disclosed or used, confidential information cannot be undisclosed, and the difficulty in measuring the damages caused by its dissemination makes it a prime example of an act causing irreparable injury. Through his connections with T&D, Dubea's competition with Pike, his solicitation of Pike's customers and employees and his use and disclosure of Pike's confidential information have harmed Pike beyond repair.

Indeed, in his Employment Agreement with Pike, Dubea acknowledged that "any breach by [Dubea] of any of the provisions of Sections 5.03, 5.05, 5.06 and 5.07 shall cause irreparable harm to [Pike] that could not be adequately compensated by monetary damages and that, in the event of such a breach, [Dubea] shall waive the defense in any action for specific performance that a remedy at law would be adequate . . . ". (Pike Decl., Exh. A § 5.10.)

<b>Argument</b>

**A.    Preliminary Injunctive Relief Is Appropriate.**

Federal courts sitting in diversity use federal standards to examine requests for preliminary injunctions. Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 799 (3d Cir. 1989). Those standards are well-established and consist of the following four factors: (1) whether the moving party has shown a reasonable probability of success on the merits; (2) whether the moving party will be irreparably injured by the denial of the relief; (3) whether

- 12 -

granting preliminary relief will result in greater harm to the nonmoving party; and (4) whether granting preliminary relief will be in the public interest.  United States v. Bell, 414 F.3d 474, 478 n.4 (3d Cir. 2005) (internal citation omitted).  As discussed below, Pike easily satisfies each of those elements.

1.    **Pike is likely to succeed on the merits of its claims.**

Pike is likely to succeed in showing that Dubea breached the confidentiality and non-compete provisions of the Employment Agreement, that he tortiously interfered with Pike's contracts and business relations, and that he misappropriated Pike's valuable trade secrets.[2]

Delaware enforces agreements barring former employees from disclosing confidential information gained in the course of their work.  See, e.g., E.I. duPont de Nemours & Co. v. Am. Potash & Chem. Corp., 200 A.2d 428, 431 (Del. Ch. 1964) (holding the law is "well settled" that if an employee "has agreed either expressly or by implication as one of the terms of his contract of employment" that he will not divulge his employer's trade secrets or confidential information, "the employer is entitled to an injunction against a threatened use or disclosure of such confidential information".)  In fact, Delaware courts have the power to enjoin disclosure of such trade secrets even in the absence of a contractual agreement.   See Delaware Uniform Trade Secrets Act, 6 Del. C. §§ 2002-2003 (providing that court may issue both injunctive relief and damages to victim of trade secret misappropriation).[3]

---

[2] Dubea's conduct is governed by Delaware law pursuant to an express choice of law provision in his Employment Agreement.  (See Pike Decl., Exh. A § 6.06(a). ("This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles of such State."). )

[3] A "trade secret" is broadly defined to encompass "information, including a formula, pattern, compilation, program, device, method, technique or process," that . . . [d]erives

- 13 -

Delaware law also enforces covenants not to compete embodied in employment agreements. See Faw, Casson & Co. v. Cranston, 375 A.2d 463, 465 (Del. Ch. 1977); Knowles-Zeswitz Music, Inc. v. Cara, 260 A.2d 171, 174 (Del. Ch. 1969). The general rule is that covenants not to compete are permissible when their purpose and reasonable effect is to "protect an employer from sustaining damages which an employee's subsequent competition may cause". Faw, 375 A.2d at 465; see also Ciena Corp. v. Jarrard, 203 F.3d 312, 324 (4th Cir. 2000) (affirming preliminary injunction that, under Delaware law, enforced covenant not to compete which protected employer from harm); Research & Trading Corp. v. Pfuhl, C.A. No. 12527, 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992) (upholding covenant not to compete which protected employer's "legitimate interest in protecting from misappropriation the goodwill that, through its employees, it has created").[4] Such covenants also must be reasonable in duration and geographical scope. See Faw, 375 A.2d at 465; see also Pfuhl, 1992 WL 345465, at *12 ("While most judicial opinions regarding the reasonableness of the geographic extent of employee non-competition agreements speak in terms of physical distances, the reality is that it is the employer's goodwill in a particular market which is entitled to protection . . . [even if] this market, or more accurately, the employer's customer base, extends throughout the nation".). Pike's non-compete agreement with Dubea, under which Dubea received lavish compensation in exchange for his promise not to compete in Pike's market for five years, plainly meets those requirements.

