# EXHIBIT A

Not Reported in A.2d                                                                                   Page 2
Not Reported in A.2d, 2004 WL 1878784 (Del.Ch.)
(Cite as: 2004 WL 1878784 (Del.Ch.))



Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
ALL PRO MAIDS, INC. Plaintiff,
v.
Susan LAYTON, as an individual and Mama's Maids, LLC, a Delaware Limited Liability Company Defendants.
**No. Civ.A. 058-N.**

Submitted April 15, 2004.
Decided Aug. 9, 2004.
Revised Aug. 10, 2004.

Chase T. Brockstedt, of Murphy, Spadaro, & Landon, Wilmington, Delaware, for Plaintiff.

David R. Hackett, of Griffin & Hackett, P.A., Georgetown, Delaware, for Defendants.

MEMORANDUM OPINION

PARSONS, Vice Chancellor.

*1 All Pro Maids, Inc. ("APM") brought this action against Susan Layton ("Layton"), a former employee of APM, and Mama's Maids, LLC ("MM"), a company formed by Layton and another former APM employee. APM alleges breach of contract and tortious interference with contract and prospective business relations. APM seeks damages and injunctive relief, including specific performance of a covenant not to compete. This matter was tried on March 1, 2004. The parties completed post-trial briefing on April 15, 2004. This Memorandum Opinion reflects the Court's post-trial findings of fact and conclusions of law.

In this opinion, the Court concludes that the Agreement is valid and enforceable and was breached by Layton, that Layton and MM tortiously interfered with APM's contracts and prospective business

relations, that Layton and MM are jointly and severally liable for damages in the amount of $51,433, but no injunctive relief is appropriate, and that Layton is liable to APM for its reasonable attorneys' fees and expenses in pursuing enforcement of its rights under the Agreement.

I. FACTUAL BACKGROUND

APM is a Delaware corporation with its principal place of business in Lewes, Delaware. James and Michele Sprinkle founded APM, which provides cleaning services for commercial and residential properties. The Sprinkles spent five to seven years "knocking on doors" to acquire clients and establish their business. [FN1]

FN1. Trial transcript ("Tr.") at 136.

In October 1997, APM hired Layton as office manager. Her duties included hiring, supervising, and firing cleaning staff, preparing contracts for new customers, scheduling services for customers, handling customer complaints, and billing. Layton had the primary responsibility for interacting with clients to ensure that APM met their cleaning needs.

On October 22, 1997, Layton signed a written document entitled "Employment Agreement" (the "Agreement") with APM. [FN2] The Agreement contains a covenant not to compete. The provisions relating to that covenant are as follows:

FN2. PTX 3.

1. An employee who decides to terminate service with the company must give seven (7) days notice.
2. During the time of your employment with All Pro Maids, Inc., you shall not, in the home or commercial cleaning field, directly or indirectly solicit business from, contract with, or take employment with any customer or former customer of the ALL PRO MAIDS, INC. or any other cleaning company or individual where you have
A. Worked physically upon a customer's premises;
B. Acted in a supervisory capacity for the ALL PRO MAIDS, INC.;
C. Acted as a salesperson for the ALL PRO MAIDS, INC.;

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1878784 (Del.Ch.)
(Cite as: 2004 WL 1878784 (Del.Ch.))

Page 3

3. Employee agrees that, in the event this Agreement terminates, regardless of the reason for the termination or the party terminating the Agreement, Employee will not, directly or indirectly, either as an individual or as a partner or joint venturer or as an employee or agent of any person, or as an officer, director, or as a shareholder or otherwise, for a period of one (1) year from the termination of the Agreement in the home or commercial cleaning field *work, solicit, contract or take employment for any current or former customer of* the ALL PRO MAIDS where Employee was engaged as described in the paragraph 2(a), (b), and (c) or in the territories covered by the following zip codes: [21 zip codes all in Sussex County, DE].

*2 4. In the event or [sic: of] a breach or threat of breach by an Employee of the terms of this Agreement, the parties agree that ALL PRO MAIDS remedy at law will be inadequate and that ALL PRO MAIDS will be entitled, in addition to any other remedies available by law, to appropriate injunctive and other equitable relief in order to get a Court Order to stop the Employee from violating the Agreement. Employee will be responsible for all court costs and attorney's fees necessary to enforce this Agreement. [FN3]

FN3. *Id*

APM's policy is that all employees--including cleaners, supervisors and managers--must sign this Agreement.

In the spring of 2003, Layton's relationship with APM soured and she decided to resign. Before Layton resigned, Rebecca Truitt ("Truitt"), another employee of APM, approached her about starting a cleaning business. Layton told Truitt that she had signed a covenant not to compete with APM, and therefore might be unable to join the new business. Layton testified that she then asked her attorney, Larry Fifer ("Fifer"), to review the Agreement and that he advised her orally that it was unenforceable. [FN4] On May 16, 2003, Layton submitted a letter of resignation to APM, stating an intention to leave on May 30, 2003. Upon receiving the letter, James Sprinkle asked Layton to leave APM's employ immediately.

FN4. Tr. at 40-41. Layton did not pay Fifer anything for his advice.

On May 22, 2003, Layton and Truitt filed a Certificate of Formation with the State of Delaware for Mama's Maids, LLC, a commercial cleaning service. On May 29, 2003, MM cleaned for Quality Roofing, which up to that time had been a client of APM. By the fall of 2003, MM was servicing eleven of APM's clients, having a total of over twenty locations.

During the summer of 2003, APM became aware that it was losing clients to MM. In September 2003, after Delware National Bank, one of APM's largest clients, switched to MM, APM began contacting attorneys to pursue the possibility of legal action against Layton and MM (collectively "Defendants"). APM filed this action on November 12, 2003. [FN5]

FN5. Additional facts relevant to specific issues presented at trial are discussed below in connection with the analysis of those issues.

II. PROCEDURAL HISTORY

APM's Complaint alleged breach of the Agreement, tortious interference with contractual relations and prospective business relations, and violations of Delaware's Deceptive Trade Practices Act and Trade Secrets Act. APM sought equitable and injunctive relief, damages, attorney's fees and costs. The requested relief included a temporary restraining order and preliminary injunction to enjoin Defendants' breach of the Agreement and tortious interference.

The Court denied APM's request for a TRO on November 19, 2003, and entered an Order for expedited proceedings.

On January 9, 2004, Defendants answered the Complaint and also moved to dismiss. In support of its motion, Defendants argued that the Agreement is not valid or enforceable because it lacked consideration and mutual assent, and that APM failed to plead sufficient facts to support its claims for tortious interference and violations of the Deceptive Trade Practices and Trade Secrets Acts. Defendants also asserted that APM failed to state a claim against MM, because there was no privity of contract between APM and MM, and that APM's claim for equitable relief is barred by the doctrine of laches.

*3 APM responded to the motion to dismiss on February 19, 2004. As part of that response, APM

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1878784 (Del.Ch.)
(Cite as: 2004 WL 1878784 (Del.Ch.))

withdrew its request for a preliminary injunction and its deceptive trade practices and trade secrets claims. The Court later declined to dismiss the remaining claims and conducted a trial on the merits on March 1, 2004.

The issues presented at trial included: whether the Agreement is valid and enforceable; whether MM is an appropriate defendant; whether Defendants should be enjoined from further breach of the Agreement and from tortious interference with existing or prospective contracts; and whether damages and other remedies are appropriate.

### III. ARGUMENTS AND ANALYSIS
#### A. Breach of Contract

The most prominent issue in this case is the validity and enforceability of the covenant not to compete. The Court must first determine whether APM had an enforceable contract with Layton and, if so, whether it was breached. If the Agreement is valid and breached, the Court must determine whether specific performance or some other remedy is appropriate under the circumstances. [FN6]

> FN6. "Where a restriction on the ability to be gainfully employed is involved, the customary sensitivity of a court of equity to the particular interests affected by its remedies is heightened." *McCann Surveyors, Inc. v. Evans,* 611 A.2d 1, 3 (Del.Ch.1987).

#### 1. Validity

The Agreement between Layton and APM satisfies the requirements of a valid contract. Those requirements are mutual assent and consideration. [FN7] APM offered Layton employment and contemporaneously presented to her the Agreement, which included a covenant not to compete. Layton and APM executed the Agreement in consideration of her employment and continued employment, thereby forming a valid contract. Because many of Defendants' arguments center on the validity of the Agreement, the Court addresses these elements in more detail below.

> FN7. *See Research & Trading Corp. v. Pfuhl,* 1992 Del. Ch. LEXIS 234, at *16 (Nov. 19, 1992); *Delaware Express Shuttle, Inc. v. Older,* 2002 Del. Ch. LEXIS 124, at *40 (Oct. 23, 2002).

Layton testified that she was given an employment application and other materials to sign at the same time as the Agreement. James Sprinkle explained the Agreement to her, and told her that she would not be employed if she refused to sign it. Both Layton and Sprinkle signed the document, signifying their mutual assent. [FN8] Layton testified that she understood the document to mean that people could not go out and start a business, and that she agreed to it by signing it. [FN9] That is, Layton promised to abide by specific terms of the Agreement that effectively prevented her from conducting business with APM's clients in competition with APM for one year in a specifically delineated geographic area.

> FN8. *See Faw, Casson & Co. v. Cranston,* 375 A.2d 463, 466 (Del. Ch.1977) ("[D]efendant's act of signing the letter provided written confirmation of his agreement not to compete ....").

> FN9. Tr. at 25.

In consideration for her promise, APM employed Layton. Because Layton did not have a contract for a specified term, she was an "at-will employee." APM employed Layton for almost six years after she signed the Agreement. In Delaware, employment or continued employment may serve as consideration for an at-will employee's agreement to a restrictive covenant. [FN10] The Agreement therefore is supported by consideration and meets the requirements of a valid contract.

> FN10. *Research & Trading Corp. v. Powell,* 468 A.2d 1301, 1305 (Del. Ch.1983) ("[O]ur courts have held that continued employment of an employee whose position is terminable at will constitutes sufficient consideration to support an enforceable contract."); *see also Pfuhl,* 1992 Del. Ch. LEXIS 234, at *23 (retention of an employee at will, in exchange for a covenant not to compete, constitutes adequate consideration).

Defendants make a tortured argument that the Statute of Frauds precludes enforcement of the noncompete agreement against Layton. The Statute of Frauds requires certain contracts to be evidenced by a writing. [FN11] Assuming that the Statute of Frauds applies to the Agreement, it is satisfied. The *written* Agreement contains the terms that APM seeks to enforce in this action. Defendants have failed to

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1878784 (Del.Ch.)
**(Cite as: 2004 WL 1878784 (Del.Ch.))**

Page 5

present any persuasive authority or argument for their novel contention that the Statute of Frauds should bar the *written* terms of the Agreement simply because other terms of the employment arrangement with Layton were not memorialized in a writing.

FN11. 6 *Del. C.* § 2714.

*4 Defendants argue that Layton and APM entered into an *oral* employment contract, but that APM is trying to enforce a different contract. That contract includes the covenant not to compete and is embodied in the Agreement, which bears the title "Employment Agreement." According to Defendants, the Agreement by its terms cannot be performed within the space of one year after it was made. They therefore contend that the employment arrangement of which the covenant not to compete in the Agreement is only a part must be reduced to writing to satisfy the Statute of Frauds. [FN12] Defendants further argue that the Agreement fails to satisfy the writing requirement, because it omits terms of the oral employment contract, such as salary. Hence, they contend the Agreement is not enforceable under the Statute of Frauds.

FN12. The Statute of Frauds, 6 *Del. C.* § 2714(a), provides in relevant part:
No action shall be brought to charge any person ... upon any agreement that is not to be performed within the space of one year from the making thereof, ... unless the contract is reduced to writing, or some memorandum, or notes thereof, are signed by the party to be charged therewith...
Contrary to Defendants' position, Plaintiff argues that the Employment Agreement can be performed within one year. Plaintiff's Post-Trial Reply Brief ("PRB"; the parties' post-trial opening and reply briefs are designated herein as POB, DOB, PRB and DRB, respectively) at 6. Having concluded that the Statute of Frauds defense lacks merit on other grounds, the Court need not address this issue.

