

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
TRISTATE COURIER AND CARRIAGE, INC.,
Plaintiff,
v.
Jeff BERRYMAN, Blue Chip Logistics, LLC, Blue Marble Logistics, L.L.C., Dan Boylan, and William McGivney, Defendants.
No. C.A. 20574-NC.

Submitted Dec. 30, 2003.
Decided April 15, 2004.

William E. Manning, and Brian E. Farnan, of Klett Rooney Lieber Schorling, Wilmington, Delaware, for Plaintiff.

William W. Erhart, of William W. Erhart, P.A., Wilmington, Delaware, for Defendants Blue Chip Logistics, LLC and William McGivney.

Stephen E. Jenkins, and Richard L. Renck, of Ashby & Geddes, Wilmington, Delaware, for Defendants Jeff Berryman, Blue Marble Logistics, LLC and Dan Boylan.

MEMORANDUM OPINION

NOBLE, Vice Chancellor.

*1 Plaintiff TriState Courier and Carriage, Inc. ("TriState") seeks a permanent injunction against Defendant William McGivney ("McGivney") for breach of a covenant not to compete (the "Covenant") contained in a stock purchase agreement, dated May 2, 2003, between McGivney and TriState (the "Stock Purchase Agreement"). [FN1] TriState also brings a claim of fraud against McGivney, alleging that he intended to breach the Covenant at the time he entered into it. Furthermore, TriState seeks a permanent injunction against Defendants Blue Chip Logistics, LLC ("Blue Chip"), Blue Marble Logistics, LLC ("Blue Marble"), Jeffrey Berryman ("Berryman"), and Daniel Boylan ("Boylan"), contending that they intentionally interfered with the Covenant. Finally, TriState asserts that Blue Marble, Berryman, Boylan, and McGivney engaged in a civil conspiracy against it. [FN2]

FN1. PX-1.

FN2. Although TriState, in its Complaint, sought damages, it did not pursue that claim at trial.

In this post-trial memorandum opinion, I conclude that McGivney breached the Covenant and enjoin him from taking further actions in breach of the Covenant. Because I find McGivney used Blue Chip as his alter ego in breaching the Covenant, I also enjoin Blue Chip from breaching the Covenant by competing with TriState. In addition, I find that Blue Marble's and Boylan's participation with McGivney in luncheon meetings during which customers of TriState were solicited amounted to intentional interference with contract. As a result of this finding, I enjoin Blue Marble and Boylan from performing services for certain business entities for the duration of the Covenant. Finally, I find that TriState has shown that Blue Marble, Berryman, Boylan, and McGivney engaged in a civil conspiracy.

I. FACTUAL FINDINGS [FN3]

FN3. Although most of the Court's findings of fact are contained in this section of the opinion, some factual findings are set forth during the analysis of the various issues addressed.

A. *TriState, Its Relationship with McGivney, and the Stock Purchase Agreement*

TriState's origins are in a company called SH Deliveries. In 1993, Allen Duff ("A.Duff") acquired TriState from SH Deliveries. [FN4] At that time, the emphasis of TriState's business was in couriering-that is, TriState transported documents from one law firm

to another. [FN5]

> FN4. Trial Tr. at 6
>
> FN5. *Id.* at 7.

In June 1994, TriState hired McGivney as its president and he became a 35% owner of the company. [FN6] McGivney's responsibilities included "sales, marketing, overseeing personnel, talking to clients if any problems arose, insurance issues, ... leases, and the daily running of the company." [FN7] During his employment, McGivney was subject to a covenant not to compete. [FN8]

> FN6. *Id.* at 14, 300. McGivney did not invest any money in TriState or otherwise pay for this ownership interest. *Id.* at 14.
>
> FN7. *Id.* at 300.
>
> FN8. DX-1 (McGivney) ¶ 12.

On March 7, 2003, McGivney was terminated as TriState's president. McGivney was informed of his termination during a telephone call with A. Duff and A. Duff's son, Bruce Duff ("B.Duff"). [FN9] Although McGivney was no longer an employee of TriState, he still held a 35% equity stake in the company. Due to this awkward situation, A. Duff presented McGivney with three options: (a) remain a 35% stockholder of TriState; (b) take TriState's commercial accounts and enter into a mutual noncompetition agreement with TriState in which TriState would agree not to service the commercial customers and McGivney would agree not to service TriState's law firm clients; [FN10] or (c) sell his shares back to TriState. [FN11] McGivney took the third option and entered into the Stock Purchase Agreement. [FN12]

> FN9. Trial Tr. at 16-18. There is dispute among the parties over whether this termination was warranted or predictable, or even if it was in violation of McGivney's employment agreement. Those questions are not posed in this action.
>
> FN10. The "commercial" customers are non-law firm courier service customers.
>
> FN11. *Id.* at 17-18.

> FN12. Following McGivney's sale of his TriState stock, the Duff family continued to hold the majority interest in TriState.

*2 According to the terms of the Stock Purchase Agreement, McGivney was to receive a total of $150,000 for his shares of TriState: $100,000 up front, and $25,000 on both August 1 and December 1, 2003. [FN13] The Covenant, contained in the Stock Purchase Agreement, provides:

> FN13. PX-1 ¶ 2.2 & ex. A.

6.4 *Covenant Not to Compete.* In consideration of the Purchase Price and for a period of two (2) years from and after the Closing Date, the Seller shall not, directly or indirectly, whether alone or with any other person or entity (i) offer, sell or otherwise provide any services substantially similar to those services offered by the Company to any person or entity located within the geographic region in which the Company conducts its business or has conducted its business within the 3 year period prior to the Closing Date, (ii) solicit, or assist in the solicitation of, any person or entity who is or has been a customer of the Company for the purpose of selling such person or entity goods or services identical to or reasonably substitutable for the Company's goods or services or (iii) solicit, or assist in the solicitation of, any person employed or engaged by the Company in any capacity (including, without limitation, as an employee or independent contractor), to terminate such employment or other engagement, whether or not such person is employed or engaged pursuant to a contract with the Company and whether or not such person is employed or otherwise engaged at will. [FN14]

> FN14. *Id.* ¶ 6.4.

Thus, upon entering into the Stock Purchase Agreement, McGivney made three promises, lasting for a period of 2 years. First, he promised not to provide any services *substantially similar* to those offered by TriState within the geographic region in which TriState conducts its business. [FN15] Second, he promised not to solicit, or assist in the solicitation of, any customer of TriState for the purpose of offering services *reasonably substitutable* for TriState's services, whether or not within the geographic region TriState conducts its business. Third, McGivney promised not to solicit, or assist in

the solicitation of, any person employed by TriState. [FN16] The first two promises beg the question: what services did TriState offer?

> FN15. TriState's principal place of business is in Wilmington, Delaware.
>
> FN16. McGivney also committed not to do indirectly that which he could not do directly.

B. *Services Offered by TriState*

All parties agree that TriState is engaged in the courier business. [FN17] The emphasis of TriState's business is transporting documents for law firms. [FN18] TriState also provides this service for hospitals, a local pharmacy chain, and various printing companies. [FN19] Furthermore, TriState also performed legal research services for its customers. [FN20]

> FN17. See Pl.'s Post-Trial Br. at 3; Post-Trial Br. of Defs. Jeff Berryman, Blue Marble Logistics, LLC, & Dan Boylan at 4; *see also* Trial Tr. at 7 (A. Duff noting, "Basically [TriState] is a courier company.").
>
> FN18. Trial Tr. at 7.
>
> FN19. *Id* at 17.
>
> FN20. *Id* at 37.

What is at issue is whether TriState provided copying services or the moving of large packages long distances (which may be viewed by some as "freight forwarding").

