IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PIKE ELECTRIC CORPORATION and PIKE ELECTRIC, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MICK DUBEA, <br><br> Defendant. | C.A. No. _____ |

## DECLARATION OF ERIC PIKE

I, J. Eric Pike, hereby declare the following:

1. I am the CEO of Pike Electric Corporation. Pike Electric Corporation ("Pike Corp.") is a Delaware corporation. Pike Electric, Inc. ("Pike Inc."), incorporated in North Carolina, is the operational arm of Pike Corp. and a wholly-owned subsidiary of Pike Corp. Throughout, Pike Corp. and Pike Inc. will collectively be referred to as "Pike." I submit this declaration in support of Pike's Brief in Support of its Motion for a Preliminary Injunction and for Expedited Discovery.

2. Pike provides electric distribution and transmission services to electrical utilities, cooperatives and municipalities across the eastern half of the United States. Its services include power line construction and maintenance, storm restoration, right-of-way maintenance and fiber-optic installation. Pike

has been in business since 1945.

3. Pike has entered into employment agreements containing non-compete provisions with many of its valued employees, including skilled linemen and managers. Those contracts are necessary to ensure that Pike has the labor force needed to operate its business and provide its customers with electricity. Similarly, Pike's operations, especially its customer relationships, require the constant long-term attention of senior management. Accordingly, Pike has, from time to time, entered into employment agreements with its senior management to ensure that its customer relationships will not be unexpectedly disrupted.

4. Pike's customers generally have no contractual obligation to assign work to Pike, but, based on long-standing business practices, Pike has a reasonable expectancy that many of them will continue to do so. Nevertheless, most of Pike's customer arrangements, including its master service arrangements, can be terminated on short notice. As a result, Pike is at risk of losing significant business in a short time if its competitors can convince its customers to change service providers.

5. Pike's business depends on its long standing relationships with its customers, its competitive and proprietary pricing models and its proven supply of qualified personnel. Any damage to Pike's relationship with its customers,

any disclosure of its confidential pricing secrets and any disruption to its labor supply would cause immediate and irreparable damage to Pike.

6. On July 1, 2004, Pike acquired all the outstanding shares of the common stock of a privately-held company called Red Simpson Inc. ("RSI"). At the time of the acquisition, RSI employed over 1,500 individuals, had customers throughout the South Central and Southwestern parts of the United States and was generally considered one of America's leading power line contractors.

7. The RSI acquisition was a good strategic fit for Pike because the companies operated similar businesses in similar geographic regions, but shared only four mutual clients out of a base of nearly 150 customers. In effect, Pike purchased RSI's customers, and its employees' and executives' relationships with those customers, when it acquired RSI.

8. At the time Pike acquired RSI, Dubea was RSI's President for its Western Region, which covered nearly two-thirds of the total RSI workforce and accounted for a majority of the company's earnings. As a high ranking executive who had worked for RSI for over 20 years, Dubea was privy to a significant amount of RSI's confidential business information, including pricing models and customer lists. Moreover, Dubea was instrumental in the management, development and growth of RSI's business and goodwill in the western region of the United States. In particular, Dubea spearheaded many of RSI's important customer relationships, including its relationships with Texas Utilities, Entergy

(West) and the City of San Antonio. Dubea also owned 39,327 shares of RSI common stock, which made him one of RSI's largest stockholders.

9. Pike's efforts to purchase RSI culminated in a Stock Purchase Agreement ("SPA") between the companies. As one of the largest owners of RSI stock, Dubea was a party to the SPA. The parties to the SPA recognized Dubea's integral role with RSI, and understood that his participation in the combined Pike-RSI enterprise would be critical to its success. In particular, Pike knew that its success in Texas and Louisiana would depend on RSI's customer relationships in those areas, including the relationships cultivated by Dubea. Pike would not have purchased RSI if it would not have been able to receive the benefit of those relationships.

10. Because customers in the power line industry are not bound by long-term service contracts, Pike was concerned that it would be easy for RSI's senior management effectively to "opt out" of the merger by starting their own competing businesses and taking RSI's existing customers and employees with them. In particular, Pike wanted to ensure that Dubea came to work for the merged company, and did not use his existing relationships with the customers in RSI's Western District (which Dubea headed) to form a competing business after the closing.

11. It was in Dubea's financial interest to facilitate the closing of Pike's acquisition of RSI as he was ultimately paid over $8.2 million for his RSI stock.

- 4 -

Dubea would not have been paid that money for his RSI stock had he not entered into an employment agreement with Pike as part of the RSI acquisition.

12.  Dubea not only received $8.2 million in cash from the acquisition, but on July 1, 2004, in keeping with the terms of the SPA, he also agreed to a generous written employment agreement with Pike Inc. (the "Employment Agreement").

13.  Under the Employment Agreement, Dubea was hired as Pike's Vice President for its Western Region — substantially the same position he had held with RSI — and was given responsibility for all of Pike's operations in Oklahoma and Texas. Dubea reported directly to me, the CEO of Pike, and received a base salary of $330,000 per year. Dubea was also given the opportunity to purchase up to 21,479 Restricted Shares of Pike common stock on very favorable terms. Dubea, in fact, purchased over $1 million of Restricted Shares ("Restricted Shares") that are scheduled to vest on the second, third and fourth anniversaries of the closing and have a current market value of approximately $1.5 million. In addition, Dubea was paid a "Base Amount" of approximately $5 million (half shortly after the closing, and half on the first anniversary of the closing). Finally, the parties agreed that Dubea would receive a "Multiplier Amount" of over $6 million that is scheduled to be paid out on the second, third and fourth anniversaries of the closing.

