# EXHIBIT C

STOCK PURCHASE AGREEMENT

Dated as of May 4, 2004

Among

THE MICK DUBEA 2003 GRANTOR RETAINED ANNUITY TRUST,

JOHN CHARLES SIMPSON 2003 GRANTOR RETAINED
ANNUITY TRUST FOR JOHN, JR.,

JOHN CHARLES SIMPSON 2003 GRANTOR RETAINED
ANNUITY TRUST FOR ANGELA,

MICK J. DUBEA,

JOHN C. SIMPSON,

SIMEON A. THIBEAUX, JR.,

RED SIMPSON, INC.

And

PIKE ELECTRIC, INC.

[[NYCORP:2386341v2:4743A:05/04/04−03:14 p]]

STOCK PURCHASE AGREEMENT

STOCK PURCHASE AGREEMENT (this "Agreement"), dated as of May 4, 2004, among THE MICK DUBEA 2003 GRANTOR RETAINED ANNUITY TRUST, a Texas trust ("George"), JOHN CHARLES SIMPSON 2003 GRANTOR RETAINED ANNUITY TRUST FOR JOHN, JR., a Louisiana trust ("German"), JOHN CHARLES SIMPSON 2003 GRANTOR RETAINED ANNUITY TRUST FOR ANGELA, a Louisiana trust ("Ginny"), SIMEON A. THIBEAUX, JR. ("Mr. Thibeaux", and together with George, German and Ginny, "Sellers"), MICK J. DUBEA ("Mr. Dubea"), JOHN C. SIMPSON ("Mr. Simpson" and, collectively with Mr. Dubea and Sellers, the "RSI Parties"), RED SIMPSON, INC., a Louisiana corporation ("Red Simpson"), and PIKE ELECTRIC, INC., a North Carolina corporation ("Purchaser").

WHEREAS Purchaser desires to purchase from Sellers, and Sellers desire to sell to Purchaser, all the outstanding shares (the "Shares") of common stock, no par value, of Red Simpson in accordance with, and subject to the terms of, this Agreement (such purchase and sale of the Shares is referred to in this Agreement as the "Acquisition");

WHEREAS, in connection with the Acquisition, Mr. Dubea, Rick Westbrook ("Mr. Westbrook") and Mr. Thibeaux are entering into employment agreements substantially in the form of Exhibit A, B and C, respectively (each, a "Pike Employment Agreement") and Mr. Simpson is entering into a consulting agreement substantially in the form of Exhibit D (the "Consulting Agreement");

WHEREAS, immediately after the consummation of the Acquisition and the other transactions contemplated herein, Purchaser shall own all the issued and outstanding capital stock of Red Simpson; and

WHEREAS Section 9.05(b) contains a list of certain defined terms used herein, and sets forth the Section of this Agreement in which each such term is defined.

NOW THEREFORE, the parties hereby agree as follows:

ARTICLE I

Purchase and Sale of Shares; Closing

SECTION 1.01. Purchase and Sale of the Shares. On the terms and subject to the conditions of this Agreement, at the Closing, Sellers shall sell, transfer and deliver to Purchaser, and Purchaser shall purchase from Sellers all the issued and outstanding Shares for the Initial Purchase Price, subject to adjustment as described

2

below. The number of Shares to be transferred by each Seller is set forth on Schedule 1.01. All Shares delivered to Purchaser shall be free and clear of all Liens. The Estimated Purchase Price, the Initial Purchase Price and the Adjusted Purchase Price shall be allocated among Sellers in accordance with their Proportionate Amounts.

SECTION 1.02. Closing Date. The closing of the Acquisition (the "Closing") shall take place at the offices of Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York, New York 10019, at 10:00 a.m. on the third business day following the satisfaction (or, to the extent permitted, the waiver) of the conditions set forth in Article VI, or at such other place, time and date as may be agreed by Sellers' Representative and Purchaser. The date on which the Closing occurs is referred to in this Agreement as the "Closing Date".

SECTION 1.03. Transactions To Be Effected at the Closing. At the Closing:

(a) each Seller shall deliver to Purchaser certificates representing the Shares held by such Seller, duly endorsed in blank or accompanied by stock powers duly endorsed in blank in proper form for transfer, with appropriate transfer stamps, if any, affixed;

(b) the RSI Parties and Red Simpson shall deliver, or cause to be delivered, to Purchaser the documents required to be delivered by them pursuant to Article VI;

(c) Purchaser shall deliver, or cause to be delivered, to Sellers' Representative, the documents required to be delivered by it pursuant to Article VI;

(d) Purchaser shall deliver by wire transfer in immediately available funds $36,800,000 (the "Escrow Amount") to a bank account designated in writing by Sellers' Representative at least two business days prior to Closing Date at The Bank of New York (or another financial institution reasonably acceptable to Purchaser and Sellers' Representative) (the "Escrow Agent"). The Escrow Amount shall be held, invested and subsequently disbursed in accordance with the terms, conditions and provisions of the escrow agreement substantially in the form of Exhibit E (the "Escrow Agreement"), providing for the establishment of an escrow account with the Escrow Agent to secure the obligations of the RSI Parties under Article VIII, Section 1.06 and Section 1.08; and

(e) Purchaser shall deliver to each Seller payment by wire transfer to a bank account designated in writing by Sellers' Representative at least two business days prior to the Closing Date funds in the amount of such Seller's Proportionate Amount of the difference between (x) the Estimated Purchase Price and (y) the Escrow Amount.

SECTION 1.04. Estimated Purchase Price and Adjusted Purchase Price. (a) At least three business days prior to the Closing Date, Sellers' Representative shall deliver to Purchaser a detailed worksheet certified by the Chief Financial Officer of Red Simpson, setting forth a good faith estimate of the Adjusted Purchase Price (the "Estimated Purchase Price"), including (i) the Master Deferred Compensation Schedule,

together with supporting detail thereto, (ii) a good faith estimate of the Deferred Compensation Liability and supporting detail thereto, (iii) a good faith estimate of the Closing Debt and supporting detail thereto, (iv) a good faith estimate of the Working Capital Adjustment and supporting detail thereto and (v) a good faith estimate of the Company Expenses and supporting detail thereto. For the avoidance of doubt, the Estimated Purchase Price shall reflect the deductions from the Initial Purchase Price for (A) the Insurance Reserve, (B) the Severance Liability, (C) the Aircraft Amount and (D) the AEP Amount. The worksheet, the Master Deferred Compensation Schedule and the Estimated Purchase Price shall be prepared by Sellers' Representative in consultation with Purchaser and shall be reasonably satisfactory to Purchaser.

(b) The term "Adjusted Purchase Price" means the Initial Purchase Price as adjusted by the Working Capital Adjustment. The term "Initial Purchase Price" means an amount equal to (i) $235,656,000, (ii) less the Deferred Compensation Liability, (iii) less the Closing Debt, (iv) less the Company Expenses, (v) less the Insurance Reserve, (vi) less the Severance Liability, (vii) less the Aircraft Amount and (viii) less the AEP Amount. The Initial Purchase Price shall be either increased by the amount by which Closing Working Capital exceeds $34,700,000, or decreased by the amount by which Closing Working Capital is less than $34,700,000 (the "Working Capital Adjustment").

SECTION 1.05. AEP Payment. (a) On the later of (i) the Closing and (ii) the date that is 10 days following determination of the New AEP Crew Member Volume Amount (or, if the AEP Re-bid is rejected, the date that is 10 days following receipt by Red Simpson of notice from AEP of the rejection of the AEP Re-bid), Purchaser shall deliver to Sellers' Representative the Adjusted AEP Amount. Such payment shall be made to the bank accounts of Sellers designated in writing by Sellers' Representative at least two business days prior to the date of payment. Any payments made pursuant to this Section 1.05 shall be allocated to each Seller in the Proportionate Amount for such Seller.

(b) For purposes of this Agreement:

"AEP" means American Electric Power Company, Inc. and its subsidiaries

"AEP Amount" means $15,000,000.

"Adjusted AEP Amount" means (i) $15,000,000, if the New AEP Crew Member Volume Amount equals or exceeds the Old AEP Crew Member Volume Amount and (ii) $15,000,000 less the Retained Amount, if the New AEP Crew Member Volume Amount is less than the Old AEP Crew Member Volume Amount.

"AEP Re-bid" means the Transmission and Distribution Contractor Services Request for Proposal submitted by Red Simpson to AEP in April, 2004.

"AEP Project" means the work contracted by AEP to be undertaken by Red Simpson and its Subsidiaries in response to the AEP Re-bid.

"AEP Work Crew Member Volume Decline" means the difference between (i) 1.00 and (ii) the quotient of (A) the New AEP Crew Member Volume Amount and (B) the Old AEP Crew Member Volume Amount.

"New AEP Crew Member Volume Amount" means the number of line workers to be initially employed by Red Simpson and its Subsidiaries on the AEP Project upon award of such project, such number to be mutually determined by Purchaser and Sellers' Representative, within 30 days of such award, so as to meet AEP's demands in respect of the AEP Project, it being agreed by the parties that such number shall be determined in accordance with past staffing practices of Red Simpson used to determine the Old AEP Crew Member Volume Amount. Purchaser and Sellers' Representative shall seek in good faith to resolve any dispute in respect of calculation of the New AEP Crew Member Volume Amount. If Purchaser and Sellers' Representative are unable, within 30 days of the award to Red Simpson and its Subsidiaries of the AEP Project, to resolve any dispute as to such calculation, such dispute shall be subject to dispute resolution by the Cash Flow Amount Accounting Firm in accordance with the procedures set forth in Section 1.08(b). All fees and disbursements incurred in connection with the resolution thereof shall be allocated in the same manner as those allocated in Section 1.08(b).

"Old AEP Crew Member Volume Amount" means the number of line workers employed by Red Simpson and its Subsidiaries at December 31, 2003, in the work performed for AEP in Regions 5 and 6 currently subject to the AEP Re-bid, as set forth on Schedule 1.05.

"Retained Amount" means the product of (i) $15,000,000 and (ii) the product of (A) 2.00 and (B) the AEP Work Crew Member Volume Decline.

SECTION 1.06. Purchase Price Adjustment. (a) Within 60 days after the Closing Date, Purchaser shall prepare and deliver to Sellers' Representative a statement (the "Statement") setting forth its calculation of the Adjusted Purchase Price, which shall include (i) a calculation of the Working Capital as of the close of business on the day immediately preceding the Closing Date ("Closing Working Capital"), (ii) a calculation of the Deferred Compensation Liability (that will reflect any of Purchaser's revisions to the Master Deferred Compensation Schedule), (iii) a calculation of the Closing Debt, and (iv) a calculation of the Company Expenses. For the avoidance of doubt, the Statement setting forth Purchaser's calculation of the Adjusted Purchase Price shall reflect the deductions from the Initial Purchase Price for (A) the Insurance Reserve, (B) the Severance Liability, (C) the Aircraft Amount and (D) the AEP Amount. At Purchaser's option, a physical inventory shall be conducted jointly by Purchaser and by Sellers' Representative on or before the Closing Date for the purpose of preparing the Statement. Purchaser and Sellers shall each pay their own costs and expenses incurred in connection with such physical inventory. In preparing its calculation of the Deferred Compensation Liability pursuant to clause (ii) above, Purchaser shall provide a draft to Sellers' Representative and Sellers' Representative shall have a reasonable opportunity to review such draft and convey any comments thereto. All disputes with respect to the Deferred Compensation Liability shall be subject to the dispute resolution procedures contained in

this Section 1.06; provided, however, that in the event that any dispute with respect to the Deferred Compensation Liability is not settled prior to the time the disputed amount is required to be paid pursuant to the terms of this Agreement, any Pike Employment Agreement or any Employment Agreement Amendment, Purchaser's calculation of such amount shall be final and binding on the parties. Purchaser agrees that it will calculate all amounts attributable to the Profit Sharing Interests and the Minority Interests in a manner consistent with past practice; provided that such past practice represents a reasonable, good faith interpretation of the terms of the Contracts relating to such Profit Sharing Interests and Minority Interests.

(b) During the 45-day period following Sellers' Representative's receipt of the Statement, Sellers' Representative and its independent auditor shall be permitted to review the working papers of Purchaser and Purchaser's independent auditor relating to such Statement. The Statement shall become final and binding upon the parties on the 45th day following delivery thereof, unless Sellers' Representative gives written notice of its disagreement with such Statement (a "Notice of Disagreement") to Purchaser prior to such date. Any Notice of Disagreement shall (i) specify in reasonable detail the nature of any disagreement so asserted and (ii) only include disagreements based on mathematical errors or based on the Adjusted Purchase Price or any component thereof not being calculated in accordance with this Agreement. If a Notice of Disagreement is received by Purchaser in a timely manner, then the Statement (as revised in accordance with this sentence) shall become final and binding upon Sellers, Sellers' Representative and Purchaser on the earlier of (A) the date Sellers' Representative and Purchaser resolve in writing any differences they have with respect to the matters specified in the Notice of Disagreement or (B) the date any disputed matters are finally resolved in writing by the Accounting Firm. During the 30-day period following the delivery of a Notice of Disagreement, Sellers' Representative and Purchaser shall seek in good faith to resolve in writing any differences that they may have with respect to the matters specified in the Notice of Disagreement. During such period, Purchaser and its auditors shall have access to the working papers of Sellers' Representative and its independent auditor prepared in connection with such Notice of Disagreement, and Sellers' Representative and his auditors shall continue to have reasonable access to the working papers of Purchaser and its independent auditor prepared in connection with the Statement. If, at the end of such 30-day period, Sellers' Representative and Purchaser have not finally resolved all of the differences that they may have with respect to matters specified in the Notice of Disagreement, Sellers' Representative and Purchaser shall submit to an independent accounting firm (the "Accounting Firm") any and all matters that remain in dispute and which were properly included in the Notice of Disagreement. The Accounting Firm shall be the Chicago office of KPMG or, if such firm is unable or unwilling to act, such other nationally recognized independent public accounting firm as shall be agreed upon by Sellers' Representative and Purchaser in writing. Sellers' Representative and Purchaser shall jointly request that the Accounting Firm render its decision, which shall be final and binding on the parties, resolving the matters submitted to the Accounting Firm within 30 days following submission. Judgment may be entered upon the determination of the Accounting Firm in any court having jurisdiction over the party against which such determination is to be enforced. The fees and disbursements of Sellers' Representative, Sellers and Sellers' Representative's independent auditor incurred in connection with

their review of the Statement and delivery of any Notice of Disagreement shall be borne by Sellers, and the fees and disbursements of Purchaser and Purchaser's independent auditor incurred in connection with their preparation of the Statement and review of any Notice of Disagreement shall be borne by Purchaser. The fees and expenses of the Accounting Firm incurred in any arbitration relating to the Statement shall be borne by the person whose calculation of the Adjusted Purchase Price is further from the Adjusted Purchase Price as finally determined by the Accounting Firm but the other fees and expenses of the parties to such arbitration shall be paid by the party incurring such cost.

