42

replacement and restoration thereof to the condition of such asset before such event or, if required, to such other (better) condition as may be required by Applicable Law;

(c)  maintain its level and quality of inventory and supplies, raw materials and spare parts in the ordinary course in a manner consistent with past practice; and

(d)  not spend less than a pro rata portion of the capital expenditure budget of Red Simpson of $15.6 million (the "Capex Amount") for the year ending December 31, 2004, such pro rata portion to be equal to the Capex Amount, multiplied by a fraction, the numerator of which is the number of days in calendar year 2004 ending on and prior to the day immediately preceding the Closing Date and the denominator of which is 365.

SECTION 5.04.  Advise of Changes.  The RSI Parties and Red Simpson shall promptly advise Purchaser in writing of the occurrence of any event, occurrence, development or state of circumstances or facts known to them which is material to the business, assets, condition (financial or otherwise) or results of operations of Red Simpson and its Subsidiaries, taken as a whole.  The RSI Parties and Red Simpson, on the one hand, and Purchaser, on the other hand, agree to give prompt notice to each other of, and to use their respective reasonable best efforts to prevent or promptly remedy, (a) the occurrence or failure to occur or the impending or threatened occurrence or failure to occur, of any event which occurrence or failure to occur would be likely to cause any of its representations or warranties in this Agreement to be untrue or inaccurate in any material respect (or in all respects in the case of any representation or warranty containing any materiality qualification) at any time from the date hereof to the Closing and (b) any material failure (or any failure in the case of any covenant, condition or agreement containing any materiality qualification) on its part to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder; provided, however, that no such notification shall affect the representations, warranties, covenants, agreements or indemnities of the parties or the conditions to the obligations of the parties.

SECTION 5.05.  Consultation.  In connection with the continuing operation of the business of Red Simpson and its Subsidiaries, between the date of this Agreement and the Closing, the RSI Parties and Red Simpson shall use reasonable best efforts to consult in good faith on a regular and frequent basis with the representatives of Purchaser to report material operational developments and the general status of ongoing operations pursuant to procedures reasonably requested by Purchaser or such representatives.  The RSI Parties and Red Simpson acknowledge that any such consultation shall not constitute a waiver by Purchaser of any rights it may have under this Agreement.

SECTION 5.06.  Insurance.  Red Simpson shall, and shall cause its Subsidiaries to, keep all insurance policies set forth in Schedule 3.12, or suitable replacements therefor, in full force and effect through the close of business on the Closing Date in a manner and of a term reasonably satisfactory to Purchaser.

SECTION 5.07. <u>Access to Information.</u> The RSI Parties and Red Simpson shall, and Red Simpson shall cause its Subsidiaries to, afford to Purchaser and its lenders and its and their accountants, counsel and other representatives access, upon reasonable notice during normal business hours during the period prior to the Closing, to all the personnel properties, books, Contracts, commitments, Tax Returns and records of Red Simpson and its Subsidiaries, and, during such period shall furnish promptly to Purchaser any information concerning Red Simpson or any of its Subsidiaries as Purchaser may reasonably request.

SECTION 5.08. <u>Purchaser Financing.</u> (a) The RSI Parties and Red Simpson shall, and Red Simpson shall cause its Subsidiaries and its and their employees, representatives and affiliates to, provide such assistance to Purchaser as may be reasonably requested by Purchaser, in securing the credit facilities sought by the Purchaser in connection with the Acquisition.

(b) After the Closing and until the one year anniversary of the Closing Date, the RSI Parties shall, and shall cause their representatives and affiliates to, at Purchaser's expense, provide such assistance as Purchaser shall reasonably request, in securing any financing sought by Purchaser to refinance any indebtedness incurred by Purchaser or its subsidiaries in connection with the Acquisition.

(c) Purchaser shall use its reasonable best efforts to obtain the debt financing described in the commitment letter provided to Sellers' Representative; <u>provided</u>, <u>however</u>, Purchaser shall not be required to agree to any terms additional to, or more burdensome than, those set forth in such commitment letter or pay additional fees or greater rates of interest in order to obtain such financing.

SECTION 5.09. <u>HSR Compliance and Reasonable Efforts.</u>
(a) Purchaser, Red Simpson and the RSI Parties shall, and Red Simpson shall cause its Subsidiaries to, (i) as promptly as practicable, but in no event later than five business days following the execution and delivery of this Agreement, file with the United States Federal Trade Commission (the "<u>FTC</u>") and the United States Department of Justice (the "<u>DOJ</u>") the notification and report form required for the transactions contemplated hereby and any supplemental information requested in connection therewith pursuant to the HSR Act and (ii) subject to Section 5.08(c), use their reasonable best efforts to cause to be taken all other actions necessary or appropriate for the purpose of consummating and effectuating the transactions contemplated by this Agreement as soon as practicable, but no later than the Outside Date. Any notification and report form and supplemental information shall be in substantial compliance with the requirements of the HSR Act. Purchaser, Red Simpson and the RSI Parties shall, and Red Simpson shall cause its Subsidiaries to, furnish to the other such necessary information and reasonable assistance as the other may request in connection with its preparation of any filing or submission that is necessary under the HSR Act. Purchaser, Red Simpson and the RSI Parties shall, and Red Simpson shall cause its Subsidiaries to, keep each other party apprised of the status of any communications with, and any inquiries or requests for additional information from, the FTC and the DOJ and shall comply promptly with any such inquiry or request and shall promptly provide any supplemental information requested in

connection with the filings made hereunder pursuant to the HSR Act. Any such supplemental information shall be in substantial compliance with the requirements of the HSR Act. Each party shall use its reasonable best efforts to obtain any clearance required under the HSR Act for the consummation of the transactions contemplated by this Agreement. Notwithstanding anything in this Agreement to the contrary, (i) Purchaser and its affiliates shall not be required to commence or defend any Proceeding or to divest, dispose of or hold separate any assets or any business to secure such HSR Act clearance and (ii) Red Simpson and the RSI Parties shall not, and Red Simpson shall cause its Subsidiaries to not, agree to any divestiture or disposal of assets or enter into any agreement with the FTC or any other Governmental Entity regarding the Acquisition without the prior written consent of Purchaser. The RSI Parties, on the one hand, and Purchaser, on the other hand, shall each be responsible for 50% of any filing fees incurred by the RSI Parties, Red Simpson and Purchaser associated with the HSR filing.

(b) Prior to the Closing and for a period of 12 months thereafter, the RSI Parties shall, and shall cause their affiliates to, use their reasonable best efforts (at their own expense) to obtain all consents, waivers and approvals from third parties necessary or desirable (i) to permit the consummation of the Acquisition and (ii) to permit Purchaser or Red Simpson to repay all Indebtedness at or prior to the Closing (collectively, the "Financing Consents"). Notwithstanding the foregoing, without Purchaser's prior written consent, no material term under any Contract shall be waived, amended or modified in order to obtain any such consent, waiver or approval.

SECTION 5.10. Expenses; Transfer Taxes. (a) Except as provided in Sections 5.09 and 9.03 and Article VIII, all costs and expenses incurred in connection with this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the party incurring such expense; provided, however, that, except as provided in Section 5.09, the RSI Parties shall bear all costs and expenses of Red Simpson and its Subsidiaries incurred in connection with this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby.

(b) All excise, registration, stamp, recording, documentary, conveyance, transfer, gross receipts and similar Taxes (collectively, "Transfer Taxes") applicable to the transfer of the Shares shall be paid by the Sellers. Each party shall use reasonable best efforts to avail itself of any available exemptions from any such Transfer Taxes or fees, and to cooperate with the other parties in providing any information and documentation that may be necessary to obtain such exemptions.

SECTION 5.11. Brokers or Finders. Purchaser and each of the RSI Parties represent that, as to itself and its affiliates, no agent, broker, investment banker or other firm or person is or will be entitled to any broker's or finder's fee or any other commission or similar fee in connection with any of the transactions contemplated by this Agreement, except, as to the RSI Parties and Red Simpson, KeyBanc Capital Markets. The fees and expenses of KeyBanc Capital Markets are as set forth on Schedule 5.11.

SECTION 5.12. Tax Matters. (a) Cooperation. The RSI Parties, Red Simpson and Purchaser shall reasonably cooperate, and shall cause their respective

affiliates, officers, employees, agents, accountants and representatives to reasonably cooperate, in preparing and filing all Tax Returns, including maintaining and making available to each other all records necessary in connection with Taxes and in resolving all disputes and audits with respect to all taxable periods relating to Taxes. Sellers' Representative and its affiliates will need access, from time to time, after the Closing Date, to certain accounting and Tax records and information held by Red Simpson and its Subsidiaries to the extent such records and information pertain to events occurring prior to the Closing Date; therefore, Purchaser shall, and shall cause each of its subsidiaries (including Red Simpson) to, (i) use its reasonable efforts to retain and maintain such records until the applicable statute of limitations (or, if earlier, such time as Sellers' Representative agrees that such retention and maintenance is no longer necessary), and (ii) to allow Sellers' Representative and its agents and representatives (and agents or representatives of any of its affiliates), upon reasonable prior notice at times and dates mutually acceptable to the parties, to inspect, review and make copies of such records as Sellers' Representative reasonably deems necessary or appropriate from time to time, such activities to be conducted during normal business hours and at Sellers' Representative's expense.

(b) Preparation of Tax Returns. Red Simpson shall cause to be prepared and timely filed all Tax Returns for Red Simpson and its Subsidiaries for all periods ending on or prior to the Closing Date. The Tax Return for the S Corporation short year shall not be filed without the prior written consent of Seller's Representative (which consent shall not be unreasonably withheld or delayed). Purchaser shall cause Red Simpson to permit Seller's Representative to review and comment on all other Tax Returns for periods ending on or prior to the Closing Date. Neither Purchaser nor Red Simpson shall (i) file or cause to be filed any amended Tax Returns, (ii) revoke, amend or seek to modify any material election made by Red Simpson or (iii) seek any private letter ruling with respect to any such election, in each case relating to any period ending on or prior to the Closing Date without the prior written consent of Sellers' Representative (which consent shall not be unreasonably withheld or delayed); provided however, no such consent shall be required if an amended Tax Return or private letter ruling is required by applicable law.

(c) Tax Claims. Purchaser will provide Sellers' Representative with prompt notice of any written inquiries, audits, examinations or proposed adjustments by the Internal Revenue Service or any other Taxing Authority, which relate to Red Simpson or any of its Subsidiaries ("Tax Claim") and which Tax Claim might result in an indemnity payment by the Sellers under Section 8.01; provided, however, that the failure to give such notice shall not affect the indemnification provisions in Section 8.01 except to the extent Sellers demonstrate that they have been actually and materially prejudiced as a result of such failure. Sellers' Representative shall at its expense control the resolution, disposition and settlement of any Tax Claim relating solely to Taxes which could reasonably be expected to result in an indemnity payment by the Seller under Section 8.01 (an "Indemnified Tax Claim"), using counsel selected by the Sellers' Representative; provided, however, that such counsel is reasonably satisfactory to Purchaser and provided further that Purchaser acknowledges its satisfaction with the firm of Jones, Walker, Waechter, Poitevent, Carrère & Denègre, L.L.P. ("Jones Walker").

