IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PIKE ELECTRIC CORPORATION and )
PIKE ELECTRIC, INC., )
                                  )
                Plaintiffs, )      C.A. No. 05-879 (SLR)
                                  )
      v. )
                                    )
MICK DUBEA, )
                                    )
              Defendant. )

## ANSWER TO COMPLAINT AND COUNTERCLAIM

Defendant, Mick Dubea ("Mr. Dubea"), by his undersigned counsel, hereby answers the

Complaint of Plaintiffs, Pike Electric Corporation and Pike Electric, Inc. (collectively, "Pike"),

and counterclaims, as follows:

       1.       Denied, except it is admitted that in the first sentence Plaintiffs purport to

characterize the claims they seek against Mr. Dubea.  By way of further answer,  Mr. Dubea

denies that he: (1) competed or is competing against Pike, solicited or is soliciting Pike's

customers or employees or violated his July 1, 2004 employment agreement (the "Employment

Agreement"); (2) disclosed or is disclosing any confidential information of Pike; (3) tortiously

interfered or continues tortiously to interfere with Pike employee agreements or Pike's business

relations with existing or prospective customers; or (4) misused or continues to misuse any trade

secrets of Pike or "jump-start[ed]" a competing business.  Mr. Dubea further denies that he

forfeited any compensation given to him by Pike or that any such forfeiture is authorized by the

Employment Agreement.  Mr. Dubea further denies Pike has suffered any cognizable, let alone

irreparable harm, or that Pike is entitled to any equitable, injunctive or other relief in this action.

2.      Admitted that the allegations of paragraph 2 describe a portion of the relief Plaintiffs purport to seek.  By way of further answer, Mr. Dubea denies that Pike is entitled to the declaratory relief it seeks; and denies that he has forfeited any entitlement to the deferred compensation he earned at Red Simpson, Inc. ("RSI") and which Pike is obligated to pay.

3.      Admitted.

4.      Admitted.

5.      Admitted.

6.      The allegations of this paragraph state a legal conclusion to which no response is required.

7.      Admitted.

8.      Admitted.

9.      Admitted.

10.     Denied, except it is admitted that the allegations of paragraph 10 describe Pike's business in a general way as it existed at the time that Pike terminated Mr. Dubea without cause on or about August 22, 2005.  Mr. Dubea is without knowledge or information sufficient to admit or deny the allegations of this paragraph regarding the current business operations of Pike. Mr. Dubea admits that Pike holds itself out as having been in business since 1945.

11.     Denied, except it is admitted that the business of providing electric distribution and transmission services to electrical utilities, cooperatives and municipalities requires appropriate personnel.  Mr. Dubea is without knowledge or information sufficient to admit or deny the allegation in the second, third and fourth sentences in paragraph 11 concerning the labor conditions at Pike or its competitors, Pike's practices regarding employment agreements with

2

covenants not to compete, and Pike's evaluation of the necessity of employment agreements with non-compete provisions.

12.    Denied, except it is admitted that some of Pike's customers assign work to it under master service agreements; that Pike's customers generally have no obligation to continue to assign work to Pike; and that most of Pike's customers have the right to terminate the services of its electric distribution and service provider(s) on short notice. For further answer, Mr. Dubea has no knowledge regarding Pike's relationships with its customers since Pike terminated his employment without cause on or about August 22, 2005.

13.    Mr. Dubea is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of this paragraph, as they are phrased in the present tense concerning Pike's business and Mr. Dubea has not been employed by Pike since on or about August 22, 2005 and for that reason the allegations of paragraph 13 are denied.

14.    Admitted.

15.    Mr. Dubea is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of the first sentence of this paragraph and for that reason they are denied. It is admitted that Pike acquired the stock of RSI in a Stock Purchase Agreement ("SPA") dated May 4, 2004, the terms of which speak for themselves and to which Mr. Dubea respectfully refers the Court for its contents.

16.    Denied, except admitted that, at the time Pike acquired RSI, Mr. Dubea had worked at RSI for over 20 years; that he was one of two Presidents at RSI who reported to the Chief Executive Officer; that he managed RSI's Western Region, which had approximately 900 employees of RSI's total workforce of approximately 1500; that the Western Region that he managed accounted for a majority of RSI's earnings; that RSI and its employees, including Mr.

