IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PIKE ELECTRIC CORPORATION &
PIKE ELECTRIC, INC.,

Plaintiffs,

vs.

MICK DUBEA,

Defendant.

Civil Action No. 05-879 (SLR)

**REDACTED - PUBLIC VERSION**

### DECLARATION OF SARAH E. PAUL

I, Sarah E. Paul, declare as follows:

1.    I am an associate at Cravath, Swaine & Moore LLP ("Cravath"), and I
respectfully submit this Declaration in support of Plaintiff Pike Electric Corporation and Pike

Electric, Inc. (collectively, "Pike's") Memorandum of Law In Support of Plaintiffs' Motion for

Order Rejecting Defendant's Claims of Privilege and for Discovery Sanctions Due to Spoliation

of Evidence in the above-entitled action.

2.    In August 2005, Dubea stopped working for Pike, and on September 22, 2005,
Pike officially terminated Mick Dubea ("Dubea") without cause.

3.    Thereafter, Cravath, as counsel for Pike, began to investigate whether Pike had
meritorious claims against Mick Dubea, Chad Dubea or any other former RSI employees who

had left Pike to join T&D Solutions Ltd.

4.    In late October 2005, Cravath engaged Kimmons Security Services, Inc. to aid in
its investigation.

5.    On December 20, 2005, Pike instituted the above-entitled action against Mick Dubea in this court. Pike also sued Chad Dubea, T&D Solutions Ltd., T&D Solution Managers, LLC and Corey Close in the United States District Court for the Southern District of Texas. Dubea was served with the Complaint on December 29, 2005.

6.    In connection with a subpoena served by Cravath on AT&T seeking copies of Dubea's emails, AT&T informed Cravath that they are unable to produce archives of Mick Dubea's email account because AT&T does not maintain an archive of its customers' emails.

7.    Attached hereto as Exhibit A is a true and correct copy of the April 3, 2006, letter from Joseph S. Naylor to Sarah E. Paul.

8.    Attached hereto as Exhibit B is a true and correct copy of the February 22, 2006, letter from Michael A. Paskin to Lewis H. Lazarus.

9.    Attached hereto as Exhibit C is a true and correct copy of the April 21, 2006, letter from Lewis H. Lazarus to Sarah E. Paul.

10.    Attached hereto as Exhibit D is a true and correct copy of Dubea's Employment Agreement with Pike, dated July 1, 2004.

11.    Attached hereto as Exhibit E is a true and correct copy of the order and memorandum opinion denying motion to compel the government to return certain documents in its possession in *In re Grand Jury Matter*, Misc. No. 97-20-SLR, (D. Del. June 27, 1997).

Executed on April 27, 2006

_____
Sarah E. Paul

# Exhibit A

# MORRIS, JAMES, HITCHENS & WILLIAMS LLP

222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801-1621
(302) 888-6800
Facsimile (302) 888-6989
www.morrisjames.com

Joseph S. Naylor
(302) 888-6914
jnaylor@morrisjames.com

Mailing Address
P.O. Box 2306
Wilmington, DE 19899-2306

April 3, 2006

VIA EMAIL and FIRST-CLASS MAIL

Sarah E. Paul, Esquire
Cravath, Swaine & Moore LLP
Worldwide Plaza, 825 Eighth Avenue
New York, NY 10019

RE:    *Pike Electric Corp. and Pike Electric, Inc. v. Dubea*
       *D. Del., C.A. No. 05-879-SLR*

Dear Sarah:

Below are my responses to and follow-up questions concerning your March 31, 2006 letter:

Litigation-hold letter. Your response is unclear whether a litigation-hold letter was sent to the several individuals that we identified in our letter and who you do not expect to be custodians of relevant documents. We disagree with your position that those individuals are unlikely to possess relevant materials, particularly with regard to Barney Ratliff, Zack Blackmon, John Merritt, Suzette Jessup, and the LGB-affiliated directors and employees. Pike's decision to limit the scope of individuals to whom it directed the litigation-hold letter is only compounding its failure to issue such a letter more promptly. For our part, we sent Mr. Dubea a litigation-hold letter in early January 2006.

Computers and email accounts to be searched for responsive electronic documents. As indicated above, we disagree with your assessment that a number of the current Pike employees are unlikely to possess relevant materials. Specifically, Barney Ratliff is or was the Chief Administrative officer at Pike and a key member of the executive team. Zack Blackmon is or was Pike's Vice President of Human Resources and worked with Mr. Dubea on integrating Pike and RSI. John Merritt is or was a vice president and long-term employee with strong relations with Eric Pike and Jeff Collins. Suzette Jessup is or was a vice president at Pike with administrative responsibilities, including employment. It is also likely that the LGB-affiliated directors and employees are custodians of discoverable information concerning the allegations in the complaint and Mr. Dubea's counterclaim.

Sarah Paul, Esquire                        MORRIS, JAMES, HITCHENS & WILLIAMS LLP
April 3, 2006
Page 2

        Further, the fact that Mr. Dubea did not list all of those individuals in his initial
disclosures is not grounds for you to refuse to search for documents in their custody or on which
they were copied. The purpose of initial disclosures is to identify prospective witnesses
associated with or known to the other party early in the litigation to assist that other party in
deciding whom they wish to depose without the necessity of first serving multiple boilerplate
interrogatories seeking this information. *See* Moore Federal Practice 3d § 26.22(4)(a).
Accordingly, the duty to disclose those individuals was an obligation that lay most appropriately
with Pike, and not Mr. Dubea. Moreover, even if Rule 26(a) did require Mr. Dubea to list those
individuals, we are not aware of any authority suggesting that the failure to do so prohibits our
seeking responsive and discoverable materials in their custody. If you are aware of and intend to
rely upon any such authority, please let us know.

        We therefore restate our request that you search Pike's computers and email accounts for
all of the individuals listed in our March 28 letter for responsive documents.

        Responsive documents on personal email accounts. You state that Pike has "no
knowledge" of any of its employees transmitting or receiving responsive emails via personal e-
mail account. Please state what efforts your firm and/or person(s) at Pike have made to
communicate directly with those employees to determine whether such communications exist.
Conversely, if your lack of knowledge is based on either a failure to inquire or speculation,
please confirm that fact as well.

        Search terms. In addition to the terms that you propose, you should also run searches
using the following terms: "MJB," "4.03," "5.07," "5.10," "July 1," and "forfeit." Also, please
explain your basis for your suggesting that, in certain circumstances, a custodian's potentially
relevant documents might not be retrievable via a term search.

        Mr. Dubea's search for responsive emails and other electronic documents consisted of
our firm manually reviewing all files on his laptop computer.

        Blackberries and other PDA devices. You state that you will investigate how
blackberries and PDA devices used by Pike employees are connected to Pike's network. Please
provide us a response to this issue by Wednesday, April 5, 2006.

        180-day policy. Your response states that "certain emails" are automatically deleted
every 180 days; but that this policy does not apply to emails received by Pike's officers; nor does
it apply to emails that are "archived" by individual employees. Please provide us additional
information regarding all three points. First, what "certain emails" are you referring to that are
automatically deleted? Second, how are emails received by Pike's officers, including any such
emails that are attempted to be deleted, maintained separately? Third, explain the process by
which an employee would archive an email and how, where, and for what duration would that
archived email be stored. Please provide complete answers to these questions by April 5.

Sarah Paul, Esquire                                  MORRIS, JAMES, HITCHENS & WILLIAMS LLP
April 3, 2006
Page 3

Backup tapes.  Your proposed limited approach to reviewing backup tapes is
unacceptable.  Unless someone from Pike is able to certify under oath that the proposed
snapshots will infallibly catch every email sent or received between January 1 and December 20,
2005, we request that you examine all available backup tapes during that period.  Immediate
resolution of this issue is of utmost importance.  Please provide confirmation by April 5 that your
proposed snapshots will catch all emails or alternatively that you will be reviewing all available
backup tapes during the above period.

Delay in reviewing the backup tapes.  We understand that the Texas defendants have
made significant and good-faith efforts to provide Pike with all of the information required by
the default standard.  Although this is an issue more appropriately raised with Texas counsel, if
you are objecting to producing documents to Mr. Dubea based on the Texas Defendants' failure
to comply with that standard, please identify by April 5 all instances in which you claim those
Defendants are presently not in compliance.

Your vague suggestion that Pike does not intend to produce responsive documents until
some point after April 12, and even then that its production will be on a rolling basis, is also
unacceptable.  We understand and appreciate the burden associated with reviewing and
processing Pike's electronic documents.  However, any difficulty that you have in producing
substantially all Pike responsive documents is largely of your own making.  By your own
admission you admit that no one from your firm will be reviewing Pike's electronic documents
until tomorrow at the earliest.  That fact by itself strongly suggests that Pike's discovery efforts
to date have been woefully inadequate in a case in which it sought expedition.

In light of the expedited nature of this litigation, we assumed each party would be
producing responsive documents on or immediately after the date a response to the document
requests and interrogatories is due.  Please advise by April 5 the extent to which you anticipate
that Pike will be unable or unwilling to produce substantially all of its responsive documents,
including emails, by April 12.  Given the compressed time frame to complete discovery, it is not
appropriate for Pike to delay Mr. Dubea's receipt of paper discovery.

Missing RSI server.  Mr. Dubea has no information regarding the missing RSI server and
was not even aware that it was missing.  We repeat our request that you identify the person at
Pike most knowledgeable about the missing RSI server, including but not limited to the fact that
it was last seen on July 15, 2005.  Please identify that person by April 5.

Sarah Paul, Esquire                          MORRIS, JAMES, HITCHENS & WILLIAMS LLP
April 3, 2006
Page 4


                                   Very truly yours,

                                   /s/ Joseph S. Naylor

                                   Joseph S. Naylor

JSN/gca

cc:    Alyssa M. Schwartz, Esquire (via email)
       Lewis Lazarus, Esquire (via email)
       Teri Danish, Esquire (via email)

1370419/1

# Exhibit B

# CRAVATH, SWAINE & MOORE LLP

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: (212) 474-1000
FACSIMILE: (212) 474-3700

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: 44-20-7453-1000
FACSIMILE: 44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER

(212) 474-1760

February 22, 2006

Pike v. Dubea

Dear Lewis:

      In the course of our investigative efforts in the above-referenced action, we have come into possession of a document that appears to contain potentially privileged communications between Mr. Dubea and one of his attorneys concerning an unrelated matter. A copy of that document is attached hereto. In an abundance of caution, we are hereby notifying you of our receipt of the document pursuant to Rule 4.4 of the Delaware Rules of Professional Conduct and Model Rule 4.4 of the ABA Model Rules of Professional Conduct. While we believe that any privilege that otherwise might have applied to the document may have been waived, given the lack of any apparent relevance of the document to our litigation, we will ensure that any copies of the document in the possession of Pike or any of its representatives are promptly destroyed.

