IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PIKE ELECTRIC CORPORATION and PIKE ELECTRIC, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MICK DUBEA, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 05-879-SLR <br> ) <br> ) <br> ) <br> ) <br> ) |

AFFIDAVIT OF MICK DUBEA

STATE OF TEXAS       )
                       ) SS
COUNTY OF JEFFERSON   )

       I, Mick Dubea, being duly sworn, depose and say:

    1.    At no time did I knowingly or intentionally discard or destroy any document or evidence that I thought might be relevant to this case.

    2.    I have no recollection of throwing away either PIKE 00016833 or PIKE 00016834. Nor can I recall when those documents were discarded.

    3.    I have resided at 2570 Ashley in Beaumont, Texas for more than 5 years. In 2005 and 2006, the trash at my home was generally picked up once a week by employees of the City of Beaumont.

    4.    The City of Beaumont provides one trash receptacle to each resident for whom it picks up trash. For an extra fee, the City of Beaumont will provide extra trash receptacles. I have had two trash receptacles for the past several years.

1

**B 1**

5.    The trash receptacles are green and plastic. The lid is on hinges that open up to allow the deposit of trash. Each container is 41 inches tall with a diameter of 31 inches. Therefore, the volume is just under 18 cubic feet. The container is capable of holding approximately ten large bags of trash.

6.    Virtually all of my trash is thrown away in my house in plastic bags with a tie at the top. It is the practice of myself and my wife to tie the plastic bag before disposing of it in the receptacle.

7.    Because I have two receptacles, my practice is to fill one receptacle at a time. In the location where I leave the two receptacles, one is more accessible, so the closer one fills up first. If it fills up in the middle of the week, I begin placing additional bags into the second container. On Tuesday, the day trash is collected by the City of Beaumont, I will typically take the first receptacle out, and if the second is more than half full from overflow from the first, I will take that out as well. If I have started to deposit trash in the second receptacle, but it is less than half full, I will leave that trash until the following week, or sometimes it may remain there for many weeks, if the household is not generating a significant amount of trash.

8.    I traveled out of town from December 12th through December 22nd. My wife joined me on that trip from December 16th through December 22nd. I was again out of town from January 4th through January 6th. Both my wife and I were also out of town (on separate trips) from January 9th through the 13th.

## REDACTED

9.    In June or July of 2005, I became aware that Sammy Christian, Alex Graham, and my son Chad were considering the possibility of starting a business that

2

**B 2**

would compete with Pike. Each of them had worked for Red Simpson, Inc. ("RSI") and then for Pike following Pike's acquisition of RSI on July 1, 2004. I understood that my son, and his friends Alex Graham and Sammy Christian (who were my friends as well), were dissatisfied with many changes implemented by Pike after the RSI acquisition.

10.          **REDACTED**

I understood that I was subject to an Employment Agreement with Pike. I told them I could not be involved because I did not want to run a risk of violating my Employment Agreement.

**REDACTED**

11.    While there were some things that I understood I could not do under my Employment Agreement, there were others about which I was not sure. One issue about which I was uncertain was whether my son Chad's use of funds from a grantor retained annuity trust that I had established in November 2003 with Chad as the beneficiary to fund a potential new entity would somehow violate a provision of my Employment Agreement. Also, I was aware that Alex and Sammy had employment agreements with Pike, and, because I consider them my friends, I was concerned about what exposure they might have if they went forward with a venture that would compete with Pike.


**REDACTED**


3

_Mick Joseph Dubea III_
Mick Joseph Dubea III

SWORN TO AND SUBSCRIBED before me this 10th day of May, 2006.

_Mary B Moore_
Notary Public

MARY BETH MOORE
Notary Public, State of Texas
My Comm. Expires June 13, 2009

1387218/2

4

**B 4**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

PIKE ELECTRIC CORPORATION and )
PIKE ELECTRIC, INC., )
)
      Plaintiffs, )
) Civil Action No. 05-879-SLR
    v. )
) **CONFIDENTIAL**
MICK DUBEA, ) **FILED UNDER SEAL**
)
)
      Defendant. )

**AFFIDAVIT OF MATTHEW F. LINTNER IN SUPPORT OF MICK DUBEA'S
ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR
ORDER REJECTING DEFENDANT'S CLAIM OF PRIVILEGE
AND FOR DISCOVERY SANCTIONS**

STATE OF DELAWARE      )
                    ) SS
COUNTY OF NEW CASTLE    )

        I, Matthew F. Lintner, being duly sworn, depose and say:

      1.      I am a partner with Morris, James, Hitchens & Williams LLP, counsel for

Mick Dubea in the above-captioned matter.

      2.      Attached hereto as Exhibit "A" is a true and correct copy of excerpts of

the Deposition of Rob L. Kimmons taken on April 28, 2006.

      3.      Attached hereto as "Exhibit B" is a true and correct copy of a document

which Rob L. Kimmons handed to Lewis Lazarus, an attorney with this firm, at the

Deposition of Rob L. Kimmons taken on April 28, 2006 (the "Kimmons document").

      4.      Attached hereto as "Exhibit C" is a true and correct copy of an e-mail sent

from Lewis Lazarus, an attorney with this firm, to Sarah Paul, an attorney representing

the plaintiffs in the above-captioned matter. Following up on that e-mail, this firm sent a

**B 5**

written demand five days latter, on April 21, 2006, for return of certain documents based on a claim of privilege. A true and correct copy of that letter is attached hereto as Exhibit "D".

