IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PIKE ELECTRIC CORPORATION &
PIKE ELECTRIC, INC.,

Plaintiffs,

vs.

MICK DUBEA,

Defendant.

Civil Action No. 05-879 (SLR)

**REDACTED - PUBLIC VERSION**

## DECLARATION OF SARAH E. PAUL

I, Sarah E. Paul, declare as follows:

1.      I am an associate at Cravath, Swaine & Moore LLP ("Cravath"), and I
respectfully submit this Declaration in support of Plaintiffs Pike Electric Corporation and Pike
Electric, Inc. (collectively, "Pike's" ) Reply Brief In Further Support of Plaintiffs' Motion for
Order Rejecting Defendant's Claims of Privilege and for Discovery Sanctions Due to Spoliation
of Evidence in the above-entitled action.

2.      Attached hereto as Exhibit A is a true and correct copy of the document bates
stamped PIKE00016600.

3.      Attached hereto as Exhibit B is a true and correct copy of Section 28-20 of the
Beaumont, Texas, Code of Ordinances.

4.      Attached hereto as Exhibit C is a true and correct copy of the document bates
stamped EDUBEA022037.

5.     Attached hereto as Exhibit D is a true and correct copy of the document bates stamped EDUBEA028496.

6.     Attached hereto as Exhibit E is a true and correct copy of Mick Dubea's Employment Agreement with Pike.

Executed on May 18, 2006

_____
Sarah E. Paul

**EXHIBIT A**



CONFIDENTIAL

PIKE 00016600

# EXHIBIT B

## DIVISION 1. GENERALLY

### Sec. 28-20.1. Definitions.

The following definitions shall apply in the interpretation and enforcement of this article:

*Automated containers* means any containers for refuse provided by the city having a capacity of sixty (60) to ninety (90) gallons and equipped with wheels for mobility.

*Building materials* means any material such as lumber, brick, plaster, gutters or other substances accumulated as a result of repairs or additions to existing buildings, construction of new buildings or demolition of existing structures.

*Bulk container* means a metal container of not less than two (2) cubic yards nor larger than ten (10) cubic yards, made of watertight construction with doors opening on two (2) sides and top, and constructed so that it can be emptied mechanically by specially equipped trucks. Containers shall be covered.

*Business trash* means any waste accumulation of dust, paper and cardboard, excelsior, rags or other accumulations, other than garbage or household trash, which are usually attendant to the operation of stores, restaurants, offices and similar businesses.

*City* means the City of Beaumont.

*Commercial establishment* means any retail, restaurant, manufacturing, wholesale, institutional, religious, governmental or other nonresidential establishment at which garbage or trash may be generated, and having connection to the city's water system.

*Curbline* means the area directly behind the curb. In the absence of a curb, the area directly behind the edge of pavement.

*Garbage* means every accumulation of animal, vegetable, and other waste matter that attends the preparations, handling, consumption, storage or decay of plant and animal matter, including meats, fish and seafoods, birds, fruits, vegetable or dairy products and the waste wrappers or containers thereof.

*Hazardous refuse* means materials such as poison, acids, caustics, chemical, infected materials, offal, fecal matter, and explosives or as defined by the Texas Natural Resource Conservation Commission.

*Household trash* means every waste accumulation of paper, sweepings, dust, rags, bottles, cans, or other matter of any kind, other than garbage, which is usually attendant to housekeeping.

*Industrial waste* means all waste, including solids, semisolids, sludges and liquids, created by factories, processing plants or other manufacturing enterprises or as defined by the Texas Natural Resource Conservation Commission.

*Inspectors* means person appointed by the department director authorized to enforce health and sanitation, building, and sanitation codes or ordinances.

*Landfill division* means a division of solid waste management designated to perform sanitary landfill disposal services for the public.

*Litter* means any manmade or man-used object, organic or inorganic material, or solid waste and specifically includes trash which is not placed in: a container, or an authorized sanitary waste disposal site; or another approved area, depository, a vehicle designated for transport or disposal of litter, trash, garbage or waste.

*Loading and unloading* area means any stream, river or lakeside or land dock, space or area used by any moving vehicle for the purpose of receiving, shipping and transporting goods, wares, commodities or persons.

*Multiple residential unit* means any duplex, apartments, group or apartments or condominium used as a dwelling place for more than one family.

*Person*  means any individual, firm, company, corporation, or association.

*Postconsumer waste*  means a material or product that has served its intended use and has been discarded after passing through the hands of a final user. For the purpose of this article, the term does not include industrial or hazardous waste.

*Portable packing unit*  means a metal container, not exceeding four thousand five hundred (4,500) pounds gross weight, with four (4) to six (6) cubic yard capacity, that contains a packing mechanism and an internal or external power unit.

*Private collector*  means any person or firm engaging in the business of collecting, hauling or transporting, in the city, any garbage, waste or refuse.

*Recyclable material*  means material that is capable of being recycled, and used in the manufacture of products which otherwise may be produced using raw or virgin materials. For the purpose of this article, the term applies to materials that have ben recovered or diverted from the solid waste stream for purposes of reuse, recycling or reclamation. These recyclable materials are not considered solid wastes unless they are subsequently damaged beyond use as a recyclable material, abandoned, or discarded.

*Recycled material*  means a material that consists of materials derived from postconsumer waste, industrial waste, or hazardous waste which can be used in place of a raw or virgin material in manufacturing a new product.

*Recycled product*  means a product which meets the requirements for recycled material content as prescribed by the rules established by the department described in Section 361.427.

*Recycling*  means a process by which materials that have served their intended use or are scrapped, discarded, used, surplus, or obsolete are collected, separated, or processed and returned to use in the form of raw materials in the production of new products.

*Refuse*  means all putrescible and nonputrescible solid and semisolid wastes, including garbage, rubbish, and ashes.

*Refuse container*  means a metal or plastic container for refuse, of substantial construction, with a tight-fitting lid, and handles sufficient for safe and convenient handling for collection at curbside. Except for those areas served by automated collection equipment, such containers shall have a capacity of not more than thirty-two (32) gallons and a total weight, when full, of not more than fifty (50) pounds or an empty weight of not more than ten (10) pounds, and shall be kept in serviceable condition at all times. Any areas serviced by automated collection equipment shall only use the automated containers as approved by the director of solid waste management. Any container which does not meet standards set by the department of solid waste management shall be removed. Exceptions to these requirements may be made by the director of solid waste management.

*Residentially zoned property*  means property zoned for only single family residential uses under the zoning ordinances of the city.

*Roll-off/roll-on container*  means a unit, varying in capacity between five (5) cubic yards and forty (40) cubic yards, which is used for collecting, storing, and transporting building materials, business trash, industrial waste, hazardous refuse, refuse or yard trash. The unit may or may not use an auxiliary stationary packing mechanism for composition of materials into the container and may be of the open or enclosed variety. The distinguishing feature of the detachable container is that it is picked up by a specially-equipped truckand becomes an integral part of the truck for transporting the waste material to the disposal site.

*Single residential unit*  means any dwelling place occupied by one family.

*Small dead animals*  means dead cats, dogs, small household pets and other animals of similar size.

*Solid waste management department*  means the department under the control of the director of solid waste management designated to perform garbage and trash collection services, landfill waste disposal and recycling for the city.

*Solid Waste Disposal Act*  means the Solid Waste Disposal Act, Article 4477-7, VTCS, as amended and under the authority of the Texas Department of Health.

*Tree and shrubbery trimmings* means waste accumulation of tree branches, tree limbs, parts of trees, bushes, rubbery and cuttings or clippings created as refuse in the case of trees or bushes.

*Vacant property* means property that does not contain any structure whatsoever.

*White goods* means major appliances such as refrigerators, freezers, washing machines, dryers, hot water heaters, stoves, dishwashers, etc.

*Yard waste* means leaves, grass clippings, yard and garden debris, and brush, including clean woody vegetative material not greater than six (6) inches in diameter, that results from landscaping maintenance and land-clearing operations. The term does not include stumps, roots, or shrubs with intact root balls.

(Ord. No. 92-7, § 1, 1-28-92; Ord. No. 94-35, § 1, 7-12-94; Ord. No. 00-63, § 1, 8-15-00)

## Sec. 28-20.2. Administration and enforcement.

The administration and enforcement of the provisions of this article, including provisions for refuse collection throughout the city, by both private contractors and the city, shall be primarily the duty of the solid waste management department with assistance from the public safety department.

(Ord. No. 92-7, § 1, 1-28-92)

## Sec. 28-20.3. Notice of violation--Authority to issue.

Inspectors appointed by the department head shall have the authority to enforce sections 28-20.8, 28-20.11, 28-20.12, 28-20.13, 28-21.1, 28-21.3, 28-21.4, 28-21.8, 28-20.14, 28-20.15, 28-21.10, 28-21.11, 28-21.12, 28-21.13, 28-22.2, 28-22.3, 28-23.1 and 28-23.5, and 28-21.8 of this article by issuing a notice, in accordance with section 28-20.4, informing the proper person of the date and nature of violation. Other violations of this article shall be enforced by the issuance of a summons or warrant as provided by law.

