# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PIKE ELECTRIC CORPORATION and<br>PIKE ELECTRIC, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-879 (SLR) |
| | ) | |
| MICK DUBEA, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT MICK DUBEA'S MOTION FOR LEAVE TO FILE FIRST AMENDED ANSWER TO THE COMPLAINT, ADDITIONAL DEFENSES, AND COUNTERCLAIM

Defendant Mick Dubea moves the Court, pursuant to Fed.R.Civ.P. 15(a), for leave to file his First Amended Answer and Additional Defenses to the Complaint and Amended Counterclaim. A copy of the proposed amendment is attached as Exhibit A. Pursuant to Local Rule 15.1, a version of the proposed amendment marked to show changes from Mr. Dubea's initial responsive pleading is attached as Exhibit B.

In support of this motion, Mr. Dubea states as follows:

1. On January 30, 2006, Mr. Dubea filed his initial Answer and Counterclaim. That Counterclaim sought a declaration that Mr. Dubea is entitled to all of the deferred compensation due under the Employment Agreement and that the non-compete provisions of his Employment Agreement are invalid and unenforceable.

2. The parties agreed that all motions to amend the pleadings shall be filed on or before July 18, 2006.

3.   Since Mr. Dubea filed his original counterclaim, Plaintiff Pike has affirmatively breached its obligations by failing to make a payment to Mr. Dubea and vest shares that were due to him on July 1, 2006.

4.   Based primarily upon this recent conduct, Mr. Dubea seeks leave to amend his Answer and Additional Defenses to the Complaint and Counterclaim.

5.   Counsel for plaintiffs has indicated that plaintiffs do not oppose the filing of the amended pleading as reflected in the certification filed contemporaneously with this motion.

6.   Federal Rule of Civil Procedure 15(a) states that leave to amend pleadings "shall be freely given when justice so requires."

WHEREFORE, Mr. Dubea respectfully moves this Court for leave to file his First Amended Answer and Additional Defenses to the Complaint and Amended Counterclaim.

MORRIS, JAMES, HITCHENS & WILLIAMS LLP


Lewis H. Lazarus (#2374)
Matthew F. Lintner (#4371)
Joseph S. Naylor (#3886)
R. Christian Walker (#4802)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800

Attorneys for Defendant Mick Dubea

Dated:  July 18, 2006

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| PIKE ELECTRIC CORPORATION and PIKE ELECTRIC, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No. 05-879 (SLR) |
| MICK DUBEA, | ) ) ) | |
| Defendant. | ) | |

### DEFENDANT MICK DUBEA'S AMENDED ANSWER AND ADDITIONAL DEFENSES TO COMPLAINT AND AMENDED COUNTERCLAIM AGAINST PIKE ELECTRIC CORPORATION AND PIKE ELECTRIC, INC.

Defendant, Mick Dubea ("Mr. Dubea"), by his undersigned counsel, hereby answers the Complaint of Plaintiffs, Pike Electric Corporation and Pike Electric, Inc. (collectively, "Pike"), and counterclaims, as follows:

1.  Denied, except it is admitted that in the first sentence Plaintiffs purport to characterize the claims they seek against Mr. Dubea. By way of further answer, Mr. Dubea denies that he: (1) competed or is competing against Pike, solicited or is soliciting Pike's customers or employees or violated his July 1, 2004 Employment Agreement (the "Employment Agreement"); (2) disclosed or is disclosing any confidential information of Pike; (3) tortiously interfered or continues tortiously to interfere with Pike employee agreements or Pike's business relations with existing or prospective customers; or (4) misused or continues to misuse any trade secrets of Pike or "jump-start[ed]" a competing business. Mr. Dubea further denies that he forfeited any compensation given to him by Pike or that any such forfeiture is authorized by the Employment Agreement. Mr. Dubea

further denies Pike has suffered any cognizable, let alone irreparable harm, or that Pike is entitled to any equitable, injunctive or other relief in this action.

2.      Admitted that the allegations of paragraph 2 describe a portion of the relief Plaintiffs purport to seek.  By way of further answer, Mr. Dubea denies that Pike is entitled to the declaratory relief it seeks; and denies that he has forfeited any entitlement to the deferred compensation he earned at Red Simpson, Inc. ("RSI") and which Pike is obligated to pay.

3.      Admitted.

4.      Admitted.

5.      Admitted.

6.      The allegations of this paragraph state a legal conclusion to which no response is required.

7.      Admitted.

8.      Admitted.

9.      Admitted.

10.      Denied, except it is admitted that the allegations of paragraph 10 describe Pike's business in a general way as it existed at the time that Pike terminated Mr. Dubea without cause on or about August 22, 2005.  Mr. Dubea is without knowledge or information sufficient to admit or deny the allegations of this paragraph regarding the current business operations of Pike.  Mr. Dubea admits that Pike holds itself out as having been in business since 1945.

11.      Denied, except it is admitted that the business of providing electric distribution and transmission services to electrical utilities, cooperatives and municipalities

requires appropriate personnel. Mr. Dubea is without knowledge or information sufficient to admit or deny the allegation in the second, third and fourth sentences in paragraph 11 concerning the labor conditions at Pike or its competitors, Pike's practices regarding employment agreements with covenants not to compete, and Pike's evaluation of the necessity of employment agreements with non-compete provisions.

12.    Denied, except it is admitted that some of Pike's customers assign work to it under master service agreements; that Pike's customers generally have no obligation to continue to assign work to Pike; and that most of Pike's customers have the right to terminate the services of its electric distribution and service provider(s) on short notice. For further answer, Mr. Dubea has no knowledge regarding Pike's relationships with its customers since Pike terminated his employment without cause on or about August 22, 2005.

13.    Mr. Dubea is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of this paragraph, as they are phrased in the present tense concerning Pike's business and Mr. Dubea has not been employed by Pike since on or about August 22, 2005 and for that reason the allegations of paragraph 13 are denied.

14.    Admitted.

15.    Mr. Dubea is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of the first sentence of this paragraph and for that reason they are denied. It is admitted that Pike acquired the stock of RSI in a Stock Purchase Agreement ("SPA") dated May 4, 2004, the terms of which speak for themselves and to which Mr. Dubea respectfully refers the Court for its contents.

16.     Denied, except admitted that, at the time Pike acquired RSI, Mr. Dubea had

worked at RSI for over 20 years; that he was one of two Presidents at RSI who reported to

the Chief Executive Officer; that he managed RSI's Western Region, which had

approximately 900 employees of RSI's total workforce of approximately 1500; that the

Western Region that he managed accounted for a majority of RSI's earnings; that RSI and

its employees, including Mr. Dubea, succeeded in obtaining business from Texas Utilities,

Entergy (West), and the City of San Antonio; and that he owned 39,327 shares of RSI

stock comprising approximately 4% of its issued and outstanding common stock as of July

1, 2004.

17.     Denied, except it is admitted that Mr. Dubea is a party to the SPA, which is

a writing that speaks for itself, that RSI had legal and financial advisors during the drafting

by Pike of the SPA, and that RSI's legal counsel also provided advice to Mr. Dubea.

18.     Denied, except it is admitted that the SPA is a writing which speaks for

itself.  For further answer, Mr. Dubea is without knowledge or information as to Pike's

belief about the importance of Mr. Dubea to Pike's success in Texas and Louisiana,

particularly since Pike elected to terminate Mr. Dubea without cause barely one year after

the completion of the acquisition of RSI.

19.     Mr. Dubea is without knowledge or information sufficient to form a belief

as to the truth or falsity of the allegations of this paragraph and for that reason they are

denied.

20.     Denied, except it is admitted that Mr. Dubea is a party to the SPA and to the

Employment Agreement, as amended May 5, 2005, each of which is a writing whose terms

speak for themselves and to which Mr. Dubea respectfully refers the Court for its contents.

4

21.     Denied, except it is admitted that the Mick Dubea 2003 Grantor Retained Annuity Trust received approximately $6.87 million at closing for its 39,327 shares of RSI stock; that the SPA resulted in fees to Pike's majority owner, Lindsay, Goldberg and Bessemer ("LGB"), of $3.125 million and facilitated an IPO of Pike one year later in which LGB or its affiliates received proceeds from the sale of over three million Pike shares offered in the IPO of approximately $42 million; that Mr. Dubea entered into the Employment Agreement with Pike on July 1, 2004 which was amended on May 5, 2005, and that his Employment Agreement with Pike, as amended, superseded his employment agreement with RSI; and that he was employed by Pike until August 22, 2005 when Pike elected to terminate him without cause. Mr. Dubea lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second sentence of this paragraph concerning Pike's intentions if Mr. Dubea did not agree to sign an employment agreement with Pike and for that reason they are denied.

22.     Denied, except it is admitted that Pike paid the Mick Dubea 2003 Grantor Retained Annuity Trust what Pike determined to be the value of the 39,327 RSI shares of common stock held by the Mick Dubea 2003 Grantor Retained Annuity Trust and that Mr. Dubea signed the Employment Agreement dated July 1, 2004 with Pike, which Pike amended on May 5, 2005, the terms of which speak for themselves and to which Mr. Dubea respectfully refers the Court for its contents.

23.     Denied, except it is admitted that Pike hired Mr. Dubea as Vice President of its Western Region and, in connection with his employment, Mr. Dubea signed the Employment Agreement, which is a writing drafted by Pike that speaks for itself; that through the acquisition, Pike acquired the RSI operation in Oklahoma and Texas that RSI

and its employees, including Mr. Dubea, successfully developed and managed; that for a period of time Mr. Dubea reported directly to Eric J. Pike, the CEO of Pike; that he received a base salary of $330,000 per year and an opportunity for a nominal bonus, which cumulatively reflected a compensation reduction of almost two-thirds from his historical salary and bonus at RSI; that he was given the opportunity to purchase up to $2.0 million of Restricted Shares of Pike common stock with funds he was otherwise due from his deferred compensation earned at RSI; that Mr. Dubea elected to purchase $1.0 million of Restricted Shares of Pike common stock which as of January 27, 2006 had a market value of approximately $1.6 million; that the Restricted Shares are scheduled to vest in accordance with a schedule set forth in the Employment Agreement; that Pike honored the Base Amount of the deferred compensation Mr. Dubea had earned while at RSI by paying him approximately $1.91 million in 2004 and $1.91 million in 2005; that Pike assumed RSI's obligation to pay Mr. Dubea approximately double the value of its deferred compensation; and that Mr. Dubea is due $2.46 million on July 1, 2006, $1.23 million on July 1, 2007, and $2.46 million on July 1, 2008 for sums that Mr. Dubea had already contractually earned and that, but for the Employment Agreement, would have been due at the closing of the SPA.

