# EXHIBIT A

Robert Kimmons

April 28, 2006

```
 1    name?

 2         A.    I'm sorry, Milburn, M-i-l-b-u-r-n.

 3         Q.    (BY MR. LAZARUS)   Is that a man or woman?

 4         A.    Woman.

 5         Q.    Anyone else?

 6         A.    Bruce Music, M-u-s-i-c.

 7         Q.    Anyone else?

 8         A.    Other than clerical type stuff, that's all I

 9    can think of right now.

10         Q.    Did your office subcontract out to do any work

11    in connection with its investigation in this case?

12         A.    I believe we did use one subcontractor.

13         Q.    And who was that, sir?

14         A.    I'm hesitating because I'm not sure I can

15    remember his name.  I didn't deal with him.  That was

16    Royce Maza's portion of the case.  I think his name is

17    Mike something, but I can't recall his name.

18         Q.    Do you know the company?

19         A.    He works for himself.

20         Q.    What was Royce Maza's portion of the case?

21         A.    Royce is --

22                MS. PAUL:   Objection to form.

23         A.    Royce is involved in research, as well as the

24    trash refuge part of the case.

25         Q.    (BY MR. LAZARUS)   Is the gentleman Mike
```

Robert Kimmons                                                April 28, 2006

```
 1   involved in the trash refuge part of the case?

 2        A.    I believe in a limited way he was.  That's

 3   where he came into play.

 4        Q.    What did he do, Mike?

 5             MS. PAUL:  Objection.  Calls for work

 6   product, what did he do.

 7             MR. LAZARUS:  I know what my question

 8   was.

 9             MS. PAUL:  I instruct him not to answer

10   the details of what he did.

11        Q.  (BY MR. LAZARUS)  Jim Dunbar was involved in

12   the case you said.  What did he do?

13             MS. PAUL:  Objection.  Work product.  I

14   instruct you not to answer.

15        Q.  (BY MR. LAZARUS)  How long has Royce Maza been

16   with your company, sir?

17        A.    Quite a while.  I'd say 12, 13 years.

18        Q.    Where does he reside, in Houston?

19        A.    Yes, sir.

20        Q.    What's his background, prior to coming to you?

21        A.    Royce has a degree in business, was not former

22   law enforcement.  He's been with me since he was

23   probably right out of college.

24        Q.    Did you give him any particular training at

25   your company to become an investigator?
```

Robert Kimmons

April 28, 2006

1    Mr. Kimmons has been at the direction of counsel and is

2    all work product protected.  Now, Mr. Lazarus states

3    that he's only asking for facts; however, there is case

4    law that states that, you know, in a deposition

5    situation a discussion of factual matters may reveal

6    counsel's, or an investigator on counsel's behalf,

7    tactical or strategic thoughts.  And so, Your Honor, all

8    we're trying to do here today is to protect our

9    work-product privilege on matters that Mr. Kimmons never

10   intended to testify to.  We never intended for him to

11   testify to that information, so defendants are not

12   prejudiced in any way.  As to the documents on which,

13   you know, he may potentially be a witness on, defendants

14   have been permitted to ask questions.

15                THE COURT:  I'm not sure what this

16   individual's background is.  It would be helpful for me

17   in my decision making to understand exactly what he did

18   in connection with this case so that I can make a better

19   determination of what facts he should be charged -- with

20   what facts he should be charged.  So, Ms. Paul, if you

21   would explain his role in connection with this

22   litigation.

23                MS. PAUL:  Yes, absolutely, Your Honor.

24   Mr. Kimmons was engaged by Cravath in probably early

25   November of 2005 to conduct work for us in anticipation

Page 107

```
 1    of a potential lawsuit against Mick Dubea and other
 2    former employees of RSI which was acquired by Pike.
 3    That was the scope of his investigation.  At all times
 4    he was under the direction of counsel, and so that --
 5    and his work for Cravath, you know, continues to be
 6    ongoing and, in fact, he's testified about this
 7    information this morning.
 8                THE COURT:  All right.  And the reason
 9    that you-all listed him in the 26(a) disclosures was
10    why?  What facts did you intend for him to have
11    knowledge?
12                MS. PAUL:  In the course of his
13    investigation at the direction of counsel, he collected
14    documents from Mr. Dubea's trash and from the trash of
15    Mr. Alex Graham.  That information, because it's
16    defendants' own -- although Alex Graham is not a
17    defendant but he's someone that was under
18    investigation -- it's their own documents, Mick Dubea's
19    own documents specifically, so there's no -- we can't
20    claim work product over that, and when we identified him
21    on our initial disclosures we intended, you know, to
22    produce those documents to defendants, which we have,
23    and to potentially have Mr. Kimmons testify to that
24    information.
25                THE COURT:  So the only information that
```

Robert Kimmons                                                                April 28, 2006

1    was deciding, hey, I'm going to keep this?

2        A.    That's not where it's done, though.   It's done

3    back at the office.   I'll clarify it, though.   If we see

4    it's grass clippings, we're not going to bring it back

5    but if it's trash with documents it's going to be

6    brought back to the office and gone through there.

7        Q.    So it's your testimony that the entire

8    contents of the trash can, with the exception of grass

9    and things like that, were brought back to your office?

10       A.    That's how it's normally done, and I know it

11   was brought back because I saw it brought back.   I would

12   have to clarify that there was no way anything could

13   have been thrown away besides grass.   I can't say that a

14   hundred percent.   That's normally not how it's done.   It

15   would be brought back to the office, because we lay it

16   out on the table with rubber gloves and that kind of

17   thing and go through it.

18       Q.    And again the reason you can't tell us is

19   because you weren't there at the time it was pulled?

20       A.    That's correct.

21       Q.    You said you have some videotape of where the

22   trash cans were located, correct?

23       A.    Yes.

24       Q.    Does that videotape show the trash actually

25   being taken out of the receptacle?

Robert Kimmons                                                          April 28, 2006

1      A.    By the garbage -- you know, I don't know.  I

2   haven't looked at it in a long time.

3      Q.    Have you reviewed the videotapes?

4      A.    Yes, but I didn't review it for this

5   deposition.  I didn't really think it would be

6   pertinent, other than I know it has pictures of the cans

7   sitting out there.  I don't recall it having pictures of

8   the truck actually picking it up.  I don't think that's

9   true.

10     Q.    The document that you gave us today that have

11  the trash retrieval dates on it that you prepared for

12  us, am I correct in assuming that the dates that are on

13  this document are the only dates that someone from your

14  firm went to retrieve trash?

15     A.    That's true.

16     Q.    And the only two locations where anyone from

17  your firm attempted to retrieve trash was from Mick

18  Dubea's or Alex Graham's trash?

19     A.    Correct.

20     Q.    So let me -- I know you have a number of

21  geographic locations for your offices.  Is that correct?

22     A.    Associate offices.  I do have a small office

23  in Round Rock near Austin.

24     Q.    You had an office in Dallas for a while?

25     A.    Yeah, I've had several but now I've just got