Importantly, courts are even more willing to enforce a covenant not to compete when, as is the case here, it is negotiated in connection with the sale of a business. See Kurt H. Decker,

---

independent economic value, actual or potential, from not being generally known". 6 Del. C. § 2001(4)(a).

[4] All unreported cases are attached at Exhibit A hereto.

Covenants Not to Compete, § 3.9 at 63 (2d ed. 1993). That is generally due to the fact that the seller and purchaser of a business are on a more equal footing, from a negotiating standpoint, than a typical employer and employee. Id. Delaware law is in accord with those principles. See Faw, 375 A.2d at 465 ("[C]ovenants are subject to somewhat greater scrutiny when contained in an employment contract as opposed to contracts for the sale of a business".); see also Tristate Courier & Carriage, Inc. v. Berryman, C.A. No. 20574-NC, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2002) (holding that because non-compete covenant was part of contract for sale of stock, inquiry into its enforceability was "less searching than if the Covenant had been contained in an employment contract"). A further purpose of requiring a covenant not to compete in connection with the sale of a business, and another reason why it is more likely to be enforced, is to protect the goodwill of the business being sold. See Tull v. Turek, 147 A.2d 658, 662 (Del. 1958); Decker, supra, § 3.9 at 63 ("Particularly when the goodwill of a business is included in the sale, a restrictive covenant is strongly likely to be enforced.").

Furthermore, Delaware law protects an employer's contracts and business relations from a former employee's interference. Tortious interference with contract has been "widely recognized", and entails the "non-controversial" requirements of: "(1) a contract, (2) about which the defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury". Irwin v. Leighton, Inc. v. W. M. Anderson Co., 532 A.2d 983, 992 (Del. Ch. 1987). Similarly, tortious interference with business relations is "broadly defined", reflecting the principle that "[t]he liability for inducing breach of contract is now regarded as but one instance, rather than the exclusive limits, of protection against improper interference in business relations". Upjohn Co. v. Riahom Corp., 650 F. Supp. 485, 488 (D. Del. 1986) (internal citation omitted). The central distinction between

- 15 -

the two torts is that, with respect to the latter, there may, under certain circumstances, be a "privilege" to interfere with prospective business opportunities within the limits of fair competition. See Ethypharm S.A. France v. Bentley Pharms., Inc., 388 F. Supp. 2d 426, 434-35 (D. Del. 2005). Delaware courts, however, have held that a former employee is not "privileged" to interfere with his former employer's business relations if he signed a covenant not to compete. See, e.g., All Pro Maids, Inc. v. Layton, C.A. No. 058-N, 2004 WL 1878784, at *8 (Del. Ch. Aug. 10, 2004) (holding former employee, who had signed covenant not to compete, liable for tortious interference with former employer's customer relationships).

Under those standards, Pike is highly likely to succeed on the merits of its claims against Dubea. First, under his Employment Agreement, Dubea is prohibited from using Pike's confidential information except in connection with his employment by Pike. (See Pike Decl., Exh. A §§ 5.03 & 5.04.) Confidential information includes "trade secrets and confidential or proprietary information," such as, inter alia, customer and vendor lists and employee compensation data. (See id., § 5.03(f).) Even without the benefit of discovery, there are already powerful signs that Dubea has used Pike's confidential pricing information and customer lists to steal Pike's customers. Pike also believes that Dubea has used Pike's confidential salary information to lure away Pike's employees, offering them slightly more attractive compensation packages. Expedited discovery, if granted, will reveal precisely what confidential information Dubea possesses, and the ways in which he has used that information to benefit Pike's competitor, T&D.

Dubea's misuse of Pike's confidential information would plainly be a breach of Dubea's Employment Agreement. Moreover, that misuse would independently violate the Delaware Uniform Trade Secrets Act ("DUTSA"). A confidential customer list, for instance, "is precisely

the type of business information which is regularly accorded trade secret status". <u>Liveware</u>

<u>Publ'g, Inc. v. Best Software, Inc.</u>, 252 F. Supp. 2d 74, 85 (D. Del. 2003) (citing 6 <u>Del. C.</u>

2001(4)), <u>aff'd</u>, 125 Fed. Appx. 428 (3d Cir. 2005); <u>see also, e.g.</u>, <u>Total Care Physicians, P.A. v.</u>

<u>O'Hara</u>, 798 A.2d 1043, 1052 (Del. Super. Ct. 2001) (holding that "super bills", which compiled

patient addresses, medical diagnoses, treatment codes and insurance information were "valuable

data in the commercial operation of a medical practice" and, thus, were trade secrets under the

DUTSA).