Interestingly, Defendants elsewhere concede, as they must, that "at will" employment contracts do not need to be in writing. [FN13] If one were to accept Defendants' argument, however, no employer could enter into a written covenant not to compete having a duration of one year or more with an at-will employee without reducing to writing all the other terms of their

employment arrangement. There could not be a separate agreement that focused primarily on the covenant not to compete. The Court is not aware of any authority that requires such a result. [FN14]

FN13. DOB at 13.

FN14. Defendants' reliance on *Enloe v. Gorkin,* 1990 WL 263563 (Del.Super.Dec. 26, 1990), is misplaced. In *Enloe,* the plaintiff tried to enforce a doctor's note regarding a patient's condition as a contract. The court ruled the writing was a note, not a contract. *Id.* at *2. In contrast, this Court has held that the writing at issue here is a valid contract.

Defendants' sole basis for invoking the Statute of Frauds is the duration of the covenant not to compete. That covenant, however, is memorialized in the *written* Agreement, and it includes all the material terms of the covenant. As demonstrated above, the parties assented to the Agreement and it is supported by consideration. Thus, the Court rejects Defendants' Statute of Frauds defense.

In another tortured argument, Defendants contend that the parole evidence rule bars APM from relying upon extrinsic evidence of what Defendants characterize as the missing terms of mutual assent and consideration in an effort to supplement the written Agreement and thereby satisfy the Statute of Frauds and other requirements for a valid contract. Since the Court has concluded that the Agreement is supported by mutual assent and consideration and that it complies with the Statute of Frauds, there is no merit to Defendants' parole evidence argument. As explained in *Taylor v Jones*:
The Parole Evidence Rule is a principle of substantive law that prevents the use of extrinsic evidence of an oral agreement to vary a fully integrated agreement that the parties have reduced to writing. [FN15]

FN15. 2002 Del. Ch. LEXIS 152, at *10-11 (Dec. 17, 2002).

Contrary to Defendants' argument, the parole evidence rule provides no basis to bar the introduction of the *written* Agreement. Instead, it bars extrinsic evidence of oral agreements to vary fully integrated agreements that are reduced to writing. [FN16] The Rule does not preclude the use of

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1878784 (Del.Ch.)
(Cite as: 2004 WL 1878784 (Del.Ch.))

extrinsic evidence of the elements necessary to form a contract that does not contradict the writing itself, such as the consideration reflected in APM's continued employment of Layton. [FN17]

> FN16. Id

> FN17. See Equitable Trust Co. v. Gallagher, 102 A.2d 538 (Del.1954); Benz v. Wilmington Trust Co., 333 A.2d 169 (Del.1975).

*5 The Agreement between APM and Layton is valid as a matter of contract law. Defendants' arguments to the contrary are wholly without merit.

### 2. Breach

Layton in concert with MM acquired eleven of APM's clients within four months of her resignation. Defendants have admitted that the Agreement was breached if it was valid. [FN18] Layton is therefore individually liable to APM for her breach of the Agreement. [FN19]

> FN18. DOB at 22.

> FN19. MM was not in privity of contract with APM. Nor has APM asserted any claim against MM or Truitt for breach of contract or for contributing to Layton's breach of her contract with APM. MM is accused, however, of tortious interference with APM's client contracts and prospective business relations, discussed infra.

### 3. Enforceability

To be enforceable, a covenant not to compete must (1) meet general contract law requirements, (2) be reasonable in scope and duration, both geographically and temporally, (3) advance a legitimate economic interest of the party enforcing the covenant, and (4) survive a balance of the equities. [FN20] When seeking specific performance of a covenant not to compete, the plaintiff has the burden of establishing her case by clear and convincing evidence . [FN21]

> FN20. Delaware Express Shuttle, 2002 Del. Ch. LEXIS 124, at *40.

> FN21. Tristate Courier & Carriage, Inc v Berryman, 2004 Del. Ch. LEXIS 43, at *35 (Apr. 15, 2004).

As noted above, the Agreement meets general contract law requirements.

The restrictive covenant in the Agreement is limited to one year and an area defined by specific zip codes where the majority of APM's clients are located. [FN22] Defendants conceded that if the covenant not to compete is valid, it is reasonable as to time and geography. [FN23]

> FN22. PTX 3. The language of the Agreement (¶ 3) arguably could be construed in the disjunctive to prohibit Layton, in the home or commercial cleaning field, from working, soliciting, contracting or taking employment (1) for any current or former customer of APM with which she had had contact on behalf of APM or (2) in the territories covered by 21 specified zip codes in Sussex County. Both sides, however, have construed the prohibition in the conjunctive to apply only to entities that were current or former customers of APM and located in the defined territory. Accordingly, the Court has adopted that construction for purposes of this opinion.

> FN23. DRB at 6. Noncompete agreements covering limited areas for two or fewer years generally have been held to be reasonable. See Delaware Express Shuttle, 2002 Del. Ch. LEXIS 124, at *54 (finding three years unreasonable because of rapid customer turnover, and reducing duration of covenant to two years); COPI of Delaware, Inc. v. Kelly, 1996 Del. Ch. LEXIS 136, at *12 (Oct 25, 1996) (two year restriction reasonable for company officers and sales personnel); Pfuhl, 1992 Del. Ch. LEXIS 234, at *31 (one year restriction reasonable for company's vice president).

Courts recognize protection of an employer's goodwill as a legitimate economic interest for a restrictive covenant. [FN24] "[A]n employer has an interest in the goodwill created by its sales representatives and other employees, which is vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs." [FN25] This is particularly true where, as here, the evidence demonstrates the importance of personal contacts to the success of a company [FN26]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1878784 (Del.Ch.)
(Cite as: 2004 WL 1878784 (Del.Ch.))

Page 7

FN24. *Rhis, Inc v Boyce,* 2001 Del Ch
LEXIS 118, at * 20 (Sept. 26, 2001).

FN25. *Pfuhl,* 1992 WL 345465 234, at *12;
*Tristate,* C.A. No. 20574, mem. op. at 28-
29.

FN26. *Tristate,* C.A. No. 20574, mem. op. at
29.

As office manager, Layton had the opportunity to
develop economically valuable relationships with
APM's customers. James Sprinkle testified that
Layton held the most important position at APM and
was its most important person. [FN27] She hired and
supervised all of the cleaners and their supervisors,
bid on prospective clients, prepared contracts for new
clients, scheduled cleaning services for clients, and
handled complaints. Layton testified that she ran the
business. [FN28] As a result, Layton knew all the
clients, what services they needed and how much they
paid for the services. She easily could put this
knowledge and experience to her own use and to the
detriment of APM. The Agreement serves a
legitimate purpose in protecting APM's goodwill,
confidentiality, and established contracts. [FN29]

FN27. Tr. at 151.

FN28. *Id* at 27.

FN29. Defendants concede that, "The
Restrictive Covenant is designed to protect a
legitimate business interest of APM." DRB
at 6.

The balance of the equities favors specific
enforcement of the Agreement. On the one hand,
APM required Layton to sign a covenant not to
compete as a condition of employment. Sprinkle
explained the Agreement to Layton and she
understood it. The Agreement served to protect
APM's valuable business relationships with its
customers--relationships that would be vulnerable to
misappropriation by an employee in Layton's
position. Failing to enforce the Agreement would
deprive APM of the benefit of its bargain. On the
other hand, specific enforcement of the Agreement
would preclude Layton from soliciting APM's
customers for a reasonable period of time and in a
limited area. Layton has been and is free to pursue
clients that were not associated with APM before she

left. Upon expiration of the Agreement and any
injunction imposed by this Court, Layton would be
free to pursue any clients she wishes. With Layton
having enjoyed the benefits of almost six years of
employment with APM, the Court fails to see any
undue hardship to Layton from enforcement of the
Agreement

*6 The Court further finds that the Agreement is
enforceable in equity. The noncompetition clause,
however, expired by its own terms on May 16, 2004,
one year after Layton left APM. The consequences of
that expiration are discussed under "Remedies," *infra*

### 4. Prior Material Breach
Defendants contend for the first time in their post-
trial brief that even if the Agreement is valid, APM
cannot enforce it because APM committed a prior
material breach. [FN30] According to Defendants,
APM breached the Agreement by asking Layton to
leave APM on the day she submitted her resignation
without providing her with seven days notice or
paying her for those days. Notwithstanding the
belated assertion of this defense, the Court will
address Defendants' arguments.

FN30. DOB at 27-29.

Defendants failed to identify the source of this
purported obligation to provide an at-will employee
with notice or compensation for the notice period.
The Court can only speculate that it stems from the
Agreement. [FN31] Yet, nothing in the Agreement
required APM to pay Layton after she submitted her
resignation. The Agreement states that the *employee*
must give seven days notice before leaving. It does
*not* impose any obligations on the employer once the
employee resigns or gives notice. [FN32] Defendants
also failed to present any evidence of an oral contract
requiring notice to Layton. An employer may
terminate an at-will employee, like Layton, at any
time, subject to the implied covenant of good faith
and fair dealing [FN33]

FN31. *See* DOB at 27, citing *Dickinson
Medical Group v. Foote,* 1989 Del.Super.
LEXIS 156 (Mar. 23, 1989)(holding that
medical group's failure to compensate a
physician for services as delineated in her
contract was a material breach, which
excused her continued performance, where
doctor had an employment contract for a
defined term). Unlike the doctor in

Not Reported in A.2d                                                      Page 8
Not Reported in A.2d, 2004 WL 1878784 (Del.Ch.)
(Cite as: 2004 WL 1878784 (Del.Ch.))

*Dickinson,* Layton was an at-will employee.

FN32. *See* PTX 3. Moreover, Layton presented no evidence that she ever requested payment for those days.

FN33. *Merrill v. Crothall-American, Inc.,* 606 A.2d 96, 103 (Del.1992) (Employer has "freedom to terminate an at-will employment contract for its own legitimate business, or even highly subjective, reasons."); *see also E.I. du Pont de Nemours & Co. v. Pressman,* 679 A.2d 436, 437 (Del.1996) (Employment-at-will doctrine "generally permits the dismissal of employees without cause and regardless of motive.").

Not surprisingly, Defendants argue that by asking Layton to leave APM on the day she submitted her resignation, rather than the later date Layton unilaterally offered, APM violated the implied covenant of good faith and fair dealing. Such an implied covenant accompanies every employment contract. [FN34] Defendants presented no evidence, however, that even suggests that APM hired Layton or terminated her employment in bad faith. In fact, Layton voluntarily chose to resign even after Sprinkle assured her that her job was not in danger. APM acted within its rights in asking Layton, an at-will employee, to leave the same day she submitted her resignation. [FN35]

FN34. *Cornely v. Hartco, Inc.,* 1994 Del. Ch. LEXIS 5, at *6 (Jan. 27, 1994) ("An implied covenant of good faith and fair dealing is included in every employment contract made under the laws of Delaware.").

FN35. Even if APM's failure to pay Layton for seven days after her resignation did constitute a breach, it would not be sufficiently material to render the entire Agreement unenforceable. *See McCann,* 611 A.2d at 3 ("a *material* breach of the other party excuses performance") (emphasis added).

The Court therefore finds that APM did not commit a prior material breach that would preclude enforcement of its Agreement with Layton.

   B.   Tortious Interference with Existing and

Prospective Business Relations

   APM asserts that Defendants tortiously interfered with its existing contracts and prospective business relations. The torts of interference with contracts and interference with prospective business relationships are closely related. [FN36] For each of the torts, APM must prove respectively: (1) the existence of either a valid contract or reasonable probability of a business expectancy; (2) the interferer's knowledge of the contract or expectancy; (3) intentional interference that induces or causes a breach or a termination of the business expectancy; and (4) damages. [FN37] In addition, for interference with business expectancies, the Court must also consider Defendants' right to interfere with APM's expectancies within the limits of fair competition. [FN38] APM must prove the elements of these torts by a preponderance of the evidence. [FN39]

FN36. *Delaware Express Shuttle,* 2002 Del. Ch. LEXIS 124, at *88.