TriState submitted a series of five invoices for copying services which it provided to Richards Layton & Finger ("RLF"), a law firm in Wilmington, Delaware. [FN21] These invoices show that from January through March 2003, TriState billed RLF $25,426.96 for copying services. [FN22]

> FN21. PX-2.
>
> FN22. *Id*

*3 The Defendants contend that, although TriState performed these services, they are more fairly characterized as single-event occurrences, and not truly a part of the services TriState provided at that time. Specifically, they point to the fact that the copying work evidenced by those five invoices was outsourced to Digital Legal Services ("DLS"), a company owned primarily by B. Duff. They further note that TriState did not have a separately equipped and staffed copying center and had only a general office copier in its office. The Defendants also point to B. Duff's testimony that TriState does not compete with DLS, which was actively engaged in the copying business. [FN23] Thus, the Defendants argue that, since DLS is in the copying business and TriState does not compete with DLS, TriState therefore cannot be engaged in the copying business. [FN24]

> FN23. Trial Tr. at 231.
>
> FN24. An admittedly troubling aspect of this case is the perception that B. Duff is using his relationship with TriState to prevent Blue Marble from competing with DLS in the copying business.

For purposes of assessing the applicability of the Covenant, however, the Court need only determine whether TriState *offered* copying services. [FN25] It is quite clear that TriState offered copying services at the time of the Stock Purchase Agreement. Regardless of whether or not the copying service was outsourced, it was TriState which owed the duty to the customer. The invoices are TriState invoices. [FN26] Indeed, McGivney testified that these invoices were the result of an agreement between TriState and RLF. [FN27] Furthermore, TriState was to receive 10% of the amount invoiced to RLF for its services. [FN28] Given these facts, the Court can only conclude that TriState offered copying services.

> FN25. *See* PX-1 ¶ 6.4(i).
>
> FN26. PX-2.
>
> FN27. Trial Tr. at 350; *see also id* at 277 (reporting the statement of an agent of RLF: "My understanding on [the copies] was that *TriState would be doing the copying* using DLS's facilities because [the agent] knew of the relationship between the two.") (emphasis added).
>
> FN28. *Id* at 65.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Also at issue is whether TriState offered the delivery of large packages over great distances for its customers. No one disputes that TriState offered courier services-delivery of envelopes and small packages within limited geographic areas. TriState, however, also offered and undertook to transport larger packages for longer distances. For example, in December 2002, TriState moved computer equipment for RLF from its Wilmington, Delaware offices to Peoria, Illinois. [FN29] This job entailed renting a truck, packing the equipment in Delaware, moving the equipment and unloading the equipment in Illinois. [FN30] TriState did the actual shipping of the boxes because McGivney decided TriState could do the job cheaper than a third-party carrier. [FN31] Once again, while this was not a major segment of TriState's business, TriState's invoices, as well as the trial testimony, amply demonstrate that TriState offered such delivery as a service to its customers.

>FN29. PX-3. This exhibit also includes invoices to Hilton DFW Lakes Executive Conferences Center for a pickup at the Hotel du Pont in Wilmington, Delaware and drop off in Grapevine, Texas, followed by a shipment from Grapevine to Miami, Florida. The contents of the shipment are not disclosed.

>FN30. Trial Tr. at 38.

>FN31. Id. at 60, 312-13.

C. *The Rise and Fall of Blue Chip*

Blue Chip was formed in Delaware on June 10, 2003, [FN32] by McGivney and Boylan. [FN33] Richard McGovern ("McGovern") was president of Blue Chip until he resigned on November 12, 2003. [FN34] When McGovern was hired, he was given a 10% ownership stake in the company, which was to increase to 33% over a five-year period. [FN35]

>FN32. Id. at 318.

>FN33. Id. at 414.

>FN34. Id. at 93.

>FN35. Id. at 316-17.

Blue Chip has been alternatively described as engaged in freight forwarding or logistics. [FN36] Based on the testimony at trial, it appears that, regardless of which label is attached, Blue Chip's services involved arranging the delivery of cargo. [FN37] Although there may be some overlap between such a service and a courier service, in general, Blue Chip's services involved moving larger items farther. As McGovern described its services, Blue Chip handles "all the details about getting a particular item or product picked up, moved across the country or around the world and delivered, and whatever regulatory agencies need to be dealt with along the way [Blue Chip] deal[s] with, and [Blue Chip] contract[s] out people to handle various parts of the job." [FN38] For example, in the summer of 2003, Blue Chip moved between 150 and 180 boxes for Baker Botts L.L.P., a law firm, from Delaware to Houston, Texas. [FN39]

>FN36. Id. at 125, 414.

>FN37. Id. at 125. McGivney and Blue Chip take great pains to show that TriState was not in the business of freight forwarding. Specifically, they state that TriState does not have a motor carrier license, appropriate insurance, or a motor vehicle carrier bond necessary to be engaged in the business. Defs. William McGivney and Blue Chip Logistics, LLC's Opening Br. at 24. As with the copying services, however, for purposes of the Covenant, this Court only has to make a factual finding as to whether defendant Blue Chip offered services substantially similar to those offered by TriState, not whether TriState is "engaged" in a particular business. As such, the Court does not find whether or not either TriState or Blue Chip was *engaged* in a specific business, but instead makes factual findings as to the services each *provided*.

>FN38. Trial Tr. at 124.

>FN39. Id. at 268, 283.

*4 Much of Blue Chip's future success was staked to obtaining a large job which involved assisting in the relocation of a business from Delaware to Georgia and which would have produced a large profit and the opportunity for more work. [FN40] After Blue Chip failed to secure that work, Boylan left Blue Chip. As of McGovern's departure on November 12, 2003, Blue Chip had no employees other than McGivney,

the sole owner. Currently, there are no phone lines in the Blue Chip offices, which are in McGivney's basement. [FN41] Essentially, Blue Chip is now merely a shell of a business-it is not viable.

   FN40. *Id.* at 118-19.

   FN41. *Id.* at 415-16.

   D. *Blue Marble Structure, Officers, and Services Offered*

Blue Marble is a Delaware limited liability company formed on June 17, 2003, with its principal place of business in Wilmington, Delaware. [FN42] It opened for business in mid-September 2003. Blue Marble operates a copying, courier, and legal research business. [FN43] A form letter introducing Blue Marble lists its services as including courier service, document imaging, FedEx services, and legal research. [FN44] Blue Marble has a price list for courier service to various cities, including Wilmington, Newark, Dover, and Georgetown, Delaware; Philadelphia and West Chester, Pennsylvania; Baltimore and Elkton, Maryland; Washington, D.C.; and New York City. [FN45] Its legal research services include nationwide and local document retrieval, as well as providing docket sheets, bankruptcy new petition alerts, District and Chancery Court new case alerts, case monitoring, daily Bankruptcy, District and Chancery Court calendars, litigation searches, and UCC, tax lien, and judgment searches. [FN46] Its copying service involves printing, binding, and production of legal documents. [FN47] Blue Marble primarily serves local law firms but also serves nonlegal commercial clients such as pharmacies and hospitals. [FN48] Blue Marble has expressly stated its intention to compete with TriState. [FN49]

   FN42. Pretrial Stipulation and Order at 5.

   FN43. Trial Tr. at 406.

   FN44. DX-7 (Berryman).

   FN45. DX-8 (Berryman).

   FN46. *Id.*

   FN47. *Id.*

   FN48. Trial Tr. at 406.

   FN49. *See* Post-Trial Br. of Defs. Jeff Berryman, Blue Marble Logistics, LLC, and Dan Boylan, at 11 ("Blue Marble intends to compete with the two major delivery services in Wilmington, Parcels and TriState, as well as the various copy services, including DLS.").

Blue Marble is owned by defendants Boylan and Berryman, along with Andy Thompson ("Thompson") and Dennis Schofield ("Schofield"). There is no written limited liability company agreement for Blue Marble; the allocation of ownership interests is based on an oral agreement among its owners. [FN50]

   FN50. Trial Tr. at 404.