RLF1-2960197-1

14. Dubea's performance as Vice President, while adequate, did not meet Pike's high expectations. Therefore, on September 22, 2005, Pike terminated Dubea without cause. Under the Employment Agreement and the amendments thereto, because Pike terminated Dubea without cause, Dubea remained eligible to receive payment of the Multiplier Amount and his Restricted Shares would continue to vest as scheduled.

15. On October 5, 2005, Chad Dubea ("Chad"), Dubea's son and a then-current Pike employee, formed a company registered in Harlingen, Texas called T&D Solutions Ltd. ("T&D"). I believe that T&D was formed with Dubea's financial backing, advice and support, and I expect to be able to prove that to be true through discovery in this case. It is also my understanding that Chad is living with Dubea in Beaumont, Texas, where I believe Dubea is providing advice and guidance in connection with T&D's business and helping to run the day-to-day operations of T&D. I expect to gain further support for those beliefs through discovery in this case.

16. Upon information and belief, T&D provides electric distribution and transmission services to electrical utilities, cooperatives and municipalities in Texas and Louisiana. Its services include power line construction and maintenance and storm restoration. It competes directly with Pike.

17. Chad, despite forming T&D on October 5, 2005, did not leave his job at Pike until October 21, 2005. Upon information and belief, T&D began

soliciting the employment of Pike's personnel on or about October 21, 2005, having specifically waited until Pike's managers were busy attending an out of state meeting. Since that time, over fifty-five employees have left Pike and joined T&D. The following employees, at a minimum, left Pike for T&D in breach their employment agreements: Chuck Chaddrick, Tim Droddy, Clifton Droddy and Sammy Christian. I believe that T&D, and Dubea, knew about the existence of those employment agreements, but nevertheless endeavored to cause the employees to breach those agreements. The remaining employees that left Pike to join T&D are skilled laborers that have proven almost impossible to replace in the current market. Tellingly, each employee that left Pike was a former RSI employee with a longstanding relationship with Dubea.

18. Upon information and belief, T&D, with Dubea's assistance, also convinced the former controller for RSI, C.P.A. Corey Close ("Close"), to leave Pike and join their ranks. When Close left Pike he sought permission to take his work computer with him. After assurances that he would not be working in the power line industry and would not disclose or use the confidential information contained on the computer, Pike acceded to Close's request. Close is now the CEO of T&D, and on information and belief, is using the valuable confidential information gained as an employee of RSI and Pike and taken from his Pike computer in furtherance of T&D's competing business.

19. Upon information and belief, T&D also began soliciting business from Pike's customers on or about October 21, 2005. To date, the following companies have given at least some of their Pike work to T&D: Entergy (West), Beauregard Electric Cooperative, Sam Houston Electric Cooperative, Sharyland Development and American Electric Power.

20. Attached hereto as Exhibit A is a true and complete copy of Mick Dubea's Employment Agreement with Pike Inc., dated July 1, 2004.

21. Attached hereto as Exhibit B is a true and complete copy of the Amendment Agreement between Mick Dubea and Pike Inc., dated May 5, 2005.

22. Attached hereto as Exhibit C is a true and complete copy of the Stock Purchase Agreement between Pike Inc. and the Mick Dubea 2003 Grantor Retained Annuity Trust, the John Charles Simpson 2003 Grantor Retained Annuity Trust for John, Jr., the John Charles Simpson 2003 Grantor Retained Annuity Trust for Angela, Mick J. Dubea, John C. Simpson, Simeon A. Thibeaux, Jr. and RSI, dated May 4, 2004.

23. Attached hereto as Exhibit D is a true and complete copy of the Employment Contract, Nonqualified Deferred Compensation Agreement and Agreement not to Compete between RSI and Chuck Chaddrick, dated July 3, 2000.

24. Attached hereto as Exhibit E is a true and complete copy of the Amendment Agreement between RSI and Chuck Chaddrick, dated May 6, 2004.

25. Attached hereto as Exhibit F is a true and complete copy of the Second Amendment Agreement between RSI and Chuck Chaddrick, dated May 2005.

26. Attached hereto as Exhibit G is a true and complete copy of the Employment Contract, Nonqualified Deferred Compensation Agreement and Agreement not to Compete between RSI and Timothy Droddy, dated May 12, 1999.

27. Attached hereto as Exhibit H is a true and complete copy of the Amendment Agreement between RSI and Timothy Droddy, dated May 6, 2004.

28. Attached hereto as Exhibit I is a true and complete copy of the Second Amendment Agreement between RSI and Timothy Droddy, dated May 31, 2005.

29. Attached hereto as Exhibit J is a true and complete copy of the Employment Contract, Nonqualified Deferred Compensation Agreement and Agreement not to Compete between RSI and Clifton Droddy, dated April 12, 2002.

30. Attached hereto as Exhibit K is a true and complete copy of the Amendment Agreement between RSI and Clifton Droddy, dated May 6, 2004.

31. Attached hereto as Exhibit L is a true and complete copy of the Second Amendment Agreement between RSI and Clifton Droddy, dated May 31, 2005.

32. Attached hereto as Exhibit M is a true and complete copy of the Employment Contract, Nonqualified Deferred Compensation Agreement and Agreement not to Compete between RSI and Samuel Christian, dated December 31, 1997.

33. Attached hereto as Exhibit N is a true and complete copy of the Amendment Agreement between RSI and Samuel Christian, dated May 6, 2004.

34. Attached hereto as Exhibit O is a true and complete copy of the Second Amendment Agreement between RSI and Samuel Christian, dated May 31, 2005.

35. I declare under penalty of perjury that the foregoing is true and correct.

Executed on December ____, 2005

_____
J. Eric Pike