(c) If (i) the Adjusted Purchase Price is less than the Estimated Purchase Price, Sellers shall, or (ii) the Adjusted Purchase Price is more than the Estimated Purchase Price, Purchaser shall, within three business days after the Adjusted Purchase Price becomes final and binding on the parties in accordance with this Section 1.06, make payment by wire transfer in immediately available funds of the amount of such difference, together with interest thereon at a rate equal to 5% per annum, calculated on the basis of the actual number of days elapsed from the Closing Date to the date of payment, divided by 365. Such payment shall be made to the bank accounts of Sellers or Purchaser, as the case may be, designated in writing by Sellers' Representative, on the one hand, and Purchaser, on the other hand, at least two business days prior to the date of payment. Any payments made by or to Sellers shall be allocated to each Seller in the Proportionate Amount for such Seller.

(d) For purposes of this Agreement:

"Agreed Accounting Principles" means generally accepted accounting principles in effect in the United States ("GAAP") consistently applied in the same manner and using the same principles and methodologies as employed in the 2003 Financial Statements; provided, however, that (i) subject to clause (ii) below, with respect to any matter as to which there is difference in accounting treatment between GAAP and the accounting principles applied in the preparation of the 2003 Financial Statements, GAAP shall be applied in calculating such item, and (ii) the working capital principles and illustrative calculations described on Exhibit F shall be used to calculate the items described therein.

"Aircraft" means that Raytheon C90B - King Air - Jaguar Edition aircraft bearing the serial number LJ-1500.

"Aircraft Amount" means $1,291,859.

"Closing Debt" means the aggregate amount of principal, interest, fees, prepayment penalties, expense reimbursements and other amounts owing by Red Simpson and its Subsidiaries immediately prior to the Closing (whether or not then due) in respect of all indebtedness described in clauses (a), (b) (other than letters of credit), and, without duplication, (e) of the definition of Indebtedness, assuming that all such Indebtedness is repaid and cancelled at such time.

"Company Expenses" means (i) the fees and expenses of KeyBanc Capital Markets to be paid by Red Simpson and (ii) all other fees and expenses relating to the transactions contemplated by this Agreement incurred by Red Simpson and its Subsidiaries through the Closing to the extent not paid by the Sellers, Red Simpson or its Subsidiaries prior to the close of business on the day immediately preceding the Closing Date (it being acknowledged and agreed that Sellers are obligated to pay or cause Red Simpson or its Subsidiaries to pay all such fees and expenses).

"Current Assets" means the total consolidated current assets of Red Simpson and its Subsidiaries (including cash and marketable securities). Current Assets shall be calculated in accordance with the Agreed Accounting Principles.

"Current Liabilities" means the total consolidated current liabilities of Red Simpson and its Subsidiaries. Current Liabilities shall be calculated in accordance with the Agreed Accounting Principles. Neither Current Assets nor Current Liabilities shall include (i) the Deferred Compensation Liability, (ii) any amounts included in the calculation of the Closing Debt, (iii) any amounts included in the calculation of Company Expenses, (iv) any fees or expenses included in the calculation of the Company Expenses or (v) any amounts relating to Taxes or (vi) any other amounts that are expressly taken into account in the computation of the Initial Purchase Price.

"Deferred Compensation Liability" means an amount equal to (A) the Tax-Adjusted Notional Amount, plus (B) the Minority Interest Amount, less (C) $1,250,000.

"Indebtedness" means (a) all indebtedness of Red Simpson and its Subsidiaries for money borrowed from any other person, including any RSI Party, (b) without duplication, all indebtedness of Red Simpson and its Subsidiaries evidenced by a promissory note (including those relating to Max Green), letter of credit, credit facility, debenture or similar security, (c) all guarantees by Red Simpson or its Subsidiaries of any indebtedness, liabilities or obligations of any other person (in each case other than endorsements for the purpose of collection in the ordinary course of business), (d) all obligations of Red Simpson and its Subsidiaries relating to capital leases, foreign currency swaps, interest rate swaps, commodity swaps, options, caps, collars, hedges or forward exchanges or similar agreements and, without duplication (e) any Liens securing any obligations set forth in clause (a), (b), (c) or (d).

"Insurance Reserve" shall mean the amount of $3,863,840, representing (a) the pre-tax amount of $6,232,000 (all of which is assumed to be deductible for Tax purposes for purposes of this definition) multiplied by (b) .62.

"Minority Interest Amount" means the aggregate liability in respect of all Minority Interest Base Amounts, as set forth on the Master Deferred Compensation Schedule. Such liability shall be determined after giving effect to the resolution (pursuant to the provisions of Section 1.06) of any revisions to the Master Deferred Compensation Schedule made by Purchaser and any disputes thereof by Sellers' Representative.

"Pre-Tax Notional Amount" means the sum of (a) aggregate liability (i) in respect of all amounts attributable to Profit Sharing Interests, as shown on the Master Deferred Compensation Schedule, and (ii) in respect of all multiplier and additional amounts attributable to both Profit Sharing Interests and Minority Interests, as shown on the Master Deferred Compensation Schedule (such liability shall be determined after giving effect to the resolution (pursuant to the provisions of Section 1.06) of any revisions to the Master Deferred Compensation Schedule made by Purchaser and any disputes thereof by Sellers' Representative) and (b) an amount equal to all amounts payable under Sections 3111 and 3301 of the Code, and any state and local employer-paid employment taxes (the "Employment Tax Amounts"), in respect of the items described in clauses (i) and (ii), assuming that the items described in clauses (i) and (ii) are the only amounts of compensation payable to the relevant individuals in the applicable years.

"Severance Liability" means $303,583, representing the product of (a) the sum of (i) the maximum pre-tax amount payable under the Severance Plan (all of which is assumed to be deductible for Tax purposes for purposes of this definition) and (ii) all Employment Tax Amounts payable in respect of the items described in clause (i) above, assuming that the amount payable to each relevant individual under the Severance Plan is the only amount of compensation payable to such individual in the applicable year and (b) 0.62.

"Tax-Adjusted Notional Amount" means the product of (a) the Pre-Tax Notional Amount and (b) 0.62.

"Working Capital" means Current Assets minus Current Liabilities as of the close of business on the day immediately preceding the Closing Date.

SECTION 1.07. Appointment of Sellers' Representative. (a) Each RSI Party appoints Mr. Simpson as the representative of such RSI Party ("Sellers' Representative") to act as the agent and on behalf of such RSI Party for purposes under this Agreement of (i) determining the Estimated Purchase Price, the Initial Purchase Price, the Adjusted Purchase Price, the Additional Amount and any adjustments to be made under Sections 1.04, 1.05, and 1.06 and the amount payable pursuant to Section 1.08, (ii) determining whether the conditions to Closing in Article VI have been satisfied, including waiving any such condition if Sellers' Representative, in its sole discretion, determines that such waiver is appropriate or desirable, (iii) taking any action that may be necessary or desirable, as determined by Sellers' Representative in its sole discretion, in connection with the termination of this Agreement in accordance with Section 7.01, (iv) taking any action that may be necessary or desirable, as determined by Sellers' Representative in its sole discretion, in connection with any amendment of this Agreement, (v) accepting notices on behalf of such RSI Party in accordance with Section 9.04, (vi) delivering or causing to be delivered to Purchaser, at the Closing, certificates representing the Shares, (vii) granting any consent or waiver in respect of this Agreement on behalf of such RSI Party, (viii) executing and delivering, in its capacity as the representative of such RSI Party, any and all notices, documents or certificates to be executed by Sellers' Representative, on behalf of such RSI Party, in connection with this

Agreement and the transactions contemplated hereby, (ix) entering into and amending the Escrow Agreement and (x) for any other purpose consistent with its appointment as representative of the RSI Parties. As the representative of the RSI Parties, Sellers' Representative shall act as the agent for all such persons and have authority to bind each such person in connection with this Agreement, and Purchaser may rely on such appointment and authority until the receipt of written notice of the appointment of a successor Sellers' Representative.

(b)  Each RSI Party appoints Mr. Simpson as such RSI Party's true and lawful attorney-in-fact and agent (the "Attorney-in-Fact"), with full power of substitution and resubstitution, in such RSI Party's name, place and stead, in any and all capacities, in connection with the transactions contemplated by this Agreement, granting to the Attorney-in-Fact, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection with this Agreement, including the sale of the Shares by a Seller as fully to all intents and purposes as such Seller might or could do in person. Purchaser may rely on such appointment and authority until the receipt of written notice of the appointment of a successor Attorney-in-Fact.

SECTION 1 08.  Federal Project. (a) Within 90 days of the completion (or, if earlier, the termination) of that certain federal project known as "Gillette Electric Construction, Inc., Contract No: DACA 27-02-C- September 30, 2002 by the U.S. Army Corps of Engineers, Louisville District" (the "Federal Project"), Purchaser shall deliver to Sellers' Representative a statement (the "Federal Project Cash Flow Statement") setting forth the Federal Project Cash Flow Amount.

(b)  During the 45-day period following Sellers' Representative's receipt of the Federal Project Cash Flow Statement, Sellers' Representative and its independent auditor shall be permitted to review the working papers of Purchaser and Purchaser's independent auditor relating to such Federal Project Cash Flow Statement. The Federal Project Cash Flow Statement shall become final and binding upon the parties on the 45th day following delivery thereof, unless Sellers' Representative gives written notice of its disagreement with such Federal Project Cash Flow Statement (a "Federal Project Cash Flow Amount Notice of Disagreement") to Purchaser prior to such date. Any Federal Project Cash Flow Amount Notice of Disagreement shall (i) specify in reasonable detail the nature of any disagreement so asserted and (ii) only include disagreements based on mathematical errors or based on the Federal Project Cash Flow Amount or any component thereof not being calculated in accordance with this Agreement. If a Federal Project Cash Flow Amount Notice of Disagreement is received by Purchaser in a timely manner, then the Federal Project Cash Flow Amount Statement (as revised in accordance with this sentence) shall become final and binding upon Sellers, Sellers' Representative and Purchaser on the earlier of (A) the date Sellers' Representative and Purchaser resolve in writing any differences they have with respect to the matters specified in the Federal Project Cash Flow Amount Notice of Disagreement or (B) the date any disputed matters are finally resolved in writing by the Cash Flow Amount Accounting Firm. During the 30-day period following the delivery of a Federal Project Cash Flow Amount Notice of Disagreement, Sellers' Representative and Purchaser shall seek in good faith to resolve in writing any differences that they may have with respect to the matters specified therein.

During such period, Purchaser and its auditors shall have access to the working papers of Sellers' Representative and its independent auditor prepared in connection with such Federal Project Cash Flow Amount Notice of Disagreement, and Sellers' Representative and his auditors shall continue to have reasonable access to the working papers of Purchaser and its independent auditor prepared in connection with the Federal Project Cash Flow Amount Statement. If, at the end of such 30-day period, Sellers' Representative and Purchaser have not finally resolved all of the differences that they may have with respect to matters specified in the Federal Project Cash Flow Amount Notice of Disagreement, Sellers' Representative and Purchaser shall submit to an independent accounting firm (the "Cash Flow Amount Accounting Firm") any and all matters that remain in dispute and which were properly included in the Federal Project Cash Flow Amount Notice of Disagreement. The Cash Flow Amount Accounting Firm shall be the Chicago office of KPMG or, if such firm is unable or unwilling to act, such other nationally recognized independent public accounting firm as shall be agreed upon by Sellers' Representative and Purchaser in writing. Sellers' Representative and Purchaser shall jointly request that the Cash Flow Amount Accounting Firm render its decision, which shall be final and binding on the parties, resolving the matters submitted to the Cash Flow Amount Accounting Firm within 30 days following submission. Judgment may be entered upon the determination of the Cash Flow Amount Accounting Firm in any court having jurisdiction over the party against which such determination is to be enforced. The fees and disbursements of Sellers' Representative, Sellers and Sellers' Representative's independent auditor incurred in connection with their review of the Federal Project Cash Flow Statement and delivery of any Federal Project Cash Flow Amount Notice of Disagreement shall be borne by Sellers, and the fees and disbursements of Purchaser and Purchaser's independent auditor incurred in connection with their preparation of the Federal Project Cash Flow Statement and review of any Federal Project Cash Flow Amount Notice of Disagreement shall be borne by Purchaser. The fees and expenses of the Cash Flow Amount Accounting Firm incurred in any arbitration relating to the Federal Project Cash Flow Statement shall be borne by the person whose calculation of the Federal Project Cash Flow Amount is further from the Federal Project Cash Flow Amount as finally determined by the Cash Flow Amount Accounting Firm but the other fees and expenses of the parties to such arbitration shall be paid by the party incurring such cost.