Seller's Representative shall not settle any Indemnified Tax Claim without the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed). Purchaser shall have the right to participate in all aspects of the defense of an Indemnified Tax Claim and shall have the right to employ its own counsel at its expense with respect to such Indemnified Tax Claim. Sellers' Representative shall endeavor in good faith and use reasonable best efforts to advise Purchaser of all proceedings related to the contest of any Indemnified Tax Claim, all action taken or proposed to be taken by any Taxing Authority with respect to such Indemnified Tax Claim and all action proposed to be taken by the Sellers' Representative with respect to such Indemnified Tax Claim. Sellers' Representative shall promptly notify Purchaser if, in connection with any Indemnified Tax Claim, any Taxing Authority proposes to make any assessment or adjustments with respect to Tax items of Red Simpson and its Subsidiaries, which assessments or adjustments might not result in an indemnity payment by Sellers under Section 8.01. Purchaser shall control all proceedings with respect to all other Tax Claims. Neither Purchaser nor Red Simpson shall agree to any extension of the statute of limitation for any tax year ending on or prior to the Closing Date without the consent of the Sellers' Representative (which shall not be unreasonably withheld or delayed); provided, however that no such consent shall be required if an extension is requested by the Internal Revenue Service.

With respect to a Tax Claim that relates only in part to Taxes which could reasonably be expected to result in an indemnity payment by the Sellers under Section 8.01 ("Joint Tax Claim"), Purchaser shall endeavor in good faith and use reasonable best efforts to advise Sellers' Representative of (i) all proceedings related to the contest of such Joint Tax Claim, (ii) all action taken or proposed to be taken by any Taxing Authority with respect to such Joint Tax Claim, and (iii) all action proposed to be taken by Purchaser with respect to such Joint Tax Claim. Purchaser shall, to the extent practicable in advance of any proceedings, permit Sellers' Representative reasonable opportunity to review the content of documentation, protests, memoranda of fact and law, briefs, and stipulations of fact relating solely to the indemnifiable portion of such Joint Tax Claim. Purchaser shall consider in good faith any of Sellers' Representative's suggestions with respect to any Joint Tax Claim. Purchaser shall not settle any portion of a Joint Tax Claim that would give rise to an indemnity payment by the Sellers under Section 8.01 without the prior written consent of Sellers' Representative (which consent shall not be unreasonably withheld or delayed).

(d) Tax Sharing Agreements. The RSI Parties and Red Simpson shall cause the provisions of any tax sharing agreement between any RSI Party or any of its affiliates (other than Red Simpson and its Subsidiaries), on the one hand, and Red Simpson or any of its Subsidiaries, on the other hand, to be terminated on or before the Closing Date. After the Closing Date, no party shall have any rights or obligations under any such Tax sharing agreement.

SECTION 5.13. Publicity. No public release or public announcement concerning the transactions contemplated hereby shall be issued by any party without the prior consent of the other parties (which consent shall not be unreasonably withheld), except as such release or announcement may be required by law or the rules or

regulations of any United States Governmental Entity or any securities exchange or other regulatory body or similar entity, in which case the party required to make the release or announcement shall allow the other party reasonable time to comment on such release or announcement in advance of such issuance; provided, however, that each of Red Simpson and Purchaser may make internal announcements to their respective employees and, in the case of Purchaser, its affiliates and financing sources; and provided further that, except as required by any Applicable Law, any rule or regulation of any securities exchange or other regulatory body or similar entity or by GAAP, the parties shall not make any public announcement regarding the purchase price paid in the Acquisition.

SECTION 5.14. Resignations. At the Closing, the RSI Parties and Red Simpson shall cause to be delivered to Purchaser duly signed resignations (from the applicable board of directors), effective immediately after the Closing, of all directors of Red Simpson and each of its Subsidiaries and shall take such other action as is necessary to accomplish the foregoing.

SECTION 5.15. Arrangements with RSI Parties. Except as set forth in Schedule 5.15, prior to the Closing, the RSI Parties and Red Simpson shall cause all Contracts between Red Simpson or its Subsidiaries, on the one hand, and the RSI Parties and their affiliates (other than Red Simpson and its wholly owned Subsidiaries), on the other hand, to be terminated or settled and be of no further force or effect, notwithstanding any terms thereof to the contrary.

SECTION 5.16. Customer Meetings. Prior to the Closing, the RSI Parties shall, and shall cause Red Simpson and its Subsidiaries to, arrange for joint meetings among Purchaser (and its affiliates) and Mr. Simpson with certain customers of Red Simpson and its Subsidiaries set forth on Schedule 5.16 to discuss, without limitation, the status of the customer relationship ("Customer Calls").

SECTION 5.17. Trustee Undertaking. The RSI Parties shall cause the trustees of any Seller that is a trust to require each beneficiary of such trust who is of legal capacity (or in the case of a beneficiary not of legal capacity, the parent or legal guardian of such beneficiary) and who is to receive a distribution of trust proceeds comprised in whole or in part of any consideration received by such trust pursuant to the Acquisition, to execute, as a condition precedent to the receipt of any such distribution, an agreement whereby each such beneficiary agrees to return up to the entire amount of all such distributions to the trust to the extent necessary to enable such trust to comply with its obligation to indemnify Purchaser pursuant to Article VIII.

SECTION 5.18. Lease. At Closing, Purchaser, or Purchaser's designated entity, and Simpson-Noles L L.C., a Louisiana limited liability company ("Simpson-Noles"), owner of the land and premises located at 4615 Parliament Drive, Alexandria, Louisiana 71315 (collectively, the "Premises") shall enter into a lease (the "Lease") of that portion of the Premises currently occupied by Red Simpson and its Subsidiaries to Purchaser which Lease shall be in the form of Exhibit H.

48

SECTION 5.19. Employee Benefit Matters. (a) For a period of six months after the Closing, Purchaser shall provide, or cause Red Simpson to provide, to employees of Red Simpson and its Subsidiaries who remain employed by Red Simpson or any of its Subsidiaries after the Closing benefits that, taken as a whole, are not materially less favorable in the aggregate to such employees than one of (i) those provided to such employees under the Benefit Plans (other than the Profit Sharing Interests, the Minority Interests and any other plans providing for the issuance of capital stock of Red Simpson or any of its Subsidiaries or based on the value of capital stock of Red Simpson or any of its Subsidiaries) at the benefit levels in effect on the date of this Agreement and (ii) those provided by Purchaser to its employees from time to time after the Closing, and the choice of which of the foregoing shall be provided shall be determined in the sole discretion of Purchaser.

(b) Nothing contained in this Agreement shall be construed to prevent, from and after the Closing, the termination of employment of any individual employee of Red Simpson or any of its Subsidiaries or any change in the particular employee benefits provided to any such individual employee or the amendment or termination of any particular Benefit Plan or Benefit Agreement.

(c) Prior to the close of business on the day immediately preceding the Closing Date, Red Simpson shall pay to (i) each holder of any Profit Sharing Interest or Minority Interest, whose employment with Red Simpson or any of its Subsidiaries has terminated not less than one day prior to the Closing and who would otherwise receive a payment from Red Simpson in respect of such interest on or after the Closing, and (ii) each holder of any Profit Sharing Interest or Minority Interest who is currently employed by Red Simpson but who is no longer accruing benefits with respect to any Profit Sharing Interest or Minority Interest and who has already begun to receive payments with respect to such holder's accrued interests, in the case of this clause (ii), all of whom are listed on Schedule 5.19(c), an amount in cash equal to the aggregate amount payable to such holder in respect of all such interests held by such holder such that on and after the Closing Red Simpson and its Subsidiaries shall have no obligation or liability to such holder in respect of any such interests.

(d) Prior to the close of business on the day immediately preceding the Closing Date, Red Simpson and its Subsidiaries shall repay all Indebtedness owed to Max Green and secure the release of all Liens associated therewith. Such release shall be in a form reasonably satisfactory to Purchaser.

SECTION 5.20. Amendments of RSI Employment Agreements. The RSI Parties and Red Simpson shall use their reasonable best efforts to obtain from each holder of any Profit Sharing Interest or Minority Interest (other than the Excluded Holders) a duly executed and delivered amendment to such holder's existing employment agreement or agreements, as the case may be, substantially in the form of Exhibit I (an "Employment Agreement Amendment"). The RSI Parties and Red Simpson shall notify Purchaser in advance of, and describe in reasonable detail to Purchaser, the manner in which such Employment Agreement Amendments will be obtained, including any written communications with such holders, and no action shall be taken in connection therewith

to which Purchaser reasonably objects. In connection with their obtaining Employment Agreement Amendments, the RSI Parties and Red Simpson shall, except as otherwise expressly provided in the Employment Agreement Amendments, cause all the Profit Sharing Interests and Minority Interests to be terminated and of no further force and effect, and, except with respect to holders of Profit Sharing Interests or Minority Interests entering into Employment Agreement Amendments or Pike Employment Agreements, all amounts accrued to the benefit of the holders of such Profit Sharing Interests and Minority Interests to be paid in full as of the close of business on the day immediately preceding the Closing Date in a manner reasonably satisfactory to Purchaser.

SECTION 5.21. <u>Subsidiary.</u> Red Simpson shall use its reasonable best efforts to terminate at or prior to the day prior to the Closing Date the corporate existence of each of its Subsidiaries established as a result of a Contract in respect of a Minority Interest through a merger of each such Subsidiary with a newly-created wholly owned Subsidiary of Red Simpson (the "<u>Surviving Entity</u>"). The RSI Parties shall ensure that the Surviving Entity does not hold any assets. Immediately prior to the close of the business on the day prior to the Closing Date, Red Simpson shall distribute all capital stock of the Surviving Entity to George, German and Ginny in a manner reasonably acceptable to Purchaser.

SECTION 5.22. Employment Agreement and Consulting Agreement. The RSI Parties and Red Simpson shall use their reasonable best efforts to assist Purchaser to (i) enter into an employment agreement reasonably satisfactory to Purchaser with Ronald Applebee and (ii) a consulting agreement reasonably satisfactory to Purchaser with Rodney Frisard.

SECTION 5.23. <u>AEP Notice.</u> The parties shall use their reasonable best efforts to have AEP set forth the New AEP Work Crew Member Volume Amount in writing promptly following receipt by Red Simpson of notice by AEP awarding the AEP Project.

SECTION 5.24. <u>Further Assurances.</u> From time to time, as and when requested by any party, each party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions, as such other party may reasonably deem necessary or desirable to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

## ARTICLE VI

### Conditions Precedent

SECTION 6.01. <u>Conditions to Each Party's Obligation.</u> The obligation of Purchaser to purchase and pay for the Shares and to consummate the other transactions contemplated hereby and by the Ancillary Agreements and the obligation of Sellers to sell the Shares to Purchaser and for the RSI Parties to consummate the other transactions

contemplated hereby and by the Ancillary Agreements is subject to the satisfaction or waiver on or prior to the Closing of the following conditions:

(a) <u>Governmental Approvals.</u> The waiting period under the HSR Act shall have expired or been terminated. All other authorizations, consents, orders or approvals of, or declarations or filings with, or expirations of waiting periods imposed by, any Governmental Entity necessary for the consummation of the Acquisition shall have been obtained or filed or shall have occurred.