Dubea, succeeded in obtaining business from Texas Utilities, Entergy (West), and the City of

San Antonio; and that he owned 39,327 shares of RSI stock comprising approximately 4% of its

issued and outstanding common stock as of July 1, 2004.

17.    Denied, except it is admitted that Mr. Dubea is a party to the SPA, which is a

writing that speaks for itself, that RSI had legal and financial advisors during the drafting by Pike

of the SPA, and that RSI's legal counsel also provided advice to Mr. Dubea.

18.    Denied, except it is admitted that the SPA is a writing which speaks for itself.  For

further answer, Mr. Dubea is without knowledge or information as to Pike's belief about the

importance of Mr. Dubea to Pike's success in Texas and Louisiana, particularly since Pike

elected to terminate Mr. Dubea without cause barely one year after the completion of the

acquisition of RSI.

19.    Mr. Dubea is without knowledge or information sufficient to form a belief as to

the truth or falsity of the allegations of this paragraph and for that reason they are denied.

20.    Denied, except it is admitted that Mr. Dubea is a party to the SPA and to the

Employment Agreement, as amended May 5, 2005, each of which is a writing whose terms

speak for themselves and to which Mr. Dubea respectfully refers the Court for its contents.

21.    Denied, except it is admitted that the Mick Dubea 2003 Grantor Retained Annuity

Trust received approximately $6.87 million at closing for its 39,327 shares of RSI stock; that the

SPA resulted in fees to Pike's majority owner, Lindsay, Goldberg and Bessemer ("LGB"), of

$3.125 million and facilitated an IPO of Pike one year later in which LGB or its affiliates

received proceeds from the sale of over three million Pike shares offered in the IPO of

approximately $42 million; that Mr. Dubea entered into the Employment Agreement with Pike

on July 1, 2004 which was amended on May 5, 2005, and that his Employment Agreement with

4

Pike, as amended, superseded his employment agreement with RSI; and that he was employed by Pike until August 22, 2005 when Pike elected to terminate him without cause. Mr. Dubea lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second sentence of this paragraph concerning Pike's intentions if Mr. Dubea did not agree to sign an employment agreement with Pike and for that reason they are denied.

22.     Denied, except it is admitted that Pike paid the Mick Dubea 2003 Grantor Retained Annuity Trust what Pike determined to be the value of the 39,327 RSI shares of common stock held by the Mick Dubea 2003 Grantor Retained Annuity Trust and that Mr. Dubea signed the Employment Agreement dated July 1, 2004 with Pike, which Pike amended on May 5, 2005, the terms of which speak for themselves and to which Mr. Dubea respectfully refers the Court for its contents.

23.     Denied, except it is admitted that Pike hired Mr. Dubea as Vice President of its Western Region and, in connection with his employment, Mr. Dubea signed the Employment Agreement, which is a writing drafted by Pike that speaks for itself; that through the acquisition, Pike acquired the RSI operation in Oklahoma and Texas that RSI and its employees, including Mr. Dubea, successfully developed and managed; that for a period of time Mr. Dubea reported directly to Eric J. Pike, the CEO of Pike; that he received a base salary of $330,000 per year and an opportunity for a nominal bonus, which cumulatively reflected a compensation reduction of almost two-thirds from his historical salary and bonus at RSI; that he was given the opportunity to purchase up to $2.0 million of Restricted Shares of Pike common stock with funds he was otherwise due from his deferred compensation earned at RSI; that Mr. Dubea elected to purchase $1.0 million of Restricted Shares of Pike common stock which as of January 27, 2006 had a market value of approximately $1.6 million; that the Restricted Shares are scheduled to vest in

5

accordance with a schedule set forth in the Employment Agreement; that Pike honored the Base

Amount of the deferred compensation Mr. Dubea had earned while at RSI by paying him

approximately $1.91 million in 2004 and $1.91 million in 2005; that Pike assumed RSI's

obligation to pay Mr. Dubea approximately double the value of its deferred compensation; and

that Mr. Dubea is due $2.46 million on July 1, 2006, $1.23 million on July 1, 2007, and $2.46

million on July 1, 2008 for sums that Mr. Dubea had already contractually earned and that, but

for the Employment Agreement, would have been due at the closing of the SPA.

    24.    Denied, except it is admitted that Mr. Dubea signed the Employment Agreement,
which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its
contents.

    25.    Denied, except it is admitted that Mr. Dubea signed the Employment Agreement,
which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its
contents.