Sincerely,

Michael A. Paskin

Lewis H. Lazarus, Esq.
    Morris, James, Hitchens & Williams LLP
      222 Delaware Avenue, 10th Floor
        Wilmington, Delaware 19899-2306

Encl.

BY FEDERAL EXPRESS

Copy w/o encl to:

William J. Wade, Esq.
    Richards, Layton & Finger
      One Rodney Square
        920 North King Street
          Wilmington, DE 19801

BY FIRST CLASS MAIL

# Exhibit C

# MORRIS, JAMES, HITCHENS & WILLIAMS LLP

222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801-1621
(302) 888-6800
Facsimile (302) 571-1750
www.morrisjames.com

Lewis H. Lazarus
(302) 888-6970
llazarus@morrisjames.com

Mailing Address
P.O. Box 2306
Wilmington, DE 19899-2306

April 21, 2006

VIA EMAIL

Sarah E. Paul, Esquire
Cravath, Swaine & Moore LLP
Worldwide Plaza, 825 Eighth Avenue
New York, NY 10019

Re:    *Pike Electric Corp. and Pike Electric, Inc. v. Dubea*
       D. Del., C.A. No. 05-879-SLR

Dear Sarah:

I write in response to the recent production of documents obtained by Kimmons Security Services, Inc. ("Kimmons") at the direction of Pike Electric Corporation and/or your firm. The documents listed below are protected by attorney-client and/or work-product privileges:

PIKE00016648;
PIKE00016655 through and including PIKE00016656;
PIKE00016659 through and including PIKE00016662;
PIKE00016665 through and including PIKE00016761;
PIKE00016827;
PIKE00016829;
PIKE00016834.

Accordingly, I request the immediate return of all original and duplicate copies of those documents. I further request the deletion of all electronic files of these documents that exist, including all communications reflecting their content. Mr. Dubea reserves all rights as to the

Sarah Paul, Esquire
April 21, 2006
Page 2

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Kimmons documents pending the Kimmons deposition.  Mr. Dubea does not intend to waive privilege as to any and all other documents not specifically identified above.

                    Sincerely,

                    Lewis H. Lazarus

LHL/kam

cc:    Alyssa M. Schwartz, Esquire (via hand delivery)
       Teri Danish, Esquire (via Federal Express)

# Exhibit D

EXECUTION COPY

EMPLOYMENT AGREEMENT dated as of July 1, 2004, between PIKE ELECTRIC, INC. ("Employer"), a North Carolina corporation, and MICK J. DUBEA, an individual domiciled in the State of Texas ("Executive").

WHEREAS, as of the date of this Agreement, Executive is President, Western Region, of Red Simpson, Inc., a Louisiana corporation ("RSI"), and in such capacity has been instrumental in the management, development and growth of RSI and its business and the goodwill therein;

WHEREAS RSI, Employer, Executive and certain other parties have entered into a Stock Purchase Agreement dated as of May 4, 2004 (the "Stock Purchase Agreement"), pursuant to which Employer will acquire for cash all the outstanding stock of RSI;

WHEREAS, through the Mick Dubea 2003 Grantor Retained Annuity Trust (the "Trust"), Executive will benefit from the sale of 39,327 shares of common stock of RSI, which will be acquired for cash by Employer pursuant to the transactions contemplated by the Stock Purchase Agreement; and

WHEREAS, as a condition to the Closing (as such term, and each other capitalized term that is used but not defined herein, is defined in the Stock Purchase Agreement), Employer and Executive have agreed to enter into this Agreement;

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, the parties hereto agree as follows:

## ARTICLE I

### Employment

SECTION 1.01. Effectiveness. This Agreement shall become effective as of the Closing. This Agreement shall be null and void ab initio and of no further force and effect if the Closing does not occur or the Stock Purchase Agreement is terminated pursuant to its terms prior to the Closing.

SECTION 1.02. Position. Employer shall hire Executive, and Executive shall serve, as Vice President, Western Region. For a period of two years following the Closing, Executive shall report directly to the Chief Executive Officer of Employer (the "CEO"). After such two-year period, Executive shall report to the CEO unless the CEO determines that it has become necessary for Executive to report to another person due to the restructuring of Employer or its businesses. Executive shall be responsible for the management of all operations of Employer in Oklahoma and Texas under the direction of the CEO, and shall perform such other services and duties, which may include

[2347676]

PIKE 00017035

2

business development in other geographical areas, as are consistent and appropriate for his position and as determined from time to time by the CEO.

SECTION 1.03. Term. The term of Executive's employment under this Agreement (the "Term") shall commence upon the Closing and shall expire on the date that is four years after the Closing. Executive's employment with Employer shall be "at will" and, subject to the provisions of Article IV, Executive's employment under this Agreement may be terminated by either party at any time and for any reason.

SECTION 1.04. Time and Effort. Executive shall serve Employer faithfully, loyally, honestly and to the best of Executive's ability. Executive shall devote all Executive's business time to the performance of Executive's duties on behalf of Employer.

SECTION 1.05. Location. During the Term, Executive's principal place of employment shall be at Beaumont, Texas, or such other location, as reasonably determined from time to time by the CEO to be necessary for the fulfillment of Executive's duties to Employer; provided, however, that Executive and the CEO shall mutually and reasonably agree on the location of any such move if the CEO determines that such move is in the best interests of Employer. In the event that Executive's principal place of employment is transferred to a location in excess of 50 miles from Beaumont, Texas, Employer will pay or reimburse Executive for (a) all reasonable moving expenses relating to the physical transfer of Executive's furniture and personal belongings and (b) all realtor fees in connection with Executive's purchase of a new primary residence.

SECTION 1.06. Resignation from RSI. Executive hereby agrees that his employment with RSI and its affiliates shall terminate as of the Closing, and he shall resign as a director, officer and employee of RSI and its affiliates effective as of the Closing.

## ARTICLE II

### Compensation

SECTION 2.01. Base Salary. As compensation for all services rendered by Executive to Employer and all its affiliates in any capacity (including services as an officer or employee), Employer shall pay Executive a base salary ("Base Salary") during the Term at the annual rate during 2004 of $330,000, and thereafter subject to increase or decrease as may be determined from time to time by the Board of Directors of Employer (the "Board"). The Base Salary shall be payable in accordance with Employer's standard payroll practices.

SECTION 2.02. RSI Deferred Compensation. (a) Employer shall pay to Executive (i) an amount in cash equal to 50% of the Base Amount (as defined below)

[734267l]

CONFIDENTIAL

3

not more than 75 days after the Closing and (ii) an amount in cash equal to 50% of the Base Amount on the first anniversary of the Closing. Employer's obligation to pay such amounts shall not be terminated or reduced for any reason, including the termination of Executive's employment for any reason.

(b)  Subject to any acceleration of the Gross Multiplier Amount Reduction (as defined below) for the purpose of purchasing Shares (as defined below) in accordance with Section 2.03, Employer shall pay to Executive an amount in cash equal to 40% of the Multiplier Amount (as defined below) on the second anniversary of the Closing, an amount in cash equal to 20% of the Multiplier Amount on the third anniversary of the Closing and an amount in cash equal to 40% of the Multiplier Amount on the fourth anniversary of the Closing; provided, however, that if the performance target conditions established by the Board in its sole discretion are satisfied, Employer shall pay to Executive, in lieu of the foregoing payments which shall not be paid, an amount in cash equal to 50% of the Multiplier Amount on the second anniversary of the Closing, an amount in cash equal to 20% of the Multiplier Amount on the third anniversary of the Closing and an amount in cash equal to 30% of the Multiplier Amount on the fourth anniversary of the Closing; provided further, however, that upon the occurrence of a Change in Control (as defined below), Employer shall promptly pay to Executive any portion of the Multiplier Amount that is unpaid (other than any amount that is unpaid as a result of any forfeiture pursuant to this Section 2.02(b)) as of the occurrence of such Change in Control. In the event Executive provides timely notice to Employer of a Tax Demand (as defined below), (i) Employer shall pay to Executive a portion of the then remaining unpaid Multiplier Amount equal to the lesser of such unpaid Multiplier Amount and the Tax Amount (as defined below), which payment shall be made no less than ten days prior to the date such Tax Amount is required to be remitted to the applicable tax authority, and (ii) the amount of any remaining unpaid installments of the Multiplier Amount shall be reduced in order of maturity in an aggregate amount equal to the Tax Amount. Notwithstanding the foregoing, Employer shall not make any payment described in this Section 2.02(b), and Executive shall not be entitled to receive any such payment, in the event that, prior to the payment of such amount, Executive has terminated his employment for any reason, other than death, Disability (as defined below) or Good Reason (as defined below), or Employer has terminated Executive's employment for Cause (as defined below).

(c)  Executive agrees that RSI shall have no obligation to make any payment under the Existing Employment Agreement (as defined below), and Executive shall not be entitled to receive any such payment.

(d)  For purposes of this Agreement, the term "Base Amount" shall mean the aggregate amount that RSI would be obligated to pay to Executive, but for this Agreement, pursuant to Article II of the Amendment and Restatement of Employment Contract, Nonqualified Deferred Compensation Agreement and Agreement Not To Compete, dated as of January 7, 2004, by and between Executive and RSI (the "Existing Employment Agreement") in the event that Executive's employment with RSI were

[12(2/04)]

PIKE 00017037

4

terminated as of the Closing, but without giving effect to Section 2.07 or 4.15 of the Existing Employment Agreement; provided, however, that the Base Amount shall be as set forth on the Master Deferred Compensation Schedule as finally determined in accordance with the terms of the Stock Purchase Agreement; provided further, however, that the Base Amount shall be reduced by the Gross Base Amount Reduction (as defined below) that is surrendered in connection with Executive's purchase of Shares pursuant to Section 2.03 (if any).

(e)  For purposes of this Agreement, the term "Multiplier Amount" shall mean the excess of (i) the aggregate amount that RSI would be obligated to pay to Executive, but for this Agreement, pursuant to Section 2.07 of the Existing Employment Agreement as a result of the consummation of the transactions contemplated by the Stock Purchase Agreement, including any additional amounts described in Section 4.15 of the Existing Employment Agreement, over (ii) the Base Amount before reduction by the Gross Base Amount Reduction (if any); provided, however, that the Multiplier Amount shall be as set forth on the Master Deferred Compensation Schedule as finally determined in accordance with the terms of the Stock Purchase Agreement; provided further, however, that in the event that Executive elects to use a portion of the Gross Multiplier Amount Reduction to purchase Shares in accordance with Section 2.03(a), a pro-rata portion of the Gross Multiplier Amount Reduction shall be deducted from each payment of the Multiplier Amount that shall be made to Executive in accordance with the first sentence of Section 2.02(b).

(f)  For purposes of this Agreement, the term "Change in Control" shall mean LGB Pike LLC and its affiliates ceasing to own, directly or indirectly, voting securities of Employer representing at least 35% of the aggregate voting power of all classes of Employer securities entitled to vote for directors of Employer.