5.      This firm sent a letter to its client, Mr. Mick Dubea, on January 7, 2006, advising him to retain any documents pertinent to this litigation.

6.      Attached hereto as Exhibit "E" is a true and correct excerpt of the recent F.R.C.P. Rule 30(b)(6) deposition of the plaintiffs in this matter. The deponent was Michael C. Stone. Pike's designee confirmed that Pike failed to take any steps to preserve key relevant documents until six weeks ago – at least five months after Pike itself admits that it reasonably anticipated litigation with Mr. Dubea. Pike's designee further confirmed that the document retention orders given by Pike's CEO, Eric Pike, were factually inaccurate and could offer no assurance that those improper instructions did not contribute to the deletion of relevant electronic documents. He also testified that, to his knowledge, Pike is still allowing potentially relevant electronic documents to be deleted pursuant to what he described as a 180-day-auto-deletion policy.

_____
Matthew F. Lintner

SWORN TO AND SUBSCRIBED before me this 11th day of May, 2006.

SHEILA R. STODDARD
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 19, 2007

_____
Notary Public

1389883/1

**B 6**

# EXHIBIT A

Robert Kimmons                                    April 28, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PIKE ELECTRIC CORPORATION  )
and PIKE ELECTRIC, INC.,   )
            Plaintiffs,    ) Civil Action No. 05-879-SLR
                           )
    vs.                    )
                           )
MICK DUBEA,                )
            Defendant.     )

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

PIKE ELECTRIC CORPORATION &)
PIKE ELECTRIC, INC.        )
                           )    CIVIL ACTION NO.
V.                         )    M-05-410
                          -)    JURY REQUESTED
T&D SOLUTIONS, LTD., T&D   )
SOLUTION MANAGERS, L.L.C., )
CORY CLOSE & CHAD DUBEA    )

ORAL DEPOSITION

ROB L. KIMMONS

APRIL 28, 2006

ORAL DEPOSITION OF ROB L. KIMMONS, produced as a

witness at the instance of the Defendants and duly

sworn, was taken in the above-styled and numbered cause

on the 28th day of April, 2006, from 9:15 a.m. to

2:30 p.m., before Linda K. Garrison, Certified Shorthand

Reporter in and for the State of Texas, reported by

computerized stenotype machine at the offices of

Schirrmeister Diaz-Arrastia Brem, L.L.P., 700 Milam,

10th Floor, Houston, Texas, pursuant to the Federal

Rules of Civil Procedure.

713.524.4600   Esquire Deposition Services   713.524.4600
3401 Louisiana Ste. 300   Houston, T.X. 77002            1.800.767.9532
33e2dd3f-2086-4788-87f2-4575030229fb

B 7

Robert Kimmons                                    April 28, 2006

**Page 18**

1  investigator?
2      A.   Yes, sir.
3      Q.   And what organizations are they?
4      A.   World Association of Detectives is one. We're
5  in a lot of security organizations. American Society
6  for Industrial Security I mentioned, Certified Fraud
7  Examiners, American Forensic Institute, of course the
8  State Board of Private Investigators. We've been in the
9  Better Business Bureau 23, 24 years. We're members of
10  some water organizations. We do a lot of 9/11 type
11  protection for the water industry on the securities
12  side, so I'm a member of five or six water
13  organizations. That's the ones that come to mind.
14      Q.   How many people are currently employed at your
15  company today?
16      A.   I hesitate because we use a lot of contract
17  people, too. We have about ten regular employees and
18  then we also use probably another 15 to 18 contract
19  people on each side of our fence, both investigative and
20  security we use contract people.
21      Q.   And how many of the ten people are
22  investigative versus security?
23      A.   Some of us are involved in both sides of it,
24  but there's at least five or six of us that are heavily
25  involved in the investigative side, and then we use

**Page 19**

1  quite a few contractors also in that area and
2  consultants.
3      Q.   Do you do any training of the people in the
4  investigative side with respect to investigative
5  techniques?
6      A.   Yes, sir.
7      Q.   What kind of training do you supply?
8      A.   We actually are a training facility. We train
9  our own people. I have a certified instructor, a
10  retired Houston officer who also handles our training,
11  and I believe now we have to have -- on the
12  investigative side I think we have to have about 16
13  hours a year in training, and he provides that to our
14  staff.
15      Q.   Where does that requirement come from of the
16  16 hours a year of training?
17      A.   The state board, which is now run by DPS, the
18  state police.
19      Q.   And the state board of who?
20      A.   They keep changing the name of it. It's
21  something like State Board of Private Investigators and
22  Security Agencies. That's not exactly right but
23  something like that. DPS just took it over, and they
24  changed the name, so I'm not sure exactly how it's
25  phrased.