(Ord. No. 92-7, § 1, 1-28-92)

## Sec. 28-20.4. Same--Method of issuance.

When an inspector issues a notice for a violation of this article, notice shall be sufficient if served on the offending person by:

(1) Attaching a correction notice upon the container to whom it is directed.

(2) Certified mail, with delivery reported, a copy of the notice to the last known address of the person as shown on the current tax roll or water bill.

(Ord. No. 92-7, § 1, 1-28-92)

## Sec. 28-20.5. Same--Response.

The party whom receives a notice of violation by certified mail, will pay the fee assessment set forth herein below as in full satisfaction of such violation. The fee assessment will be included on the water bill for payment in accordance with section 28-24.6. Continued violation of the section in 28-20.3 may result in termination of garbage service and institution of legal action.

For violation of section:

*Fee Assessment*

28-20.8 . . . $ 15.00

28-20.11 . . . 15.00

28-20.12 . . . 15.00

28-20.13 . . . 15.00

28-21.1 . . . 10.00

28-21.3 . . . 10.00

28-21.4 . . . 10.00

28-21.8 . . . 15.00

(Ord. No. 92-7, § 1, 1-28-92)

## Sec. 28-20.6. Violation of article.

Unless otherwise specifically provided, a violation of any provision of this article shall constitute a Class 1 misdemeanor and, unless the penalty for such violation is paid in accordance with section 28-20.3 through 28-20.5 of this article, upon conviction thereof, the court may impose a fine of not less than twenty-five dollars ($25.00) nor more than one thousand dollars ($1,000.00).

(Ord. No. 92-7, § 1, 1-28-92)

## Sec. 28-20.7. Bulk containers utilized by commercial establishments.

Any commercial establishment which desires to utilize a bulk container for its refuse shall employ the services of a private contractor to service that container. Such container shall at all times be clean, neat, and in good state of repair. Cleaning up materials spilled from the container when emptying shall be the responsibility of the private contractor or the property owner or occupant. No refuse shall be placed adjacent to any bulk container. The property owner of any establishment for which a bulk container screening requirement applies must maintain such screening in a clean and neat condition and in good state of repair.

(Ord. No. 92-7, § 1, 1-28-92)

## Sec. 28-20.8. Hazardous refuse not to be placed in collection containers; special care and preparation required before placing certain refuse items in containers.

No infectious or pathological refuse or any other refuse that may cause a public health hazard shall be placed in any container used for collection by the city or collection by any private agency. The following are several types of special refuse items which shall be given special care and preparation before disposing of the same in any refuse container.

(1) *Hypodermic instruments and other sharp articles.* No person shall dispose of or discard any hypodermic syringe, hypodermic needle or any instrument or device for making hypodermic injections without prior placement in puncture resistant container for disposal so as to avoid the possibility of causing injury to the collection personnel.

(2) *Ashes.* Ashes that are to be collected by the city or private collectors must have been wetted and cooled to the touch prior to collection. Ashes shall be placed in suitable containers of such size and weight as stipulated in section 28-21.1 and shall not be placed with the normal refuse unless separately wrapped, so that they will not cause injury to the collection personnel.

(3) *Pressurized cans.* All pressurized cans containing pesticides or any other dangerous materials

shall be released of all pressure before being deposited in a container for collection by the city or any private collection agency.

(4) *Glass.* All broken glass or any type of glass that may cause injury to refuse collection personnel shall be separately wrapped to prevent injury and placed with the normal refuse.

(5) *Pesticides.* All pesticides and other poisonous containers shall be emptied and triple rinsed before being placed for collection.

(Ord. No. 92-7, § 1, 1-28-92)

## Sec. 28-20.9. Disposal of refuse and debris from construction, demolition, etc., operations.

(a) The city shall not be responsible for the collection or hauling of building materials originating from private property preliminary to, during or subsequent to the construction of new buildings or alterations or additions to existing buildings of whatever type or from demolition of existing structures. Such material shall be removed by the owner of the property or by the contractor. A stop work order may be issued by the inspector until such material has been removed by the owner or contractor. In addition, all contractors must provide refuse receptacles for construction debris and litter to be deposited in on a regular basis.

(b) Loose dirt, mud, clay, rocks, construction materials and other debris deposited upon any public highway, street and sidewalk or private property as a result of construction or demolition operations shall be immediately removed by the contractor. Construction and demolition sites shall be kept clean and orderly at all times.

(c) The prime contractor or developer of a construction or demolition site shall be responsible for maintaining the site as required by this section.

(Ord. No. 92-7, § 1, 1-28-92)

## Sec. 28-20.10. Collection, removal and disposal of industrial waste.

Industrial waste shall be collected, removed and disposed of in an approved manner by the operator of the factory, plant or enterprise creating or causing same.

(Ord. No. 92-7, § 1, 1-28-92)

## Sec. 28-20.11. Unlawful deposits generally; littering.

(a) No person shall place any accumulation of refuse or trash in any street, street right-of-way, median strip, alley or other public place of travel, nor upon any private property, except as stated in other sections of this article.

(b) It shall be unlawful for any person to:

(1) Scatter refuse about or litter any public or private street, area or place.

(2) Cast, throw, place, sweep or deposit anywhere within the city any refuse or trash in such a manner that it may be carried or deposited by the elements upon any street, sidewalk, alley, sewer, parkway or other public place or into any occupied or unoccupied premises within the city.

(3) Throw or deposit any refuse, trash or debris in any stream, body of water, or drainage system.

(c) The driver of any vehicle shall be responsible for assuring that no litter is thrown from the vehicle or occurs through the lack of proper covering.

)rd. No. 92-7, § 1, 1-28-92)

### Sec. 28-20.12. Placing refuse or refuse containers on, in or over drainage systems.

No person shall place any refuse or refuse container on, in or over any drainage system.

(Ord. No. 92-7, § 1, 1-28-92)

### Sec. 28-20.13. Property to be kept free of litter.

All owners or occupants shall maintain the real property owned or occupied by them in a clean and litter-free condition. This section shall not be construed as prohibiting the storage of refuse or litter in authorized containers for collection pursuant to the provisions of this article.

(Ord. No. 92-7, § 1, 1-28-92)

### Sec. 28-20.14. Interference with or damaging containers.

No person, other than employees of the city charged with such duty, shall interfere with the contents of any refuse container set out for removal by the city or any private collection agency, unless authorized by the director of solid waste management or his designated agent. It shall be unlawful for any person to damage or destroy any refuse container placed at the curbline for collection.

(Ord. No. 92-7, § 1, 1-28-92)

### Sec. 28-20.15. Scavenging of recyclable materials from residential areas prohibited.

(a) No person or persons other than the current resident of the property on which the items are placed or an authorized carrier, shall remove, pick up, or transfer recyclable materials, containers or bins left at curbside in either specifically marked recovery containers or any other type of container which is to be picked up by a designated carrier for the purpose of removal of recyclable materials. Materials referred to, and to be left at curbside in specifically marked containers, will include recyclable materials included in the city's recycling program.

(b) Each removal of an item or items from a residential subdivision residence location or a single-family residence location shall constitute a separate violation of this section. Unauthorized persons removing materials or bins other than those persons designated by the city to remove such materials shall be fined as follows:

(1) Upon first conviction of violation of this section, the person shall be fined twenty-five dollars ($25.00) for each such violation.

(2) Upon second conviction of violation of this section, the person shall be fined one hundred dollars ($100.00) for each violation.

(3) Upon third and subsequent convictions of violation of this section, the person shall be fined two hundred dollars ($200.00) for each such violation.

(Ord. No. 92-7, § 1, 1-28-92)

**EXHIBIT C**

# REDACTED

**EXHIBIT D**

REDACTED

**EXHIBIT E**



EXECUTION COPY

EMPLOYMENT AGREEMENT dated as of July 1, 2004, between PIKE ELECTRIC, INC. ("Employer"), a North Carolina corporation, and MICK J. DUBEA, an individual domiciled in the State of Texas ("Executive").

WHEREAS, as of the date of this Agreement, Executive is President, Western Region, of Red Simpson, Inc., a Louisiana corporation ("RSI"), and in such capacity has been instrumental in the management, development and growth of RSI and its business and the goodwill therein;

WHEREAS RSI, Employer, Executive and certain other parties have entered into a Stock Purchase Agreement dated as of May 4, 2004 (the "Stock Purchase Agreement"), pursuant to which Employer will acquire for cash all the outstanding stock of RSI;

WHEREAS, through the Mick Dubea 2003 Grantor Retained Annuity Trust (the "Trust"), Executive will benefit from the sale of 39,327 shares of common stock of RSI, which will be acquired for cash by Employer pursuant to the transactions contemplated by the Stock Purchase Agreement; and

WHEREAS, as a condition to the Closing (as such term, and each other capitalized term that is used but not defined herein, is defined in the Stock Purchase Agreement), Employer and Executive have agreed to enter into this Agreement;

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, the parties hereto agree as follows:

## ARTICLE I

### Employment

SECTION 1.01. Effectiveness. This Agreement shall become effective as of the Closing. This Agreement shall be null and void ab initio and of no further force and effect if the Closing does not occur or the Stock Purchase Agreement is terminated pursuant to its terms prior to the Closing.