24.    Denied, except it is admitted that Mr. Dubea signed the Employment Agreement, which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its contents.

25.    Denied, except it is admitted that Mr. Dubea signed the Employment Agreement, which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its contents.

26.     Denied, except it is admitted that Mr. Dubea signed the Employment Agreement, which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its contents.

27.     Denied, except it is admitted that Mr. Dubea signed the Employment Agreement, which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its contents.

28.     Denied, except it is admitted that Mr. Dubea signed the Employment Agreement, which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its contents.

29.     Denied, except it is admitted that Mr. Dubea signed the Employment Agreement, which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its contents.  By way of further answer, Mr. Dubea denies that Pike is entitled to specific performance in this action or has the right to cease making payments to which Mr. Dubea is entitled under the Employment Agreement.

30.     Denied, except it is admitted that Mr. Dubea signed the Employment Agreement, which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its contents.

31.     Admitted.

32.      Denied, except it is admitted that Pike terminated Mr. Dubea's employment without cause on August 22, 2005 and paid him his base salary for a period of time ending thirty days after the August 22, 2005 effective date of Mr. Dubea's termination of employment; that Mr. Dubea's performance as a Pike Vice President was exemplary; that Pike's CEO, Eric Pike, routinely complimented Mr. Dubea on his performance and

profitability; that because Pike terminated Mr. Dubea without cause he remains eligible to receive payment of the Multiplier Amount and for his Restricted Shares to continue to vest pursuant to his Employment Agreement as amended; and that Mr. Dubea received payments of approximately $1.91 million in 2004 and $1.91 million in 2005, and is due $2.46 million on July 1, 2006, $1.23 million on July 1, 2007, and $2.46 million on July 1, 2008 for the deferred compensation he earned at RSI and which Pike agreed to pay; and that his Restricted Shares vest on the following schedule: 40% on July 1, 2006; 20% on July 1, 2007; and 40% on July 1, 2008.

33.    Denied, except it is admitted that Chad Dubea is Mr. Dubea's son; that he worked for RSI for approximately twelve years at various positions throughout the organization and rose through the ranks to supervisor in Harlingen, Texas; that Chad left his job at Pike on or about October 21, 2005 shortly after Pike elected to terminate his father without cause; and that he relocated from Harlingen, Texas to Beaumont, Texas. It is denied that Mr. Dubea provided financial support and backing to Chad in the formation of Chad's business, T&D Solutions, Ltd. ("T&D"), or that he is providing advice and guidance in connection with T&D's business or that he is helping to run the day-to-day operations of T&D.

34.    Denied, except it is admitted that, upon information and belief, T&D provides electric distribution and transmission services, and power line construction, maintenance and storm restoration services.

35.    Denied, except admitted that, upon information and belief, Chad left his employment with Pike on or about October 21, 2005. Mr. Dubea lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of the

8

second and third sentences of this paragraph and for that reason they are denied. The fourth sentence states a legal conclusion to which no response is required. Mr. Dubea denies the allegations of the fifth and sixth sentences of this paragraph except it is admitted that Chuck Chaddrick, Tim Droddy, Clifton Droddy, Sammy Christian, and Alex Graham were among the former employees of RSI who continued to work at Pike after Pike's acquisition of RSI and who have since left Pike. For further answer, Mr. Dubea states that he is aware that the above individuals work for T&D but specifically denies that he endeavored to cause any of them to leave Pike.

36.    Mr. Dubea is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of this paragraph and for that reason they are denied, except that Mr. Dubea denies that he assisted T&D in convincing Corey Close to leave Pike.

37.    The allegations in this paragraph concerning T&D are denied for lack of knowledge or information sufficient to form a belief as to their truth or falsity. Mr. Dubea denies that he has solicited any of Pike's employees or that he used or continues to use any Pike confidential information to solicit Pike's employees.

38.    Denied. For further answer, Mr. Dubea lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of the first sentence of this paragraph and for that reason they are denied.

39.    Mr. Dubea is without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of this paragraph and for that reason they are denied, except that Mr. Dubea denies that he has used or will continue to use Pike confidential information to "steal Pike's customers."

9

40.     Denied.

41.     Denied, except admitted that Mr. Dubea signed the Employment

Agreement, as amended May 5, 2005, which is a writing that speaks for itself, and to

which Mr. Dubea respectfully refers the Court for its terms.

### COUNT I

42.     Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through

41 as if set forth herein at length.

43.     Denied.

44.     Denied.

45.     Denied.

46.     Denied.

### COUNT II

47.     Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through

46 as if set forth herein at length.

48.     Denied.

49.     Denied.

50.     Denied.

### COUNT III

51.     Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through

51 as if set forth herein at length.

52.     Denied.

53.     Denied.

54.     Denied.

10

55.    Denied.

## COUNT IV

56.    Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through 56 as if set forth herein at length.

57.    Admitted.

58.    Admitted.

59.    This paragraph states conclusions of law to which no responses are required, and is, therefore, denied.

60.    Denied.

61.    Denied.

## COUNT V

62.    Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through 61 as if set forth herein at length.

63.    Denied.

64.    Denied.

65.    Denied.

66.    Denied.

## COUNT VI

67.    Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through 66 as if set forth herein at length.

68.    Mr. Dubea lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of this paragraph and for that reason they are denied.

11

69.     Mr. Dubea lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of this paragraph and for that reason they are denied.

70.     Denied.

71.     Denied.

72.     Denied.

## COUNT VII

73.     Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through 72 as if set forth herein at length.

74.     This paragraph states conclusions of law to which no responses are required, and is, therefore, denied.

75.     Denied, except it is admitted that Pike purports to seek a declaration of legal rights pursuant to 28 U.S.C. § 2201.

76.     Denied.

## ADDITIONAL DEFENSES

### FIRST ADDITIONAL DEFENSE

77.     Pike's Complaint fails to state a claim upon which relief can be granted.

### SECOND ADDITIONAL DEFENSE

78.     Pike's claims, if any, are barred in whole or in part by the doctrines of waiver and/or estoppel.

### THIRD ADDITIONAL DEFENSE

79.     Pike is precluded from obtaining any and all relief by virtue of its bad faith conduct.

12

## FOURTH ADDITIONAL DEFENSE

80.    Pike is precluded from obtaining any and all relief by virtue of its unclean hands.

## FIFTH ADDITIONAL DEFENSE

81.    Pike's claims, if any, are barred by the doctrine of laches.

## SIXTH ADDITIONAL DEFENSE

82.    Pike's claims, if any, are barred by its material breach of the Employment Agreement.

## SEVENTH ADDITIONAL DEFENSE

83.    Pike's claims, if any, are barred by its breach of the implied covenant of good faith and fair dealing.

## EIGHTH ADDITIONAL DEFENSE

84.    Pike's claims, if any, are precluded in whole or in part by its failure to mitigate damages.

## NINTH ADDITIONAL DEFENSE

85.    Pike's claims based on the non-compete provision of the Employment Agreement, if any, are precluded in whole, as the non-compete provision is unreasonable, overbroad, unduly restrictive and unenforceable.

## TENTH ADDITIONAL DEFENSE

86.    The forfeiture provision under the Employment Agreement is an unenforceable punitive damages provision.

13

## ELEVENTH ADDITIONAL DEFENSE

87.     The forfeiture provision under the Employment Agreement is unenforceable under the facts of this case as a matter of public policy.

## TWELFTH ADDITIONAL DEFENSE

88.     Even if Pike were able to establish a breach of the Employment Agreement and injury, Pike is not entitled to both actual damages and forfeiture of the Multiplier Amount.

WHEREFORE, Mr. Dubea respectfully requests that the Complaint be dismissed and judgment be entered in his favor and against Pike, plus attorneys' fees and costs.

## COUNTERCLAIM OF MICK DUBEA AGAINST PIKE ELECTRIC CORPORATION AND PIKE ELECTRIC, INC.

### FACTUAL BACKGROUND

89.     Counterclaim Plaintiff, Mick Dubea ("Dubea") is an adult individual and resident of the State of Texas, who resides at 2570 Ashley Street, Beaumont, Texas 77702.

90.     Counterclaim Defendant Pike Electric Corporation is a Delaware corporation, and Counterclaim Defendant Pike Electric, Inc. is a North Carolina corporation (collectively, "Pike"), with their principal place of business at 100 Pike Way, Mount Airy, North Carolina.

91.     This Counterclaim arises out of the July 1, 2004 employment agreement between Mr. Dubea and Pike (the "Employment Agreement") and Pike's wrongful attempts to deprive Mr. Dubea of his vested deferred compensation.

14

## RSI's Pre-Acquisition Deferred Compensation Program

92.     Prior to joining Pike, Mr. Dubea was employed since 1984 with Red Simpson, Inc. ("RSI"), becoming the President of RSI's Western Region in 2002. Under RSI's pre-acquisition compensation program, Mr. Dubea earned a relatively low salary for a president, but had the opportunity, through diligent effort, to earn significant bonuses payable pursuant to RSI's deferred compensation program.

93.     Under RSI's deferred compensation program, approximately 127 participating RSI employees, including Mr. Dubea, had a vested right to receive deferred compensation in five equal installments over a four year period following their separation from the company. RSI called this payment the Base Amount. Mr. Dubea's employment agreement with RSI also included a change of control provision that would have entitled him to a lump sum payment of a multiplier amount of his deferred compensation (the "Multiplier Amount") in accordance with Section 2.07 of his employment agreement dated January 7, 2004 with RSI. Although only two other employees were entitled under their RSI employment agreements to a lump sum payment in the event of a change of control transaction, John Simpson, Pike's CEO and controlling stockholder, agreed to pay the other RSI employees who participated in RSI's deferred compensation program a multiplier amount equal to their respective Base Amount.

94.     Through the acquisition, Pike assumed RSI's obligations to pay the Base and Multiplier Amounts owed to the former RSI employees, including Mr. Dubea. Pike further agreed that the Base Amount would be paid in two 50% installments on July 1, 2004, and July 1, 2005, respectively. The Multiplier Amount would occur in three installments of 40%, 20% and 40% on the July 1, 2006, July 1, 2007, and July 1, 2008,

15

respectively. Mr. Dubea's Employment Agreement contained an additional provision stating that if he was terminated without cause prior to July 1, 2005, Pike was required to pay him the entire Base Amount and Multiplier Amount immediately.