    <u>Second</u>, Dubea's Employment Agreement also contains a covenant not to compete under

which Dubea, for five years following his employment, is prohibited from (1) competing with

Pike in the United States, and (2) soliciting Pike's customers and employees. (<u>See</u> Pike Decl.,

Exh. A § 5.07.) That covenant was carefully negotiated in connection with Pike's purchase of

RSI and, as such, is subject to a "less searching" judicial inquiry than an ordinary employee non-

compete covenant. <u>See, e.g.</u>, <u>Tristate Courier</u>, 2004 WL 835886, at *10. Here, it was crucial for

Pike to ensure that senior RSI executives like Dubea, who were instrumental in developing RSI's

business and customer goodwill, came to work for the merged company rather than starting their

own competing businesses and taking RSI's relationships with them. The covenant was thus

designed for the valid purpose of "protect[ing] an employer from sustaining damages which an

employee's subsequent competition may cause". <u>See</u> <u>Faw</u>, 375 A.2d at 465; <u>see also</u> <u>Tull</u>, 147

A.2d at 662 (holding that covenant not to compete in a contract for the sale of a business is

included solely "for the protection of the purchaser in his enjoyment of the business and its built-

up good will") . Importantly, Dubea stood to be compensated handsomely under the

Employment Agreement during the Restricted Period, <u>even if</u> he ceased working for Pike. By

doing nothing more than honoring the terms of the Employment Agreement, Dubea stands to

receive approximately $7.5 million in cash and restricted stock over the next three years. Thus, the term and scope of the covenants are reasonable, and should be enforced as written.

Dubea, Pike believes, is blatantly violating the covenant not to compete by, among other things, funding T&D, assisting in T&D's daily operations, and using the training and knowledge Pike provided him to bring customers and employees to T&D. Such conduct is "exactly the conduct Delaware courts find most egregious and supportive of enforcing [covenants not to compete]". Curtis 1000, Inc. v. Youngblade, 878 F. Supp. 1224, 1272 (N.D. Iowa 1995) (applying Delaware law); see also All Pro Maids, 2004 WL 1878784, at *5 (holding restrictive covenant served to protect employer's valuable business relationships, which were "vulnerable to misappropriation" by key employee) (internal citation omitted). Dubea's conduct would thus compel a finding of liability on Pike's breach of contract claim. Expedited discovery, Pike expects, would provide the necessary additional proof for that claim, as it would uncover the precise nature of Dubea's involvement with T&D and pinpoint the employees and customers with whom Dubea has improperly associated.

Third, the activities described above would also render Dubea liable in tort. Several of the employees who have left Pike to join T&D are subject to employment agreements that contain binding and enforceable non-compete and non-disclosure provisions. (Copies of those employment agreements and amendments thereto are attached as Exhibits D-O to Pike Decl.) If Dubea has indeed, as Pike suspects, intentionally interfered with those provisions by recruiting the employees for T&D, then he is liable for tortious interference with contract. See Irwin, 532 A.2d at 992. Similarly, if Dubea has intentionally used the relationships and knowledge he gained from Pike to lure Pike's customers to T&D, Dubea is liable for tortious interference with business relations. See Bentley, 388 F. Supp. 2d at 435. Although "privilege" to interfere is

- 18 -

typically a defense to tortious interference with business relations, that defense is not available to

Dubea in light of his contractual agreement to refrain from competing with Pike. See <u>All Pro</u>

<u>Maids</u>, 2004 WL 1878784, at *8. The expedited discovery requested by Pike will reveal the

substance of Dubea's interactions with Pike's customers and employees.

### 2.    Pike will suffer irreparable injury in the absence of preliminary injunctive relief.

Unless a preliminary injunction is granted, Pike will suffer irreparable harm. See <u>KOS</u>

<u>Pharms., Inc. v. Andrx Corp.</u>, 369 F.3d 700, 727 (3d Cir. 2004) (stating that irreparable harm

"must be of a peculiar nature, so that compensation in money alone cannot atone for it").