FN37. *Id.; see also DeBonaventura v. Nationwide Mutual Ins. Co.,* 419 A.2d 942, 947 (Del. Ch.1980). In some cases, the court has also noted that defendants interference must be without justification. *Irwin Lieghton, Inc v. W.M. Andersen Co.,* 532 A.2d 982, 992 (Del. Ch.1987); *CPM Indus., Inc v. Fayda Chems. & Minerals, Inc.,* 1997 Del. Ch. LEXIS 175, at *23-24 (Nov. 26, 1997). Defendants failed to demonstrate a valid justification for their actions in this case.

FN38. *Id.; see also DeBonaventura,* 419 A.2d at 947.

FN39. *See Pfuhl,* 1992 Del. Ch. LEXIS 234, at *38.

*7 APM had valid contracts or business relationships with at least eleven of MM's clients. [FN40] Those clients had been long-term customers of APM, and APM reasonably expected to continue servicing them.

FN40. In its opening brief, APM argued that twelve of MM's fourteen commercial clients were former APM clients. POB at 7. The twelfth client is Tanger Outlets (formerly known as Rehoboth Outlets), which MM began working for after January 1, 2004.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1878784 (Del.Ch.)
(Cite as: 2004 WL 1878784 (Del.Ch.))

Rehoboth Outlets had been a client of APM at one point, but was using another cleaning service when it switched to MM. Since APM did not seriously pursue any claims for relief as to Tanger Outlets at trial or in its post-trial briefing and the evidence regarding it is incomplete, the Court has not considered Tanger Outlets for purposes of this opinion.

Layton testified that she knew about all the APM contracts entered into during her employment. [FN41]

FN41. Tr. at 27-28.

Defendants began servicing APM clients shortly after Layton left APM, notwithstanding their knowledge of the Agreement. By the time of trial (March 1, 2004), eleven former APM clients had hired MM to perform cleaning services for them. Contracting with these clients and servicing them constitute intentional acts of Layton and MM. Under the circumstances of this case, those acts are sufficient to support a claim of tortious interference. Based on the evidence presented at trial, the Court finds that Layton or Truitt (or persons acting on MM's behalf) had contacts with each of these eleven clients that facilitated their switch from APM to MM.

APM identified five clients who breached their contracts with APM by failing to give thirty days notice before terminating APM's services. They are: Quality Roofing, Thorogoods, Century 21, Sussex Eye Center, and Ferguson. Each of these clients left APM and became a client of MM. Layton herself testified that, at least, Quality Roofing, Thorogoods, and Century 21, had contracts with APM that included thirty-day notice provisions. APM presented evidence that Sussex Eye Center and Ferguson also had contracts with APM with thirty-day notice provisions when they switched to MM. The evidence further showed that each of those five clients terminated their relationship with APM without providing the requisite notice.

APM had long term business relationships with all eleven clients and a reasonable expectancy that those relationships would continue. Layton knew about those relationships as a result of her employment at APM, and she and MM intentionally interfered with them. APM lost the profits that it otherwise would have made had Defendants not interfered.

Layton was not privileged to interfere with APM's

prospective business relationships because she was prohibited from working, soliciting, contracting or taking employment for any current or former clients of APM under the Agreement. Layton's actions, even under a mistaken understanding of the enforceability of the Agreement, were at her own risk.

MM also was not privileged to compete with APM under the circumstances. MM is a distinct corporate entity from Layton. The Court recognizes that fact and that MM was not a party to the covenant not to compete with APM. Layton, however, is a principal and employee of MM. The privilege to compete is circumscribed by the limits of fair competition. [FN42] MM's status as a separate business entity does not provide it with a privilege to compete beyond the limits of fair competition. MM did not have a privilege to take advantage of the information and goodwill that Layton had obtained during her employment with APM when Layton's participation in the challenged activities was both a breach of contract and tortious. Furthermore, MM would be vicariously liable for Layton's torts under the doctrine of respondeat superior. [FN43]

FN42. *Delaware Express Shuttle,* 2002 Del. Ch. LEXIS 124, at *88. The other partner in MM, Rebecca Truitt, sought out Layton's participation to take advantage of her expertise and contacts as APM's office manager. Truitt also knew about Layton's covenant not to compete with APM from the time she and Layton formed MM. Therefore, the Court concludes that the conduct of MM through Truitt was not privileged.

FN43. Restatement (Second) of Agency § § 219, 220 cmt. a (2004).

*8 The Court finds that APM proved that Defendants are liable for tortious interference with APM's contracts with each of the five clients identified above as having failed to provide thirty days notice. The Court also finds Layton and MM liable for tortious interference with APM's prospective business relations with respect to all eleven clients, because they were not privileged to compete due to Layton's Agreement with APM and MM's acquisition of those clients in contravention of Layton's obligations to APM.

C. Defenses
1. Laches

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1878784 (Del.Ch.)
(Cite as: 2004 WL 1878784 (Del.Ch.))

Defendants argue that APM's claim for injunctive relief is barred by the doctrine of laches. Laches will bar a claim if the claimant had actual or constructive knowledge of the claim and unreasonably delayed in bringing it, and the delay caused prejudice to the Defendants. [FN44] Defendants argue that APM knew about Layton's breach of the Agreement in early June, but waited until November to file suit, and has put forth no valid reason for the delay. Defendants also claim prejudice by the delay because they incurred costs in organizing a new business, spent the time arranging to work for former APM clients, not suspecting that the restrictive covenant would be enforced, and now must bear the costs of defending this action.

> FN44. E.g., *Fike v. Ruger*, 752 A.2d 112, 113 (Del.2000); *Kerns v. Dukes*, C.A. No.1999-S, mem. op. at 19 (Del. Ch. Apr. 2, 2004).

Defendants' arguments are not persuasive. For laches to apply, the claimant's delay must be unreasonable. When Layton resigned, she did not advise APM that she planned to start a competing cleaning business with Truitt. Likewise, there is no evidence that APM or the Sprinkles obtained contemporaneous knowledge of that fact from any other source. In the succeeding months, James Sprinkle contacted each client who terminated and asked what cleaning services they were using. Except for Quality Roofing, no one told him that it was Defendants. [FN45] Sprinkle testified that APM clients transferred to MM one-by-one over time, and APM hesitated to take on the financial burden of a lawsuit over the loss of one or two clients. Moreover, as soon as Sprinkle learned that Quality Roofing had begun using the Truitts, he had his attorney send them a warning letter. [FN46] When Sprinkle realized that Defendants were causing serious financial harm to APM he began consulting with attorneys about the problem, and filed suit as soon as he found an attorney to accept the case. [FN47]

> FN45. In June 2003, Thorogoods and Fergusons said they would do cleaning "in house," Tr. at 156, 175-76; in July 2003, Sussex Eye Center said it was using Dee's Cleaning in Georgetown, Tr. at 144; and in August 2003, Century 21 said it was using another service but did not give a name, Tr. at 181.

> FN46. Tr. at 168, 187; DTX 9. Both Rebecca Truitt and her husband worked for APM until May 2003. Although he was not an owner of MM, Mr. Truitt worked with his wife in providing cleaning services to MM's clients.

> FN47. Sprinkle first consulted an attorney in Georgetown in September 2003. After two or three attorneys were unable to take the case, Sprinkle contacted Mr. Brockstedt, who agreed to represent APM.

The Court finds that APM's alleged "delay" in filing suit was not unreasonable under the circumstances. Moreover, it was well within the time period prescribed by the legal statute of limitations, which provides a presumptive time period for application of the equitable doctrine of laches. [FN48]

> FN48. See, e.g., *Kerns*, C.A. No.1999-S, mem. op. at 8; *U.S. Cellular Inv. Co. v. Bell Atlantic Mobile Sys., Inc.*, 677 A.2d 497, 502 (Del.1996); *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del. Ch.1993).

Defendants incurred the costs of organization and start-up almost immediately after Layton left APM. APM's alleged delay in taking action against Defendants had no effect on those start-up costs. Defendants also determined to solicit APM clients despite the risk that the restrictive covenant might be enforced against them. Any prejudice to Defendants is a result of their own doing. APM's action is not barred by laches.

2. Equitable Estoppel

*9 Defendants contend that APM is equitably estopped from enforcing the Agreement against them. The doctrine of equitable estoppel may provide a defense "when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment." [FN49] To establish equitable estoppel, the party claiming the estoppel must show that it: (1) lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; (2) relied on the conduct of the party against whom equitable estoppel is claimed; and (3) suffered a prejudicial change of position as a result of its reliance. [FN50]

> FN49. *Wilson v. American Ins. Co.*, 209 A.2d 902, 903-04 (Del.1965).

Not Reported in A.2d                                           Page 11
Not Reported in A.2d, 2004 WL 1878784 (Del.Ch.)
(Cite as: 2004 WL 1878784 (Del.Ch.))

FN50. *Waggoner v. Laster,* 581 A.2d 1127, 1136 (Del.1990); *Delaware Express Shuttle,* 2002 Del. Ch. LEXIS 124, at *37.

Defendants allege that APM led Layton to believe that the Agreement was unenforceable, and she reasonably relied on APM's representations and conduct to her detriment. Specifically, Defendants assert that Sprinkle told Layton the Agreement was unenforceable and never tried to enforce comparable agreements against four other employees who were in breach. [FN51]

FN51. DOB at 24-25.

Layton testified, however, that she did not rely on APM's representations, but rather on those of her own attorney in concluding that the Agreement was unenforceable. [FN52] In fact, she told Truitt that she could not join her in a competing business until she had her attorney look at the Agreement. [FN53] Therefore, Layton not only had, but also utilized, other means for obtaining knowledge of whether the Agreement was enforceable.

FN52. Tr. at 228. To the extent Layton tried at trial to back away from her deposition testimony and suggest that she also relied in part on Sprinkle's statement, the Court finds her deposition more credible. At the deposition, Layton testified unequivocally that she relied on her attorney, Mr. Fifer, and not Sprinkle, in starting MM. *See* Tr. at 226-27.

FN53. *Id* at 207.

Moreover, both Layton and Sprinkle testified that APM *did* try to assert the Agreement against other employees. Sometime between 2000 and 2002, two of APM's cleaners cleaned a few houses in breach of the restrictive covenant. Layton testified that Sprinkle called his attorney who advised him that the covenant could not be enforced against the cleaners. While Layton was in the room during the call, she did not hear the entire conversation. Sprinkle told Layton "there was nothing that could be done," but did not tell her why. [FN54] Nevertheless, Sprinkle still had his attorney send warning letters to the cleaners and they discontinued the offending activities. As to third employee, Layton could not say that Sprinkle had any knowledge of her alleged violations. Finally, with respect to the fourth employee, all Layton could say was that Sprinkle called and "kind of harassed [her] a little bit to try to scare her, but it didn't work." [FN55]

FN54. *Id.* at 225-226.

FN55. *Id.* at 204.

Sprinkle's actions show that he thought the restrictive covenant could be used to protect APM and that he attempted to use it for that purpose. The fact that APM did not sue these other employees may mean only that the economics of those situations did not justifying incurring the expense of legal action. Layton knew that Sprinkle had tried to use the covenant to protect APM's interest. The fact that on one occasion Sprinkle told her nothing could be done is inconclusive. There are many reasons why it might not be practicable to pursue enforcement of a restrictive covenant in a particular instance. The positions of the offending parties could differ, for example. Layton was a manager, not a cleaner. While it may not have made sense to attempt to enforce a restrictive covenant against two cleaners, who were not privy to APM's business policies, the situation could be quite different with a manager like Layton. [FN56] In these circumstances, the Court finds that Layton could not reasonably have relied on Sprinkle's comments or conduct as meaning that the Agreement could not be enforced against her. Consequently, APM is not equitably estopped from enforcing the Agreement against Defendants.

FN56. *See McCann,* 611 A.2d at 4 ("[W]here valuable trade secret or other proprietary information has been learned by the defendant and, therefore, his competition with plaintiff's business may be particularly effective and unfair, the contractual provision not to compete is more likely to be specifically enforced.").