Boylan is a resident of Elkton, Maryland and is currently the president and majority owner of Blue Marble. [FN51] Before joining Blue Marble, Boylan held various sales positions, including some management positions. [FN52] Boylan worked for TriState from November 2001 through April 3, 2003, first as a nighttime deliveryperson and subsequently as salesperson. [FN53] Boylan is McGivney's brother-in-law and has known McGivney for 38 years. [FN54]

   FN51. *Id.* at 381, 430.

   FN52. *Id.* at 382.

   FN53. *Id.* at 383-84.

   FN54. *Id.* at 384.

Berryman is vice president of operations and a minority owner of Blue Marble. Before his involvement with Blue Marble, Berryman was employed by TriState as an inside salesperson. Berryman also helped with technical aspects of TriState's computer system and its courier dispatch system. [FN55]

   FN55. *Id.* at 39.

*5 Thompson, a nondefendant minority owner of Blue Marble, had previously worked at TriState servicing TriState's nonlegal clients. [FN56] He is currently the vice president of commercial sales at Blue Marble. [FN57] Schofield, the other

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

nondefendant minority owner of Blue Marble, heads up Blue Marble's legal services department. He previously occupied the same position at TriState. [FN58]

    FN56. *Id.* at 40-41.

    FN57. *Id.* at 410.

    FN58. *Id.* at 411.

In addition to its owners, Blue Marble employs 16 people: six full-time couriers, three part-time couriers, three contract drivers, three full-time employees in the copy center, and one full-time bookkeeper. [FN59]

    FN59. *Id.* at 409.

E. *The Formation of Blue Marble and McGivney's Role*

On March 15, 2003, Gregg Lynch, a contract driver for TriState, held a meeting at his house to discuss TriState's termination of McGivney a week earlier. [FN60] Schofield, Berryman, and McGivney attended the meeting along with Jeffrey Low ("Low"), then and currently a vice president of TriState, [FN61] and Thomas Martin ("Martin"), then and currently a salesperson at TriState. [FN62] At the meeting, the attendees expressed their shock at McGivney's termination and discussed the possible formation of a competing courier company. [FN63] According to Martin, [FN64] the meeting centered on finding ways to get around any noncompete covenant that might bind McGivney (ultimately, the Covenant). These ideas included using a relative as the head of a company, or forming an alliance with companies (in New Jersey or Pennsylvania) that had offices beyond the territorial scope of any potential noncompetition agreement. [FN65] At that time, McGivney dismissed the possibility of using a relative to avoid a noncompetition agreement because it would be "too obvious." [FN66]

    FN60. *Id.* at 73, 140, 302.

    FN61. *Id.* at 71-72, 74.

    FN62. *Id.* at 138.

    FN63. *Id.* at 83, 140, 303.

    FN64. Martin has been convicted of a felony involving bank fraud and served 28 months of a 33-month prison sentence. While this has negatively affected my assessment of Martin's credibility, it does not render his testimony ineffectual. Martin testified at trial that he understands the meaning of perjury as "[t]elling an untruth" and believed that to have perjured himself would have constituted a violation of his probation. *Id.* at 139.

    FN65. *Id.* at 77.

    FN66. *Id.* at 85.

On April 22, 2003, McGivney held a meeting at his house that also was attended by Thompson, Berryman, Boylan, and Schofield. [FN67] At this meeting, McGivney informed the attendees of his impending agreement to the Covenant and that, as a result, he would not be able to participate in the courier business. [FN68]

    FN67. *Id.* at 306.

    FN68. *Id.* at 343.

On June 3, 2003, McGivney attended a meeting at Boylan's house. In addition to McGivney and Boylan, attendees included Thompson, Schofield, Berryman, McGovern, and Martin. McGivney testified that the purpose of that meeting was to introduce Blue Chip to the proprietors of Blue Marble, [FN69] although Blue Marble has conceded that that meeting "would properly be considered a Blue Marble meeting." [FN70]

    FN69. *Id.* at 320.

    FN70. Post-Trial Br. of Defs. Jeff Berryman, Blue Marble Logistics, LLC, and Dan Boylan at 13-14.

On September 7, 2003, McGivney attended a joint Blue Marble/Blue Chip meeting. The purpose of that meeting was for Tom McGivney, McGivney's brother, to present marketing strategies to the proprietors of both companies. [FN71]

    FN71. Trial Tr. at 329-30.

Both McGovern and Martin testified that McGivney

was at several other Blue Marble meetings. McGovern testified that McGivney attended Blue Marble meetings in May, June, July, and August. [FN72] Although McGivney claims that he was there to discuss Blue Chip business, Blue Marble, according to McGovern, "seemed to monopolize most of the conversation[s]," in which McGivney "certainly participated." [FN73] I do not give much weight to this testimony, however, because in his deposition, McGovern had testified, " 'I can't say that [McGivney] actually did anything other than like the kind of friendly advice that I got involved with Blue Marble. You know, yes, he was certainly in the room. Yes, he took part in discussions. I could not honestly tell you anything that he said." ' [FN74]

 FN72. *Id* at 102.

 FN73. *Id* at 103.

 FN74. *Id* at 133.

*6 Martin also testified that there were between eight and ten Blue Marble meetings, and that McGivney attended every meeting except for a July meeting, during which McGivney telephoned from Galveston, Texas. [FN75] Again, however, this testimony does not prove the extent of McGivney's participation in discussions of, and interest in, the Blue Marble start-up. [FN76]

 FN75. *Id* at 147.

 FN76. It may be worth pausing to note that this case involves two widely divergent stories. One side posits that McGivney's participation in the formation of Blue Marble was limited to friendly advice and input as to how Blue Chip and Blue Marble could work together. The other side argues that McGivney was integral to the start-up of Blue Marble, with a conscious intent on the part of the participants to defeat the purposes of the Covenant. The witnesses cannot be said to have helped the Court conclusively to sort out these competing visions. In a case such as this, in addition to assessing the accuracy of each witness's testimony, the Court tends to turn to the evidence that plainly shows the parties' actions.

An August 7, 2003 e-mail sent from Jamie Walker ("Walker"), a computer technician with whom Blue Marble met to discuss installing internet cables for Blue Marble's office, [FN77] to both Boylan and McGivney discusses *Blue Marble's* internet connection. [FN78] It combines a confirmation that an internet connection was ordered, and a bid for other Blue Marble computer equipment. [FN79] Although McGivney testified he had never seen the e-mail, he conceded that it was intended for him. [FN80] I can find no other reason for Walker to send this e-mail to McGivney other than the fact that he believed McGivney to be involved in the start-up of Blue Marble.

 FN77. *Id* at 353.

 FN78. PX-10.

 FN79. *Id*

 FN80. Trial Tr. at 354.

Among the more probative documents tendered by the parties are McGivney's, Boylan's, and Berryman's cell phone records, as well as McGivney's home telephone records, for the three weeks between September 1, 2003, and September 23, 2003. [FN81] The records indicate that during this twenty-two day span, McGivney spoke with Boylan 57 times and with Berryman 72 times. Thus, in the weeks before Blue Marble began operations in the middle of September, McGivney spoke with two of its owners 129 times on the telephone. I do not believe that McGivney spoke to Berryman and Boylan this number of times simply because of a friendly interest in Blue Marble. I reject the notion that this number is the product (or, more accurately, the sum) of random social or personal communications. Instead, the phone records support the reasonable inference that McGivney, in the weeks leading up to the opening of Blue Marble, was actively involved in that effect.

 FN81. PX-9.

Accordingly, based on these facts, the Court concludes that McGivney had a significant role and provided substantial assistance in the start-up of Blue Marble.

F. *Blue Marble's Reliance on RLF*

According to Martin, Blue Marble is "built around Richards, Layton & Finger." [FN82] This statement is corroborated by pro forma financials submitted to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 835886 (Del.Ch.)
(Cite as: 2004 WL 835886 (Del.Ch.))

Page 37

Wilmington Trust Company by Blue Marble, as part of a loan application presentation, in which RLF was projected to be the source of $517,700 out of $880,000 in total sales, or 59% of Blue Marble's revenue. [FN83] An internal forecast increased the projection to $650,700 out of $1,013,000 in total sales, or 64% of total revenue. [FN84]

>FN82. Trial Tr. at 155.
>
>FN83. DX-1 (Berryman) at AT0242.
>
>FN84. Id. at AT0246.