(c) If (i) the Federal Project Cash Flow Amount is less than $0.00, Sellers shall, or (ii) the Federal Project Cash Flow Amount is more than $0.00, Purchaser shall, within three business days after the Federal Project Cash Flow Amount becomes final and binding on the parties in accordance with this Section 1.08, make payment by wire transfer in immediately available funds of 50% of the amount by which the Federal Project Cash Flow Amount deviates from $0.00. Such payment shall be made to the bank accounts of Sellers or Purchaser, as the case may be, designated in writing by Sellers' Representative, on the one hand, and Purchaser, on the other hand, at least two business days prior to the date of payment. Any payments made by or to Sellers' Representative shall be allocated to each Seller in the Proportionate Amount for such Seller.

(d) For purposes of this Agreement:

[[NYCORP:2386341v2:4743A:05/04/04-03:14 p]]

"Federal Project Cash Flow Amount" shall mean (i) all cash receipts received by Purchaser and its Subsidiaries and Red Simpson and its Subsidiaries from and including the Closing Date in respect of the Federal Project less (ii) any cash payments made by Purchaser and its Subsidiaries and Red Simpson and its Subsidiaries from and including the Closing Date in respect of the Federal Project, including all cash costs incurred to perform the Federal Project.

ARTICLE II

Representations and Warranties
Relating to the RSI Parties

Each RSI Party hereby represents and warrants to Purchaser, as of the date hereof and as of the Closing, as follows:

SECTION 2.01.  Authority; Execution and Delivery; Enforceability.
(a)  Such RSI Party has full power and authority to execute this Agreement and the other agreements and instruments executed and delivered in connection with this Agreement, including the Escrow Agreement (the "Ancillary Agreements"), to which it is, or is specified to be, a party and to consummate the transactions contemplated to be consummated by it hereby and thereby. Such RSI Party has duly executed and delivered this Agreement and prior to the Closing will have duly executed and delivered each Ancillary Agreement to which it is, or is specified to be, a party.  This Agreement constitutes, and each Ancillary Agreement to which it is, or is specified to be, a party, when so executed and delivered by such RSI Party will constitute, its legal, valid and binding obligation, enforceable against it in accordance with its terms.

(b)  The trustee of each of George, German and Ginny is authorized by the trust agreement of such trust to execute, deliver and perform this Agreement and the Ancillary Agreements to which such trust is, or is specified to be, a party, and to consummate the transactions contemplated to be consummated by such trust hereby and thereby.  Each of George, German and Ginny has taken all institutional action, if any, required to authorize the execution, delivery and performance of this Agreement and the Ancillary Agreements to which such trust is, or is specified to be, a party, and to consummate the transactions contemplated to be consummated by such trust hereby and thereby.

(c)  Each of George, German and Ginny has delivered to Purchaser true and complete copies of its trust agreement.

SECTION 2.02.  No Conflicts; Consents.  (a)  Except as set forth in Schedule 2.02, the execution and delivery by such RSI Party of this Agreement and each Ancillary Agreement to which it is, or is specified to be, a party do not, and the consummation of the transactions contemplated hereby and thereby and compliance by such RSI Party with the terms hereof and thereof will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise

to a right of termination, cancellation or acceleration of any obligation, or to increased, additional, accelerated or guaranteed rights or entitlements of any person under, or result in the creation of any Lien upon any of the properties or assets of such RSI Party under, any provision of (i) in the case of George, German and Ginny, the trust agreement of such RSI Party, (ii) any Contract to which such RSI Party is a party or by which any of its properties or assets is bound or (iii) any Judgment or Applicable Law applicable to such RSI Party or its properties or assets.

(b)  No consent, approval, license, permit, order or authorization ("Consent") of, or registration, declaration or filing with, any Federal, state, local or foreign government or any court of competent jurisdiction, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign (a "Governmental Entity") is required to be obtained or made by or with respect to such RSI Party in connection with the execution, delivery and performance of this Agreement or any Ancillary Agreement or the consummation of the transactions contemplated hereby and thereby, other than compliance with and filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act").

SECTION 2.03.  The Shares.  In the case of any Seller, such Seller has good and valid title to the Shares to be transferred by it to Purchaser in the Acquisition, free and clear of all Liens.  Assuming Purchaser has the requisite power and authority to be the lawful owner of the Shares, upon delivery to Purchaser at the Closing of certificates representing such Seller's Shares, duly endorsed by the such Seller for transfer to Purchaser, and upon such Seller's receipt of the amount to be paid to such Seller pursuant to Section 1.03(e), good and valid title to such Shares will pass to Purchaser, free and clear of any Liens.  In the case of any Seller, such Seller's Shares are not subject to any voting trust agreement or other Contract (other than this Agreement and Article XI of Red Simpson's Articles of Incorporation), including any Contract restricting or otherwise relating to the voting, dividend rights or disposition of such Shares.

SECTION 2.04.  Capital Stock.  Such RSI Party has not granted any options, warrants, rights, convertible or exchangeable securities, "phantom" stock rights, stock appreciation rights, stock-based performance units, commitments, Contracts, arrangements or undertakings of any kind (i) obligating such RSI Party to deliver or sell, or cause to be issued, delivered or sold, shares of capital stock in, or any security convertible, exercisable or exchangeable for any capital stock in, Red Simpson or any of its Subsidiaries, (ii) obligating such RSI Party to purchase or otherwise acquire any shares of capital stock or equity interests of Red Simpson or any of its Subsidiaries or any security convertible, exercisable or exchangeable for any capital stock or equity interests of Red Simpson or any of its Subsidiaries or (iii) that give any person the right to receive any economic benefit or right similar to or derived from the economic benefits and rights occurring to holders of Shares.

Notwithstanding anything in this Agreement to the contrary, (i) each representation and warranty contained in this Article II made by Ginny and German also shall be deemed made by Mr. Simpson with respect to Ginny and German and (ii) each

representation and warranty contained in this Article II made by George also shall be deemed made by Mr. Dubea with respect to George.

## ARTICLE III

### Representations and Warranties
### Relating to Red Simpson

The RSI Parties and Red Simpson hereby represent and warrant to Purchaser, as of the date hereof and as of the Closing, as follows:

SECTION 3.01. Organization and Standing; Books; Authority. (a) Each of Red Simpson and its Subsidiaries is a corporation or limited liability company, as the case may be, duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, as the case may be, which jurisdiction is set forth in Schedule 3.01. Each of Red Simpson and its Subsidiaries has full corporate power and authority and possesses all governmental certificates, franchises, licenses, permits, authorizations and approvals ("Permits") necessary to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as presently conducted, other than such Permits the lack of which, individually or in the aggregate, has not had and could not reasonably be expected to have a material adverse effect or change (i) on the business, assets, condition (financial or otherwise) or results of operations of Red Simpson and its Subsidiaries, taken as a whole, (ii) on the ability of Red Simpson or any RSI Party to perform its obligations under this Agreement and the Ancillary Agreements or (iii) on the ability of Red Simpson or the RSI Parties to consummate the Acquisition and the other transactions contemplated by this Agreement and the Ancillary Agreements (a "Company Material Adverse Effect"). Except as set forth on Schedule 3.01, each of Red Simpson and its Subsidiaries is duly qualified and in good standing to do business as a foreign corporation in each jurisdiction in which the conduct or nature of its business or the ownership, leasing or holding of its properties or assets makes such qualification necessary, except such jurisdictions where the failure to be so qualified or in good standing, individually or in the aggregate, has not had and could not reasonably be expected to have a Company Material Adverse Effect. A list of the jurisdictions in which Red Simpson and its Subsidiaries are so qualified is set forth in Schedule 3.01. The term "Subsidiary" means each person controlled, directly or indirectly, by Red Simpson. For the avoidance of doubt, the term "Subsidiary" includes Simpson-Noles.

(b) Red Simpson has delivered to Purchaser true and complete copies of (i) the articles of incorporation and by-laws, each as amended to date, of Red Simpson and (ii) the articles of incorporation, bylaws or similar organizational documents, each as amended to date, of each Subsidiary. The stock certificate and transfer books and the minute books of Red Simpson and each of its Subsidiaries (which have been delivered to Purchaser prior to the date hereof) are true and complete.

      (c) Red Simpson has full power and authority to execute this Agreement and the Ancillary Agreements to which it is, or is specified to be, a party and to consummate the transactions contemplated to be consummated by it hereby and thereby. Red Simpson has taken all corporate action required to authorize the execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is, or is specified to be, a party and to consummate the transactions contemplated to be consummated by it hereby and thereby. Red Simpson has duly executed and delivered this Agreement and prior to the Closing will have duly executed and delivered each Ancillary Agreement to which it is, or is specified to be, a party. This Agreement constitutes, and each Ancillary Agreement to which it is, or is specified to be, a party, when so executed and delivered by Red Simpson will constitute, its legal, valid and binding obligation, enforceable against it in accordance with its terms.

      SECTION 3.02. <u>Capital Stock of Red Simpson and its Subsidiaries.</u>
(a) The authorized capital stock of Red Simpson consists of (i) 2,000,000 shares of Common Stock, no par value ("<u>Common Stock</u>"), and (ii) no shares of preferred stock. There are issued and outstanding only 929,442 shares of Common Stock (constituting the Shares). Except as set forth in the preceding sentence, there are no issued or outstanding shares of capital stock of Red Simpson. Schedule 3.02(a)(i) sets forth a true and complete list of (A) all Profit Sharing Interests, the grant date and the name of the holder thereof, (B) the corporate title of such holder, (C) the liability of Red Simpson and its Subsidiaries as of December 31, 2002 and as of December 31, 2003 in respect of each Profit Sharing Interest (without giving effect to the Employment Agreement Amendments or the Pike Employment Agreements) and (D) the estimated aggregate liability of Red Simpson and its Subsidiaries as of the close of business on March 31, 2004 in respect of all Profit Sharing Interests (without giving effect to the Employment Agreement Amendments or the Pike Employment Agreements), assuming in each case that all conditions for payment in respect of each Profit Sharing Interest have or will be met and that no such liability is or will be reduced as a result of the violation of any covenant or agreement. Except as set forth on Schedule 3.02(a)(ii), each Profit Sharing Interest has been granted pursuant to an agreement that contains terms and conditions that are identical in all material respects to the form of agreement set forth in Exhibit G. There are no options, warrants, rights, convertible or exchangeable securities, "phantom" stock rights (other than the Minority Interests and the Profit Sharing Interests), stock appreciation rights, stock-based performance units, commitments, Contracts, arrangements or undertakings of any kind to which Red Simpson or any of its Subsidiaries is a party or by which any of them is bound (i) obligating Red Simpson or any of its Subsidiaries to issue, deliver or sell, or cause to be issued, delivered or sold, shares of capital stock in, or any security convertible, exercisable or exchangeable for any capital stock or equity interest in, Red Simpson or any Voting Company Debt, (ii) obligating Red Simpson or any of its Subsidiaries to issue, grant, extend or enter into any such option, warrant, right, security, unit, commitment, Contract, arrangement or undertaking, (iii) except as set forth in Schedule 3.02(b)(ii), obligating Red Simpson or any of its Subsidiaries to repurchase, redeem or otherwise acquire any shares of capital stock or equity interests of Red Simpson or any of its Subsidiaries or any security convertible, exercisable or exchangeable for any capital stock or equity interests of Red Simpson or any of its Subsidiaries or (iv) except for the Minority Interests and the Profit

15

Sharing Interests set forth on Schedule 3.02(a)(i) or Schedule 3.02(b)(ii), that give any person the right to receive any economic benefit or right similar to or derived from the economic benefits and rights occurring to holders of Shares, including by way of "earn-outs" or similar contingent consideration arrangements. There are no shares of capital stock or other equity securities of Red Simpson issued, reserved for issuance or outstanding, other than the Shares and 160,997 shares of Common Stock held in treasury.

(b) Schedule 3.02(b)(i) sets forth for each Subsidiary a true and complete list of the amount of its authorized capital stock or equity interests, the amount of its outstanding capital stock or equity interests, and the record and beneficial owners thereof. Schedule 3.02(b)(ii) sets forth a true and complete list of (A) all Minority Interests, the grant date and the name of the holder thereof, (B) the corporate title of such holder, if any, (C) the liability of Red Simpson and its Subsidiaries as of December 31, 2002 and as of December 31, 2003 in respect of each Minority Interest (without giving effect to the Employment Agreement Amendments or the Pike Employment Agreements) and (D) the estimated aggregate liability of Red Simpson and its Subsidiaries as of March 31, 2004 in respect of all Minority Interests (without giving effect to the Employment Agreement Amendments or the Pike Employment Agreements), assuming in each case that all conditions for payment in respect of such Minority Interest have or will be met and that no such liability is or will be reduced as a result of the violation of any covenant or agreement. Except as set forth on Schedule 3.02(b)(iii), each Minority Interest has been granted pursuant to an agreement that contains terms and conditions that are identical in all material respects to the form of agreement set forth in Exhibit G. Except as set forth on Schedule 3.02(b)(i) or 3.02(b)(ii), there are no issued or outstanding shares of capital stock or similar equity interests of any Subsidiary or any such shares or interests reserved for issuance. There are no options, warrants, rights, convertible or exchangeable securities, "phantom" stock rights (other than the Minority Interests and the Profit Sharing Interests), stock appreciation rights, stock-based performance units, commitments, Contracts, arrangements or undertakings of any kind to which any Subsidiary is a party or by which any of them is bound (i) obligating any Subsidiary to issue, deliver or sell, or cause to be issued, delivered or sold, shares of capital stock in, or any security convertible, exercisable or exchangeable for any capital stock in, any Subsidiary or any Voting Company Debt, (ii) obligating any Subsidiary to issue, grant, extend or enter into any such option, warrant, right, security, unit, commitment, Contract, arrangement or undertaking, (iii) except as set forth in Schedule 3.02(b)(ii), obligating Red Simpson or any of its Subsidiaries to repurchase, redeem or otherwise acquire any shares of capital stock or equity interests of Red Simpson or any of its Subsidiaries or any security convertible, exercisable or exchangeable for any capital stock or equity interests of Red Simpson or any of its Subsidiaries or (iv) except as set forth in Schedule 3.02(b)(iv), that give any person the right to receive any economic benefit or right similar to or derived from the economic benefits and rights accruing to holders of Shares or holders of capital stock or equity interests in any Subsidiary, including by way of "earn-outs" or similar contingent consideration arrangements.