(b) <u>No Injunctions or Restraints.</u> No Applicable Law or temporary restraining order, or preliminary or permanent injunction or other order or decree enacted, entered, promulgated, enforced or issued by any Governmental Entity or other legal restraint or prohibition (each, a "<u>Legal Restraint</u>") shall be in effect preventing the sale of any Shares.

SECTION 6.02. <u>Conditions to Obligation of Purchaser.</u> The obligation of Purchaser to purchase and pay for the Shares and to consummate the other transactions contemplated hereby and by the Ancillary Agreements is subject to the satisfaction (or waiver by Purchaser) on or prior to the Closing Date of the following conditions:

(a) <u>Representations and Warranties.</u> The representations and warranties of each RSI Party and Red Simpson in this Agreement and the Ancillary Agreements that are qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, as of the date hereof and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date). Purchaser shall have received a certificate signed by each RSI Party, or by Sellers' Representative on their behalf, and Red Simpson to such effect.

(b) <u>Performance of Obligations of the RSI Parties.</u> Each RSI Party and Red Simpson shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by such RSI Party or Red Simpson, as the case may be, by the time of the Closing, and Purchaser shall have received a certificate signed by each RSI Party, or by Sellers' Representative on their behalf, and Red Simpson to such effect.

(c) <u>Opinion of Counsel.</u> Purchaser shall have received an opinion dated the Closing Date of Jones Walker, counsel to Red Simpson and the RSI Parties, substantially in the form of Exhibit J.

(d) <u>Absence of Proceedings.</u> There shall not be pending or threatened by any Governmental Entity any Proceeding (i) challenging or seeking to restrain or prohibit the Acquisition or any other transaction contemplated by this Agreement or the Ancillary Agreements or seeking to obtain from Purchaser or any of its subsidiaries in connection with the Acquisition any damages in relation to Purchaser, Red Simpson and their

respective subsidiaries, (ii) seeking to prohibit or limit the ownership or operation by Purchaser or any of its subsidiaries of any portion of the business or assets of Purchaser, Red Simpson or any of their respective subsidiaries, or to compel Purchaser, Red Simpson or any of their respective subsidiaries to dispose of or hold separate any portion of the business or assets of Purchaser, Red Simpson or any of their respective subsidiaries, in each case as a result of the Acquisition or any of the other transactions contemplated by this Agreement or the Ancillary Agreements, (iii) arising from or relating to the Profit Sharing Interests or the Minority Interests, (iv) arising from or relating to any Benefit Plan and seeking any form of relief that could reasonably be expected to have a Company Material Adverse Effect, (v) seeking to impose limitations on ability of Purchaser to acquire or hold, or exercise full rights of ownership of, the Shares, including the right to vote the Shares on all matters properly presented to the stockholders of Red Simpson or (vi) seeking to prohibit Purchaser or any of its subsidiaries from effectively controlling in any material respect the business or operations of Red Simpson or any of its Subsidiaries.

(e) Escrow Agreement. Each RSI Party and the Escrow Agent shall have duly executed and delivered to Purchaser counterparts of the Escrow Agreement.

(f) Employment Agreements and Consulting Agreements. Each of Mr. Dubea, Mr. Westbrook and Mr. Thibeaux shall have duly executed and delivered to Purchaser counterparts of the employment agreements set forth as Exhibits A, B and C, respectively and Mr. Simpson shall have duly executed and delivered to Purchaser a counterpart of the consulting agreement set forth as Exhibit D.

(g) Lease. Simpson-Noles shall have duly executed and delivered to Purchaser counterparts of the Lease.

(h) Amendments of RSI Employment Agreements. Red Simpson shall have delivered to Purchaser duly executed counterparts of Employment Agreement Amendments from holders of Profit Sharing Interests and Minority Interests (other than the Excluded Holders) representing (i) at least 90% of all such holders and (ii) at least 90% of the aggregate value of all Profit Sharing Interests and Minority Interests held by all such holders as of December 31, 2003 (as determined by the amounts shown next to the names of such individuals on Schedule 3.02(a)(i) and Schedule 3.02(b)(ii)).

(i) Compliance with Sections 5.19(c), 5.19(d) and 5.20. Red Simpson shall have delivered evidence reasonably satisfactory to Purchaser of compliance with Sections 5.19(c) and 5.19(d) and the last sentence of Section 5.20.

(j) Financing. Purchaser shall have obtained the funds necessary to (i) consummate the Acquisition, (ii) refinance all indebtedness of Purchaser and its subsidiaries and Red Simpson and its Subsidiaries (including all Indebtedness) and (iii) pay all related fees and expenses.

(k) Filings. Red Simpson and its Subsidiaries shall have made all such filings with all Governmental Entities as are necessary or required of plans that are

52

intended to be exempt from Parts 2, 3 and 4 of Title I of ERISA, together with any payment required to be made in connection therewith, and Red Simpson shall have delivered a true and complete copy of all such filings to Purchaser.

(l) <u>Waiver.</u> Red Simpson and each Seller shall have delivered to Purchaser a duly executed waiver reasonably satisfactory to Purchaser indicating that Red Simpson and each Seller has waived all of its rights under Article XI of Red Simpson's Articles of Incorporation with respect to the transfer of the Shares to Purchaser in the Acquisition.

(m) <u>Liens.</u> Red Simpson shall have delivered to Purchaser releases, in a form reasonably satisfactory to Purchaser, of all Liens that are or would be required to be set forth on Schedule 3.05 or 3.06(b).

(n) <u>Other Documents.</u> The RSI Parties and Red Simpson shall have furnished to Purchaser such other documents relating to corporate existence and authority, absence of Liens, and such other matters as Purchaser or its counsel may reasonably request.

(o) <u>Customer Calls.</u> Purchaser shall be reasonably satisfied with the results of the Customer Calls.

(p) <u>Simpson-Noles.</u> Red Simpson shall have delivered to Purchaser a release, in a form reasonably satisfactory to Purchaser, of Red Simpson and its Subsidiaries (other than Simpson-Noles) and their successors and assigns from all obligations and liabilities (including by way of guarantee) in respect of any indebtedness of Simpson-Noles.

(q) <u>Acceptance by Purchaser's Counsel.</u> The form and substance of all legal matters contemplated herein and of all documents delivered hereunder shall be reasonably acceptable to Cravath, Swaine & Moore LLP, counsel to Purchaser.

SECTION 6.03. <u>Conditions to Obligation of the RSI Parties.</u> The obligation of Sellers to sell the Shares and of the RSI Parties to consummate the other transactions contemplated hereby and by the Ancillary Agreements is subject to the satisfaction (or waiver by Sellers' Representative) on or prior to the Closing Date of the following conditions:

(a) <u>Representations and Warranties.</u> The representations and warranties of Purchaser made in this Agreement and the Ancillary Agreements that are qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, as of the date hereof and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date). Sellers' Representative shall have received a certificate signed by an authorized officer of Purchaser to such effect.

53

(b) <u>Performance of Obligations of Purchaser.</u> Purchaser shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Purchaser by the time of the Closing, and Sellers' Representative shall have received a certificate signed by an authorized officer of Purchaser to such effect.

(c) <u>Opinion of Purchaser's Counsel.</u> Sellers' Representative shall have received an opinion dated the Closing Date substantially in the form of Exhibit K. Such opinion shall be of Bell, Davis & Pitt, P.A., North Carolina counsel to Purchaser.

(d) <u>Absence of Proceedings.</u> There shall not be pending or threatened by any Governmental Entity any Proceeding challenging or seeking to restrain or prohibit the Acquisition or any other transaction contemplated by this Agreement or the Ancillary Agreements or seeking to obtain material damages from any RSI Party in connection with the Acquisition.

(e) <u>Lease.</u> Purchaser shall have duly executed and delivered to Simpson-Noles counterparts of the Lease.

(f) <u>Other Documents.</u> Purchaser shall have furnished to Sellers' Representative such other documents relating to corporate existence and authority and such other matters as Sellers' Representative or its counsel may reasonably request.

(g) <u>Acceptance by Counsel.</u> The form and substance of all legal matters contemplated herein and of all documents delivered hereunder shall be reasonably acceptable to Jones Walker, counsel to the RSI Parties and Red Simpson.

(h) <u>Frustration of Closing Conditions.</u> Neither Purchaser nor any RSI Party may rely on the failure of any condition set forth in this Article VI to be satisfied if such failure was caused by such party's failure to act in good faith or to use its reasonable best efforts to cause the Closing to occur, as required by Section 5.09.

ARTICLE VII

Termination, Amendment and Waiver

SECTION 7.01. Termination. Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated and the Acquisition and the other transactions contemplated by this Agreement abandoned at any time prior to the Closing:

(a) by mutual written consent of Sellers' Representative and Purchaser;

(b) by Sellers' Representative if any of the conditions set forth in Sections 6.01 or 6.03 shall have become incapable of fulfillment by the Outside Date, and shall not have been waived in writing by Sellers' Representative;

54

(c) by Purchaser if any of the conditions set forth in Sections 6.01 or 6.02 shall have become incapable of fulfillment by the Outside Date, and shall not have been waived in writing by Purchaser; or

(d) by Sellers' Representative or Purchaser, if the Closing does not occur on or prior to August 2, 2004 (the "Outside Date");

provided, however, that the party seeking termination pursuant to clause (b), (c) or (d) is not then in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement.

SECTION 7.02. Confidential Information. In the event of termination by Sellers' Representative or Purchaser pursuant to Section 7.01, written notice thereof shall forthwith be given to the other and the transactions contemplated by this Agreement shall be terminated, without further action by any party. If the transactions contemplated by this Agreement are terminated as provided herein:

(a) Purchaser shall return all documents and other material received from any RSI Party or Red Simpson relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to Red Simpson; and

(b) all confidential information received by Purchaser with respect to the business of Red Simpson and its Subsidiaries shall be treated in accordance with the Confidentiality Agreement, which shall remain in full force and effect notwithstanding the termination of this Agreement.

SECTION 7.03. Effect of Termination. If this Agreement is terminated and the transactions contemplated hereby are abandoned as described in Section 7.01, this Agreement shall become null and void and of no further force and effect, except for the provisions of (i) Section 5.01(a) relating to confidential information, (ii) Section 5.10 relating to certain expenses, (iii) Section 5.11 relating to finder's fees and broker's fees, (iv) Section 7.01, Section 7.02 and this Section 7.03, (v) Section 5.14 relating to publicity and (vi) Article IX. Nothing in this Section 7.03 shall be deemed to release any party from any liability for any breach by such party of the terms and provisions of this Agreement or to impair the right of any party to compel specific performance by any other party of its obligations under this Agreement.