    26.    Denied, except it is admitted that Mr. Dubea signed the Employment Agreement,
which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its
contents.

    27.    Denied, except it is admitted that Mr. Dubea signed the Employment Agreement,
which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its
contents.

    28.    Denied, except it is admitted that Mr. Dubea signed the Employment Agreement,
which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its
contents.

29.    Denied, except it is admitted that Mr. Dubea signed the Employment Agreement, which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its contents. By way of further answer, Mr. Dubea denies that Pike is entitled to specific performance in this action or has the right to cease making payments to which Mr. Dubea is entitled under the Employment Agreement.

30.    Denied, except it is admitted that Mr. Dubea signed the Employment Agreement, which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its contents.

31.    Admitted.

32.    Denied, except it is admitted that Pike terminated Mr. Dubea's employment without cause on August 22, 2005 and paid him his base salary for a period of time ending thirty days after the August 22, 2005 effective date of Mr. Dubea's termination of employment; that Mr. Dubea's performance as a Pike Vice President was exemplary; that Pike's CEO, Eric Pike, routinely complimented Mr. Dubea on his performance and profitability; that because Pike terminated Mr. Dubea without cause he remains eligible to receive payment of the Multiplier Amount and for his Restricted Shares to continue to vest pursuant to his Employment Agreement as amended; and that Mr. Dubea received payments of approximately $1.91 million in 2004 and $1.91 million in 2005, and is due $2.46 million on July 1, 2006, $1.23 million on July 1, 2007, and $2.46 million on July 1, 2008 for the deferred compensation he earned at RSI and which Pike agreed to pay; and that his Restricted Shares vest on the following schedule: 40% on July 1, 2006; 20% on July 1, 2007; and 40% on July 1, 2008.

33.    Denied, except it is admitted that Chad Dubea is Mr. Dubea's son; that he worked for RSI for approximately twelve years at various positions throughout the organization and rose

through the ranks to supervisor in Harlingen, Texas; that Chad left his job at Pike on or about

October 21, 2005 shortly after Pike elected to terminate his father without cause; and that he

relocated from Harlingen, Texas to Beaumont, Texas. It is denied that Mr. Dubea provided

financial support and backing to Chad in the formation of Chad's business, T&D Solutions, Ltd.

("T&D"), or that he is providing advice and guidance in connection with T&D's business or that

he is helping to run the day-to-day operations of T&D.

34.    Denied, except it is admitted that, upon information and belief, T&D provides

electric distribution and transmission services, and power line construction, maintenance and

storm restoration services.

35.    Denied, except admitted that, upon information and belief, Chad left his

employment with Pike on or about October 21, 2005. Mr. Dubea lacks sufficient knowledge or

information to form a belief as to the truth or falsity of the allegations of the second and third

sentences of this paragraph and for that reason they are denied. The fourth sentence states a legal

conclusion to which no response is required. Mr. Dubea denies the allegations of the fifth and

sixth sentences of this paragraph except it is admitted that Chuck Chaddrick, Tim Droddy,

Clifton Droddy, Sammy Christian, and Alex Graham were among the former employees of RSI

who continued to work at Pike after Pike's acquisition of RSI and who have since left Pike. For

further answer, Mr. Dubea states that he is aware that the above individuals work for T&D but

specifically denies that he endeavored to cause any of them to leave Pike.

36.    Mr. Dubea is without knowledge or information sufficient to form a belief as to

the truth or falsity of the allegations of this paragraph and for that reason they are denied, except

that Mr. Dubea denies that he assisted T&D in convincing Corey Close to leave Pike.

37.     The allegations in this paragraph concerning T&D are denied for lack of knowledge or information sufficient to form a belief as to their truth or falsity.  Mr. Dubea denies that he has solicited any of Pike's employees or that he used or continues to use any Pike confidential information to solicit Pike's employees.

38.     Denied.  For further answer, Mr. Dubea lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of the first sentence of this paragraph and for that reason they are denied.

39.     Mr. Dubea is without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of this paragraph and for that reason they are denied, except that Mr. Dubea denies that he has used or will continue to use Pike confidential information to "steal Pike's customers."

40.     Denied.

41.     Denied, except admitted that Mr. Dubea signed the Employment Agreement, as amended May 5, 2005, which is a writing that speaks for itself, and to which Mr. Dubea respectfully refers the Court for its terms.

## COUNT I

42.     Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through 41 as if set forth herein at length.