(g)  For purposes of this Agreement, the term "Tax Demand" shall mean the receipt by Executive of a written notice of deficiency from, or other written demand by, any tax authority, requiring the payment of tax on any unpaid portion of the Multiplier Amount (the amount of such tax demanded by such tax authority, the "Tax Amount").

SECTION 2.03.  Equity Participation.  (a)  On the date of the Closing, Employer shall permit Executive to purchase up to 21,479 whole shares of common stock, no par value, of Pike Holdings, Inc. ("Shares") at a purchase price per share of $93.11 (the "Purchase Price").  No less than five days prior to Closing, Executive shall give written notice to Employer of his intent (if any) to acquire Shares pursuant to this Section 2.03, the number of Shares to be acquired and the method of payment therefor (the "Election Date").  Executive shall be permitted to acquire such Shares by one or a combination of any of the following methods: (i) paying the purchase price for the applicable Shares in cash on the date of the Closing by wire transfer of immediately available funds, (ii) irrevocably surrendering at the Closing a portion of Executive's Base Amount (the "Gross Base Amount Reduction") in an amount that, after giving

[130676]

CONFIDENTIAL

PIKE 00017038

5



effect to all applicable withholdings (such resulting amount, the "Net Base Amount Reduction"), is equal to the aggregate purchase price for the applicable Shares; provided that, in the event the Base Amount is adjusted after the Closing such that the Gross Base Amount Reduction exceeds such adjusted Base Amount, Executive shall promptly pay to Employer in cash the amount of such excess and until such payment is made Employer shall be entitled to withhold such excess from any amounts otherwise payable to Executive, whether pursuant to this Agreement or otherwise or (iii) irrevocably surrendering at the Closing a portion of the Multiplier Amount (the "Gross Multiplier Amount Reduction") with a value not to exceed $1,000,000, after the withholding of any required taxes (the "Net Multiplier Amount Reduction"), it being expressly understood that Employer shall allow Executive to accelerate his receipt of the Gross Multiplier Amount Reduction solely for purposes of purchasing Shares in accordance with this Section 2.03(a). Subject to Section 2.03(b), at the Closing, Employer shall deliver to Executive that number of Shares equal to (A) the sum of the cash paid, the Net Base Amount Reduction and the Net Multiplier Amount Reduction (in each case, if any) for such Shares divided by (B) the Purchase Price.

(b) (i) It is expressly understood between the parties that any Shares acquired pursuant to this Section 2.03 through Executive's surrender of the Net Multiplier Amount Reduction will be treated as restricted shares ("Restricted Shares"). Until the Restricted Shares have become vested in accordance with Section 2.03(b)(ii), they may not be, directly or indirectly, offered, transferred, sold, assigned, pledged, hypothecated or otherwise disposed of, and shall be subject to forfeiture in accordance with the terms hereof. Certificates issued in respect of the Restricted Shares shall be registered in the name of Executive and deposited by him, together with a stock power endorsed in blank, with Employer. Until the Restricted Shares have become vested, Executive shall not be entitled to exercise any voting rights with respect to such Restricted Shares and shall not be entitled to receive dividends or other distributions with respect to such Restricted Shares; provided that when Restricted Shares have become vested, the holder of such Restricted Shares shall be entitled to receive the amount of dividends or other distributions with a record date after the Closing Date theretofore paid with respect to that number of Shares represented by such Restricted Shares. When the Restricted Shares become vested, Employer shall deliver the applicable certificates to Executive or his legal representative. Employee acknowledges that the Shares shall also be subject to the restrictions and limitations set forth in the Stockholders Agreement set forth on Exhibit A hereto (the "Stockholders Agreement").

(ii) Unless forfeited in accordance with this Section 2.03(b)(ii), the Restricted Shares shall become vested in accordance with the following schedule: (1) 40% of the Restricted Shares shall become vested on the second anniversary of the Closing, (2) 20% of the Restricted Shares shall become vested on the third anniversary of the Closing and (3) 40% of the Restricted Shares shall become vested on the fourth anniversary of the Closing; provided, however, that if the performance target conditions established by the Board in its sole discretion are satisfied, in lieu of the foregoing

[2242478]

CONFIDENTIAL

PIKE 00017039

6

vesting schedule, 50% of the Restricted Shares shall become vested on the second anniversary of the Closing, 20% of the Restricted Shares shall become vested on the third anniversary of the Closing and 30% of the Restricted Shares shall become vested on the fourth anniversary of the Closing; provided further, however, that upon the occurrence of a Change in Control, all Restricted Shares (other than any Restricted Shares that have been forfeited pursuant to this Section 2.03(b)) shall become immediately vested as of the occurrence of such Change in Control. Notwithstanding the foregoing, all unvested Restricted Shares shall be forfeited (and Employee shall not have any interest in such Restricted Shares) and Employer shall not be required to deliver the certificates as described in Section 2.03(b)(i), in the event that, prior to vesting of such Restricted Shares, Executive has terminated his employment for any reason, other than death, Disability or Good Reason, or Employer has terminated Executive's employment for Cause.

(c) Notwithstanding the foregoing, Employer shall not deliver, and Executive shall have no right to receive, any Shares, unless and until Executive shall have executed and delivered to Employer a counterpart to the Stockholders Agreement, and Executive hereby agrees to be bound by, and honor and comply with, the terms and conditions of such Agreement.

(d) Any Shares issued pursuant to this Section 2.03 shall be issued in certificated form and shall bear a legend indicating that they have been issued pursuant to an exemption from the registration requirements of Federal and state securities laws, that their resale is restricted and that they are subject to the provisions of a stockholders agreement governing, inter alia, the transfer and voting of the Shares.

(e) No later than the Election Date, Executive shall deliver an opinion of counsel reasonably acceptable to Employer that any acquisition of Shares under this Section 2.03 meets an applicable exemption from the registration requirements of all Federal and applicable state securities laws. Notwithstanding the foregoing, in no event shall Executive be entitled to purchase any Shares under this Section 2.03 to the extent that Employer reasonably determines such purchase does not meet an applicable exemption from Federal and applicable state securities laws.

(f) Executive hereby represents and warrants to, and covenants with, Employer that any acquisition of Shares by Executive pursuant to this Section 2.03 will be solely for investment purposes for Executive's own account (and not for the account of any other person) and that Executive has no agreement, understanding or arrangement to subdivide, sell, assign, transfer or otherwise dispose of all or any part of any of such Shares to any other person.

SECTION 2.04. Withholding Taxes. Employer and its affiliates may withhold from any amounts payable under this Agreement such Federal, state, local and foreign taxes as may be required to be withheld pursuant to any applicable law or regulation.

[2342676]

PIKE 00017040



7

## ARTICLE III

### Employee Benefits

SECTION 3.01. <u>Benefit Plans.</u>  During the Term, Executive shall be entitled to participate in any employee benefit plan offered by Employer (collectively, "<u>Benefit Plans</u>") on the same basis as other officers of Employer, subject to the terms and conditions of such Benefit Plan as in effect from time to time.  A schedule of Benefit Plans currently maintained by Employer is set forth on Exhibit B hereto. Executive agrees that any such Benefit Plan may be amended or terminated from time to time by Employer in its sole discretion.  Executive shall be given credit for years of service performed for RSI with respect to each Benefit Plan to the extent permitted by applicable law and the terms of such Benefit Plan.

SECTION 3.02. <u>Business Expenses.</u>  Employer shall reimburse Executive for all necessary and reasonable "out-of-pocket" business expenses incurred by Executive in the performance of Executive's duties hereunder; <u>provided</u> that Executive furnishes to Employer adequate records or other documentary evidence required to substantiate such expenditures and otherwise complies with the expense reimbursement policy of Employer in effect at such time.

## ARTICLE IV

### Termination

SECTION 4.01. <u>Exclusive Rights.</u>  Except as set forth in this Article IV, in the event that Executive's employment with Employer is terminated, whether by Employer or Executive, at any time and for any reason, Executive shall have no further rights to any compensation or any other benefits under this Agreement, any Benefit Plan or any employee benefit policies or other benefit arrangements in effect from time to time, whether maintained or provided by Employer, RSI or any of their affiliates.

SECTION 4.02. <u>Accrued Rights.</u>  Upon the termination of Executive's employment under this Agreement for any reason, Executive shall be entitled to receive (a) Base Salary earned through the effective date of termination that remains unpaid as of such date, (b) reimbursement for any unreimbursed business expenses incurred by Executive prior to the effective date of Executive's termination to the extent such expenses are reimbursable under Section 3.02, (c) any benefits (other than benefits under any severance, termination or change in control plan, program or policy then in effect) to which Executive may be entitled under the Benefit Plans as of the effective date of Executive's termination, which benefits shall be payable in accordance with the terms of such Benefits Plans as in effect from time to time, and (d) any portion of the Base Amount that remains unpaid as of the effective date of Executive's termination.

{2242678}

CONFIDENTIAL

PIKE 00017041

8

SECTION 4.03. Termination by Employer other than for Cause.
(a) If Employer elects to terminate Executive's employment prior to the expiration of the Term for any reason other than death, Disability or Cause, Employer shall (i) provide written notice to Executive at least 30 days prior to the effective date of Executive's termination of employment or (ii) in lieu of providing such notice, continue to pay Executive's Base Salary through the period of time ending 30 days after the effective date of Executive's termination of employment. In the event of any such termination, Employer shall pay to Executive a lump-sum amount in cash equal to one year of Executive's then current Base Salary. If Employer elects to terminate Executive's employment prior to the first anniversary of the Closing for any reason other than death, Disability or Cause, Employer shall pay Executive an amount in cash equal to any portion of the Multiplier Amount that remains unpaid as of the effective' date of Executive's termination, which payments shall be made promptly after the effective date of Executive's termination, and all Restricted Shares acquired pursuant to Section 2.03 of this Agreement shall become immediately vested as of the date of such termination. If Employer elects to terminate Executive's employment on or following the first anniversary of the Closing but prior to the end of the Term for any reason other than death, Disability or Cause, Employer shall pay Executive any unpaid portions of the Multiplier Amount in accordance with the schedule set forth under Section 2.02(b) and all Restricted Shares acquired pursuant to Section 2.03 shall continue to vest in accordance with the schedule set forth under Section 2.03(b)(ii), in each case, subject to Section 5.10. Notwithstanding the foregoing, Employer shall not be obligated to make any payment described in this Section 4.03(a), and no Restricted Shares shall become vested in accordance with this Section 4.03(a), until such time as Executive has provided an irrevocable waiver and general release of claims (other than any claims for payments that Executive is entitled to receive in accordance with this Section 4.03(a)) in favor of Employer, its affiliates, and their respective affiliates, directors, officers, employees, shareholders, owners, members, partners, agents and representatives in form and substance satisfactory to Employer.