**Page 20**

1      Q.   Do you have any concerns in your business of
2  the perception that some have that it's -- some might
3  say there's the capacity for some sleaze by some
4  investigators? Are you concerned about that?
5          MS. PAUL: Objection. You can answer if
6  you can.
7      A.   I mean, I don't sit around and worry about it.
8  Obviously it's there. I try to use it to my advantage
9  in actually marketing and all. Just like in the legal
10  profession, there's people out there that you're not
11  proud of, and so we -- I feel like we're not in that
12  category, and so we use it to our advantage with
13  clients, and we keep our clients for that reason, I
14  think.
15      Q.   (BY MR. LAZARUS) And how do you use it to your
16  advantage?
17      A.   Just touting our record and our history and
18  the type people that we have.
19      Q.   And are there -- do you also tout the methods
20  that you use in investigation that distinguish you from
21  others?
22      A.   I guess it would depend on the client and
23  circumstances. Normally it's just clients -- obviously
24  new clients usually ask about your background and track
25  record.

**Page 21**

1      Q.   Are there some methods that some of your
2  competitors use that you don't approve of?
3      A.   In the past there have been. I don't really
4  keep up with my competitors too much anymore, so I don't
5  know. I'm sure there are.
6      Q.   What sort of things are you referring to in
7  the past that concerned you?
8      A.   Well, there's been occasions where
9  investigators in this area have done things they
10  shouldn't, as far as not telling the truth, wiretapping,
11  things that we don't get involved in.
12      Q.   Besides not telling the truth and wiretapping,
13  is there anything else that you would not get involved
14  in as an investigator?
15      A.   Anything that's illegal.
16      Q.   I'm going to now start to ask you a series of
17  questions about your investigation in this matter. Let
18  me preface it at the beginning by saying I'm only
19  interested in the facts within your knowledge of your
20  assignment in this matter. I am not interested in the
21  mental impressions, conclusions, opinions or legal
22  theories of Cravath or any representative of Pike. So
23  in answering my questions I would ask that you not
24  disclose any information to me concerning your mental
25  impressions, conclusions, opinions or legal theories of

6 (Pages 18 to 21)

B 8

Robert Kimmons                                    April 28, 2006

---

**Page 58**

1  that.
2  Q.  (BY MR. LAZARUS)  Do you have documents -- what
3  documents do you have that Kimmons came into possession
4  of that were not created specifically in connection with
5  your investigation?
6          MS. PAUL:  Again, if you can answer
7  without revealing your work product --
8          MR. LAZARUS:  And I object.  You're now
9  coaching the witness.
10         MS. PAUL:  I'm not coaching the witness.
11 I'm preserving our work-product protection.  If you want
12 me to just object flat out, I can do that.  If he can
13 answer the question without revealing work product, he
14 should answer your question.
15 Q.  (BY MR. LAZARUS)  Correct, you should answer
16 the question.
17         MS. PAUL:  If he can do it without
18 revealing work product.
19 A.  Other than talking about the trash that we
20 brought, I don't think I can answer that question
21 without it being work product, work I was doing for the
22 law firm.
23 Q.  (BY MR. LAZARUS)  Here's my question.  What is
24 the difference between a piece of trash that you
25 collected and another document that was created by

---

**Page 59**

1  someone else that Kimmons came into possession of?
2          MS. PAUL:  Objection to form.
3  A.  I think that's more of a legal question.  I
4  was told, going by talking to the law firm and preparing
5  for this deposition, this would be what we would
6  disclose.  I think you're getting into something that
7  the attorneys need to address with you, not me, as far
8  as what's work product and what's not.
9  Q.  (BY MR. LAZARUS)  So you don't really have an
10 understanding of work product other than what your
11 counsel says?
12 A.  I think I have a basic understanding of what
13 it is.  As far as I'm concerned, it's all work product,
14 but I'm not a lawyer.
15 Q.  Is the trash work product also?
16         MS. PAUL:  Objection.  Calls for a legal
17 conclusion.
18         MR. LAZARUS:  I'm asking for his
19 understanding.
20         MS. PAUL:  As a factual matter?
21         MR. LAZARUS:  Whatever his understanding.
22 A.  Again, I'm not in the position to practice
23 law, but as far as I'm concerned it would have all been
24 work product, yes.
25 Q.  (BY MR. LAZARUS)  So in your view the trash was

---

**Page 60**

1  work product as well?
2  A.  Could have been construed that way, sure.
3  Q.  And do you have an understanding of what's
4  different about the trash versus other documents that
5  you came into possession of that were not specifically
6  created in connection with your investigation?
7          MS. PAUL:  Objection.  Calls for a legal
8  conclusion.
9  A.  Not really.
10 Q.  (BY MR. LAZARUS)  Now, do you know what a
11 privilege log is in connection with document production
12 in litigation?
13 A.  Privilege log?
14 Q.  Yes, sir.
15 A.  I'm not certain.
16 Q.  Have you ever -- in prior cases have you
17 produced some documents but withheld others because they
18 were privileged for work product, for example?
19 A.  Nothing like that comes to mind.
20         MR. LAZARUS:  Let me ask the court
21 reporter to mark Kimmons Exhibit 3.
22         (Exhibit 3 marked)
23 Q.  The court reporter has marked as Kimmons
24 Exhibit 3 a document dated April 21, 2006 on the
25 letterhead of Cravath, Swaine & Moore LLP, signed by