SECTION 1.02. Position. Employer shall hire Executive, and Executive shall serve, as Vice President, Western Region. For a period of two years following the Closing, Executive shall report directly to the Chief Executive Officer of Employer (the "CEO"). After such two-year period, Executive shall report to the CEO unless the CEO determines that it has become necessary for Executive to report to another person due to the restructuring of Employer or its businesses. Executive shall be responsible for the management of all operations of Employer in Oklahoma and Texas under the direction of the CEO, and shall perform such other services and duties, which may include

[23-02676]

PIKE 00017035

2

business development in other geographical areas, as are consistent and appropriate for his position and as determined from time to time by the CEO.

SECTION 1.03. Term. The term of Executive's employment under this Agreement (the "Term") shall commence upon the Closing and shall expire on the date that is four years after the Closing. Executive's employment with Employer shall be "at will" and, subject to the provisions of Article IV, Executive's employment under this Agreement may be terminated by either party at any time and for any reason.

SECTION 1.04. Time and Effort. Executive shall serve Employer faithfully, loyally, honestly and to the best of Executive's ability. Executive shall devote all Executive's business time to the performance of Executive's duties on behalf of Employer.

SECTION 1.05. Location. During the Term, Executive's principal place of employment shall be at Beaumont, Texas, or such other location, as reasonably determined from time to time by the CEO to be necessary for the fulfillment of Executive's duties to Employer; provided, however, that Executive and the CEO shall mutually and reasonably agree on the location of any such move if the CEO determines that such move is in the best interests of Employer. In the event that Executive's principal place of employment is transferred to a location in excess of 50 miles from Beaumont, Texas, Employer will pay or reimburse Executive for (a) all reasonable moving expenses relating to the physical transfer of Executive's furniture and personal belongings and (b) all realtor fees in connection with Executive's purchase of a new primary residence.

SECTION 1.06. Resignation from RSI. Executive hereby agrees that his employment with RSI and its affiliates shall terminate as of the Closing, and he shall resign as a director, officer and employee of RSI and its affiliates effective as of the Closing.

## ARTICLE II

### Compensation

SECTION 2.01. Base Salary. As compensation for all services rendered by Executive to Employer and all its affiliates in any capacity (including services as an officer or employee), Employer shall pay Executive a base salary ("Base Salary") during the Term at the annual rate during 2004 of $330,000, and thereafter subject to increase or decrease as may be determined from time to time by the Board of Directors of Employer (the "Board"). The Base Salary shall be payable in accordance with Employer's standard payroll practices.

SECTION 2.02. RSI Deferred Compensation. (a) Employer shall pay to Executive (i) an amount in cash equal to 50% of the Base Amount (as defined below)

[2342676]

CONFIDENTIAL



3

not more than 75 days after the Closing and (ii) an amount in cash equal to 50% of the Base Amount on the first anniversary of the Closing. Employer's obligation to pay such amounts shall not be terminated or reduced for any reason, including the termination of Executive's employment for any reason.

(b)   Subject to any acceleration of the Gross Multiplier Amount Reduction (as defined below) for the purpose of purchasing Shares (as defined below) in accordance with Section 2.03, Employer shall pay to Executive an amount in cash equal to 40% of the Multiplier Amount (as defined below) on the second anniversary of the Closing, an amount in cash equal to 20% of the Multiplier Amount on the third anniversary of the Closing and an amount in cash equal to 40% of the Multiplier Amount on the fourth anniversary of the Closing; provided, however, that if the performance target conditions established by the Board in its sole discretion are satisfied, Employer shall pay to Executive, in lieu of the foregoing payments which shall not be paid, an amount in cash equal to 50% of the Multiplier Amount on the second anniversary of the Closing, an amount in cash equal to 20% of the Multiplier Amount on the third anniversary of the Closing and an amount in cash equal to 30% of the Multiplier Amount on the fourth anniversary of the Closing; provided further, however, that upon the occurrence of a Change in Control (as defined below), Employer shall promptly pay to Executive any portion of the Multiplier Amount that is unpaid (other than any amount that is unpaid as a result of any forfeiture pursuant to this Section 2.02(b)) as of the occurrence of such Change in Control. In the event Executive provides timely notice to Employer of a Tax Demand (as defined below), (i) Employer shall pay to Executive a portion of the then remaining unpaid Multiplier Amount equal to the lesser of such unpaid Multiplier Amount and the Tax Amount (as defined below), which payment shall be made no less than ten days prior to the date such Tax Amount is required to be remitted to the applicable tax authority, and (ii) the amount of any remaining unpaid installments of the Multiplier Amount shall be reduced in order of maturity in an aggregate amount equal to the Tax Amount. Notwithstanding the foregoing, Employer shall not make any payment described in this Section 2.02(b), and Executive shall not be entitled to receive any such payment, in the event that, prior to the payment of such amount, Executive has terminated his employment for any reason, other than death, Disability (as defined below) or Good Reason (as defined below), or Employer has terminated Executive's employment for Cause (as defined below).

(c)   Executive agrees that RSI shall have no obligation to make any payment under the Existing Employment Agreement (as defined below), and Executive shall not be entitled to receive any such payment.

(d)   For purposes of this Agreement, the term "Base Amount" shall mean the aggregate amount that RSI would be obligated to pay to Executive, but for this Agreement, pursuant to Article II of the Amendment and Restatement of Employment Contract, Nonqualified Deferred Compensation Agreement and Agreement Not To Compete, dated as of January 7, 2004, by and between Executive and RSI (the "Existing Employment Agreement") in the event that Executive's employment with RSI were

[1342676]

CONFIDENTIAL

PIKE 00017037

4

terminated as of the Closing, but without giving effect to Section 2.07 or 4.15 of the Existing Employment Agreement; provided, however, that the Base Amount shall be as set forth on the Master Deferred Compensation Schedule as finally determined in accordance with the terms of the Stock Purchase Agreement; provided further, however, that the Base Amount shall be reduced by the Gross Base Amount Reduction (as defined below) that is surrendered in connection with Executive's purchase of Shares pursuant to Section 2.03 (if any).

(e)  For purposes of this Agreement, the term "Multiplier Amount" shall mean the excess of (i) the aggregate amount that RSI would be obligated to pay to Executive, but for this Agreement, pursuant to Section 2.07 of the Existing Employment Agreement as a result of the consummation of the transactions contemplated by the Stock Purchase Agreement, including any additional amounts described in Section 4.15 of the Existing Employment Agreement, over (ii) the Base Amount before reduction by the Gross Base Amount Reduction (if any); provided, however, that the Multiplier Amount shall be as set forth on the Master Deferred Compensation Schedule as finally determined in accordance with the terms of the Stock Purchase Agreement; provided further, however, that in the event that Executive elects to use a portion of the Gross Multiplier Amount Reduction to purchase Shares in accordance with Section 2.03(a), a pro-rata portion of the Gross Multiplier Amount Reduction shall be deducted from each payment of the Multiplier Amount that shall be made to Executive in accordance with the first sentence of Section 2.02(b).

(f)  For purposes of this Agreement, the term "Change in Control" shall mean LGB Pike LLC and its affiliates ceasing to own, directly or indirectly, voting securities of Employer representing at least 35% of the aggregate voting power of all classes of Employer securities entitled to vote for directors of Employer.

(g)  For purposes of this Agreement, the term "Tax Demand" shall mean the receipt by Executive of a written notice of deficiency from, or other written demand by, any tax authority, requiring the payment of tax on any unpaid portion of the Multiplier Amount (the amount of such tax demanded by such tax authority, the "Tax Amount").