95.    Pike acquired RSI pursuant to a May 4, 2004 Stock Purchase Agreement for the purchase of all of the outstanding shares of RSI common stock. In connection with this transaction, RSI's stockholders (and not Pike) provided the funds to pay the Base and Multiplier Amounts by agreeing to a reduction of the purchase price of approximately $55.1 million ($37 million on a tax-adjusted basis), in exchange for Pike's assuming RSI's payment obligation to its former employees.

### Pike Hires Mr. Dubea as Vice President of its Western Region

96.    By the terms of the Employment Agreement, Pike hired Mr. Dubea for a four-year term as the Vice President of its Western Region. Under the direction of Pike Chief Executive Officer, J. Eric Pike, Mr. Dubea was responsible for the management of all Pike operations in Oklahoma and Texas.

97.    Pike established the Western Region assigned to Mr. Dubea after its acquisition of RSI. At the time of the acquisition, RSI stock was owned as follows: (1) by two trusts established by CEO and controlling stockholder John Simpson, who owned 864,929 shares, or 93.06%; (2) by the Mick Dubea 2003 Grantor Retained Annuity Trust, which owned 39,327 shares, or 4.23%; and (3) by RSI Chief Financial Officer ("CFO"), Albert Thibeaux, Jr., who owned 25,186 shares, or 2.71%. As Mr. Dubea owned less than five percent of the RSI stock, he had no right to establish RSI policy, and he had limited bargaining power with respect to the Pike acquisition.

98.     Under the Employment Agreement, Mr. Dubea was entitled to several forms of compensation: (1) an annual base salary of $330,000; (2) payment of the deferred compensation Base Amount of $3,821,650 that he previously earned as an RSI employee; and (3) his Multiplier Amount in connection with the acquisition totaling $7,723,893, which was also fully earned and vested upon consummation of the acquisition and, but for the Employment Agreement, would have been paid in full at the closing of the acquisition.

99.     Of Mr. Dubea's $7,723,893 Multiplier Amount, Pike and Mr. Dubea agreed $6,150,329 would be payable in cash and $1,573,564 would be payable in the form of 10,740 restricted shares of Pike common stock (the "Restricted Shares").

100.     The Employment Agreement also prohibited Mr. Dubea from disclosing confidential information (Section 5.03) and engaging in any competitive business within the entire United States of America for a five-year period after he is no longer employed by Pike (Section 5.07).

### Mr. Dubea's Performance as a Pike Regional Vice President

101.     Pike's business is divided into five regions, with service to 19 states and customers as far north as Pennsylvania, as far south as Florida and as far west as Texas. Under the leadership of Mr. Dubea, Pike's post-acquisition Western Region performed at a high level of profitability.

102.     Consistent with his region's positive performance, Mr. Dubea received only positive feedback from his direct superior, Eric Pike, from July 2004 to May 2005. Pike complimented Mr. Dubea for his attention to detail and profitability. Mr. Dubea's performance was excellent and Pike's Western Region was well-organized and profitable under his management.

17

103.    As required under the Employment Agreement, Pike subsequently paid Mr.
Dubea the Base Amount in installments of approximately $1,910,825 in 2004 and
$1,910,825 in 2005.

### The Planned IPO and Purported Integration of RSI into Pike

104.    Upon information and belief, Pike acquired RSI pursuant to a plan devised
by Pike and its majority owner, Lindsay, Goldberg & Bessemer L.P. ("LGB"), a leveraged
buyout firm.  Upon information and belief, Pike and LGB planned to acquire RSI, create
an impression in the market that RSI would be fully integrated into Pike, and earn a
substantial return on its investment through a speedy IPO.

105.    According to its IPO Prospectus, dated July 26, 2005 (the "IPO
Prospectus"), Pike offered 10 million shares of its stock at a price of $14.00 per share.
LGB, through LGB Pike II LLC, and Pike board member Reginald L. Banner, offered an
additional 3.5 million shares.

106.    Pivotal to the success of the IPO was the impression that RSI would be
quickly integrated into Pike.  The IPO Prospectus described the RSI acquisition as:
"substantially expand[ing] [Pike's] business, service territory, workforce and scope of
operations."  It further stated: "we have incorporated the entire [RSI] fleet into our tracking
systems and rebranded substantially all of the [RSI] fleet with the 'Pike' emblem.  In
addition, we have accelerated our integration of [RSI's] crews and as of June 30, 2005, we
completed the transition to reporting [RSI's] transactions through our financial systems."

107.    In the months prior to the IPO, Mr. Dubea assisted Pike in carrying out
tasks which Pike advised were critical to the success of the IPO.  For example, Eric Pike,
in April, 2005, presented Mr. Dubea with an amendment to the Employment Agreement,

18

which he asked Mr. Dubea and the approximately 125 other former RSI managers and supervisors entitled to deferred compensation to sign. Mr. Dubea was told that the amendment was necessary to assist Pike in the IPO and that without it, Pike would suffer a reduced valuation in the IPO. Among other things, the amendment provided that if employees were to violate their non-compete obligations, they would no longer forfeit their unpaid deferred compensation but instead would receive it plus interest on the 15th anniversary of the Closing (or July 1, 2019).

108.    This amendment enabled Pike to exclude the approximately $30 million in deferred compensation still owed to the former RSI employees from the calculation of Pike's adjusted EBITDA for financial-accounting purposes. For this reason, Pike was eager to have the former RSI employees sign the amendment and repeatedly urged Mr. Dubea both to sign and convince the employees in the Western Region to sign.

109.    At Pike's insistence, Mr. Dubea signed the amendment on May 5, 2005, and urged the former RSI employees to do the same. Following Mr. Dubea's lead, the former RSI employees in the Western Region who were entitled to deferred compensation also signed the amendment.

### Mr. Dubea's Termination Without Cause

110.    After Mr. Dubea signed the amendment, and significant progress had been made toward integration in the Western Region, Eric Pike began to criticize Mr. Dubea's management style. At a June 16, 2005 meeting, Eric Pike informed Mr. Dubea that he, all of a sudden, was no longer doing things the "Pike way."

111.    Upon information and believe, Pike decided to terminate Mr. Dubea on or before June 30, 2005. Pike knew, however, that terminating Mr. Dubea before July 1,

19

2005 triggered the acceleration of the Multiplier Amount. Accordingly, Pike wrongfully delayed Mr. Dubea's termination until August 22, 2005, on which date he was summarily dismissed without cause a mere three weeks after Pike cashed in on the IPO, despite its claim several weeks earlier that Mr. Dubea was "critical" to the "success" of the "combined RSI-Pike enterprise.

112.    At all relevant points both before and after his termination, Mr. Dubea has complied with all of the obligations and terms of his Employment Agreement, including but not limited to Sections 5.03 and 5.07.

113.    Without conducting an adequate and reasonable investigation, Pike subsequently filed this lawsuit, in which it erroneously alleged, among other things, that Mr. Dubea breached Sections 5.03 and 5.07 of the Employment Agreement by using and disclosing Pike's confidential information in furtherance of his son's competing business and by competing with Pike and soliciting Pike's customers and employees. As a consequence of these alleged breaches, Pike has claimed that Mr. Dubea forfeited all rights to the unpaid portion of his Multiplier Amount.

114.    Had Pike conducted an adequate and reasonable investigation, it would have discovered that Mr. Dubea never disclosed Pike's confidential information, solicited Pike's customers or employees, never competed with Pike, and did not otherwise violate the terms of his Employment Agreement in any way.

115.    On June 1, 2006, Mr. Dubea's counsel wrote to Pike's counsel advising that the first annual installment of the Multiplier Amount, consisting of $2,460,132 and a vesting of 4,296 of Restricted Shares, would be due on July 1, 2006.

116.    On June 24, 2006, Pike's counsel responded with a letter stating Pike's position that Mr. Dubea breached Section 5.07 of his Employment Agreement, and that as a result Mr. Dubea has forfeited his Restricted Shares and right to future cash payments under the Multiplier Amount.

117.    Pike's letter is incorrect, however, because Mr. Dubea has never violated Section 5.07 or any other section of his Employment Agreement, and even if he had, the consequence would not be not the outright forfeiture that Pike claims.

## COUNT I – BREACH OF CONTRACT

### Pike's Failure to Make Cash Payment and Vest Restricted Shares
### Representing the 2006 Portion of Mr. Dubea's Multiplier Amount

118.    Mr. Dubea incorporates by reference the allegations of the foregoing paragraphs as if set forth herein at length.

119.    The Employment Agreement obligated Pike on July 1, 2006, to pay Mr. Dubea $2,460,132 in cash and vest 4,296 of Mr. Dubea's restricted shares representing the 2006 portion of the Multiplier Amount.

120.    Mr. Dubea has not engaged in any conduct resulting in a forfeiture of the Multiplier Amount.

121.    Pike has wrongfully failed to make that payment and vest the shares representing the 2006 portion of Mr. Dubea's Multiplier Amount.

122.    Mr. Dubea has incurred and will continue to incur damages as a result.

**COUNT II – ANTICIPATORY REPUDIATION / DECLARATORY JUDGMENT**

**Pike's Repudiation of Obligation to Pay Multiplier Amount
Entitles Mr. Dubea to Damages for Total Breach and Discharges Mr. Dubea's
Remaining Duties of Performance under the Employment Agreement**

123.    Mr. Dubea incorporates by reference the allegations of the foregoing paragraphs as if set forth herein at length.

124.    Through its Verified Complaint as reaffirmed in its counsel's June 24, 2006 letter, Pike unequivocally declared that it does not intend to perform its promise to pay the remaining portions of the Multiplier Amount to Mr. Dubea as they become due in 2007 and 2008.

125.    Pike's wrongful repudiation gives Mr. Dubea an immediate claim to damages for total breach, including the payments that normally would not have become due until 2007 and 2008, respectively.

126.    Pike's wrongful repudiation also discharges Mr. Dubea's remaining duties of performance under the Employment Agreement.

127.    Moreover, Section 5.10 of the Employment Agreement states that if Pike fails to make timely payment of any portion of the Multiplier Amount within 30 days of the date that it is informed in writing that such amount is due, other than as a result of a forfeiture as determined by Pike in good faith, Mr. Dubea shall thereafter be promptly relieved of any further obligation to comply with, *inter alia*, Section 5.07.

128.    Pike's statement that Mr. Dubea forfeited his Multiplier Amount by violating Section 5.07 is erroneous and not in good faith.

129.    Because Pike claims that it is justified in treating the remainder of Mr. Dubea Multiplier Amount as forfeited, a justiciable controversy exists sufficient for this

22

Court to declare the rights and remedies of the parties with respect to the Employment Agreement.