<u>First</u>, Dubea has waived any defense that a remedy at law would be adequate. Under

Section 5.10 of the Employment Agreement, Dubea agreed that "any breach by [Dubea] of [<u>inter</u>

<u>alia</u>, the non-disclosure or non-compete provisions] shall cause irreparable harm to [Pike] that

could not be adequately compensated by monetary damages, and that, in the event of such a

breach, [Dubea] shall waive the defense in any action for specific performance that a remedy at

law would be adequate". (<u>See</u> Pike Decl., Exh. A at § 5.10.) Delaware law enforces contractual

agreements which provide that a breach by one party constitutes irreparable harm to the other.

See, e.g., <u>True North Commc'ns, Inc. v. Publicis S.A.</u>, 711 A.2d 34, 44 (Del. Ch. 1997)

("Defendants cannot now say there is no irreparable harm to [plaintiff] upon [defendants']

breach of § 1.1., given that it expressly says so in the contract."), <u>aff'd</u>, 705 A.2d 244 (Del.

1997).

<u>Second</u>, it is well-established that the misappropriation of trade secrets constitutes

irreparable harm. <u>See, e.g.</u>, <u>BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.</u>, 229 F.3d 254, 263

(3d Cir. 2000); <u>North Atlantic Instruments, Inc. v. Haber</u>, 188 F.3d 38, 49 (2d Cir. 1999); <u>FMC</u>

<u>Corp. v. Varco Int'l, Inc.</u>, 677 F.2d 500, 504-05 (5th Cir. 1982). The loss of trade secrets cannot

be measured in monetary damages because "a trade secret once lost is, of course, lost forever".

Haber, 188 F.3d 38, 49 (quoting FMC Corp. v. Taiwan Tainin Giant Indus. Co., 730 F.2d 61, 63

(2d Cir. 1984) (per curium)).  Importantly, "[i]t is not the number of trade secrets taken that

determines whether the threat of irreparable harm exists.  The fact that a single trade secret may

be disclosed is enough."  Varco Int'l, 677 F.2d at 503.

Those well-established principles apply to the instant case.  Dubea was a senior executive

at both RSI and Pike, a position that afforded him access to significant quantities of Pike's trade

secrets and confidential information.  Pike believes that Dubea has unlawfully used that

extensive knowledge and goodwill to impermissibly solicit Pike's customers and employees, and

will continue to do so in the future.  Monetary relief would be inadequate to compensate Pike for

those losses, which are devastating to Pike, and preliminary injunctive relief is essential to

prevent Dubea from further harming Pike's business.

Third, numerous jurisdictions also agree that a breach of a covenant not to compete will

cause irreparable injury.  See Youngblade, 878 F. Supp. at 1273 (collecting cases).  Such

breaches give rise to irreparable harm because "competitive injuries and loss of goodwill are

difficult to quantify".  Basicomputer Corp. v. Scott, 973 F.2d 507, 512 (6th Cir. 1992); see also

Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551

(4th Cir. 1994); Ferrero v. Assoc'd Materials Inc., 923 F.2d 1441, 1449 (11th Cir. 1991).  Some

courts have even held that "[w]henever an employee uses his experience gained from an

employer in violation of a reasonable covenant not to compete, irreparable injury occurs and

injunctive relief is appropriate".  JAK Prods., Inc. v. Wiza, 986 F.2d 1080, 1084 (7th Cir. 1993).

Similarly, in some jurisdictions, "irreparable injury is presumed in cases involving tortious

interference with business relationships". <u>Special Purpose Accounts Receivable Co-op Corp. v.</u>
<u>Prime One Capital</u>, 125 F. Supp. 2d 1093, 1105 (S.D. Fla. 2000).

Here, the competitive injuries inflicted on Pike have harmed and will continue to harm
Pike beyond repair. There is a limited supply of skilled workers that are capable of performing
Pike's work. That shortage has become particularly acute in recent months, due to the hurricanes
and storms that have swept through the United States. Pike's customers, moreover, largely
operate under contracts that can be terminated on short notice. As a result, there are many
customers with whom Pike has a reasonable expectancy of a continued relationship, but who can
quickly be lost to Pike's great detriment. Dubea's conduct, therefore, is immeasurably damaging
to Pike, and the only way to curtail that ongoing damage is by putting a stop to Dubea's unlawful
activities.