D. Remedies
1. Damages

*10 The proper measure of damages for breach of a covenant not to compete is APM's lost profits. [FN57] APM contends that it should receive five years of projected lost profits because the eleven clients it lost to MM had been clients of APM for an average of five years. If Layton had not breached the Agreement, however, Defendants could have competed legitimately for that business after May 16,

Not Reported in A.2d                                                   Page 12
Not Reported in A.2d, 2004 WL 1878784 (Del.Ch.)
(Cite as: 2004 WL 1878784 (Del.Ch.))

2004. APM's clients could terminate their service contracts with APM at any time provided they give thirty days notice. Because the Truitts cleaned for many of those clients and Layton was their contact person, APM might have lost some or all of those clients to MM through valid competition within a relatively short time after May 16, 2004. The Court, therefore, finds that APM has not proven that it is entitled to recover five years of lost profits.

> FN57. *See Rhis,* 2001 Del. Ch. LEXIS 118, at *24 (awarding damages based on plaintiff's historical profit margin); *cf. Delaware Express Shuttle,* 2002 Del. Ch. LEXIS 124, at *60-61 (awarding plaintiff the defendants' profits instead of plaintiff's lost profits, where plaintiff did not prove its lost profits).

APM's damages should be based on a shorter time period. APM's expert, Andrew C. Verzilli ("Verzilli"), testified that, in his opinion, APM's lost profits from May 2003 through May 2004 would have been $31,000, and through May 2005 would have been $56,600. [FN58] These figures take into account the normal 5% attrition rate of APM's clients. They also reflect Verzilli's conservative assumption of no growth in the annual revenues from the lost customers during the period from May 2004 to May 2005 and his discounting of the revenues for that period to present value using a discount rate of 15% to account for market and risk conditions. This two-year projection of lost profits accounts for APM's likely eventual loss of the clients in issue due to permissible competition from Defendants, but also assumes that those clients, on average, would have remained with APM through May 2005, absent Layton's breach and Defendants' tortious conduct during the term of the Agreement.

> FN58. PTX 38; Tr. at 99.

Defendants contend the Court should not award damages because APM failed to prove Defendants proximately caused any damage. Specifically, Defendants contend that the eleven clients left either because they wanted to continue receiving services from the Truitts or they were dissatisfied with APM. The Truitts had been with APM since 1992 and serviced almost all of the clients who switched to MM.

The Court finds this argument unpersuasive. The

evidence showed that APM clients dealt with Layton more than anyone else at APM. Sprinkle testified that Layton "had all the knowledge, what we charged, how often we went there, what kind of supplies they got, the dates, the cleaning, the contacts, the phone numbers, the cell phones. She knew everybody." [FN59] It is therefore reasonable to infer that Layton contributed to MM's success in obtaining APM's former clients. Defendants' argument might well have merit if the Truitts had started a competing cleaning business on their own, but they chose not to do so. Instead, they joined with Layton to form MM. The Court finds that the evidence fully supports an award of damages against Defendants for the eleven clients at issue. [FN60]

> FN59. Tr. at 159-60.

> FN60. Defendants rely heavily on *Total Care Physicians, P.A. v. O'Hara,* 2003 WL 21733023 (Del.Super. July 10, 2003). The *Total Care* case involved claims for misappropriation of trade secrets; APM did not pursue any trade secrets claim at trial. In any case, the proofs presented in this case satisfy APM's burden on causation, assuming it is as stated in *Total Care.*

*11 Defendants also contend that only Layton, and not MM, can be held liable for breach of the Agreement, because only Layton is bound by the Agreement. The Court agrees that MM is not bound by the Agreement. Therefore, it is not liable for the damages caused by Layton's breach. MM is liable, however, for the damages caused by their tortious interference with five of APM's contracts and with APM's prospective business relations with the eleven clients it lost to MM.

In addition, Defendants challenge the methods Verzilli used to calculate damages. Specifically, Defendants criticize Verzilli's treatment of fixed costs, taxes and the starting point for his first year damages. [FN61] Notably, Defendants did not proffer a damages expert of their own.

> FN61. DOB at 38, 40.

Verzilli explained at trial that he did not deduct fixed costs because APM had to pay the fixed costs for its existing clients notwithstanding the loss of eleven clients to MM. The amount of these costs, therefore, was not affected by the breach and tortious

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1878784 (Del.Ch.)
(Cite as: 2004 WL 1878784 (Del.Ch.))

interference. The federal district court for Delaware has held that "fixed overhead is not to be charged against Plaintiff's damages." [FN62] Based on the evidence presented, and the absence of any competing expert testimony from Defendants, the Court will not charge fixed costs against Plaintiff's damages. The Court finds that APM's expert properly did not deduct fixed costs in calculating lost profits.

> FN62. *W.L. Gore & Assoc., Inc. v. Carlisle Corp.*, 1978 U.S. Dist. LEXIS 17698, at * 39 (D.Del. May 17, 1978); *see also Vitex Mfr. Corp. v. Caribtex Corp.*, 377 F.2d 795, 799 (3d Cir.1967) (holding that overhead should not be deducted from lost profits because overhead remained constant and was unaffected by the contract); *Paper Converting Machine Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 23 (Fed.Cir.1984) ("Thus fixed costs ... are excluded when determining profits.")

Defendants further challenge Verzilli's failure to deduct taxes from his calculation of lost profits. Verzilli admitted being uncertain whether this was a requirement in Delaware. Awards of lost profits are considered taxable income by the IRS and, as a result, by the State of Delaware. [FN63] Deducting taxes from the lost profits calculation would result in a double tax on the award. Thus, the Court concludes that Verzilli's calculation was proper.

> FN63. *See* Internal Revenue Service Pub. 525, 2003; 30 *Del. C.* § 1105.

Finally, Defendants contest Verzilli's estimate that APM's lost profits for the first year, ending May 16, 2004, was $31,000, because he did not make any adjustment "for the fact that clients left at various times during the one-year term of the Restrictive Covenant." [FN64] In another case involving an award of damages for tortious interference and breach of a restrictive covenant, this Court stated: [FN65]

> FN64. DOB at 39.

> FN65. *Delaware Express Shuttle*, 2002 Del. Ch. LEXIS 124, at *60, quoting *Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992).

The law does not require certainty in the award of damages when a wrong has been proven and injury established. Responsible estimates that lack mathematical certainty are permissible so long as the Court has a basis to make a responsible estimate of damages.

The evidence here shows that the eleven clients began using MM at various times from May 29 to September 2, 2003. Defendants argue that Verzilli improperly estimated lost profits for the first year from May 2003 to May 2004. They also argue that Verzilli should have presented his data on a client by client basis, instead of in the aggregate, as he did.

The Court finds the aggregate numbers are sufficient, but agrees with Defendants that they should be adjusted somewhat because the clients left after May. The evidence indicates that the average time after May 16, 2003, that the eleven clients switched to MM was two months. Accordingly, the Court will reduce Verzilli's estimate of lost profits for the first year ($31,000) by one sixth or $5,167.

*12 The Court will award APM damages on its claims for breach of contract and tortious interference equal to APM's projected lost profits for the period through May 16, 2005, in the amount of $51,433 ($56,600--$5,167). Layton and MM are jointly and severally liable for that amount.

### 2. Equitable Relief

APM requested specific enforcement of the Agreement and a permanent injunction barring Defendants from interfering with APM's current and prospective customers. The Court has concluded that the Agreement is enforceable. By its own terms, however, the Agreement expired on May 16, 2004. Thus the Agreement cannot be specifically enforced as written. Subject to the uncertainties created by this litigation, MM was privileged to compete at the expiration of the agreement. Consequently, there has been no showing that tortious interference with prospective business relations is likely to continue in the future. If that were to occur, APM could seek appropriate remedies at that time.

APM requested that the Court craft an equitable remedy enjoining Defendants from competing with APM for a year from the date of judgment. Having determined to award APM money damages that reflect the impact of the noncompetition agreement, the Court concludes that APM's request would, in effect, extend the restriction imposed by the Agreement for another year. [FN66] That would not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1878784 (Del.Ch.)
(Cite as: 2004 WL 1878784 (Del.Ch.))

be appropriate in the circumstances of this case.

> FN66. *See Tri-State,* C.A. No. 20574-N,
> mem. op. at 40 n. 152 (noting that the
> noncompete agreement provides "the most
> appropriate caliper for measuring and
> defining an appropriate remedy.")

Moreover, the harm has already occurred. The Court cannot order the clients to return to APM. It would be detrimental to the clients, and not particularly helpful to APM, if the Court were to enjoin MM from servicing those clients without forcing them to return to APM. [FN67] Therefore, MM will be permitted to retain the eleven clients and the Court will compensate APM for the loss of those clients with an award of money damages. The remedy at law, money damages, is adequate in this action.

> FN67. In apparent recognition of these
> difficulties, APM does not seek to preclude
> Defendants from continuing to serve the
> eleven former APM clients in question. PRB
> at 17.

### 3. Fees and Costs

APM has requested costs and reasonable attorneys fees as specified by the Agreement. The Agreement provides: "[e]mployee will be responsible for all court costs and attorneys fees necessary to enforce this agreement." Former Chancellor Allen addressed such a request in the employment context. He stated:

> With respect to contracts it is settled that a
> provision by which one party undertakes to pay
> counsel fees of the other in the event of his own
> breach is not void as against public policy. While
> no Delaware case has been found in which a fee
> shifting provision in an employment contract has
> been directed against an employee, cases in other
> jurisdictions have enforced such provisions in this
> way. [FN68]

> FN68. *Pfuhl,* 1992 WL 345465, at *14; *see
> also Knight v. Grinnage,* 1997 WL 633299
> (Del. Ch. Oct. 7, 1997)(Steele, V.C.)

Chancellor Allen noted certain public policy concerns when the fee shifting provision is part of an employment contract because of concerns over disparities in bargaining power but found that those concerns were not implicated with respect to the business savvy parties before him.

Those public policy concerns are not implicated in this case for other reasons. APM is not a large corporation with enormous bargaining power. It is a small family owned business in Sussex County, Delaware, serving local clients. The evidence shows that Layton was a very important employee of APM. In addition, the fee shifting provision does not relate to a breach of any term of the general employment relationship, but rather to Layton's knowing and intentional conduct after resigning from APM in violation of a covenant not to compete. The Court will award APM court costs and attorneys fees against Layton in accordance with the Agreement.

**\*13** The record does not demonstrate the amount or the reasonableness of fees incurred by APM. Thus, the Court's holding is limited to establishing APM's right to fees and costs, taking into account that APM abandoned certain of its initial claims. Determination of the proper amount of those fees and costs must await appropriate supplementation of the record. Within ten days of the date of this Memorandum Opinion, APM's counsel shall submit an affidavit and appropriate documentation showing the amount and reasonableness of the attorneys fees and costs they claim. Defendants may file any opposition to APM's application within ten days after the date of that submission.

### CONCLUSION

For the foregoing reasons, Layton is liable for breach of the Agreement. Layton and MM are liable for tortious interference with APM's contractual and prospective business relations. Layton and MM are jointly and severally liable for damages in the amount of $51,433. APM's claim for injunctive relief is denied. APM shall supplement the record to demonstrate the amount and reasonableness of their requested attorneys' fees and court costs.

Counsel shall promptly confer and submit a stipulated or proposed form of judgment in accordance with this opinion and 10 Del. C. § 4734.

IT IS SO ORDERED.

Not Reported in A.2d, 2004 WL 1878784 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1992 WL 345465 (Del.Ch.)

**(Cite as: 1992 WL 345465 (Del.Ch.))**

Page 16



Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
RESEARCH & TRADING CORPORATION,
Plaintiff,
v.
Henry PFUHL, Jr., William N. Clark, and Michael J.
Lozanoff, Defendants.
**Civ. A. No. 12527.**

Submitted: Oct. 8, 1992.
Decided: Nov. 18, 1992.