In light of these projections, Blue Marble's success was predicated on its ability to build a relationship with RLF.

G. *McGivney's (Lack of an) Equity Stake in Blue Marble*

TriState argues that McGivney has a concealed and undocumented equity stake in Blue Marble. It has failed to prove this allegation.

*7 McGivney has not contributed any capital to Blue Marble. Martin, a witness sponsored by TriState, testified that, although McGivney attempted to give money to Blue Marble, McGivney, in fact, never contributed any funds to Blue Marble. [FN85] Martin further testified that the start-up funds for Blue Marble were to come from the proceeds of the sale of Boylan's home and a line of credit from a bank. [FN86] The better evidence introduced at trial shows that Blue Marble's start-up funds came from the following sources: a $50,000 contribution of capital from Boylan; [FN87] a $30,000 loan from Thompson; [FN88] a $10,000 loan from Schofield; [FN89] a $30,000 loan from Bill DiStefino; [FN90] and a $35,000 loan from Ted Stein. [FN91]

>FN85. Trial Tr. at 144, 178, 181, 198.
>
>FN86. Id. at 199.
>
>FN87. Id. at 396.
>
>FN88. Trial Tr. at 396; DX-2 (Berryman) (letter to Thompson regarding loan); DX-3 (Berryman) (same).
>
>FN89. Trial Tr. at 396; DX-6 (Berryman) (letter to Schofield regarding loan).
>
>FN90. Trial Tr. at 396-97; DX-4 (Berryman) (letter to DiStefino regarding loan).
>
>FN91. Trial Tr. at 397; DX-5 (Berryman) (letter to Stein regarding loan).

Blue Marble also applied for a line of credit with Wilmington Trust Company in the amount of $100,000, for which Thompson has pledged the equity in his home as collateral. [FN92] This application was pending at the time of trial.

>FN92. Trial Tr. at 400-02.

TriState argues that regardless of the fact that McGivney contributed no capital to Blue Marble, he owns a 51% equity stake in the company, and that Blue Marble plans to "funnel money" to McGivney. [FN93] For this, TriState relies on Martin's testimony that McGivney was to own 51% of Blue Marble, with Boylan owning 20% and Berryman, Martin, Schofield, and Thompson each owning 7.25%. [FN94] In order to conceal McGivney's ownership, TriState argues, Boylan was to say that he owned 71% of Blue Marble. [FN95] Then, according to McGovern, Boylan was going to "work something out" with McGivney to get money to McGivney. [FN96]

>FN93. Pl.'s Post-Trial Br. at 9.
>
>FN94. Trial Tr. at 150-51. There is no written ownership agreement for Blue Marble and the allocation of the ownership interests is based on an oral agreement among its owners. Thus, a factual finding of who owns what equity stake is not easy.
>
>FN95. Id.
>
>FN96. Id. at 107.

But, other than this testimony, TriState provides no evidence of an ownership structure of Blue Marble in which McGivney has an equity stake. As the following colloquy shows, any equity interest McGivney *might* have in Blue Marble is a *future* interest:

>Q [By Mr. Renck]: And I believe you said that is was currently structured that--I guess four or five of you had like seven-and-a-quarter percent, and Dan Boylan had 70 percent. Is that correct?

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A [Mr. Martin]: It was seven-and-a-quarter, seven-and-a-quarter, seven-and-a-quarter--Dan Boylan had 70 percent, 51 to go to [McGivney] upon the complete of his two-year noncompete.
Q: So to your knowledge, any ownership interest that McGivney might have in Blue Marble was not supposed to occur until his noncompete period ended. Correct?
* * * * *
A: Right. Those shares were going to be given to him--in other words, Dan, as I knew it, for the period of his noncompete--was going to be the majority shareholder until the completion of [McGivney's] noncompete. [FN97]

>FN97. Id at 197-98.

Thus, TriState can only assert that McGivney, at most, has a future interest in Blue Marble equity that would not vest until after the expiration of the Covenant. [FN98] Given this lack of persuasive testimony, in addition to the fact that Blue Marble is entirely funded through contributions and loans *not* made by McGivney, and Boylan's explanation that some of his 71% equity is earmarked for distribution to future financial contributors, [FN99] TriState has not proven that McGivney has a current equity stake in Blue Marble. [FN100]

>FN98. Boylan expressly challenges this assertion. Id at 429-30.

>FN99. Id at 429.

>FN100. Tracy McDonald, whose lack of involvement in this case leads me to give her testimony great weight, testified that McGivney said he was "involved" with Blue Marble. Id at 218. However, she also stated he was more involved with Blue Chip. Id. I do not infer from this statement a then-present ownership interest of McGivney in Blue Marble.

H. *McGivney's Ongoing Aid to Blue Marble*

*8 Although McGivney has no current ownership interest in Blue Marble (or one that has been proven), he has provided aid to Blue Marble in its search for clients.

1. *Pachulski Stang Ziehl Young Jones & Weintraub*

In late August or early September 2003, McGivney had lunch with Martin and Tracy McDonald ("McDonald"), the legal secretary to the managing partner of the Wilmington office of Pachulski Stang Ziehl Young Jones & Weintraub ("Pachulski Stang"). [FN101] Pachulski Stang is a TriState client. [FN102] McDonald testified that during this lunch, McGivney asked McDonald if Pachulski Stang would consider using Blue Marble. Specifically, she testified:

>FN101. Id at 215-17.

>FN102. Id at 215.

Q [By Mr. Manning]: Did the possibility of Blue Marble getting work from Pachulski come up at the meeting?
A [Ms. McDonald]: Yes.
Q: Did Bill McGivney ask if Blue Marble might get some of Pachulski's work?
A: If it was a possibility.
Q: What was your response?
A: That [the managing partner] made those decisions. [FN103]

>FN103. Id at 218.

Martin has corroborated this testimony, [FN104] although McGivney testified it was Martin, and not McGivney, who started the conversation about Blue Marble. [FN105]

>FN104. Id at 171.

>FN105. Id at 335. Even though the Defendants point to this portion of the record to claim that Martin was the individual who started the inquiry into whether Pachulski Stang could be a client, the transcript shows McGivney only testified that Martin began the discussions of Blue Marble, not that Martin began any potential solicitation of Pachulski Stang.

As noted, I give great weight to the testimony of McDonald as an independent observer. [FN106] Although McDonald did not have a decision-making position at Pachulski Stang, her position as legal secretary to the managing partner could have led to a perception that she would be able to influence the decision makers. While no business promptly came out of the meeting, McDonald's testimony makes clear that McGivney assisted in Blue Marble's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

solicitation of Pachulski Stang's business by facilitating this lunch meeting with Martin, then an agent of Blue Marble.

> FN106. The Defendants attempt to discredit McDonald's credibility by noting that she testified she did not seek employment with Blue Marble, *id.* at 219, while McGivney, *id.* at 335, and Martin, in deposition testimony, *id.* at 206, both testified that she did. I do not find this sufficient to discredit McDonald's seemingly sincere and truthful testimony regarding McGivney's solicitation of business.

2. *RLF*

Martin testified to a similar lunch meeting with Archie Bethard ("Bethard"), manager of general services at RLF. [FN107] Although Bethard does not make final decisions at RLF, he has a major role in deciding which vendors RLF uses. [FN108] Martin testified that the purpose of this gathering, which included Martin, McGivney, and Bethard, was to gauge whether Blue Marble would be able to obtain work from RLF. [FN109] To counter this testimony, Blue Marble offered the testimony of Bethard, who stated he did not recall what was discussed at the lunch, but that he did recall that McGivney did not solicit him directly for work on behalf of Blue Marble. [FN110] McGivney testified that the lunch was purely social-essentially an update to Bethard of what was going on in McGivney's life. [FN111] A second lunch involving Bethard, this time including Bethard, McGivney, and Boylan, occurred on August 26, 2003. [FN112] Again, McGivney testified that the purpose of the lunch was purely social. [FN113]

> FN107. *Id.* at 168. Martin testified that this meeting took place on or about March 19, 2003. *Id.* McGivney testified that it took place in April or May. *Id.* at 331.
>
> FN108. *Id.* at 288.
>
> FN109. *Id.* at 167-69.
>
> FN110. *Id.* at 270-71.
>
> FN111. *Id.* at 331-32.
>
> FN112. *Id.* at 332.