(c) The Shares and all outstanding shares of capital stock or equity interests of each Subsidiary are duly authorized, validly issued, fully paid and nonassessable. The Shares, all outstanding shares of capital stock or equity interests of

each Subsidiary and all shares of capital stock and all equity interests of Red Simpson and each of its Subsidiaries that have previously been outstanding are not, and have not been, subject to or issued in violation of any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of any Applicable Law, the articles of incorporation or by-laws or similar organizational documents of Red Simpson or any of its Subsidiaries or any Contract to which Red Simpson or any of its Subsidiaries is a party or otherwise bound.

(d)  There are not any bonds, debentures, notes or other indebtedness of Red Simpson or any of its Subsidiaries having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matters on which holders of Shares or holders of any shares of capital stock or equity interests in any Subsidiary may vote ("Voting Company Debt").

(e)  Except for its interests in its Subsidiaries and its interest in Simpson-Noles, Red Simpson does not own, directly or indirectly, any capital stock, membership interest, partnership interest, limited liability company interest, joint venture interest or other equity interest. Except as set forth on Schedule 3.02(b)(ii), there are no outstanding contractual obligations of Red Simpson or any of its Subsidiaries to make any investment (in the form of a loan, capital contribution, guarantee or otherwise) in any person. Immediately after the Closing, there will not be any Subsidiary that does not actively engage in the business of Red Simpson as such business is conducted on the date hereof, except dormant subsidiaries relating to Minority Interests held by currently active employees of RSI which are not terminated in accordance with Section 5.21 despite Red Simpson having used its reasonable best efforts to effect such termination in accordance with Section 5.21.

(f)  The aggregate liability of Red Simpson and its Subsidiaries in respect of all Profit Sharing Interests and all Minority Interests will not exceed the Payout Amount.

SECTION 3.03.  No Conflicts; Consents.  (a)  Except as set forth in Schedule 3.03, the execution and delivery by the RSI Parties and Red Simpson of this Agreement and each Ancillary Agreement to which any of them is, or is specified to be, a party do not, and the consummation of the transactions contemplated hereby and thereby and compliance by the RSI Parties and Red Simpson with the terms hereof and thereof will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any person under, or result in the creation of any Lien upon any of the properties or assets of Red Simpson or any of its Subsidiaries under, any provision of (i) the articles of incorporation, by-laws or similar organizational documents of Red Simpson or any of its Subsidiaries, (ii) any material Contract to which Red Simpson or any of its Subsidiaries is a party or by which any of their respective properties or assets are bound or (iii) any Judgment or Applicable Law applicable to Red Simpson or any of its Subsidiaries or their respective properties or assets.

(b) No Consent of, or registration, declaration or filing with, any Governmental Entity is required to be obtained or made by or with respect to Red Simpson or any of its Subsidiaries in connection with the execution, delivery and performance of this Agreement or any Ancillary Agreement or the consummation of the transactions contemplated hereby and thereby, other than compliance with and filings under the HSR Act.

SECTION 3.04. <u>Financial Statements.</u> (a) Schedule 3.04(a)(i) sets forth (i) the audited consolidated statements of earnings and cash flows for Red Simpson for the fiscal years ended December 31, 2001 and December 31, 2002, together with the audited consolidated balance sheets for Red Simpson as of December 31, 2001 and December 31, 2002 (collectively, the "<u>Historical Financial Statements</u>") and (ii) the audited consolidated statements of earnings and cash flows for Red Simpson for the fiscal year ended December 31, 2003, together with the audited consolidated balance sheet for Red Simpson as of December 31, 2003 (the "<u>2003 Financial Statements</u>" and, together with the Historical Financial Statements, the "<u>Financial Statements</u>"). The Financial Statements have been prepared from the books and records of Red Simpson and, except as expressly described on Schedule 3.04(a)(ii) (such Schedule 3.04(a)(ii) solely with respect to the Historical Financial Statements), in conformity with GAAP consistently applied and on that basis fairly present the consolidated financial condition, results of operations and cash flows of Red Simpson and its Subsidiaries as of the respective dates thereof and for the respective periods indicated. The audited consolidated balance sheet for Red Simpson as of December 31, 2002 is referred to herein as the "<u>Balance Sheet</u>".

(b) Red Simpson and its Subsidiaries do not have any liabilities or obligations of any nature (whether accrued, absolute, contingent, unasserted or otherwise), except (i) as disclosed or reflected in the Balance Sheet, (ii) for items set forth in Schedule 3.04(b), and (iii) for liabilities and obligations incurred in the ordinary course of business consistent with past practice and not in violation of this Agreement, none of which, in the case of this clause (iii), has had or could reasonably be expected, individually or in the aggregate, to have a Company Material Adverse Effect or could reasonably be expected to result in an aggregate liability or obligation to Red Simpson or its Subsidiaries in excess of $1,000,000.

(c) Red Simpson and its Subsidiaries do not have any liabilities or obligations of any nature of the type described in clause (c) or (d) of the definition of Indebtedness.

SECTION 3.05. <u>Assets Other than Real Property Interests.</u> (a) Red Simpson or one of its wholly-owned Subsidiaries has good and valid title to all the material assets reflected on the Balance Sheet or thereafter acquired, other than those disposed of since the date of the Balance Sheet in the ordinary course of business consistent with past practice, in each case free and clear of all mortgages, liens, pledges, security interests, charges, easements, leases, subleases, covenants, rights of way, rights of first refusal, options, claims, restrictions or encumbrances of any kind (collectively, "Liens"), except (i) such Liens as are set forth in Schedule 3.05, (ii) mechanics', carriers', workmen's, repairmen's or other like Liens arising or incurred in the ordinary course of

18

business, (iii) Liens for Taxes that are not due and payable or that may thereafter be paid without penalty and (iv) Liens which are not substantial in amount, do not materially detract from the value of the property subject thereto and do not materially impair the use of the property subject thereto (the Liens described above are referred to collectively as "Permitted Liens").

(b) Except as set forth on Schedule 3.05(b)(i), the assets of Red Simpson and its wholly-owned Subsidiaries constitute, in the aggregate, all of the assets and properties used, held for use or intended for use in the conduct or operation of Red Simpson and its Subsidiaries in the manner currently being conducted and operated. Except as set forth in Schedule 3.05(b)(ii), none of the RSI Parties own any assets used, held for use or intended to be used in the conduct or operation of the business of Red Simpson and its Subsidiaries.

(c) This Section 3.05 does not relate to real property or interests in real property, such items being the subject of Section 3.06.

SECTION 3.06. Real Property. (a) Schedule 3.06(a) sets forth a true and complete list of all real property and interests in real property owned in fee by Red Simpson or any of its Subsidiaries (individually, an "Owned Property") and identifies any material lease, reciprocal easement or operating agreements relating thereto. Schedule 3.06(a) also sets forth a true and complete list of all real property and interests in real property leased or subleased by Red Simpson or any of its Subsidiaries (individually, a "Leased Property") and identifies any material base leases, subleases, reciprocal easement or operating agreements relating thereto. Red Simpson or one of its wholly-owned Subsidiaries has good and marketable fee title to all Owned Property and good and valid title to the leasehold estates in all Leased Property (an Owned Property or Leased Property being sometimes referred to herein, individually, as a "Company Property"), in each case free and clear of all Liens, except (i) Liens described in clause (ii), (iii) or (iv) of Section 3.05(a), (ii) such Liens as are set forth in Schedule 3.05 or Schedule 3.06(b), (iii) easements, covenants, rights-of-way and other similar restrictions of record, (iv) any conditions that may be shown by a physical inspection of any Owned Property made prior to the date hereof and (v) (A) zoning, building and other similar restrictions, and (B) Liens that have been placed by any developer, landlord or other third party on property over which Red Simpson or any of its Subsidiaries has easement rights or on any Leased Property and subordination or similar agreements relating thereto. None of the items set forth in clauses (iii), (iv) and (v) above, individually or in the aggregate, materially impairs or could reasonably be expected materially to impair, the continued use and operation of the Company Property to which they relate in the conduct of the business of Red Simpson and its Subsidiaries as currently conducted.

(b) With respect to each parcel of Owned Property, (i) other than as set forth on Schedule 3.06(a), neither Red Simpson nor any of its Subsidiaries has leased or otherwise granted to anyone the right to use or occupy such Owned Property or any portion thereof, (ii) other than as set forth on Schedule 5.02(b), there are no outstanding contracts, options, rights of first offer or rights of first refusal to purchase any Owned

Property or any portion thereof or interest therein, (iii) all improvements on the Owned Property are in good condition and repair (ordinary wear and tear excepted) and sufficient for the operation of Red Simpson's business, and (iv) there is no condemnation or other proceeding in eminent domain, pending or threatened, affecting any parcel of Owned Property or any portion thereof or interest therein.

(c) With respect to each parcel of Leased Property, (i) each lease for such Leased Property is valid and in full force and effect, (ii) to the knowledge of Sellers, neither Red Simpson nor any other party to the lease is in breach or default under such lease and no event has occurred or circumstance exists, which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, (iii) other than as set forth in Schedule 3 03, the transaction contemplated by this Agreement does not require the consent of any other party to the lease, (iv) neither Red Simpson nor any of its Subsidiaries has subleased, licensed or otherwise granted anyone the right to use or occupy such Leased Property or any portion thereof, and (v) neither Red Simpson nor any of its Subsidiaries has collaterally assigned or granted any other security interest in any such leasehold estate or any interest therein.

(d) Except as set forth on Schedule 3.06(b)(i), the Company Properties constitute, in the aggregate, all of the real property used, held for use or intended for use in the conduct or operation of the business of Red Simpson and its Subsidiaries in the manner currently being conducted and operated. None of the Company Properties set forth on Schedule 5.02(b) and identified thereon as properties to be disposed of prior to Closing are used, held for use or intended for use in the conduct or operation of the business of Red Simpson and its Subsidiaries.

SECTION 3.07. Intellectual Property. (a) Schedule 3.07(a)(i) sets forth a true and complete list of all material Intellectual Property, owned, used, filed by or licensed to Red Simpson or any of its Subsidiaries (excluding Standard Software). The Intellectual Property required to be set forth on Schedule 3.07(a)(i) is referred to in this Agreement as the "Company Intellectual Property". None of the Company Intellectual Property is registered or subject to an application for registration. Except as set forth in Schedule 3.07(a)(ii), (i) Red Simpson or one of its wholly-owned Subsidiaries is the sole and exclusive owner of, and Red Simpson and its Subsidiaries have the right to use, display, modify, enhance, distribute, and sublicense, without payment to any other person, all Company Intellectual Property and the consummation of the Acquisition and the other transactions contemplated hereby and by the Ancillary Agreements does not and will not conflict with, alter or impair any such rights, and (ii) during the past five years, none of Red Simpson or any of its Subsidiaries has received any written or oral communication from any person asserting any ownership interest in any Company Intellectual Property.

(b) None of Red Simpson or any of its Subsidiaries has granted any license of any kind relating to any Company Intellectual Property. Except as set forth in Schedule 3.07(b), none of Red Simpson or any of its Subsidiaries is bound by or a party to any option, license or similar Contract relating to the Intellectual Property of any third party for the use of such Intellectual Property in the conduct of the business of Red

Simpson and its Subsidiaries, except for "shrink-wrap" or "click-through" license agreements relating to computer software licensed to Red Simpson or a Subsidiary in the ordinary course of business ("Standard Software").

(c) The conduct of the business of Red Simpson and its Subsidiaries as currently conducted does not violate, conflict with or infringe the Intellectual Property of any other person, except for such violations, conflicts or infringements that, individually or in the aggregate, have not had and could not reasonably be expected to have a Company Material Adverse Effect. Except as set forth in Schedule 3.07(c), (i) no claims are pending or, to the knowledge of Red Simpson, threatened, against Red Simpson or any of its Subsidiaries by any person with respect to the ownership, validity, enforceability, effectiveness or use in the business of Red Simpson or any of its Subsidiaries of any Intellectual Property and (ii) during the past five years none of Red Simpson or any of its Subsidiaries has received any written or oral communication from any person alleging that Red Simpson or any of its Subsidiaries violated any rights relating to Intellectual Property of any person. To the knowledge of Red Simpson, no Intellectual Property of any other person violates, conflicts with or infringes the Company Intellectual Property of Red Simpson or any of its Subsidiaries.