ARTICLE VIII

Indemnification

SECTION 8.01. Tax Indemnification. (a) From and after the Closing, the RSI Parties, jointly and severally, shall indemnify Purchaser, its affiliates (including Red Simpson and its Subsidiaries) and each of their respective officers, directors, employees, stockholders, affiliates, agents and representatives (the "Purchaser Indemnitees") against and hold them harmless from (i) all liability for Taxes arising from any breach or inaccuracy of any representation or warranty contained in Section 3.13, (ii)

all liability for Taxes arising from the failure of Red Simpson (or any predecessor) to have been an S Corporation for Federal income Tax purposes (or comparable provision of state or local law) through the Closing Date or from the failure of Gillette to have been a qualified subchapter S subsidiary of Red Simpson for Federal income Tax purposes (or comparable provision of state or local law) through the Closing Date, (iii) all liability for Taxes of Red Simpson (or any predecessor) or any of its Subsidiaries for any taxable period, or portion thereof, ending on or prior to the Closing Date and (iv) all liability for reasonable legal fees and expenses for any item attributable to any item in clause (i), (ii) or (iii) above.

(b) The RSI Parties shall pay to Purchaser upon written demand an amount equal to 38% of any portion of the Pre-Tax Notional Amount that was assumed to be deductible in the determination of the Tax-Adjusted Notional Amount Purchaser is unable to deduct for Tax purposes in the Tax period in which such portion of the Pre-Tax Notional Amount was paid; provided, however, that if Purchaser is able to deduct such portion in a later Tax period, Purchaser shall notify the Sellers' Representative of such deduction and pay to Sellers' Representative, on behalf of the RSI Parties, the economic benefit of such later deduction, but only to the extent of indemnity payments previously made by the RSI Parties with respect to such portion. Such payment shall be made on the later of (i) 10 days following Sellers' Representative's receipt of such written demand and (ii) 10 days following the date Purchaser has filed a Tax Return for the applicable period.

(c) The RSI Parties shall pay to Purchaser upon written demand an amount equal to 38% of any portion of the pre-tax amount of the Insurance Reserve that was assumed to be deductible in the determination of the Insurance Reserve Purchaser is unable to deduct for Tax purposes in the Tax period in which such portion of the pre-tax amount was paid; provided, however, that if Purchaser is able to deduct such portion in a later Tax period, Purchaser shall notify the Sellers' Representative of such deduction and pay to Sellers' Representative, on behalf of the RSI Parties, the economic benefit of such later deduction, but only to the extent of indemnity payments previously made by the RSI Parties with respect to such portion. Such payment shall be made on the later of (i) 10 days following Sellers' Representative's receipt of such written demand and (ii) 10 days following the date Purchaser has filed a Tax Return for the applicable period.

(d) The RSI Parties shall pay to Purchaser upon written demand an amount equal to 38% of any portion of the pre-tax amount of the Severance Liability that was assumed to be deductible in the determination of the Severance Liability Purchaser is unable to deduct for Tax purposes in the Tax period in which such portion of the pre-tax amount was paid; provided, however, that if Purchaser is able to deduct such portion in a later Tax period, Purchaser shall notify the Sellers' Representative of such deduction and pay to Sellers' Representative, on behalf of the RSI Parties, the economic benefit of such later deduction, but only to the extent of indemnity payments previously made by the RSI Parties with respect to such portion. Such payment shall be made on the later of (i) 10 days following Sellers' Representative's receipt of such written demand and (ii) 10 days following the date Purchaser has filed a Tax Return for the applicable period.

56

(e) In the case of any taxable period that begins before, and ends after, the Closing Date (a "Straddle Period"), (i) real, personal, intangible property and other ad valorem Taxes ("Property Taxes") for the portion of the Straddle Period ending on the Closing Date shall be equal to the amount of such Property Taxes for the entire Straddle Period, multiplied by a fraction, the numerator of which is the number of days during the Straddle Period that are in the portion of such period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period and (ii) all other Taxes for the portion of the Straddle Period ending on the Closing Date shall be determined based on an actual closing of the books as if the taxable period ended as of the close of business on the Closing Date.

(f) Purchaser shall pay to Sellers' Representative, on behalf of the RSI Parties, an amount equal to 62% of any Employment Tax Amount that Purchaser determines, (i) in connection with the payment or forfeiture of any base amount, multiplier amount or additional amount (as described in the definition of "Pre-Tax Notional Amount"), is not required to be paid, (ii) in connection with the forfeiture of any amount that would have been payable under the Severance Plan, is not required to be paid, (iii) in connection with any Employment Tax Amount that was assumed to have been paid under the definition of "Pre-Tax Notional Amount", would not have been required to be paid if the amounts described in clauses (i) and (ii) of the definition of "Pre-Tax Notional Amount" were assumed to be the last amounts of compensation paid by Red Simpson, Purchaser or any of their respective affiliates to the relevant individuals in the applicable year and (iv) in connection with any Employment Tax Amount that was assumed to have been paid under the definition of "Severance Liability", would not have been required to be paid if the amount paid to an individual under the Severance Plan was assumed to be the last amount of compensation paid to the relevant individual by Red Simpson, Purchaser or any of their respective affiliates in the applicable year; provided, however, that, in each case, if Purchaser or Red Simpson or its affiliates are subsequently required to pay any such Employment Tax Amounts, Purchaser shall notify Sellers' Representative in writing of such requirement and not later than 10 days following Sellers' Representative's receipt of such written notice the RSI Parties shall pay to Purchaser the amount of such Employment Tax Amount.

(g) Except as provided in Section 8.01(b), 8.01(c), 8.01(d) or 8.01(f), any indemnity payment to be made under this Section 8.01 shall be paid within 10 days after the indemnified party makes written demand upon the indemnifying party, but in no case earlier than five business days prior to the date on which the relevant Taxes are required to be paid to the relevant Taxing Authority (including as estimated Tax payments).

(h) Notwithstanding the foregoing, (i) Mr. Dubea and George shall only be responsible under this Section 8.01 for George's Proportionate Amount of any Losses for which indemnification is sought and (ii) Mr. Thibeaux shall only be responsible under this Section 8.01 for Mr. Thibeaux's Proportionate Amount of any Losses for which indemnification is sought. As between the Purchaser Indemnitees and the other RSI Parties, the other RSI Parties shall remain responsible for 100% of all Losses for which indemnification is sought under this Section 8.01, notwithstanding such limitation of liability as to Mr. Dubea, George and Mr. Thibeaux.

SECTION 8.02. Other Indemnification by the RSI Parties. (a) Each RSI Party shall indemnify each Purchaser Indemnitee against and hold it harmless from, any loss, liability, fine, fee, penalty, claim, damage or expense, including reasonable legal fees and expenses (collectively, "Losses"), suffered or incurred by such Purchaser Indemnitee (other than any Loss relating to Taxes, for which indemnification provisions are set forth in Section 8.01) arising from, relating to or otherwise in respect of:

(i) any breach of any representation or warranty made, or deemed made, by such RSI Party in Article II or in any certificate delivered pursuant hereto relating to Article II; and

(ii) any breach of any covenant or agreement of such RSI Party contained in Section 5.01(b).

(b) The RSI Parties shall, jointly and severally, indemnify each Purchaser Indemnitee against and hold it harmless from any Losses suffered or incurred by such Purchaser Indemnitee (other than any Loss relating to Taxes, for which indemnification provisions are set forth in Section 8.01) arising from, relating to or otherwise in respect of (A) any breach of any covenant or agreement of any RSI Party contained in this Agreement (other than Section 5.01(b), for which indemnification is provided in Section 8.02(a)) or in any certificate delivered pursuant hereto relating to any such covenant or agreement and (B) any breach of any covenant of Red Simpson to be performed by Red Simpson at or prior to the Closing contained in this Agreement or in any certificate delivered pursuant hereto relating to any such covenant.

(c) The RSI Parties shall, jointly and severally, indemnify each Purchaser Indemnitee against and hold it harmless from any Losses suffered or incurred by Purchaser Indemnitee (other than, in the case of clause (i) of this Section 8.02(c), any Loss relating to Taxes, for which indemnification provisions are set forth in Section 8.01) arising from, relating to or otherwise in respect of:

(i) any breach of any representation or warranty contained in this Agreement (other than a representation or warranty included in Article II, for which indemnification is provided in Section 8.02(a)) or in any certificate delivered pursuant hereto relating to such representations and warranties;

(ii) any fees, expenses or other payments incurred or owed by any RSI Party or Red Simpson or any of its Subsidiaries to any agents, brokers, investment bankers or other firms or persons retained or employed by any of them in connection with the transactions contemplated by this Agreement or the Ancillary Agreements, except to the extent included in the calculation of Company Expenses;

(iii) any failure of Red Simpson or any of its Subsidiaries or any of their respective directors, officers, employees or agents to comply with, or any other violation of, any provision or requirement of ERISA or the

rules or regulations promulgated thereunder, whether arising as a result of a claim made by any participant in any Benefit Plan or any Governmental Entity or otherwise;

(iv) all obligations and liabilities in respect of all Profit Sharing Interests, all Minority Interests, all Employment Agreement Amendments and, solely with respect to Section 2.02 of the Pike Employment Agreements, the Pike Employment Agreements in excess of the Payout Amount either (x) arising from or relating to periods on or prior to the Closing Date or (y) arising from or relating to periods following the Closing Date, but, in the case of this clause (y), only to the extent due to the required continuation by Purchaser, Red Simpson or its Subsidiaries of a Profit Sharing Interest or Minority Interest in effect prior to the Closing or any termination of such a Profit Sharing Interest or Minority Interest by Purchaser, Red Simpson or their Subsidiaries or any settlement by any person of any dispute relating thereto (it being understood that Purchaser, Red Simpson and their Subsidiaries shall be entitled following the Closing to enter into any such settlement);

(v) all obligations and liabilities arising from, relating to, or otherwise in respect of, any property set forth on Schedule 5.02(b), or any agreement effecting the transfer, sale or distribution of any such property;

(vi) all obligations and liabilities arising from, relating to, or otherwise in respect of, (and costs associated with) (A) payments made to Quentin Gillette and Beth Gillette or any other person pursuant to that Settlement Agreement among Quentin Gillette, Beth Gillette and Red Simpson, dated as of April 20, 2004, (B) payments made to Quentin Gillette or any other person pursuant to that Agreement Not to Complete between Quentin Gillette and Red Simpson, dated as of April 20, 2004, (C) payments made to Beth Gillette or any other person pursuant to that Agreement Not to Compete between Beth Gillette and Red Simpson, dated as of April 20, 2004, (D) payments made to Quentin Gillette and Beth Gillette or any other person pursuant to Section 1(d) and 1(e) of the Gillette Stock Purchase Agreement among Quentin Gillette, Beth Gillette and Red Simpson, dated as of June 8, 2003, and (E) the enforcement of the terms of any existing non-competition agreement with Quentin Gillette and Beth Gillette; and

(vii) all obligations and liabilities arising from, relating to, or otherwise in respect of, the sale of the Aircraft;

(viii) all obligations and liabilities arising from, relating to, or otherwise in respect of, the Severance Plan in excess of $489,650; and

(ix) except for the obligations of Red Simpson under the Lease, all obligations and liabilities arising from, relating to, or otherwise in respect

of, Simpson-Noles, including those relating to (A) the transfer of membership interests in Simpson-Noles and (B) the Operating Agreement of Simpson-Noles, L.L.C., dated as of June 26, 1996, between Red Simpson and Rodney V. Noles.