43.     Denied.

44.     Denied.

45.     Denied.

46.     Denied.

9

## COUNT II

47.    Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through 46 as if set forth herein at length.

48.    Denied.

49.    Denied.

50.    Denied.

## COUNT III

51.    Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through 51 as if set forth herein at length.

52.    Denied.

53.    Denied.

54.    Denied.

55.    Denied.

## COUNT IV

56.    Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through 56 as if set forth herein at length.

57.    Admitted.

58.    Admitted.

59.    This paragraph states conclusions of law to which no responses are required, and is, therefore, denied.

60.    Denied.

61.    Denied.

## COUNT V

62.    Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through 61 as if set forth herein at length.

63.    Denied.

64.    Denied.

65.    Denied.

66.    Denied.

## COUNT VI

67.    Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through 66 as if set forth herein at length.

68.    Mr. Dubea lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of this paragraph and for that reason they are denied.

69.    Mr. Dubea lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of this paragraph and for that reason they are denied.

70.    Denied.

71.    Denied.

72.    Denied.

## COUNT VII

73.    Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through 72 as if set forth herein at length.

74.    This paragraph states conclusions of law to which no responses are required, and is, therefore, denied.

75.    Denied, except it is admitted that Pike purports to seek a declaration of legal rights pursuant to 28 U.S.C. § 2201.

76.    Denied.

## **ADDITIONAL DEFENSES**

### FIRST ADDITIONAL DEFENSE

77.    Pike's Complaint fails to state a claim upon which relief can be granted.

### SECOND ADDITIONAL DEFENSE

78.    Pike's claims, if any, are barred in whole or in part by the doctrines of waiver and/or estoppel.

### THIRD ADDITIONAL DEFENSE

79.    Pike is precluded from obtaining any and all relief by virtue of its bad faith conduct.

### FOURTH ADDITIONAL DEFENSE

80.    Pike is precluded from obtaining any and all relief by virtue of its unclean hands.

### FIFTH ADDITIONAL DEFENSE

81.    Pike's claims, if any, are barred by the doctrine of laches.

### SIXTH ADDITIONAL DEFENSE

82.    Pike's claims, if any, are barred by its material breach of the Employment Agreement.

### SEVENTH ADDITIONAL DEFENSE

83.    Pike's claims, if any, are barred by its breach of the implied covenant of good faith and fair dealing.

<u>EIGHTH ADDITIONAL DEFENSE</u>

84.    Pike's claims, if any, are precluded in whole or in part by its failure to mitigate damages.

<u>NINTH ADDITIONAL DEFENSE</u>

85.    Pike's claims based on the non-compete provision of the Employment Agreement, if any, are precluded in whole, as the non-compete provision is unreasonable, overbroad, unduly restrictive and unenforceable.

WHEREFORE, Mr. Dubea respectfully requests that the Complaint be dismissed and judgment be entered in his favor and against Pike, plus attorneys' fees and costs.

## COUNTERCLAIM OF MICK DUBEA AGAINST <u>PIKE ELECTRIC CORPORATION AND PIKE ELECTRIC, INC.</u>

### FACTUAL BACKGROUND

86.    Counterclaim Plaintiff, Mick Dubea ("Dubea") is an adult individual and resident of the State of Texas, who resides at 2570 Ashley Street, Beaumont, Texas 77702.

87.    Counterclaim Defendant Pike Electric Corporation is a Delaware corporation, and Counterclaim Defendant Pike Electric, Inc. is a North Carolina corporation (collectively, "Pike"), with their principal place of business at 100 Pike Way, Mount Airy, North Carolina.

### Pike's Employment Agreement with Mr. Dubea

88.    This Counterclaim arises out of the July 1, 2004 employment agreement between Mr. Dubea and Pike (the "Employment Agreement") and Pike's wrongful attempts to deprive Mr. Dubea of his vested deferred compensation.

89.    By the terms of the Employment Agreement, Pike hired Mr. Dubea for a four year term as the Vice President of its Western Region. Under the direction of Pike Chief Executive

13

Officer ("CEO"), J. Eric Pike ("Eric Pike"), Mr. Dubea was responsible for the management of all Pike operations in Oklahoma and Texas.

90.     Pike established the Western Region assigned to Mr. Dubea after its acquisition of Red Simpson, Inc. ("RSI"). Pike acquired RSI pursuant to a May 4, 2004 Stock Purchase Agreement (the "SPA") for the purchase of all of the outstanding shares of RSI common stock.