(b) For purposes of this Agreement, the term "Cause" shall mean (i) Executive's willful failure or refusal to perform those duties that Executive is assigned or required to perform pursuant to this Agreement, (ii) Executive's failure to perform any obligation imposed upon Executive pursuant to this Agreement, including any willful failure to comply with any material employee policy of Employer, (iii) Executive's theft or misappropriation of Employer's funds or property or Executive's willful breach of any fiduciary duty to Employer in the performance of Executive's duties hereunder, (iv) Executive's conviction of, or a plea of guilty or nolo contendere to, a misdemeanor involving moral turpitude, fraud, dishonesty or theft that impairs the reputation of Employer or any of its affiliates or any felony (other than any traffic laws or laws governing operation of a motor vehicle) (or the equivalent thereof in a jurisdiction other than the United States), (v) Executive's gross negligence or willful misconduct in the performance of Executive's duties hereunder that results in material injury to the property, financial condition or business reputation of Employer or any of its affiliates

[2343676]

CONFIDENTIAL

PIKE 00017042



and (vi) Executive's breach of the provisions of Article V of this Agreement. "Cause" shall not exist under this Section 4.03(b) until and unless (A) the CEO has given Executive written notice that he believes Executive has engaged in conduct that constitutes Cause, (B) such notice identifies the clause or clauses of this Section 4.03(b) that describe the prohibited conduct that Executive is alleged to be or have been engaged in and (C) the Board has unanimously determined in good faith that conclusive evidence supporting the termination of Executive for Cause exists. In the event that Executive is alleged to have engaged in any conduct that falls under clause (i) or (ii) of this Section 4.03(b), Executive shall be given not less than 30 days to remedy such conduct; provided, however, that if Executive engages in any subsequent conduct that the Board determines in accordance with clause (C) of this Section 4.03(b) constitutes Cause, the Board shall be entitled to terminate his employment without giving Executive an opportunity to remedy his subsequent conduct.

SECTION 4.04. Termination by Executive. If Executive resigns or terminates employment for any reason, Executive shall provide written notice at least 30 days prior to the effective date of such resignation or termination. If Executive elects to terminate his employment for Good Reason at any time during the Term, Employer shall pay Executive any unpaid portions of the Multiplier Amount in accordance with the schedule set forth under Section 2.02(b), and all Restricted Shares acquired pursuant to Section 2.03 shall continue to vest in accordance with the schedule set forth under Section 2.02(b), in each case, subject to Section 5.10. Notwithstanding the foregoing, Employer shall not be obligated to make any payment described in this Section 4.04, and no Restricted Shares shall become vested in accordance with this Section 4.04 until such time as Executive has provided an irrevocable waiver and general release of claims (other than any claims for payments that Executive is entitled to receive in accordance with this Section 4.04) in favor of Employer, its affiliates, and their respective affiliates, directors, officers, employees, shareholders, owners, members, partners, agents and representatives in form and substance satisfactory to Employer.

SECTION 4.05. Termination upon Death or Disability. (a) Executive's employment under this Agreement shall terminate automatically upon Executive's death or Disability. In the event of any such termination, Employer shall promptly pay to Executive or Executive's designated beneficiary, as the case may be, any portion of the Multiplier Amount that is unpaid as of the date of such termination, and all Restricted Shares acquired pursuant to Section 2.03 shall become immediately vested.

(b) For purposes of this Agreement, the term "Disability" shall mean (i) the inability of Executive, due to illness, accident or any other physical or mental incapacity, to perform Executive's duties in a normal manner for a period of 180 days (whether or not consecutive) in any twelve-month period during the Term or (ii) Executive's being accepted for long-term disability benefits under any long-term disability plan in which Executive is then participating. The Board shall determine, in good faith, on the basis of the facts then available, whether and when the Disability of Executive has occurred. Such determination shall take into consideration the expert

[2342676]

CONFIDENTIAL

10

medical opinion of a physician mutually agreeable to Employer and Executive based upon such physician's examination of Executive. Executive agrees to make himself available for such examination upon the reasonable request of Employer.

SECTION 4.06. Resignation for Good Reason. Executive may terminate his employment or consultancy under this Agreement at any time for Good Reason. As used herein, the term "Good Reason" shall mean the occurrence, without Executive's consent, of any of the events or circumstances set forth in the following clauses (a) through (c):

(a) the assignment to Executive of any duties or responsibilities that are inconsistent in any material respect with the Executive's status, title and position as set forth in Section 1.02;

(b) any willful failure of employer to pay or provide to Executive any portion of Executive's compensation or benefits required under this Agreement, within 30 days of the date Executive informs Employer in writing that such compensation and benefits are due; or

(c) any material breach of this Agreement by Employer.

"Good Reason" shall not exist under clauses (a), (b) or (c) until and unless Executive has given the Board notice of the applicable event within 30 days of the date Executive has actual knowledge of such event. Such notice shall specifically delineate such claimed breach and shall inform the Board that the Company is required to cure such breach (if curable) within 30 days (the "Cure Period") after such notice is given in accordance with this Section 4.06. If such breach is not so cured (or is not curable), Executive may resign for Good Reason within a reasonable time after the end of the Cure Period. If such breach is cured within the Cure Period, Good Reason shall not exist hereunder; provided, however, that if Employer commits a similar breach of this Agreement within 12 months of the giving of the foregoing notice, Executive may terminate his employment for Good Reason without giving the Company an opportunity to cure such subsequent breach.

## ARTICLE V

### Executive's Covenants

SECTION 5.01. Employer's Interests. Executive acknowledges that RSI has expended substantial amounts of time, money and effort to develop business strategies, substantial customer relationships, supplier and vendor relationships, employee relationships, goodwill, business secrets, confidential information and intellectual property and to build an effective organization and that Employer, as the sole shareholder of RSI after the Closing, has a legitimate business interest and right in protecting those assets as well as any similar assets that Employer may develop or obtain following the Closing. Executive acknowledges that Employer is entitled to

[242674]

CONFIDENTIAL

PIKE 00017044

11



protect and preserve the going concern value of the business of RSI and its own business (together with the business of RSI, the "Business") following the Closing to the extent permitted by law. Executive acknowledges and agrees that the restrictions imposed upon Executive under Sections 5.03, 5.05, 5.06, 5.07 and 5.08 of this Agreement are reasonable and necessary for the protection of such assets and that, in light of the amounts payable pursuant to this Agreement and the consideration to be paid to the Trust pursuant to the Stock Purchase Agreement, the restrictions set forth in this Agreement will not prevent Executive from earning an adequate and reasonable livelihood and supporting his dependents without violating any provision of this Agreement.

SECTION 5.02. Consideration to Executive. Executive acknowledges he has been informed that Employer would not have agreed to enter into the Stock Purchase Agreement, pursuant to which the Trust's shares of RSI stock will be purchased for cash, and that Employer would not have agreed to enter into this Agreement and make the payments hereunder, without Executive's agreeing to enter into and to honor the provisions and covenants of this Article V. Therefore, Executive agrees that, in consideration of (a) Employer's entering into this Agreement and Employer's obligations hereunder, (b) Employer's entering into the Stock Purchase Agreement and Employer's obligation to purchase the shares of RSI stock held by the Trust for cash thereunder and (c) other good and valuable consideration, the receipt of which is hereby acknowledged, Executive shall be bound by, and agrees to honor and comply with, the provisions and covenants contained in this Article V following the Closing.

SECTION 5.03. Non-Disclosure of Confidential Information.
(a)  Executive acknowledges, that in the performance of his duties as an employee of RSI, Executive has received, and may in the future as an employee of Employer be given access to, Confidential Information (as defined below).

(b)  Executive agrees that all Confidential Information has been, is and shall be the sole property of Employer or RSI, as the case may be, and that Executive has no right, title or interest therein.

(c)  Prior to the date of this Agreement, Executive has not, directly or indirectly, disclosed or caused or permitted to be disclosed, to any person or entity whatsoever, or utilized or caused or permitted to be utilized, by any person or entity whatsoever, any Confidential Information acquired pursuant to Executive's employment with RSI, except (i) as Executive reasonably believed to be necessary in the discharge of Executive's duties as an employee of RSI or (ii) as required by law or as ordered by a court of competent jurisdiction.

(d)  Except as otherwise specifically provided in Section 5.04, Executive shall not, directly or indirectly, disclose or cause to be disclosed, to any person or entity whatsoever, or utilize or, directly or indirectly, cause to be utilized, by any person or
[1042674]

CONFIDENTIAL

PIKE 00017045

12

entity whatsoever, any Confidential Information acquired pursuant to Executive's employment with Employer or RSI (whether acquired prior to or subsequent to the execution of this Agreement) or otherwise.

(e) Except as expressly required pursuant to Section 5.11, Executive shall not disclose to any person, other than Executive's immediate family and legal or financial advisors, the existence or contents of this Agreement and, to the extent such information is disclosed to Executive's immediate family or legal or financial advisors, Executive shall instruct those parties to comply with the non-disclosure requirements of this Section 5.03.

(f) For purposes of this Agreement, "Confidential Information" shall mean trade secrets and confidential or proprietary information, knowledge or data that is or will be used, developed, obtained or owned by Employer, RSI or the Business relating to the business, operations, products or services of Employer, RSI or the Business or the business, operations, products or services of any customer thereof, including products, services, fees, pricing, designs, marketing plans, strategies, analyses, forecasts, formulas, drawings, photographs, reports, records, computer software (whether or not owned by, or designed for, Employer, RSI or the Business), operating systems, applications, program listings, flow charts, manuals, documentation, data, databases, specifications, technology, inventions, developments, methods, improvements, techniques, devices, products, know-how, processes, financial data, customer, supplier and vendor lists, contact persons, cost information, executive information, regulatory matters, personnel matters, employee information, employee compensation, accounting and business methods, patents, trade secrets, copyrightable works and information with respect to any supplier, vendor, customer, employee or independent contractor of Employer, RSI or the Business, in each case whether patentable or unpatentable, whether or not reduced to writing or other tangible medium of expression and whether or not reduced to practice, and all similar and related information in whatever form, and all such items of any supplier, vendor, customer, employee or independent contractor of Employer, RSI or the Business or any other person with which Employer or RSI has a business relationship or owes a duty of confidentiality; provided, however, that Confidential Information shall not include information that is generally known to the public other than as a result of disclosure by Executive in breach of this Agreement or in breach of any similar covenant made by Executive prior to entering into this Agreement or any other duty of confidentiality.

SECTION 5.04.  Permitted Disclosure.  Executive may (a) utilize and disclose Confidential Information as required in the discharge of Executive's duties as an employee of Employer, subject to any specific restriction, limitation or condition placed on such use or disclosure by Employer, and (b) disclose Confidential Information to the extent required by applicable law or as ordered by a court of competent jurisdiction; provided that in such event, or if Executive receives a request from a court or other governmental authority to disclose Confidential Information, (i) Executive shall give prompt written notice to Employer and consult with and provide reasonable assistance to Employer in seeking a protective order or request for other appropriate
(2242676)

PIKE 00017046

13

remedy, (ii) in the event that such protective order or remedy is not obtained, or if Employer waives the seeking of such protective order or other remedy, (A) Executive shall disclose only that portion of the Confidential Information that, in the opinion of Executive's legal counsel, is legally required to be disclosed (and Executive shall be entitled to rely on the advice of such counsel) and (B) if requested in writing by Employer to do so, which writing contains an undertaking to reimburse Executive for any expenses incurred by him, then Executive shall exercise his reasonable best efforts to ensure that confidential treatment shall be accorded such Confidential Information by the receiving person or entity and (iii) Employer shall be given an opportunity to review such Confidential Information prior to disclosure thereof.