---

**Page 61**

1  Sarah Paul to Lewis Lazarus, attaching something called
2  a Kimmons privilege log.  I'll ask you to take as much
3  time as you need to familiarize yourself with this
4  document.
5          MS. PAUL:  I'd like the record to reflect
6  that this is not -- I don't believe it is the most
7  recent version.
8          MR. LAZARUS:  I understand that.
9          MS. PAUL:  Right.  I just want the record
10 to reflect it.
11 A.  Okay.
12 Q.  (BY MR. LAZARUS)  Have you ever seen this
13 letter from Ms. Paul to me before today?
14 A.  I don't recall seeing it.
15 Q.  Let's turn to the document called Kimmons
16 privilege log.  Have you ever seen that before, sir?
17 A.  I don't think I've seen this document.
18 Q.  Who is John Colonese?
19 A.  I don't know.  I think -- is he a lawyer with
20 your firm?
21 Q.  I'm just asking if you know.  He's not with my
22 firm.
23         MR. LAZARUS:  For the record, he was
24 referring to Ms. Paul's firm.
25         MS. PAUL:  For the record, he's a

---

16 (Pages 58 to 61)

33e2dd3f-2086-4788-87f2-4575030229fb

B 9

Robert Kimmons                                    April 28, 2006

---

**Page 66**

1  A.  Yes, sir.  We copied those if we could.  There
2  was probably a few that you just couldn't, I mean, they
3  were just too bad a shape, but for the most part we
4  copied those that we couldn't keep the originals.
5  Q.  So you may have some copies of some documents
6  but you threw away the originals.  Is that correct?
7  A.  That's correct, and I brought you copies of
8  the copies.  I brought you those today with the
9  originals and marked them.
10  Q.  So that the record is clear, there are some
11  original documents that you found in the trash of which
12  you made copies but you discarded the original that you
13  found in the trash.  Is that correct, sir?
14  A.  That's correct.
15  Q.  How many such documents did you destroy the
16  original but keep a copy?
17  A.  I didn't count them, but I can show you which
18  ones they are in what I brought you.
19  Q.  Are there any documents that you destroyed
20  that you did not keep a copy of?
21  A.  Not documents.  There were things like --
22  well, I guess they are documents -- things like
23  advertisements and that kind of thing that may have had,
24  you know, so much -- there were some maggots from time
25  to time, and we threw some of that stuff away, but

---

**Page 67**

1  nothing else, other than something like that that would
2  be just a form advertisement that would come in the
3  mail.
4  Q.  Are there some documents you threw away even
5  though it had no food or other contaminating item on
6  them?
7  A.  I would have to get with Royce on that, but I
8  wouldn't -- that's probably true if it was, like, an
9  advertisement, especially one that hadn't even been
10  opened or anything.  We might very well throw something
11  like that away.
12  Q.  I direct your attention to item eight on the
13  Kimmons privilege log.  It's dated December 18, 2005,
14  number of pages 46, source Rob Kimmons, privilege AC and
15  WP.  It's a fax, author Rob Kimmons, recipient J. Wes
16  Earnhardt, Esquire.  The description is fax re: update
17  of investigation at direction of legal counsel,
18  containing investigative research.
19  I take it, sir -- and I'm not asking for
20  the content, I'm just asking for a description.  When
21  you would send a document containing investigative
22  research, what does that mean as opposed to simply
23  documents an investigator collected?
24  MS. PAUL:  Objection.  Calls for work
25  product.  Also calls for a legal conclusion.  I instruct

---

**Page 68**

1  him not to answer on the basis of work product.
2  MR. LAZARUS:  I'm just trying to
3  understand the privilege log, and I'm hoping the witness
4  can help me.
5  Q.  (BY MR. LAZARUS)  Did you sometimes send -- do
6  you know what this means on the privilege log,
7  investigative research?
8  A.  I believe so.
9  Q.  What does that mean?
10  A.  It's a broad term to me, any research or work
11  done on the case.  I mean, it's a pretty broad term.
12  Q.  Are you a lawyer, Mr. Kimmons?
13  A.  No, sir.
14  Q.  So is it fair to say that any research that
15  you did was factual research?
16  A.  Factual research?
17  Q.  Yes, sir.  You didn't do any legal research,
18  did you?
19  A.  That's correct.
20  Q.  You were investigating facts, correct?
21  A.  Right.
22  Q.  Did the update containing investigative
23  research set forth facts that you had uncovered in your
24  investigation?
25  MS. PAUL:  Objection.  Calls for work

---

**Page 69**

1  product.  Do not answer.
2  MR. LAZARUS:  I'm not asking for work
3  product.  I'm just asking whether it sets forth facts.
4  MS. PAUL:  If you want to frame it that
5  broadly.
6  A.  If I understand you correctly, I would hope
7  that it would be factual information, yes.
8  Q.  (BY MR. LAZARUS)  Could it be anything other
9  than factual information?
10  A.  Not to my knowledge.
11  Q.  Let's look at item 11, 12/28/2005, number of
12  pages 224, source Rob Kimmons, privilege AC and WP,
13  document type e-mail with mailed attachments, with an
14  asterisk reflecting that the attachments had been
15  produced in part.  The author was Rob Kimmons, and the
16  recipient was Eric Pike and Sandy King, with a copy to
17  J. Wes Earnhardt, Esquire.  The description is an e-mail
18  re: update of investigation at direction of legal
19  counsel attaching investigator's research and attaching
20  documents investigator collected.  Do you see line 11
21  that I just read from, sir?
22  A.  Yes.
23  Q.  Do you maintain at Kimmons an electronic file
24  concerning the e-mails that you sent to Eric Pike?
25  A.  Yes.  The only reason I hesitate is I had an