SECTION 2.03.  Equity Participation.  (a)  On the date of the Closing, Employer shall permit Executive to purchase up to 21,479 whole shares of common stock, no par value, of Pike Holdings, Inc. ("Shares") at a purchase price per share of $93.11 (the "Purchase Price").  No less than five days prior to Closing, Executive shall give written notice to Employer of his intent (if any) to acquire Shares pursuant to this Section 2.03, the number of Shares to be acquired and the method of payment therefor (the "Election Date").  Executive shall be permitted to acquire such Shares by one or a combination of any of the following methods: (i) paying the purchase price for the applicable Shares in cash on the date of the Closing by wire transfer of immediately available funds, (ii) irrevocably surrendering at the Closing a portion of Executive's Base Amount (the "Gross Base Amount Reduction") in an amount that, after giving

[1242676]

CONFIDENTIAL



5

effect to all applicable withholdings (such resulting amount, the "Net Base Amount Reduction"), is equal to the aggregate purchase price for the applicable Shares; provided that, in the event the Base Amount is adjusted after the Closing such that the Gross Base Amount Reduction exceeds such adjusted Base Amount, Executive shall promptly pay to Employer in cash the amount of such excess and until such payment is made Employer shall be entitled to withhold such excess from any amounts otherwise payable to Executive, whether pursuant to this Agreement or otherwise or (iii) irrevocably surrendering at the Closing a portion of the Multiplier Amount (the "Gross Multiplier Amount Reduction") with a value not to exceed $1,000,000, after the withholding of any required taxes (the "Net Multiplier Amount Reduction"), it being expressly understood that Employer shall allow Executive to accelerate his receipt of the Gross Multiplier Amount Reduction solely for purposes of purchasing Shares in accordance with this Section 2.03(a). Subject to Section 2.03(b), at the Closing, Employer shall deliver to Executive that number of Shares equal to (A) the sum of the cash paid, the Net Base Amount Reduction and the Net Multiplier Amount Reduction (in each case, if any) for such Shares divided by (B) the Purchase Price.

(b) (i) It is expressly understood between the parties that any Shares acquired pursuant to this Section 2.03 through Executive's surrender of the Net Multiplier Amount Reduction will be treated as restricted shares ("Restricted Shares"). Until the Restricted Shares have become vested in accordance with Section 2.03(b)(ii), they may not be, directly or indirectly, offered, transferred, sold, assigned, pledged, hypothecated or otherwise disposed of, and shall be subject to forfeiture in accordance with the terms hereof. Certificates issued in respect of the Restricted Shares shall be registered in the name of Executive and deposited by him, together with a stock power endorsed in blank, with Employer. Until the Restricted Shares have become vested, Executive shall not be entitled to exercise any voting rights with respect to such Restricted Shares and shall not be entitled to receive dividends or other distributions with respect to such Restricted Shares; provided that when Restricted Shares have become vested, the holder of such Restricted Shares shall be entitled to receive the amount of dividends or other distributions with a record date after the Closing Date theretofore paid with respect to that number of Shares represented by such Restricted Shares. When the Restricted Shares become vested, Employer shall deliver the applicable certificates to Executive or his legal representative. Employee acknowledges that the Shares shall also be subject to the restrictions and limitations set forth in the Stockholders Agreement set forth on Exhibit A hereto (the "Stockholders Agreement").

(ii) Unless forfeited in accordance with this Section 2.03(b)(ii), the Restricted Shares shall become vested in accordance with the following schedule: (1) 40% of the Restricted Shares shall become vested on the second anniversary of the Closing, (2) 20% of the Restricted Shares shall become vested on the third anniversary of the Closing and (3) 40% of the Restricted Shares shall become vested on the fourth anniversary of the Closing; provided, however, that if the performance target conditions established by the Board in its sole discretion are satisfied, in lieu of the foregoing

[3341676]

CONFIDENTIAL

PIKE 00017039

6

vesting schedule, 50% of the Restricted Shares shall become vested on the second anniversary of the Closing, 20% of the Restricted Shares shall become vested on the third anniversary of the Closing and 30% of the Restricted Shares shall become vested on the fourth anniversary of the Closing; provided further, however, that upon the occurrence of a Change in Control, all Restricted Shares (other than any Restricted Shares that have been forfeited pursuant to this Section 2.03(b)) shall become immediately vested as of the occurrence of such Change in Control. Notwithstanding the foregoing, all unvested Restricted Shares shall be forfeited (and Employee shall not have any interest in such Restricted Shares) and Employer shall not be required to deliver the certificates as described in Section 2.03(b)(i), in the event that, prior to vesting of such Restricted Shares, Executive has terminated his employment for any reason, other than death, Disability or Good Reason, or Employer has terminated Executive's employment for Cause.

(c) Notwithstanding the foregoing, Employer shall not deliver, and Executive shall have no right to receive, any Shares, unless and until Executive shall have executed and delivered to Employer a counterpart to the Stockholders Agreement, and Executive hereby agrees to be bound by, and honor and comply with, the terms and conditions of such Agreement.

(d) Any Shares issued pursuant to this Section 2.03 shall be issued in certificated form and shall bear a legend indicating that they have been issued pursuant to an exemption from the registration requirements of Federal and state securities laws, that their resale is restricted and that they are subject to the provisions of a stockholders agreement governing, inter alia, the transfer and voting of the Shares.

(e) No later than the Election Date, Executive shall deliver an opinion of counsel reasonably acceptable to Employer that any acquisition of Shares under this Section 2.03 meets an applicable exemption from the registration requirements of all Federal and applicable state securities laws. Notwithstanding the foregoing, in no event shall Executive be entitled to purchase any Shares under this Section 2.03 to the extent that Employer reasonably determines such purchase does not meet an applicable exemption from Federal and applicable state securities laws.

(f) Executive hereby represents and warrants to, and covenants with, Employer that any acquisition of Shares by Executive pursuant to this Section 2.03 will be solely for investment purposes for Executive's own account (and not for the account of any other person) and that Executive has no agreement, understanding or arrangement to subdivide, sell, assign, transfer or otherwise dispose of all or any part of any of such Shares to any other person.

SECTION 2.04. Withholding Taxes. Employer and its affiliates may withhold from any amounts payable under this Agreement such Federal, state, local and foreign taxes as may be required to be withheld pursuant to any applicable law or regulation.

[2342676]

PIKE 00017040



7

## ARTICLE III

### Employee Benefits

SECTION 3.01. Benefit Plans. During the Term, Executive shall be entitled to participate in any employee benefit plan offered by Employer (collectively, "Benefit Plans") on the same basis as other officers of Employer, subject to the terms and conditions of such Benefit Plan as in effect from time to time. A schedule of Benefit Plans currently maintained by Employer is set forth on Exhibit B hereto. Executive agrees that any such Benefit Plan may be amended or terminated from time to time by Employer in its sole discretion. Executive shall be given credit for years of service performed for RSI with respect to each Benefit Plan to the extent permitted by applicable law and the terms of such Benefit Plan.

SECTION 3.02. Business Expenses. Employer shall reimburse Executive for all necessary and reasonable "out-of-pocket" business expenses incurred by Executive in the performance of Executive's duties hereunder; provided that Executive furnishes to Employer adequate records or other documentary evidence required to substantiate such expenditures and otherwise complies with the expense reimbursement policy of Employer in effect at such time.

## ARTICLE IV

### Termination

SECTION 4.01. Exclusive Rights. Except as set forth in this Article IV, in the event that Executive's employment with Employer is terminated, whether by Employer or Executive, at any time and for any reason, Executive shall have no further rights to any compensation or any other benefits under this Agreement, any Benefit Plan or any employee benefit policies or other benefit arrangements in effect from time to time, whether maintained or provided by Employer, RSI or any of their affiliates.

SECTION 4.02. Accrued Rights. Upon the termination of Executive's employment under this Agreement for any reason, Executive shall be entitled to receive (a) Base Salary earned through the effective date of termination that remains unpaid as of such date, (b) reimbursement for any unreimbursed business expenses incurred by Executive prior to the effective date of Executive's termination to the extent such expenses are reimbursable under Section 3.02, (c) any benefits (other than benefits under any severance, termination or change in control plan, program or policy then in effect) to which Executive may be entitled under the Benefit Plans as of the effective date of Executive's termination, which benefits shall be payable in accordance with the terms of such Benefits Plans as in effect from time to time, and (d) any portion of the Base Amount that remains unpaid as of the effective date of Executive's termination.

{23426761}

CONFIDENTIAL

8

SECTION 4.03. <u>Termination by Employer other than for Cause.</u>
(a)  If Employer elects to terminate Executive's employment prior to the expiration of
the Term for any reason other than death, Disability or Cause, Employer shall
(i) provide written notice to Executive at least 30 days prior to the effective date of
Executive's termination of employment or (ii) in lieu of providing such notice, continue
to pay Executive's Base Salary through the period of time ending 30 days after the
effective date of Executive's termination of employment.  In the event of any such
termination, Employer shall pay to Executive a lump-sum amount in cash equal to one
year of Executive's then current Base Salary.  If Employer elects to terminate
Executive's employment prior to the first anniversary of the Closing for any reason
other than death, Disability or Cause, Employer shall pay Executive an amount in cash
equal to any portion of the Multiplier Amount that remains unpaid as of the effective
date of Executive's termination, which payments shall be made promptly after the
effective date of Executive's termination, and all Restricted Shares acquired pursuant to
Section 2.03 of this Agreement shall become immediately vested as of the date of such
termination.  If Employer elects to terminate Executive's employment on or following
the first anniversary of the Closing but prior to the end of the Term for any reason other
than death, Disability or Cause, Employer shall pay Executive any unpaid portions of
the Multiplier Amount in accordance with the schedule set forth under Section 2.02(b)
and all Restricted Shares acquired pursuant to Section 2.03 shall continue to vest in
accordance with the schedule set forth under Section 2.03(b)(ii), in each case, subject to
Section 5.10.  Notwithstanding the foregoing, Employer shall not be obligated to make
any payment described in this Section 4.03(a), and no Restricted Shares shall become
vested in accordance with this Section 4.03(a), until such time as Executive has
provided an irrevocable waiver and general release of claims (other than any claims for
payments that Executive is entitled to receive in accordance with this Section 4.03(a)) in
favor of Employer, its affiliates, and their respective affiliates, directors, officers,
employees, shareholders, owners, members, partners, agents and representatives in form
and substance satisfactory to Employer.