130.     Mr. Dubea is entitled to a declaration that (a) he has complied with all of the obligations and terms of his Employment Agreement, including but not limited to Sections 5.03 and 5.07; (b) the balance of the Multiplier Amount is immediately due and owing, including the payments and vesting of Restricted Shares that normally would not have become due until 2007 and 2008, respectively; and (c) his remaining obligations under the Employment Agreement are discharged, including but not limited to his obligations under Sections 5.07.

## COUNT III – DECLARATORY JUDGMENT

### Unenforceability of Section 5.07 of the Employment Agreement

131.     Mr. Dubea incorporates by reference the allegations of the foregoing paragraphs as if set forth herein at length.

132.     To be enforceable, a covenant not to compete must be valid under general principles of contact law, be reasonable in time and scope and advance a legitimate economic interest of the employer.

133.     The restrictions purportedly imposed by Section 5.07 of the Employment Agreement are patently overbroad and unreasonable.

134.     Pike serves 19 states within the territorial limits of Pennsylvania in the north, Florida in the south and Texas in the west.  As such, Pike's attempt to restrict Mr. Dubea from competitive conduct in the entire United States is overbroad and unreasonable.

135.     Moreover, Pike's five-year restriction is well beyond any temporal duration necessary to protect its purported long standing customer relationships.  It is not necessary

23

to preclude Mr. Dubea from the market for five whole years to safeguard long-term relationships Pike is not likely to lose.

136.     Pike contends that Section 5.07 is enforceable as written.

137.     Accordingly, a justiciable controversy exists sufficient for this Court to determine the enforceability of this provision.

138.     Mr. Dubea is entitled to a declaration that Section 5.07 of the Employment Agreement is invalid and unenforceable, or, in the alternative, that it should be reformed to be reasonable in length and scope.

## COUNT IV – DECLARATORY JUDGMENT

### Consequence For Violating Section 5.07 of Employment Agreement
### Is Not Forfeiture

139.     Mr. Dubea incorporates by reference the allegations of the foregoing paragraphs as if set forth herein at length.

140.     The May 2005 amendment to the Employment Agreement eliminated forfeiture as a consequence for violating Section 5.07, and it was the parties' intent that in the event of a 5.07 violation, Mr. Dubea's right to receive his Multiplier Amount would be deferred until July 1, 2019.

141.     Because Pike disputes this construction of the Employment Agreement and the amendment, a justiciable controversy exists sufficient for this Court to declare the rights and remedies of the parties with respect to the consequence for violating Section 5.07.

24

## COUNT V – DECLARATORY JUDGMENT

### <u>Forfeiture Language in Section 5.10 Is Unenforceable</u>

142.    Mr. Dubea incorporates by reference the allegations of the foregoing paragraphs as if set forth herein at length.

143.    Certain language in Section 5.10 of the Employment Agreement purports to state circumstances under which Mr. Dubea forfeits the right to payment of the Multiplier Amount.

144.    That language is void and unenforceable as a matter of public policy for a variety of reasons, including but not limited to (a) an employee who, like Mr. Dubea, is terminated without cause, cannot forfeit vested deferred compensation for breach of a restrictive covenant; (b) forfeiture of the Multiplier Amount does not represent a reasonable pre-estimate of damages that would result from breach and instead is designed to punish Mr. Dubea for a violation of his restrictive covenants; and (c) the consequence of being terminated without cause and subsequently violating restrictive covenants cannot be more severe than the consequence of being terminated for cause for the same conduct.

145.    Even if the forfeiture language in Section 5.10 were facially valid, it would still not be enforceable under the facts and circumstances of this case for a variety of reasons, including but not limited to (a) any violations of the restrictive covenants by Mr. Dubea were not material; (b) forfeiture of the Multiplier Amount would be so disproportionate to the actual harm proximately caused by Mr. Dubea's conduct; and (c) Pike's delay in terminating Mr. Dubea until after July 1, 2006, was in bad faith.

25

146.    Because Pike contends that the forfeiture language in Section 5.10 is valid and enforceable against Mr. Dubea, a justiciable controversy exists sufficient for this Court to declare the rights and remedies of the parties with respect to this issue.

147.    Mr. Dubea is entitled to a declaration that the forfeiture language in Section 5.10 of the Employment Agreement is invalid and unenforceable both on its face as a matter of public policy and under the specific facts and circumstances of this case.

### PRAYER FOR RELIEF

WHEREFORE, Mr. Dubea respectfully requests that this Court:

(1)    Enter a declaratory judgment that Mr. Dubea has complied with all of the obligations and terms of his Employment Agreement, including but not limited to Sections 5.03 and 5.07;

(2)    Award Mr. Dubea damages including interest based on Pike's wrongful failure to pay the cash component and vest the Restricted Shares of the 2006 portion of Mr. Dubea's Multiplier Amount on July 1, 2006;

(3)    Enter a declaratory judgment that Mr. Dubea is entitled to acceleration of all Multiplier Amounts due under the Employment Agreement, including all cash payments and vesting of his Restricted Shares;

(4)    Enter a declaratory judgment that Mr. Dubea's remaining obligations under the Employment Agreement are discharged, including but not limited to his obligations under Sections 5.07;

(5)    Enter a declaratory judgment that Section 5.07 of the Employment Agreement is invalid and unenforceable, or, alternatively, enter a declaratory judgment establishing a reasonable scope and duration of that section;

26

(6)    Enter a declaratory judgment that the consequence for violating Section 5.07 is not forfeiture and otherwise declare the rights and remedies of the parties as to the consequence for violating Section 5.07;

(7)    Enter a declaratory judgment that the forfeiture language in Section 5.10 of the Employment Agreement is invalid and unenforceable both on its face as a matter of public policy and under the specific facts and circumstances of this case; and

(8)    Award Mr. Dubea his attorneys' fees and costs, and such other relief as the Court deems appropriate.

MORRIS, JAMES, HITCHENS & WILLIAMS LLP


_____

Lewis H. Lazarus (#2374)
Matthew F. Lintner (#4371)
Joseph S. Naylor (#3886)
R. Christian Walker (#4802)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800

Attorneys for Defendant Mick Dubea

Dated: July 18, 2006

27

1424338

**EXHIBIT B**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PIKE ELECTRIC CORPORATION and<br>PIKE ELECTRIC, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-879 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| MICK DUBEA, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT MICK DUBEA'S AMENDED ANSWER AND ADDITIONAL DEFENSES TO COMPLAINT AND AMENDED COUNTERCLAIM AGAINST PIKE ELECTRIC CORPORATION AND PIKE ELECTRIC, INC.

Defendant, Mick Dubea ("Mr. Dubea"), by his undersigned counsel, hereby answers the Complaint of Plaintiffs, Pike Electric Corporation and Pike Electric, Inc. (collectively, "Pike"), and counterclaims, as follows:

1.     Denied, except it is admitted that in the first sentence Plaintiffs purport to characterize the claims they seek against Mr. Dubea. By way of further answer, Mr. Dubea denies that he: (1) competed or is competing against Pike, solicited or is soliciting Pike's customers or employees or violated his July 1, 2004 ~~employment agreement~~Employment Agreement (the "Employment Agreement"); (2) disclosed or is disclosing any confidential information of Pike; (3) tortiously interfered or continues tortiously to interfere with Pike employee agreements or Pike's business relations with existing or prospective customers; or (4) misused or continues to misuse any trade secrets of Pike or "jump-start[ed]" a competing business. Mr. Dubea further denies that he forfeited any compensation given to him by Pike or that any such forfeiture is authorized

by the Employment Agreement. Mr. Dubea further denies Pike has suffered any cognizable, let alone irreparable harm, or that Pike is entitled to any equitable, injunctive or other relief in this action.

2.    Admitted that the allegations of paragraph 2 describe a portion of the relief Plaintiffs purport to seek. By way of further answer, Mr. Dubea denies that Pike is entitled to the declaratory relief it seeks; and denies that he has forfeited any entitlement to the deferred compensation he earned at Red Simpson, Inc. ("RSI") and which Pike is obligated to pay.

3.    Admitted.

4.    Admitted.

5.    Admitted.

6.    The allegations of this paragraph state a legal conclusion to which no response is required.

7.    Admitted.

8.    Admitted.

9.    Admitted.

10.    Denied, except it is admitted that the allegations of paragraph 10 describe Pike's business in a general way as it existed at the time that Pike terminated Mr. Dubea without cause on or about August 22, 2005. Mr. Dubea is without knowledge or information sufficient to admit or deny the allegations of this paragraph regarding the current business operations of Pike. Mr. Dubea admits that Pike holds itself out as having been in business since 1945.

2

11.     Denied, except it is admitted that the business of providing electric distribution and transmission services to electrical utilities, cooperatives and municipalities requires appropriate personnel.  Mr. Dubea is without knowledge or information sufficient to admit or deny the allegation in the second, third and fourth sentences in paragraph 11 concerning the labor conditions at Pike or its competitors, Pike's practices regarding employment agreements with covenants not to compete, and Pike's evaluation of the necessity of employment agreements with non-compete provisions.

12.     Denied, except it is admitted that some of Pike's customers assign work to it under master service agreements; that Pike's customers generally have no obligation to continue to assign work to Pike; and that most of Pike's customers have the right to terminate the services of its electric distribution and service provider(s) on short notice. For further answer, Mr. Dubea has no knowledge regarding Pike's relationships with its customers since Pike terminated his employment without cause on or about August 22, 2005.

13.     Mr. Dubea is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of this paragraph, as they are phrased in the present tense concerning Pike's business and Mr. Dubea has not been employed by Pike since on or about August 22, 2005 and for that reason the allegations of paragraph 13 are denied.

14.     Admitted.

15.     Mr. Dubea is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of the first sentence of this paragraph and for that reason they are denied.  It is admitted that Pike acquired the stock of RSI in a Stock

3

Purchase Agreement ("SPA") dated May 4, 2004, the terms of which speak for themselves and to which Mr. Dubea respectfully refers the Court for its contents.

16.    Denied, except admitted that, at the time Pike acquired RSI, Mr. Dubea had worked at RSI for over 20 years; that he was one of two Presidents at RSI who reported to the Chief Executive Officer; that he managed RSI's Western Region, which had approximately 900 employees of RSI's total workforce of approximately 1500; that the Western Region that he managed accounted for a majority of RSI's earnings; that RSI and its employees, including Mr. Dubea, succeeded in obtaining business from Texas Utilities, Entergy (West), and the City of San Antonio; and that he owned 39,327 shares of RSI stock comprising approximately 4% of its issued and outstanding common stock as of July 1, 2004.

17.    Denied, except it is admitted that Mr. Dubea is a party to the SPA, which is a writing that speaks for itself, that RSI had legal and financial advisors during the drafting by Pike of the SPA, and that RSI's legal counsel also provided advice to Mr. Dubea.