### 3.    The balance of harms favors Pike.

Looking at the balance of harms between the parties, it is clear that the equities – let
alone their 'balance' – overwhelmingly favor Pike. This is not a case in which an individual is
deprived of the opportunity to earn his livelihood through the aggressive enforcement of a
covenant not to compete. Rather, Dubea is the beneficiary of a generous Employment
Agreement, under which he received a base salary of $330,000 a year and the opportunity to
purchase up to 21,479 Restricted Shares of Pike common stock on very favorable terms. So long
as he did not breach the restrictive covenants contained in the Employment Agreement, Dubea
was set to receive over $7.5 million from Pike during the years 2006 through 2008. Thus, simply
by complying with his Employment Agreement, Dubea stood to be well-compensated, whether
he continued to be employed by Pike or not.

By contrast, Pike will suffer severe economic harm, and will lose the principal benefit it
bargained for in its acquisition of RSI, if Dubea is permitted to continue his unlawful conduct.

- 21 -

Such harm far outweighs any potential harm to Dubea from the issuance of an injunction. <u>See,</u> <u>e.g.,</u> <u>Youngblade</u>, 878 F. Supp. at 1266 & 1274 (in the balance of harms, "[s]ubstantial weight is given to the plaintiff's harm when 'valuable trade secret or other propriety information has been learned by the defendant and, therefore, his competition with plaintiff's business may be particularly effective and unfair'" (internal citations omitted)).

### 4. Granting preliminary injunctive relief is in the public interest.

Lastly, there can be no doubt that "the public interest is served by discouraging practices aimed at surreptitiously acquiring trade secrets, by prohibiting misappropriation of trade secrets, and by condemning the theft of clients through unfair competition". <u>Avery Dennison Corp. v.</u> <u>Kitsonas</u>, 118 F. Supp. 2d 848, 855 (S.D. Ohio 2000); <u>see also</u> <u>Morgan Stanley DW Inc. v.</u> <u>Rothe</u>, 150 F. Supp. 2d 67, 79 (D.D.C. 2001) (holding that by issuing an injunction, the court served the public interest in protecting trade-secret client lists and other confidential information). Moreover, "the public interest is best served . . . by upholding the restrictive covenants freely entered into". <u>Nat'l Bus. Servs., Inc. v. Wright</u>, 2 F. Supp. 2d 701, 709 (E.D. Pa. 1998) (holding enforcement of non-compete agreement furthered public interest); <u>see also</u> <u>Autonation, Inc. v. O'Brien</u>, 347 F. Supp. 2d 1299, 1308 (S.D. Fla. 2004) (same). Therefore, the final factor for consideration, the public interest, weighs strongly in favor of granting Pike the preliminary relief it seeks.

### B. Expedited Discovery Is Necessary.

Expedited discovery should be permitted in connection with Pike's request for preliminary injunctive relief. Pike requires prompt access to further evidence of Dubea's wrongdoing, not just the wrongdoing of which Pike has already become aware through its own investigative efforts. Specifically, Pike seeks limited discovery of the documents and communications in Dubea's possession concerning: (1) Dubea's contacts with T&D and its

- 22 -

principals, directors, officers and employers; (2) the formation, financing, and corporate structure of T&D; (3) Dubea's recent contacts with Pike's and RSI's employees, customers and suppliers; (4) confidential information obtained by Dubea in his capacity as an employee of Pike and RSI; and, (5) the phone numbers, electronic mail accounts and bank accounts used by Dubea during his suspected involvement with T&D.  Pike also seeks the opportunity to take Dubea's deposition on those same topics.  Absent the chance to pursue that discovery, Pike will continue to suffer irreparable harm and will be unable to prepare adequately for a preliminary injunction hearing.

Rule 26(d) of the Federal Rules of Civil Procedure gives district courts broad power to authorize expedited discovery in lieu of the formal discovery conferences contemplated by Rule 26(f).  See Fed. R. Civ. P. 26 (d-f) (2005).  "Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." Ellsworth Assocs., Inc. v. United States, 917 F. Supp. 841, 844 (D.D.C. 1996); see also Fed. R. Civ. P. 26 advisory committee's notes (1993 amendments to subdivision (d)).