M. Duncan Grant, and David Fournier, of Pepper,
Hamilton & Scheetz, Wilmington, Philip H.
Lebowitz, and Christopher M. Arfaa, of Pepper,
Hamilton & Scheetz, Philadelphia, Pa., for plaintiff.

James F. Maher, and Teresa C. Fariss, of Young,
Conaway, Stargatt & Taylor, Wilmington, for
defendants.

MEMORANDUM OPINION

ALLEN, Chancellor.

*1 Research & Trading Corporation ("RTC") has
sued three of its former senior officers seeking
specific enforcement of covenants restricting their
ability, for a period of one year following their
separation from RTC, to deal with RTC customers on
behalf of any RTC business competitor. The
defendants are Henry Pfuhl, Jr., the former president
of RTC; Michael J. Lozanoff, the former head of
sales and marketing of the firm and William N. Clark,
the former chief financial officer of the Company.
The central allegation is that the defendants left RTC
in early 1992 and established a firm, Safety
Technology & Systems, Inc ("STSI"), that competes
directly with RTC and, more particularly, solicits
business directly from RTC customers and suppliers,
with whom the defendants had dealt regularly as
senior officers of RTC.

Defendants do not deny that they have solicited RTC
customers in circumstances that would seem to
violate the covenants contained in RTC's standard
employment contract. Rather they assert a number of
positions designed to show that the restriction of such
a covenant does not bind any of them because either
(1) they never signed a contract containing such a
restriction (Mr. Clark's position); (2) the contract that
they signed had been terminated and the new legal
relationship contained no such covenant (Mr. Pfuhl);
or (3) RTC had breached its obligation in a number of
respects, thus destroying the relationship and
excusing compliance with the covenant (all
defendants). Beyond these points defendants assert
that these covenants ought not to be specifically
enforced by a court of equity in these circumstances.
They say their business is a new one not capable of
inflicting substantial damage upon plaintiff who
already faces competition from a large number of
sources.

The case has been through a four day trial. For the
reasons that follow I conclude that the covenants are
valid, binding and enforceable; that plaintiff did not
violate the employment agreements in a way that
excused defendants from compliance with the agreed
upon covenants; and that specifically enforcing them
to the extent now sought, is more consistent with
equity in the circumstances than would be a refusal to
do so.

I.

RTC is a small firm engaged in the business of
manufacturing and marketing safety devices and
systems designed to protect persons required to work
at heights, from accidental falls. Products marketed
by RTC include so called "soft goods," such as
harnesses, body belts and shock absorbing lanyards,
and "devices," such as retracting lifelines, horizontal
systems, confined entry systems and vertical climbing
equipment. Its annual sales are approximately $3.2
million, which comprises 5-6% of the total U.S.
market for fall protection equipment.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1992 WL 345465 (Del.Ch.)
(Cite as: 1992 WL 345465 (Del.Ch.))

RTC is controlled by its sole shareholder, Dr. J. Nigel Ellis, Ph.D., who founded RTC in 1971. Ellis is an expert in the fall protection field. Through another company he started, Ellis provides consulting services to companies interested in using his expertise to abate fall hazards. RTC sells its products nationally largely through a network of independent agents. Approximately 70% of its goods are sold to distributors, 10% to various other resellers and 20% to end users. RTC's largest single customer is Vallen Corporation which is one of the three largest distributors of fall protection equipment in the United States and accounts for 45% of RTC's total sales.

*2 Mr. Pfuhl was trained as an engineer and had spent his working life in a series of manufacturing process assignments in various industries. He was hired by RTC in December of 1988 as vice president of operations, but was soon named President of the Company. Pfuhl personally participated and supervised RTC's negotiations with suppliers and customers, including Vallen Corporation. Pfuhl, at the insistence of Ellis, signed a non-competition agreement on January 10, 1989.

Michael Lozanoff strikes me as an energetic and ambitious businessman. He too had been trained as an engineer, but his field is sales and marketing. Lozanoff was hired as vice-president of sales and marketing in December of 1989. In this position, he of course had access to RTC's customers' identities and requirements, RTC's suppliers' identities and products, and other information concerning each customer, supplier and product. He had personal dealings with many of RTC's best customers including Vallen. Lozanoff signed a non-competition agreement on December 27, 1989.

Mr. Clark, an accountant, was hired as Chief Financial Officer on July 18, 1991. Clark had access to the following information: RTC's customers' identities and requirements, RTC product specifications, RTC's suppliers' identities and products, and other information concerning each customer, supplier and product. Although there is conflicting evidence on the issue, as explained below, I find that Clark signed a non-competition agreement.

The covenant in issue provides, in part, as follows:
(1) To protect [RTC's] valuable trade secrets, proprietary information and confidential information, Employee agrees that while Employee is employed by RTC and *for a period of twelve months after the termination of his employment with RTC, for any reason whatsoever, Employee: (i) shall not, on his own behalf or on behalf of any competitor of RTC, directly or indirectly, engage in the business of selling, soliciting, purchasing or promoting the sale of any products which compete with RTC's products to or from any person,* firm, partnership, corporation, or institution of any kind, *which Employee had dealt with, called upon, solicited, sold to, or purchased from, either personally or through co-employees that he supervised* and (ii) shall not, on his own behalf or on behalf of any competitor of RTC, directly or indirectly, sell, purchase, or promote any products which he, either personally or through co-employees he supervised, sold, purchased, or promoted for RTC at any time during employee's employment with RTC. (emphasis added) [FN1]
(PX 133). The agreement contains the following remedy provisions:
(3) In the event of a violation of this Agreement by the Employee, RTC shall be entitled to seek such relief as may be appropriate including but not limited to the right of injunction and monetary damages.
(4) In the event of a violation of this Agreement by the Employee, the term of all covenants and restrictions contained in this Agreement shall be automatically extended for a period of one year from and after the latter of (i) the date on which the employee permanently ceases such violation, or (ii) the date of entry by a court of any order or judgment enforcing such covenant or restriction.
*3 (PX 133).

Lastly, the agreement requires the employee to pay RTC's counsel fees if legal action enforcing it results in vindication of the Company's rights. All three of the defendants signed this form of agreement, although Lozanoff, as indicated (note 1), altered his agreement with an interlineation before signing it.

* * *

The relationship between Mr. Ellis, the owner, and the three senior managers of RTC seems to have never been satisfactory. Mr. Pfuhl, the first of the three to arrive, rapidly grew dissatisfied. Mr. Lozanoff too became frustrated by the business situation of the firm and Mr. Clark, the most recent arrival, seems to have fallen rather quickly into an adversarial relationship with Ellis. A series of specific problems arose, but most basically, the officers saw their opportunities as being tied to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1992 WL 345465 (Del.Ch.)
(Cite as: 1992 WL 345465 (Del.Ch.))

financial performance of the Company and saw that performance as being limited by inadequate capitalization, the diversion (as they saw it) of funds from RTC to Ellis and another firm he owned, and by poor management decisions forced by Ellis. Thus, while they had no ownership interest in RTC, the defendants felt aggrieved by what they saw as Dr. Ellis' mismanagement of RTC. These frustrations ultimately led to their separation from RTC. One of the core issues in this case is whether the sources of this frustration--Mr. Ellis' conduct towards RTC and them--constitutes a legal basis to release them from the effects of the covenants contained in their employment contracts, which I conclude are otherwise valid and binding.

* * *

After working at RTC only six months, Mr. Pfuhl grew dissatisfied with his position, feeling that he was asked to bear the responsibilities of a corporate president, while being regarded as a vice president. On June 26, 1989, Pfuhl submitted a resignation stating that he would cease performing his duties on July 7, 1989. Mr. Ellis discussed Pfuhl's problems with him, and the two reached an accommodation providing that Pfuhl would be promoted to President and provided with increased compensation. No new written agreement was entered at that time.

When he began his employment with RTC, Mr. Pfuhl had been promised by Mr. Ellis that he would have the opportunity to purchase equity in RTC, as part of his compensation, "after one year's successful service, using the book share value audited for the end of 1988." (PX 8 at 2) Some discussions between Pfuhl, Ellis, and his attorney, William Scari, Esquire, were held regarding the purchase of RTC stock by Pfuhl. It is undisputed, however, that no plan for stock participation by management was presented to the board and Pfuhl never in fact received any equity in RTC.

Lozanoff also received, upon the late 1989 commencement of his employment, a promise from Pfuhl, as President of RTC, that he would receive an opportunity to purchase equity in RTC. Lozanoff also never received any equity in the company. Pfuhl and Lozanoff, however, never extended any offers to purchase equity in RTC, other than a management leveraged buyout proposal for 100% of the RTC stock, discussed below. This proposal, which Ellis rejected, differed radically from the transaction envisioned by RTC's promise to the

defendants to sell them stock.

*4 One of the numerous conflicts between the defendants Ellis concerned Pfuhl's objections to the relationship between RTC and Dynamic Scientific Controls, ("DSC") a consulting company also owned by Ellis. Pfuhl objected to practices by which RTC was providing facilities to DSC to conduct seminars, as well as the services of RTC employees, at no cost to DSC, while RTC also paid certain DSC expenses. In addition, RTC was paying DSC for services it provided to RTC. Mr. Ellis explained these payments as appropriate on the view that RTC's connection with DSC, and the expertise in safety technology and techniques that it possesses, gives RTC an advantage over its competitors, who merely supply safety equipment, by enabling it to market itself as the creator of solutions to safety problems.

Since all of the common stock of these entities was owned by Ellis, any alleged unfairness to RTC in its dealings with DSC did not harm any minority stockholders to whom Ellis, Pfuhl or the other defendants owed fiduciary duties. Assuming, nevertheless, for the sake of argument only that, by virtue of their positions as senior officers, the defendants have legal standing to object to these transactions, they have not borne their burden of showing any harm to RTC (and thus to their own future prospects as employees). Ellis maintains that DSC's relationship with RTC has been and continues to be very beneficial to RTC. I cannot conclude on the evidence that this relationship adversely effected RTC.

Ellis was also at odds with Pfuhl and Clark with regard to the need to alter RTC's financial structure. In 1990, RTC experienced financial difficulties that ultimately resulted in a breach of some of the covenants in its loan agreement with Mellon Bank. Pfuhl informed the bank that RTC would begin seeking an infusion of equity capital to bring it into conformance with the covenants. Ellis did not allow Pfuhl to do so, however. Ellis sought instead to avoid the dilution of his control over RTC by pursuing a "bootstrap" budget, designed to resolve RTC's financial difficulties without bringing in additional equity investors.

Clark and Pfuhl opposed this approach and Pfuhl argued that it would result in a sharp decline in RTC's sales. In response to Ellis' refusal to raise additional equity, on November 11, 1991, all three of the

Not Reported in A.2d                                                           Page 19
Not Reported in A.2d, 1992 WL 345465 (Del.Ch.)
(Cite as: 1992 WL 345465 (Del.Ch.))

defendants proposed a leveraged buy-out of RTC through which they would acquire all of RTC's common stock from Ellis.    In the proposal Ellis would give up all of his stock in RTC in exchange for unguaranteed notes of RTC and no cash.    Ellis immediately and flatly rejected the offer, stating that he would not sell his company for less than $20 million (which on the evidence appears to be an absurdly high price)  About this same point in time, the file containing the non-competition agreements for RTC employees disappeared.

Additional conflicts arose between Ellis and his managers in October 1991 when a judgment of $900,000 was rendered against RTC in a personal injury case in New Jersey.    Clark and Pfuhl stated that RTC was obligated to inform Mellon Bank because the judgment would be considered an unusual event.    By late November, Clark refused to continue to give information to Mellon without also disclosing the judgment.    Ellis thought the judgment could be settled while the case was on appeal.    In addition, over the protests of Clark and Pfuhl, Ellis granted a request by Mellon for a third mortgage on RTC's building, in apparent violation of an order issued in the personal injury litigation prohibiting RTC from transferring its assets. [FN2] According to his personal notes from this point in time, Ellis began to view Clark as a loose cannon and a malicious person.