> FN113. *Id.* at 332. Bethard did not recall whether business was discussed at the second lunch. *Id.* at 272.

I find that the two lunches with Bethard amounted to an attempted solicitation of RLF, a TriState customer, on behalf of Blue Marble. First, it is curious that McGivney testified the lunches were set up because Bethard "wanted to know how [McGivney] was doing, what's happening, ... how [McGivney was] surviving," [FN114] and because McGivney wanted to "get out of the house to see [Bethard], see a friend and enjoy a lunch," [FN115] yet, at both lunches, an agent of Blue Marble was present. Second, Bethard's testimony was that he did not recollect what exactly was discussed at the lunches. He did not testify that Blue Marble business was not discussed at the lunches. [FN116] Although Bethard testified that McGivney himself did not directly solicit work on behalf of Blue Marble, [FN117] this testimony alone does not lead to the conclusion that McGivney did not participate in the lunches in an effort to obtain business for Blue Marble. [FN118]

> FN114. *Id.* at 331-32.
>
> FN115. *Id.*
>
> FN116. *See id.* at 270-272.
>
> FN117. *Id.* at 271.
>
> FN118. The first RLF lunch may have occurred before McGivney was subject to the Covenant, but after his termination. Therefore, the August 26 lunch may be the only lunch that can be said to violate the Covenant. The earlier lunch, nevertheless, supports the conclusion that McGivney did, in fact, assist in the solicitation of RLF after becoming subject to the Covenant.

*9 Given the totality of the circumstances, including Martin's testimony, the fact that an agent of Blue Marble was present at two "personal lunches," and the finding that McDonald had been similarly solicited at the Pachulski Stang lunch, I find that McGivney, by bringing agents of RLF and Blue Marble together at the lunches, assisted in the solicitation of RLF work on behalf of Blue Marble. [FN119]

> FN119. I observe that the conflicts in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                           Page 40
Not Reported in A.2d, 2004 WL 835886 (Del.Ch.)
(Cite as: 2004 WL 835886 (Del.Ch.))

trial testimony were substantial. The majority of witnesses at trial seemed, at times, evasive. Where possible, I have attempted to rely on documentary evidence, such as telephone records, to ascertain the course of conduct of the parties. When this has not been possible, I have looked to the totality of circumstances and the record as a whole and have relied on my observations of the witnesses at trial.

## II. ANALYSIS

With the majority of the Court's factual findings set forth, I now turn to consider the various legal issues presented in this action. In doing so, I address some factual issues that are best undertaken in this section.

As this Court has previously observed, "specific enforcement of [non-competition] covenants involves important interests of commercial enterprises and of individuals seeking to support themselves and their families financially." [FN120] This case is a paradigm of that statement. The future viability of Blue Marble as an ongoing enterprise, the continued success of TriState, and the financial opportunities of McGivney, Boylan, Berryman, Thompson, and Schofield, rest substantially on the practical consequences of the Covenant. As such, this "case requires a careful evaluation of the specific facts and circumstances presented." [FN121]

> FN120. *Del., Express Shuttle, Inc. v. Older,* 2002 WL 31458243, at *11 (Del. Ch. Oct. 23, 2002). To the extent that the Court's factual findings involve specific performance by McGivney of the Covenant and to the extent that it may be required by Delaware law, they are found under a clear and convincing standard. *See Cirrus Holding Co. Ltd. v. Cirrus Indus., Inc.,* 794 A.2d 1191, 1201 (Del. Ch.2001) (holding that where "the plaintiff ultimately seeks relief in the form of ... specific performance, the court must keep in mind, in assessing the reasonable likelihood of success, that the plaintiff will bear the burden of establishing its case by 'clear and convincing' evidence.").

> FN121. *Del. Express Shuttle, Inc.,* 2002 WL 31458243, at *11.

### A. *McGivney Breached the Covenant*

#### 1. *Provision of "Substantially Similar" Services*

The first prohibition of the Covenant is that McGivney not, directly or indirectly, "offer, sell or otherwise provide any services *substantially similar* to those services *offered* by the Company to any person or entity located with the geographic region in which [TriState] conducts its business or has conducted its business within the 3 year period prior to the Closing Date." [FN122] McGivney has breached this provision.

> FN122. PX-1 ¶ 6.4(i) (emphasis added).

Violation of this provision only requires that McGivney provide a service substantially similar to one offered by TriState. It does not require that McGivney be engaged in the same business as TriState is engaged in. I focus on this term because McGivney, as president of TriState for eight years, is intimately aware of TriState's business and the services it offers. Indeed, it was McGivney who had procured for TriState both the copying and delivery jobs from RLF. Given McGivney's detailed knowledge of TriState's services, it is appropriate to conduct such an exacting inquiry into the services provided by TriState.

Although TriState was not engaged in the freight forwarding business as such, it, at times (*e.g.,* the December 2002 move of RLF's computer equipment), provided services substantially similar to those offered by Blue Chip. Accordingly, McGivney, through Blue Chip (essentially McGivney's alter ego), violated this provision of the Covenant. [FN123]

> FN123. McGivney argues that TriState should be estopped from asserting a breach of contract claim against him due to the doctrines of acquiescence and waiver. Specifically, McGivney points out that he informed Patricia Ritchie ("Ritchie"), acting president of TriState, of his involvement in Blue Chip and that he had "done a job" for RLF; also he gave Ritchie his Blue Chip business card. Trial Tr. at 324. Ritchie, McGivney testified, "seemed generally pleased" at this.
> Waiver involves the voluntary and *intentional* relinquishment of a known right. *See George v. Frank A. Robino, Inc.,* 334 A.2d 223, 224 (Del.1975) ("Intention [to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

waive one's rights] forms the foundation of the doctrine of waiver, and it must clearly appear from the evidence."). Even if McGivney's testimony is accepted, a casual reference to a new company and its business and an indication of being pleased does not demonstrate the requisite intent necessary to establish waiver.

Acquiescence requires proof of full knowledge of a party's rights and all material facts, and that that party remained inactive for a considerable time, leading the other party to believe that the act has been approved. *Brandywine Dev. Group., L.L.C. v. Alpha Trust*, 2003 WL 241727, at *4 (Del. Ch. Jan. 30, 2003). I am not persuaded that Ritchie was well informed of the terms of the Covenant or of the previous delivery jobs performed by TriState when McGivney was president, and therefore I decline to apply this doctrine to bar TriState's claims based on Ritchie's (lack of) action.

Further, Blue Marble offers what can only be considered as services directly in competition with TriState. Included in these services, for purposes of the Covenant, is TriState's copier service. More important is the courier business in which Blue Marble and TriState directly compete. Thus, when McGivney aided the start-up of Blue Marble, he indirectly competed with TriState by assisting in the development of a company offering services substantially similar to those offered by TriState and, thus, breached the Covenant.

*2. Solicitation, and Assistance of Solicitation, of TriState Customers*

*10 The second requirement of the Covenant is that McGivney not, directly or indirectly, "solicit, or assist in the solicitation of, any person or entity who is or has been a customer of [TriState] for the purpose of selling such person or entity goods or services identical to or reasonably substitutable for [TriState's] goods or services." [FN124] McGivney has also breached this provision.

FN124. PX-1 ¶ 6.4(ii).