(d) For purposes of this Agreement:

"Intellectual Property" means any patent (including all reissues, divisions, continuations and extensions thereof), patent application, patent right, corporate name, trademark, trademark registration, trademark application, service mark, trade name, business name, brand name, copyright, copyright registration, design, design registration, or any right to any of the foregoing.

SECTION 3.08. Contracts. (a) Except as set forth in the applicable section of Schedule 3.08(a), none of Red Simpson or any of its Subsidiaries is a party to or bound by any:

(i) employment agreement or employment contract;

(ii) collective bargaining agreement or other contract with any labor organization, union or association;

(iii) covenant not to compete, geographic restriction or other covenant restricting the development, manufacture, marketing or distribution of the products or services of Red Simpson or any of its Subsidiaries;

(iv) Contract (other than this Agreement and the Ancillary Agreements) with (A) any RSI Party or any affiliate of Red Simpson or any RSI Party, (B) any former shareholder, partner or member of any business acquired by Red Simpson or any of its Subsidiaries or (C) any current or former shareholder, officer, director or employee of Red Simpson or any of its Subsidiaries, including a Contract in respect of any Profit Sharing Interest or Minority Interest;

21

(v) lease, sublease or similar Contract with any person (other than Red Simpson or any of its wholly-owned Subsidiaries) under which Red Simpson or any of its Subsidiaries is a lessor or sublessor of, or makes available for use to any person (other than Red Simpson or any of its wholly-owned Subsidiaries), (A) any Company Property or (B) any portion of any premises otherwise occupied by Red Simpson or any of its Subsidiaries;

(vi) lease, sublease or similar Contract with any person (other than Red Simpson or any of its wholly-owned Subsidiaries) under which (A) Red Simpson or any of its Subsidiaries is lessee of, or holds or uses, any machinery, equipment, vehicle or other tangible personal property owned by any person or (B) Red Simpson or any of its Subsidiaries is a lessor or sublessor of, or makes available for use by any person, any tangible personal property owned or leased by Red Simpson or any of its Subsidiaries, in any such case which has an aggregate future liability or receivable, as the case may be, in excess of $100,000;

(vii) (A) continuing Contract for the future purchase of materials, supplies, equipment or services, (B) management, consulting or other similar Contract or (C) advertising agreement or arrangement, in any such case which has an aggregate future liability to any person (other than Red Simpson or any of its wholly-owned Subsidiaries) in excess of $100,000;

(viii) license, sublicense, option or other agreement relating in whole or in part to Company Intellectual Property of Red Simpson or any of its Subsidiaries (including any license or other agreement under which Red Simpson or any of its Subsidiaries is licensee or licensor of any Intellectual Property);

(ix) Contract under which Red Simpson or any of its Subsidiaries has borrowed any money from, or issued any note, bond (including performance bonds), letter of credit, debenture or other evidence of indebtedness to, any person (other than Red Simpson or any of its wholly-owned Subsidiaries) or any other note, bond, letter of credit, debenture or other evidence of indebtedness of Red Simpson or any of its Subsidiaries (other than in favor of Red Simpson or any of its wholly-owned Subsidiaries) or any other instrument evidencing Indebtedness;

(x) Contract (including any so-called take-or-pay or keepwell agreements) under which (A) any person has directly or indirectly guaranteed indebtedness, liabilities or obligations of Red Simpson or any of its Subsidiaries or (B) Red Simpson or any of its Subsidiaries has directly or indirectly guaranteed indebtedness, liabilities or obligations of any person (in each case other than endorsements for the purpose of collection in the ordinary course of business);

(xi) Contract under which Red Simpson or any of its Subsidiaries has, directly or indirectly, made or committed to make any advance, loan, extension of credit or capital contribution to, or other investment in, any person (other than Red Simpson or any of its wholly-owned Subsidiaries and other than extensions of trade credit in the ordinary course of business);

(xii) Contract granting a Lien upon any Company Property or any other asset;

(xiii) Contract providing for indemnification of any person with respect to liabilities relating to any current or former business of Red Simpson, a Subsidiary or any predecessor person, other than indemnification provisions included in service agreements with customers of Red Simpson and its Subsidiaries entered into in the ordinary course of business;

(xiv) power of attorney (other than a power of attorney given in the ordinary course of business with respect to routine tax matters);

(xv) Contract not made in the ordinary course of business;

(xvi) confidentiality agreement;

(xvii) Contract (including a purchase order) involving payment by Red Simpson and its Subsidiaries of more than $100,000 over the life of such Contract (other than purchase orders entered into in the ordinary course of business after the date of this Agreement and not in violation of this Agreement);

(xviii) Contract involving the obligation of Red Simpson or any of its Subsidiaries to deliver products or services for payment of more than $100,000 over the life of such Contract (other than Contracts entered into with customers in the ordinary course of business after the date of this Agreement and not in violation of this Agreement);

(xix) Contract with any customer of Red Simpson or any of its Subsidiaries that accounted for in excess of $1,500,000 in revenue for Red Simpson and its Subsidiaries for the year ended December 31, 2003;

(xx) Contract for the sale of any asset of Red Simpson or any of its Subsidiaries or the grant of any preferential rights to purchase any such asset or requiring the consent of any party to the transfer thereof;

(xxi) Contract with or material license or Permit by or from any Governmental Entity;

(xxii) Contract evidencing any joint venture, partnership, limited liability company or similar arrangement;

(xxiii) Contract for the acquisition of any capital stock, assets or business of any other person (specifically noting any provision for payment of a portion of a purchase price therefor after the Closing, including by way of "earn-outs" or similar arrangements);

(xxiv) Contract providing for the services of any sales representative or agent or similar representative involving the payment or receipt over the life of such Contract in excess of $100,000 by Red Simpson and its Subsidiaries;

(xxv) other Contract that has an aggregate future liability to any person (other than Red Simpson or any of its Subsidiaries) in excess of $100,000 (other than Contracts with customers or purchase orders entered into in the ordinary course of business after the date of this Agreement and not in violation of this Agreement);

(xxvi) Contract providing any person with rights or obligations with respect to any capital stock or equity interests of Red Simpson or any of its Subsidiaries;

(xxvii) Contract restricting the ability of Red Simpson and its Subsidiaries to employ, or solicit for employment, any person;

(xxviii) Contract that requires Red Simpson or any of its Subsidiaries to take any actions or incur expenses to remedy non-compliance with any Environmental Law; or

(xxix) Contract other than as set forth above to which Red Simpson or any of its Subsidiaries is a party or by which it or any of its assets or businesses is bound or to which it or any of its assets or businesses is subject that is material to the business of Red Simpson and its Subsidiaries or the use or operation of their assets.

(b) Except as set forth in Schedule 3.08(b), all Contracts required to be listed in the Schedules (the "Company Contracts") (i) were duly and validly executed and delivered by the parties thereto and (ii) are valid, binding and in full force and effect and are enforceable by Red Simpson or the applicable Subsidiary in accordance with their terms, except for such failures to be valid, binding, in full force and effect or enforceable that, individually or in the aggregate, have not had and could not reasonably be expected to have a Company Material Adverse Effect. Except as set forth in Schedule 3.08(b), Red Simpson or the applicable Subsidiary has performed all obligations required to be performed by it to date under Company Contracts, and it is not (with or without the lapse of time or the giving of notice, or both) in breach or default in any respect thereunder and, to the knowledge of Red Simpson, no other party to any Company Contract is (with or without the lapse of time or the giving of notice, or both) in breach or default in any

24

respect thereunder, except for such noncompliance, breaches and defaults that, individually or in the aggregate, have not had and could not reasonably be expected to have a Company Material Adverse Effect. None of Red Simpson or any of its Subsidiaries has, except as disclosed in the applicable Schedule, received any notice of the intention of any party to terminate (i) any Company Contract with any Key Customer, or (ii) any other Company Contract the effect of which in the case of this clause (ii) could reasonably be expected to have a Company Material Adverse Effect. True and complete copies of all Company Contracts, together with all modifications and amendments thereto, have been delivered to Purchaser.

SECTION 3.09. Personal Property. Schedule 3.09 sets forth a brief description of each item of personal property of Red Simpson and its Subsidiaries with an original cost in excess of $150,000, indicating, in each case, the purchase price thereof, the year of purchase and the accumulated book depreciation. Each item of personal property of Red Simpson and its Subsidiaries set forth on Schedule 3.09 is free from any material defect (ordinary wear and tear excepted), is suitable for current uses, and has been maintained in all material respects in accordance with the past practice of Red Simpson and its Subsidiaries and generally accepted industry practice, and no repairs, or regularly scheduled replacements or maintenance relating to any such item has been deferred. All leased personal property of the business of Red Simpson and its Subsidiaries is in all material respects in the condition required of such property by the terms of the lease applicable thereto.

SECTION 3.10. Receivables and Fuel Tax Credit. All the accounts receivable and amounts recorded as retainages of Red Simpson and its Subsidiaries (a) represent actual indebtedness incurred by the applicable account debtors or contracting parties and (b) have arisen from bona fide transactions in the ordinary course of business. To the knowledge of Red Simpson, all such accounts receivable and retainages are good and collectible at the aggregate recorded amounts thereof, net of any applicable reserves for doubtful accounts reflected on the audited consolidated balance sheet for Red Simpson as of December 31, 2003 included in the 2003 Financial Statements (the "2003 Balance Sheet"). To the knowledge of Red Simpson, the reserve for doubtful accounts in the 2003 Balance Sheet is adequate. Except as set forth on Schedule 3.10, since December 31, 2002, there have not been any write-offs as uncollectible of any receivables or retainages, except for write-offs in the ordinary course of business and consistent with past practices, none of which are greater than $50,000 for any single customer. To the knowledge of Red Simpson, the amount recorded for Fuel Tax Credit receivable in the 2003 Balance Sheet is good and collectible.

SECTION 3.11. Permits. Except as set forth in Schedule 3.11(i), (a) all material Permits possessed by Red Simpson and its Subsidiaries are in full force and effect and validly held by Red Simpson or one of its Subsidiaries, and Red Simpson or the applicable Subsidiary has complied in all material respects with all terms and conditions thereof, (b) during the past five years, none of Red Simpson or any of its Subsidiaries has received notice of any claim, suit, action or proceeding (a "Proceeding") relating to the revocation or material adverse modification of any such Permits, and (c) none of such Permits will be subject to suspension, material adverse modification,

revocation or nonrenewal as a result of the execution and delivery of this Agreement or the consummation of the Acquisition. Schedule 3.11(ii) sets forth a true and correct list of all material Permits issued or granted to Red Simpson or any of its Subsidiaries.

SECTION 3.12. Insurance. Red Simpson and its Subsidiaries maintain policies of fire and casualty, liability and other forms of insurance in such amounts, with such deductibles and against such risks and losses as are reasonable for the business and assets of Red Simpson and its Subsidiaries. The insurance policies owned and maintained by Red Simpson and its Subsidiaries or pursuant to which Red Simpson or its Subsidiaries are the named insured or otherwise a beneficiary of coverage as of the date hereof are set forth on Schedule 3.12(a). Except as set forth on Schedule 3.12(b), all such policies are in full force and effect. All premiums due and payable on such policies have been paid, and no notice of cancellation or termination has been received with respect to any such policy which has not been replaced on substantially similar terms prior to the date of such cancellation. The activities and operations of Red Simpson and its Subsidiaries have been conducted in a manner so as to conform in all material respects to all applicable provisions of such insurance policies and to the knowledge of Red Simpson, no basis exists for early termination of any of such insurance policies on the part of the insurer. To the knowledge of Red Simpson, no facts or circumstances exist that would relieve the insurer under any such policy of its obligation to satisfy in full any valid claim of Red Simpson or its Subsidiaries thereunder. Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will result in a gap in coverage or give any insurer a right to terminate or modify any of the terms of any such insurance policies. Except as set forth on Schedule 3.12(c), to the knowledge of Red Simpson, none of Red Simpson or its Subsidiaries has failed to give notice or present any material claim under any such insurance policy or binder in due and timely fashion, and no denial of coverage or reservation of rights has been issued on any claim by any insurance carrier. No insurance carrier has denied any claims made against any of the policies required to be listed on Schedule 3.12(a). Except as set forth on Schedule 3.12(d), the premiums on all insurance policies for periods prior to June 1, 1998, have been paid in full and there will be no future retrospective premium adjustments or loss charges on such policies.

SECTION 3.13. Taxes. (a) For purposes of this Agreement:

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Tax" or "Taxes" shall mean all (i) Federal, state, local, foreign and other taxes, assessments, duties or similar charges of any kind whatsoever, including all corporate franchise, income, sales, use, ad valorem, receipts, value added, profits, license, withholding, payroll, employment, excise, property, net worth, capital gains, transfer, stamp, documentary, social security, payroll, environmental, alternative minimum, occupation, recapture, unclaimed property and other taxes, and including any interest, penalties and additions imposed with respect to such amounts, (ii) liability for the payment of any amounts of the type described in clause (i) as a result of being a member of an affiliated, consolidated, combined, unitary or aggregate group and (iii) liability for the payment of any amounts as a result of an express or implied obligation to indemnify

26

any other person with respect to the payment of any amounts of the type described in clause (i) or (ii).

"Tax Return" or "Tax Returns" shall mean all returns, declarations of estimated tax payments, reports, estimates, information returns and statements, including any related or supporting information with respect to any of the foregoing, filed or to be filed with any Taxing Authority in connection with the determination, assessment, collection or administration of any Taxes.

"Taxing Authority" shall mean any domestic, foreign, federal, national, state, county, parish, or municipal or other local government, any subdivision, agency, commission or authority thereof, or any quasi-governmental body exercising tax regulatory authority.