(d) The RSI Parties shall not have any liability:

(i) under clause (i) of Section 8.02(c) unless the aggregate of all Losses for which the RSI Parties would, but for this clause (i), be liable thereunder exceeds on a cumulative basis an amount equal to $5,000,000, and then only to the extent of any such excess; provided, however, that this clause (i) shall not apply to any claim for indemnification arising out of (x) a breach or alleged breach of Section 3.01(c), 3.02, 3.04(c), 3.05(b) or 3.15 or the first sentence of Section 3.01(a) or (y) an intentional or willful breach of any representation or warranty;

(ii) under clause (i) of Section 8.02(c) for any individual items where the Loss relating thereto is less than $10,000; provided, however, that this clause (ii) shall not apply to any claim for indemnification arising out of (x) a breach or alleged breach of Section 3.01(c), 3.02, 3.04(c), 3.05(b) or 3.15 or the first sentence of Section 3.01(a) or (y) an intentional or willful breach of any representation or warranty;

(iii) under clause (i) of Section 8.02(c) in excess of $21,800,000; provided, however, that this clause (iii) shall not apply to any claim for indemnification arising out of (x) a breach or alleged breach of Section 3.01(c), 3.02, 3.04(c), 3.05(b) or 3.15 or the first sentence of Section 3.01(a) or (y) an intentional or willful breach of any representation or warranty; and

(iv) under Section 8.01, 8.02(a)(ii) or 8.02(b) or clause (i), (ii), (iii) or (iv) of Section 8.02(c) in excess of the Adjusted Purchase Price; provided, however, that this clause (iv) shall not apply to any claim for indemnification arising out of (x) a breach or alleged breach of Section 3.01(c), 3.02, 3.04(c) or 3.05(b) or the first sentence of Section 3.01(a) or (y) an intentional or willful breach of any representation or warranty.

(e) Notwithstanding the foregoing, (i) Mr. Dubea and George shall only be responsible under Section 8.02(b) or 8.02(c) for George's Proportionate Amount of any Losses for which indemnification is sought and (ii) Mr. Thibeaux shall only be responsible under Section 8.02(b) or 8.02(c) for Mr. Thibeaux's Proportionate Amount of any Losses for which indemnification is sought. As between the Purchaser Indemnitees and the other RSI Parties, the other RSI Parties shall remain responsible for 100% of all Losses for which indemnification is sought under Section 8.02(b) or 8.02(c), notwithstanding such limitation of liability as to Mr. Dubea, George and Mr. Thibeaux.

(f) The parties acknowledge and agree that (i) the indemnification provisions set forth in Sections 8.02(a)(i), 8.02(c)(i) (solely with respect to a breach or alleged breach of Section 3.01(c), 3.02 or 3.04(c) or the first sentence of Section 3.01(a)), 8.02(c)(v), 8.02(c)(vi), 8.02(c)(vii), 8.02 (c)(viii) and 8.02(c)(ix) are not subject to any cap or basket; (ii) the indemnification provisions set forth in Sections 8.01, 8.02(a), 8.02(b), 8.02(c)(i) (solely with respect to any breach or alleged breach of Section 3.01(c), 3.02, 3.04(c), 3.05(b) or 3.15 or the first sentence of Section 3.01(a)), 8.02(c)(ii), 8.02(c)(iii), 8.02(c)(iv), 8.02(c)(v), 8.02(c)(vi), 8.02(c)(vii), 8.02(c)(viii) and 8.02(c)(ix) are not subject to any basket; (iii) with respect to any Losses for which Purchaser is entitled to indemnification pursuant to clauses (iii) or (iv) of Section 8.02(c), the RSI Parties' indemnification obligation shall be for 100% of such Losses until the RSI Parties have made indemnification payments pursuant to such clauses in an aggregate amount of $50,000,000 and for 50% of all such Losses in excess of $50,000,000 in the aggregate; and (iv) except as otherwise provided in Sections 8.01(h) and 8.02(e), the indemnification obligations provided in Section 8.01, Section 8.02(b) and Section 8.02(c) shall be joint and several and the Purchaser Indemnitees shall be entitled to seek indemnification from any RSI Party in respect of indemnification provided in Section 8.01, Section 8.02(b) and Section 8.02(c).

(g) Purchaser acknowledges that liability in respect of Section 8.02(a) shall be individual and Purchaser shall only be entitled to seek indemnification in respect thereof from the RSI Party in breach, or deemed to be in breach, of the applicable representation, warranty, covenant or certificate.

(h) For the avoidance of doubt, the parties acknowledge and agree that after the Closing Red Simpson and its Subsidiaries shall be Purchaser Indemnitees and shall be entitled to indemnification from the RSI Parties under this Article VIII notwithstanding the fact that Red Simpson has made representations and agreed to covenants in favor of Purchaser hereunder.

(i) Except as otherwise specifically provided in this Agreement, each party acknowledges that, should Closing occur, its sole and exclusive monetary remedy with respect to any and all claims relating to this Agreement and the Acquisition (other than claims of, or causes of action arising from, fraud) shall be pursuant to the indemnification provisions set forth in this Article VIII.

SECTION 8.03. Escrow. The parties acknowledge and agree that prior to attempting to recover against the RSI Parties pursuant to the indemnification provisions of this Article VIII, Purchaser shall first proceed against and withdraw from the Escrow Amount unless such recovery relates to Section 8.01, 8.02(a), 8.02(c)(ii), 8.02(c)(v), 8.02(c)(vi), 8.02(c)(vii), 8.02(c)(viii), 8.02(c)(ix) or a breach or alleged breach of Section 3.01(c), 3.02, 3.04(c), 3.05(b) or the first sentence of Section 3.01(a) (and this Section 8.03 shall not limit the right of Purchaser to first proceed directly against the RSI Parties pursuant any of such Sections) or an intentional or willful breach of any representation or warranty.

61

SECTION 8.04. <u>Indemnification and Reimbursement by Purchaser.</u>
(a) Purchaser shall indemnify each RSI Party and each of their respective trustees, affiliates (other than Red Simpson and its Subsidiaries), agents and representatives (the "Seller Indemnitees") against and hold it harmless from any Loss suffered or incurred by such Seller Indemnitee arising from, relating to or otherwise in respect of:

(i) any breach of any representation or warranty of Purchaser contained in Article IV or in any certificate delivered pursuant hereto relating to Article IV;

(ii) any breach of any covenant of Purchaser contained in this Agreement or in any certificate delivered pursuant hereto relating to such covenant;

(iii) any fees, expenses or other payments incurred or owed by Purchaser to any agents, brokers, investment bankers or other firms or persons retained or employed by it in connection with the transactions contemplated by this Agreement; and

(iv) any liability of Mr. Simpson, John Charles Simpson 2003 Grantor Retained Annuity Trust for John, Jr., John Charles Simpson, Jr., Trust, John Charles Simpson 2003 Grantor Retained Annuity Trust for Angela or Angela Katherine Simpson Trust (collectively, the "Performance Bond Guarantors") under the Agreement of Indemnity, dated as of February 12, 2004, among the Performance Bond Guarantors, the Ohio Casualty Insurance Company and Red Simpson to the extent that such liability arises after the Closing.

(b) Purchaser shall reimburse Sellers (by payment to Sellers' Representative) with respect to any amounts (up to the Cap) to which an employee would have been entitled pursuant to an Employment Agreement Amendment or Section 2.02 of a Pike Employment Agreement that is forfeited by such employee pursuant to the terms of such Employment Agreement Amendment or Pike Employment Agreement, according to the following formula: (i) Purchaser shall reimburse Sellers for 50% of any portion of the forfeited amount that was assumed not to be deductible for Tax purposes in the determination of the Tax Adjusted Notional Amount; and (ii) Purchaser shall reimburse Sellers for 31% of any portion of the forfeited amount that was assumed to be deductible for Tax purposes in the determination of the Tax Adjusted Notional Amount. For purposes of this Section 8.04(b), the "Cap" shall be the amount that represents 50% of the aggregate amounts to which all employees would have been entitled pursuant to Section 1.02 of the Employment Agreement Amendments or Section 2.02(b) of the Pike Employment Agreements. For the avoidance of doubt, Purchaser shall not make any reimbursement with respect to any forfeited amounts to the extent such forfeited amounts, together with all other forfeited amounts exceed the Cap.

(c) Purchaser shall reimburse Sellers (by payment to Sellers' Representative) an amount equal to 62% of any amounts otherwise payable to employees under the Severance Plan that are forfeited in accordance with the terms thereof.

SECTION 8.05.  Calculation of Losses.  Any indemnity payment made to, by or on behalf of Purchaser under this Agreement shall be treated as an adjustment to the Adjusted Purchase Price, for Tax purposes, unless a final determination (which shall include the execution of a Form 870-AD or successor form) with respect to the indemnified party causes any such payment not to be treated as an adjustment to the Adjusted Purchase Price for United States Federal income tax purposes. Any indemnity payment made to Red Simpson or any of its Subsidiaries shall be treated as a capital contribution for Tax purposes, unless a final determination causes any such payment to be otherwise treated for U.S. Federal income tax purposes.

SECTION 8.06.  Termination of Indemnification.  The obligations to indemnify and hold harmless any party (i) pursuant to Section 8.01(a)(i), 8.02(a)(i), 8.02(c)(i) or 8.04(a)(i) shall terminate when the applicable representation or warranty terminates pursuant to Section 8.08, (ii) pursuant to Section 8.02(b) and Section 8.04(a)(ii) shall terminate at the close of business on the eighteen month anniversary of the last date on which performance under the applicable covenant is required hereunder and (iii) pursuant to the other clauses of Sections 8.01, 8.02(a), 8.02(c) and 8.04(a) shall not terminate; provided, however, that such obligations to indemnify and hold harmless shall not terminate with respect to any item as to which the person to be indemnified shall have, before the expiration of the applicable period, previously made a claim by delivering a notice of such claim pursuant to Section 8.07 to the party to be providing the indemnification.

SECTION 8.07.  Procedures. (a) Third Party Claims.  In order for a person (the "indemnified party") to be entitled to any indemnification provided for under Section 8.02 or 8.04(a) in respect of, arising out of or involving a claim made by any person against the indemnified party (a "Third Party Claim"), such indemnified party must notify the indemnifying party in writing of the Third Party Claim promptly following receipt by such indemnified party of written notice of the Third Party Claim; provided, however, that failure to give such notification shall not affect the indemnification provided hereunder except to the extent the indemnifying party shall demonstrate that it has been actually and materially prejudiced as a result of such failure. Thereafter, the indemnified party shall deliver to the indemnifying party, promptly following the indemnified party's receipt thereof, copies of all notices and documents (including court papers) received by the indemnified party relating to the Third Party Claim.