91.     At the time of the acquisition, RSI stock was owned as follows: (1) by two trusts established by RSI founder's son and CEO, John Simpson, which owned 864,929 shares, or 93.06%; (2) by the Mick Dubea 2003 Grantor Retained Annuity Trust, which  owned 39,327 shares, or 4.23%; and (3) by RSI Chief Financial Officer ("CFO"), Albert Thibeaux, Jr., who owned 25,186 shares, or 2.71%. As Mr. Dubea owned less than five percent of the RSI stock, he had no right to establish RSI policy, and he had limited bargaining power with respect to the Pike acquisition.

92.     Pike agreed to pay Mr. Dubea three forms of compensation under the Employment Agreement:  (1) an annual base salary of $330,000; (2) payment of deferred compensation Mr. Dubea previously earned as an RSI employee (the "Base Amount"); and (3) a multiplier bonus amount awarded by RSI in connection with the acquisition, which was also fully earned and vested upon consummation of the acquisition and, but for the Employment Agreement, would have been paid in full at the closing of the SPA (the "Multiplier Amount"). The Base and Multiplier Amounts were existing obligations of RSI that Pike assumed but refused to pay except on the conditions and pursuant to the schedule provided under the Employment Agreement.

93.     The Employment Agreement also includes non-disclosure and non-compete provisions. The non-compete provisions purport to prohibit Mr. Dubea from engaging in any competitive business within the entire "United States of America" for a five year period.

### RSI's Pre-Acquisition Deferred Compensation Program

94.     Prior to joining Pike, Mr. Dubea was employed since 1984 with RSI, becoming the President of RSI's Western Region in 2002. Under RSI's pre-acquisition compensation program, Mr. Dubea earned a relatively low salary for a president, but had the opportunity, through diligent effort, to earn significant bonuses payable pursuant to RSI's deferred compensation program.

95.     Under RSI's deferred compensation program, approximately 127 participating RSI employees, including Mr. Dubea, had a vested right to receive deferred compensation in five equal installments over a four year period following their separation from the company. RSI called this payment the Base Amount. Mr. Dubea's employment agreement with RSI also included a change of control provision that would have entitled him to a lump sum payment of a multiplier amount of his deferred compensation in accordance with Section 2.07 of his employment agreement dated January 7, 2004 with RSI.

96.     In connection with the acquisition, a portion of the proceeds was set aside in an amount sufficient to fund the Multiplier Amount equal to 100% of the Base Amount, with the amounts payable by Pike following the acquisition in three installments of 40%, 20% and 40% on the second, third and fourth anniversaries of the first payment of the Base Amount.

97.     Through the acquisition, Pike assumed RSI's obligations to pay the Base and Multiplier Amounts owed to the former RSI employees, including Mr. Dubea. RSI provided funding at the Closing for Pike to meet these obligations. Pike agreed to, and did, pay Mr.

15

Dubea the Base Amount in installments of approximately $1.91 million in 2004 and $1.91 million in 2005. Pike also agreed, under the express terms of the Employment Agreement, to pay Mr. Dubea the Multiplier Amount in three installments of $2.46 million on July 1, 2006, $1.23 million on July 1, 2007 and $2.46 million on July 1, 2008. Pike also agreed to give Mr. Dubea the opportunity to purchase up to $2.0 million of Restricted Shares of Pike common stock with funds he was otherwise due from his deferred compensation earned at RSI. If, however, Pike terminated Mr. Dubea without cause prior to July 1, 2005, the Employment Agreement required acceleration and prompt payment in cash to Mr. Dubea of the Multiplier Amount, and immediate vesting of his Restricted Shares.

### Mr. Dubea's Performance as a Pike Regional Vice President

98.     Pike's business is divided into five regions, with service to 19 states and customers as far north as Pennsylvania, as far south as Florida and as far west as Texas. Under the leadership of Mr. Dubea, Pike's post-acquisition Western Region performed at a high level of profitability.

99.     Consistent with his region's positive performance, Mr. Dubea received only positive feedback from his direct superior, Eric Pike, from July 2004 to May 2005. Pike complimented Mr. Dubea for his attention to detail and profitability. Mr. Dubea's performance was excellent and Pike's Western Region was well-organized and profitable under his management.