SECTION 5.05. Inventions. (a) Executive hereby represents to Employer that he has no right, title or interest in or to any Inventions (as defined below). From and after the Closing, Executive hereby assigns to Employer or its designee all Executive's rights, title and interest in and to, any and all Inventions, whether or not patentable, that Executive may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, within the scope of, and during the term of, Executive's employment with Employer. Executive further acknowledges that all original works of authorship that are created or contributed to by Executive (solely or jointly with others) within the scope of, and during the period of, Executive's employment with Employer are to be deemed "works made for hire", as that term is defined in the United States Copyright Act, and the copyright and all other intellectual property rights therein shall be the sole property of Employer or its designee. Executive shall take all reasonably requested actions and execute all reasonably requested documents to assist Employer, or its designee, at Employer's expense, in every way to secure Employer's or its designee's rights under this Section 5.05.

(b) For purposes of this Agreement, the term "Inventions" shall mean all inventions, works of authorship, developments, improvements and trade secrets (including products, services, processes, know-how, designs, developments, techniques, formulas, methods, mask works, developmental or experimental work, discoveries, ideas, source and object codes, software, databases, documentation, site content, text, graphics, programs and related items) and any works in progress, whether or not patentable or registrable under copyright or similar statutes, that relate to the proposed or current business, services, products or research and development of Employer or RSI.

SECTION 5.06. Non-Disparagement. After the date hereof, Executive shall not, whether in writing or orally, criticize or disparage Employer, RSI or the Business or any of their respective former, current or future directors, officers, employees, agents or representatives; provided that Executive may provide critical assessments of Employer to Employer within the scope, and during the term, of Executive's employment with Employer.

[?]42676]

CONFIDENTIAL

PIKE 00017047

14

SECTION 5.07. Non-Competition. (a) For the Restricted Period, Executive shall not, and shall cause each of Executive's representatives, agents and affiliates not to, directly or indirectly:

(i) (A) engage in activity or business, or establish any new business, within the United States of America that is in competition, in whole or in part, with the Business or Employer ("Competitive Activities"), including (1) selling goods or performing services of the type sold or performed by the Business or Employer (x) at any time prior to the Closing or (y) prior to the time Executive ceases to be an employee of Employer or (2) assisting any person or entity in any way to do, or attempt to do, anything prohibited by clause (1), or (B) perform any action or activity or engage in any course of conduct that is detrimental to the business reputation of the Business or Employer or any business of Employer conducted at any time prior to the time Executive ceases to be an employee of Employer;

(ii) (A) solicit any person or entity that is a customer (or prospective customer) of Employer or any of its affiliates to purchase any goods or services sold or performed by Employer or any of its affiliates from any person other than Employer or any of its affiliates or to reduce or refrain from doing any business with Employer or any of its affiliates, (B) solicit, recruit or hire any employee of Employer or any of its affiliates or any person who has worked for Employer or any of its affiliates, (C) solicit or encourage any employee of Employer or any of its affiliates to leave the employment of Employer or any of its affiliates or recommend to any person that such person employ or engage any employee of Employer or any of its affiliates, (D) intentionally interfere with or damage (or attempt to interfere with or damage) any relationship between Employer or any of its affiliates, on one hand, and any of their respective employees, customers or suppliers, on the other hand (or any person or entity that Employer or any of its affiliates has approached or has made significant plans to approach as a prospective employee, customer or supplier); or any governmental authority or any agent or representative thereof or (E) assist any person or entity in any way to do, or attempt to do, anything prohibited by this clause (ii);

(iii) serve as a director, officer, affiliate, employee, broker, independent contractor, consultant, agent, representative or advisor for any Competitor (as defined below) and in such capacity engage in, or directly or indirectly manage or supervise personnel engaged in, any activity (A) which is substantially similar or substantially related to any activity in which Executive was engaged, in whole or in part, at Employer or RSI in his capacity as a director, officer or employee, (B) for which Executive had managerial or supervisory responsibility at Employer or RSI or (C) which utilizes the same or substantially similar specialized knowledge or skills as those utilized by Executive in his activities with Employer or RSI, in each

[2342676]

CONFIDENTIAL

PIKE 00017048

15

case at any time prior to Executive's termination of employment with Employer; or

(iv) form, or acquire any equity ownership, voting or profit participation interest in, any Competitor, other than an interest of less than 5% in a Competitor that is publicly traded.

(b) for purposes of this Agreement, the term "Restricted Period" shall mean a period commencing on the date of the Closing and terminating five years from the date Executive ceases to be an employee of Employer for any reason. The Restricted Period shall be tolled during (and shall be deemed automatically extended by) any period in which Executive is in violation of this Section 5.07.

(c) for purposes of this Agreement, the term "Competitor" shall mean any business, person or entity that engages in any activity or owns or controls a significant interest in any business, person or entity that engages in any activity, that, in either case, competes in the United States of America with any activity in which Employer is engaged.

(d) for purposes of this Agreement, the term "solicit" shall mean the initiation of any communication of any kind whatsoever for the purpose of inviting, encouraging or requesting the taking (or refraining from taking) of any action.

SECTION 5.08. Release. (a) Executive, on behalf of Executive and his spouse, heirs, dependents, representatives, executors, administrators and successors and assigns (the "Releasing Parties"), hereby waives, releases and forever discharges Employer and each of its former, current and future shareholders, subsidiaries, affiliates, owners, directors, officers, employees and agents, and each of the respective predecessors, successors and assigns of each of the foregoing (the "Released Parties"), from any and all manner of actions and causes of action, suits, debts, dues, accounts, bonds, covenants, contracts, liabilities, obligations, agreements, judgments, charges, claims (including any claim for attorneys' fees), rights and demands whatsoever that Executive and the Releasing Parties have, had or may hereafter have against the Released Parties or any of them relating to, arising out of or by reason of any cause, act, event, omission, matter or thing whatsoever arising on or prior to the Closing, whether known or unknown, including without limitation any and all matters relating to Executive's employment by RSI and its affiliates, and any and all matters arising under any Federal, state or local statute, rule or regulation, or principle of common, tort or contract law, including, but not limited to, the Fair Labor Standards Act of 1938, as amended, the Family and Medical Leave Act of 1993, as amended, Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, as amended, the Americans with Disabilities Act of 1990, as amended, the Worker Adjustment and Retraining Notification Act of 1988, as amended, the Executive Retirement Income Security Act of 1974, as amended, and any other equivalent or similar Federal, state or local statute; provided, however, that nothing herein shall

[2][474]

CONFIDENTIAL

PIKE 00017049

16

release Employer from any claims or damages based on any right or claim Executive may have to enforce this Agreement. It is understood that nothing in this Section 5.08 is to be construed as an admission on behalf of the Released Parties of any wrongdoing with respect to Executive or any Releasing Party, any such wrongdoing being expressly denied.

(b)  Executive represents and warrants that he fully understands the terms of the release contained in this Section 5.08, that he had the benefit of advice of legal counsel, and that he knowingly and voluntarily, of his own free will, without any duress, being fully informed, and after due deliberation, accepts its terms as his own free act. Executive understands that, as a result of executing this Agreement, he will not have the right to assert that RSI, Employer or any other of the Released Parties has, at any time on or prior to the Closing, violated any of his rights in connection with his employment or otherwise.

SECTION 5.09.  Records.  Effective as of the Closing, all memoranda, books, records, documents, papers, plans, information, letters and other data relating to Confidential Information or the business, employee or supplier information or customer accounts of Employer, RSI or the Business, whether prepared by Executive or otherwise, coming into Executive's possession (or which previously came into Executive's possession) shall be and remain the exclusive property of Employer and Executive shall not directly or indirectly assert any interest or property rights therein. Upon termination of employment with Employer for any reason, and upon the request of Employer at any time, Executive shall immediately deliver to Employer all such memoranda, books, records, documents, papers, plans, information, letters and other data, and all copies thereof or therefrom, and Executive shall not retain, or cause or permit to be retained, any copies or other embodiments of such materials. Executive further agrees that Executive shall not retain or use for Executive's account at any time any trade names, trademark or other proprietary business designation used or owned in connection with the Business.

SECTION 5.10.  Specific Performance.  Executive agrees that any breach by Executive of any of the provisions of Sections 5.03, 5.05, 5.06 and 5.07 shall cause irreparable harm to Employer that could not be adequately compensated by monetary damages and that, in the event of such a breach, Executive shall waive the defense in any action for specific performance that a remedy at law would be adequate, and Employer shall be entitled to (a) specifically enforce such terms and provisions without the necessity of proving actual damages or posting any bond and (b) cease making any payments or providing any benefit (including by way of vesting of any Restricted Shares acquired pursuant to Section 2.03) otherwise required by this Agreement, in each case in addition to any other remedy to which Employer may be entitled at law or in equity; provided, however, that if Employer fails to make timely payment of any portion of the Base Amount or the Multiplier Amount required to be paid hereunder (or fails to deliver the share certificates with respect to any Restricted Shares, as required pursuant to Section 2.03(b)(i)) within 30 days of the date Executive
[3343676]

CONFIDENTIAL

PIKE 00017050

17



informs Employer in writing that such amount is due, in the case of the Multiplier Amount (or any Restricted Shares purchased pursuant to Section 2.03), other than as a result of Executive's forfeiture of such amount (or such Restricted Shares) pursuant to Section 2.02(b), Section 2.03(b) or this Section 5.10, in each case as determined by Employer in good faith, Executive shall thereafter be promptly relieved of any further obligation to comply with Sections 5.06 and 5.07; and provided further, however, that solely for purposes of Section 5.07, (i) in the event that Executive forfeits any portion of the Multiplier Amount as a result of Executive's termination of employment by Employer for Cause or by Executive without Good Reason on or prior to the 18-month anniversary of the Closing Date, the Restricted Period shall terminate 18 months from the date of Executive's termination of employment and (ii) in the event that Executive forfeits any portion of the Multiplier Amount as a result of Executive's termination of employment by Employer for Cause or by Executive without Good Reason after the 18-month anniversary of the Closing Date, the duration of the Restricted Period shall be equal to the duration of Executive's employment with Employer.

SECTION 5.11. Notification of Subsequent Employer. Prior to accepting employment with any other person or entity during any period during which Executive remains subject to any of the covenants set forth in Article V, Executive shall provide such prospective employer with written notice of the relevant provisions of this Agreement, with a copy of such notice delivered simultaneously to Employer.