---

18 (Pages 66 to 69)

Robert Kimmons                                        April 28, 2006

Page 82

1  not to answer.
2      Q.  (BY MR. LAZARUS) Do you accept your counsel's
3  instruction?
4      A.  Yes, sir.
5      Q.  Are you aware, sir, of any documents that you
6  sent to Cravath that are not reflected on the privilege
7  log?
8      A.  I'm not aware of any, but I would have to go
9  through and compare this to my files.
10     Q.  Physically where are the documents that are
11 identified on the privilege log as having been sent to
12 Cravath? And I'm referring now to documents the
13 investigator collected. They're at your office?
14     A.  Yes, sir, other than what I brought here
15 today.
16         MR. LAZARUS: Could you mark this as the
17 next exhibit?
18         (Exhibit 5 marked)
19     Q.  The court reporter has marked and I've placed
20 in front of you as Kimmons 5 a document entitled Pike's
21 responses and objections to Defendant Mick Dubea's first
22 set of interrogatories. It's a 20-page document. Have
23 you seen this document before?
24     A.  I don't think so.
25     Q.  Okay. Were you aware that interrogatories

Page 83

1  were served by Mick Dubea to Pike?
2         (Phone call; break from 11:47-11:49)
3      Q  (BY MR. LAZARUS) Going back to Kimmons Exhibit
4  4 for just a minute, can you describe for me the nature
5  of the documents you sent to Cravath apart from trash?
6         MS. PAUL: Objection. Calls for work
7  product. I instruct you not to answer.
8      Q.  (BY MR. LAZARUS) Do you accept your attorney's
9  instruction?
10     A.  Yes, sir.
11     Q.  Do you have any factual knowledge that
12 Mr. Mick Dubea disclosed Pike's job pricing information
13 to anyone outside of Pike?
14         MS. PAUL: Objection. Calls for work
15 product. Any factual knowledge that he might have, if
16 he has any, would have come from his investigation, so I
17 object.
18     Q.  (BY MR. LAZARUS) Have you ever seen any check
19 that Mick Dubea wrote to T&D?
20         MS. PAUL: If you can answer without
21 disclosing work product, you can answer.
22     A.  I don't think so.
23     Q.  (BY MR. LAZARUS) Have you ever personally
24 observed Mick Dubea talking to any Pike employee?
25         MS. PAUL: Objection. Calls for work

Page 84

1  product. I instruct you not to answer.
2      Q.  (BY MR. LAZARUS) Do you accept your attorney's
3  instruction?
4      A.  Yes, sir.
5      Q.  Have you ever observed Mick Dubea talking to
6  any Pike customer?
7         MS. PAUL: Same objection. I instruct
8  you not to answer.
9      Q.  (BY MR. LAZARUS) Have you ever personally
10 examined cell phone telephone records of Mick Dubea?
11 When I say "you," I mean Kimmons.
12         MS. PAUL: Same objection. Instruct you
13 not to answer.
14     Q.  (BY MR. LAZARUS) Do you know whether Pike has
15 any records -- cell phone records of Mick Dubea?
16         MS. PAUL: Same objection.
17     Q.  (BY MR. LAZARUS) Do you accept your attorney's
18 direction?
19     A.  Yes, sir.
20         MS. PAUL: To the extent that he learned
21 it through the course of his investigation, if he has
22 other information.
23         MR. LAZARUS: That's not the question I'm
24 asking. I'm just asking what knowledge he has.
25         MS. PAUL: But I want to clarify that my

Page 85

1  objection is with respect to that.
2         MR. LAZARUS: I'm just asking for the
3  factual knowledge that he has.
4         MS. PAUL: Right.
5      Q.  (BY MR. LAZARUS) Were you personally involved
6  in collecting trash from the home of Mick Dubea?
7      A.  No, sir, not in the collection of it.
8      Q.  Did you authorize someone to collect trash
9  from the home of Mick Dubea?
10     A.  Yes.
11     Q.  Who did you authorize to collect trash from
12 the home of Mick Dubea?
13     A.  It would have been Royce Maza.
14     Q.  And what direction did you give him with
15 respect to how to collect that trash?
16         MS. PAUL: Objection. Calls for work
17 product. At his direction?
18         MR. LAZARUS: Yes.
19         MS. PAUL: Someone else at Kimmons?
20         MR. LAZARUS: Yes.
21         MS. PAUL: Objection. Instruct you not
22 to answer.
23     Q.  (BY MR. LAZARUS) How did Kimmons undertake to
24 obtain the trash that it retrieved from the trash of
25 Mick Dubea?