(b)  For purposes of this Agreement, the term "<u>Cause</u>" shall mean
(i) Executive's willful failure or refusal to perform those duties that Executive is assigned
or required to perform pursuant to this Agreement, (ii) Executive's failure to perform any
obligation imposed upon Executive pursuant to this Agreement, including any willful
failure to comply with any material employee policy of Employer, (iii) Executive's theft
or misappropriation of Employer's funds or property or Executive's willful breach of any
fiduciary duty to Employer in the performance of Executive's duties hereunder,
(iv) Executive's conviction of, or a plea of guilty or nolo contendere to, a misdemeanor
involving moral turpitude, fraud, dishonesty or theft that impairs the reputation of
Employer or any of its affiliates or any felony (other than any traffic laws or laws
governing operation of a motor vehicle) (or the equivalent thereof in a jurisdiction other
than the United States), (v) Executive's gross negligence or willful misconduct in the
performance of Executive's duties hereunder that results in material injury to the
property, financial condition or business reputation of Employer or any of its affiliates

[2242676]

CONFIDENTIAL

PIKE 00017042

9



and (vi) Executive's breach of the provisions of Article V of this Agreement. "Cause" shall not exist under this Section 4.03(b) until and unless (A) the CEO has given Executive written notice that he believes Executive has engaged in conduct that constitutes Cause, (B) such notice identifies the clause or clauses of this Section 4.03(b) that describe the prohibited conduct that Executive is alleged to be or have been engaged in and (C) the Board has unanimously determined in good faith that conclusive evidence supporting the termination of Executive for Cause exists. In the event that Executive is alleged to have engaged in any conduct that falls under clause (i) or (ii) of this Section 4.03(b), Executive shall be given not less than 30 days to remedy such conduct; provided, however, that if Executive engages in any subsequent conduct that the Board determines in accordance with clause (C) of this Section 4.03(b) constitutes Cause, the Board shall be entitled to terminate his employment without giving Executive an opportunity to remedy his subsequent conduct.

SECTION 4.04. Termination by Executive. If Executive resigns or terminates employment for any reason, Executive shall provide written notice at least 30 days prior to the effective date of such resignation or termination. If Executive elects to terminate his employment for Good Reason at any time during the Term, Employer shall pay Executive any unpaid portions of the Multiplier Amount in accordance with the schedule set forth under Section 2.02(b), and all Restricted Shares acquired pursuant to Section 2.03 shall continue to vest in accordance with the schedule set forth under Section 2.02(b), in each case, subject to Section 5.10. Notwithstanding the foregoing, Employer shall not be obligated to make any payment described in this Section 4.04, and no Restricted Shares shall become vested in accordance with this Section 4.04 until such time as Executive has provided an irrevocable waiver and general release of claims (other than any claims for payments that Executive is entitled to receive in accordance with this Section 4.04) in favor of Employer, its affiliates, and their respective affiliates, directors, officers, employees, shareholders, owners, members, partners, agents and representatives in form and substance satisfactory to Employer.

SECTION 4.05. Termination upon Death or Disability. (a) Executive's employment under this Agreement shall terminate automatically upon Executive's death or Disability. In the event of any such termination, Employer shall promptly pay to Executive or Executive's designated beneficiary, as the case may be, any portion of the Multiplier Amount that is unpaid as of the date of such termination, and all Restricted Shares acquired pursuant to Section 2.03 shall become immediately vested.

(b) For purposes of this Agreement, the term "Disability" shall mean (i) the inability of Executive, due to illness, accident or any other physical or mental incapacity, to perform Executive's duties in a normal manner for a period of 180 days (whether or not consecutive) in any twelve-month period during the Term or (ii) Executive's being accepted for long-term disability benefits under any long-term disability plan in which Executive is then participating. The Board shall determine, in good faith, on the basis of the facts then available, whether and when the Disability of Executive has occurred. Such determination shall take into consideration the expert

CONFIDENTIAL

PIKE 00017043

10

medical opinion of a physician mutually agreeable to Employer and Executive based upon such physician's examination of Executive. Executive agrees to make himself available for such examination upon the reasonable request of Employer.

SECTION 4.06. Resignation for Good Reason. Executive may terminate his employment or consultancy under this Agreement at any time for Good Reason. As used herein, the term "Good Reason" shall mean the occurrence, without Executive's consent, of any of the events or circumstances set forth in the following clauses (a) through (c):

(a) the assignment to Executive of any duties or responsibilities that are inconsistent in any material respect with the Executive's status, title and position as set forth in Section 1.02;

(b) any willful failure of employer to pay or provide to Executive any portion of Executive's compensation or benefits required under this Agreement, within 30 days of the date Executive informs Employer in writing that such compensation and benefits are due; or

(c) any material breach of this Agreement by Employer.

"Good Reason" shall not exist under clauses (a), (b) or (c) until and unless Executive has given the Board notice of the applicable event within 30 days of the date Executive has actual knowledge of such event. Such notice shall specifically delineate such claimed breach and shall inform the Board that the Company is required to cure such breach (if curable) within 30 days (the "Cure Period") after such notice is given in accordance with this Section 4.06. If such breach is not so cured (or is not curable), Executive may resign for Good Reason within a reasonable time after the end of the Cure Period. If such breach is cured within the Cure Period, Good Reason shall not exist hereunder; provided, however, that if Employer commits a similar breach of this Agreement within 12 months of the giving of the foregoing notice, Executive may terminate his employment for Good Reason without giving the Company an opportunity to cure such subsequent breach.

## ARTICLE V

### Executive's Covenants

SECTION 5.01. Employer's Interests. Executive acknowledges that RSI has expended substantial amounts of time, money and effort to develop business strategies, substantial customer relationships, supplier and vendor relationships, employee relationships, goodwill, business secrets, confidential information and intellectual property and to build an effective organization and that Employer, as the sole shareholder of RSI after the Closing, has a legitimate business interest and right in protecting those assets as well as any similar assets that Employer may develop or obtain following the Closing. Executive acknowledges that Employer is entitled to

[72416761]

CONFIDENTIAL

11

protect and preserve the going concern value of the business of RSI and its own business (together with the business of RSI, the "Business") following the Closing to the extent permitted by law. Executive acknowledges and agrees that the restrictions imposed upon Executive under Sections 5.03, 5.05, 5.06, 5.07 and 5.08 of this Agreement are reasonable and necessary for the protection of such assets and that, in light of the amounts payable pursuant to this Agreement and the consideration to be paid to the Trust pursuant to the Stock Purchase Agreement, the restrictions set forth in this Agreement will not prevent Executive from earning an adequate and reasonable livelihood and supporting his dependents without violating any provision of this Agreement.

SECTION 5.02. Consideration to Executive. Executive acknowledges he has been informed that Employer would not have agreed to enter into the Stock Purchase Agreement, pursuant to which the Trust's shares of RSI stock will be purchased for cash, and that Employer would not have agreed to enter into this Agreement and make the payments hereunder, without Executive's agreeing to enter into and to honor the provisions and covenants of this Article V. Therefore, Executive agrees that, in consideration of (a) Employer's entering into this Agreement and Employer's obligations hereunder, (b) Employer's entering into the Stock Purchase Agreement and Employer's obligation to purchase the shares of RSI stock held by the Trust for cash thereunder and (c) other good and valuable consideration, the receipt of which is hereby acknowledged, Executive shall be bound by, and agrees to honor and comply with, the provisions and covenants contained in this Article V following the Closing.

SECTION 5.03. Non-Disclosure of Confidential Information.

(a)   Executive acknowledges, that in the performance of his duties as an employee of RSI, Executive has received, and may in the future as an employee of Employer be given access to, Confidential Information (as defined below).

(b)   Executive agrees that all Confidential Information has been, is and shall be the sole property of Employer or RSI, as the case may be, and that Executive has no right, title or interest therein.

(c)   Prior to the date of this Agreement, Executive has not, directly or indirectly, disclosed or caused or permitted to be disclosed, to any person or entity whatsoever, or utilized or caused or permitted to be utilized, by any person or entity whatsoever, any Confidential Information acquired pursuant to Executive's employment with RSI, except (i) as Executive reasonably believed to be necessary in the discharge of Executive's duties as an employee of RSI or (ii) as required by law or as ordered by a court of competent jurisdiction.