18.    Denied, except it is admitted that the SPA is a writing which speaks for itself. For further answer, Mr. Dubea is without knowledge or information as to Pike's belief about the importance of Mr. Dubea to Pike's success in Texas and Louisiana, particularly since Pike elected to terminate Mr. Dubea without cause barely one year after the completion of the acquisition of RSI.

19.    Mr. Dubea is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of this paragraph and for that reason they are denied.

4

20.    Denied, except it is admitted that Mr. Dubea is a party to the SPA and to the Employment Agreement, as amended May 5, 2005, each of which is a writing whose terms speak for themselves and to which Mr. Dubea respectfully refers the Court for its contents.

21.    Denied, except it is admitted that the Mick Dubea 2003 Grantor Retained Annuity Trust received approximately $6.87 million at closing for its 39,327 shares of RSI stock; that the SPA resulted in fees to Pike's majority owner, Lindsay, Goldberg and Bessemer ("LGB"), of $3.125 million and facilitated an IPO of Pike one year later in which LGB or its affiliates received proceeds from the sale of over three million Pike shares offered in the IPO of approximately $42 million; that Mr. Dubea entered into the Employment Agreement with Pike on July 1, 2004 which was amended on May 5, 2005, and that his Employment Agreement with Pike, as amended, superseded his employment agreement with RSI; and that he was employed by Pike until August 22, 2005 when Pike elected to terminate him without cause.  Mr. Dubea lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second sentence of this paragraph concerning Pike's intentions if Mr. Dubea did not agree to sign an employment agreement with Pike and for that reason they are denied.

22.    Denied, except it is admitted that Pike paid the Mick Dubea 2003 Grantor Retained Annuity Trust what Pike determined to be the value of the 39,327 RSI shares of common stock held by the Mick Dubea 2003 Grantor Retained Annuity Trust and that Mr. Dubea signed the Employment Agreement dated July 1, 2004 with Pike, which Pike amended on May 5, 2005, the terms of which speak for themselves and to which Mr. Dubea respectfully refers the Court for its contents.

5

23.    Denied, except it is admitted that Pike hired Mr. Dubea as Vice President of its Western Region and, in connection with his employment, Mr. Dubea signed the Employment Agreement, which is a writing drafted by Pike that speaks for itself; that through the acquisition, Pike acquired the RSI operation in Oklahoma and Texas that RSI and its employees, including Mr. Dubea, successfully developed and managed; that for a period of time Mr. Dubea reported directly to Eric J. Pike, the CEO of Pike; that he received a base salary of $330,000 per year and an opportunity for a nominal bonus, which cumulatively reflected a compensation reduction of almost two-thirds from his historical salary and bonus at RSI; that he was given the opportunity to purchase up to $2.0 million of Restricted Shares of Pike common stock with funds he was otherwise due from his deferred compensation earned at RSI; that Mr. Dubea elected to purchase $1.0 million of Restricted Shares of Pike common stock which as of January 27, 2006 had a market value of approximately $1.6 million; that the Restricted Shares are scheduled to vest in accordance with a schedule set forth in the Employment Agreement; that Pike honored the Base Amount of the deferred compensation Mr. Dubea had earned while at RSI by paying him approximately $1.91 million in 2004 and $1.91 million in 2005; that Pike assumed RSI's obligation to pay Mr. Dubea approximately double the value of its deferred compensation; and that Mr. Dubea is due $2.46 million on July 1, 2006, $1.23 million on July 1, 2007, and $2.46 million on July 1, 2008 for sums that Mr. Dubea had already contractually earned and that, but for the Employment Agreement, would have been due at the closing of the SPA.

6

24.     Denied, except it is admitted that Mr. Dubea signed the Employment Agreement, which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its contents.

25.     Denied, except it is admitted that Mr. Dubea signed the Employment Agreement, which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its contents.

26.     Denied, except it is admitted that Mr. Dubea signed the Employment Agreement, which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its contents.

27.     Denied, except it is admitted that Mr. Dubea signed the Employment Agreement, which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its contents.

28.     Denied, except it is admitted that Mr. Dubea signed the Employment Agreement, which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its contents.

29.     Denied, except it is admitted that Mr. Dubea signed the Employment Agreement, which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its contents.  By way of further answer, Mr. Dubea denies that Pike is entitled to specific performance in this action or has the right to cease making payments to which Mr. Dubea is entitled under the Employment Agreement.

30.     Denied, except it is admitted that Mr. Dubea signed the Employment Agreement, which is a writing that speaks for itself to which Mr. Dubea respectfully refers the Court for its contents.

7

31.    Admitted.

32.    Denied, except it is admitted that Pike terminated Mr. Dubea's employment without cause on August 22, 2005 and paid him his base salary for a period of time ending thirty days after the August 22, 2005 effective date of Mr. Dubea's termination of employment; that Mr. Dubea's performance as a Pike Vice President was exemplary; that Pike's CEO, Eric Pike, routinely complimented Mr. Dubea on his performance and profitability; that because Pike terminated Mr. Dubea without cause he remains eligible to receive payment of the Multiplier Amount and for his Restricted Shares to continue to vest pursuant to his Employment Agreement as amended; and that Mr. Dubea received payments of approximately $1.91 million in 2004 and $1.91 million in 2005, and is due $2.46 million on July 1, 2006, $1.23 million on July 1, 2007, and $2.46 million on July 1, 2008 for the deferred compensation he earned at RSI and which Pike agreed to pay; and that his Restricted Shares vest on the following schedule:  40% on July 1, 2006; 20% on July 1, 2007; and 40% on July 1, 2008.

33.    Denied, except it is admitted that Chad Dubea is Mr. Dubea's son; that he worked for RSI for approximately twelve years at various positions throughout the organization and rose through the ranks to supervisor in Harlingen, Texas; that Chad left his job at Pike on or about October 21, 2005 shortly after Pike elected to terminate his father without cause; and that he relocated from Harlingen, Texas to Beaumont, Texas.  It is denied that Mr. Dubea provided financial support and backing to Chad in the formation of Chad's business, T&D Solutions, Ltd. ("T&D"), or that he is providing advice and guidance in connection with T&D's business or that he is helping to run the day-to-day operations of T&D.

34.    Denied, except it is admitted that, upon information and belief, T&D provides electric distribution and transmission services, and power line construction, maintenance and storm restoration services.

35.    Denied, except admitted that, upon information and belief, Chad left his employment with Pike on or about October 21, 2005. Mr. Dubea lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of the second and third sentences of this paragraph and for that reason they are denied. The fourth sentence states a legal conclusion to which no response is required. Mr. Dubea denies the allegations of the fifth and sixth sentences of this paragraph except it is admitted that Chuck Chaddrick, Tim Droddy, Clifton Droddy, Sammy Christian, and Alex Graham were among the former employees of RSI who continued to work at Pike after Pike's acquisition of RSI and who have since left Pike. For further answer, Mr. Dubea states that he is aware that the above individuals work for T&D but specifically denies that he endeavored to cause any of them to leave Pike.

36.    Mr. Dubea is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of this paragraph and for that reason they are denied, except that Mr. Dubea denies that he assisted T&D in convincing Corey Close to leave Pike.

37.    The allegations in this paragraph concerning T&D are denied for lack of knowledge or information sufficient to form a belief as to their truth or falsity. Mr. Dubea denies that he has solicited any of Pike's employees or that he used or continues to use any Pike confidential information to solicit Pike's employees.

9

38.     Denied.  For further answer, Mr. Dubea lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of the first sentence of this paragraph and for that reason they are denied.

39.     Mr. Dubea is without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of this paragraph and for that reason they are denied, except that Mr. Dubea denies that he has used or will continue to use Pike confidential information to "steal Pike's customers."

40.     Denied.

41.     Denied, except admitted that Mr. Dubea signed the Employment Agreement, as amended May 5, 2005, which is a writing that speaks for itself, and to which Mr. Dubea respectfully refers the Court for its terms.

## **COUNT I**

42.     Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through 41 as if set forth herein at length.

43.     Denied.

44.     Denied.

45.     Denied.

46.     Denied.

10

## COUNT II

47.    Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through 46 as if set forth herein at length.

48.    Denied.

49.    Denied.

50.    Denied.

## COUNT III

51.    Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through 51 as if set forth herein at length.

52.    Denied.

53.    Denied.

54.    Denied.

55.    Denied.

## COUNT IV

56.    Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through 56 as if set forth herein at length.

57.    Admitted.

58.    Admitted.

59.    This paragraph states conclusions of law to which no responses are required, and is, therefore, denied.

60.    Denied.

61.    Denied.

## COUNT V

62.    Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through 61 as if set forth herein at length.

63.    Denied.

64.    Denied.

65.    Denied.

66.    Denied.

## COUNT VI

67.    Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through 66 as if set forth herein at length.

68.    Mr. Dubea lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of this paragraph and for that reason they are denied.

69.    Mr. Dubea lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of this paragraph and for that reason they are denied.

70.    Denied.

71.    Denied.

72.    Denied.

## COUNT VII

73.    Mr. Dubea incorporates his responses in the foregoing paragraphs 1 through 72 as if set forth herein at length.

74.    This paragraph states conclusions of law to which no responses are required, and is, therefore, denied.

75.     Denied, except it is admitted that Pike purports to seek a declaration of legal rights pursuant to 28 U.S.C. § 2201.

76.     Denied.

## ADDITIONAL DEFENSES

### FIRST ADDITIONAL DEFENSE

77.     Pike's Complaint fails to state a claim upon which relief can be granted.

### SECOND ADDITIONAL DEFENSE

78.     Pike's claims, if any, are barred in whole or in part by the doctrines of waiver and/or estoppel.

### THIRD ADDITIONAL DEFENSE

79.     Pike is precluded from obtaining any and all relief by virtue of its bad faith conduct.

### FOURTH ADDITIONAL DEFENSE

80.     Pike is precluded from obtaining any and all relief by virtue of its unclean hands.

### FIFTH ADDITIONAL DEFENSE

81.     Pike's claims, if any, are barred by the doctrine of laches.

### SIXTH ADDITIONAL DEFENSE

82.     Pike's claims, if any, are barred by its material breach of the Employment Agreement.

### SEVENTH ADDITIONAL DEFENSE

13

83.    Pike's claims, if any, are barred by its breach of the implied covenant of good faith and fair dealing.

### EIGHTH ADDITIONAL DEFENSE

84.    Pike's claims, if any, are precluded in whole or in part by its failure to mitigate damages.

### NINTH ADDITIONAL DEFENSE

85.    Pike's claims based on the non-compete provision of the Employment Agreement, if any, are precluded in whole, as the non-compete provision is unreasonable, overbroad, unduly restrictive and unenforceable.