There are two prevalent standards under which expedited discovery motions are decided in the federal courts:  the Notaro test and the reasonableness test.  Under the Notaro test, a plaintiff seeking an order for expedited discovery must show:  "(1) irreparable injury, (2) some probability of success on the merits' (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted".  Notaro v. Koch, 95 F.R.D. 403, 405 (S.D.N.Y. 1982).

The second test, the so-called reasonableness test, has been described as "less demanding" than the Notaro test and "generally has been utilized when the purpose of the

expedited discovery is to gather evidence for an upcoming preliminary injunction hearing".

BAE Sys. Aircraft Controls, Inc. v. Eclipse Aviation Corp., 224 F.R.D. 581, 587 (D. Del. 2004)

(internal citation omitted). The reasonableness test allows a court to examine the request for

expedited discovery "on the entirety of the record to date and the reasonableness of the request in

light of all the surrounding circumstances". Semitool, Inc. v. Tokyo Electron Am., Inc., 208

F.R.D. 273, 275 (N.D. Cal 2002) (quotation and original emphasis omitted). This Court has

stated that, under the reasonableness test, "[i]f the discovery requests are narrowly tailored to fit

the issues raised in preliminary injunction, expedited discovery should be granted". BAE Sys.

Aircraft Controls, Inc., 224 F.R.D. at 587.

Pike's request for expedited discovery meets the requirements of both the Notaro test and

the reasonableness test. Pike has already demonstrated the first two factors of the Notaro test;

namely, a probability of success on the merits of its claims as well as irreparable injury. (See

Argument §§A.1 & A.2 supra.) It is also clear that the second two factors of the Notaro test are

satisfied. Expedited discovery is required to help Pike stem the losses from the irreparable injury

it faces, for such discovery would allow Pike to determine, inter alia, the full extent of the

information Dubea has misappropriated; the identity of any parties at T&D to whom Dubea has

disclosed this information; the substance of those disclosures; and the extent to which Dubea has

aided T&D in its attempts to compete with Pike. In turn, it is inconceivable that Dubea would

suffer any undue injury from being required to engage in such discovery. Thus, the injury that

would result to Pike from not conducting expedited discovery would be tremendous, and would

far outweigh any inconvenience to Dubea from conducting such discovery. See, e.g., Twentieth

Century Fox Film Corp. v. Mow Trading Corp., 749 F. Supp. 473, 475 (S.D.N.Y. 1990)

(permitting expedited discovery, under <u>Notaro</u> test, because irreparable injury potentially faced by plaintiff was of "far greater significance than any inconvenience to defendant").

      Likewise, expedited discovery should be permitted under the less stringent requirements of the "reasonableness" test. The instant case presents the precise situation for which the reasonableness test exists, as Pike would use expedited discovery to gather evidence for a hearing on its motion for a preliminary injunction. <u>See</u> <u>BAE Sys. Aircraft Controls, Inc.</u>, 224 F.R.D. at 587; <u>Edudata Corp. v. Scientific Computers, Inc.</u>, 599 F. Supp. 1084, 1088 (D. Minn. 1984) (granting expedited discovery because further development of record before preliminary injunction hearing would "better enable court to judge parties' interests and respective chances for success on the merits"). Additionally, Pike's discovery requests are narrowly tailored to fit the issues raised by this motion. <u>See</u> <u>BAE Sys. Aircraft Controls, Inc.</u>, 224 F.R.D. at 587. Pike's proposed written discovery consists only of seven document requests and Pike seeks to depose only one individual: Dubea himself. Dubea will not be unduly prejudiced by those reasonable requests, which Pike has demonstrated good cause to pursue.

## Conclusion

For the foregoing reasons, Pike respectfully requests that this Court enter an Order

granting Pike's Motion for a Preliminary Injunction and for Expedited Discovery.

William J. Wade  (#704)
Wade@rlf.com
Alyssa M. Schwartz (#4351)
Schwartz@rlf.com
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE  19899
(302) 651-7700

OF COUNSEL:
Michael A. Paskin
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000

Attorneys for Plaintiffs Pike Electric
Corporation and Pike Electric, Inc.

December 20, 2005

- 26 -