*5 Meanwhile, Ellis' relationship with Lozanoff was also deteriorating as the two clashed over the proper approach for RTC's sales efforts.   Lozanoff opposed Ellis' initiative to increase RTC's efforts to expand its base of end user customers, at the expense, in Lozanoff's view, of efforts to expand sales to distributors.    Lozanoff also believed that he was entitled to certain bonuses which were not paid to him.    In addition, it was Lozanoff who presented the idea of a management buy-out to Ellis, and Ellis may have resented the proposal.

By November 1991, Ellis began formulating plans to replace Pfuhl and Clark, and contacted a management recruiter to find replacements.    On January 31, 1992, Ellis fired Clark.    Shortly thereafter, Pfuhl and Lozanoff resigned their positions with RTC.

* * *

On March 6, 1992, approximately 5 weeks after Ellis terminated Clark's employment with RTC, defendants founded STSI.    Pfuhl was appointed STSI's

President; Clark became Chief Financial Officer and Lozanoff became Vice President for Sales and Marketing.    STSI sells the same type of products as those RTC markets.

On March 30, 1992, the defendants sent a letter to between 200 and 300 potential distributors and customers, including approximately 35 customers of RTC and RTC's largest customer, Vallen.   Lozanoff, or employees of RTC supervised by Lozanoff, had personal responsibility for handling these 35 customers.    In addition, Pfuhl contacted North Safety Products, a distributor of RTC products in Canada with whom Pfuhl worked closely, while he was employed at RTC.    The purpose of Pfuhl's contact with North Safety was to secure them, not as a distributor, but rather as a supplier, and STSI has in fact purchased inventory from North Safety.

Lozanoff and Pfuhl have communicated with some of RTC's suppliers and customers and conveyed information which may reflect negatively upon RTC. Specifically, the defendants have informed RTC's suppliers and customers that RTC is planning to change its marketing orientation from directing its efforts to serve distributors to attempting to serve end users.    Also, the defendants have informed other companies that RTC is in a weak financial condition.

Finally, Pfuhl has approached IKAR Gmbh, a German supplier with whom RTC has an exclusive distributorship.    Pfuhl himself negotiated RTC's distributorship with IKAR when he was serving as a senior officer of RTC.    IKAR, in response to Pfuhl's recent inquiries on behalf of STSI, has provided STSI with some sample items of safety equipment.

II.

This suit was filed on April 14, 1992.    In it RTC originally sought damages as well as an injunction preventing the defendants:  (1) from soliciting any RTC customers or suppliers, with whom the defendants, or those under their supervision, had contact during their employment with RTC, and (2) from tortiously interfering with each other's obligation to refrain from doing so. Following trial, however, RTC narrowed its request for injunctive relief on these claims to a subset of customers and suppliers that it claims are essential to its continued successful operation.    Nevertheless, RTC continues to seek monetary damages in the form of an accounting with regard to the defendant's solicitation of other RTC customers not on the shorter list, but

Not Reported in A.2d
Not Reported in A.2d, 1992 WL 345465 (Del.Ch.)
(Cite as: 1992 WL 345465 (Del.Ch.))

with whom the defendants dealt while they were at RTC. [FN3]   In addition, RTC seeks injunctive relief to prevent the defendants from continuing to solicit IKAR Gmbh.   Finally, RTC originally asserted a claim under the Delaware Uniform Trade Secrets Act, 6 Del.C. § § 2001-2009 (1990 Supp.), alleging that the defendants had misappropriated trade secrets of RTC.   RTC has since abandoned this claim after trial.

*6 The defendants have counterclaimed alleging that RTC has breached its employment contracts with each of them and seeking damages, including lost wages.   In addition, the defendants have counterclaimed under the Trade Secret Act seeking attorneys' fees on the grounds that RTC pressed its trade secret claim in bad faith.   There is no persuasive evidence of that assertion in the record, however, and that claim will hereby be dismissed.

### III.

Under early English common law, courts were hostile to employee covenants not to compete and regarded them as contrary to public policy.   *See Colgate v. Bacheler,* 78 Eng.Rep. 1097 (1596) (holding it unlawful "to restrain any [person] to use a lawful trade at any time or at any place").   *See also* Note, Enforceability of Contracts Not to Compete After a Term of Employment, 28 Col.L.Rev. 81, 82-83, n 19 (1928).   As Chancellor Wolcott noted in *Capital Bakers v. Leahy,* Del.Ch., 178 A. 648 (1935), however, by the early twentieth century it was "too well settled to be disputed" that an employee's non-competition agreement was "*not* void as against public policy, when the purpose of the agreement and its reasonable operation [was] to protect his employer from injury ...." *Id.* at 649.   The conditions on the enforceability of employee covenants not to compete which are applicable today have evolved and been refined from this basic principle.

In my view a request to specifically enforce an employee's covenant not to compete requires a two-step analysis.   First, the court must determine whether the non-competition agreement is itself valid and enforceable as a matter of contract law.   This determination initially involves the typical issues presented in any action for breach of contract such as "whether the promise was in fact made, whether it was supported by consideration ... [and] whether a material breach of the other party excuses performance." *McCann Surveyors, Inc. v. Evans,* Del.Ch., 611 A.2d 1, 3 (1987).   Assuming the

covenant is valid under ordinary contract principles, an agreement restricting competition will still be unenforceable, even at law, unless (1) its duration is reasonably limited temporally, (2) its scope is reasonably limited geographically, (3) its purpose is to protect legitimate interests of the employer, and (4) its operation is such as to reasonably protect those interests. *McCann Surveyors* at 3; *Knowles-Zeswitz Music, Inc. v. Cara,* Del.Ch., 260 A.2d 171 (1969).

If, after this first step is completed, the court concludes that the non-competition provision is valid, the covenant may be enforced by injunction, only if it meets certain additional conditions.   "[C]ovenants not to compete, when contained in employment agreements, will not be mechanically or automatically specifically enforced." *McCann Surveyors,* at 5.   The courts have recognized that a non-competition agreement may be valid,

> "but yet may not be specifically enforceable in the circumstances presented at the time of the application for enforcement.   Where a restriction on the ability to be gainfully employed is involved, the customary sensitivity of a court of equity to the particular interests affected by its remedies is heightened.

*7 *Id* at 3.   This second step requires the court to balance the equities to the end that,

> [i]f it appears that the interests the employer seeks to protect are slight or ephemeral while the consequences of specific enforcement to the employee are grave, equity may well leave the plaintiff to pursue his legal remedies and decline to grant the special remedy of injunction.

*Lewmor Inc. v. Fleming,* Del.Ch., C.A. No. 8355, Allen, C., slip op. at 5   (Jan. 29, 1986), *citing, Burris Foods v. Razzano,* Del.Ch., C.A. No. 1077, Walsh, V.C. (July 18, 1984). [FN4]

Plaintiff, of course, claims that all of those tests are satisfied in the evidence adduced at trial.   Defendants, on the other hand, advance a variety of arguments in support of their position that RTC should be denied enforcement of the non-competition agreements.   First, each of the defendants argues that their individual agreement is not a valid contract and cannot be enforced in the manner sought by RTC.   Pfuhl maintains that his agreement has terminated by its own terms.   Lozanoff takes the position that his agreement contains terms which allow the activities RTC seeks to have enjoined.   Clark claims that he never entered into any agreement.   *See infra* Part IV-A.   Secondly, defendants maintain that RTC

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 21
Not Reported in A.2d, 1992 WL 345465 (Del.Ch.)
(Cite as: 1992 WL 345465 (Del.Ch.))

cannot enforce these agreements because it has materially breached them: (1) with regard to Pfuhl and Lozanoff, by failing to grant them an opportunity to purchase equity in RTC; (2) with regard to Lozanoff, by failing to pay promised bonuses; (3) with regard to all defendants, by breaching the implied covenant of good faith and fair dealing contained in all three agreements, by discharging them for wrongful reasons. *See infra* Part IV-B. Thirdly, defendants argue that the agreements are unenforceable because they are not reasonably limited in time, geographic scope, and in the type of activities which they restrict. *See infra* Part V. Finally, the defendants maintain that RTC cannot enforce any of these agreements by means of an injunction because such enforcement is inequitable in that the defendants' activities pose little threat to RTC while they provide an income for the defendants. *See Infra* Part VI. I turn now to a detailed discussion of each of the defendants' positions.

IV.

A. The Validity of the Agreements Under General Contract Law

I find that each of the defendants is a party to a non-competition agreement that is a valid contractual obligation. These restrictive covenants are reasonably fitted in terms of the duration and extent of the restriction to protect a valuable interest of the employer. All three agreements are identical with the exception of the amendment made by Lozanoff to his agreement.

(1) *Henry Pfuhl* asserts that an alleged resignation from his position as a vice president, in June of 1989, terminated his original employment contract, and thus terminated his obligations under the non-competition agreement he signed when he joined RTC. I find that although Pfuhl did tender his resignation, he never actually terminated his employment with RTC and in fact was promoted. The modified terms of his employment were not put in writing until later, but at all times the parties acted on the understanding that the non-modified terms of the employment contract remained in place. The later signing of the agreement containing the restrictive covenant demonstrates that fact.

*8 (2) *Mr. Lozanoff* concedes that he signed a valid contract not to compete with RTC. He argues, however, that RTC has materially breached that contract and that he has not violated its terms,

because of the amendment he inserted in the agreement before signing it.

Before signing his non-competition agreement, Mr. Lozanoff inserted additional language, underlined below, into paragraph 1, which as modified reads:

To protect valuable trade secrets, proprietary information and confidential information, ... Employee: (i) shall not, on his own behalf or on behalf of any competitor of RTC, directly or indirectly, engage in the business of selling, soliciting, purchasing or promoting the sale of any products which compete with RTC's *products at time of termination* to or from any person, firm, partnership, corporation, or institution of any kind, which employee had dealt with, called upon, solicited, sold to, or purchased from, either personally or through co-employees that he supervised....

(PX 135). Lozanoff maintains that the language he inserted means that he is free to compete with RTC by selling new products that by definition, did not compete with RTC at the time of termination. Moreover, he says much of STSI's product line is made up of such new products. I need not decide whether STSI's product line is new in this sense, since I do not interpret this interlineation in the way that Mr. Lozanoff suggests. Rather, the contract plainly means that he is restricted from dealing with RTC customers in conjunction with any RTC "products [existing] at the time of [his] termination." The proscribed competition may be from a new product or an old product, the contract does not distinguish.

(3) *Mr. Clark* denies ever signing any non-competition agreement. There is, however, substantial evidence to support the conclusion that in fact he did sign one. Clark's job offer letter from RTC states that he must sign a non-competition agreement upon the commencement of his employment. Edie Hazeltine, Ellis' administrative assistant at that time and an RTC employee, testified that in October 1991 she received a copy of the agreement signed by Clark for Ellis' signature.

A cover memorandum written by Ms. Hazeltine to Dee Sawicz, another RTC employee, and dated October 8, 1991, states:

I am returning the attached non-competition form that was completed by William Clark.... Please see that two additional non-compete agreements are signed by Bill as soon as possible.

(PX 87). The recipient of this memorandum, Dee

Not Reported in A.2d
Not Reported in A.2d, 1992 WL 345465 (Del.Ch.)
**(Cite as: 1992 WL 345465 (Del.Ch.))**

Sawicz, testified at trial that she never saw an agreement signed by Clark. However, Ms. Sawicz responded to the memorandum purporting to transmit the non-competition agreement without questioning Ms. Hazeltine regarding the whereabouts of the Clark agreement it describes. After weighing the conflicting evidence, I conclude that RTC has proven by the preponderance of the evidence that Clark did sign a non-competition agreement on the standard form used by RTC for this purpose.

*9 All three of these non-competition agreements were assented to by the three defendants, and supported by adequate consideration in the form of the employment or continued employment the defendants received from RTC. All three of the defendants were at will employees. It appears to be the law that the retention of an employee at will, in exchange for a covenant not to compete with the employer, constitutes consideration sufficient to support contractual obligations. *Research & Trading Corp. v. Powell*, Del.Ch., 468 A.2d 1301, 1305 (1983).