As reviewed above, McGivney, through the lunch meetings, assisted in Blue Marble's solicitation of RLF and Pachulski Stang. Both entities had been customers of TriState. Because McGivney, by way of the lunch meetings, assisted in the solicitation of these clients on behalf of Blue Marble, which was in competition with TriState for the opportunity to provide "reasonably substitutable" services, McGivney breached this provision of the Covenant.

*3. Solicitation, and Assistance of Solicitation of TriState Employees*

The third promise made by McGivney in the Covenant was that he would not "solicit, or assist in the solicitation of, any person employed or engaged by [TriState] in any capacity (including, without limitation, as an employee or independent contractor), to terminate such employment or other engagement, whether or not such person is employed or engaged pursuant to a contract with [TriState] and whether or not such person is employed or otherwise engaged at will." [FN125] TriState has failed to introduce any evidence from which I can determine that McGivney induced (or attempted to induce) TriState employees to leave TriState in order to join either Blue Chip or Blue Marble.

FN125. PX-1 ¶ 6.4(iii).

B. *Enforceability of the Covenant*

I next turn to the question of whether the Covenant is enforceable. In order for a covenant not to compete to be enforceable, it must (1) meet general contract law requirements, (2) be reasonable in scope and duration, (3) advance a legitimate economic interest of the party enforcing the covenant, and (4) survive a balance of the equities. [FN126] Because the Covenant is part of a contract for the sale of stock, this inquiry is less searching than if the Covenant had been contained in an employment contract. [FN127]

FN126. *Del. Express Shuttle, Inc.*, 2002 WL 31458243, at *11; *see also Research & Trading Corp. v. Pfuhl*, 1992 WL 345465, at *11 (Del. Ch. Nov. 18, 1992) ("Although the non-competition agreements are valid contracts, they will not be enforceable unless the following requirements are met: (1) their duration is reasonably limited temporally, (2) their scope is reasonably limited geographically, (3) their purpose is to protect legitimate interests of the employer, (4) their operation is such as to reasonably protect those interests.").

> FN127. *Faw, Casson & Co. v. Cranston,* 375 A.2d 463, 465 (Del. Ch.1977) ("[C]ovenants are subject to somewhat greater scrutiny when contained in an employment contract as opposed to contracts for the sale of a business.").

As to the first inquiry, the Covenant fulfills general contract principles. A promise not to compete was made, valid consideration (in the form of cash payment under the Stock Purchase Agreement) was given, and no performance has been excused. [FN128]

> FN128. *See Del. Express Shuttle, Inc.,* 2002 WL 31458243, at *11 (noting that "issues typical of any contract action" include "whether a promise was made, whether there was consideration given, and whether one party's breach excused the other's performance"); *see also Faw, Casson & Co.,* 375 A.2d at 466 ("The formal elements required in an agreement not to compete are the same as those required for a contract in general, namely a mutual assent to the terms of the agreement by all parties and the existence of consideration." (citation omitted)).

TriState seeks to protect the goodwill of its clients and its confidential information. These have long been recognized as legitimate economic interests of a former employer. [FN129] "[A]n employer has an interest in the goodwill created by its sales representatives and other employees, which is vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs." [FN130] This holds true especially here, where testimony showed that the courier business is a competitive business and that personal contacts are critical to the success or failure of the venture. More than anything else, TriState has a legitimate interest in preventing McGivney's contacts, developed as an employee and officer of TriState, from being used in competition against it. McGivney, by way of his employment (essentially, his running of the business) at TriState, has complete knowledge of TriState's proprietary information, including its business strategies, logistics, and costs.

> FN129. *See Research & Trading Corp.,* 1992 WL 345465, at *12 ("Interests which the law has recognized as legitimate include protection of employer goodwill and protection of employer confidential information from misuse.").

> FN130. *Id.* at *12.

*11 In light of these facts, the Covenant is reasonable in duration and scope. As to duration (two years), the Court has previously upheld restrictive covenants of two years or more [FN131] and the Defendants have offered no reason why such precedent is inapplicable here. The geographic limitation is for a geographic region in which TriState conducts or has conducted business within the 3 years prior to the closing date. This is reasonable to meet TriState's goals of maintaining goodwill and confidentiality. As the Court stated in *Delaware Express Shuttle, Inc. v. Older:*

> FN131. *See, e.g., Singh v. Batta Envtl. Assocs., Inc.,* 2003 WL 21309115, at *7 (Del. Ch. May 21, 2003).

Restrictions that disallow activities that are "in competition with" or involve "soliciting" customers of the employer ... inherently establish a geographic limit that ultimately protects the legitimate economic interests of the employer and provide a reasonable and foreseeable basis for ascertaining the territorial scope of the covenant not to compete, even if no geographic limitation is expressly set forth in the agreement. [FN132]

> FN132. *Del. Express Shuttle, Inc.,* 2002 WL 31458243, at *13.

None of the Defendants has proffered a reason why the Covenant should not be declared valid.

The final task of the Court in determining whether the Covenant is valid is a balance of the equities. Because TriState seeks injunctive relief, I perform this analysis in a separate section.

C. *McGivney Did Not Commit Fraud*

TriState argues that McGivney committed fraud by executing the Stock Purchase Agreement when he had no intention of abiding by the Covenant, which is contained in that agreement. In order to prove fraud, one must prove:
1) a false representation, usually one of fact made by the defendant; 2) the defendant's knowledge or

belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance. [FN133]

> FN133. *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del.1992).

One cannot, however, establish the first element of fraud, a false representation, by merely pointing to the existence of an agreement between the parties. Although TriState has proven that McGivney breached the Covenant, such a claim "cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced' or alleging that the contracting parties never intended to perform." [FN134] That is to say, "[a]s a general rule under Delaware law, where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort." [FN135]

> FN134. *IOTEX Communications, Inc. v. Defries*, 1998 WL 914265, at * 5 (Del. Ch. Dec. 21, 1998); *see also Dann v. Chrysler Corp.*, 174 A.2d 696, 700 (Del. Ch.1961) ("Using the word 'fraud' or its equivalent in any form is just not a substitute for the statement of sufficient facts to make the basis of the charge reasonably apparent.")

> FN135. *Pinkert v. John J. Olivieri, P.A.*, 2001 WL 641737, at *5 (D.Del. May 24, 2001).

In *IOTEX Communications, Inc. v. Defries*, this Court applied New York law and stated that "a false promise can support a claim of fraud only where that promise was collateral or extraneous to the terms [of] an enforceable agreement in place between the parties." [FN136] As this Court has noted, that an agreement has been reached "is not the type of fact that a court should consider for purposes of misrepresentation claims." [FN137] TriState simply has not pointed to a promise or representation, other than the existence of the Stock Purchase Agreement, upon which it can ground its fraud claim. [FN138] Thus, its fraud claim fails.

> FN136. 1998 WL 914265, at *6 (citation and internal quotations omitted).

> FN137. *Mark Fox Group, Inc. v. E.I. duPont de Nemours & Co.*, 2003 WL 21524886, at *6 (Del. Ch. July 2, 2003).

> FN138. *See Diamond Elec., Inc. v. Del. Solid Waste Auth.*, 1999 WL 160161, at *7 (Del. Ch. Mar. 15, 1999) ("A breach of contract claim cannot be turned into a fraud claim simply by alleging that the other party never intended to perform.").

D. *Tortious Interference with the Covenant*

*12 The Plaintiffs have alleged that Blue Marble, Blue Chip, Boylan, and Berryman intentionally interfered with TriState's contract with McGivney (the Covenant). In order to establish the tort of tortious interference with contract, a plaintiff must show that there is a contract which the defendant was aware of, along with an intentional act by the defendant that is a significant factor in causing the breach of that contract. That act must be without justification and must cause injury. [FN139]

> FN139. *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch.1987) ("There must be (1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury.").

Blue Chip, as discussed above, is essentially the alter ego of McGivney; it is a tool of McGivney which he has used to breach the Covenant. Because it is under the exclusive control of McGivney, it is difficult to accord it separate status as a tortfeasor which interferes with McGivney's contractual obligation.