(b) Except as set forth in Schedule 3.13, (i) Red Simpson and each of its Subsidiaries, and any affiliated group, within the meaning of Section 1504 of the Code, of which Red Simpson or any of its Subsidiaries is or has been a member, has filed or caused to be filed in a timely manner (within any applicable extension periods) all Tax Returns required to be filed by the Code or by applicable state, local or foreign tax laws, and each such Tax Return was true, complete and correct in all material respects, (ii) all Taxes with respect to taxable periods covered by such Tax Returns, and all other Taxes for which Red Simpson or any of its Subsidiaries is or might otherwise be liable have been timely paid in full and the 2003 Balance Sheet reflects an adequate reserve for all Taxes payable by Red Simpson and its Subsidiaries for all taxable periods and portions thereof through the date of the 2003 Balance Sheet, and (iii) there are no liens for Taxes with respect to any of the assets or properties of Red Simpson or any of its Subsidiaries except for statutory liens for Taxes not yet due or payable.

(c) Except with respect to Tax Returns that were not timely filed, as set forth in Schedule 3.13, (i) the relevant statute of limitations is closed with respect to the Federal income Tax Returns of Red Simpson and each of its Subsidiaries for all years through 1998 and the relevant statute of limitations is closed with respect to all material state and local income Tax Returns of Red Simpson and each of its Subsidiaries for all years through 1998. Except as set forth in Schedule 3.13, no Tax Return of Red Simpson or any of its Subsidiaries is under audit or examination by any Taxing Authority, and no written or unwritten notice of such an audit or examination has been received by Red Simpson or any of its Subsidiaries. Each material deficiency resulting from any audit or examination relating to Taxes by any Taxing Authority has been timely paid. No material issues relating to Taxes were raised by the relevant Taxing Authority in any completed audit or examination that can reasonably be expected to recur in a later taxable period. Red Simpson has made available to Purchaser documents setting forth the dates of the most recent audits or examinations of Red Simpson, any of its Subsidiaries or any affiliated group of which Red Simpson or any of its Subsidiaries has ever been a member by any Taxing Authority in respect of Federal, foreign and material state and local Taxes for all taxable periods for which the statute of limitations has not yet expired.

27

(d)  Except as set forth in Schedule 3.13, none of Red Simpson or any of its Subsidiaries is party to or bound by any written or oral tax sharing agreement, tax indemnity obligation or similar agreement, arrangement or practice with respect to Taxes (including any advance pricing agreement, closing agreement or other agreement relating to Taxes with any Taxing Authority).

(e)  None of Red Simpson or any of its Subsidiaries shall be required to include in a taxable period ending after the Closing Date taxable income attributable to income that accrued in a prior taxable period but was not recognized in any prior taxable period as a result of the installment method of accounting, the long-term contract method of accounting, the cash method of accounting or Section 481 of the Code or any comparable provision of state, local, or foreign Tax law, or for any other reason.

(f)  Except as set forth in Schedule 3.13, (i) none of the RSI Parties or any of their affiliates have made with respect to Red Simpson or any of its Subsidiaries, or any property held by Red Simpson or any of its Subsidiaries, any consent under Section 341 of the Code, (ii) no property of Red Simpson or any of its Subsidiaries is "tax exempt use property" within the meaning of Section 168(h) of the Code, (iii) none of Red Simpson or any of its Subsidiaries is a party to any lease made pursuant to Section 168(f)(8) of the Internal Revenue Code of 1954, and (iv) none of the assets of Red Simpson or any of its Subsidiaries is subject to a lease under Section 7701(h) of the Code or under any predecessor section thereof.

(g)  Except as set forth in Schedule 3.13, (i) there are no outstanding agreements or waivers extending, or having the effect of extending, the statutory period of limitation for assessment or collection of any Taxes, (ii) none of Red Simpson or any of its Subsidiaries, or any affiliated group, within the meaning of Section 1504 of the Code, of which Red Simpson or any of its Subsidiaries is or has been a member, has requested any extension of time within which to file any Tax Return, which return has not yet been filed, or pay any Taxes and (iii) no power of attorney with respect to any Taxes has been executed or filed with any Taxing Authority by or on behalf of Red Simpson or any of its Subsidiaries.

(h)  Except as set forth in Schedule 3.13, Red Simpson and its Subsidiaries have complied in all material respects with all Applicable Laws relating to the payment and withholding of Taxes (including withholding of Taxes pursuant to Sections 1441, 1442, 3121 and 3402 of the Code or any comparable provision of any state, local or foreign laws) and have, within the time and in the manner prescribed by Applicable Law, withheld from and paid over to the proper Taxing Authorities all amounts required to be so withheld and paid over under Applicable Laws.

(i)  Red Simpson has delivered to Purchaser for inspection (i) true and complete copies of all Tax Returns of Red Simpson, each Subsidiary and any affiliated groups of which Red Simpson or any of its Subsidiaries is or has ever been a part (but, in the case of any such affiliated group, only the portions of such Tax Returns relating to Red Simpson or any of its Subsidiaries) relating to Taxes for all taxable periods for which the applicable statute of limitations has not yet expired and (ii) true and complete copies

28

of all private letter rulings, revenue agent reports, information document requests, notices of proposed deficiencies, deficiency notices, protests, petitions, closing agreements, settlement agreements, pending ruling requests, and any similar documents, submitted by, received by or agreed to by or on behalf of Red Simpson or any of its Subsidiaries, or, to the extent related to the income, business, assets, operations, activities or status of Red Simpson or any of its Subsidiaries, submitted by, received by or agreed to by or on behalf of any affiliated group of which Red Simpson or any of its Subsidiaries is or has ever been a part, and relating to Taxes for all taxable periods for which the statute of limitations has not yet expired.

(j)  Schedule 3.13 sets forth (i) each jurisdiction in which Red Simpson or any of its Subsidiaries joins or has joined for any taxable period ending after December 31, 1997 in the filing of any consolidated, combined or unitary Tax Return, and (ii) the common parent corporation and the other individual members of the consolidated, combined or unitary group filing such Tax Return.

(k)  Schedule 3.13 sets forth each state, county, local, municipal or foreign jurisdiction in which Red Simpson or any of its Subsidiaries files or has been required to file a Tax Return relating to state and local income, franchise, license, excise, net worth, property or sales and use taxes or is or has been liable for any Taxes on a "nexus" basis at any time for taxable periods ending after December 31, 1997.

(l)  Red Simpson is not a United States real property holding company within the meaning of Section 897(c) of the Code.

(m)  Red Simpson has at all times from January 1, 1997 had in effect a valid election to be treated as an S Corporation under Section 1362 of the Code (or its predecessor Code provision) and under the corresponding provisions of applicable state and local laws where Red Simpson files Tax Returns, and none of the RSI Parties or Red Simpson have taken any action that would have caused a termination of any such election for any period. Since January 1, 1997, Red Simpson has not acquired assets with a carryover basis from a C Corporation under the Code, and no shares of capital stock of Red Simpson were held by any person or entity that was ineligible to be an S Corporation shareholder. Gillette Electric Construction, Inc. ("Gillette") has at all times from June 9, 2003 had in effect a valid election to be treated as a qualified subchapter S subsidiary of Red Simpson under Section 1362 of the Code (or its predecessor Code provision) and under the corresponding provisions of applicable state and local laws. Since June 9, 2003, Gillette has not acquired assets with a carryover basis from a C Corporation under the Code. Purchaser has been provided with a copy of the filing effecting such elections by Red Simpson and Gillette and all amendments thereto.

SECTION 3.14. Proceedings. Schedule 3.14(i) sets forth a list of each pending or, to the knowledge of Red Simpson, threatened Proceeding against or involving Red Simpson or any of its Subsidiaries or any of their properties or assets and that (a) relates to or involves more than $50,000, (b) seeks any injunctive relief, (c) relates to the transactions contemplated by this Agreement or the Ancillary Agreements, (d) involves any current or former director or officer of Red Simpson or any

[[NYCORP:2386341v2:4743A:05/04/04–03:14 p]]

of its Subsidiaries, (e) involves any current or former employee of Red Simpson or any of its Subsidiaries (other than workers compensation Proceedings) or (f) relates to or involves a workers compensation claim that could result in a liability to Red Simpson or its Subsidiaries in excess of $25,000. Except as set forth in Schedule 3.14(ii), none of the Proceedings listed in Schedule 3.14(i) could have, if determined adversely to Red Simpson or any of its Subsidiaries, individually or in the aggregate, a Company Material Adverse Effect. Except as set forth in Schedule 3.14(iii), none of Red Simpson or any of its Subsidiaries is a party or subject to or in default under any Judgment. Except as set forth in Schedule 3.14(iv) and except for cross-claims and counter-claims made in Proceedings otherwise disclosed in Schedule 3.14(i), there is not any Proceeding by Red Simpson or any of its Subsidiaries pending, or which Red Simpson or any of its Subsidiaries intends to initiate, against any other person. Except as set forth in Schedule 3.14(v), to the knowledge of Red Simpson, there is no pending or threatened investigation by any Governmental Entity of or involving Red Simpson or any of its Subsidiaries and there has been no such investigation during the past five years. For all purposes of this Agreement, any group of similar or related Proceedings shall constitute one Proceeding.

       SECTION 3.15. <u>Benefit Plans.</u> (a) Except (i) as set forth in Schedule 3.15(a)(i)(A) and (ii) for the severance plan (the "<u>Severance Plan</u>") adopted on May 4, 2004 for the benefit of certain administrative employees of Red Simpson, a copy of which is attached as Schedule 3.15(a)(i)(B), there are not any employment, consulting, deferred compensation, indemnification, severance, change-in-control or termination agreements, arrangements or understandings between Red Simpson or any of its Subsidiaries and any current or former director, officer, employee, agent, consultant or independent contractor of Red Simpson or any of its Subsidiaries (collectively, the "<u>Benefit Agreements</u>"), nor does Red Simpson or any of its Subsidiaries have any general severance plan, program or policy. Except as set forth in Schedule 3.15(a)(ii), since the date of the Balance Sheet, Red Simpson and its Subsidiaries have not adopted, amended, modified or terminated (or agreed or announced an intention to take any such actions with respect to) any collective bargaining agreement or other contract with any labor organization, union or association, or any bonus, pension, profit sharing, compensation, deferred compensation (including the Profit Sharing Interests and the Minority Interests), incentive compensation, stock ownership, stock purchase, stock option, phantom stock, retirement, thrift, savings, stock bonus, restricted stock, cafeteria, paid time off, perquisite, fringe benefit, vacation, severance, disability, death benefit, hospitalization, medical, welfare benefit or other plan, program, policy, arrangement or understanding, written or oral (whether or not legally binding), that is maintained, contributed to, or required to be maintained or contributed to, by Red Simpson, any of its Subsidiaries, or any other person or entity that, together with Red Simpson or any of its Subsidiaries, is or was treated as a single employer under Section 414(b), (c), (m) or (o) of the Code (each, together with Red Simpson, a "<u>Commonly Controlled Entity</u>"), in each case providing benefits to any current or former director, officer, employee, agent, consultant or independent contractor of Red Simpson, any of its Subsidiaries or any Commonly Controlled Entity (collectively, "<u>Benefit Plans</u>"), or any Benefit Agreement and have not made any material change in any actuarial or other assumption used to calculate funding obligations with respect to any Benefit Plan or any change in the manner in which

contributions to any Benefit Plan are made or the basis on which such contributions are determined.

(b)  Schedule 3.15(b) contains a list of all Benefit Plans, including those that are "employee pension benefit plans" (as defined in Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) (sometimes referred to herein as "Red Simpson Pension Plans") or "employee welfare benefit plans" (as defined in Section 3(1) of ERISA). Red Simpson has delivered to Purchaser true and complete copies of (i) each Benefit Plan and Benefit Agreement (or, in the case of any unwritten Benefit Plan or Benefit Agreement, a description thereof), (ii) the three most recent annual reports on Form 5500 required to be filed with the Internal Revenue Service with respect to each Benefit Plan, if applicable, and each other report, return or other document filed with any Governmental Entity, (iii) the most recent summary plan description for each Benefit Plan for which a summary plan description is required or was otherwise provided to plan participants or beneficiaries and (iv) each trust agreement and insurance or annuity contract or other funding or financing arrangement in effect relating to any Benefit Plan or Benefit Agreement.

(c)  Except as set forth in Schedule 3.15(c), Red Simpson, each of its Subsidiaries, each Benefit Plan, and each fiduciary thereunder is in compliance in all material respects with the applicable provisions of ERISA, the Code and all other Applicable Laws. Each Benefit Plan and Benefit Agreement has been administered in compliance with its terms in all material respects. All reports, returns and similar documents with respect to all Benefit Plans required to be filed with any Governmental Entity or distributed to any Benefit Plan participant have been duly and timely filed (or filed in accordance with the Department of Labor's Delinquent Filer Voluntary Compliance Program together with any payment required to be made in connection therewith) or distributed and, all such reports, returns and similar documents actually filed or distributed were, as of the date filed or distributed, true, complete and correct in all material respects. Except as set forth in Schedule 3.15(c), there is no pending or, to the knowledge of Red Simpson, threatened, investigation, dispute or Proceeding (except for claims for benefits payable in the normal course of operation of the Benefit Plans and Benefit Agreements) against, involving or relating to any Benefit Plan or Benefit Agreement, and there are no facts or circumstances that could give rise to any liability in the event of any such investigation, dispute or Proceeding. Except as set forth in Schedule 3.15(c), all contributions, payments and premiums required to be made under the terms of any Benefit Plan or any Benefit Agreement have been timely made. All payments to be made from, or pursuant to the terms of, any Benefit Plan or any Benefit Agreement have been timely made.