(b)  Assumption.  If a Third Party Claim is made against an indemnified party, the indemnifying party shall be entitled to participate in the defense thereof and, if it so chooses, to assume the defense thereof with counsel selected by the indemnifying party; provided, however, that such counsel is not reasonably objected to by the indemnified party. Should the indemnifying party so elect to assume the defense of a Third Party Claim, the indemnifying party shall not be liable to the indemnified party for

any legal expenses subsequently incurred by the indemnified party in connection with the defense thereof. If the indemnifying party assumes such defense, the indemnified party shall have the right to participate in the defense thereof and to employ counsel, at its own expense, separate from the counsel employed by the indemnifying party, it being understood that the indemnifying party shall control such defense. The indemnifying party shall be liable for the reasonable fees and expenses of counsel employed by the indemnified party for any period during which the indemnifying party has not assumed the defense thereof. If the indemnifying party chooses to defend or prosecute a Third Party Claim, all the indemnified parties shall cooperate in the defense or prosecution thereof. Such cooperation shall include the retention and (upon the indemnifying party's request) the provision to the indemnifying party of records and information that are reasonably relevant to such Third Party Claim, and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Whether or not the indemnifying party assumes the defense of a Third Party Claim, the indemnified party shall not admit any liability with respect to, or settle, compromise or discharge, such Third Party Claim without the indemnifying party's prior written consent (which shall not be unreasonably withheld or delayed). If the indemnifying party assumes the defense of a Third Party Claim, the indemnified party shall agree to any settlement, compromise or discharge of a Third Party Claim that the indemnifying party may recommend and that by its terms obligates the indemnifying party to pay the full amount of the liability in connection with such Third Party Claim, that releases the indemnified party completely in connection with such Third Party Claim and that would not otherwise impose injunctive or other nonmonetary relief against the indemnified party, provided, however, that without the prior written consent of Purchaser (which consent shall not be unreasonably withheld), the indemnifying party may not take any action in respect of a Third Party Claim that Purchaser reasonably determines would have a material adverse effect on the business of Purchaser or its affiliates, or that would impose non-monetary relief against Purchaser or its affiliates. Notwithstanding the foregoing, the indemnifying party shall not be entitled to assume the defense of any Third Party Claim (and shall be liable for the reasonable fees and expenses of counsel incurred by the indemnified party in defending such Third Party Claim) if the Third Party Claim seeks an order, injunction or other equitable relief or relief for other than money damages against the indemnified party that, if successful, would interfere with Purchaser's ownership of Shares or the operation of the business of Red Simpson and its Subsidiaries and that the indemnified party reasonably determines, after conferring with its outside counsel, cannot be separated from any related claim for money damages. If such equitable relief or other relief portion of the Third Party Claim can be so separated from that for money damages, the indemnifying party shall be entitled to assume the defense of the portion relating to money damages.

(c) Other Claims. In the event any indemnified party should have a claim against any indemnifying party under Section 8.02 or 8.04 that does not involve a Third Party Claim being asserted against or sought to be collected from such indemnified party, the indemnified party shall deliver notice of such claim with reasonable promptness to the indemnifying party. The failure by any indemnified party so to notify the indemnifying party shall not relieve the indemnifying party from any liability that it may have to such indemnified party under Section 8.02 or 8.04, except to the extent that the

indemnifying party demonstrates that it has been actually and materially prejudiced by such failure. If the indemnifying party does not notify the indemnified party within 20 calendar days following its receipt of such notice that the indemnifying party disputes its liability to the indemnified party under Section 8.02 or 8.04, such claim specified by the indemnified party in such notice shall be conclusively deemed a liability of the indemnifying party under Section 8.02 or 8.04 and the indemnifying party shall pay the amount of such liability to the indemnified party on demand or, in the case of any notice in which the amount of the claim (or any portion thereof) is estimated, on such later date when the amount of such claim (or such portion thereof) becomes finally determined.

SECTION 8.08. <u>Survival of Representations.</u>  The representations and warranties in this Agreement and in any certificate delivered pursuant hereto (in each case, other than the representations and warranties relating to Taxes, and those contained in Sections 2.01, 2.02, 2.03, 2.04, 3.01(c), 3.02, 3.04(c), 3.05(b) and 3.15 and the first sentence of Section 3.01(a)) shall survive the Closing and shall terminate at the close of business on the eighteen month anniversary of the Closing Date. The representations and warranties contained in Sections 2.01, 2.02, 2.03, 2.04, 3.01(c), 3.02, 3.04(c) and 3.05(b) and the first sentence of Section 3.01(a) shall survive indefinitely. The representations and warranties relating to Taxes and those contained in Section 3.15 shall survive the Closing until the termination of the applicable statute of limitations.

SECTION 8.09. <u>Consequential Damages.</u>  No party hereto shall be liable to any other party hereto or their respective officers, directors, employees, stockholders, trustees, affiliates, agents or representatives on account of any indemnity obligation set forth in this Article VIII for any indirect, consequential, special, incidental or punitive damages; <u>provided, however,</u> that the foregoing limitation shall not apply with respect to any such indirect, consequential, special, incidental or punitive damages required to be paid to a third party pursuant to a Third Party Claim.

ARTICLE IX

<u>General Provisions</u>

SECTION 9.01. <u>Assignment.</u>  This Agreement and the rights and obligations hereunder shall not be assignable or transferable by any party (including by operation of law in connection with a merger or consolidation of such party) without the prior written consent of the other parties hereto. Notwithstanding the foregoing, Purchaser may assign all or a portion of its rights hereunder to any affiliate of Purchaser, provided that Purchaser shall remain liable for each of its obligations hereunder. Any attempted assignment in violation of this Section 9.01 shall be void.

SECTION 9.02. <u>No Third-Party Beneficiaries.</u>  Except as provided in Article VIII, this Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person, other than the parties hereto and such assigns, any legal or equitable rights hereunder.

65

SECTION 9.03. <u>Attorney Fees.</u> In any action or proceeding brought to enforce any provision of this Agreement, or where any provision hereof is validly asserted as a defense, the successful party shall be entitled to recover reasonable attorneys' fees up to an amount equal to $750,000 in addition to any other available remedy.

SECTION 9.04. <u>Notices.</u> All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand or sent by facsimile or sent, postage prepaid, by registered, certified or express mail or overnight courier service and shall be deemed given when so delivered by hand or facsimile, or if mailed, three days after mailing (one business day in the case of express mail or overnight courier service), as follows:

(i) if to Purchaser or to Red Simpson after the Closing,

> Pike Electric, Inc.
> 100 Pike Way
> Mount Airy, NC 27030
> Attention: J. Eric Pike
> Telecopy: (336) 719-4585

> and

> Goldberg Lindsay & Co. LLC
> 630 Fifth Avenue
> New York, NY 10111
> Attention: Adam Godfrey
> Telecopy: 212-651-1101

with a copy to:

> Cravath, Swaine & Moore LLP
> Worldwide Plaza
> 825 Eighth Avenue
> New York, NY 10019
> Attention: Richard Hall, Esq.
> Telecopy: 212-474-3700

(ii) if to any RSI Party or Sellers' Representative or to Red Simpson prior to the Closing,

> John C. Simpson, President and Chief Executive Officer
> 4615 Parliament Drive
> Suite 220
> Alexandria, LA 71315

[[NYCORP:2386341v2:4743A:05/04/04–03:14 p]]

66

with a copy to:

        Jones, Walker, Waechter, Poitevent, Carrère & Denègre, L.L.P.
        51st Floor
        201 St. Charles Avenue
        New Orleans, LA 70170-5100
        Attention: L. Richards McMillan, II
        Telecopy: 504-582-8012

        (iii) if to any RSI Party or Sellers' Representative after the Closing,

        John C. Simpson
        P.O. Box 76
        Pineville, LA 71361

with a copy to:

        Jones, Walker, Waechter, Poitevent, Carrère & Denègre, L.L.P.
        51st Floor
        201 St. Charles Avenue
        New Orleans, LA 70170-5100
        Attention: L. Richards McMillan, II
        Telecopy: 504-582-8012

        SECTION 9.05. <u>Interpretation; Exhibits and Schedules; Certain Definitions.</u> (a) The headings contained in this Agreement, in any Exhibit or Schedule hereto and in the table of contents to this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Any matter set forth in any provision, subprovision, section or subsection of any Schedule shall only apply to such provision, subprovision, section or subsection of such Schedule, except to the extent that another provision, subprovision, section, subsection of such Schedule or any other Schedule is specifically cross-referenced therein. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein, shall have the meaning as defined in this Agreement. When a reference is made in this Agreement to a Section, Exhibit or Schedule, such reference shall be to a Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated.

        (b) For purposes of this Agreement:

        "<u>affiliate</u>" of any person means another person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such first person.

"Applicable Law" means any statute, law (including common law), ordinance, rule or regulation, including those relating to occupational safety and health and the protection of the environment.

"business day" shall mean a day, other than a Saturday or a Sunday, on which commercial banks are not required or authorized to close in the City of New York.

"Contract" means any written or oral contract, lease, license, indenture, agreement, commitment or other legally binding agreement.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a person, whether through the ownership of stock or other equity interests, as an officer, director, trustee or executor, by Contract or otherwise. Any person who, directly or indirectly, owns or controls at least 10% of the voting power or value of equity interests in any other person shall, for purposes of this Agreement, be conclusively deemed to have control of such person.

"Excluded Holders" means Mr. Ron Schenk, Mr. Keith Smith, Mr. Dubea, Mr. Westbrook, Mr. Thibeaux and those persons listed on Schedule 5.19(c).

"including" means including, without limitation.

"Judgment" means any judgment, injunction, order or decree.

"knowledge of Red Simpson" means the knowledge, after reasonable inquiry, of each RSI Party and each officer and director of Red Simpson.

"Master Deferred Compensation Schedule" means a true and complete list as of the Closing of (a) the name and corporate title of each holder of a Profit Sharing Interest or a Minority Interest who, as of the Closing, has entered into an Employment Agreement Amendment, the aggregate liability to such holder in accordance with Section 1.01 and 1.02 of such Employment Agreement Amendment (assuming that all conditions in respect of such aggregate liability will be met), and the portion of such aggregate liability which both relates to a Minority Interest and which is attributable to the acquisition price of any equity or share capital of any Subsidiary (the "Minority Interest Base Amounts"), (b) the name and corporate title of each holder of a Profit Sharing Interest or a Minority Interest who, as of the Closing, has entered into a Pike Employment Agreement, the aggregate liability to such holder in accordance with the terms of Section 2.02(a) and Section 2.02(b) of such Pike Employment Agreement (assuming that all conditions in respect of such aggregate liability will be met), and the portion of such aggregate liability that constitutes Minority Interest Base Amounts and (c) the name and corporate title of each holder of a Profit Sharing Interest or a Minority Interest who, as of the Closing, has not entered into an Employment Agreement Amendment or a Pike Employment Agreement, the aggregate liability to such holder in respect of such Profit Sharing Interest or Minority Interest (assuming that all conditions in respect of such aggregate liability will be met), and the portion of such aggregate liability that constitutes Minority Interest Base Amounts.