### The Planned IPO and Purported Integration of RSI into Pike

100.     Upon information and belief, Pike acquired RSI pursuant to a plan devised by Pike and its majority owner, Lindsay, Goldberg & Bessemer L.P. ("LGB"), a leveraged buyout firm. Upon information and belief, Pike and LGB planned to acquire RSI, create an impression

16

in the market that RSI would be fully integrated into Pike, and earn a substantial return on its investment through a speedy IPO.

101.    According to its IPO Prospectus, dated July 26, 2005 (the "IPO Prospectus"), Pike offered 10 million shares of its stock at a price of $14.00 per share. LGB, through LGB Pike II LLC, and Pike board member Reginald L. Banner, offered an additional 3.5 million shares.

102.    Pivotal to the success of the IPO was the impression that RSI would be quickly integrated into RSI. The IPO Prospectus described the RSI acquisition as: "substantially expand[ing] [Pike's] business, service territory, workforce and scope of operations." It further stated: "we have incorporated the entire [RSI] fleet into our tracking systems and rebranded substantially all of the [RSI] fleet with the 'Pike' emblem. In addition, we have accelerated our integration of [RSI's] crews and as of June 30, 2005, we completed the transition to reporting [RSI's] transactions through our financial systems."

103.    In the months prior to the IPO, Mr. Dubea assisted Pike in carrying out tasks which Pike advised were critical to the success of the IPO. For example, Eric Pike, in April, 2005, presented Mr. Dubea with an amendment to the Employment Agreement, which he asked Mr. Dubea and the approximately 125 other former RSI managers and supervisors entitled to deferred compensation to sign. Mr. Dubea was told that the amendment was necessary to assist Pike in the IPO and that without it, Pike would suffer a reduced valuation in the IPO. Among other things, the amendment provided that if Pike terminated the employees for certain reasons, the employees would no longer forfeit their unpaid deferred compensation but instead would receive it plus interest on the fifteenth anniversary of the Closing as that term was defined in the SPA. This amendment enabled Pike to avoid having to record an annual accrual for deferred compensation. At the time of the IPO, Pike anticipated that the annual expense for this

obligation would have been $6.6 million, of which $5.5 million would have been allocated to cost of operations. For this reason, Pike was eager to have the former RSI employees sign the amendment and repeatedly urged Mr. Dubea both to sign, and convince the employees in the Western Region to sign.

104.    At Pike's insistence, Mr. Dubea signed the amendment on May 5, 2005 and urged the former RSI employees to do the same. Following Mr. Dubea's lead, the former RSI employees in the Western Region who were entitled to deferred compensation also signed the amendment.

### Mr. Dubea's Termination Without Cause

105.    After Mr. Dubea signed the amendment, and significant progress had been made toward integration in the Western Region, Eric Pike began to criticize Mr. Dubea's management style. At a June 16, 2005 meeting, Eric Pike informed Mr. Dubea that he, all of a sudden, was no longer doing things the "Pike way."

106.    Upon information and belief, Pike decided to terminate Mr. Dubea on or before June 30, 2005. Pike knew, however, that terminating Mr. Dubea before July 1, 2005 triggered the acceleration of the Multiplier Amount.

107.    The IPO closed on July 28, 2005. Despite claiming Mr. Dubea was "critical" to the "success" of the "combined RSI-Pike enterprise," Pike summarily dismissed him without cause a mere three weeks after cashing in on the IPO. To avoid the acceleration of Mr. Dubea's entitlement to the Multiplier Amounts totaling $6.15 million and the vesting of his Restricted Shares purchased for $1.0 million, Pike wrongfully delayed Mr. Dubea's termination until August 22, 2005.

## COUNT I
### Declaratory Judgment
### Entitlement to the Multiplier Amount

108.    Mr. Dubea incorporates by reference the foregoing allegations of paragraphs 1
through 107 as if set forth herein at length.

109.    A justiciable controversy exists sufficient for this Court to declare the rights and
remedies of the parties with respect to the Employment Agreement.

110.    By this action, Pike seeks to avoid paying vested deferred compensation owed to
Mr. Dubea.  Without citing a specific provision of the Employment Agreement, Pike vaguely
alleges that Mr. Dubea forfeited the outstanding Multiplier Amount by "breaching his
obligations to Pike" and engaging in "unlawful conduct at issue in this action."  (Compl. at ¶¶ 1,
23.)  Through such allegations, Pike has declared that it does not intend to continue with
payments that it owes to Mr. Dubea.