SECTION 5.12. Executive Representations. Executive represents and warrants to Employer that (a) Schedule 5.12 to this Agreement sets forth a true, complete and correct list of all contracts, agreements, understandings and arrangements between or among Executive and RSI or any of its affiliates (collectively, the "Existing Agreements") and (b) the execution and delivery of this Agreement by Executive and Employer and the performance by Executive of Executive's duties hereunder shall not constitute a breach of, or otherwise contravene, or be prevented, interfered with or hindered by, the terms of any Existing Agreement or other agreement, arrangement, understanding or policy or program to which Executive is a party or otherwise bound.

SECTION 5.13. Cooperation. Following termination of his employment, Executive shall provide Executive's reasonable cooperation in connection with any suit, action or proceeding (or any appeal therefrom) that relates to events occurring during Executive's employment with Employer; provided that Employer shall reimburse Executive for expenses reasonably incurred and compensate Executive (at the hourly equivalent of his final base compensation, assuming a 40-hour work week) for time actually spent in connection with such cooperation.

SECTION 5.14. Scope of Covenants. For purposes of this Article V, the term "Employer" includes Employer's subsidiaries (including RSI) and affiliates, and its and their predecessors, successors and assigns.

[7242676]

CONFIDENTIAL

PIKE 00017051

18

## ARTICLE VI

### Miscellaneous

SECTION 6.01.  Assignment.  This Agreement is personal to Executive and shall not be assignable by Executive.  The parties agree that any attempt by Executive to delegate Executive's duties hereunder shall be null and void.  Employer may assign this Agreement and its rights and obligations thereunder, in whole or in part, to any person that is an affiliate, or a successor in interest to substantially all the business or assets, of Employer.  Upon such assignment, the rights and obligations of Employer hereunder shall become the rights and obligations of such affiliate or successor person or entity; provided that Employer shall remain liable for each of its obligations hereunder.  For purposes of this Agreement, the term "Employer" shall include any permitted assignee to which this Agreement is assigned.

SECTION 6.02.  Successors.  This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of Employer and the personal and legal representatives, executors, administrators, successors, distributees, devisees and legatees of Executive.  Executive acknowledges and agrees that all Executive's covenants and obligations to Employer, as well as the rights of Employer under this Agreement, shall run in favor of and shall be enforceable by Employer, its affiliates and their successors and assigns.

SECTION 6.03.  Entire Agreement.  This Agreement contains the entire understanding of Executive, on the one hand, and Employer and its affiliates, on the other hand, with respect to the subject matter hereof, and all oral or written agreements or representations, express or implied, with respect to the subject matter hereof are set forth in this Agreement.  Without limiting the generality of the foregoing, all the Existing Agreements shall be terminated and of no further force and effect, and Executive shall be entitled to no further payments or benefits thereunder, as of the Closing.

SECTION 6.04.  Amendment.  This Agreement may not be altered, modified or amended except by written instrument signed by the parties hereto.

[2342676]

CONFIDENTIAL

19

SECTION 6.05.  Notice.  All notices, requests, demands and other communications required or permitted to be given under the terms of this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three Business Days after they have been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the other party as set forth below:

| | |
|---|---|
| If to Employer: | Pike Electric, Inc.<br>100 Pike Way<br>Mount Airy, NC 27030<br>Attention: J. Eric Pike<br>Telecopy: (336) 719-4585 |
| with a copy to: | Cravath, Swaine & Moore LLP<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019<br>Attention:  Richard Hall, Esq.<br>Telecopy:  212-474-3700 |
| If to Executive: | Mick Dubea<br>2570 Ashley<br>Beaumont, TX 77702 |

The parties may change the address to which notices under this Agreement shall be sent by providing written notice to the other in the manner specified above.  For purposes of this Section 6.05, the term "Business Day" shall mean a day that is not a Saturday, a Sunday or a day on which banking institutions are legally permitted to be closed in the city of New York.

SECTION 6.06.  Governing Law; Jurisdiction; Waiver of Jury Trial.
(a)   This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles of such State.

(b)   Each party irrevocably submits to the exclusive jurisdiction of (i) the courts of the State of Delaware and (ii) the United States District Court for the District of Delaware for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby.  Each party agrees to commence any such action, suit or proceeding either in the United States District Court for the District of Delaware, or if such suit, action or other proceeding may not be brought in such court for

[NY2 1676]

CONFIDENTIAL

20

jurisdictional reasons, in the courts of the State of Delaware. Each party further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth above shall be effective service of process for any action, suit or proceeding in Delaware with respect to any matters to which it has submitted to jurisdiction in this Section 6.06. Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in (i) the courts of the State of Delaware or (ii) the United States District Court for the District of Delaware, and hereby and thereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

(c)  Each party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement or any transaction contemplated hereby. Each party (i) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 6.06.

SECTION 6.07.  Severability.  If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable in any jurisdiction, then such provision, covenant or condition shall, as to such jurisdiction, be modified or restricted to the extent necessary to make such provision valid, binding and enforceable, or, if such provision cannot be modified or restricted, then such provision shall, as to such jurisdiction, be deemed to be excised from this Agreement and any such invalidity, illegality or unenforceability with respect to such provision shall not invalidate or render unenforceable such provision in any other jurisdiction, and the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

SECTION 6.08.  Survival.  Subject to Section 1.01, the rights and obligations of Employer and Executive under the provisions of this Agreement, including Articles V and VI, shall survive and remain binding and enforceable, notwithstanding any termination of Executive's employment with Employer for any reason, to the extent necessary to preserve the intended benefits of such provisions.

SECTION 6.09.  No Waiver.  The failure of a party to insist upon strict adherence to the terms of this Agreement on any occasion shall not be considered a waiver of such party's rights or deprive such party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

[23425?6]

CONFIDENTIAL

PIKE 00017054

21

SECTION 6.10. Determinations. Unless otherwise expressly provided in this Agreement, all determinations of Employer or the Board shall be in the good faith discretion of Employer or the Board, as applicable.

SECTION 6.11. Counterparts. This Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

SECTION 6.12. Construction. (a) The headings in this Agreement are for convenience only, are not a part of this Agreement and shall not affect the construction of the provisions of this Agreement.

(b) For purposes of this Agreement, the words "include" and "including", and variations thereof, shall not be deemed to be terms of limitation but rather shall be deemed to be followed by the words "without limitation".

(c) For purposes of this Agreement, the terms "subsidiary" and "affiliate" shall have the meanings ascribed to such terms in the Stock Purchase Agreement.

REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

[7343676]

CONFIDENTIAL

IN WITNESS WHEREOF, the parties have duly executed this Agreement of the date first written above.

PIKE ELECTRIC, INC.,

by _____

    Name:
    Title:

MICK J. DUBEA,



[23\2676]

CONFIDENTIAL

PIKE 00017057

# Exhibit E

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

IN RE GRAND JURY MATTER       )
                                 )      Misc. No. 97-20-SLR
_____ )

### ORDER

At Wilmington, this 2ᵀᴴday of June, 1997, consistent with the memorandum

opinion issued this same date,

IT IS ORDERED that movant's motion is denied. (D.I. 1)

_____
United States District Judge



# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

IN RE GRAND JURY MATTER     )
                                  )     Misc. No. 97-20-SLR
_____)

Charles M. Oberly, III, Esquire, of Oberly, Jennings & Drexler, P.A., Wilmington, Delaware, attorney for movant.

Gregory M. Sleet, United States Attorney, and Colm F. Connolly, Assistant United States Attorney, United States Attorney's Office, Wilmington, Delaware, attorneys for the government.

## MEMORANDUM OPINION

Dated: June 27, 1997
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

The target[1] of an ongoing grand jury investigation ("movant") has filed a motion to compel the government to return certain documents in its possession that the target claims are protected by the work product doctrine and/or the attorney-client privilege. (D.I. 1) Movant further requests that the court preclude the government from utilizing the information contained in these documents and to determine whether the use of these documents has undermined and tainted the grand jury process. (D.I. 1) The documents at issue in this motion were obtained pursuant to a subpoena duces tecum.[2] The government opposes the motion. (D.I. 3, 5) Jurisdiction over this matter is established pursuant to Fed. Crim. R. 17(c).[3] See In Re Grand Jury, 111 F.3d 1066, 1075-1076 (3d Cir. 1997) (agreeing to entertain motion under Federal

---

1.   Fed. R. Crim. P. 6(e)(6) requires that "[r]ecords, orders and subpoenas relating to grand jury proceedings shall be kept under seal to the extent and for such time as is necessary to prevent disclosure of matters occurring before a grand jury." In keeping with this rule, this memorandum opinion will not include names or other identifying details of the parties involved. Furthermore, this memorandum opinion, like all other documents relating to this matter, will be sealed.

2.   Originally, movant also sought the return of three documents seized pursuant to a search warrant executed on his home on July 31, 1996. The parties have reached an agreement as to all but one of these documents. (D.I. 4 at 11) As for the remaining document, counsel for movant has reserved the right to assert that it is work product and cannot be used for evidentiary purposes. (D.I. 4 at 11) Since the government has given movant a copy of this document, there is no further issue for the court to determine at this time. (D.I. 4 at 11)

3.   Furthermore, this motion is not moot despite the fact that the file has been turned over to the government and grand jury. See In re Grand Jury Subpoena Dated Dec. 7 and 8, 40 F.3d 1096, 1100 (10th Cir. 1994) (citing Church of Scientology of California v. United States, 113 S. Ct. 447, 449 (1992)).

1

Criminal Rule 17(c) even though party cited another basis for its motion). For the reasons stated below, the court shall deny movant's motion.