22 (Pages 82 to 85)

B 11

Robert Kimmons                                April 28, 2006

Page 86

1    A.   If it was put out at the curb, we would then
2  intercept the person picking it up and get it from them
3  after they left his residence.
4    Q.   And how would you do that?  You say
5  "intercept."  What does that mean?
6    A.   Just stop and talk to the trash collector.
7    Q.   And say what?
8    A.   I don't know exactly what he said.  Generally
9  we would tell them that we were conducting -- we were
10 private investigators conducting an investigation, would
11 they give us the trash basically, but I don't know
12 exactly what he said to them.
13   Q.   Do you know who the individual was who
14 collected Mick Dubea's trash that someone at Kimmons
15 talked to?
16   A.   No, sir.
17   Q.   Do you know whether they paid him any money or
18 offered anything of value to that person?
19   A.   I think they did pay -- I know they did pay
20 him cash, like, ten or $20 some of the time.
21   Q.   Was it the same person?
22   A.   I don't know.
23   Q.   Where does Mick Dubea keep his trash?
24   A.   When we got it, out at the curb.  Other than
25 that, I don't know.

Page 87

1    Q.   Do you know in what form the trash was put out
2  for pickup by the trash remover?  In other words, was it
3  just in a bag or was it --
4    A.   Those are, I believe, the big cans there where
5  the truck actually pulls the cans up and dumps the trash
6  bags out of the can.
7    Q.   So was the trash in a can with a top?  Was it
8  in a closed can?
9    A.   I believe so.
10   Q.   And within the can was the trash just there by
11 itself or was it in a contained, enclosed plastic bag?
12   A.   I don't know for sure, I wasn't there, but I
13 presume it's usually in bags and then they dump it out
14 of the can.
15   Q.   Was the bag closed?
16   A.   I don't know.
17   Q.   Was there a tie to the bag?
18   A.   I don't know.
19   Q.   Is Kimmons continuing to monitor the trash of
20 Mick Dubea?
21       MS. PAUL:  You can answer that.
22   A.   No, we're not.
23   Q   (BY MR. LAZARUS)  Why not?
24   A.   We were instructed to stop.
25   Q.   When was the last time you picked up the trash

Page 88

1  of Mick Dubea?
2    A.   I believe it was the 17th.  It would be the
3  last date on there.  January 17th, I think, on the log.
4    Q.   You brought over today a trash retrieval
5  schedule and report.  Is that in the nature of
6  investigative research?
7    A.   I don't understand the question.
8        MS. PAUL:  Objection.  Calls for a legal
9  conclusion.
10   Q.   (BY MR. LAZARUS)  Well, go back to Kimmons 5 -
11 I'm sorry, Kimmons 4, the privilege log.  For example,
12 in the description, let's look on the last page, Page 3,
13 there's a number of descriptions that says "attaching
14 investigator's research."  Could this be an example of
15 investigator's research?
16       MS. PAUL:  Same objection.  Calls for a
17 legal conclusion.  He didn't make the distinctions on
18 here, which are legal distinctions, which is the reason
19 for the objection.
20   A.   I don't know.
21   Q.   (BY MR. LAZARUS)  Do you consider this
22 investigative research, sir?
23       MS. PAUL:  Same objection.
24   A.   As it refers to this log, I don't know if
25 that's what they're referring to or not.

Page 89

1    Q.   (BY MR. LAZARUS)  I'm asking you, do you
2  consider this investigative research, this log?
3        MS. PAUL:  Are you now asking --
4        MR. LAZARUS:  I'm asking him whether he
5  considers this piece of paper to be investigative
6  research.
7        MS. PAUL:  Apart from how it's defined on
8  this log?
9        MR. LAZARUS:  Yes.
10   A.   That piece of paper investigative research, I
11 guess it could be called that.
12   Q.   (BY MR. LAZARUS)  Are you continuing to
13 retrieve trash from the trash of Alex Graham?
14   A.   No, sir.
15   Q.   Did you only pick up trash from the trash of
16 Alex Graham on one occasion?
17   A.   Yes, sir.
18   Q.   Why did you go on that one occasion and no
19 other occasion?
20       MS. PAUL:  Objection.  Calls for work
21 product, his thought process, deciding when, how many
22 times.
23   Q.   (BY MR. LAZARUS)  Did anybody see you
24 collecting trash at Alex Graham's house?
25   A.   I didn't collect it, but to my knowledge, no.

23 (Pages 86 to 89)

Robert Kimmons                                    April 28, 2006

## Page 106

1  Mr. Kimmons has been at the direction of counsel and is
2  all work product protected. Now, Mr. Lazarus states
3  that he's only asking for facts; however, there is case
4  law that states that, you know, in a deposition
5  situation a discussion of factual matters may reveal
6  counsel's, or an investigator on counsel's behalf,
7  tactical or strategic thoughts. And so, Your Honor, all
8  we're trying to do here today is to protect our
9  work-product privilege on matters that Mr. Kimmons never
10 intended to testify to. We never intended for him to
11 testify to that information, so defendants are not
12 prejudiced in any way. As to the documents on which,
13 you know, he may potentially be a witness on, defendants
14 have been permitted to ask questions.
15         THE COURT: I'm not sure what this
16 individual's background is. It would be helpful for me
17 in my decision making to understand exactly what he did
18 in connection with this case so that I can make a better
19 determination of what facts he should be charged -- with
20 what facts he should be charged. So, Ms. Paul, if you
21 would explain his role in connection with this
22 litigation.
23         MS. PAUL: Yes, absolutely, Your Honor.
24 Mr. Kimmons was engaged by Cravath in probably early
25 November of 2005 to conduct work for us in anticipation