(d)   Except as otherwise specifically provided in Section 5.04, Executive shall not, directly or indirectly, disclose or cause to be disclosed, to any person or entity whatsoever, or utilize or, directly or indirectly, cause to be utilized, by any person or
[7342674]

PIKE 00017045

12

entity whatsoever, any Confidential Information acquired pursuant to Executive's employment with Employer or RSI (whether acquired prior to or subsequent to the execution of this Agreement) or otherwise.

(e) Except as expressly required pursuant to Section 5.11, Executive shall not disclose to any person, other than Executive's immediate family and legal or financial advisors, the existence or contents of this Agreement and, to the extent such information is disclosed to Executive's immediate family or legal or financial advisors, Executive shall instruct those parties to comply with the non-disclosure requirements of this Section 5.03.

(f) For purposes of this Agreement, "Confidential Information" shall mean trade secrets and confidential or proprietary information, knowledge or data that is or will be used, developed, obtained or owned by Employer, RSI or the Business relating to the business, operations, products or services of Employer, RSI or the Business or the business, operations, products or services of any customer thereof, including products, services, fees, pricing, designs, marketing plans, strategies, analyses, forecasts, formulas, drawings, photographs, reports, records, computer software (whether or not owned by, or designed for, Employer, RSI or the Business), operating systems, applications, program listings, flow charts, manuals, documentation, data, databases, specifications, technology, inventions, developments, methods, improvements, techniques, devices, products, know-how, processes, financial data, customer, supplier and vendor lists, contact persons, cost information, executive information, regulatory matters, personnel matters, employee information, employee compensation, accounting and business methods, patents, trade secrets, copyrightable works and information with respect to any supplier, vendor, customer, employee or independent contractor of Employer, RSI or the Business, in each case whether patentable or unpatentable, whether or not reduced to writing or other tangible medium of expression and whether or not reduced to practice, and all similar and related information in whatever form, and all such items of any supplier, vendor, customer, employee or independent contractor of Employer, RSI or the Business or any other person with which Employer or RSI has a business relationship or owes a duty of confidentiality; provided, however, that Confidential Information shall not include information that is generally known to the public other than as a result of disclosure by Executive in breach of this Agreement or in breach of any similar covenant made by Executive prior to entering into this Agreement or any other duty of confidentiality.

SECTION 5.04. Permitted Disclosure. Executive may (a) utilize and disclose Confidential Information as required in the discharge of Executive's duties as an employee of Employer, subject to any specific restriction, limitation or condition placed on such use or disclosure by Employer, and (b) disclose Confidential Information to the extent required by applicable law or as ordered by a court of competent jurisdiction; provided that in such event, or if Executive receives a request from a court or other governmental authority to disclose Confidential Information, (i) Executive shall give prompt written notice to Employer and consult with and provide reasonable assistance to Employer in seeking a protective order or request for other appropriate
[7242676]

CONFIDENTIAL

PIKE 00017046

13

remedy, (ii) in the event that such protective order or remedy is not obtained, or if Employer waives the seeking of such protective order or other remedy, (A) Executive shall disclose only that portion of the Confidential Information that, in the opinion of Executive's legal counsel, is legally required to be disclosed (and Executive shall be entitled to rely on the advice of such counsel) and (B) if requested in writing by Employer to do so, which writing contains an undertaking to reimburse Executive for any expenses incurred by him, then Executive shall exercise his reasonable best efforts to ensure that confidential treatment shall be accorded such Confidential Information by the receiving person or entity and (ii) Employer shall be given an opportunity to review such Confidential Information prior to disclosure thereof.

SECTION 5.05. Inventions. (a) Executive hereby represents to Employer that he has no right, title or interest in or to any Inventions (as defined below). From and after the Closing, Executive hereby assigns to Employer or its designee all Executive's rights, title and interest in and to, any and all Inventions, whether or not patentable, that Executive may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, within the scope of, and during the term of, Executive's employment with Employer. Executive further acknowledges that all original works of authorship that are created or contributed to by Executive (solely or jointly with others) within the scope of, and during the period of, Executive's employment with Employer are to be deemed "works made for hire", as that term is defined in the United States Copyright Act, and the copyright and all other intellectual property rights therein shall be the sole property of Employer or its designee. Executive shall take all reasonably requested actions and execute all reasonably requested documents to assist Employer, or its designee, at Employer's expense, in every way to secure Employer's or its designee's rights under this Section 5.05.

(b) For purposes of this Agreement, the term "Inventions" shall mean all inventions, works of authorship, developments, improvements and trade secrets (including products, services, processes, know-how, designs, developments, techniques, formulas, methods, mask works, developmental or experimental work, discoveries, ideas, source and object codes, software, databases, documentation, site content, text, graphics, programs and related items) and any works in progress, whether or not patentable or registrable under copyright or similar statutes, that relate to the proposed or current business, services, products or research and development of Employer or RSI.

SECTION 5.06. Non-Disparagement. After the date hereof, Executive shall not, whether in writing or orally, criticize or disparage Employer, RSI or the Business or any of their respective former, current or future directors, officers, employees, agents or representatives; provided that Executive may provide critical assessments of Employer to Employer within the scope, and during the term, of Executive's employment with Employer.

[5]42676]

PIKE 00017047

14

SECTION 5.07. <u>Non-Competition.</u> (a) For the Restricted Period, Executive shall not, and shall cause each of Executive's representatives, agents and affiliates not to, directly or indirectly:

(i) (A) engage in activity or business, or establish any new business, within the United States of America that is in competition, in whole or in part, with the Business or Employer ("<u>Competitive Activities</u>"), including (1) selling goods or performing services of the type sold or performed by the Business or Employer (x) at any time prior to the Closing or (y) prior to the time Executive ceases to be an employee of Employer or (2) assisting any person or entity in any way to do, or attempt to do, anything prohibited by clause (1), or (B) perform any action or activity or engage in any course of conduct that is detrimental to the business reputation of the Business or Employer or any business of Employer conducted at any time prior to the time Executive ceases to be an employee of Employer;

(ii) (A) solicit any person or entity that is a customer (or prospective customer) of Employer or any of its affiliates to purchase any goods or services sold or performed by Employer or any of its affiliates from any person other than Employer or any of its affiliates or to reduce or refrain from doing any business with Employer or any of its affiliates, (B) solicit, recruit or hire any employee of Employer or any of its affiliates or any person who has worked for Employer or any of its affiliates, (C) solicit or encourage any employee of Employer or any of its affiliates to leave the employment of Employer or any of its affiliates or recommend to any person that such person employ or engage any employee of Employer or any of its affiliates, (D) intentionally interfere with or damage (or attempt to interfere with or damage) any relationship between Employer or any of its affiliates, on one hand, and any of their respective employees, customers or suppliers, on the other hand (or any person or entity that Employer or any of its affiliates has approached or has made significant plans to approach as a prospective employee, customer or supplier); or any governmental authority or any agent or representative thereof or (E) assist any person or entity in any way to do, or attempt to do, anything prohibited by this clause (ii);

(iii) serve as a director, officer, affiliate, employee, broker, independent contractor, consultant, agent, representative or advisor for any Competitor (as defined below) and in such capacity engage in, or directly or indirectly manage or supervise personnel engaged in, any activity (A) which is substantially similar or substantially related to any activity in which Executive was engaged, in whole or in part, at Employer or RSI in his capacity as a director, officer or employee, (B) for which Executive had managerial or supervisory responsibility at Employer or RSI or (C) which utilizes the same or substantially similar specialized knowledge or skills as those utilized by Executive in his activities with Employer or RSI, in each

[2342676]

PIKE 00017048

15



case at any time prior to Executive's termination of employment with Employer; or

(iv) form, or acquire any equity ownership, voting or profit participation interest in, any Competitor, other than an interest of less than 5% in a Competitor that is publicly traded.

(b) for purposes of this Agreement, the term "Restricted Period" shall mean a period commencing on the date of the Closing and terminating five years from the date Executive ceases to be an employee of Employer for any reason. The Restricted Period shall be tolled during (and shall be deemed automatically extended by) any period in which Executive is in violation of this Section 5.07.

(c) for purposes of this Agreement, the term "Competitor" shall mean any business, person or entity that engages in any activity or owns or controls a significant interest in any business, person or entity that engages in any activity, that, in either case, competes in the United States of America with any activity in which Employer is engaged.

(d) for purposes of this Agreement, the term "solicit" shall mean the initiation of any communication of any kind whatsoever for the purpose of inviting, encouraging or requesting the taking (or refraining from taking) of any action.