### TENTH ADDITIONAL DEFENSE

86.    The forfeiture provision under the Employment Agreement is an unenforceable punitive damages provision.

14

## ELEVENTH ADDITIONAL DEFENSE

87. <u>The forfeiture provision under the Employment Agreement is unenforceable under the facts of this case as a matter of public policy.</u>

## TWELFTH ADDITIONAL DEFENSE

88. <u>Even if Pike were able to establish a breach of the Employment Agreement and injury, Pike is not entitled to both actual damages and forfeiture of the Multiplier Amount.</u>

WHEREFORE, Mr. Dubea respectfully requests that the Complaint be dismissed and judgment be entered in his favor and against Pike, plus attorneys' fees and costs.

## COUNTERCLAIM OF MICK DUBEA AGAINST PIKE ELECTRIC CORPORATION AND PIKE ELECTRIC, INC.

### FACTUAL BACKGROUND

<u>89.</u>    86. Counterclaim Plaintiff, Mick Dubea ("Dubea") is an adult individual and resident of the State of Texas, who resides at 2570 Ashley Street, Beaumont, Texas 77702.

<u>90.</u>    87. Counterclaim Defendant Pike Electric Corporation is a Delaware corporation, and Counterclaim Defendant Pike Electric, Inc. is a North Carolina corporation (collectively, "Pike"), with their principal place of business at 100 Pike Way, Mount Airy, North Carolina.

### ~~Pike's Employment Agreement with Mr. Dubea~~

<u>91.</u>    88. This Counterclaim arises out of the July 1, 2004 employment agreement between Mr. Dubea and Pike (the "Employment Agreement") and Pike's wrongful attempts to deprive Mr. Dubea of his vested deferred compensation.

15

89.     By the terms of the Employment Agreement, Pike hired Mr. Dubea for a four year term as the Vice President of its Western Region. Under the direction of Pike Chief Executive Officer ("CEO"), J. Eric Pike ("Eric Pike"), Mr. Dubea was responsible for the management of all Pike operations in Oklahoma and Texas.

90.     Pike established the Western Region assigned to Mr. Dubea after its acquisition of Red Simpson, Inc. ("RSI"). Pike acquired RSI pursuant to a May 4, 2004 Stock Purchase Agreement (the "SPA") for the purchase of all of the outstanding shares of RSI common stock.

91.     At the time of the acquisition, RSI stock was owned as follows: (1) by two trusts established by RSI founder's son and CEO, John Simpson, which owned 864,929 shares, or 93.06%; (2) by the Mick Dubea 2003 Grantor Retained Annuity Trust, which owned 39,327 shares, or 4.23%; and (3) by RSI Chief Financial Officer ("CFO"), Albert Thibeaux, Jr., who owned 25,186 shares, or 2.71%. As Mr. Dubea owned less than five percent of the RSI stock, he had no right to establish RSI policy, and he had limited bargaining power with respect to the Pike acquisition.

92.     Pike agreed to pay Mr. Dubea three forms of compensation under the Employment Agreement: (1) an annual base salary of $330,000; (2) payment of deferred compensation Mr. Dubea previously earned as an RSI employee (the "Base Amount"); and (3) a multiplier bonus amount awarded by RSI in connection with the acquisition, which was also fully earned and vested upon consummation of the acquisition and, but for the Employment Agreement, would have been paid in full at the closing of the SPA (the "Multiplier Amount"). The Base and Multiplier Amounts were existing obligations of RSI

16

that Pike assumed but refused to pay except on the conditions and pursuant to the schedule provided under the Employment Agreement.

93.     The Employment Agreement also includes non-disclosure and non-compete provisions. The non-compete provisions purport to prohibit Mr. Dubea from engaging in any competitive business within the entire "United States of America" for a five year period.

17

**RSI's Pre-Acquisition Deferred Compensation Program**

92.     94.-Prior to joining Pike, Mr. Dubea was employed since 1984 with Red
Simpson, Inc. ("RSI"), becoming the President of RSI's Western Region in 2002.  Under
RSI's pre-acquisition compensation program, Mr. Dubea earned a relatively low salary for
a president, but had the opportunity, through diligent effort, to earn significant bonuses
payable pursuant to RSI's deferred compensation program.

93.     95.-Under RSI's deferred compensation program, approximately 127
participating RSI employees, including Mr. Dubea, had a vested right to receive deferred
compensation in five equal installments over a four year period following their separation
from the company.  RSI called this payment the Base Amount.  Mr. Dubea's employment
agreement with RSI also included a change of control provision that would have entitled
him to a lump sum payment of a multiplier amount of his deferred compensation (the
"Multiplier Amount") in accordance with Section 2.07 of his employment agreement dated
January 7, 2004 with RSI.

~~96.    In connection with the acquisition, a portion of the proceeds was set aside in an amount sufficient to fund the Multiplier Amount equal to 100% of the Base Amount, with the amounts payable by Pike following the acquisition in three installments of 40%, 20% and 40% on the second, third and fourth anniversaries of the first payment of the Base Amount.~~   Although only two other employees were entitled under their RSI employment agreements to a lump sum payment in the event of a change of control transaction, John Simpson, Pike's CEO and controlling stockholder, agreed to pay the other RSI employees who participated in RSI's deferred compensation program a multiplier amount equal to their respective Base Amount.

94.    ~~97.~~ Through the acquisition, Pike assumed RSI's obligations to pay the Base and Multiplier Amounts owed to the former RSI employees, including Mr. Dubea. ~~RSI provided funding at the Closing for Pike to meet these obligations.  Pike agreed to, and did, pay Mr. Dubea the Base Amount in installments of approximately $1.91 million in 2004 and $1.91 million in 2005.  Pike also agreed, under the express terms of the Employment Agreement, to pay Mr. Dubea the Multiplier Amount~~Pike further agreed that the Base Amount would be paid in two 50% installments on July 1, 2004, and July 1, 2005, respectively.  The Multiplier Amount would occur in three installments of ~~$2.46 million on~~40%, 20% and 40% on the July 1, 2006, ~~$1.23 million on July 1, 2007 and $2.46 million on July 1, 2008.  Pike also agreed to give Mr. Dubea the opportunity to purchase up to $2.0 million of Restricted Shares of Pike common stock with funds he was otherwise due from his deferred compensation earned at RSI.  If, however, Pike~~July 1, 2007, and July 1, 2008, respectively.  Mr. Dubea's Employment Agreement contained an additional provision stating that if he was terminated ~~Mr. Dubea~~ without cause prior to July 1, 2005, ~~the~~

19

~~Employment Agreement required acceleration and prompt payment in cash to Mr. Dubea~~

~~of the Multiplier Amount, and immediate vesting of his Restricted Shares.~~ Pike was

required to pay him the entire Base Amount and Multiplier Amount immediately.

95.    Pike acquired RSI pursuant to a May 4, 2004 Stock Purchase Agreement for

the purchase of all of the outstanding shares of RSI common stock. In connection with this

transaction, RSI's stockholders (and not Pike) provided the funds to pay the Base and

Multiplier Amounts by agreeing to a reduction of the purchase price of approximately

$55.1 million ($37 million on a tax-adjusted basis), in exchange for Pike's assuming RSI's

payment obligation to its former employees.

**Pike Hires Mr. Dubea as Vice President of its Western Region**

96.    By the terms of the Employment Agreement, Pike hired Mr. Dubea for a

four-year term as the Vice President of its Western Region.  Under the direction of Pike

Chief Executive Officer, J. Eric Pike, Mr. Dubea was responsible for the management of

all Pike operations in Oklahoma and Texas.

97.    Pike established the Western Region assigned to Mr. Dubea after its

acquisition of RSI.  At the time of the acquisition, RSI stock was owned as follows: (1) by

two trusts established by CEO and controlling stockholder John Simpson, who owned

864,929 shares, or 93.06%; (2) by the Mick Dubea 2003 Grantor Retained Annuity Trust,

which owned 39,327 shares, or 4.23%; and (3) by RSI Chief Financial Officer ("CFO"),

Albert Thibeaux, Jr., who owned 25,186 shares, or 2.71%.  As Mr. Dubea owned less than

five percent of the RSI stock, he had no right to establish RSI policy, and he had limited

bargaining power with respect to the Pike acquisition.

98.      Under the Employment Agreement, Mr. Dubea was entitled to several forms of compensation: (1) an annual base salary of $330,000; (2) payment of the deferred compensation Base Amount of $3,821,650 that he previously earned as an RSI employee; and (3) his Multiplier Amount in connection with the acquisition totaling $7,723,893, which was also fully earned and vested upon consummation of the acquisition and, but for the Employment Agreement, would have been paid in full at the closing of the acquisition.

99.      Of Mr. Dubea's $7,723,893 Multiplier Amount, Pike and Mr. Dubea agreed $6,150,329 would be payable in cash and $1,573,564 would be payable in the form of 10,740 restricted shares of Pike common stock (the "Restricted Shares").

100.      The Employment Agreement also prohibited Mr. Dubea from disclosing confidential information (Section 5.03) and engaging in any competitive business within the entire United States of America for a five-year period after he is no longer employed by Pike (Section 5.07).

**Mr. Dubea's Performance as a Pike Regional Vice President**

101.      98.-Pike's business is divided into five regions, with service to 19 states and customers as far north as Pennsylvania, as far south as Florida and as far west as Texas. Under the leadership of Mr. Dubea, Pike's post-acquisition Western Region performed at a high level of profitability.

102.      99.-Consistent with his region's positive performance, Mr. Dubea received only positive feedback from his direct superior, Eric Pike, from July 2004 to May 2005. Pike complimented Mr. Dubea for his attention to detail and profitability.  Mr. Dubea's performance was excellent and Pike's Western Region was well-organized and profitable under his management.

21

103.    As required under the Employment Agreement, Pike subsequently paid Mr. Dubea the Base Amount in installments of approximately $1,910,825 in 2004 and $1,910,825 in 2005.

**The Planned IPO and Purported Integration of RSI into Pike**

104.    ~~100.~~Upon information and belief, Pike acquired RSI pursuant to a plan devised by Pike and its majority owner, Lindsay, Goldberg & Bessemer L.P. ("LGB"), a leveraged buyout firm.  Upon information and belief, Pike and LGB planned to acquire RSI, create an impression in the market that RSI would be fully integrated into Pike, and earn a substantial return on its investment through a speedy IPO.