B. Affirmative Contract Defenses

All three defendants argue that RTC cannot now seek enforcement of the non-competition agreements because it has materially breached their employment contracts. These alleged breaches fall into two broad categories: (1) breaches of express promises in each defendant's contract of employment and (2) conduct by RTC and Ellis which defendants argue amounts to a breach of the implied covenant of good faith and fair dealing.

1. *Alleged Breaches of Express Contractual Obligations*

(a) Stock purchase rights

Defendants received, from Ellis and RTC, representations that they would be afforded opportunities to purchase RTC stock after they had worked at the Company for a period of time. In the case of Mr. Clark, for example, that representation came in a letter inducing him to accept employment:
> As the Chief Financial Officer you will be given a chance for equity and the terms will be detailed when the opportunity arises. This usually occurs after one year's service for this position.

It is undisputed that no program to facilitate stock

ownership was put in place by the time the defendants left RTC. The record indicates that the defendants, Ellis, and Ellis' lawyer Mr. Scari, engaged in discussions concerning equity ownership for the defendants by means of a vesting mechanism, and that the defendants expressed a desire to obtain stock without paying cash.

I cannot conclude, however, that in these circumstances, this delay in putting into effect an employee stock ownership plan as envisioned by the parties constitutes a material breach of the defendants' employment contracts. Pfuhl worked at RTC for approximately three years and Lozanoff for approximately two years. Both were told that they would have the opportunity to purchase equity, at book value, [FN5] after being employed by RTC for 12 months. They were not promised an opportunity to be given stock. The details of a plan that would provide an opportunity to buy stock were left for future negotiation.

The record is unclear and contradicted concerning why the efforts to negotiate the terms of an employee incentive stock ownership plan were not completed. Defendants did not want to expend cash for the acquisition of RTC stock, nor did they want any plan that would result in a current tax liability for them in connection with any acquisition of RTC stock. RTC's lawyer was assigned the task to try to propose a plan. After he met with Pfuhl & Lozanoff, the project moved slowly. The lawyer asserted that it did so because he was awaiting the development of performance criteria by Mr. Pfuhl.

*10 The evidence will not support the conclusion, in my opinion, that Ellis was proceeding in bad faith in pursuing this open item nor that he misrepresented his present intention at the time of contracting. The parties had not yet come to agreement on this point. In this respect at least, I conclude that RTC's failure to arrange a program permitting defendant to buy stock did not constitute a material breach of the employment contract that excused compliance with the non-competition provision.

(b) Bonuses for Lozanoff

Defendant Lozanoff alleges that RTC has breached its employment contract with him by failing to pay him bonuses in 1990 and 1991 which he was promised when he accepted a position with RTC. RTC contends that it promised to pay a bonus to

Not Reported in A.2d                                                              Page 23
Not Reported in A.2d, 1992 WL 345465 (Del.Ch.)
(Cite as: 1992 WL 345465 (Del.Ch.))

Lozanoff in 1990 alone, and only if RTC achieved certain performance criteria. RTC maintains that Lozanoff did not receive a bonus because the performance criteria were not met.

Lozanoff claims that these performance criteria were in fact set during a discussion that he had with Pfuhl sometime during the first four weeks of his employment at RTC. No document, however, records the establishment of the alleged performance criteria. Neither the Board nor Dr. Ellis was ever informed of any such discussion between defendants. Bonuses for RTC employees were, however, discussed at a meeting of the RTC board on February 27, 1990. Pfuhl attended that meeting. At that time the Board resolved that no bonuses would be paid for that year unless RTC's net income exceeded $200,000. Since this performance goal was not met, no bonuses were paid to RTC personnel for services rendered in 1990. Thus, I conclude that the fact that no bonus was paid to Lozanoff in 1990 was not a breach of his employment contract.

   *2. Alleged Breaches of the Implied Covenant of Good Faith*

The defendants allege that Ellis fired Clark, and forced Pfuhl and Lozanoff to resign, because they refused to cooperate with an allegedly fraudulent scheme to deceive Mellon Bank concerning the financial condition of RTC, and the diversion of RTC revenue to DSC. In Delaware it appears to be the case that an employee at will is subject to termination with or without cause. *Gaines v. Wilmington Trust Co.*, Del.Super., C.A. No. 90C-MR-135, Del Pesco, J., slip op. at 3 (June 3, 1991), *citing, Heideck v. Kent General Hosp., Inc.*, Del.Super., 446 A.2d 1095 (1982). All defendants in this action were at will employees and therefore, standing alone, their termination does not constitute a breach of their employment contracts.

Nevertheless, even an at will employment contract contains an implied covenant of good faith and fair dealing. *See Merrill v. Crothall-American, Inc.*, Del.Supr., 606 A.2d 96, 101 (1992). Therefore, the termination of an at will employee, in violation of an obligation of good faith and fair dealing, will constitute a breach of the employee's employment contract, and may entitle the employee to damages. [FN6] Plainly the circumstances in which an at will employee is terminated may have a vital bearing upon the question whether a covenant against future competition will be specifically enforced.

*11 In this case, however, the defendants have failed to prove that Ellis fired Clark in retaliation for his refusal to make misrepresentations to Mellon Bank. The record amply reflects Ellis' general dissatisfaction with Clark and their numerous clashes. While some of these clashes surrounded what disclosures should properly have been made to Mellon Bank, I conclude, based on the record evidence, that Ellis' dismissal of Clark was not motivated by any improper purpose, but represented the termination of an employee whose relationship with Mr. Ellis had degenerated beyond repair. As such, Ellis' discharge of Clark did not violate Clark's employment agreement.

Pfuhl and Lozanoff resigned voluntarily, but these defendants have alleged that in fact they were constructively discharged by Ellis for wrongful reasons. This allegation is not supported by the record evidence. The evidence demonstrates that Ellis was at odds with Pfuhl and Lozanoff repeatedly during their tenure at RTC. The evidence leads me to conclude that the defendants resigned because they believed that Ellis was on the verge of either firing them or taking other unfavorable action. In fact he probably was on the verge of such action. The effort to remove Ellis from the company with no cash payment was itself either a symptom or conclusive evidence of a complete breakdown in that degree of mutual respect among senior employees that seems essential for success in a small enterprise. Ellis' motivations do not appear to me to have been improper and thus his actions violated no implied covenant of good faith and fair dealing. Therefore, I conclude that the firing of Clark and the actions taken or threatened by Ellis, which may have induced Lozanoff and Pfuhl to resign, did not amount to a breach of RTC's employment contracts with the defendants.

                              V.

Reasonableness Of The Restrictions On Competition
Although the non-competition agreements are valid contracts, they will not be enforceable unless the following requirements are met: (1) their duration is reasonably limited temporally, (2) their scope is reasonably limited geographically, (3) their purpose is to protect legitimate interests of the employer, (4) their operation is such as to reasonably protect those interests. *McCann Surveyors* at 3; *Knowles-Zeswitz, supra*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 24
Not Reported in A.2d, 1992 WL 345465 (Del.Ch.)
**(Cite as: 1992 WL 345465 (Del.Ch.))**

*1. Time*

The non-competition agreement is only of one year duration.    This is plainly reasonable in the circumstances. [FN7]

*2. Geographic extent*

A non-competition agreement will only be enforced over a geographic area that is reasonable under the circumstances.    Thus, in *Knowles-Zeswitz,* a case involving a local music store, the court limited the enforcement of an employee's non-competition agreement, which, as written, prohibited the employee from competing within 100 miles of Wilmington, Delaware, to bar the defendant only from soliciting his former customers within the much smaller area of New Castle County, Delaware.    *Knowles-Zeswitz, supra,* at 175-76.

*\*12 While most judicial opinions regarding the reasonableness of the geographic extent of employee non-competition agreements speak in terms of physical distances, the reality is that it is the employer's goodwill in a particular market that is entitled to protection.    If this market, or more accurately, the employer's customer base, extends throughout the nation, or indeed even internationally, and the employee would *gain from the employment* some advantage in any part of that market, then it is appropriate that an employee subject to a non-competition agreement be prohibited from soliciting those customers on behalf of a competitor regardless of their geographic location.

The employment agreements in issue contain no geographic limitation on the obligation of the defendants not to solicit customers and suppliers of RTC with whom they or their subordinates had contact.    Given the broad distribution of RTC's customers geographically, however, and the limited nature of relief sought by RTC, it is not unreasonable to restrict defendants from dealing with RTC's customers wherever located. *Weiss & Assoc., Inc. v. Weiderlight,* Conn.Supr., 546 A.2d 216, 220-21 (1988) (finding a bar on soliciting a former employer's customers to be reasonable despite lack of geographic limitation), *citing, Tuttle v. Riggs-Warfield-Roloson, Inc.,* Md.Supr., 246 A.2d 588 (1968), *see also Chapman & Drake v. Harrington,* Me.Supr., 545 A.2d 645, 648 (1988); Restatement (Second) of Contracts § 188 (1981) (Illustration 11).

*3. Purpose and Operation*

A non-competition agreement will only be enforced to protect the legitimate economic interests of the employer.    Interests which the law has recognized as legitimate include protection of employer goodwill and protection of employer confidential information from misuse.    The former of these interests is principally implicated in this case.

Courts have long recognized that an employer has an interest in the goodwill created by its sales representatives and other employees, which is vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs.    In *Knowles-Zeswitz,* this Court noted that:

> [r]easonable protection for an owner of a decentralized business is necessary because the former employee has had an opportunity to develop economically valuable relationships with his former employer's customers ...

*Knowles-Zeswitz, supra,* at 175.    In recognition of the employer's right to preserve its customer relationships from misappropriation, this court has repeatedly enjoined former employees from dealing with the customers of their former employers with whom the employee had contact. [FN8]

In this case, RTC has a legitimate interest in protecting from misappropriation the goodwill that, through its employees, it has created.    The relief that RTC has requested (that the defendants be enjoined from dealing with a list of key RTC customers) is no broader than necessary to protect these interests.

*\*13 The granting of this relief would leave the defendants free to solicit any of the other potential purchasers in the country, including two of the top three distributors of fall hazard abatement equipment in the U.S.    Thus, the operation of this agreement is such as to protect the legitimate interests of RTC without placing unreasonable restrictions on the defendants.    The non-competition agreements therefore satisfy the requirements for validity in that they operate reasonably to protect the legitimate interests of the plaintiffs.

VI.

Equitable Considerations

Having    concluded    that    the    non-competition agreements are valid, I now turn to an examination of

equitable considerations raised by the request to specifically enforce these provisions. This analysis involves balancing the interests sought to be protected by plaintiff, RTC, against the injury that injunctive relief would cause to the individual defendants.

Plaintiff is seeking narrow injunctive relief: to prevent defendants from soliciting identified, important customers, with whom defendants have had contact. The granting of this relief would leave the defendants free to solicit much of the relevant market. The defendants' marketing activities threaten valuable customer relationships which the defendants cultivated for RTC while in its employ. This court recognizes that such relationships should be protected from interference by the former employees who created them. *Hammermill*, slip op. at 11-12.

Defendants urge that their enterprise, STSI, is quite small and thus poses little threat to RTC. They assert that the relief would afford plaintiff little but could put STSI out of business. I accept neither element of this assertion. The requested injunctive relief would not bar the defendants from the industry, but would instead leave them free to pursue any potential customers who were not serviced by them or their subordinates while they were employed by RTC. Included among those whom the defendants would be free to solicit are two of the three largest distributors of fall hazard abatement equipment in the U.S. [FN9]

Thus, I find that the employer's interests in this case, rather than being "slight or ephemeral" are, on the contrary, weighty and worthy of the court's protection. In addition, the harm which granting the requested injunctive relief would do to the defendants is far from grave.

Therefore, a balancing of the equities in this case reveals no reason why the plaintiff should be denied the narrow injunctive relief which it has requested. The requested relief protects the legitimate rights of the plaintiff without unduly harming the defendants and their new enterprise.