Blue Marble, Boylan, and Berryman were aware of the Covenant and did not question its validity. What is at issue is whether these defendants acted in such a way as to bring about McGivney's breach and if they did, whether those actions were justified.

McGivney first breached the Covenant by aiding in the start-up of Blue Marble. I have concluded that Berryman, Boylan, and others set out to form Blue

Marble with McGivney's assistance. They continued to seek out McGivney's assistance knowing full well that McGivney was subject to the Covenant. [FN140] I am hard pressed, given the facts of this case, to find that parties with intimate knowledge of a covenant not to compete who nevertheless actively pursued the advice and assistance of the signatory to that covenant in order to engage in direct competition with the beneficiary of the covenant were not substantial factors in causing a breach of the noncompetition agreement. [FN141]

> FN140. Indeed, they had enlisted his assistance even before execution of the Stock Purchase Agreement. McGivney, at an April 22, 2003 meeting which included Thompson, Berryman, Schofield, and Boylan, informed the attendees that he would soon be bound by a new noncompetition agreement. Trial Tr. at 306. The parties dispute, but I do not resolve because the question is not before the Court, whether McGivney violated the noncompetition provisions of his pre-existing employment agreement with TriState.

> FN141. I pause to note that the test only requires a finding that the defendants are substantial factors in causing the breach; not that they are the "but for" cause of the breach.

In addition, Boylan and Blue Marble were significant factors in causing McGivney's other principal breach-assisting in the solicitation of TriState clients on behalf of Blue Marble. I have found that McGivney, by bringing both Bethard and McDonald (as agents of RLF and Pachulski Stang respectively) and Boylan and Martin (as agents of Blue Marble) together, assisted Blue Marble's solicitation of TriState clients. As to this breach of the Covenant, it is clear Blue Marble willfully and knowingly took advantage of McGivney's connections by sending its agents to participate in these lunches, and therefore undertook intentional acts that were a significant factor in facilitating McGivney's breach of that contract. Because Boylan had knowledge of the Covenant, participated individually in one of the lunches, and had a direct interest (as a principal and equity owner of Blue Marble) in the solicitation of those clients, I find that he individually intentionally interfered with the Covenant by being a significant factor in causing McGivney's breach of the Covenant with respect to soliciting RLF.

None of the Defendants has presented any evidence upon which I can find any of these acts justified. Blue Marble and its principals had full knowledge of the restrictions imposed on McGivney by the Covenant, yet they actively sought out (and took advantage of) McGivney's assistance in starting a company to compete with TriState and to solicit TriState customers. These actions can neither be justified nor countenanced.

In order to recover damages for the tort of interference with contract, a plaintiff must prove injury. A party threatened with such harm is not relegated to suffering the injury in fact before she can seek equitable relief. Here, there are two related concerns. One is the solicitation of TriState's customers; the other is TriState's loss of business from those customers. TriState contracted with McGivney for a specific right-the right to deal with its customers without the fear of McGivney's use of relationships developed as a TriState officer and employee to aid its competitors. [FN142] In substance, it contracted, for a period of limited duration, for a defense of the good will of its clients. Thus, TriState's right not to have its customers solicited with the aid of McGivney has been harmed by the actions of Blue Marble. Blue Marble placed those relationships in jeopardy and, more importantly, also caused TriState to suffer the substantial risk that it would lose business with RLF and Pachulski Stang. TriState's injury from the potential loss of business with those firms, resulting from the conduct at issue in this proceeding, is real, palpable, and imminent, or so the evidence at trial established. That risk, in these circumstances, is also sufficient to complete the elements of a tortious interference with contract cause of action.

> FN142. This is a right which, as a general matter, is entitled to protection in a judicial proceeding. See, e.g., Research & Trading Corp., 1992 WL 345465, at *12.

E. *TriState Has Demonstrated A Civil Conspiracy*

*13 Finally, TriState argues that Blue Marble, Berryman, Boylan, and McGivney engaged in a civil conspiracy. The elements of civil conspiracy are: "(1) A confederation or combination of two or more persons; (2) An unlawful act done in furtherance of

the conspiracy; and (3) Actual damages." [FN143]

> FN143. *Nicolet, Inc. v. Nutt,* 525 A.2d 146, 149-50 (Del.1987). The combination must be undertaken in furtherance of some unlawful purpose. *See Elder v. El Di, Inc.,* 1997 WL 364049, at *12 (Del.Super.Apr. 24, 1997) ("Civil conspiracy is the combination of two or more persons or entities for an unlawful purpose...")

McGivney, Boylan, Berryman, and Blue Marble came together at various times with a purpose of avoiding the Covenant. That conduct, on the part of Boylan, Berryman, and Blue Marble, included tortious interference with the agreement between McGivney and TriState. Acts in furtherance of the conspiracy included coordinating the start-up of Blue Marble with McGivney and the solicitation of TriState customers at lunches attended by McGivney. Proof that Blue Marble had been successful in soliciting clients of TriState was lacking, but, as set forth above, TriState demonstrated injury. Thus, TriState has established that it is likely that it would suffer significant harm if the wrongdoers are not enjoined, as a result of the combination of the defendants who have committed tortious, and, thus, unlawful acts in furtherance of the conspiracy. [FN144]

> FN144. This conclusion may be of little moment. A civil conspiracy cannot exist in the absence of a separate actionable wrong. For reasons set forth later, I conclude that equitable relief should be focused on preventing adverse consequences that are likely to result from the unjustified conduct and not on the broad scope that the concept of civil conspiracy in general might suggest.

### III. APPROPRIATE REMEDIES

"To merit a permanent injunction, a plaintiff must show: (1) actual success on the merits, (2) irreparable harm, and (3) the harm resulting from a failure to issue an injunction outweighs the harm to the opposing party if the court issues the injunction." [FN145] In the context of enforcing a covenant not to compete, "[e]quity may decline to grant specific enforcement if the interests that the employer seeks to protect are ephemeral in contrast to the grave harm to the employee resulting from enforcing the restriction." [FN146] I note that Blue Marble, Berryman, and Boylan-those parties found to have intentionally interfered with the Covenant-are not signatories to the Covenant. Nevertheless, the Court has found that they intentionally interfered with the Covenant.

> FN145. *COPI of Del., Inc. v. Kelly,* 1996 WL 633302, at *4 (Del. Ch. Oct. 26, 1996).

> FN146. *Del Express Shuttle, Inc.,* 2002 WL 31458243, at *11.

As to the first element, actual success on the merits, I have found that McGivney breached his Covenant by operating Blue Chip, aiding in the formation of Blue Marble and aiding Blue Marble in its solicitation of TriState clients. I have further found that by their actions, Blue Marble, Berryman, and Boylan intentionally interfered with the Covenant.

The irreparable harm coming from all of these actions is the loss (or foreseeable loss) of client goodwill, and the suffering of the use of client connections against it. This is specifically the type of harm TriState and the Duffs sought to protect against by way of the Covenant. In the competitive business that TriState is engaged in, such loss could be substantially adverse to its future success, and certainly irreparable. [FN147] What is more difficult is balancing the equities.

> FN147. The harms resulting from competition by someone bound by a noncompetition agreement are frequently found to be irreparable. *See Singh,* 2003 WL 21309115, at *9. I reject, in this context, the argument that an award of damages would be sufficient to remedy any tortious interference with contract. Disgorgement of profits (or perhaps some other measure) may be available, but its efficacy would be limited, at best, to specific transactions and would not fully account for the impact on longstanding relationships.

The Defendants also argue that TriState had no legitimate expectation in continued customer relationships because courier services are fungible and changing service providers is easy. The Defendants' own conduct defeats this argument: if, for example, initiating a courier business and attracting major customers, such as RLF, were so easy, Blue Marble and the other individual defendants would not have gone

to the trouble of trading on McGivney's experience and contacts.