(d)  Except as set forth on Schedule 3.15(d), (i) all Red Simpson Pension Plans have been the subject of determination letters from the Internal Revenue Service to the effect that such Red Simpson Pension Plans and their related trusts are qualified and exempt from Federal income taxes under Sections 401(a) and 501(a), respectively, of the Code, and no such determination letter has been revoked nor, to the knowledge of Red Simpson, has revocation been threatened, nor has any event occurred nor does any circumstance exist that would adversely affect any Red Simpson Pension Plan's

qualification, nor has any such Red Simpson Pension Plan been amended since the date of its most recent determination letter or application therefor in any respect that would adversely affect its qualification, materially increase its costs or require security under Section 307 of ERISA; (ii) Red Simpson has delivered to the Purchaser a true and complete copy of the most recent determination letter received with respect to each Red Simpson Pension Plan, as well as a true and complete copy of each pending application for a determination letter, if any; and (iii) Red Simpson has provided to Purchaser a list of all amendments to the Red Simpson Pension Plans as to which a favorable determination letter has not yet been received. As of the Closing, Red Simpson and its Subsidiaries have made such filings with all Governmental Entities as are necessary or required of plans that are intended to be exempt from Parts 2, 3 and 4 of Title I of ERISA (it being acknowledged that the Profit Sharing Interests and the Minority Interests are intended to be exempt therefrom), and Red Simpson has delivered to Purchaser a true and complete copy of all such filings.

(e) No Red Simpson Pension Plan is, or has been, a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA or is, or has been, subject to the provisions of Part 3 of Title I or Title IV of ERISA, and none of Red Simpson, its Subsidiaries and any Commonly Controlled Entity could have any actual or contingent liability under Title IV of ERISA. Red Simpson and its Subsidiaries have not incurred, and could not be reasonably be expected to incur, any unfunded liability in relation to any Benefit Plan for which funding is required, and for any Benefit Plan for which funding is not required, all unfunded liabilities have been properly accrued on the 2003 Balance Sheet. None of Red Simpson, any of its Subsidiaries, any employee of Red Simpson or any of its Subsidiaries or any of the Benefit Plans that are subject to ERISA, including the Red Simpson Pension Plans, any trusts created thereunder or any trustee, fiduciary or administrator thereof, has engaged in a "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) or has acted or failed to act in any manner resulting in a breach of fiduciary responsibility that could subject Red Simpson, any of its Subsidiaries or any employee of Red Simpson or any of its Subsidiaries to the tax or penalty on prohibited transactions imposed by such Section 4975 or to any liability or sanction under Title I of ERISA or any other Applicable Law. None of such Benefit Plans and trusts has been terminated or is reasonably expected to be terminated.

(f) With respect to any Benefit Plan that is an employee welfare benefit plan, except as set forth on Schedule 3.15(f), (i) no such Benefit Plan is unfunded or funded through a "welfare benefits fund" (as such term is defined in Section 419(e) of the Code), (ii) each such Benefit Plan that is a "group health plan" (as such term is defined in Section 5001(b)(1) of the Code) complies with the applicable requirements of Section 4980B(f) of the Code and (iii) each such Benefit Plan may be amended or terminated without material liability to Red Simpson and its Subsidiaries at any time. Red Simpson and its Subsidiaries have no obligations for retiree health and life benefits under any Benefit Plan or Benefit Agreement.

(g) Except as set forth in Schedule 3.15(g), none of the execution and delivery of this Agreement or the Ancillary Agreements, the consummation of the Acquisition or the other transactions contemplated hereby and thereby (alone or in

[[NYCORP:2386341v2:4743A:05/04/04--03:14 p]]

32

combination with any other event, termination of employment), individually or collectively (the "Transactions"), will (i) entitle any current or former director, officer, employee, agent, consultant or independent contractor of Red Simpson or any of its Subsidiaries to severance, termination or change in control benefits, (ii) accelerate the time of payment or vesting or trigger any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, increase the amount payable or trigger any other material obligation pursuant to, any Benefit Plan or Benefit Agreement or (iii) result in any breach or violation of, or a default under, any Benefit Plan or Benefit Agreement.

(h)  No amount or other entitlement or economic benefit that could be received (whether in cash or property or the vesting of property) as a result of the Transactions by or for the benefit of any shareholder, director, officer, employee, agent, consultant or independent contractor of Red Simpson or any of its Subsidiaries or any of their affiliates could be characterized as an "excess parachute payment" (as defined in Section 280G(b)(1) of the Code) and no such individual is entitled to receive any additional payment from Red Simpson, any of its Subsidiaries or any other person in the event that the excise tax under Section 4999 of the Code is imposed on such individual.

(i)  Neither Red Simpson nor any of its Subsidiaries has any liability or obligation, including under or on account of a Benefit Plan, arising out of the hiring of any person by Red Simpson or any of its Subsidiaries to provide services to Red Simpson or any of its Subsidiaries and treating such person as an agent, consultant or independent contractor and not as an employee of Red Simpson or any of its Subsidiaries. Except as set forth in Schedule 3.15(i), there are no "leased employees" (as defined in Section 414(n) of the code) of Red Simpson or any of its Subsidiaries.

SECTION 3.16.  Absence of Changes or Events.  Except as set forth in Schedule 3.16, since December 31, 2003, there has not been any event, occurrence, development or state of circumstances or facts that has had or could reasonably be expected to have a Company Material Adverse Effect. Except as set forth in Schedule 3.16, since December 31, 2003, the business of Red Simpson and its Subsidiaries has been conducted in the ordinary course and in substantially the same manner as previously conducted. Except as set forth in Schedule 3.16, since December 31, 2003 until the date hereof, none of Red Simpson or any of its Subsidiaries has taken any action that, if taken after the date of this Agreement, would constitute a breach of Section 5.02.

SECTION 3.17.  Compliance.  Except as set forth in Schedule 3.17, Red Simpson and its Subsidiaries are in compliance in all material respects with all Applicable Laws. Except as set forth in Schedule 3.17, none of Red Simpson, any of its Subsidiaries or any of their directors or officers has received any written or Oral communication during the past five years from any person that alleges that Red Simpson or any of its Subsidiaries is not in compliance in any material respect with any Applicable Law.

SECTION 3.18. <u>Employee and Labor Matters.</u> (a) None of the employees of Red Simpson and its Subsidiaries is represented by any labor union with respect to such employee's employment. Except as set forth in Schedule 3.18(a): (i) there is not any, and during the past five years there has not been any, labor strike, work stoppage or lockout pending, or, to the knowledge of Red Simpson, threatened, against or involving Red Simpson or any of its Subsidiaries; (ii) to the knowledge of Red Simpson, no union organizational campaign is in progress with respect to the employees of Red Simpson or any of its Subsidiaries; (iii) none of Red Simpson or any of its Subsidiaries is engaged in any material violation of any Applicable Law relating to labor relations, employment or worker safety; (iv) there are not any unfair labor practice charges or complaints against Red Simpson or any of its Subsidiaries pending, or, to the knowledge of Red Simpson, threatened, before the National Labor Relations Board; (v) there are not any pending, or, to the knowledge of Red Simpson, threatened, labor or employment grievances against Red Simpson as to which there is a reasonable possibility of adverse determination and that, if adversely determined, individually or in the aggregate would be material to Red Simpson and its Subsidiaries; (vi) there are not any pending, or, to the knowledge of Red Simpson, threatened, charges against Red Simpson or any of its Subsidiaries or any of their current or former employees before the Equal Employment Opportunity Commission or any state or local agency responsible for the prevention of unlawful employment practices and that, if adversely determined, individually or in the aggregate would be material to Red Simpson and its Subsidiaries; and (vii) none of Red Simpson or any of its Subsidiaries has received written or oral communication during the past five years of the intent of any Governmental Entity responsible for the enforcement of labor or employment laws to conduct an investigation of or involving Red Simpson or any of its Subsidiaries and, to the knowledge of Red Simpson, no such investigation is in progress.

(b) Schedule 3.18(b) sets forth the name and address of each employee of Red Simpson and its Subsidiaries as of January 31, 2004, and contains a list of all officers and other employees of, and consultants to, Red Simpson and its Subsidiaries whose current annual salary (including bonus) is $60,000 or more, together with the current job title or relationship to Red Simpson and its Subsidiaries and the current annual salary (including bonus) for each such person, including a description of Benefit Agreements and Benefit Plans (other than Profit Sharing Interests and Minority Interests) applicable to such persons.

(c) No employee of Red Simpson or any of its Subsidiaries is, to the knowledge of Red Simpson, a party to or bound by any Contract, or subject to any Judgment, that may interfere with the use of such person's best efforts to promote the interests of Red Simpson and its Subsidiaries, that may conflict with the transactions contemplated hereby or that has had or could reasonably be expected to have a Company Material Adverse Effect. To the knowledge of Red Simpson, no activity of any employee, agent, consultant or independent contractor of Red Simpson or any of its Subsidiaries performed while employed by, or providing services to, Red Simpson or any of its Subsidiaries has caused a violation of any employment contract, confidentiality agreement or other Contract to which such person was a party.

SECTION 3.19. Transactions with Affiliates. Except as set forth in Schedule 3.19, none of the Contracts required to be set forth in Schedule 3.08(a) as a result of Section 3.08(a)(iv) will continue in effect subsequent to the Closing (other than the Employment Agreement Amendments, the Pike Employment Agreements and the Consulting Agreement). Except as set forth in Schedule 3.19, after the Closing, no affiliate of any RSI Party (other than Red Simpson) and no current or former shareholder, officer, director or employee of Red Simpson or any of its Subsidiaries will have any material interest in any property, asset (real or personal, tangible or intangible) or Contract of Red Simpson or any of its Subsidiaries or used in or pertaining to their business other than Contracts representing their Profit Sharing Interests and Minority Interests, to the extent that such interests have not been fully paid.

SECTION 3.20. Customers. Except for the customers named in Schedule 3.20 (any customer required to be so named, the "Key Customers"), none of Red Simpson or any of its Subsidiaries has any customer to whom it made more than 5% of its total sales during the fiscal year ended December 31, 2002 or the fiscal year ended December 31, 2003. Except as set forth in Schedule 3.20, since December 31, 2002, there has not been (a) any material adverse change in the business relationship of Red Simpson or any of its Subsidiaries with any Key Customer or (b) any change in the agreements with any such Key Customer, other than changes in the ordinary course of business. During the past twelve months, to the knowledge of Red Simpson, except as set forth on Schedule 3.20, none of Red Simpson or any of its Subsidiaries has (a) received any material written or Oral complaint from a Key Customer concerning its products and services, or (b) been informed in writing or Orally by any Key Customer, or otherwise has reason to believe, that such Key Customer expects to significantly reduce the services it will require from Red Simpson or any of its Subsidiaries or seek to terminate, re-bid or otherwise materially and adversely change the terms, conditions or pricing of such services. No Key Customer has informed Red Simpson or any of its Subsidiaries in writing or Orally that such Key Customer intends to change its relationship with Red Simpson or any of its Subsidiaries in any material manner because of the consummation of the transactions contemplated by this Agreement. No Key Customer is conducting an audit of the records of Red Simpson or any of its Subsidiaries in connection with the services provided by Red Simpson or its Subsidiaries. None of Red Simpson or any of its Subsidiaries has been informed in writing or Orally by any Key Customer, or otherwise has reason to believe, that any Key Customer intends to commence such an audit. None of Red Simpson or its Subsidiaries has made any payment or provided any services or other value to any Key Customer other than in the ordinary course of business consistent with past practice pursuant to the Contracts entered into with such Key Customer.

SECTION 3.21. Environmental Matters. (a) Except as set forth in Schedule 3.21:

(i) Red Simpson and its Subsidiaries are, and have been, in compliance in all material respects with all Environmental Laws, and neither Red Simpson nor any of its Subsidiaries has received any (A) written or Oral notice that alleges that Red Simpson or any of its

Subsidiaries is in violation of, or has any material liability under, any Environmental Law, (B) written request for information pursuant to any Environmental Law, or (C) notice regarding any requirement that is proposed for adoption or implementation under any Environmental Law and that would be applicable to the operations of Red Simpson or any of its Subsidiaries, the adoption or implementation of which is reasonably likely to have a Company Material Adverse Effect;

(ii) Red Simpson and its Subsidiaries have obtained and are in compliance in all material respects with all Permits pursuant to Environmental Law (collectively "Environmental Permits") necessary for their operations as currently conducted;

(iii) there are no material Environmental Claims pending or, to the knowledge of Red Simpson, threatened, against Red Simpson or any of its Subsidiaries;

(iv) there have been no Releases of any Hazardous Material that could reasonably be expected to form the basis of any material Environmental Claim against Red Simpson or any of its Subsidiaries or against any person whose liabilities for such Environmental Claims Red Simpson or any of its Subsidiaries has, or may have, retained or assumed, either contractually or by operation of law; and

(v) (A) neither Red Simpson nor any of its Subsidiaries has retained or assumed, either contractually or by operation of law, any material liabilities or obligations that could reasonably be expected to form the basis of any Environmental Claim against Red Simpson or any of its Subsidiaries, and (B) to the knowledge of Red Simpson, no Environmental Claims are pending against any person whose liabilities for such Environmental Claims Red Simpson or any of its Subsidiaries has, or may have, retained or assumed, either contractually or by operation of law.

(b) For purposes of this Agreement:

"Environmental Claim" means any and all administrative, regulatory or judicial Proceedings, orders, demands, directives, Liens, investigations, or written or Oral notices of violation by or from any person alleging liability of whatever kind or nature arising out of, based on or resulting from (A) the presence or Release of, or exposure to, any Hazardous Materials at any location; or (B) the failure to comply with any Environmental Law.