68

The Master Deferred Compensation Schedule shall include (a) the aggregate liability as of the Closing in respect of the items described in clauses (a), (b) and (c) of the immediately preceding paragraph and (b) the portion of such aggregate liability that constitutes Minority Interest Base Amounts. The preliminary draft of the Master Deferred Compensation Schedule is attached hereto as Exhibit L. The parties agree that the preliminary schedule delivered by Sellers' Representative pursuant to Section 1.04(a) shall contain a good faith estimate of the liabilities described in this definition as of the close of business on the day immediately preceding the Closing Date.

"Minority Interests" means the interest of any current or former director, officer or employee of Red Simpson or any of its Subsidiaries (or any of their predecessors) pursuant to any Contract pursuant to which such individual received any portion of the equity or share capital of any Subsidiary and pursuant to which Red Simpson or any of its Subsidiaries is required at any time to repurchase or redeem such equity or share capital, including pursuant to any Contract entitled "Employment Contract, Agreement to Buy and Sell and Agreement Not to Compete".

"Minority Interest Base Amounts" shall have the meaning ascribed to such term in the definition of Master Deferred Compensation Schedule.

"Oral" shall mean, with respect to any communication received by or made to Red Simpson or its Subsidiaries, an oral communication to any of the RSI parties, or any officer or director of Red Simpson.

"Payout Amount" means (a) the Pre-Tax Notional Amount plus (b) the Minority Interest Amount.

"person" means any individual, firm, corporation, partnership, limited liability company, trust, joint venture, Governmental Entity or other entity.

"Profit Sharing Interests" means the interest of any current or former director, officer or employee of Red Simpson or any of its Subsidiaries (or any of their predecessors) pursuant to (a) any Contract pursuant to which such individual is entitled to receive a payment in cash at any time, the amount of which is determined by reference to (i) the earnings, profits or other financial measurement of Red Simpson or any of its Subsidiaries or any business, work team or division thereof, (ii) the value of any equity or capital interest in Red Simpson or any of its Subsidiaries or (iii) the value of any stock or asset sale involving Red Simpson or any of its Subsidiaries, including, in each case, pursuant to any Contract entitled "Employment Contract, Nonqualified Deferred Compensation Agreement and Agreement Not to Compete", (b) Sections 2.01(a) and 2.02(b) of any Pike Employment Agreement or (c) Sections 1.01 and 1.02 of any Employment Agreement Amendment.

"Proportionate Amount" means 4.231% in the case of George; 46.529% in the case of German; 46.529% in the case of Ginny and 2.709% in the case of Mr. Thibeaux.

"Securities Act" means the Securities Act of 1933, as amended.

69

"subsidiary" of any person means another person, an amount of the voting securities, other voting ownership or voting partnership interests of which is sufficient to elect at least a majority of its Board of Directors or other governing body (or, if there are no such voting interests, 50% or more of the equity interests of which) is owned directly or indirectly by such first person or by another subsidiary of such first person.

(c)  The following terms have the meanings set forth in the Sections set forth below:

| Term | Section |
| --- | --- |
| Accounting Firm | Section 1.06(b) |
| Acquisition | Recitals |
| Adjusted AEP Amount | Section 1.05(b) |
| Adjusted Purchase Price | Section 1.04(b) |
| AEP | Section 1.05(b) |
| AEP Amount | Section 1.05(b) |
| AEP Project | Section 1.05(b) |
| AEP Re-bid | Section 1.05(b) |
| AEP Work Crew Member Volume Decline | Section 1.05(b) |
| affiliate | Section 9.05(b) |
| Agreed Accounting Principles | Section 1.06(d) |
| Agreement | Preamble |
| Aircraft | Section 1.06(d) |
| Ancillary Agreements | Section 2.01(a) |
| Applicable Law | Section 9.05(b) |
| Attorney-in-Fact | Section 1.07(b) |
| Balance Sheet | Section 3.04(a) |
| Benefit Agreements | Section 3.15(a) |
| Benefit Plans | Section 3.15(a) |
| business day | Section 9.05(b) |
| Cap | Section 8.04(b) |
| Capex Amount | Section 5.03(d) |
| Cash Flow Amount Accounting Firm | Section 1.08(b) |
| Closing | Section 1.02 |
| Closing Date | Section 1.02 |
| Closing Debt | Section 1.06(d) |
| Closing Working Capital | Section 1.06(a) |
| Code | Section 3.13(a) |
| Common Stock | Section 3.02(a) |
| Commonly Controlled Entity | Section 3.15(a) |
| Company Contracts | Section 3.08(b) |
| Company Expenses | Section 1.06(d) |
| Company Intellectual Property | Section 3.07(a) |
| Company Material Adverse Effect | Section 3.01(a) |
| Company Property | Section 3.06(a) |

70

| Term | Section |
|------|---------|
| Confidentiality Agreement | Section 5.01(a) |
| Consent | Section 2.02(b) |
| Consulting Agreement | Recitals |
| Contract | Section 9.05(b) |
| Control | Section 9.05(b) |
| Current Assets | Section 1.06(d) |
| Current Liabilities | Section 1.06(d) |
| Deferred Compensation Liability | Section 1.06(d) |
| DOJ | Section 5.09(a) |
| Employment Agreement Amendment | Section 5.20 |
| Employment Tax Amounts | Section 1.06(d) |
| Environmental Claim | Section 3.21(b) |
| Environmental Laws | Section 3.21(b) |
| Environmental Permits | Section 3.21(a) |
| ERISA | Section 3.15(b) |
| Escrow Agent | Section 1.03(d) |
| Escrow Agreement | Section 1.03(d) |
| Escrow Amount | Section 1.03(d) |
| Estimated Purchase Price | Section 1.04(a) |
| Excluded Holders | Section 9.05(b) |
| Federal Project | Section 1.08(a) |
| Federal Project Cash Flow Amount | Section 1.08(d) |
| Federal Project Cash Flow Amount Notice of Disagreement | Section 1.08(b) |
| Federal Project Cash Flow Statement | Section 1.08(a) |
| Financial Statements | Section 3.04(a) |
| Financing Consents | Section 5.09(b) |
| FTC | Section 5.09(a) |
| GAAP | Section 1.06(d) |
| George | Preamble |
| German | Preamble |
| Gillette | Section 3.13(m) |
| Ginny | Preamble |
| Governmental Entity | Section 2.02(b) |
| HSR Act | Section 2.02(b) |
| Hazardous Materials | Section 3.21(b) |
| Historical Financial Statements | Section 3.04(a) |
| including | Section 9.05(b) |
| Indebtedness | Section 1.06(d) |
| indemnified party | Section 8.07(a) |
| Indemnified Tax Claim | Section 5.12(c) |
| Initial Purchase Price | Section 1.04(b) |
| Insurance Reserve | Section 1.06(d) |
| Intellectual Property | Section 3.07(d) |
| Joint Tax Claim | Section 5.12(c) |

| Term | Section |
|------|---------|
| Jones Walker | Section 5.12(c) |
| Judgment | Section 9.05(b) |
| Key Customers | Section 3.20 |
| knowledge of Red Simpson | Section 9.05(b) |
| Lease | Section 5.18 |
| Leased Property | Section 3.06(a) |
| Legal Restraint | Section 6.01(b) |
| Liens | Section 3.05(a) |
| Losses | Section 8.02(a) |
| Master Deferred Compensation Schedule | Section 9.05(b) |
| Minority Interest Amount | Section 1.06(d) |
| Minority Interests | Section 9.05(b) |
| Mr. Dubea | Preamble |
| Mr. Simpson | Preamble |
| Mr. Thibeaux | Preamble |
| Mr. Westbrook | Recitals |
| New AEP Crew Member Volume Amount | Section 1.05(b) |
| Notice of Disagreement | Section 1.06(b) |
| Old AEP Crew Member Volume Amount | Section 1.05(b) |
| Oral | Section 9.05(b) |
| Outside Date | Section 7.01(d) |
| Owned Property | Section 3.06 |
| Payout Amount | Section 9.05(b) |
| Performance Bond Guarantors | Section 8.04(a) |
| Permits | Section 3.01(a) |
| person | Section 9.05(b) |
| Permitted Liens | Section 3.05(a) |
| Pike Employment Agreement | Recitals |
| Pre-Tax Notional Amount | Section 1.06(d) |
| Premises | Section 5.18 |
| Proceeding | Section 3.11(a) |
| Profit Sharing Interests | Section 9.05(b) |
| Property Taxes | Section 8.01(e) |
| Proportionate Amount | Section 9.05(b) |
| Purchaser | Preamble |
| Purchaser Indemnitees | Section 8.01(a) |
| Purchaser Material Adverse Effect | Section 4.01 |
| RSI Parties | Preamble |
| Red Simpson | Preamble |
| Red Simpson Pension Plans | Section 3.15(b) |
| Release | Section 3.21(b) |
| Retained Amount | Section 1.05(b) |
| Securities Act | Section 9.05(b) |
| Sellers | Preamble |

72

| Term | Section |
|---|---|
| Seller Indemnitees | Section 8.04 |
| Sellers' Representative | Section 1.07(a) |
| Severance Liability | Section 1.06(d) |
| Severance Plan | Section 3.15 |
| Shares | Recitals |
| Simpson-Noles | Section 5.18 |
| Standard Software | Section 3.07(b) |
| Statement | Section 1.06(a) |
| Straddle Period | Section 8.01(e) |
| Subsidiary | Section 3.01(a) |
| subsidiary | Section 9.05(b) |
| Surviving Entity | Section 5.21 |
| Tax | Section 3.13(a) |
| Tax-Adjusted Notional Amount | Section 1.06(d) |
| Tax Claim | Section 5.12(c) |
| Taxing Authority | Section 3.13(a) |
| Tax Return | Section 3.13(a) |
| Third Party Claim | Section 8.07(a) |
| Transactions | Section 3.15(g) |
| Transfer Taxes | Section 5.10(b) |
| 2003 Balance Sheet | Section 3.10 |
| 2003 Financial Statements | Section 3.04(a) |
| Voting Company Debt | Section 3.02(d) |
| Working Capital Adjustment | Section 1.04(b) |
| Working Capital | Section 1.06(d) |

SECTION 9.06. <u>Counterparts.</u> This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other parties.

SECTION 9.07. <u>Entire Agreement.</u> This Agreement and the Ancillary Agreements, along with the Schedules and Exhibits thereto, contain the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter.

SECTION 9.08. <u>Reliance.</u> All representations, warranties, covenants, and agreements of the RSI Parties and Purchaser made in this Agreement shall be deemed to have been relied upon by the party or parties to this Agreement to whom they are made, and shall survive the Closing as provided in Sections 8.06 and 8.08 regardless of any investigation or knowledge of any facts, circumstances or events on the part of such party or its representatives or agents and each party hereby expressly reserves their respective rights to rely on, enforce and seek redress with respect to any breach of or non-compliance with any such representations, warranties, covenants and/or agreements

73

regardless of any investigation or knowledge of any facts, circumstances or events on the part of such party or its representatives or agents.