111.    Mr. Dubea is entitled to full payment of the Multiplier Amount on several
independent grounds.

112.    First, as a matter of law, an employee who, like Mr. Dubea, is terminated without
cause, cannot forfeit vested deferred compensation for breach of a restrictive covenant.

113.    Second, even if Pike has the legal right to assert a forfeiture, the Employment
Agreement does not provide that Mr. Dubea forfeits his Multiplier Amount and Restricted Shares
for breach of the non-compete provisions.

114.    Third, even if Pike could demonstrate a contractual basis for a forfeiture on
grounds other than for breach of the non-compete provisions, its bad faith termination of Mr.
Dubea constituted a breach of the Employment Agreement that destroyed the parties' mutuality

of obligations. Pike could not, therefore, enforce any provision of the Employment Agreement, including any purported forfeiture provision.

115.    Fourth, even if Pike could demonstrate a contractual basis for a forfeiture on grounds other than for breach of the non-compete provisions, a forfeiture provision that is unreasonable as to temporal duration and geographic scope is unenforceable.

116.    Fifth, even if Pike could demonstrate a contractual basis for a forfeiture on grounds other than for breach of the non-compete provisions, a provision that seeks to punish Mr. Dubea by imposing a forfeiture of the value of $6.15 million deferred compensation and Restricted Shares constitutes a penalty that is void as inequitable and against public policy.

117.    As Pike has no basis for forfeiture of the Multiplier Amount, a declaration that Mr. Dubea is entitled to his deferred compensation and Restricted Shares is warranted.

## COUNT II
### Declaratory Judgment
### Unenforceability of Non-Compete Provisions

118.    Mr. Dubea incorporates by reference the foregoing allegations of paragraphs 1 through 117 as if set forth herein at length.

119.    A justiciable controversy exists sufficient for this Court to declare the rights and remedies of the parties with respect to the Employment Agreement.

120.    To be enforceable, a covenant not to compete must be valid under general principles of contact law, be reasonable in time and scope and advance a legitimate economic interest of the employer.

121.    The non-compete provisions of the Employment Agreement are both invalid and unreasonable, and should not be enforced.

122. Pike's bad faith conduct, as discussed above, constitutes a breach of the covenant of good faith and fair dealing implied in the Employment Agreement, which excuses any obligation of Mr. Dubea to abide by the non-compete provisions and renders such provisions invalid and unenforceable.

123. In addition, the restrictions purportedly imposed by the non-compete provisions are patently overbroad and unreasonable.

124. As stated above, Pike serves 19 states within the territorial limits of Pennsylvania in the north, Florida in the south and Texas in the west. As such, Pike's attempt to restrict Mr. Dubea from competitive conduct in the entire United States is overbroad and unreasonable.

125. Moreover, Pike's five year restriction is well beyond any temporal duration necessary to protect its purported long standing customer relationships. It is not necessary to preclude Mr. Dubea from the market for five whole years to safeguard long term relationships Pike is not likely to lose.

126. Accordingly, Mr. Dubea is entitled to a declaration that the non-compete provisions of the Employment Agreement are invalid and unenforceable.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Dubea respectfully requests that this Court:

(1) Enter a declaratory judgment that Mr. Dubea is entitled to all of the compensation due under the Employment Agreement, including the Multiplier Amount and vesting of his Restricted Shares;

(2) Enter a declaratory judgment that the non-compete provisions of the Employment Agreement are invalid and unenforceable; and

(3)    Award Mr. Dubea his attorneys' fees and costs, and such other relief as the Court deems appropriate.

MORRIS, JAMES, HITCHENS & WILLIAMS LLP


Lewis H. Lazarus (#2374)
Matthew F. Lintner (#4371)
Thomas E. Hanson, Jr. (#4102)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800

Attorneys for Defendant, Mick Dubea

Dated: January 30, 2006

22

1343583

<u>CERTIFICATE OF ELECTRONIC SERVICE</u>

I, Lewis H. Lazarus, hereby certify that on this 30th day of January, 2006, I

caused to be served the foregoing Answer to Complaint and Counterclaim, along with a copy of

this Certificate of Electronic Service, upon the following counsel of record via electronic filing:

> William J. Wade, Esquire
> Richards, Layton & Finger
> One Rodney Square
> P.O. Box 551
> Wilmington, DE 19899

_____
Lewis H. Lazarus (#2374)

1343591