## II. BACKGROUND

The government has convened a grand jury to investigate the disappearance of a woman. The woman was reported missing on or about June 27, 1996. The government has identified movant as the target of its ongoing investigation. During the relevant time period, movant was a partner with a law firm.[4]

On June 30, 1996, when movant learned that he was considered a suspect in connection with the woman's disappearance, he retained an attorney. On July 10, 1996, movant and his attorney met with the current chairman of movant's law firm. (D.I. 3, Ex. H) At the outset of the meeting, the chairman "informed [m]ovant and his [attorney] that because [the law firm] did not represent [m]ovant, any communications were not privileged or otherwise covered by an attorney-client relationship." (D.I. 3, Ex. H)

According to his affidavit, movant's attorney directed movant to "prepare a time-line of everything he could remember concerning his whereabouts on June 27, 1996 and immediately thereafter." (D.I. 1, Ex. B) Movant's attorney also claims that he directed movant to "write down his thoughts and notes, as he remembered them, of anything he could recall about his relationship with [the woman], such as restaurants visited, gifts purchased, and any events or incidents he could recall." (D.I. 1, Ex. B) Movant's attorney asserts that he made this request in order to provide movant with representation in any future legal proceedings. (D.I. 1, Ex. B) In

---

4.    Movant has since resigned his partnership effective May 31, 1997.

2

his affidavit, movant alleges that in July 1996 he began compiling the requested information on several sheets of legal paper. (D.I. 1, Ex. A) Movant placed some of these documents in a file he maintained at his law office. During this time, the media's interest in movant's alleged connection to the woman's disappearance made him concerned that someone might search through his office and discover the documents. Because of this concern, movant placed the file in the office of one of his law partners ("the law partner").[5] (D.I. 1, Ex. A) The law partner was initially unaware that movant had placed the file in his office. (D.I. 3, Ex. G and D.I. 1, Ex. A)

    In his affidavit, the law partner asserts that, sometime in July 1996, movant told him that if he "saw a file in [his] office which [he] did not recognize, [he] was not to destroy the file or throw it out." (D.I. 3, Ex. G) The law partner states that he gave movant a quizzical look, suggesting that he found the statement odd. (D.I. 3, Ex. G) According to the law partner, movant told him that "he was concerned that the media could look at the contents of the file." (D.I. 3, Ex. G) The law partner claims that movant did not tell him the contents of the file; did not state explicitly that the file contained confidential or privileged information; and did not instruct him not to look at the contents of the file. (D.I. 3, Ex. G)

    Movant disputes the law partner's recollection of these events. Movant claims that in August or September 1996, he told the law partner that he had placed a "confidential file in [his] office on his shelves so as to keep it from anyone who might enter [movant's] office." (D.I. 1, Ex. A) Movant claims that the law partner "was advised [that] the documents were confidential and were for [movant's] attorneys." (D.I. 1, Ex. A) He also claims that he did not authorize the law partner to review or disclose the contents of the file. (D.I. 1, Ex. A)

---

5.    The law partner's office is located next door to movant's office. (D.I. 3, Ex. G)

3

According to the law partner, sometime in July or August 1996, he noticed a file

that was face down and not vertically aligned with other files on his bookshelf. (D.I. 3, Ex. G)

He took the file off the shelf and saw that it contained hand-written notes on white, lined paper.

(D.I. 3, Ex. G) The law partner read through the notes and assumed that this was the file that

movant had mentioned to him. (D.I. 3, Ex. G) After reading the notes, the law partner placed

them back into the file and returned the file to its original place on the shelf. (D.I. 3, Ex. G) The

documents remained in the law partner's office until November 4, 1996. During this time, the law

partner frequently observed the file in the same place where movant had initially placed it. (D.I. 3,

Ex. G)

On November 4, 1996, the government called the chairman of the movant's law

firm to ask if he was aware that movant's law partner possessed a file that movant had given to

him. The chairman responded that the law partner had described the file to him. (D.I. 3, Ex. G)

The government then advised the chairman that (1) a grand jury subpoena was being issued for

the file; (2) the file should be considered under subpoena; and (3) he should advise the law partner

that any disposal of the file could be considered obstruction of justice. (D.I. 3, Ex. G) At this

time, the chairman raised a concern that disclosure of the file might reveal information relating to

the representation of the law firm's clients. The government and the chairman then agreed that

the file would be produced under seal, and representatives from the law firm would screen the

documents for any information relating to the representation of the law firm's clients. (D.I. 3, Ex.

H)

After speaking with the government, the chairman telephoned movant's law

partner and advised him that a grand jury subpoena would be issued for the file that movant had

4

placed in his office. The chairman also advised the law partner that he had requested that the file

be produced under seal, and instructed the law partner to place it in a sealed envelope while in the

presence of the government agent serving the subpoena. The chairman then called the

government to confirm his contact with the law partner and arrange the procedures for

representatives from the law firm to screen the documents. The chairman again called the law

partner to notify him that the government would serve the subpoena soon and to review the

procedures for sealing the file. (D.I. 3, Ex. H)

On that same day, the government called movant's law partner directly to inform

him that a grand jury subpoena would be served on him for movant's file in his office. The

government directed the law partner not to destroy the file; to do so would constitute an

obstruction of justice. (D.I. 3, Ex. G) The law partner then removed the file from the shelf and

looked through the documents to confirm that they were the same ones he had examined earlier.

(D.I. 3, Ex. G) According to the law partner, the documents appeared to be in the same condition

as when he first examined them. (D.I. 3, Ex. G)

Shortly after the government's call, Special Agent Kevin Shannon ("Agent

Shannon") arrived at the law partner's office and presented him with a subpoena for the file. In

Agent Shannon's presence, the law partner placed the file in an envelope, sealed it, wrote his

name on it, and dated it. (D.I. 3, Ex. G and D) Agent Shannon also wrote his initials on the

envelope and dated it. (D.I. 3, Ex. G and D) He then delivered the file directly to Assistant

United States Attorney ("AUSA") Patricia C. Hannigan, who retained custody of it. (D.I. 3, Ex.

D and E)

5

According to the chairman, he called movant's attorney later that day, informed him that the government had taken custody of movant's file, and stated that no copies of the file had been made. (D.I. 3, Ex. H) Movant's attorney claims that he did not speak to the chairman until November 6, 1996, two days after the government took custody of the file; and did not learn until that time that the file had been seized. (D.I. 4, Ex. B) Movant's attorney also claims that, although he was not aware that movant had placed the documents in a law partner's office, he was aware that movant had complied with his request to prepare the documents. (D.I. 4, Ex. B)

On November 5, 1996, AUSA Hannigan met with the chairman and the executive partner of the law firm. In the presence of the chairman and the executive partner, AUSA Hannigan unsealed the envelope and allowed them to review the documents. (D.I. 3, Ex. E) The chairman and the executive partner determined that the documents in the file contained no information relating to the law firm's representation of clients and returned the file to AUSA Hannigan. (D.I. 3, Ex. E and H) AUSA Hannigan then reviewed the documents, determined that they were not privileged as to movant, and delivered copies of the documents to AUSA Colm Connolly. (D.I. 3, Ex. E) AUSA Hannigan has retained custody of the original documents. She claims that, except for reviewing documents for privilege, she has had no involvement in the investigation relating to the disappearance of the woman. (D.I. 3, Ex. E)

On November 7, 1996, movant's attorney called the law partner at his office. Movant's attorney asserts that the law partner "believed the materials were something that a person might prepare at the request of an attorney." (D.I. 4, Ex. B) The law partner allegedly stated to movant's attorney that he believed movant had conveyed the impression that he was not to examine the file. (D.I. 4, Ex. B) According to movant's attorney, the law partner also told him

6

that he believed the file contained privileged information and indicated that he had conveyed this opinion to the government. (D.I. 4, Ex. B)

      The government asserts that on at least two occasions between November 7, 1996 and November 12, 1996, AUSA Connolly spoke to another of movant's attorneys about the file obtained from the law partner's office. (D.I. 5, Ex. A) The government claims that on both occasions it informed this attorney that it did not believe the documents were protected by either the attorney-client privilege or the work product doctrine. On November 12, 1996, the government received a letter from this attorney, explaining that the letter was a "follow-up on our conversations regarding" the file seized from the law partner's office. (D.I. 4, Ex. C) The letter explained that the documents in the file were created at the request of movant's attorney and were "a work-in-progress." (D.I. 4, Ex. C) As such, according to the letter, the documents were protected by the attorney-client privilege and should be returned immediately. (D.I. 4, Ex. C)

      The government responded to the November 12th letter on or about November 26, 1996. On that day, AUSA Connolly spoke with the attorney who sent the November 12th letter and informed him that the government did not believe the materials in the file were protected by the attorney-client privilege or the work product doctrine. (D.I. 3, Ex. I) AUSA Connolly also advised this attorney that to the extent his client insisted the materials were protected from disclosure he would have to "take the issue up with the Court." (D.I. 3, Ex. I) According to AUSA Connolly, between December 30, 1996 and February 1997, he spoke to movant's attorney at least twice about the applicability of the attorney-client privilege and the work product doctrine. (D.I. 3, Ex. I) AUSA Connolly claims that during this time, movant's attorney informed him that he was researching the question and intended to file a motion. (D.I. 3,

7

Ex. I)  In response, AUSA Connolly informed movant's attorney that the government still

believe the materials were not protected by either the work product doctrine or the attorney-

client privilege.  (D.I. 3, Ex. I)  On March 14, 1997, movant filed the present motion requesting

that the documents seized from his law partner's office be returned.

## III. DISCUSSION

### A. Attorney-Client Privilege[6]

As the Supreme Court observed in Upjohn Co. v. United States, the purpose of the

attorney-client privilege "is to encourage full and frank communication between attorneys and

their clients and thereby promote broader public interests in the observance of law and

administration of justice." 449 U.S. 383, 389 (1981).  In particular, the Court recognized that the

purpose of the privilege is "to encourage clients to make full disclosure to their attorneys." Id.

(quoting Fisher v. United States, 425 U.S. 391, 403 (1976)).  The privilege recognizes that

"sound legal advice or advocacy depends upon the lawyer's being fully informed by the client."

Id.  Thus, "[t]he privilege exists to protect not only the giving of professional advice to those

who can act on it but also the giving of information to the lawyer to enable him to give sound and

informed advice." Id. at 390.

The privilege, however, "must be strictly confined within the narrowest possible

limits consistent with the logic of its principle" because it obstructs the search for the truth and

because its benefits are indirect and speculative.  In re Grand Jury Investigation, 599 F.2d 1224,

---

6.   The attorney-client privilege is made applicable to grand jury proceedings pursuant to Rule
1101(c) and (d) of the Federal Rules of Evidence.  Rule 1101(c) provides "the rule with respect to
privileges applies to all stages of all actions, cases, and proceedings." Fed. R. Evid. 1101(c).
Rule 1101(d), which makes the Federal Rules of Evidence inapplicable to grand jury proceedings,
contains a specific exception with respect to the rule on privileges. Fed. R. Evid. 1101(d).

8

1235 (3d Cir. 1979) (quoting 8 Wigmore on Evidence § 2291 at 554 (McNaughton rev. ed. 1961)).  The recognition of the attorney-client privilege is determined on a case-by-case basis even though this approach may leave uncertain its outermost boundaries.  Upjohn v. United States, 449 U.S. at 396.  Furthermore, the burden of demonstrating the existence of an attorney-client privilege rests upon the party asserting the privilege.  Matter of Grand Jury Empaneled February 14, 1978, 603 F.2d 469, 474 (3d Cir. 1979); see also United States v. Voigt, 89 F.3d 1050, 1067 n.6 (3d Cir. 1996), cert denied, 117 S. Ct. 623 (1996).

Movant argues that the documents are protected because they "were prepared at the request of and intended to be viewed exclusively by counsel." (D.I. 1 at 12)  According to movant, he never intended his law partner to review the documents.  Movant also asserts that the documents' confidential nature was fully apparent despite the fact that they were placed in his law partner's office. (D.I. 1 at 12)  The court is unpersuaded by movant's arguments.  "The attorney-client privilege exists to foster disclosure and communication between the attorney and the client."  In re Grand Jury Investigation., 599 F.2d at 1235 (citation omitted).  For this reason, "[t]he privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney."  Upjohn v. United States, 449 U.S. at 395 (emphasis added).