## Page 107

1  of a potential lawsuit against Mick Dubea and other
2  former employees of RSI which was acquired by Pike.
3  That was the scope of his investigation. At all times
4  he was under the direction of counsel, and so that --
5  and his work for Cravath, you know, continues to be
6  ongoing and, in fact, he's testified about this
7  information this morning.
8          THE COURT: All right. And the reason
9  that you-all listed him in the 26(a) disclosures was
10 why? What facts did you intend for him to have
11 knowledge?
12         MS. PAUL: In the course of his
13 investigation at the direction of counsel, he collected
14 documents from Mr. Dubea's trash and from the trash of
15 Mr. Alex Graham. That information, because it's
16 defendants' own -- although Alex Graham is not a
17 defendant but he's someone that was under
18 investigation -- it's their own documents, Mick Dubea's
19 own documents specifically, so there's no -- we can't
20 claim work product over that, and when we identified him
21 on our initial disclosures we intended, you know, to
22 produce those documents to defendants, which we have,
23 and to potentially have Mr. Kimmons testify to that
24 information.
25         THE COURT: So the only information that

## Page 108

1  he potentially has is information -- is how he collected
2  the documents in the first instance and turning the
3  documents over. I mean, is that basically --
4          MS. PAUL: Yes.
5          THE COURT: -- what you're intending?
6          MS. PAUL: Yes, Your Honor, that is
7  basically it, and it was framed rather broadly in our
8  initial disclosures and perhaps too broadly, but in the
9  interest of, you know, fair disclosure we wanted to
10 identify Mr. Kimmons at the outset.
11         MR. LAZARUS: Your Honor, if I may. If
12 you're finished, Ms. Paul.
13         MS. PAUL: Yes, I am.
14         MR. LAZARUS: Your Honor, may I speak?
15         THE COURT: Yes, you may.
16         MR. LAZARUS: That is precisely the
17 problem. This witness has collected lots of documents
18 that were generated by people other than this witness
19 and other than Cravath. When we served our subpoena on
20 Kimmons, Cravath identified itself as the counsel for
21 Kimmons. The lawyer for Cravath wrote a letter to me
22 dated March 29th, 2006, advised that much of what
23 Kimmons had done was work product, but then made the
24 following statement: To the extent that Kimmons came in
25 possession of relevant documents that were not created

## Page 109

1  specifically in connection with its investigation,
2  copies of those documents have been delivered to Cravath
3  and will be reviewed for potential production by Pike in
4  response to Dubea's first request for production of
5  documents.
6          Now, in this deposition today I have
7  established that there are hundreds of documents that
8  were not created specifically in connection with its
9  investigation that they have withheld claiming that they
10 are work product. I don't know what the documents are
11 because they won't even let him answer as to what the
12 nature of the documents are, but I think they are
13 certainly documents created by third parties, not for
14 this investigation. There's not a wit of analytical or
15 strategic thought about those documents. Whatever
16 documents he obtained that contained factual
17 information, he sent it to Cravath. All of those -- and
18 he retained them. All of those documents, to the extent
19 they contain facts, are discoverable. The case law,
20 Your Honor --
21         THE COURT: You don't need to go into the
22 case law. I know the case law. I'm interested in the
23 facts.
24         So, Ms. Paul, would you respond to what
25 the difference is between the documents that you are

28 (Pages 106 to 109)

33e2dd3f-2086-4788-87f2-4575030229fb

**B 13**

# EXHIBIT B

# REDACTED
# IN FULL

# EXHIBIT C

5/11/2006

**From:**    "Lazarus, Lewis"
**To:**      'Sarah Paul'
**Cc:**      Lintner, Matthew F.; Naylor, Joseph S.
**Sent:**    4/16/2006   4:18PM
**Subject:** Pike v. Dubea

The Kimmons documents you produced as part of Pike's production are stamped confidential. Notwithstanding that designation, I assume you do not object to my sharing them with Mr. Dubea. Several of the documents on their face implicate the attorney client and/or work product privileges. They appear to be documents he already has seen in any event. Please let me know promptly. Thanks.

Lewis H. Lazarus, Esq.
Morris, James, Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE  19899-2306
(For courier deliveries, the zip code is 19801)
llazarus@morrisjames.com
302 888 6970 Direct Dial
302 571 1750 Fax
<http://www.morrisjames.com/> www.morrisjames.com

This communication may be subject to the attorney-client privilege or the attorney work product privilege or may be otherwise confidential. Any dissemination, copying or use of this communication by or to anyone other than the designated and intended recipient(s) is unauthorized. If you are not the intended recipient, please delete or destroy this communication immediately.

To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**B 15**

# EXHIBIT D

# MORRIS, JAMES, HITCHENS & WILLIAMS LLP

222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801-1621
(302) 888-6800
Facsimile (302) 571-1750
www.morrisjames.com

Lewis H. Lazarus                                                                              Mailing Address
(302) 888-6970                                                                               P.O. Box 2306
llazarus@morrisjames.com                                                          Wilmington, DE 19899-2306

April 21, 2006

VIA EMAIL

Sarah E. Paul, Esquire
Cravath, Swaine & Moore LLP
Worldwide Plaza, 825 Eighth Avenue
New York, NY 10019

Re:    *Pike Electric Corp. and Pike Electric, Inc. v. Dubea*
       D. Del. C.A. No. 05-879-SLR

Dear Sarah:

I write in response to the recent production of documents obtained by Kimmons Security Services, Inc. ("Kimmons") at the direction of Pike Electric Corporation and/or your firm. The documents listed below are protected by attorney-client and/or work-product privileges:

PIKE00016648;
PIKE00016655 through and including PIKE00016656;
PIKE00016659 through and including PIKE00016662;
PIKE00016665 through and including PIKE00016676;
PIKE00016827;
PIKE00016829;
PIKE00016834

Accordingly, I request the immediate return of all original and duplicate copies of these documents. I further request the deletion of all electronic files of these documents that exist, including all communications reflecting their content. Mr. Dubea reserves all rights as to the

Dover (302) 678-8815  •  Broom Street (302) 655-2599  •  Newark (302) 368-4200

**B 16**

Sarah Paul, Esquire
April 21, 2006
Page 2

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Kimmons documents pending the Kimmons deposition. Mr. Dubea does not intend to waive privileges to any and all other documents not specifically identified above.

Sincerely,

Lewis H. Lazarus

LHL/kam

cc:    Alyssa M. Schwartz, Esquire (via hand delivery)
       Teri Danish, Esquire (via Federal Express)

1380684/1

**B 17**

# EXHIBIT E

Page 158

1  by Mr. Dubea.
2     Q.  Do you have a specific date when Pike
3  first anticipated litigation?
4        MS. PAUL:  Objection, assumes that
5  there was one.
6        THE WITNESS:  Again, I would say
7  late October, early November.
8     Q.  (Mr. Naylor)  And you don't have any
9  date more specific than that?
10       MS. PAUL:  Objection.
11       THE WITNESS:  No.
12    Q.  (Mr. Naylor)  I just want to go back to
13  something we were talking in the last few minutes
14  before we broke, which was the possibility that
15  emails that would have been responsive to --
16  responsive or discoverable in the Dubea litigation
17  might have been deleted.  And based on your
18  testimony there's two areas where I think it is
19  possible that responsive emails might have been
20  deleted.  And I want you to let me know whether
21  you disagree with my assessment.
22       The first is emails -- responsive emails
23  that were sent between July 2005 and late March
24  2006, to the extent they were deleted by the Pike
25  employee that received them they would no longer

Page 159

1  be on the system in any way, correct?
2        MS. PAUL:  Objection to the form.
3        THE WITNESS:  That is correct.
4     Q.  (Mr. Naylor)  Now if Pike had put in
5  place some sort of document retention system that
6  prevented people from deleting responsive emails
7  in late October of 2005 that would have preserved
8  any emails sent after that date, correct?
9        MS. PAUL:  Objection to form.
10       THE WITNESS:  If a directive was
11  given do not delete as stated in these emails to
12  not delete; yes.
13    Q.  (Mr. Naylor)  Could you say what you're
14  saying yes to?  Let me state it a different way.
15    A.  Please do.
16    Q.  If a hold letter had gone out in late
17  October, that would have -- if function -- if all
18  this is to function properly, that would have
19  prevented deletions of any emails sent after that
20  date that would otherwise -- that would be
21  discoverable in connection with this litigation,
22  correct?
23       MS. PAUL:  Objection to form.
24       THE WITNESS:  Correct.
25    Q.  (Mr. Naylor)  But that letter -- but a

Page 160

1  litigation hold letter was not sent out for the
2  first time until March 30th, 2006?
3     A.  That is correct.
4     Q.  So any email or electronic
5  communications sent during that intervening
6  period, if the recipient did not take special care
7  to preserve it, it's possible that could have been
8  deleted, correct?
9        MS. PAUL:  Objection to form.
10       THE WITNESS:  Yes, it could have
11  been.
12    Q.  (Mr. Naylor)  It's also possible that
13  emails that were sent in August, September and
14  early October of 2005, if they merely sat in
15  someone's in-box, they would have been subject to
16  the auto-deletion policy by the time the hold went
17  into effect in late March 2006, correct?
18       MS. PAUL:  Objection to form.  Are
19  you asking about all people, officers?
20    Q.  (Mr. Naylor)  You can answer the
21  question.
22    A.  If the -- if the auto-deletion policy
23  were in place for the individual; yes.
24    Q.  And if that policy had been suspended in
25  connection with a litigation hold, those emails

Page 161

1  potentially could have been saved, correct?
2     A.  Potentially, yes.
3     Q.  I want to draw your attention back to
4  what I believe is Exhibit Nine, which in a non-
5  derogatory sense I will refer to as your cheat
6  sheet.
7        MS. PAUL:  I object to the use of
8  the phrase "cheat sheet" to describe the document.
9     Q.  (Mr. Naylor)  Section 2b lists people --
10  2b and 2c lists people who it's your testimony
11  that Pike sent retention notices to, correct?
12    A.  That is correct.
13    Q.  Is it correct that anyone -- that all --
14  that any Pike employee not listed there did not
15  receive a retention notice?
16       MS. PAUL:  Objection to form.
17       THE WITNESS:  Is it correct that
18  they did not?
19    Q.  (Mr. Naylor)  Yes.
20    A.  I do not know that.
21    Q.  Who's the person at Pike most
22  knowledgeable about who would have received
23  document retention notices?
24    A.  Eric Pike.
25    Q.  I'm going to run -- I'm going to list a

41 (Pages 158 to 161)

RE

B 18