SECTION 5.08. Release. (a) Executive, on behalf of Executive and his spouse, heirs, dependents, representatives, executors, administrators and successors and assigns (the "Releasing Parties"), hereby waives, releases and forever discharges Employer and each of its former, current and future shareholders, subsidiaries, affiliates, owners, directors, officers, employees and agents, and each of the respective predecessors, successors and assigns of each of the foregoing (the "Released Parties"), from any and all manner of actions and causes of action, suits, debts, dues, accounts, bonds, covenants, contracts, liabilities, obligations, agreements, judgments, charges, claims (including any claim for attorneys' fees), rights and demands whatsoever that Executive and the Releasing Parties have, had or may hereafter have against the Released Parties or any of them relating to, arising out of or by reason of any cause, act, event, omission, matter or thing whatsoever arising on or prior to the Closing, whether known or unknown, including without limitation any and all matters relating to Executive's employment by RSI and its affiliates, and any and all matters arising under any Federal, state or local statute, rule or regulation, or principle of common, tort or contract law, including, but not limited to, the Fair Labor Standards Act of 1938, as amended, the Family and Medical Leave Act of 1993, as amended, Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, as amended, the Americans with Disabilities Act of 1990, as amended, the Worker Adjustment and Retraining Notification Act of 1988, as amended, the Executive Retirement Income Security Act of 1974, as amended, and any other equivalent or similar Federal, state or local statute; provided, however, that nothing herein shall
[23-47676]

CONFIDENTIAL

PIKE 00017049

16

release Employer from any claims or damages based on any right or claim Executive may have to enforce this Agreement. It is understood that nothing in this Section 5.08 is to be construed as an admission on behalf of the Released Parties of any wrongdoing with respect to Executive or any Releasing Party, any such wrongdoing being expressly denied.

(b) Executive represents and warrants that he fully understands the terms of the release contained in this Section 5.08, that he had the benefit of advice of legal counsel, and that he knowingly and voluntarily, of his own free will, without any duress, being fully informed, and after due deliberation, accepts its terms as his own free act. Executive understands that, as a result of executing this Agreement, he will not have the right to assert that RSI, Employer or any other of the Released Parties has, at any time on or prior to the Closing, violated any of his rights in connection with his employment or otherwise.

SECTION 5.09. Records. Effective as of the Closing, all memoranda, books, records, documents, papers, plans, information, letters and other data relating to Confidential Information or the business, employee or supplier information or customer accounts of Employer, RSI or the Business, whether prepared by Executive or otherwise, coming into Executive's possession (or which previously came into Executive's possession) shall be and remain the exclusive property of Employer and Executive shall not directly or indirectly assert any interest or property rights therein. Upon termination of employment with Employer for any reason, and upon the request of Employer at any time, Executive shall immediately deliver to Employer all such memoranda, books, records, documents, papers, plans, information, letters and other data, and all copies thereof or therefrom, and Executive shall not retain, or cause or permit to be retained, any copies or other embodiments of such materials. Executive further agrees that Executive shall not retain or use for Executive's account at any time any trade names, trademark or other proprietary business designation used or owned in connection with the Business.

SECTION 5.10. Specific Performance. Executive agrees that any breach by Executive of any of the provisions of Sections 5.03, 5.05, 5.06 and 5.07 shall cause irreparable harm to Employer that could not be adequately compensated by monetary damages and that, in the event of such a breach, Executive shall waive the defense in any action for specific performance that a remedy at law would be adequate, and Employer shall be entitled to (a) specifically enforce such terms and provisions without the necessity of proving actual damages or posting any bond and (b) cease making any payments or providing any benefit (including by way of vesting of any Restricted Shares acquired pursuant to Section 2.03) otherwise required by this Agreement, in each case in addition to any other remedy to which Employer may be entitled at law or in equity; provided, however, that if Employer fails to make timely payment of any portion of the Base Amount or the Multiplier Amount required to be paid hereunder (or fails to deliver the share certificates with respect to any Restricted Shares, as required pursuant to Section 2.03(b)(i)) within 30 days of the date Executive

[22462676]

CONFIDENTIAL

PIKE 00017050

17



informs Employer in writing that such amount is due, in the case of the Multiplier Amount (or any Restricted Shares purchased pursuant to Section 2.03), other than as a result of Executive's forfeiture of such amount (or such Restricted Shares) pursuant to Section 2.02(b), Section 2.03(b) or this Section 5.10, in each case as determined by Employer in good faith, Executive shall thereafter be promptly relieved of any further obligation to comply with Sections 5.06 and 5.07; and provided further, however, that solely for purposes of Section 5.07, (i) in the event that Executive forfeits any portion of the Multiplier Amount as a result of Executive's termination of employment by Employer for Cause or by Executive without Good Reason on or prior to the 18-month anniversary of the Closing Date, the Restricted Period shall terminate 18 months from the date of Executive's termination of employment and (ii) in the event that Executive forfeits any portion of the Multiplier Amount as a result of Executive's termination of employment by Employer for Cause or by Executive without Good Reason after the 18-month anniversary of the Closing Date, the duration of the Restricted Period shall be equal to the duration of Executive's employment with Employer.

SECTION 5.11. Notification of Subsequent Employer. Prior to accepting employment with any other person or entity during any period during which Executive remains subject to any of the covenants set forth in Article V, Executive shall provide such prospective employer with written notice of the relevant provisions of this Agreement, with a copy of such notice delivered simultaneously to Employer.

SECTION 5.12. Executive Representations. Executive represents and warrants to Employer that (a) Schedule 5.12 to this Agreement sets forth a true, complete and correct list of all contracts, agreements, understandings and arrangements between or among Executive and RSI or any of its affiliates (collectively, the "Existing Agreements") and (b) the execution and delivery of this Agreement by Executive and Employer and the performance by Executive of Executive's duties hereunder shall not constitute a breach of, or otherwise contravene, or be prevented, interfered with or hindered by, the terms of any Existing Agreement or other agreement, arrangement, understanding or policy or program to which Executive is a party or otherwise bound.

SECTION 5.13. Cooperation. Following termination of his employment, Executive shall provide Executive's reasonable cooperation in connection with any suit, action or proceeding (or any appeal therefrom) that relates to events occurring during Executive's employment with Employer; provided that Employer shall reimburse Executive for expenses reasonably incurred and compensate Executive (at the hourly equivalent of his final base compensation, assuming a 40-hour work week) for time actually spent in connection with such cooperation.

SECTION 5.14. Scope of Covenants. For purposes of this Article V, the term "Employer" includes Employer's subsidiaries (including RSI) and affiliates, and its and their predecessors, successors and assigns.

[2342676]

CONFIDENTIAL

18

## ARTICLE VI

### Miscellaneous

SECTION 6.01.  Assignment.  This Agreement is personal to Executive and shall not be assignable by Executive. The parties agree that any attempt by Executive to delegate Executive's duties hereunder shall be null and void. Employer may assign this Agreement and its rights and obligations thereunder, in whole or in part, to any person that is an affiliate, or a successor in interest to substantially all the business or assets, of Employer. Upon such assignment, the rights and obligations of Employer hereunder shall become the rights and obligations of such affiliate or successor person or entity; provided that Employer shall remain liable for each of its obligations hereunder. For purposes of this Agreement, the term "Employer" shall include any permitted assignee to which this Agreement is assigned.

SECTION 6.02.  Successors.  This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of Employer and the personal and legal representatives, executors, administrators, successors, distributees, devisees and legatees of Executive. Executive acknowledges and agrees that all Executive's covenants and obligations to Employer, as well as the rights of Employer under this Agreement, shall run in favor of and shall be enforceable by Employer, its affiliates and their successors and assigns.

SECTION 6.03.  Entire Agreement.  This Agreement contains the entire understanding of Executive, on the one hand, and Employer and its affiliates, on the other hand, with respect to the subject matter hereof, and all oral or written agreements or representations, express or implied, with respect to the subject matter hereof are set forth in this Agreement. Without limiting the generality of the foregoing, all the Existing Agreements shall be terminated and of no further force and effect, and Executive shall be entitled to no further payments or benefits thereunder, as of the Closing.

SECTION 6.04.  Amendment.  This Agreement may not be altered, modified or amended except by written instrument signed by the parties hereto.

[2342676]

CONFIDENTIAL

PIKE 00017052



19

SECTION 6.05.  Notice.  All notices, requests, demands and other communications required or permitted to be given under the terms of this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three Business Days after they have been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the other party as set forth below:

| | |
|---|---|
| If to Employer: | Pike Electric, Inc.<br>100 Pike Way<br>Mount Airy, NC 27030<br>Attention: J. Eric Pike<br>Telecopy: (336) 719-4585 |
| with a copy to: | Cravath, Swaine & Moore LLP<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019<br>Attention: Richard Hall, Esq.<br>Telecopy: 212-474-3700 |
| If to Executive: | Mick Dubea<br>2570 Ashley<br>Beaumont, TX 77702 |

The parties may change the address to which notices under this Agreement shall be sent by providing written notice to the other in the manner specified above.  For purposes of this Section 6.05, the term "Business Day" shall mean a day that is not a Saturday, a Sunday or a day on which banking institutions are legally permitted to be closed in the city of New York.