105.    ~~101.~~According to its IPO Prospectus, dated July 26, 2005 (the "IPO Prospectus"), Pike offered 10 million shares of its stock at a price of $14.00 per share. LGB, through LGB Pike II LLC, and Pike board member Reginald L. Banner, offered an additional 3.5 million shares.

106.    ~~102.~~Pivotal to the success of the IPO was the impression that RSI would be quickly integrated into ~~RSI~~Pike.  The IPO Prospectus described the RSI acquisition as: "substantially expand[ing] [Pike's] business, service territory, workforce and scope of operations."  It further stated: "we have incorporated the entire [RSI] fleet into our tracking systems and rebranded substantially all of the [RSI] fleet with the 'Pike' emblem.  In addition, we have accelerated our integration of [RSI's] crews and as of June 30, 2005, we completed the transition to reporting [RSI's] transactions through our financial systems."

107.    ~~103.~~In the months prior to the IPO, Mr. Dubea assisted Pike in carrying out tasks which Pike advised were critical to the success of the IPO.  For example, Eric Pike, in April, 2005, presented Mr. Dubea with an amendment to the Employment Agreement,

22

which he asked Mr. Dubea and the approximately 125 other former RSI managers and

supervisors entitled to deferred compensation to sign. Mr. Dubea was told that the

amendment was necessary to assist Pike in the IPO and that without it, Pike would suffer a

reduced valuation in the IPO. Among other things, the amendment provided that if ~~Pike~~

~~terminated the employees for certain reasons, the employees~~employees were to violate

their non-compete obligations, they would no longer forfeit their unpaid deferred

compensation but instead would receive it plus interest on the ~~fifteenth~~15th anniversary of

the Closing ~~as that term was defined in the SPA. This amendment enabled Pike to avoid~~

~~having to record an annual accrual for deferred compensation. At the time of the IPO, Pike~~

~~anticipated that the annual expense for this obligation would have been $6.6 million, of~~

~~which $5.5 million would have been allocated to cost of operations. For this reason, Pike~~

~~was eager to have the former RSI employees sign the amendment and repeatedly urged Mr.~~

~~Dubea both to sign, and convince the employees in the Western Region to sign~~(or July 1,

2019).

    108.   This amendment enabled Pike to exclude the approximately $30 million in

deferred compensation still owed to the former RSI employees from the calculation of

Pike's adjusted EBITDA for financial-accounting purposes. For this reason, Pike was

eager to have the former RSI employees sign the amendment and repeatedly urged Mr.

Dubea both to sign and convince the employees in the Western Region to sign.

    109.  ~~104.~~ At Pike's insistence, Mr. Dubea signed the amendment on May 5,

~~2005~~2005, and urged the former RSI employees to do the same. Following Mr. Dubea's

lead, the former RSI employees in the Western Region who were entitled to deferred

compensation also signed the amendment.

**Mr. Dubea's Termination Without Cause**

110.   ~~105.~~ After Mr. Dubea signed the amendment, and significant progress had been made toward integration in the Western Region, Eric Pike began to criticize Mr. Dubea's management style.  At a June 16, 2005 meeting, Eric Pike informed Mr. Dubea that he, all of a sudden, was no longer doing things the "Pike way."

111.   ~~106.~~ Upon information and believe, Pike decided to terminate Mr. Dubea on or before June 30, 2005.  Pike knew, however, that terminating Mr. Dubea before July 1, 2005 triggered the acceleration of the Multiplier Amount.  Accordingly, Pike wrongfully delayed Mr. Dubea's termination until August 22, 2005, on which date he was summarily dismissed without cause a mere three weeks after Pike cashed in on the IPO, despite its claim several weeks earlier that Mr. Dubea was "critical" to the "success" of the "combined RSI-Pike enterprise.

~~107.      The IPO closed on July 28, 2005.  Despite claiming Mr. Dubea was "critical" to the "success" of the "combined RSI-Pike enterprise," Pike summarily dismissed him without cause a mere three weeks after cashing in on the IPO.  To avoid the acceleration of Mr. Dube's entitlement to the Multiplier Amounts totaling $6.15 million and the vesting of his Restricted Shares purchased for $1.0 million, Pike wrongfully delayed Mr. Dubea's termination until August 22, 2005.~~

112.   At all relevant points both before and after his termination, Mr. Dubea has complied with all of the obligations and terms of his Employment Agreement, including but not limited to Sections 5.03 and 5.07.

113.   Without conducting an adequate and reasonable investigation, Pike subsequently filed this lawsuit, in which it erroneously alleged, among other things, that

24

Mr. Dubea breached Sections 5.03 and 5.07 of the Employment Agreement by using and disclosing Pike's confidential information in furtherance of his son's competing business and by competing with Pike and soliciting Pike's customers and employees.  As a consequence of these alleged breaches, Pike has claimed that Mr. Dubea forfeited all rights to the unpaid portion of his Multiplier Amount.

114.    Had Pike conducted an adequate and reasonable investigation, it would have discovered that Mr. Dubea never disclosed Pike's confidential information, solicited Pike's customers or employees, never competed with Pike, and did not otherwise violate the terms of his Employment Agreement in any way.

115.    On June 1, 2006, Mr. Dubea's counsel wrote to Pike's counsel advising that the first annual installment of the Multiplier Amount, consisting of $2,460,132 and a vesting of 4,296 of Restricted Shares, would be due on July 1, 2006.

116.    On June 24, 2006, Pike's counsel responded with a letter stating Pike's position that Mr. Dubea breached Section 5.07 of his Employment Agreement, and that as a result Mr. Dubea has forfeited his Restricted Shares and right to future cash payments under the Multiplier Amount.

117.    Pike's letter is incorrect, however, because Mr. Dubea has never violated Section 5.07 or any other section of his Employment Agreement, and even if he had, the consequence would not be not the outright forfeiture that Pike claims.

## COUNT I – BREACH OF CONTRACT

### Pike's Failure to Make Cash Payment and Vest Restricted Shares Representing the 2006 Portion of Mr. Dubea's Multiplier Amount

118.    Mr. Dubea incorporates by reference the allegations of the foregoing paragraphs as if set forth herein at length.

25

119.    The Employment Agreement obligated Pike on July 1, 2006, to pay Mr. Dubea $2,460,132 in cash and vest 4,296 of Mr. Dubea's restricted shares representing the 2006 portion of the Multiplier Amount.

120.    Mr. Dubea has not engaged in any conduct resulting in a forfeiture of the Multiplier Amount.

121.    Pike has wrongfully failed to make that payment and vest the shares representing the 2006 portion of Mr. Dubea's Multiplier Amount.

122.    Mr. Dubea has incurred and will continue to incur damages as a result.

## COUNT ~~III~~ – ANTICIPATORY REPUDIATION / DECLARATORY JUDGMENT
### ~~Declaratory Judgment~~
### ~~Entitlement to the Multiplier Amount~~

### Pike's Repudiation of Obligation to Pay Multiplier Amount
### Entitles Mr. Dubea to Damages for Total Breach and Discharges Mr. Dubea's
### Remaining Duties of Performance under the Employment Agreement

123.    ~~108.~~ Mr. Dubea incorporates by reference the ~~foregoing~~ allegations of ~~paragraphs 1 through 107~~ the foregoing paragraphs as if set forth herein at length.

~~109.    A~~

124.    Through its Verified Complaint as reaffirmed in its counsel's June 24, 2006 letter, Pike unequivocally declared that it does not intend to perform its promise to pay the remaining portions of the Multiplier Amount to Mr. Dubea as they become due in 2007 and 2008.

125.    Pike's wrongful repudiation gives Mr. Dubea an immediate claim to damages for total breach, including the payments that normally would not have become due until 2007 and 2008, respectively.

126.    Pike's wrongful repudiation also discharges Mr. Dubea's remaining duties of performance under the Employment Agreement.

127.    Moreover, Section 5.10 of the Employment Agreement states that if Pike fails to make timely payment of any portion of the Multiplier Amount within 30 days of the date that it is informed in writing that such amount is due, other than as a result of a forfeiture as determined by Pike in good faith, Mr. Dubea shall thereafter be promptly relieved of any further obligation to comply with, *inter alia*, Section 5.07.

128.    Pike's statement that Mr. Dubea forfeited his Multiplier Amount by violating Section 5.07 is erroneous and not in good faith.

129.    Because Pike claims that it is justified in treating the remainder of Mr. Dubea Multiplier Amount as forfeited, a justiciable controversy exists sufficient for this Court to declare the rights and remedies of the parties with respect to the Employment Agreement.

~~110.    By this action, Pike seeks to avoid paying vested deferred compensation owed to Mr. Dubea. Without citing a specific provision of the Employment Agreement, Pike vaguely alleges that Mr. Dubea forfeited the outstanding Multiplier Amount by "breaching his obligations to Pike" and engaging in "unlawful conduct at issue in this action." (Compl. at ¶¶ 1, 23.) Through such allegations, Pike has declared that it does not intend to continue with payments that it owes to Mr. Dubea.~~

27

111. ~~Mr. Dubea is entitled to full payment of the Multiplier Amount on several independent grounds.~~

112. ~~First, as a matter of law, an employee who, like Mr. Dubea, is terminated without cause, cannot forfeit vested deferred compensation for breach of a restrictive covenant.~~

113. ~~Second, even if Pike has the legal right to assert a forfeiture, the Employment Agreement does not provide that Mr. Dubea forfeits his Multiplier Amount and Restricted Shares for breach of the non-compete provisions.~~

114. ~~Third, even if Pike could demonstrate a contractual basis for a forfeiture on grounds other than for breach of the non-compete provisions, its bad faith termination of Mr. Dubea constituted a breach of the Employment Agreement that destroyed the parties' mutuality of obligations. Pike could not, therefore, enforce any provision of the Employment Agreement, including any purported forfeiture provision.~~

115. ~~Fourth, even if Pike could demonstrate a contractual basis for a forfeiture on grounds other than for breach of the non-compete provisions, a forfeiture provision that is unreasonable as to temporal duration and geographic scope is unenforceable.~~

116. ~~Fifth, even if Pike could demonstrate a contractual basis for a forfeiture on grounds other than for breach of the non-compete provisions, a provision that seeks to punish Mr. Dubea by imposing a forfeiture of the value of $6.15 million deferred compensation and Restricted Shares constitutes a penalty that is void as inequitable and against public policy.~~

117. ~~As Pike has no basis for forfeiture of the Multiplier Amount, a declaration that Mr. Dubea is entitled to his deferred compensation and Restricted Shares is warranted.~~

130.    Mr. Dubea is entitled to a declaration that (a) he has complied with all of the obligations and terms of his Employment Agreement, including but not limited to Sections 5.03 and 5.07; (b) the balance of the Multiplier Amount is immediately due and owing, including the payments and vesting of Restricted Shares that normally would not have become due until 2007 and 2008, respectively; and (c) his remaining obligations under the Employment Agreement are discharged, including but not limited to his obligations under Sections 5.07.