The defendants claim that RTC is guilty of inequitable behavior, and thus should be denied injunctive relief in keeping with the ancient maxim that "[H]e who seeks equity must come into court with clean hands." *Cook v. Fusselman*, Del.Ch., 300 A.2d 246, 251 (1972), *citing*, Pomeroy on Equity Jurisprudence, (Fifth Ed.) § 400. While it is true

that equity may decline to assist a party seeking to enforce a contract that is unconscionable and the result of sharp and predatory practices, *Ryan v. Weiner*, Del.Ch., 610 A.2d 1377 (1992), the record in this case discloses no fraud, overreaching, or other inequitable conduct on the part of RTC. RTC is seeking enforcement of its agreements only to a limited extent necessary to protect its interests and not to the full letter of the contracts. RTC ought not be denied equitable relief on the basis of this defense. [FN10]

VII.
Tortious Interference With Contractual Relations Claims
A. Each Defendant with each other defendant's contract

*14 The elements of the cause of action for tortious interference are: "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury." *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, Del.Ch., 532 A.2d 983, 992 (1987), *citing, Pennzoil Oil Co. v. Getty Oil Co.*, Del.Ch., C.A. No. 7425, slip op. 42-43, Brown, C. (Feb. 6, 1984). Plaintiff has not shown by a preponderance of the evidence that any act by one of the defendants was a significant factor in occasioning the breach of covenant by any other defendant. That is, one cannot say that the complained of conduct of any one defendant would not have happened but for the actions of any other of them. Therefore this claim is dismissed.

B. IKAR Gmbh

RTC also asserts claims for tortious interference with its exclusive distributorship with IKAR Gmbh.

RTC has established that it has a contract for an exclusive distributorship with its German supplier IKAR Gmbh. The defendants were aware of this contract through their previous employment with RTC. The defendants admit that they have attempted to induce IKAR to violate this contract by becoming a supplier to their new venture, STSI. The defendants have failed to provide any satisfactory justification for their actions. RTC, however, has not shown any special injury from this conduct.

The defendants have stated that they intend to refrain

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

from further dealings with IKAR until the term of their non-competition agreement has expired. Nevertheless, where the defendants have already once induced IKAR to violate its exclusive distributorship, it is appropriate for the court to hold defendants to their word through the device of an injunction. The defendants will therefore be ordered to refrain from seeking to become a distributor of IKAR until a date one year after the effective date of the order entered on this opinion.

### VIII.
#### Plaintiff's Claim for Attorneys' fees

Plaintiff claims the right, under its contracts with defendants, to be reimbursed for the reasonable costs of prosecuting this action, particularly attorneys' fees. Each contract contains the following provision:

It is hereby expressly agreed that if any ... suit is brought against Employee ... by RTC to enforce this agreement and if RTC shall recover a judgment in any sum or obtain an injunction of any kind against Employee, RTC shall recover its reasonable counsel fees from Employee.

Generally, of course, the practice in this country is for each side to bear its own litigation costs. The rule, however, is not universal and it is recognized that such fees may be shifted by statute, by contract or, in some circumstances, pursuant to Court rule. With respect to contracts it is settled that a provision by which one party undertakes to pay counsel fees of the other in the event of his own breach is not void as against public policy. *In re Ebert,* 140 F.Supp. 597 (D.Del.1956) *citing, Petition of Warrington,* Del.Supr., 179 A. 505 (1935); *Clark v. Equitable Life Assurance Soc.,* Del.Supr., 316 A.2d 554, 555 (1974). While no Delaware case has been found in which a fee shifting provision in an employment contract has been directed against an employee, [FN11] cases in other jurisdictions have enforced such provisions in this way. *See Hill, Rogal & Hamilton Agency, Inc. v. Reynolds,* Ohio App., 1992 WL 131420, 1992 Ohio App. Lexis 2952 (June 10, 1992); *Townsend v. Collord,* Tex.Civ.App., 575 S.W.2d 422 (1978).

**\*15** The special context of an employment contract may be thought to raise special concerns. Employees as a class may be thought to lack bargaining power *vis a vis* their employers and thus the enforcement of a provision shifting legal fees in an employment contract may, at least in some cases, offend the policy of the law that has sought to permit necessitous

persons to avoid oppressive bargains that were forced upon them. [FN12]

This case, however, does not involve unsophisticated or especially necessitous workers, but educated business managers. Their employment contract contains a valid provision with respect to counsel fees; no legal principle has been advanced by them that would, in the circumstances, justify the non-enforcement of that provision. In so concluding, I assume that defendants subjectively believed themselves free to solicit business from RTC customers with whom they had dealt on RTC's behalf. Thus, I do not suppose that their actions were taken in bad faith. But while malicious infliction of competitive injury may itself justify the recovery of legal fees as damages (*see* 2 Callmann Unfair Competition, Trademarks and Monopolies § 9.20 (4th ed.1992)) a valid contract provision contemplating the conditional shifting of counsel fees is not defeated by the fact that the losing and thus liable party was proceeding under a colorable theory of law or fact.

The record does not permit a determination of the amount of legal fees that would be reasonable in this instance. Nor could it since those costs continue to accrue with the proceeding. Thus, it is possible now to rule only on the question of legal entitlement. Entry of a final order will thus have to await supplementation of the record on this point. [FN13]

Given the apparently limited resources of defendants, it is with reluctance that I conclude that they are liable for plaintiff's reasonable counsel fees. But the sentiments of the court do not present a basis to deny to plaintiff its contracted for right where, as it appears here, plaintiff itself has acted reasonably and not oppressively in bringing the suit and the clause sought to be enforced creates a legal and not an equitable remedy.

### IX
#### Defendants' Counterclaims for Breach of Contract and for Attorneys' fees Under
#### 6 Del.C. § 2004

The defendants have advanced counterclaims against RTC for alleged breaches of their employment contract with RTC, and seeking damages in the form of lost wages and benefits which the defendants would have earned had they not been constructively discharged. In light of the conclusions stated above, namely that RTC has not materially breached its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1992 WL 345465 (Del.Ch.)
(Cite as: 1992 WL 345465 (Del.Ch.))

employment contracts with the defendants, these counterclaims for breach of contract are hereby dismissed.

RTC has pursued, throughout this litigation until the end of trial, a claim against the defendants for alleged violation of the Delaware Uniform Trade Secret Act, 6 Del.C. § § 2001-2009 (Supp.1990). However, after trial was concluded, RTC dropped this claim. The defendants now seek, pursuant to 6 Del.C. § 2004, an award of the attorneys' fees they were required to pay in defense of the Trade Secret Act claim. Section 2004 states, in relevant part, that "[i]f a claim of misappropriation is made in bad faith ... the court may award reasonable attorneys' fees to the prevailing party." 6 Del.C. § 2004.

*16 The record in this case reveals that, although RTC abandoned its trade secret claims after the end of trial, it was in fact a colorable claim. There is nothing in the record, other than the bare allegation made by the defendant, to support the finding that this claim was made in bad faith. In light of the technical nature of the plaintiff's business and its dependance upon intellectual property, the trade secret claims had some force and were not in my opinion advanced in bad faith. In any case, the Trade Secret Act leaves the issue of whether to award attorneys' fees to the sound discretion of the court. I find that this is not a case in which such an award of fees would be appropriate. The defendants' counterclaim is therefore dismissed.

* * *

It is not possible now to enter a final decree with respect to all elements of the case. Specifically the amount of plaintiff's reasonable attorneys' fees cannot be determined on this record. The entry of a preliminary injunction precluding defendants from dealing with identified RTC customers protects the central rights of plaintiff, in the meantime. The question of attorneys' fees may be resolved by the filing in this case of a petition for the award of attorneys' fees together with an affidavit describing the basis for the application made. Defendants may then move for such discovery falling within the test of Rule 26(b) they deem advisable, and may thereafter, in all events, submit such writing opposing the application as they wish, including an application for an evidentiary hearing if one appears necessary to determine whether plaintiff's legal actions were reasonable at each stage of the proceeding.

FN1. The Lozanoff covenant was modified slightly, as discussed below.

FN2. The judgment was finally disclosed to Mellon in late December or early January after it had been settled.

FN3. No evidence upon which a damage award could be predicated was presented at trial. Plaintiff had available the procedures contemplated by the Rules of the Court of Chancery which are wholly adequate to uncover such evidence as may exist of sales made by STSI to any customer that RTC might claim is covered by its covenant. See note 9 infra.

FN4. See also Take-A-Break Coffee Service, Inc. v. Grose, Del.Ch., C.A. No. 11217, Jacobs, V.C. (May 14, 1990); Merrill Lynch Pierce, Fenner & Smith v. Price, Del.Ch., C.A. No. 11097, Allen, C. (Sept. 13, 1989).

FN5. The price for Pfuhl was to be book value as of the end of 1988 and for Lozanoff the book value at the end of 1989. (DTX 53, 63).

FN6. See, e.g., Magnan v. Anaconda Industries, Inc., Conn.Super., 429 A.2d 492 (1980), rev'd on other grounds, Conn.Supr., 479 A.2d 781 (1984) (firing employee in retaliation for refusal to sign untrue statement concerning a theft violated good faith); Fortune v. National Cash Register Co., Mass.Supr., 364 N.E.2d 1251 (1977) (firing salesman to prevent him from receiving earned commissions violated good faith); Monge v. Beebe Rubber Co., N.H.Supr., 316 A.2d 549 (1974) (firing employee for resisting sexual harassment violated good faith).

FN7. See, e.g., Knowles-Zeswitz, at 175; Faw, Casson & Co. v. Cranston, Del.Ch., 375 A.2d 463 (1977) (enjoining employee defendants from competing for in excess of one year); Hammermill Paper Co v Palese Del.Ch., C.A. No. 7128, Longobardi, V.C. (June 14, 1983); Merrill Lynch, (upholding one year bars against competition).

FN8. See, e.g., Hammermill, at 16; Wood v

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 28
Not Reported in A.2d, 1992 WL 345465 (Del.Ch.)
(Cite as: 1992 WL 345465 (Del.Ch.))

*Clark,* Del.Ch., C.A. No. 883-K, Allen, C. (Jan. 21, 1986); *John Roane, Inc. v. Tweed,* Del.Supr., 89 A.2d 548 (1952) (applying Maryland law); *Faw Casson & Co.; Custom Video v. N.A. Video,* Del.Ch., C.A. No. 9261, Hartnett, V.C. (Sept. 25, 1987) (applying New Jersey law); (all granting injunctions ordering employees not to solicit the business of their former employer's customers).

FN9. Moreover, even if the relief were fatal to STSI, defendants all have general business skills and were previously employed in various businesses prior to their employment with RTC. Therefore, this is not a case in which the granting of the requested injunctive relief will make it difficult or impossible for the defendants to earn a livelihood by pursuing their professions.

FN10. Plaintiff seeks to have the court retain jurisdiction to enforce possible future actions in which damages from the breach proven might be shown. I decline to do so. One trial has been held. Broad discovery rights were afforded to plaintiff, it was in a position to prove any damages that may have occurred at least up to the filing of the complaint. It has not attempted to do so. Other courts may have to decide the *res judicata* affect of this judgment, but I will not retain jurisdiction in this matter and postpone indefinitely the entry of a final judgment.

FN11. *See Lasher v Intercontinental Biologics, Inc.,* Del.Ch., C.A. No. 950, Brown, C. (June 14, 1984) (employee liable for plaintiffs legal fees). *Compare* 25 *Del.C.* § 6102 (1991) (declaring unenforceable, agreements and leases under which a residential tenant undertakes to pay a landlord's attorney's fees).

FN12. *See, e.g., Henningsen v. Bloomfield Motors, Inc.,* N.J.Supr., 161 A.2d 99 (1960) (refusing to enforce contract under which automobile dealer sought to avoid warranty liability for defective car, where purchaser due to vastly inferior bargaining power, had no true choice); *Williams v. Walker-Thomas*

*Furniture Co.,* 350 F.2d 445 (D.C.Cir.1965) (refusing to enforce unconscionable installment purchase contract under which no property purchased from seller over a period of years was considered fully paid unless all amounts on all items were fully paid).

FN13. I will, however, not permit supplementation of the record with respect to damages otherwise than with respect to attorneys' fees.

Not Reported in A.2d, 1992 WL 345465 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.