The balance of the equities clearly weighs in favor of granting an injunction against any further breaches of the Covenant by McGivney. This includes providing any assistance to Blue Marble (including any "friendly advice" that may be construed as aiding Blue Marble in any way and any assistance in the solicitation of TriState customers). McGivney, according to the terms of the Stock Purchase Agreement, is to receive $150,000 for subjecting himself to the Covenant, and is not constrained from seeking employment or pursuing business outside the scope of the restrictive covenant. He received substantial benefits from the Stock Purchase Agreement; compliance with its reasonable terms would not constitute a hardship.

*14 The balance of the equities also weighs in favor of granting an injunction against the operation of Blue Chip in competition with TriState. Blue Chip is not currently a viable company and has little prospect of future business. Enjoining Blue Chip, as the alter ego of McGivney, is warranted.

Finally, I must determine what relief should be provided for the intentional interference with the Covenant. The balance of the equities weighs against enjoining the continued operation of Blue Marble, or of Berryman's and Boylan's participation in that business. TriState has not proven that McGivney currently has an equity or financial stake in Blue Marble. [FN148] To enjoin Blue Marble from all future operations would be to provide relief that is overly broad. Although McGivney may have aided in the formation of Blue Marble, [FN149] closing down the company based on this alone is not justified. [FN150]

> FN148. This differentiates this case from the *Delaware Express* case. *Delaware Express* involved a signatory to a noncompetition agreement who had an equity stake in a company competing against the beneficiary of that agreement. See *Del Express Shuttle, Inc.*, 2002 WL 31458243, at *4-*5 (discussing employee's actions following departure from company). This is not the case here.

> FN149. He was actively involved, and provided valuable assistance, but the precise nature of his involvement is not clear. It may be that, but for McGivney's involvement, Blue Marble would not exist, but the current record does not lead to that conclusion, especially since the other individuals participating in the venture had gained substantial experience while employed by TriState, but were not bound by any covenant not to compete with it.

> FN150. Such an action would have an adverse effect not only upon Boylan and Berryman but also upon Blue Marble's numerous employees and, one may assume, persons doing or wanting to do business with it.

Blue Marble, however, willfully and knowingly took advantage of McGivney's relationship with TriState clients in order to gain "an in" with those clients to aid its efforts to solicit them. Boylan and Martin (at that time acting as an agent of Blue Marble) were fully aware that McGivney had signed (or would sign) a covenant not to compete, but nevertheless, and knowing of the risks, proceeded to appropriate the very interest that TriState had contractually protected-client goodwill. I am aware that Blue Marble's ongoing viability may depend in large part on the retention of RLF as a client. But, given Blue Marble's and Boylan's awareness of McGivney's contractual obligations (including the prohibition against his solicitation of TriState's customers), that RLF and Pachulski Stang were clients of TriState, and my findings that the RLF and Pachulski Stang lunches were intended to assist Blue Marble in its pursuit of these clients, the balance of the equities weighs in favor of enjoining Blue Marble from providing any services to either RLF or Pachulski Stang for the duration of the Covenant. In reaching this conclusion, I have considered the financial harm that may befall others involved with Blue Marble. Nonetheless, the core of this decision is the principle that Blue Marble should not be allowed to profit from its knowing and improper use of McGivney's relationships developed over the years as a TriState officer and employee. The injunctive relief has been given a scope broad enough, but no broader than necessary, to remedy the specific abuse.

For similar reasons, I conclude that Boylan should be enjoined from soliciting or providing services to RLF. By using McGivney's relationship with Bethard in order to provide Blue Marble (a company in which he

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

purports to hold a 71% equity interest) a better opportunity to gain RLF's business, [FN151] Boylan, as with Blue Marble, has knowingly intruded upon TriState's contracted-for rights, and has subjected himself to a limitation on his right to do business of this nature with RLF for the duration of the Covenant. [FN152]

> FN151. If Boylan did not need McGivney's help to obtain work from RLF, then, under these circumstances, he should not have pursued the McGivney-Bethard relationship. Boylan's incentive for doing all that he could to solicit business from RLF is demonstrated by Blue Marble's income projections which depend heavily upon RLF.

> FN152. The remedy is not the imposition of contractual obligations directly upon Blue Marble and Boylan. The task is to frame a remedy that reasonably protects TriState from the wrongful conduct of Blue Marble and Boylan. It was the Covenant (and its limitations on McGivney's actions) that Blue Marble and Boylan sought to avoid; it was the Covenant that delineated TriState's reasonable expectations; and it is the Covenant that provides the most appropriate caliper for measuring and defining an appropriate remedy, including its duration.

*15 I turn to whether the civil conspiracy claim merits separate or enhanced relief. [FN153] Any civil conspiracy claim is dependent upon other wrongful conduct. That other wrongful conduct (tortious interference with contract) has been addressed through the injunctive relief already prescribed. Civil conspiracy can be the basis for expanding the scope of relief because it allows the Court to attribute the conduct of others in pursuit of the conspiracy to a less active participant. Under the circumstances, the balancing of TriState's interests and the public interest in competition persuades me that no broader relief is necessary.

> FN153. To the extent that McGivney may have been involved with the civil conspiracy, no additional relief directed against him is called for. Compelling his compliance with the Covenant provides full and complete equitable relief to TriState.

That leaves the inquiry into whether injunctive relief directed to Berryman is appropriate. I conclude that it is not. He did not personally engage in the solicitation of RLF or Pachulski Stang. Although he joined with Boylan and others to form Blue Marble, I do not find, in the balance, that such conduct would support an injunction against him in his personal capacity. This, of course, is consistent with my conclusion that Boylan should not be enjoined from pursuing the Blue Marble venture generally.

I also note that I have factored in the public interest in vigorous competition in the courier business. This factor influenced, in part, may decision not to enjoin Blue Marble, Boylan, or Berryman generally. Nonetheless, the public interest in competition does not outweigh the purposes served by a covenant not to compete in this context. [FN154]

> FN154. Enjoining Blue Marble from doing business with RLF and Pachulski Stang, of course, carries substantially the same consequences as would enjoining RLF and Pachulski Stang from doing business with Blue Marble. Limiting the choices of RLF and Pachulski Stang, both innocent parties, as to which vendors they may use militates against the grant of injunctive relief as to their interests. Whenever a covenant not to compete is enforced, individual consumer choice is necessarily and unfortunately restricted. The Court, on this record, might have been justified in shutting down Blue Marble; instead, the scope of the injunction, which reflects the Court's exercise of its discretion, is no broader than necessary to provide the appropriate protection for TriState's legitimate interests. By limiting the scope, the competitive choices of others were not restricted, and, thus, the public policy in favor of competition is served as best as it can be in these circumstances.

### IV. CONCLUSION

For the foregoing reasons, McGivney will be enjoined from (1) offering services substantially similar to those offered by TriState, including copying and the delivery of packages, directly through Blue Chip or any other entity, and indirectly through providing aid to Blue Marble or any other entity for the remainder of the Covenant period and in the geographic region in which TriState conducts it business; and (2) soliciting or assisting in the solicitation of any person or entity who was or had

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d   Page 48
Not Reported in A.2d, 2004 WL 835886 (Del.Ch.)
(Cite as: 2004 WL 835886 (Del.Ch.))

been a customer of TriState prior to the Stock Purchase Agreement, for the purpose of offering services identical or reasonably substitutable for TriState's offered goods and services. Blue Chip, formed to offer services that TriState offers and essentially the alter ego of McGivney, will be enjoined from operation to the same scope as McGivney. Blue Marble, Boylan, and Berryman are free to pursue business in competition with TriState, except that Blue Marble may not provide such services to either Pachulski Stang or RLF, and Boylan may not provide such services to RLF, for the remainder of the Covenant period [FN155]

> FN155. I have not addressed TriState's request for an award of its attorneys' fees.

Counsel shall submit within 10 days a proposed form of final order to implement this memorandum opinion.

Not Reported in A.2d, 2004 WL 835886 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.