"Environmental Laws" means all applicable federal, state, local and foreign laws, rules, regulations, Judgments, legally binding agreements or Environmental Permits issued, promulgated or entered into by or with any Governmental Entity, relating to pollution, natural resources or protection of endangered or threatened species, human

health or the environment (including ambient air, surface water, groundwater, land surface or subsurface strata).

"Hazardous Materials" means (A) any petroleum or petroleum products, radioactive materials or wastes, asbestos in any form, urea formaldehyde foam insulation and polychlorinated biphenyls; and (B) any other chemical, material, substance or waste that in relevant form or concentration is prohibited, limited or regulated under any Environmental Law.

"Release" means any actual or threatened release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) or within any building, structure, facility or fixture.

### ARTICLE IV

### Representations and Warranties of Purchaser

Purchaser hereby represents and warrants to the RSI Parties, as of the date hereof and as of the Closing, as follows:

SECTION 4.01. Organization, Standing and Power. Purchaser is a corporation, duly organized, validly existing and in good standing under the laws of North Carolina. Purchaser has full corporate power and authority and possesses all Permits necessary to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as presently conducted, other than such Permits the lack of which, individually or in the aggregate, has not had and could not reasonably be expected to have a material adverse effect (i) on the ability of Purchaser to finance or perform its obligations under this Agreement and the Ancillary Agreements or (ii) on the ability of Purchaser to consummate the Acquisition and the other transactions contemplated by this Agreement and the Ancillary Agreements (a "Purchaser Material Adverse Effect").

SECTION 4.02. Authority; Execution and Delivery; and Enforceability. Purchaser has full power and authority to execute this Agreement and the Ancillary Agreements to which it is, or is specified to be, a party and to consummate the transactions contemplated to be consummated by it hereby and thereby. Purchaser has taken all corporate action required to authorize the execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is, or is specified to be, a party and to consummate the transactions contemplated to be consummated by it hereby and thereby. Purchaser has duly executed and delivered this Agreement and prior to the Closing will have duly executed and delivered each Ancillary Agreement to which it is, or is specified to be, a party. This Agreement constitutes, and each Ancillary Agreement to which it is, or is specified to be, a party, when so executed and delivered by Purchaser will constitute, its legal, valid and binding obligation, enforceable against it in accordance with its terms.

SECTION 4.03. <u>No Conflicts: Consents.</u> (a) Except as set forth in Schedule 4.03, the execution and delivery by Purchaser of this Agreement and each Ancillary Agreement to which it is, or is specified to be, a party do not, and the consummation of the transactions contemplated hereby and thereby and compliance by Purchaser with the terms hereof and thereof will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any person under, or result in the creation of any Lien upon any of the properties or assets of Purchaser or any of its subsidiaries under, any provision of (i) the articles of incorporation, by-laws, or similar organizational documents of Purchaser or its subsidiaries, (ii) any Contract to which Purchaser or any of its subsidiaries is a party or by which any of their respective properties or assets is bound or (iii) any Judgment or Applicable Law applicable to Purchaser or any of its subsidiaries or their respective properties or assets, other than, in the case of clauses (ii) or (iii), any such items that could not reasonably be expected to have a Purchaser Material Adverse Effect.

(b) No Consent of, or registration, declaration or filing with, any Governmental Entity is required to be obtained or made by or with respect to Purchaser or any of its subsidiaries in connection with the execution, delivery and performance of this Agreement or any Ancillary Agreement or the consummation of the transactions contemplated hereby and thereby, other than compliance with and filings under the HSR Act.

SECTION 4.04. <u>Litigation.</u> There are not any (a) outstanding Judgments against Purchaser or any of its subsidiaries, (b) Proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser or any of its subsidiaries or (c) investigations by any Governmental Entity that are, to the knowledge of Purchaser, pending or threatened against or affecting Purchaser or any of its subsidiaries that, in any case, could reasonably be expected to have a Purchaser Material Adverse Effect.

SECTION 4.05. <u>Securities Act.</u> The Shares to be purchased by Purchaser pursuant to this Agreement are being acquired for investment only and not with a view to any public distribution thereof, and Purchaser shall not offer to sell or otherwise dispose of the Shares so acquired by it in violation of any of the registration requirements of the Securities Act.

SECTION 4.06. <u>Commitment Letter.</u> Purchaser has delivered to Red Simpson a copy of the commitment letter that Purchaser has entered into with the other parties identified therein in connection with the proposed financing of a portion of the Adjusted Purchase Price. As of the date of this Agreement, Purchaser has not been informed by any party to the commitment letter that any of the conditions to consummating the financing described in such commitment letter will not be satisfied by the Closing. As of the date hereof, assuming the accuracy of all representations, warranties and covenants of Red Simpson and the RSI Parties contained in this Agreement, Purchaser has no reason to believe that any of the conditions to

38

consummating the financing described in such commitment letter will not be satisfied by the Closing.

## ARTICLE V

### Covenants; Other Agreements

SECTION 5.01. <u>Confidentiality.</u> (a) Purchaser acknowledges and agrees that the information being provided to it in connection with the Acquisition and the consummation of the other transactions contemplated hereby is subject to the terms of a confidentiality agreement, dated as of December 8, 2003, between Pike Electric, Inc. and KeyBanc Capital Markets (on behalf of Red Simpson) (the "<u>Confidentiality Agreement</u>"), the terms of which are incorporated herein by reference. Effective upon, and only upon, the Closing, the Confidentiality Agreement shall terminate.

(b) After the Closing, each of Mr. Dubea, Mr. Simpson and Mr. Thibeaux shall, and each shall cause George, German and Ginny to, keep confidential, all confidential or proprietary information relating to Red Simpson and its Subsidiaries, except (i) with respect to information which was at the Closing Date, or thereafter becomes, generally available to the public other than as a result of disclosure by the RSI Parties in breach of this Section 5.01(b) or (ii) to the extent an RSI Party is legally compelled to disclose such confidential information; provided, however, that in the case of this clause (ii), (A) the disclosing RSI Party has informed Purchaser in writing of the pending disclosure a reasonable period of time prior to such disclosure and (B) such RSI Party exercises reasonable best efforts to preserve the confidentiality of any information so disclosed.

SECTION 5.02. <u>Covenants Relating to Conduct of Business.</u> (a) Except for matters set forth in Schedule 5.02(a) or Schedule 5.02(b) or otherwise expressly permitted or expressly required by the terms of this Agreement, from the date of this Agreement to the Closing, Red Simpson shall, and shall cause each of its Subsidiaries to, conduct its business in the ordinary course in substantially the same manner as previously conducted, use its reasonable best efforts to keep intact its businesses, keep available the services of its current employees and preserve its relationships with customers, suppliers, and others with whom it deals to the end that its businesses shall be unimpaired at the Closing. The RSI Parties and Red Simpson shall not, and shall cause Red Simpson's Subsidiaries not to, take any action that would, or that could reasonably be expected to, result in any of the conditions to the Acquisition set forth in Article VI not being satisfied. In addition (and without limiting the generality of the foregoing), except as set forth in Schedule 5.02(a) or Schedule 5.02(b) or otherwise expressly permitted or expressly required by the terms of this Agreement, Red Simpson shall not, and shall cause each of its Subsidiaries to not, take any of the following actions without the prior written consent of Purchaser:

(i) amend its articles of incorporation, by-laws or similar organizational documents;

(ii) declare or pay any dividend or make any other distribution in cash or other assets to the holders of its capital stock or equity interests whether or not upon or in respect of any shares of its capital stock or equity interests; provided, however, that Red Simpson may, consistent with past practices, make distributions to the extent necessary to provide its shareholders with sufficient cash to pay estimated taxes on their distributable shares of Red Simpson's earnings (but no more), and the Subsidiaries may continue to make dividends and distributions to Red Simpson and its wholly-owned Subsidiaries;

(iii) redeem or otherwise acquire any shares of its capital stock or equity interests, or any other security convertible, exercisable or exchangeable for any capital stock or equity interests, other than redemptions of Minority Interests;

(iv) issue any capital stock or equity interests or any other security convertible, exercisable or exchangeable for any capital stock or equity interests, including options, warrants, rights, convertible or exchangeable securities, "phantom" stock rights, stock appreciation rights, stock-based performance units or similar commitments or arrangements;

(v) split, combine, reorganize, reclassify, recapitalize or take any similar action with respect to its outstanding capital stock or equity interests or authorize the issuance of any other securities in respect of, in lieu of, or in substitution for, any of its capital stock or equity interests;

(vi) (A) create or issue any Profit Sharing Interest or any Minority Interest or (B) make any payment or other distribution in respect of any Profit Sharing Interest or any Minority Interest except to employees or former employees pursuant to Section 5.19(c) or the last sentence of Section 5.20;

(vii) establish, enter into, adopt, extend, terminate, renew or amend any Benefit Plan, Benefit Agreement, collective bargaining agreement or other Contract with any labor organization, union or association except as expressly contemplated by Section 5.19(c) or Section 5.20;

(viii) (A) grant to any current or former director, officer, employee, agent or consultant of Red Simpson or any of its Subsidiaries any increase in or new type of compensation, bonus opportunity or benefits, except (i) with respect to foremen and other line workers junior to such foreman, increases in hourly wages in the ordinary course of business consistent with past practices or (ii) as required under a Benefit Plan or Benefit Agreement in effect and disclosed in Schedule 5.02(viii), (B) grant to any current or former director, officer, employee, agent, consultant or independent contractor of Red Simpson or any of its Subsidiaries the right to receive any severance, change in control or

termination pay or benefits or any increase therein other than as specifically contemplated by this Agreement, (C) take any action to accelerate or increase any rights or benefits under any Benefit Plan or Benefit Agreement other than as specifically contemplated by this Agreement, (D) take any action to fund or in any other way secure the payment of compensation or benefits under any Benefit Plan or Benefit Agreement other than as specifically contemplated by this Agreement, (E) make any material determinations not in the ordinary course of business consistent with past practice under any Benefit Plan, Benefit Agreement, collective bargaining agreement or other Contract with any labor organization, union or association or (F) terminate, or threaten to terminate, the employment of any employee of Red Simpson or its Subsidiaries;

(ix) incur or assume any material liabilities or obligations or any indebtedness described in clauses (a) through (e) of the definition of "Indebtedness", other than in the ordinary course of business and consistent with past practice; provided, however, that in no event shall Red Simpson or any of its Subsidiaries incur or assume any indebtedness described in clauses (a) through (e) of the definition of "Indebtedness" that will not be repaid prior to Closing;

(x) waive any claims or rights of substantial value;

(xi) enter into, or terminate, amend or modify any Contract that would be a Company Contract if it were in existence on the date hereof, or fail to exercise and thereby allow to lapse or reduce the value of any claims, rights or options of substantial value under any such Contract;

(xii) voluntarily permit any of its assets to become subjected to any Lien of any nature whatsoever that would have been required to be set forth in Schedule 3.05 or Schedule 3.06(b) if existing on the date of this Agreement;

(xiii) pay, lend or advance any amount to, or sell, transfer or lease any of its assets to, or enter into any agreement or arrangement with, any shareholder, officer, director or employee or affiliate of Red Simpson or any of its Subsidiaries, except for transactions among Red Simpson and its wholly-owned Subsidiaries;

(xiv) make any change in any method of accounting or accounting practice or policy (except as expressly required by GAAP), make any material election with respect to Taxes or settle or compromise any material Tax Claim;

(xv) acquire (in any manner) any business or any corporation, partnership, limited liability company, association or other business

41

organization or division thereof or otherwise acquire any assets (other than inventory, equipment and other assets acquired in the ordinary course of business consistent with past practice) that are material;

(xvi) make, incur or undertake to make or incur any capital expenditure that, individually, is in excess of $500,000 or in aggregate are in excess of $1,000,000 unless the full amount of such capital expenditure will have been paid prior to the Closing;

(xvii) sell, lease, license or otherwise dispose of any of its assets, except, sales of services, supplies and inventory, in each case in the ordinary course of business and consistent with past practice;

(xviii) enter into any lease of real property, except renewals of existing leases in the ordinary course of business;

(xix) enter into any Contract under which Red Simpson or any of its Subsidiaries, makes or commits to make any advance, loan, extension of credit or capital contribution to, or other investment in, any person;

(xx) enter into any Contract evidencing a limited liability company, partnership, joint venture or similar business relationship or entity;

(xxi) settle or compromise any dispute or any litigation set forth, or required to be set forth, on Schedule 3.14(i), 3.14(ii), 3.14(iii) or 3.14(v) in a manner that imposes any liabilities, obligations or restrictions on Red Simpson or its affiliates after the Closing; or

(xxii) authorize any of, or commit or agree to take, whether in writing or otherwise, any of the foregoing actions.

(b) From and after the close of business on the day immediately preceding the Closing Date, without the prior written consent of Purchaser, Red Simpson shall not, and shall cause each of its Subsidiaries to not, make any payment in respect of the Deferred Compensation Liability, the Closing Debt, the Company Expenses, the Insurance Reserve, the Severance Liability or any liability or obligation described in Section 8.02(c)(vi) or make any other payment that would have the effect of increasing the Adjusted Purchase Price or increasing the Closing Working Capital.

SECTION 5.03. Affirmative Covenants. Until the Closing, Red Simpson shall, and shall cause each of its Subsidiaries to:

(a) maintain its assets in the ordinary course of business and consistent with past practices in good operating order and condition, ordinary wear and tear excepted;

(b) upon any damage to, or destruction or loss of, any material asset, apply any and all insurance proceeds received with respect thereto to the prompt repair,