SECTION 9.09.  Severability.  If any provision of this Agreement (or any portion thereof) or the application of any such provision (or any portion thereof) to any person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof (or the remaining portion thereof) or the application of such provision to any other persons or circumstances.

SECTION 9.10.  Consent to Jurisdiction.  Each party irrevocably submits to the exclusive jurisdiction of (a) the courts of the State of Delaware, and (b) the United States District Court for the District of Delaware, for the purposes of any suit, action or other proceeding arising out of this Agreement, any Ancillary Agreement or any transaction contemplated hereby or thereby.  Each party agrees to commence any such action, suit or proceeding either in the United States District Court for the District of Delaware or if such suit, action or other proceeding may not be brought in such court for jurisdictional reasons, in the courts of the State of Delaware.  Each party further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth above shall be effective service of process for any action, suit or proceeding in Delaware with respect to any matters to which it has submitted to jurisdiction in this Section 9.10.  Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement, any Ancillary Agreement or the transactions contemplated hereby and thereby in (i) the courts of the State of Delaware, or (ii) the United States District Court for the District of Delaware, and hereby and thereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

SECTION 9.11.  Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles of such State.

SECTION 9.12.  Waiver of Jury Trial.  Each party hereby waives to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement, any Ancillary Agreement or any transaction contemplated hereby or thereby.  Each party (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement and the Ancillary Agreements, as applicable, by, among other things, the mutual waivers and certifications in this Section 9.12.

74

<u>Amendments and Waivers.</u>  This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto or, in the case of each RSI Party, by Sellers' Representative on behalf of such RSI Party.  The parties entitled to the benefit of a provision hereof may waive compliance with such provision in a written instrument sign by all the parties entitled to such benefit or, in the case of each RSI Party, by Sellers' Representative on behalf of such RSI Party.

IN WITNESS WHEREOF, Red Simpson, the RSI Parties and Purchaser have duly executed this Agreement as of the date first written above.

RED SIMPSON

by _____

Name: JOHN C. SIMPSON
Title: PRESIDENT & CEO

THE MICK DUBEA 2003 GRANTOR
RETAINED ANNUITY TRUST

by _____

Name:
Title:

JOHN CHARLES SIMPSON 2003
GRANTOR RETAINED ANNUITY
TRUST FOR JOHN, JR.

by _____

Name: Simeon A. Thibeaux Jr.
Title: Trustee

JOHN CHARLES SIMPSON 2003
GRANTOR RETAINED ANNUITY
TRUST FOR ANGELA

by _____

Name: Simeon A. Thibeaux Jr.
Title: Trustee

MICK J. DUBEA

_____

IN WITNESS WHEREOF, Red Simpson, the RSI Parties and Purchaser have duly executed this Agreement as of the date first written above.

RED SIMPSON

by

_____
Name:
Title:

THE MICK DUBEA 2003 GRANTOR RETAINED ANNUITY TRUST

by _Mick Dubea_____
Name: Mick Dubea
Title: Trustee

JOHN CHARLES SIMPSON 2003 GRANTOR RETAINED ANNUITY TRUST FOR JOHN, JR.

by

_____
Name:
Title:

JOHN CHARLES SIMPSON 2003 GRANTOR RETAINED ANNUITY TRUST FOR ANGELA

by

_____
Name:
Title:

MICK J. DUBEA

_Mick Dubea_____

JOHN G. SIMPSON

SIMEON A. THIBEAUX, JR.

PIKE ELECTRIC, INC.

by

Name:   J. Eric Pike
Title:   President & CEO

TABLE OF CONTENTS

Page

ARTICLE I

Purchase and Sale of Shares; Closing

SECTION 1.01.  Purchase and Sale of the Shares ............................................................1
SECTION 1.02.  Closing Date ........................................................................................2
SECTION 1.03.  Transactions To Be Effected at the Closing ............................................2
SECTION 1.04.  Estimated Purchase Price and Adjusted Purchase Price ...........................2
SECTION 1.05.  AEP Payment .......................................................................................3
SECTION 1.06.  Purchase Price Adjustment ...................................................................4
SECTION 1.07.  Appointment of Sellers' Representative ..................................................8
SECTION 1.08.  Federal Project .....................................................................................9

ARTICLE II

Representations and Warranties Relating to the RSI Parties

SECTION 2.01.  Authority; Execution and Delivery; Enforceability ................................11
SECTION 2.02.  No Conflicts; Consents .......................................................................11
SECTION 2.03.  The Shares ..........................................................................................12
SECTION 2.04.  Capital Stock ......................................................................................12

ARTICLE III

Representations and Warranties Relating to Red Simpson

SECTION 3.01.  Organization and Standing; Books; Authority .......................................13
SECTION 3.02.  Capital Stock of Red Simpson and its Subsidiaries ...............................14
SECTION 3.03.  No Conflicts; Consents .......................................................................16
SECTION 3.04.  Financial Statements ...........................................................................17
SECTION 3.05.  Assets Other than Real Property Interests .............................................17
SECTION 3.06.  Real Property ......................................................................................18
SECTION 3.07.  Intellectual Property ...........................................................................19
SECTION 3.08.  Contracts ...........................................................................................20
SECTION 3.09.  Personal Property ...............................................................................24
SECTION 3.10.  Receivables and Fuel Tax Credit ........................................................24
SECTION 3.11.  Permits ..............................................................................................24
SECTION 3.12.  Insurance ...........................................................................................25
SECTION 3.13.  Taxes .................................................................................................25
SECTION 3.14.  Proceedings ........................................................................................28

Table of Contents
(continued)

Page

SECTION 3.15. Benefit Plans .............................................................................................29
SECTION 3.16. Absence of Changes or Events........................................................................32
SECTION 3.17. Compliance ..............................................................................................32
SECTION 3.18. Employee and Labor Matters.........................................................................33
SECTION 3.19. Transactions with Affiliates ..........................................................................34
SECTION 3.20. Customers.................................................................................................34
SECTION 3.21. Environmental Matters.................................................................................34

ARTICLE IV

Representations and Warranties of Purchaser

SECTION 4.01. Organization, Standing and Power.....................................................................36
SECTION 4.02. Authority; Execution and Delivery; and Enforceability ............................36
SECTION 4.03. No Conflicts; Consents ................................................................................37
SECTION 4.04. Litigation.................................................................................................37
SECTION 4.05. Securities Act ...........................................................................................37
SECTION 4.06. Commitment Letter......................................................................................37

ARTICLE V

Covenants; Other Agreements

SECTION 5.01. Confidentiality ..........................................................................................38
SECTION 5.02. Covenants Relating to Conduct of Business.........................................................38
SECTION 5.03. Affirmative Covenants..................................................................................41
SECTION 5.04. Advise of Changes .....................................................................................42
SECTION 5.05. Consultation .............................................................................................42
SECTION 5.06. Insurance .................................................................................................42
SECTION 5.07. Access to Information ..................................................................................43
SECTION 5.08. Purchaser Financing ....................................................................................43
SECTION 5.09. HSR Compliance and Reasonable Efforts ...........................................................43
SECTION 5.10. Expenses; Transfer Taxes..............................................................................44
SECTION 5.11. Brokers or Finders.......................................................................................44
SECTION 5.12. Tax Matters ..............................................................................................44
SECTION 5.13. Publicity ..................................................................................................46
SECTION 5.14. Resignations .............................................................................................47
SECTION 5.15. Arrangements with RSI Parties........................................................................47
SECTION 5.16. Customer Meetings......................................................................................47
SECTION 5.17. Trustee Undertaking.....................................................................................47
SECTION 5.18. Lease ......................................................................................................47
SECTION 5.19. Employee Benefit Matters .............................................................................48
SECTION 5.20. Amendments of RSI Employment Agreements ......................................................48

Table of Contents
(continued)

Page

SECTION 5.21. Subsidiary ........................................................................................49
SECTION 5.22. Employment Agreement and Consulting Agreement ........................49
SECTION 5.23. AEP Notice .......................................................................................49
SECTION 5.24. Further Assurances............................................................................49

ARTICLE VI

Conditions Precedent

SECTION 6.01. Conditions to Each Party's Obligation ..............................................49
SECTION 6.02. Conditions to Obligation of Purchaser ..............................................50
SECTION 6.03. Conditions to Obligation of the RSI Parties.......................................52

ARTICLE VII

Termination, Amendment and Waiver

SECTION 7.01. Termination ........................................................................................53
SECTION 7.02. Confidential Information....................................................................54
SECTION 7.03. Effect of Termination ........................................................................54

ARTICLE VIII

Indemnification

SECTION 8.01. Tax Indemnification ...........................................................................54
SECTION 8.02. Other Indemnification by the RSI Parties ..........................................57
SECTION 8.03. Escrow ...............................................................................................60
SECTION 8.04. Indemnification and Reimbursement by Purchaser ...........................61
SECTION 8.05. Calculation of Losses.........................................................................62
SECTION 8.06. Termination of Indemnification .........................................................62
SECTION 8.07. Procedures .........................................................................................62
SECTION 8.08. Survival of Representations ...............................................................64
SECTION 8.09. Consequential Damages.....................................................................64

ARTICLE IX

General Provisions

SECTION 9.01. Assignment.........................................................................................64
SECTION 9.02. No Third-Party Beneficiaries .............................................................64
SECTION 9.03. Attorney Fees ....................................................................................65

Table of Contents
(continued)

Page

SECTION 9.04. Notices ............................................................................65
SECTION 9.05. Interpretation; Exhibits and Schedules; Certain Definitions............66
SECTION 9.06. Counterparts ....................................................................72
SECTION 9.07. Entire Agreement ...............................................................72
SECTION 9.08. Reliance...........................................................................72
SECTION 9.09. Severability ......................................................................73
SECTION 9.10. Consent to Jurisdiction ........................................................73
SECTION 9.11. Governing Law ..................................................................73
SECTION 9.12. Waiver of Jury Trial ............................................................73
SECTION 9.13. Amendments and Waivers ....................................................74

EXHIBIT A        Form of Dubea Employment Agreement
EXHIBIT B        Form of Westbrook Employment Agreement
EXHIBIT C        Form of Thibeaux Employment Agreement
EXHIBIT D        Form of Simpson Consulting Agreement
EXHIBIT E        Form of Escrow Agreement
EXHIBIT F        Agreed Accounting Principles
EXHIBIT G        Form of Profit Sharing Interest and Minority Interest
EXHIBIT H        Form of Parliament Drive Lease
EXHIBIT I        Form of Employment Agreement Amendment
EXHIBIT J        Form of Opinion of Jones, Walker, Waechter, Poitevent, Carrère &
                 Denègre, L.L.P.
EXHIBIT K        Form of Opinion of Purchaser's Counsel
EXHIBIT L        Draft Master Deferred Compensation Schedule