As the government notes, movant has not alleged any evidence to suggest that the documents were ever disclosed to his attorneys.  Indeed, movant's attorney has asserted that he did not know the location of the documents until after the government seized them. (D.I. 4, Ex. B)  According to the record, the documents remained in the law partner's office for about four months — from July 1996 to November 4, 1996 -- without the knowledge of movant's attorneys.

9

During this time period, movant made no attempt to convey the documents to his attorneys.
Movant has suggested that documents were a "work-in-progress" and would have been
transferred to his attorneys at a later date. (D.I. 1, Ex. C). Since these documents were never
conveyed to movant's attorneys, however, they are not "communications" and, therefore, are not
protected by the attorney-client privilege.[7]

### B. Work Product Doctrine

The Supreme Court stated in United States v. Nobles that, "[a]t its core, the work
product doctrine shelters the mental processes of the attorney, providing a privileged area within
which he can analyze and prepare his client's case." 422 U.S. 225, 238 (1975). Accordingly,
documents that are prepared by an attorney in anticipation of litigation are protected by the work
product doctrine. Hickman v. Taylor, 329 U.S. 495, 511 (1947). The justification for the
doctrine is to "promote[] the adversary system by enabling attorneys to prepare cases without the
fear that their work product will be used against their clients." Westinghouse Elec. Corp. v.
Republic of the Philippines, 951 F.2d 1414, 1428 (3d Cir. 1991) (citing Hickman v. Taylor, 329
U.S. at 510-511). If adversaries were allowed to routinely obtain such materials,

> [m]uch of what is now put down in writing would
> remain unwritten. An attorney's thoughts, heretofore
> inviolate, would not be his own. Inefficiency,
> unfairness, and sharp practices would inevitably develop
> in the giving of legal advice and in the preparation of
> cases for trial. The effect on the legal profession would
> be demoralizing. And the interests of the clients and the
> cause of justice would be poorly served.

---

7.  Movant also argues that the documents have not lost their privileged status even though
they were disclosed to third parties. (D.I. 1 at 12) Since the court holds that the attorney-client
privilege does not attach in this instance, the issue of waiver is irrelevant.

10

Hickman v. Taylor, 329 U.S. at 511. In recognizing the adversarial nature of an attorney's work, the Nobles court observed:

> [T]he doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as by those prepared by the attorney himself.

United States v. Nobles, 422 U.S. at 238-239 (footnote omitted). Thus, materials prepared in anticipation of possible litigation by an attorney's agent also fall within the protection of the work product doctrine. Id.

It is well settled that the work product doctrine applies to criminal, as well as civil, litigation. Id. at 236; Hughes, 633 F.2d at 285. The codification of the doctrine, found in Rule 16(b)(2) of the Federal Rules of Criminal Procedure, however, does not apply to grand jury proceedings.[8] In re Special September 1978 Grand Jury (II), 640 F.2d 49, 60 n.17 (7th Cir. 1979) (citing United States v. Nobles, 422 U.S. at 247 n.6 (White, J., concurring)); In re Sealed Case, 676 F.2d 793, 808 n.49 (D.C. Cir. 1982); In re Grand Jury Subpoena Dated November 9, 1979. Nonetheless, the doctrine has been applied to documents sought by a grand jury.[9] See e.g.,

---

8.   Rule 16(b)(2) provides, in part: "[T]his subdivision does not authorize the discovery or inspection of reports, memoranda, or other internal defense documents made by the defendant . . . in connection with the investigation . . . of the case." Fed. R. Crim. P. 16(b)(2).

9.   In the grand jury context, the work product doctrine is derived from one or more of the following sources: (1) Fed. R. Civ. P. 26(b)(3), as made applicable by Fed. R. Civ. P. 81(a)(3); common law privilege; or federal common law privilege made applicable to grand jury proceedings by Fed. R. Evid §1101(c) and (d)(2). Scott N. Stone and Robert K. Taylor, 1 Testimonial Privileges, §2.14 (2d ed. 1996); see Duffy, 473 F.2d 840 (8th Cir. 1973); In re Sealed
(continued...)

Hughes, 633 F.2d 282 (3d Cir. 1980); In re Grand Jury Investigation., 599 F.2d 1224, 1228 (3d

Cir. 1979) (citing In re Grand Jury Proceedings (Duffy), 473 F.2d 840 (8th Cir. 1973)).

      The burden of demonstrating that a particular document deserves work product

protection rests with the party asserting the doctrine. Conoco Inc. v. United States Dept. of

Justice and Dept. of Energy, 687 F.2d 724, 730 (3d Cir. 1982); Lemelson v. Bendix Corp., 104

F.R.D. 13, 16 (D. Del. 1984). In the present case, movant argues that the documents constitute

work product because they were prepared by movant, the target of a grand jury investigation, in

response to his attorney's request. The government disputes this assertion by noting that, for at

least four months, movant did not inform his attorney about the file or attempt to give it to him.

The court finds this dispute irrelevant. The documents are alleged to contain information about

movant's relationship with the woman who disappeared and his whereabouts during the period

when she was first reported missing. It is undisputed that the documents were created by movant

after he had retained counsel. Furthermore, the government does not argue that the documents

were prepared by movant in anticipation of litigation. Given these facts, the court finds that

movant acted as his attorney's agent in creating the documents. Accordingly, these documents at

issue are protected by the work product doctrine.

### 1. Waiver based on disclosure

      "Like other qualified privileges, [the work product immunity] may be waived."

Nobles, 422 U.S. at 239. When documents protected by the work product doctrine are

---

9.  (...continued)
Case, 676 F.2d at 808 n.49. Movant argues that, as evidenced by Rule 16(b)(2), the protection
derived from the work product doctrine is "far broader in the area of criminal law." (D.I. 4 at 1)
The court finds this argument inapplicable to the present case since, as stated above, Rule
16(b)(2) does not apply to grand jury proceedings.

inadvertently disclosed, waiver is established if "the circumstances surrounding the disclosure evidenced conscious disregard of the possibility that an adversary might obtain the protected materials." Westinghouse Elec. Corp. v. Republic of the Philippines, 951 F.2d at 1431. In the present case, movant placed the documents on a shelf in his law partner's office for nearly four months. During this time, movant made no attempt to protect the documents from disclosure. Even after allegedly informing his law partner that the documents were privileged and for his attorneys, movant did not make any effort to keep the documents confidential. According to the law partner, he has "never locked his office and does not close his office door except on rare occasions when [he has] confidential discussions . . . ." (D.I. 3, Ex. G) The law partner also asserts that "the understood practice at [the law firm is] that every employee has access to [his] office and every attorney, secretary, and paralegal with the firm has access to the files, bound volumes, and professional literature kept on [his] office bookshelf." (D.I. 3, Ex. G) Given these circumstances, the court holds that movant consciously disregarded the possibility that an adversary might obtain them. Thus, movant waived the work product immunity with respect to these documents.

### 2. Waiver based on timeliness

The government also argues that movant waived any work product immunity he may have had by failing to file a timely motion to quash the subpoena issued to his law partner. (D.I. 3 at 15-16). At the latest, movant learned that the government had seized his documents from his law partner's office on November 12, 1996, when his attorney sent a letter to the government arguing that the documents were privileged. By November 26, 1996, the government had informed movant's attorneys that it did not believe the documents were privileged and that, if

13

movant insisted that they were privileged, he would have to "take the issue up with the Court." (D.I. 3, Ex. I) Movant did not file the present motion until March 14, 1997, nearly four months after he learned the government had seized the documents. Movant has not provided and the court cannot find any explanation of why he waited nearly four months before filing this motion. As the government notes, during this same time, movant was actively involved in litigation relating to the grand jury investigation. See e.g. In re Grand Jury, 111 F.3d 1066, 1075-1076 (3d Cir. 1997); In re Grand Jury, 103 F.3d 1140 (3d Cir. 1997); and Matter of the Search of 1993 Jeep Grand Cherokee, 1996 WL 780473 (D. Del. Dec. 13, 1996). Thus, the court holds that movant has waived the work product immunity by waiting nearly four months before filing this motion. See Securities and Exchange Commission v. Lavin, No. 96-5286, 1997 WL 215994, *9 (D.C. Cir. May 2, 1997) (holding that the attorney-client "privilege [] [is] waived if the privilege holder fails to pursue all reasonable means of preserving the confidentiality of the privilege"); see also United States v. De La Jara, 973 F.2d 746, 748-749 (9th Cir. 1992) (holding that the attorney-client privilege is waived if the privilege holder fails to pursue all reasonable means of preserving the confidentiality of the privileged matter).[10]

---

10.    The government also argues that it has demonstrated "good cause" to overcome the protection afforded by the work product doctrine. The court agrees. Work product that contains relevant, nonprivileged "facts" are afforded less protection than work product that contains an attorney's opinions. Hickman v. Taylor, 329 U.S. at 512. The documents at issue contain information only from movant, without any input from his attorney. Given this fact, the documents apparently contain only "fact" work product. The government bases its good cause claim on movant's refusal to testify. The government asserts that the documents at issue provide the most reliable direct statement of movant relating to the woman's disappearance. The court also notes that the government has subpoenaed others and attempted to obtain tapes that may have contained information relating to movant's activities during the relevant time period. See e.g., In re Grand Jury, 111 F.3d 1006 (3d Cir. 1997); In re Grand Jury, 111 F.3d 1083 (3d Cir. 1997); In re Grand Jury, 103 F.3d 1140 (3d Cir. 1997), cert. denied, Roe v. United States, No.
                                                                              (continued...)

14

## IV. CONCLUSION

For the reasons stated above, the court holds that movant's documents are not protected by the attorney-client privilege. Furthermore, although the documents are protected by the work product doctrine, the court holds that movant waived the immunity afforded by the doctrine. Consequently, the court shall deny movant's motion.[11] An order will issue.

---

10.    (...continued)
96-1767, 1997 WL 250504 (Jun. 2, 1997). Accordingly, even if waiver was not established, the court would hold that the government had demonstrated good cause for these documents.

11.    Movant has also moved for a hearing to determine whether the grand jury has been compromised through the use of the alleged impermissibly seized documents. Since the court has held that the documents were not impermissibly seized, this issue is moot.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 27, 2006, I electronically filed the foregoing

document with the Clerk of Court using CM/ECF, and have also served the document as noted:

### BY HAND DELIVERY

Lewis H. Lazarus, Esquire
Morris James Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19899

_____
Alyssa M. Schwartz  (#4351)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 4, 2006, I electronically filed the foregoing

document with the Clerk of Court using CM/ECF, and have also served the document as noted:

### BY HAND DELIVERY

Lewis H. Lazarus, Esquire
Morris James Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE  19899

Alyssa M. Schwartz  (#4351)