SECTION 6.06.  Governing Law; Jurisdiction; Waiver of Jury Trial.
(a)  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles of such State.

(b)  Each party irrevocably submits to the exclusive jurisdiction of (i) the courts of the State of Delaware and (ii) the United States District Court for the District of Delaware for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby.  Each party agrees to commence any such action, suit or proceeding either in the United States District Court for the District of Delaware, or if such suit, action or other proceeding may not be brought in such court for
[3342676]

PIKE 00017053

20

jurisdictional reasons, in the courts of the State of Delaware. Each party further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth above shall be effective service of process for any action, suit or proceeding in Delaware with respect to any matters to which it has submitted to jurisdiction in this Section 6.06. Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in (i) the courts of the State of Delaware or (ii) the United States District Court for the District of Delaware, and hereby and thereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

(c) Each party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement or any transaction contemplated hereby. Each party (i) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 6.06.

SECTION 6.07. _Severability._ If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable in any jurisdiction, then such provision, covenant or condition shall, as to such jurisdiction, be modified or restricted to the extent necessary to make such provision valid, binding and enforceable, or, if such provision cannot be modified or restricted, then such provision shall, as to such jurisdiction, be deemed to be excised from this Agreement and any such invalidity, illegality or unenforceability with respect to such provision shall not invalidate or render unenforceable such provision in any other jurisdiction, and the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

SECTION 6.08. _Survival._ Subject to Section 1.01, the rights and obligations of Employer and Executive under the provisions of this Agreement, including Articles V and VI, shall survive and remain binding and enforceable, notwithstanding any termination of Executive's employment with Employer for any reason, to the extent necessary to preserve the intended benefits of such provisions.

SECTION 6.09. _No Waiver._ The failure of a party to insist upon strict adherence to the terms of this Agreement on any occasion shall not be considered a waiver of such party's rights or deprive such party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

[2342676]

CONFIDENTIAL

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first written above.

PIKE ELECTRIC, INC.,

by

Name: J. Eric Pike

Title: President & Chief Executive Off

MICK J. DUBEA,

[2342676]

21



SECTION 6.10.  Determinations.  Unless otherwise expressly provided in this Agreement, all determinations of Employer or the Board shall be in the good faith discretion of Employer or the Board, as applicable.

SECTION 6.11.  Counterparts.  This Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

SECTION 6.12.  Construction.  (a)  The headings in this Agreement are for convenience only, are not a part of this Agreement and shall not affect the construction of the provisions of this Agreement.

(b)  For purposes of this Agreement, the words "include" and "including", and variations thereof, shall not be deemed to be terms of limitation but rather shall be deemed to be followed by the words "without limitation".

(c)  For purposes of this Agreement, the terms "subsidiary" and "affiliate" shall have the meanings ascribed to such terms in the Stock Purchase Agreement.

REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

[2342676]

PIKE 00017056

IN WITNESS WHEREOF, the parties have duly executed this Agreement of the date first written above.

PIKE ELECTRIC, INC.,

by _____

Name:
Title:

MICK J. DUBEA,

[2342676]

PIKE 00017057

08/11/05   15:08 FAX 336 719 7453          PIKE ELECTRIC                                    ☒002    ____

AMENDMENT AGREEMENT (this "Agreement") dated as of May 5, 2005, between Pike Electric, Inc., a North Carolina corporation ("Employer"), and Mick J. Dubea, an individual domiciled in the State of Texas ("Executive").

WHEREAS Executive and Employer are party to an Employment Agreement dated as of July 1, 2004 (the "Employment Agreement"), and pursuant thereto Executive is entitled to receive the Multiplier Amount (capitalized terms used but not defined herein have the meanings assigned thereto in the Employment Agreement), subject to the terms and conditions set forth therein; and

WHEREAS Executive and Employer desire to amend the Employment Agreement to prevent, in certain circumstances, the forfeiture of the Multiplier Amount payable to Executive under the Employment Agreement;

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein, and intending to be legally bound hereby, Executive and Employer agree as follows:

SECTION 1.01. Effectiveness. This Agreement shall be effective as of March 31, 2005.

SECTION 1.02. Amendment. The last sentence of paragraph (b) of Section 2.02 of the Employment Agreement is hereby deleted and the following is substituted therefor:

"Notwithstanding the foregoing, (i) in the event that, prior to the payment of any such amount, Employer has terminated Executive's employment for Cause (other than any Cause described in clause (ii) or (vi) of Section 4.03(b)) or Executive has violated his obligations under Section 5.03, 5.05 or 5.06, Employer shall not make, and Executive shall forfeit all his entitlements to, payment of such amount and (ii) in the event that, prior to the payment of any such amount, Executive has terminated his employment for any reason (other than death, Disability or Good Reason) or Employer has terminated Executive's employment for any Cause described in clause (ii) or (vi) of Section 4.03(b) (other than as a result of a violation of Section 5.03, 5.05 or 5.06), Employer shall not make, and the Executive shall not be entitled to receive, payment of such amount until the fifteenth (15th) anniversary of the Closing and, in such event, interest shall accrue annually on the amount of such payment at the Specified Rate commencing on the date such payment would otherwise have been payable under this Section 2.02(b). For purposes of this Agreement, "Specified Rate" shall mean, with respect to each such payment, an annual interest rate equal to the sum of (i) the interpolated yield on a 15-year Treasury security as of the date on which such payment would otherwise have been payable under this Section 2.02(b), (ii) the Applicable Margin for Eurodollar Rate Tranche B Term Loans (within the meaning of the Amended and Restated Credit Agreement among Employer, Barclays Bank PLC, as Administrative Agent, and the other parties thereto dated as of July 1, 2004) as of such date and (iii) 0.75%."

CONFIDENTIAL

08/11/05  15:09 FAX 336 719 7433         PIKE ELECTRIC                    ☒003

SECTION 1.03.  No Pledge.  Executive shall not assign, pledge, hypothecate, encumber or otherwise transfer all or any portion of Executive's right to receive the Multiplier Amount, and any attempt by Executive to do so shall be null and void.

SECTION 1.04.  Assignment; Successors.  This Agreement is personal to Executive and shall not be assignable by Executive.  The parties agree that any attempt by Executive to delegate Executive's duties hereunder shall be null and void.  Employer may assign this Agreement and its rights and obligations thereunder, in whole or in part, to any person that is an affiliate, or a successor in interest to substantially all the business or assets, of Employer.  Upon such assignment, the rights and obligations of Employer hereunder shall become the rights and obligations of such affiliate or successor person or entity.  This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of Employer and the personal and legal representatives, executors, administrators, successors, distributees, devisees and legatees of Executive.  Executive acknowledges and agrees that all Executive's covenants and obligations to Employer, as well as the rights of Employer under this Agreement, shall run in favor of and shall be enforceable by Employer, its affiliates and their successors and assigns.

SECTION 1.05.  Entire Agreement.  This Agreement contains the entire understanding of the Executive, on the one hand, and Employer and its affiliates, on the other hand, with respect to the subject matter hereof, and all oral or written agreements or representations, express or implied, with respect to the subject matter hereof are set forth in this Agreement.

SECTION 1.06.  Amendment.  This Agreement may not be altered, modified or amended except by written instrument signed by both parties hereto.

SECTION 1.07.  Governing Law; Judicial Proceedings; Waiver of Jury Trial.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles of such State.  Each party irrevocably submits to the exclusive jurisdiction of (i) the courts of the State of Delaware and (ii) the United States District Court for the District of Delaware.  Each party agree to commence any such action, suit or proceeding either in the United States District Court for the District of Delaware, or if such suit, action or other proceeding may not be brought in such court for jurisdiction reasons, in the courts of the State of Delaware.  Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in (i) the courts of the State of Delaware and (ii) the United States District Court for the District of Delaware, and hereby and thereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.  Each party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury with respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement or any transaction contemplated hereby.

SECTION 1.08.  Counterparts.  This Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

CONFIDENTIAL

PIKE 00017059

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first written above.

PIKE ELECTRIC, INC.,

By: _____

J. Eric Pike
President and Chief Executive Officer

MIKE J. DUBEA,

_____

CONFIDENTIAL

PIKE 00017060

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 18, 2006, I electronically filed the foregoing

document with the Clerk of Court using CM/ECF, and have also served the document as noted:

**BY HAND DELIVERY**

Lewis H. Lazarus, Esquire
Morris James Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE  19899

Alyssa M. Schwartz  (#4351)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 25, 2006, I electronically filed the foregoing

document with the Clerk of Court using CM/ECF, and have also served the document as noted:

### BY HAND DELIVERY

Lewis H. Lazarus, Esquire
Morris James Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE  19899

Alyssa M. Schwartz  (#4351)