### COUNT ~~II~~III – DECLARATORY JUDGMENT ~~Declaratory Judgment~~

### Unenforceability of ~~Non-Compete Provisions~~Section 5.07 of the Employment Agreement

131.    ~~118.~~ Mr. Dubea incorporates by reference the ~~foregoing~~ allegations of the foregoing paragraphs 1 through 117 as if set forth herein at length.~~.11~~

~~119.    A justiciable controversy exists sufficient for this Court to declare the rights and remedies of the parties with respect to the Employment Agreement.~~

132.    ~~120.~~ To be enforceable, a covenant not to compete must be valid under general principles of contact law, be reasonable in time and scope and advance a legitimate economic interest of the employer.

133.    ~~121. The non-compete provisions of the Employment Agreement are both invalid and unreasonable, and should not be enforced.~~

~~122.    Pike's bad faith conduct, as discussed above, constitutes a breach of the covenant of good faith and fair dealing implied in the Employment Agreement, which excuses any obligation of Mr. Dubea to abide by the non-compete provisions and renders such provisions invalid and unenforceable.~~

29

123.    In addition, theThe restrictions purportedly imposed by Section 5.07 of the non-compete provisionsEmployment Agreement are patently overbroad and unreasonable.

134.    124. As stated above, Pike serves 19 states within the territorial limits of Pennsylvania in the north, Florida in the south and Texas in the west.  As such, Pike's attempt to restrict Mr. Dubea from competitive conduct in the entire United States is overbroad and unreasonable.

135.    125. Moreover, Pike's five -year restriction is well beyond any temporal duration necessary to protect its purported long standing customer relationships.  It is not necessary to preclude Mr. Dubea from the market for five whole years to safeguard long -term relationships Pike is not likely to lose.

136.    Pike contends that Section 5.07 is enforceable as written.

137.    Accordingly, a justiciable controversy exists sufficient for this Court to determine the enforceability of this provision.

138.    126. Accordingly, Mr. Dubea is entitled to a declaration that the non-compete provisionsSection 5.07 of the Employment Agreement areis invalid and unenforceable, or, in the alternative, that it should be reformed to be reasonable in length and scope.

## COUNT IV – DECLARATORY JUDGMENT

### Consequence For Violating Section 5.07 of Employment Agreement Is Not Forfeiture

139.    Mr. Dubea incorporates by reference the allegations of the foregoing paragraphs as if set forth herein at length.

140.    The May 2005 amendment to the Employment Agreement eliminated forfeiture as a consequence for violating Section 5.07, and it was the parties' intent that in

the event of a 5.07 violation, Mr. Dubea's right to receive his Multiplier Amount would be deferred until July 1, 2019.

141.    Because Pike disputes this construction of the Employment Agreement and the amendment, a justiciable controversy exists sufficient for this Court to declare the rights and remedies of the parties with respect to the consequence for violating Section 5.07.

31

## COUNT V – DECLARATORY JUDGMENT

### Forfeiture Language in Section 5.10 Is Unenforceable

142.　Mr. Dubea incorporates by reference the allegations of the foregoing paragraphs as if set forth herein at length.

143.　Certain language in Section 5.10 of the Employment Agreement purports to state circumstances under which Mr. Dubea forfeits the right to payment of the Multiplier Amount.

144.　That language is void and unenforceable as a matter of public policy for a variety of reasons, including but not limited to (a) an employee who, like Mr. Dubea, is terminated without cause, cannot forfeit vested deferred compensation for breach of a restrictive covenant; (b) forfeiture of the Multiplier Amount does not represent a reasonable pre-estimate of damages that would result from breach and instead is designed to punish Mr. Dubea for a violation of his restrictive covenants; and (c) the consequence of being terminated without cause and subsequently violating restrictive covenants cannot be more severe than the consequence of being terminated for cause for the same conduct.

145.　Even if the forfeiture language in Section 5.10 were facially valid, it would still not be enforceable under the facts and circumstances of this case for a variety of reasons, including but not limited to (a) any violations of the restrictive covenants by Mr. Dubea were not material; (b) forfeiture of the Multiplier Amount would be so disproportionate to the actual harm proximately caused by Mr. Dubea's conduct; and (c) Pike's delay in terminating Mr. Dubea until after July 1, 2006, was in bad faith.

32

146.    Because Pike contends that the forfeiture language in Section 5.10 is valid and enforceable against Mr. Dubea, a justiciable controversy exists sufficient for this Court to declare the rights and remedies of the parties with respect to this issue.

147.    Mr. Dubea is entitled to a declaration that the forfeiture language in Section 5.10 of the Employment Agreement is invalid and unenforceable both on its face as a matter of public policy and under the specific facts and circumstances of this case.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Dubea respectfully requests that this Court:

(1)    Enter a declaratory judgment that Mr. Dubea has complied with all of the obligations and terms of his Employment Agreement, including but not limited to Sections 5.03 and 5.07;

(2)    Award Mr. Dubea damages including interest based on Pike's wrongful failure to pay the cash component and vest the Restricted Shares of the 2006 portion of Mr. Dubea's Multiplier Amount on July 1, 2006;

(3)    Enter a declaratory judgment that Mr. Dubea is entitled to ~~all of the compensation~~acceleration of all Multiplier Amounts due under the Employment Agreement, including ~~the Multiplier Amount~~all cash payments and vesting of his Restricted Shares;

(~~2~~4)    Enter a declaratory judgment that ~~the non-compete provisions of~~Mr. Dubea's remaining obligations under the Employment Agreement are ~~invalid and unenforceable; and~~ discharged, including but not limited to his obligations under Sections 5.07;

(5)    Enter a declaratory judgment that Section 5.07 of the Employment

33

Agreement is invalid and unenforceable, or, alternatively, enter a declaratory judgment establishing a reasonable scope and duration of that section;

(6)    Enter a declaratory judgment that the consequence for violating Section 5.07 is not forfeiture and otherwise declare the rights and remedies of the parties as to the consequence for violating Section 5.07;

(7)    Enter a declaratory judgment that the forfeiture language in Section 5.10 of the Employment Agreement is invalid and unenforceable both on its face as a matter of public policy and under the specific facts and circumstances of this case; and

(3̶8̶)    Award Mr. Dubea his attorneys' fees and costs, and such other relief as the

Court deems appropriate.

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

_____
Lewis H. Lazarus (#2374)
Matthew F. Lintner (#4371)
T̶h̶o̶m̶a̶s̶ ̶E̶.̶ ̶H̶a̶n̶s̶o̶n̶,̶ ̶J̶r̶.̶ ̶(̶#̶4̶1̶0̶2̶)̶
Joseph S. Naylor (#3886)
R. Christian Walker (#4802)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800

Attorneys for Defendant, Mick Dubea

Dated: J̶a̶n̶u̶a̶r̶y̶ ̶3̶0̶,̶July 18, 2006

35

Document comparison done by DeltaView on Tuesday, July 18, 2006 3:03:26 PM

| Input: | |
|---|---|
| Document 1 | iManageDeskSite://WSDMS1/WS01/1424338/1 |
| Document 2 | iManageDeskSite://WSDMS1/WS01/1424338/6 |
| Rendering set | Unsaved rendering set |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 159 |
| Deletions | 99 |
| Moved from | 22 |
| Moved to | 22 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 302 |

1428531

36

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PIKE ELECTRIC CORPORATION and<br>PIKE ELECTRIC, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-879 (SLR) |
| | ) | |
| MICK DUBEA, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER</u>

On this ____ day of July, 2006, it is HEREBY ORDERED that Defendant Mick Dubea's Motion for Leave to File First Amended Answer and Additional Defenses to the Complaint and Amended Counterclaim is GRANTED.

_____

JUDGE ROBINSON

JSN/110728-0001/1427202/1

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PIKE ELECTRIC CORPORATION and<br>PIKE ELECTRIC, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-879 (SLR) |
| | ) | |
| MICK DUBEA, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFDENDANT'S RULE 7.1.1. CERTIFICATION FOR MICK DUBEA'S MOTION FOR LEAVE TO FILE FIRST AMENDED ANSWER TO THE COMPLAINT, ADDITIONAL DEFENSES, AND COUNTERCLAIM

Counsel for Defendant Mick Dubea hereby certifies that opposing counsel has advised that they do not oppose Mr. Dubea's motion to file an amended answer and additional defenses to complaint and amended counterclaim against Pike Electric Corporation and Pike Electric, Inc.

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Lewis H. Lazarus (#2374)
Matthew F. Lintner (#4371)
Joseph S. Naylor (#3886)
R. Christian Walker (#4802)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800

Attorneys for Defendant Mick Dubea

Dated: July 18, 2006

1428817

## CERTIFICATE OF SERVICE

I, Lewis H. Lazarus, hereby certify that on July 18, 2006, I caused to be filed

electronically the foregoing **Defendant Mick Dubea's Motion For Leave To File First**

**Amended Answer To The Complaint, Additional Defenses and Counterclaim and this**

**Certificate of Service** with the Clerk of Court using CM/ECF, which will send notification of

such filing(s) to the parties listed below:

> Alyssa M. Schwartz, Esquire
> Richards, Layton & Finger
> One Rodney Square
> P.O. Box 551
> Wilmington, DE 19899
> Email: *schwartz@rlf.com*

In addition, I hereby certify that on July 18, 2006, I caused the foregoing document to be

delivered by e-mail upon the following non-registered participants:

> Michael A. Paskin, Esquire
> Sarah E. Paul, Esquire
> J. Wes Earnhardt, Esquire
> Cravath, Swaine & Moore LLP
> Worldwide Plaza, 825 Eighth Avenue
> New York, NY 10019
> Email: *mpaskin@cravath.com*
> Email: *spaul@cravath.com*
> Email: *wearnhardt@cravath.com*

> Teri L. Danish, Esquire
> Rodriguez Colvin Chaney
> 1201 E. Van Buren
> Brownsville, TX 78522
> Email: *tl.danish@rcclaw.com*

> Lewis H. Lazarus (#2374)
> MORRIS JAMES HITCHENS & WILLIAMS LLP
> 222 Delaware Avenue
> P.O. Box 2306
> Wilmington, DE 19899
> (302) 888-6800
> Email: *llazarus@morrisjames.com*

1412174/1