# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

United States District Court
Southern District of Texas
FILED

AUG 0 7 2006

Michael N. Milby, Clerk

PIKE ELECTRIC CORPORATION &
PIKE ELECTRIC, INC.,

                                    Plaintiffs

                    v.

T&D SOLUTIONS, LTD., T&D SOLUTION
MANAGERS, L.L.C., CORY CLOSE &
CHAD DUBEA,

                                    Defendants.

Civil Action No. M-05-410
**Jury Demanded**

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Michael A. Paskin
N.Y. Bar No. 276750
Attorney In Charge
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Telephone: (212) 474-1000
Telecopier: (212) 474-3700

OF COUNSEL:
Sofia A. Ramon
State Bar No. 00784811
Federal ID #20871
Atlas & Hall, LLP
818 Pecan (78501)
P.O. Box 3725
McAllen, TX 78502
Telephone: (956) 632-8271
Telecopier: (956) 686-6109

Veronica Gonzales
State Bar No. 08122080
Federal ID #14270
Kittleman, Thomas & Gonzales, LLP
4900-B North 10th Street
McAllen, TX 78504
Telephone: (956) 686-8797
Telecopier: (956) 630-5199

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ............................................................................... 1

STATEMENT OF FACTS ........................................................................ 3

    A.    The Parties. .................................................................... 3

    B.    The Importance of Customer Relationships and Skilled Employees
        in the Electric Transmission and Distribution Industry. .............. 4

    C.    Pike Acquires RSI and Enters Into Employment Agreements with
        Key RSI Personnel. .......................................................... 6

    D.    Chad Dubea, Cory Close, Alex Graham and Sammy Christian
        Form T&D, Secure Funding for T&D, and Solicit Customers for
        T&D, While Each is Still Employed by Pike. .......................... 9

ARGUMENT ..................................................................................... 14

I.    SUMMARY JUDGMENT STANDARD. ............................................... 14

II.    THERE IS AMPLE EVIDENCE TO SUPPORT PIKE'S CLAIM FOR
      TORTIOUS INTERFERENCE WITH CONTRACT. ............................... 15

    A.    Defendants are Estopped From Contesting the Enforceability of the
        Non-Competes. .............................................................. 17

    B.    The Non-Compete Agreements Are Otherwise Enforceable. ............. 18

        1.    Pike made several promises that give rise to an interest in
            restraining the Relevant Employees from competing. ........... 19

        2.    The non-compete agreements do not impose a greater
            restraint than is necessary to protect the goodwill or other
            business interests of Pike. ........................................... 27

    C.    Defendants Make No Attempt to Explain Why Summary Judgment
        Should Be Granted On Pike's Claim of Tortious Interference with
        the Non-Disclosure and Extent of Service Provisions of the
        Employment Agreements .................................................. 30

Page

III.  THERE IS AMPLE EVIDENCE TO SUPPORT PIKE'S CLAIM FOR
TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACT AND
BUSINESS RELATIONS. .................................................................................30

    A.  Defendants Have Engaged in a Multitude of Independently
Tortious and Unlawful Behaviors to Gain a Competitive
Advantage Over Pike. .................................................................................32

        1.  Tortious interference with contract. ...............................................32

        2.  Misappropriation of trade secrets....................................................33

        3.  Breach of fiduciary duty, and knowing participation in
breach of fiduciary duty. ................................................................33

    B.  There is No Legal Justification or Privilege to Employ Wrongful
and Unlawful Means to Compete. ............................................................36

IV.  THERE IS AMPLE EVIDENCE TO SUPPORT PIKE'S CLAIM FOR
MISAPPROPRIATION OF TRADE SECRETS. ..................................................38

CONCLUSION............................................................................................................46

# TABLE OF AUTHORITIES

<u>Page</u>

## Cases

*Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 124 S.W.3d 678 (Tex. App. Austin 2003) ................................................................................................. 25

*Am. Fracmaster, Ltd. v. Richardson*, 71 S.W.3d 381 (Tex. App. Tyler 2001) ................................................................................................................. 17

*Am. Precision Vibrator Co. v. Nat'l Air Vibrator Co.*, 764 S.W.2d 274 (Tex. App. Houston [1st Dist.] 1989) ...................................................... 41

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................... 14

*Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787 (Tex. App. Houston [1st Dist.] 2001) ............................................................................ 27, 28

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) .................................. 14, 15

*Daniel v. Falcon Interest Realty Corp.*, 190 S.W.3d 177 (Tex. App. Houston [1st Dist.] 2005) ................................................................ 35, 38

*Deer Creek Ltd. v. North Am. Mortgage Co.*, 792 S.W.2d 198 (Tex. App. Dallas 1990) ............................................................................................ 18

*DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421 (5th Cir. 2003) ................... 16

*Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505 (Tex. 1993) ..................... 17

*E.I. duPont deNemours & Co., Inc. v. Christopher*, 431 F.2d 1012 (5th Cir. 1970) ................................................................................................ 41

*Edwards Transps., Inc. v. Circle S Transps., Inc.*, 856 S.W.2d 783 (Tex. App. Amarillo 1993) ...................................................................... 37

*FCI USA, Inc. v. Tyco Elecs. Corp.*, No. 2:06-CV-128 (TJW) (E.D. Tex. July 18, 2006) .......................................................................................... 33

*Field v. Alexander & Alexander of Ind., Inc.*, 503 N.E.2d 627 (Ind. Ct. App. 1987) ................................................................................................. 22, 23

*Fox v. Tropical Warehouses, Inc.*, 121 S.W.2d 853 (Tex. App. Fort Worth 2004) ................................................................................... 39, 43, 45

*Gonzales v. Zamora*, 791 S.W.2d 258 (Tex. App. Corpus Christi 1990) ............. 39, 43, 45

iii

*Grimes v. Andrews*, 997 S.W.2d 877 (Tex. App. Waco 1999) .......................................... 18

*Herider Farms-El Paso, Inc. v. Criswell*, 519 S.W.2d 473 (Tex. Civ. App. El Paso 1975) ................................................................................................ 35

*Hill v. Heritage Resources, Inc.*, 964 S.W.2d 89, 107 (Tex. App. 1997) ....................... 32

*Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257 (5th Cir. 1991) .................................. 15

*Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509 (Tex. 1942) ................... 33

*Lehmann v. Har-Con Corp.*, 76 S.W.3d 555 (Tex. App. Houston [14th Dist.] 2002) ............................................................................................... 18

*Leon's Fine Foods, Inc. v. McClearin*, No. 05-97-01198-CV, 2000 WL 277135 (Tex. App. Dallas Mar. 15, 2000) .................................................... 21

*Leonard Duckworth, Inc. v. Michael L. Field And Co.*, 516 F.2d 952 (5th Cir. 1975) ......................................................................................... 31, 37

*Light v. Centel Cellular Co. of Texas*, 883 S.W.2d 642 (Tex. 1994) .......................... 19, 21

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) ............................. 15, 16, 30

*Mathews Heating & Air Conditioning, LLC v. Liberty Mutual Fire Ins. Co.*, 384 F. Supp. 2d 988 (N.D. Tex. 2004) ................................................. 38

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............................................................................................................ 15

*McAnelly v. Brady Med. Clinic, P.A.*, No. 03-04-00095-CV, 2004 Tex. App. LEXIS 10028 (Tex. App. Austin Nov. 12, 2004) ................................... 25

*Meadows v. Hartford Life Ins. Co.*, 429 F. Supp. 2d 853 (S.D. Tex. 2006) .................... 33

*Molina v. Air Starter Components, Inc.*, No. 01-03-00715-CV, 2004 WL 1277491 (Tex. App. Houston [1st Dist.] June 10, 2004. ............................... 43

*Nat'l Café Servs., Ltd., v. Podaras*, 148 S.W.3d 194, 199 (Tex. App. Waco 2004) ..................................................................................................... 17, 18

*Nova Consulting Group, Inc. v. Eng'g Consulting Servs., Ltd*, No. Civ. SA03CA305FB (W.D. Tex. June 3, 2005) .................................................. 33

*Olander v. Compass Bank And Compass Bancshares, Inc.*, 172 F. Supp. 2d 846 (S.D. Tex. 2001) ....................................................................... 25

*Osborn v. Bell Helicopter Textron, Inc.*, 828 F. Supp. 446 (N.D. Tex. 1993) ............................................................................................... 28

iv

*Phillips v. Frey*, 20 F.3d 623 (5th Cir. 1994)..................................................... 38, 44

*Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455 (5th Cir. 1998) ...................................... 15

*Rheams v. Bankston, Wright & Greenhill*, 756 F.Supp. 1004, 1005 (W.D. Tex. 1991) ................................................................................. 32

*Roehrs v. Conesys, Inc.*, 2005 WL 3454015, at *7 (N.D. Tex. 2005) .............................. 32

*Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548 (Tex. App. Dallas 1993) ................................................................................. 39, 43, 44, 45

*Sautter v. The Comp Solutions Network, Inc.*, No. 14-98-00555-CV, 1998 WL 802481 (Tex. App. Houston [14th Dist.] Nov. 19, 1998) ...................................... 42

*Shipper v. Am. Auto. Ass'n, Inc.*, No. 3-94-CV-2558-R, 1997 WL 135672 (N.D. Tex. Mar. 12, 1997) ............................................................ 36

*Star Tobacco, Inc. v. Darilek*, 298 F. Supp. 2d 436 (E.D. Tex. 2003) .............................. 32

*State Nat'l Bank of El Paso v. Farah Mfg. Co., Inc.*, 678 S.W.2d 661 (Tex. App. El Paso 1984) ............................................................ 37

*Stone v. Griffin Commc'ns and Sec. Sys., Inc.*, 53 S.W.3d 687 (Tex. App. Tyler 2001) ............................................................ 28

*Strickland v. Medtronic, Inc.*, 97 S.W.3d 835 (Tex. App. Dallas 2003) ........................... 25

*Thrift v. Hubbard*, 44 F.3d 348 (5th Cir. 1995) ............................................................ 30, 31

*T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18 (Tex. App. Houston [1st Dist.] 1998) ............................................................ 44

*Totino v. Alexander & Assocs., Inc.*, No. 01-97-01204-CV, 1998 WL 552818 (Tex. App. Houston [1st Dist.] Aug. 20, 1998) ...................................... 21

*Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452 (Tex. App. Austin 2004) ............................................................ 24

*U-fuel, Inc. v. S.W. Research Inst.*, No. SA-00-CA-0480-OG, 2002 WL 1492214, at *8 (W.D. Tex. Feb. 5, 2002) ...................................... 38

*Vietnamese Fishermen's Ass'n v. The Knights of the Ku Klux Klan*, 518 F. Supp. 993 (S.D. Tex. 1981) ............................................................ 15

*Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711 (Tex. 2001) .............................. 31

*Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654 (Tex. App. Dallas 1992) .............................. 30

[[NYLIT:2385338v5:3978W:08/07/06—10:54 a]]

**Statutes & Administrative Codes**

TEX. BUS. & COM. CODE ANN. § 15.50 (Vernon 2005) ..................................................... 19

TEX. BUS. & COM. CODE ANN. § 15.50(a) (Vernon 2005)............................................... 28

**Other**

Fed. R. Civ. P. 56(c) ........................................................................................... 2, 14

RESTATEMENT (SECOND) OF TORTS § 768 (1979)............................................................ 37

## Introduction

In forming T&D Solutions, Chad Dubea and Cory Close stole Pike's trade secrets, used unlawful tactics to solicit Pike's customers and convinced many of Pike's most important employees to breach their employment contracts. They carried out those activities, and began operating T&D, behind Pike's back while still employed by Pike. There is no right, whether constitutional or otherwise, to engage in such deceptive and wrongful behavior simply by calling it "competition". Without disputing the vast majority of the facts alleged in Pike's complaint—the same pleading with respect to which this Court previously denied Defendant's motion to dismiss—Defendants now seek summary judgment.

Defendants' motion is premised on an inaccurate and incomplete description of the record, and, in setting forth their arguments, Defendants simply disregard the mountain of evidence supporting Plaintiffs' claims. Defendants also misstate the law, ignoring the well-settled standards for enforceability of covenants not to compete and misappropriation of trade secrets in Texas. Further, Defendants simply ignore certain aspects of Pike's claims, providing no argument, for example, as to why Pike's claim that Defendants tortiously interfered with the Non-disclosure and Extent of Service provisions of the relevant Employment Agreements should be dismissed. Thus, even if Defendants' arguments had merit—and they do not—the motion is really only for partial summary judgment and it would not dispose of this case.

Nevertheless, an accurate description of the facts and the law, which we submit herein, demonstrates that the Defendants' arguments are all without merit and Pike will prevail on its claims at trial. At the very least, the record compiled during

discovery creates numerous disputes of material fact that preclude summary judgment for Defendants on any ground against any of Pike's claims.

*First*, Defendants move for summary judgment on Pike's claim for tortious interference with contract solely on the ground that the non-compete covenants in the identical employment agreements of Alex Graham, Sammy Christian, Tim Droddy, Clifton Droddy, Manny Sasko and Chuck Chaddrick ("the Relevant Employees") are unenforceable. However, Defendants are estopped from challenging the enforceability of those provisions, *(see infra* §II.A) and, in any event, the provisions are valid under Texas law *(see infra* §II.B).

*Second*, Defendants move for summary judgment on Pike's claim for tortious interference with prospective business relations on the ground that the Defendants have not engaged in any "independently wrongful or tortious" behavior. (Def. Mot. at 13-14.) To the contrary, the record is replete with evidence of Defendants' wrongful and independently tortious conduct, including multiple breaches of fiduciary duty, misappropriation of trade secrets and tortious interference with the Employment Agreements of the Relevant Employees. *(See infra* §III.)

*Third*, Defendants state only two grounds for their motion with respect to Pike's claim for misappropriation of trade secrets, namely that (1) Pike has not demonstrated that it has protectable trade secrets; and (2) there is a lack of evidence regarding T&D's use of Pike's trade secrets. However, Defendants simply ignore the evidence in this case, as it is clear that Pike took reasonable steps to protect its valuable confidential information, and that T&D has benefited from the theft of Pike's customer

2

information, employee wage data, safety and training materials, and job cost data. (*See infra* §IV.)

### Statement of Facts

**A.     The Parties.**

Pike provides electric distribution and transmission services to electrical utilities, cooperatives and municipalities across the eastern half of the United States, including Texas and Louisiana. (*See e.g.*, Graham Dep. at 11:16-12:5 (Ex. 49 to the Affidavit of J. Wes Earnhardt in Opposition to Defendants' Motion for Summary Judgment (hereinafter "Earnhardt Aff. Ex. [ ]")); Christian Dep. at 11:14-19 (Earnhardt Aff. Ex. 50).)[1] Its services include power line construction and maintenance, storm restoration, right-of-way maintenance and fiber-optic installation. (LGBE00003056-3089 at 73 (Earnhardt Aff. Ex. 25).) Pike has been in business since 1945. (*Id.* at LGBE00003065.)

T&D Solutions, Ltd. and T&D Solutions, L.L.C. (collectively "T&D") were incorporated in Texas on October 5, 2005, by several then-current Pike employees, including Chad Dubea and Cory Close. (C. Dubea Dep. Ex. 9 (Earnhardt Aff. Ex. 38).) T&D provides electric distribution and transmission services to electric utilities and cooperatives, and competes directly with Pike in Texas and Louisiana. (*E.g.*, C. Dubea Dep. at 8:23-25 (Earnhardt Aff. Ex. 55); Graham Dep. at 11:16-12:15 (Earnhardt Aff. Ex. 49); Christian Dep. at 11:14-23 (Earnhardt Aff. Ex. 50).)

---

[1] Citations to the transcripts of depositions will take the following form: "[Name] at [Page]".

[[NYLIT:2385338v5:3978W:08/07/06--10:54 a]]

**B.    The Importance of Customer Relationships and Skilled Employees in the Electric Transmission and Distribution Industry.**

Pike has spent an enormous amount of time and money in an effort to retain its skilled labor force and build lasting customer relationships. To prevent its competitors from taking its employees and using the confidential information and business goodwill possessed by them, Pike has, from time to time, entered into employment agreements containing non-compete and non-disclosure provisions with many of its key employees. (*See e.g.*, Employment Contract, Nonqualified Deferred Compensation Agreement and Agreement Not to Compete ("Employment Agreements") for the Relevant Employees) (attached hereto as Exs. 1-6 to Earnhardt Aff.); PIKE 50011520-11671 (containing stock option agreements with noncompete provisions with various Pike executives) (Earnhardt Aff. Ex. 7-21).)

Most of Pike's customers assign work to it under negotiated work arrangements. (*See* E. Pike Dep. at 324:5-324:12 (Earnhardt Aff. Ex. 52) ("A lot of the contracts are renewed year over year in negotiated format. . . . Both companies [Pike and RSI] experienced around 80 percent negotiations on most of their major contracts."); DUBEA 000287-337 at 321 (Earnhardt Aff. Ex. 22) ("over 80% of contracts awarded through negotiation rather than bidding").) Under those arrangements, Pike is not required to submit a competitive bid to win the work, but is instead given the work based on its long-standing relationships with its customers. (E. Pike Dep. at 322:22-324:12 (Earnhardt Aff. Ex. 52).) While Pike's customers generally have no contractual obligation to continue to assign work to Pike, based on long-standing business practices, there is a reasonable probability that many of them will continue to do so. (*See, e.g.*, LGBE00003056-3089 at 75 (Earnhardt Aff. Ex. 25) ("Both Pike and RSI have strong,

4

long-standing relationships with their customers. . . .   For its top 15 customers,

Pike/RSI's relationships average 33 years (40 years on a revenue-weighted basis), as both

firms have effectively become part of their customers' teams . . ."); Lenz 6/27/06 Dep. at

9:12-10:4 (Earnhardt Aff. Ex. 48A).)  Pike's relationships with its customers were

cultivated by senior management at Pike and RSI.  (See e.g., Graham Dep. at 36:11-24

(Earnhardt Aff. Ex. 49) ("That relationship was built not only from me but from Mick,

Johnny and everybody. . . .").)  Consequently, as a result of Pike's long-standing

relationships with its customers, Pike is not at risk of losing significant business, unless

its competitors can convince its customers to change the service providers that they have

used for decades, or the competitors can gain access to the valued Pike employees

responsible for fostering those customer relationships.

 For that reason, it is atypical for start-up companies to gain footing in the

transmission and distribution industry, precisely because start-ups lack the critical long-

term customer relationships and trade secrets that Pike and RSI have built and developed

over the past 60 years.  (See LGBE00003056-3089 at 84 (Earnhardt Aff. Ex. 25) ("With

respect to new entrants, several significant barriers to entry exist for large scale

competitors, including: . . . (ii) the need for highly skilled personnel; (iii) the necessity of

customer relationships and knowledge of their networks . . .and (v) the need for a broad

customer base so as to effectively utilize equipment and personnel.").)  In other words, a

start-up could not effectively compete with Pike unless it could somehow obtain

comparable customer relationships and know-how in a short period of time.

5

**C.    Pike Acquires RSI and Enters Into Employment Agreements with Key RSI Personnel.**

On July 1, 2004, Pike acquired all the outstanding shares of the common stock of a privately-held company called Red Simpson Inc. ("RSI") for $194 million. (*See* Stock Purchase Agreement, PIKE00017122-17204 (Earnhardt Aff. Ex. 23).)  At the time of the acquisition, RSI employed over 1,500 individuals, had customers throughout the South Central and Southwestern parts of the United States and was generally considered one of America's leading power line contractors.  (*See* LGBE00003056-3089 at 87 (Earnhardt Aff. Ex. 25).)

The RSI acquisition was a good strategic fit for Pike because the companies operated similar businesses in similar geographic regions, but shared only two mutual clients out of their top 15 customers.  (*Id.* at 3060.)  In effect, Pike purchased RSI's customers, and its employees' and executives' relationships with those customers, when it acquired RSI.  (*See* Triedman Dep. at 31:24-32:12 (Earnhardt Aff. Ex. 56) ("We were keenly focused on the customers, the customer relationships and the employees, that is what we were buying.  And it was extremely important for us to have the people who had those customer relationships to either be with the company and certainly not interfering . . ."); Christian Dep. at 88:1-21 (Earnhardt Aff. Ex. 50) (testifying that customers and employees are what is purchased in acquisitions in the transmission and distribution industry).)

At the time Pike acquired RSI, Defendant Chad Dubea, who began working at RSI as a teenager, had been promoted to be a Pike Area Supervisor by his father Mick Dubea, who was the President of RSI's Western Region.  (C. Dubea Dep. at 190:17-20 (Earnhardt Aff. Ex. 55).)  Defendant Cory Close was RSI's controller (*i.e.*,

principal accounting officer), which gave him access to confidential and proprietary RSI information.  (Close Dep. at 27:9-18 (Earnhardt Aff. Ex. 54).)

Prior to the acquisition, RSI had employment agreements containing non-compete and non-disclosure provisions with many of its skilled employees.  (*See e.g.*, Employment Agreements (Earnhardt Aff. Exs. 1-6).)  Pike agreed with each of those employees to amend the Employment Agreements so that they would be enforceable by, and accrue to the benefit of, Pike.  (*See* Second Amendment Agreements § 1.04 (Earnhardt Aff. Exs. 1-6) ("Employee acknowledges and agrees that all Employee's covenants and obligations to Employer . . . shall run in favor of and shall be enforceable by Employer, Pike [and] their respective affiliates . . .").)

In exchange, Pike vested the employees' "Termination Benefits" provided for by the Employment Agreements, and also promised to pay a matching "Bonus Amount" over a four year period.  (*See id.* §1.02; Castaneda Dep. at 107 (Earnhardt Aff. Ex. 45).)  The Bonuses were offered to foster loyalty between Pike and the new employees it was acquiring.  (*See* Memo re: Amendments to Deferred Compensation Agreements, PIKE00003560-3567 at 60 (Earnhardt Aff. Ex. 24) ("we wanted [to offer the Bonus Amounts] to serve as a strong incentive for RSI's key employees to continue their careers with the combined RSI/Pike organization.").)  The Bonus Amounts were contingent upon the employees' return promises to:  (1) join Pike; (2) not compete with Pike before or after termination; and (3) not disclose Pike's confidential information.  (*See* First Amendment Agreements §3.03 (Earnhardt Aff. Exs. 1-6).)

The following relevant employees, at a minimum, signed such amended agreements with Pike:  Chuck Chaddrick, Tim Droddy, Clifton Droddy, Sammy

Christian, Alex Graham and Manny Sasko. (*See* Employment Agreements (Earnhardt Aff. Exs. 1-6).)

Article III of the Employment Agreements, as amended, prohibited the employees from competing with Pike for a period of two years following their termination from Pike:

> "Employee agrees that for a period of two years from termination or cessation of employment for any reason with Red Simpson, Employee will . . . Refrain from carrying on or engaging in a business similar to that of Red Simpson or Subsidiaries within the geographical area of those parishes in the State of Louisiana and those counties in the states of Texas, Mississippi, Arkansas, Oklahoma, Alabama, Florida and/or Georgia specified in Exhibit "B" attached hereto." (*Id.* at Art. III.)

The Relevant Employees also released any claim that the non-competition clauses were in any way unenforceable:

> "3.02 Employee . . . agrees and hereby acknowledges that . . . [the non-compete] provisions contain reasonable limitations as to time, geographic area and the scope of activity to be restrained. . . . Employee agrees that he will not assert, and it should not be considered, that any provisions hereof prevent him from earning a living or are otherwise void, voidable, or unenforceable. To the maximum extent allowed by law this provision shall estop Employee from bringing such action." (*Id.* §3.02.)

Section 1.05 of the Employment Agreements, as amended, required the employees to protect Pike's confidential information and trade secrets:

> "Employee acknowledges that the business methods, confidential information, and trade secrets of Red Simpson and/or Subsidiaries (collectively "Business Information") and the list of Red Simpson's and/or Subsidiaries' customers as may be determined from time to time (collectively, "Customer Lists") are valuable, special and unique assets of Red Simpson's and Subsidiaries' business. Employee shall not, during and after the term of his employment with Red Simpson, disclose all or any part of the Business Information or Customer Lists to any person, firm, corporation, association or other entity for any reason or purpose." (*Id.* §1.05.)

[[NYLIT:2385338v5:3978W:08/07/06--10:54 a]]

Moreover, Section 1.04 of the Employment Agreements, as amended, required the employees to refrain from carrying on or engaging in any other, similar business activity during the course of their employment with Pike:

> "Employee shall exert his best efforts and devote substantially all his time, attention and energies to Employer's business. Except as otherwise provided in this Agreement, during the term of employment with Employer, Employee shall not carry on or engage in other business activity, regardless of whether it is pursued for gain, profit or charity. As a limited exception to the foregoing, however, Employee may engage in other business activity if the business activity is not similar to that of the business of Red Simpson and/or Subsidiaries and if Employee's engaging in the other business activity will not interfere with his employment duties or obligations to Employer." (*Id.* §1.04.)

**D.    Chad Dubea, Cory Close, Alex Graham and Sammy Christian Form T&D, Secure Funding for T&D, and Solicit Customers for T&D, While Each is Still Employed by Pike.**

On October 5, 2005, Chad Dubea formed T&D in Harlingen, Texas. (C. Dubea Dep. Ex. 9 (Earnhardt Aff. Ex. 38).) He did not leave his job at Pike, however, until October 21, 2005, despite recruiting numerous Pike employees to join T&D and engaging in other activities to foster T&D's business during the interim weeks. (C. Dubea Dep. at 175:19-177:5 (Earnhardt Aff. Ex. 55).)

The plans to form T&D began as early as September of 2004, with discussions commencing in earnest in May and June of 2005. (Graham Dep. at 135:14-18, 153:14-21 (Earnhardt Aff. Ex. 49); Defendants' Response to Plaintiffs' Combined First Set of Request for Production of Documents and Interrogatories, Answer to Interrogatory Number 1 (Earnhardt Aff. Ex. 40).) Alex Graham and Sammy Christian, then-current Pike employees who had Employment Agreements with Pike, were intimately involved in those discussions and were "[in] on the ground floor" of the new company. (*Id.*; C. Dubea Dep. at 197:25-198:16 (Earnhardt Aff. Ex. 55).) Nevertheless,

[[NYLIT:2385338v5:3978W:08/07/06--10:54 a]]

Mr. Christian and Mr. Graham continued to work at Pike until October 22, 2005 and

November 14, 2005, respectively, and hid their participation in T&D from Pike's

management, including by directly lying to Pike's managers. (Christian Dep. at 159:3-6,

172:18-174:1 (Earnhardt Aff. Ex. 50); Graham Dep. at 186:15-16, 201:13-202:9

(Earnhardt Aff. Ex. 49).) During that time, both Mr. Christian and Mr. Graham had

access to Pike's customers, job cost information, and employee wage data. (Graham

Dep. at 30:25-31:7, 86:2-25, 100:22-103:2 (Earnhardt Aff. Ex. 49); Christian Dep. at

77:1-18; 134:1-24 (Earnhardt Aff. Ex. 50).)

        In October of 2005, Defendants, with the help of Alex Graham and

Sammy Christian, began soliciting additional Pike personnel on behalf of T&D. (*See*

*e.g.*, C. Dubea Dep. at 147-153 (Earnhardt Aff. Ex. 55).) Between October 5, 2005 and

October 21, 2005, Defendants solicited the employment of, at a minimum, the following

eight individuals: Ephraim Droddy, Tim Droddy, Clifton Droddy, Arlen Phillips, Ernesto

Rocha, Jesse Acosta, Rick Cook and Robert Strother. (*Id.*) On October 21, 2005, when

Alex Graham and Sammy Christian were still employed by Pike, Defendants solicited the

employment of, at a minimum, another six individuals, including Steve Whisneant,

Dwayne Parks, James Payne and Cody Stewart. (*Id.* at 183:2 - 183:14; Strother Dep. at

149:3-150:13, 152:21-153:5 (Earnhardt Aff. Ex. 51).) T&D solicited those employees, in

part, by using Pike's confidential wage rates taken from an RSI server, which allowed

T&D to formulate a compensation plan that would be attractive enough to induce Pike's

employees to leave to work for a start-up company. (Close Dep. Exs. 14, 16 (Earnhardt

Aff. Exs. 36, 34); C. Dubea Dep. at 159:6-18 (Earnhardt Aff. Ex. 55) and Exs. 22, 24

(Earnhardt Aff. Exs. 35, 30).)

Pike believes that since October of 2005, over ninety employees have left

Pike and joined T&D. (*See* PIKE50000536-539 (Earnhardt Aff. Ex. 43).) The following

employees, at a minimum, left Pike for T&D in breach of the obligations in their

Employment Agreements: Chuck Chaddrick, Tim Droddy, Clifton Droddy, Sammy

Christian, Alex Graham and Manny Sasko. Defendants knew about the existence of

those employment agreements and the binding covenants therein, but nevertheless

endeavored to cause the employees to breach those agreements. (C. Dubea Dep. at

162:7-163:12 (Earnhardt Aff. Ex. 55).) Chad Dubea, Mick Dubea, Alex Graham and

Sammy Christian also went together to secure equipment for T&D while all but Mick

Dubea were still employed at Pike. (Styslinger Dep. at 97-105, 108-09 (Earnhardt Aff.

Ex. 42).) Defendants induced the employees to join T&D by, among other things,

promising them promotions and equity interests in the new company once the two-year

period of their non-compete covenants had expired, and demonstrating to them how over

a period of several years it would be more financially rewarding from them to work for

T&D than for Pike. (*See* Close Dep. Exs. 14, 16 (Earnhardt Aff. Exs. 36, 34); C. Dubea

Dep. at 159:6-18 (Earnhardt Aff. Ex. 55) and Exs. 22, 24 (Earnhardt Aff. Exs. 35, 30).)

Cory Close, a C.P.A., began working for T&D in June of 2005 and now

functions as T&D's CFO. (Close Dep. at 252:19-253:5; 7:24-8:1 (Earnhardt Aff. Ex.

54).) Close had worked as RSI's controller for approximately four years and, in that

capacity, had served as the right-hand man to RSI's CFO, Simmy Thibeaux. (*See id.* at

29:21-30:2.) Close admits that when Pike acquired RSI in July of 2004, Pike trusted in

and relied upon Close to assemble and analyze sensitive financial data instrumental to the

process of integrating RSI into Pike. (*See id.* at 159:18-160:4.) So crucial was Close's

11

role in the integration that Pike tripled the amount of Close's stay-on bonus to ensure his

continued employment with Pike.  (*Id.* at 210:6-19; 235:7-17; Close Dep. Ex. 7

(Earnhardt Aff. Ex. 29) (Pike's CEO stating "We really can't do without him for the next

several months").)  Close remained a full-time employee of Pike until September 23,

2005, despite performing over 46 hours of work for T&D prior to that date.  (Close Dep.

at 270:19-271:6 (Earnhardt Aff. Ex. 54).)  Thereafter, Pike trusted Close to take his work

computer home with him, for the reason that Pike might need to call upon him for his

services in the future, and on the understanding that Close was planning on expanding his

own public accounting practice and would not be accepting a position at a competing

company.  (Mullins Dep. at 72:18-74:18 (Earnhardt Aff. Ex. 59).)

           Close, however, betrayed Pike's trust and confidence by misusing Pike's

valuable confidential information while he was still fully employed by Pike.  Specifically,

at Chad Dubea's direction, Close surreptitiously extracted payroll, bonus and

compensation information from RSI's database for a specific set of experienced Pike

employees that Chad was interested in hiring.  (Close Dep. at 154:8-158:9 (Earnhardt

Aff. Ex. 54).)  Chad Dubea intended to use, and did use, that information for purposes of

T&D's financial planning and solicitation of Pike's employees.  (*Id.* at 165:21-166:4 ("I

think the main thing it did was . . . kept Chad from having to go talk to every one of those

individuals or in the industry . . . I think it just helped him speed it up or helped T&D

speed it up"); C. Dubea Dep. at 154:9-158:10 (Earnhardt Aff. Ex. 55).)  Close also

secretly extracted a consolidated profit and loss statement from RSI's database.  (Close

Dep. at 183:9-186:1 (Earnhardt Aff. Ex. 54).)  Close used the breakdown of costs on that

profit and loss statement as the basis for T&D's initial profit and loss statement, which

12

Close and Chad Dubea used to determine the feasibility of starting a business to compete with Pike, and subsequently relied on to convince Southern Heritage Bank to provide financial backing to T&D. (*Id.* at 304:5-307:8, 310:3-11; *see* Close Dep. Ex. 18 at 51 (Earnhardt Aff. Ex. 60).)

Close continued to betray his relationship of trust and confidence with Pike even after leaving his position of full-time employment. In early October 2005, Pike engaged Close to perform certain part-time work. (Close Dep. at 313:23-314:21 (Earnhardt Aff. Ex. 54).) Close accepted that engagement and sought payment for his work without informing Pike that he was an executive with T&D. (*Id.* at 315:9-316:2.) Close later admitted to Pike that his conduct constituted a conflict of interest. (Mullins Dep. at 72:15-73:21 (Earnhardt Aff. Ex. 59).) Close further indicated to Pike that he had specifically decided to accept the part-time engagement without informing Pike of his involvement with T&D. (*Id.*)

Chad Dubea also used deceptive practices to gain access to Pike's confidential information without the help of Close. On the same day that he submitted papers to form T&D in Harlingen, Texas, Chad Dubea attended a confidential meeting between Pike and one of its largest customers, American Electric Power ("AEP"). (C. Dubea Dep. at 82:2-9, 82:17-84:3 (Earnhardt Aff. Ex. 55); *compare* C. Dubea Dep. Ex. 8 (Earnhardt Aff. Ex. 37) *with* C. Dubea Dep. Ex. 9 (Earnhardt Aff. Ex. 38).) At that meeting, AEP and Pike discussed confidential pricing, upcoming bids, and the scope of future work in Texas. (*See* C. Dubea Dep. Ex. 8 (Earnhardt Aff. Ex. 37).)

Defendants, with the help of Alex Graham and Sammy Christian, began soliciting business from Pike's customers shortly thereafter. In particular, Defendants

13

solicited business from Entergy (West) prior to October 21, 2005, when Chad Dubea,

Alex Graham and Sammy Christian were still employed by Pike. (C. Dubea Dep. at

136:13-139:13, 188:24-189:4 (Earnhardt Aff. Ex. 55); Strother Dep. at 170:1-19

(Earnhardt Aff. Ex. 51).) Cory Close, Chad Dubea, Alex Graham and Sammy Christian

used their and Mick's pre-existing relationships and contacts with those customers,

gained during their employment with Pike and RSI, along with Pike's confidential

information, in an effort to lure the customers away from Pike. (Strother Dep. at 179:9-

19 (Earnhardt Aff. Ex. 51).) Defendants' efforts have been successful. To date, the

following companies have given at least some of their business to T&D that Pike would

reasonably have expected to obtain: Entergy (West), Beauregard Electric Cooperative,

Sharyland Development, AEP, Magic Valley Electric Cooperative and Central Louisiana

Electric Company. (C. Dubea Dep. Ex. 19 (Earnhardt Aff. Ex. 44).) Those customers

are now being serviced primarily by former Pike employees now at T&D, the most

critical of which had Employment Agreements with non-compete provisions with Pike

and RSI. (Strother Dep. 239:9-11 (Earnhardt Aff. Ex. 51).)

**Argument**

## I.    SUMMARY JUDGMENT STANDARD.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary

judgment may be granted only if "there is no genuine issue as to any material fact" and

"the moving party is entitled to a judgment as a matter of law". Fed. R. Civ. P. 56(c); *see*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247 (1986). "[S]ummary judgment will not lie if the dispute about a material

fact is 'genuine . . . .'" *Anderson*, 477 U.S. at 248.

[[NYLIT:2385338v5:3978W:08/07/06—10:54 a]]

On a motion for summary judgment, the burden rests with the moving party to demonstrate there is no genuine issue of material fact. *Celotex*, 477 U.S. at 323; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citation omitted). "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Little*, 37 F.3d at 1075. Furthermore, on a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (internal quotation marks omitted); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citations omitted). "[T]he court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (citations omitted).

## II.    THERE IS AMPLE EVIDENCE TO SUPPORT PIKE'S CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT.

Texas law protects an employer's existing contracts from wrongful interference. *See, e.g., Vietnamese Fishermen's Ass'n v. The Knights of the Ku Klux Klan*, 518 F. Supp. 993, 1011 (S.D. Tex. 1981) ("It is well established that a wrongful or malicious interference with the performance or the formation of a contract . . . constitutes a tort for which damages may be recovered."). In Texas, the elements of tortious interference with contract are:  (1) an existing contract subject to interference; (2) willful or intentional interference; (3) the interference was the proximate cause of damage to the

[[NYLIT:2385338v5:3978W:08/07/06--10:54 a]]

Plaintiffs; and (4) actual damage or loss resulted from the interference. *DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 430 (5th Cir. 2003).

The discovery record clearly establishes all four elements against Defendants.[2]  Indeed, Defendants do not even attempt to challenge the existence of evidence sufficient to support three of the elements: willful interference, causation and damages.  (*See* Defs.' Mot. for Final Summ. J. ("Def. Mot."), at 5-12 (not discussing interference, causation or damages.))  Instead, the *only* basis for Defendants' motion as it concerns Pike's claim for tortious interference with contract is that the non-compete provisions within the Employment Agreements are unenforceable (*i.e.*, Defendants only contest *one* element of Pike's claim as it relates to *one* provision of the Agreements).  (*Id.*)  Defendants do not challenge any of the elements with respect to any other provisions of the contracts.  Thus, with respect to the separate "Disclosure of Information" and "Extent of Service" provisions in the Employment Agreements, Defendants' Motion is silent and therefore fails. *Little*, 37 F.3d at 1075.  Moreover, as is shown below, Defendants are estopped from contesting the enforceability of the non-compete provisions, and the non-compete agreements are, in any event, valid under Texas law.

---

[2] For example, it is undisputed that:  (1) Alex Graham had an Employment Agreement with Pike (Graham Dep. at 127:23-129:4 (Earnhardt Aff. Ex. 49)); (2) he breached the terms of that Agreement by working as a General Foreman for Pike's competitor, T&D (*id.* at 13:11-13); (3) Graham was solicited to T&D by Chad and Cory who have offered him equity ownership in the company despite knowing that he was subject to an Employment Agreement (*id.* at 212:8-21); and (4) Pike lost a valuable employee with significant customer relationships as a result (*id.* at 226:14-227:1; 34:25-37:5).  In particular, Pike lost its account with Sharyland Utilities to T&D when Graham went to work for them.  (Appelbee Dep. at 339-40 (Earnhardt Aff. Ex. 47).)

16

A.    **Defendants are Estopped From Contesting the Enforceability of the Non-Competes.**

Defendants are estopped from challenging the enforceability of the non-competition covenants because the Relevant Employees released all claims "in any way related to" their employment with Pike/RSI, and specifically released any claims that the non-compete provisions in those agreements are in any way unenforceable. The releases in the Employment Agreements at bar are attached hereto as Exhibits 1-6 to the Earnhardt Affidavit and read in pertinent part as follows:

"2.12 Release of Claims and Indemnification. . . . Employee (or his estate or successors or successors in interest) agrees to indemnify, hold harmless, reimburse and defend Red Simpson and Subsidiaries . . . from and against any and all liability, obligations, losses, claims, damages, costs and expenses . . . arising under or in any way connected with Employee's employment with Red Simpson . . ." (Employment Agreement, §2.12 (Earnhardt Aff. Exs. 1-6).)

"3.02 Employee . . . agrees and hereby acknowledges that . . . [the non-compete] provisions contain reasonable limitations as to time, geographic area and the scope of activity to be restrained. . . . Employee agrees that he will not assert, and it should not be considered, that any provisions hereof prevent him from earning a living or are otherwise void, voidable, or unenforceable. To the maximum extent allowed by law this provision shall estop Employee from bringing such action." (*Id.* §3.02.)

Those releases are valid and enforceable. "A release by a promisor in a covenant not to compete can estop the promisor from later challenging the validity of the covenant." *Nat'l Café Servs., Ltd., v. Podaras*, 148 S.W.3d 194, 199 (Tex. App. Waco 2004); *Am. Fracmaster, Ltd. v. Richardson*, 71 S.W.3d 381, 389-90 (Tex. App. Tyler 2001). "A valid release constitutes an absolute bar to any right of action on the released matter." *Nat'l Café Servs.*, 148 S.W.3d at 199 (internal quotation marks omitted); *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993); *accord*

17

*Lehmann v. Har-Con Corp.*, 76 S.W.3d 555, 565 (Tex. App. Houston [14th Dist.] 2002);

*Grimes v. Andrews,* 997 S.W.2d 877, 881 (Tex. App. Waco 1999).

When a non-movant asserts the affirmative defense of release in response to a summary judgment motion, "the non-movant must support the response with evidence sufficient to raise a fact issue on each element of the affirmative defense". *Nat'l Café Servs.*, 148 S.W.3d at 199. The non-movant can support the affirmative defense of release merely by attaching a copy of the release to its response. *Id.*; *see Deer Creek Ltd. v. North Am. Mortgage Co.*, 792 S.W.2d 198, 201 (Tex. App. Dallas 1990).

In *National Café Services*, a substantially similar release to the one at bar was held to establish a prima facie case that a former employee had released his ability to challenge the enforceability of a non-compete provision in his employment contract. 148 S.W.3d at 200. Whether the release here similarly estops Defendants from contesting the enforceability of the non-competes is at the very least a fact issue that is not properly decided on summary judgment. *Id.* at 200. Indeed, once the non-movant adequately supports each element of its claim of release, the movant has necessarily "failed to establish his entitlement to judgment as a matter of law". *Id.*

Pike has established each element of release by attaching the documents containing the release and waiver provisions. *Id.*; *Deer Creek*, 792 S.W.2d at 201. Accordingly, Defendant's motion for summary judgment with respect to Pike's claim for tortious interference with contract should be denied.

B.    **The Non-Compete Agreements Are Otherwise Enforceable.**

Because of the valid and enforceable release and waiver provisions described above, there is no need even to reach the question whether the non-compete agreements with the Relevant Employees are otherwise enforceable. Nevertheless,

18

{[NYLIT:2385338v5:3978W:08/07/06–10:54 a]]

Defendants assert that those non-compete provisions are unenforceable because "Pike
Electric made no promise that gives rise to an interest in restraining competition" and
because "any non-compete would impose a greater restraint than is necessary to protect
the goodwill or other business interests of Pike Electric". (Def. Mot. at 7.) Defendants
are wrong on both counts.

> 1. **Pike made several promises that give rise to an interest in**
>    **restraining the Relevant Employees from competing.**

The Texas statute that governs the enforceability of non-compete
covenants provides:

> "§15.50 Criteria for Enforceability of Covenants Not to Compete
>
> [A] covenant not to compete is enforceable if it is ancillary to or part of an
> otherwise enforceable agreement at the time the agreement is made to the
> extent that it contains limitations as to time, geographical area, and scope
> of activity to be restrained that are reasonable and do not impose a greater
> restraint than is necessary to protect the goodwill or other business interest
> of the promisee." TEX. BUS. & COM. CODE ANN. §15.50 (Vernon 2005).

In *Light v. Centel Cellular Co. of Texas*, 883 S.W.2d 642 (Tex. 1994), the
Texas Supreme Court held that "[S]ection 15.50 requires . . . two initial inquiries as to
formation of the covenant not to compete: (1) is there an otherwise enforceable
agreement, to which (2) the covenant not to compete is ancillary to or a part of at the time
the agreement is made". *Light*, 883 S.W.2d at 644. Defendants do not contest that there
were "otherwise enforceable agreements" between Pike and the Relevant Employees in
the Employment Agreements at issue. (*See* Def. Mot. at 7-10 (not contesting the
existence of otherwise enforceable agreements).) Instead, Defendants merely claim that
the non-compete agreements are not "ancillary to or part of" the otherwise enforceable
agreements. (*Id.*)

19

Under the court's analysis in *Light*, the "ancillary to or part of" test is satisfied when:

"(1) the consideration given by the employer in the otherwise enforceable agreement [gives] rise to the employer's interest in restraining the employee from competing; and
(2) the covenant [is] designed to enforce the employee's consideration or return promise in the otherwise enforceable agreement." *Id.* at 647.

Defendants challenge only the first prong of that test. (*See* Def. Mot. at 7-10.) Under the analysis adopted by the court in *Light*, as applied by the Fifth Circuit and the Texas courts, Pike satisfied the first prong of that test because the consideration given by Pike in at least two of the otherwise enforceable agreements gives rise to its interest in restraining the employees from competing.

*First*, in the original Employment Agreements, RSI promised to pay the Relevant Employees millions of dollars of Termination Benefits in exchange for the Employees' return promises (1) not to disclose RSI's confidential information and (2) not to compete with RSI.[3]

RSI recognized that its business methods, confidential information and trade secrets were extremely valuable. (*See* Employment Agreements, §1.05 (Earnhardt Aff. Exs. 1-6) ("Employee acknowledges that the business methods, confidential information, and trade secrets of Red Simpson . . . and the list of Red Simpson's and/or

_____

[3] The Termination Benefits were not merely deferrals of salary that had already been earned (as Defendants erroneously assert), but were instead incentive bonuses of a minimum guaranteed amount that were able to be multiplied based on the profitability of the regions in which the individual RSI employees were employed. (*See* Employment Agreement, Art. II.) The Termination Benefits were analogous to guaranteed stock option grants of variable amounts whose value would rise or fall depending on whether the employee reached established incentives, and were often referred to as "profit sharing interests". (*See* LGBE00000083-97 (Earnhardt Aff. Ex. 26); LGBE00002821-28 (Earnhardt Aff. Ex. 27).) The Relevant Employees were set to receive millions under that plan. (*See id.* (detailing Deferred Comp. Payout Schedule.))

20

Subsidiaries' customers . . . are valuable, special and unique assets of Red Simpson").) It also recognized that several key employees not only had access to that confidential information, but, absent some protective measures, could potentially use that information against RSI, either as employees of a competitor or by starting a competing business. (*See id.* §1.05.) To prevent the employees from being able to use RSI's confidential information to compete against it, RSI offered Termination Benefits in exchange for promises from the employees not to disclose or use the confidential information. (*Id.* §§1.05, Art. II, Art. III.) RSI required the Relevant Employees to sign the non-compete agreements to enforce that promise. (*Id.* at Art. III.) Thus, RSI's consideration (the Termination Benefits) in the agreement not to disclose confidential information gave rise to RSI's interest in restraining the employees from competing. *Light*, 883 S.W.2d at 647.

Contrary to Defendants' assertion that "[c]ourts have uniformly held that a promise of monetary payment to an employee does not give rise to an interest in restraining competition" (Def. Mot. at 9), courts in Texas and elsewhere have found non-compete agreements to be ancillary to agreements to provide termination benefits, and similar monetary awards, under facts much less compelling than those presented here. *See, e.g., Leon's Fine Foods, Inc. v. McClearin*, No. 05-97-01198-CV, 2000 WL 277135, at *2 (Tex. App. Dallas Mar. 15, 2000) (not designated for publication) (holding that "[t]he covenant not to compete was ancillary to the separate agreements in the termination contract *regarding severance benefits and compensation*" where the employer had promised to pay a mere $12,000 in severance to employee with non-compete agreement (emphasis added)); *Totino v. Alexander & Assocs., Inc.*, No. 01-97-01204-CV, 1998 WL 552818, at *7 (Tex. App. Houston [1st Dist.] Aug. 20, 1998) (not

21

designated for publication) (holding that "Totino and Newell's non-competition covenants were ancillary to their stock option awards" that were offered in part to secure commitment to employer's business); *Field v. Alexander & Alexander of Ind., Inc.,* 503 N.E.2d 627, 630-32 (Ind. Ct. App. 1987) (holding that stock option award designed to encourage continued employment and influence future performance, and made dependent on non-competition covenant's signing, was consideration for and ancillary to non-competition covenant).

   *Second*, in the First Amendment Agreement, Pike promised to pay the employees a "Bonus Amount" in exchange for the employees' promises to (1) not compete with Pike before or after termination, (2) not "opt out" of the Acquisition, but instead join the combined Pike/RSI entity and (3) not disclose Pike's and RSI's confidential information. (*See* Amendment Agreements at Art. I, Art. II (Earnhardt Aff. Exs. 1-6).) Pike acquired RSI to gain access to RSI's highly skilled employees, and the customer relationships and trade secrets maintained by those employees. (*See* Triedman Dep. at 31:24-32:12 (Earnhardt Aff. Ex. 56); Christian Dep. at 88:1-21 (Earnhardt Aff. Ex. 50).) In particular, Pike and RSI needed to make certain that its most valuable employees did not "opt out" of the merger and use the customer relationships, confidential information and business methods acquired while at RSI and Pike to compete with the newly formed Pike/RSI entity. (Memo re: Amendments to Deferred Compensation Agreements, PIKE00003560-3567 (Earnhardt Aff. Ex. 24).) As a result, Pike and RSI offered the Relevant Employees a Bonus Amount for agreeing to join Pike and for agreeing not to compete with Pike or disclose its confidential information. (*Id.*) Absent the acquisition that gave rise to Pike's need to protect the valuable assets it was

22

acquiring, the Relevant Employees would not have been eligible to receive the Bonus

Amounts. (*Id.*) The payment of the Bonus Amount was thus directly connected to Pike's

interest in restraining competition from the Relevant Employees because Pike did not

want to face a situation where, after the employees joined Pike and became eligible to

receive the Bonus Amounts, they then left Pike and used the very same Bonus Amounts

to form a competing business. (*See, e.g.*, Triedman Dep. at 31:24-32:13 (Earnhardt Aff.

Ex. 56).)

        Courts in Texas, and elsewhere, have found non-compete agreements to be

ancillary to monetary incentive agreements under precisely those facts. *See e.g., Totino*,

1998 WL 552818, at \*7; *Field*, 503 N.E.2d at 630-32. *Totino* is squarely on point. In

*Totino*, an insurance company, A&A, offered two of its at-will employees, Totino and

Newell, stock options in exchange for Totino and Newell's signing of employment

agreements containing a non-compete covenant. *Totino*, 1998 WL 552818, at \*5. After

A&A merged with a company named Aon, Totino and Newell left A&A/Aon to join a

competing company, and A&A sued claiming breach of the non-compete covenants. *Id.*

at \*1-2. Totino and Newell replied that the non-competes were unenforceable because

they were not "ancillary to or part of" an otherwise enforceable agreement. *Id.* at \*7.

The court disagreed, holding:

> "The evidence shows the stock option awards were (1) expressly
> conditioned on the signing of the employment agreements'
> noncompetition covenants, (2) offered in recognition of Totino and
> Newell's contributions to A&A and as part of a long-term incentive plan,
> and (3) meant to reaffirm management's commitment to linking employee
> interests to those of A&A shareholders. That is, the options were offered
> to encourage Totino and Newell's loyalty and continued employment. For
> example, there was evidence Totino was a very valuable employee who
> would be pivotal in bringing A&A employees into Aon. . . . We hold the
> trial court did not abuse its discretion in implicitly finding, under these

facts, that Totino and Newell's noncompetition covenants were ancillary to their stock option awards." *Id.*

The case at bar is remarkably analogous to *Totino*. In both cases, the plaintiffs alleged breach of non-competes, and in both cases the defendants replied that the non-competes were not ancillary to an otherwise enforceable agreement. As was the case in *Totino*, the Bonus Amounts promised by Pike were "(1) expressly conditioned on the signing of the employment agreements' noncompetition covenants", were "(2) offered in recognition of [the Relevant Employees] contributions to [Pike/RSI] and as part of a long-term incentive plan" and were "(3) meant to reaffirm [the Relevant Employees'] commitment to linking [the Relevant Employees'] interests to those of [the new Pike/RSI enterprise]". *Id.* "That is, the [Bonus Amounts] were offered to encourage [the Relevant Employees'] loyalty and continued [commitment to Pike/RSI]. For example, there [is] evidence [the Relevant Employees were] very valuable employee[s] who would be pivotal in bringing [RSI] employees [and customers] into [Pike]." *Id.* Thus, as in *Totino*, "under these facts, [the Relevant Employees'] noncompetition covenants were ancillary to their [Bonus Amounts]". *Id.*

Defendants rely on a string of factually inapposite cases for their sweeping and inaccurate proposition that "[c]ourts have uniformly held that a promise of a monetary payment to an employee does not give rise to an interest in restraining competition". (*See* Def. Mot. at 9-10.)

As an initial matter, three of the five cases cited by Defendants do not concern monetary benefits conferred by an employer on its employees at all, and are factually irrelevant. *See Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 462 (Tex. App. Austin 2004) (holding that employer's only non-illusory promise

24

was to help employee obtain immigrant status by keeping her on payroll for one month);
*Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 124 S.W.3d 678, 688 (Tex. App. Austin
2003) (holding employer's only non-illusory promise was to provide notice prior to
termination); *McAnelly v. Brady Med. Clinic, P.A.*, No. 03-04-00095-CV, 2004 Tex.
App. LEXIS 10028, at * (Tex. App. Austin Nov. 12, 2004) (holding employer's only
non-illusory promise was to buy employee doctor's remaining medical supplies).

The remaining two cases cited by Defendants are factually distinguishable
as well. In *Strickland v. Medtronic, Inc.*, 97 S.W.3d 835 (Tex. App. Dallas 2003), the
payment of any monetary benefit by employer to employee was expressly conditioned
upon the employee suffering "economic hardship" due to the non-compete. *Id.* at 839.
Clearly, the employer's promise to pay money if the very non-compete at issue caused
economic hardship *to the employee* could not give rise to *the employer's interest* in
restraining competition (*i.e.*, if anything, the employer's interest would be not to restrain
competition so that the employee did not suffer economic hardship so that the employer
would not have to pay the monetary benefit). That situation is completely different from
the one presented here, where the non-compete was specifically designed to protect *the
employer's* own interest in providing Termination Benefits in exchange for an agreement
not to disclose confidential information.

In *Olander v. Compass Bank and Compass Bancshares, Inc.*, 172 F. Supp.
2d 846, 849 (S.D. Tex. 2001), Compass Bank (the employer) gave Gary Olander (the
employee) stock options that Olander could only exercise *while employed by Compass*
(or upon death, disability or sale of the bank). In determining whether the non-compete
agreements at issue could be ancillary to Compass' promise to grant those specific stock

25

options, the court held "Compass has not articulated any coherent theory explaining how Compass' promise to Olander, *i.e.*, to grant the right to buy stock at a set price *during his employment*, gives rise to an interest in restraining Olander from competing *after* he has left . . ." *Id.* at 855 (only first emphasis added). The court made clear that its holding was to be constrained to the narrow set of facts presented by that case: "The Court does not rule that a stock option agreement can never give rise to an interest in restraining competition; rather, the Court finds that no interest in restraining Olander has been shown to arise . . . in this case." *Id.*

The facts presented by the case at bar are obviously quite different.[4] While the stock option grants promised by Compass in *Olander* were exercisable *only during* Olander's term of employment, the Termination Benefits and Bonus Amounts promised by Pike are payable *after* the employees have left Pike's employment. Thus, while the promise made by Compass in *Olander* could not possibly have any relationship to Olander's ability to compete *after he was terminated* from Compass, the promises by Pike to pay the Termination Benefits and Bonus Amounts give rise to Pike's interest in restraining competition precisely because Pike hoped to avoid a situation where after termination it (1) lost a valuable employee, (2) had to pay the employee a Bonus Amount, while (3) facing competition from that same former employee.

---

[4] Moreover, it seems the Court based its decision on the lack of argument presented by the employee. *See Olander*, 172 F. Supp. 2d at 855 ("Compass has not articulated any coherent theory" how its promise gave rise to an interest in restraining competition.).

26

2.   **The non-compete agreements do not impose a greater restraint than is necessary to protect the goodwill or other business interests of Pike.**

Defendants argue that because "Pike Electric appears to claim that the 'interest worthy of protection' justifying the non-compete is confidential information", Pike must enter into non-compete agreements with all employees potentially having access to that confidential information in order for the non-compete agreements to be "necessary to protect Pike Electric's goodwill or other business interests". (Def. Mot. at 10-12.) Defendants' argument is without merit.

*First*, Defendants cite no authority for the novel standard they urge the Court to apply. Pike is unaware of any reported case in Texas or elsewhere that holds that for a non-compete to be "necessary" to protect confidential information, goodwill or other business interests, the employer must enter into similar non-competes with all employees that would potentially have access to that information. Defendants' test is simply not the law. Instead, "the Covenants Not to Compete Act only requires that limitations of the 'scope of activity' be 'reasonable' and not 'impose a greater restraint than necessary to protect the goodwill or other business interest of the promisee'". *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 794 (Tex. App. Houston [1st Dist.] 2001) (emphasis added).

The non-compete agreements at issue clearly pass that test. The non-competes are merely for two years, and only cover specific counties where the Relevant Employees conducted business. (*See* Employment Agreements at Art. III, Ex. B (Earnhardt Aff. Exs. 1-6).) Moreover, the non-compete provisions only prevent the Relevant Employees from engaging in a business similar to Red Simpson, and would not

27

prohibit the Relevant Employees from working in-house for an electrical utility, for example. (*See Id.* §3.01(a).)

     *Second*, Defendants misinterpret the plain language of TEX. BUS. & COM. CODE ANN. §15.50 (a) (Vernon 2005), which requires that the non-compete agreements not impose "a greater restraint than is necessary to protect *the goodwill or other business interest* of [Pike]". *Id.* That statute, and the cases that interpret it, do not limit the "goodwill or other business interest" to the protection of confidential information.[5] Instead, courts have found that "personal contacts and inside information" gained during employment are "legitimate business interests" worthy of protection by a two year non-compete agreement. *Osborn v. Bell Helicopter Textron, Inc.*, 828 F. Supp. 446, 450 (N.D. Tex. 1993). Courts have also found that information regarding the employer's customers, and the employees' knowledge, training and experience gained while on the job, are legitimate interests that can be protected by a non-compete. *See Stone v. Griffin Commc'ns and Sec. Sys., Inc.*, 53 S.W.3d 687, 694 (Tex. App. Tyler 2001).

     Similarly, Pike sought to protect its customer relationships and business goodwill with the non-competes, along with its confidential information. (*See* Triedman Dep. at 31:24-32:12 (Earnhardt Aff. Ex. 56) ("We were keenly focused on the customers, the customer relationships and the employees, that is what we were buying. And it was extremely important for us to have the people who had those customer relationships to either be with the company and certainly not interfering . . ."), 152:13-153:4 ("We were handing over several hundred million dollars in cash and basically buying customer

---

[5] It seems Defendants confuse the test for whether the restraint on trade has too broad a scope with the test for whether the non-compete is ancillary to an otherwise enforceable agreement (discussed above).

28

relationships and employees and territory"); Christian Dep. at 88:1-21 (Earnhardt Aff. Ex. 50); Thibeaux Dep. at 161-68, 174, 187-88 (Earnhardt Aff. Ex. 46).)

*Third*, the non-competition provisions are only one facet, albeit a necessary one, of the scheme Pike has enacted to protect its confidential information. Pike enters into non-compete and non-disclosure agreements only with those employees that it feels are most likely to disclose or misuse the confidential information they are given (the Relevant Employees for instance). That step is surely *necessary* to protect Pike's confidential information, even though Pike does not believe those measures are appropriate for each of Pike's 5,000 employees. Indeed, Pike takes other, different, steps to prevent disclosure by other, different employees. (Collins Dep. at 51:11-52:1 (Earnhardt Aff. Ex. 53).) For instance, Pike shares its most sensitive information only with its high-ranking, long term employees in North Carolina that are not likely to leave Pike's employment (many of whom have non-competes in the form of Stock Option Agreements), or with those employees that have Employment Agreements with non-competes.[6] (E. Pike Dep. at 192-93, 272-73 (Earnhardt Aff. Ex. 52); Collins Dep. at 265:14-24 (Earnhardt Aff. Ex. 53).) Further, Pike makes each employee sign an employee handbook that requires the employee to not reveal confidential information, no matter how junior the employee is. (*See* Pike Employee Handbook, at 16, PIKE00000414 (Earnhardt Aff. Ex. 28) ("Confidential/Sensitive Information"); Collins Dep. at 41:25-42:11 (Earnhardt Aff. Ex. 53); Brinkley 151:9-22 (Earnhardt Aff. Ex. 58).)

_____

[6] Prior to the departure of the former RSI employees, Pike has only had one Supervisor level or higher employee leave in over 58 years. (E. Pike Dep. at 272-73 (Earnhardt Aff. Ex. 52).)

29

Each of those steps is necessary to protect Pike's confidential information, even though each step is not identical for each employee.

**C.    Defendants Make No Attempt to Explain Why Summary Judgment Should Be Granted On Pike's Claim of Tortious Interference with the Non-Disclosure and Extent of Service Provisions of the Employment Agreements.**

Defendants wholly ignore the separate "Extent of Service" and "Disclosure of Information" provisions contained in the Employment Agreements. (*See* Employment Agreements, §§ 1.04, 1.05 (Earnhardt Aff. Exs. 1-6).)[7] Those clauses alone afford Pike a distinct ground for recovery on its claim for tortious interference with contract, irrespective of the covenants not to compete. *See Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 662-64 (Tex. App. Dallas 1992). By ignoring those provisions, Defendants have failed to carry their burden of showing that there is no genuine issue of material fact with respect to Pike's claim for tortious interference with those sections of the Employment Agreements. Accordingly, Defendants' motion for summary judgment on Pike's tortious interference with contract claim must fail as a matter of law. *See Little*, 37 F.3d at 1075.

**III.    THERE IS AMPLE EVIDENCE TO SUPPORT PIKE'S CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACT AND BUSINESS RELATIONS.**

In Texas, tortious interference with prospective contracts or business relations is a cause of action separate and apart from tortious interference with contract. *See Thrift v. Hubbard*, 44 F.3d 348, 356 (5th Cir. 1995). Its elements are: (1) a

---

[7] Defendants clearly induced the Relevant Employees to breach those provisions by, *inter alia*, working to advance T&D's interests while still employed by Pike and using Pike's confidential information and trade secrets to jumpstart T&D's business. (*See supra* Statement of Fact § D.)

[[NYLIT:2385338v5:3978W:08/07/06--10:54 a]]

reasonable probability that Pike would have entered into a contractual relationship with

certain customers; (2) Defendants intentionally and maliciously interfered with that

reasonable probability; (3) the defendant lacked privilege or justification to do the act;

and (4) Pike has suffered actual damages as a result. *Id.* at 356-57.

An interference with a plaintiff's reasonable business expectancy can only

be excused if the solicitation takes place "within the realm of fair play". *Leonard

Duckworth, Inc. v. Michael L. Field And Co.*, 516 F.2d 952, 958 (5th Cir. 1975) (internal

quotation marks omitted). In other words, if the means of competition are unfair, or if

there is "sharp dealing or overreaching", the defendant's conduct will not be permitted so

long as the conduct is malicious. *Id.* To prove malice, a Plaintiff must show that

defendant's conduct was independently tortious or wrongful--i.e., "that the defendant's

conduct would be actionable under a recognized tort". *Wal-Mart Stores, Inc. v. Sturges*,

52 S.W.3d 711, 726 (Tex. 2001).

Again, Defendants do not even attempt to challenge the existence of

evidence sufficient to support three of the required elements: (1) Pike's reasonable

probability of entering into future contracts or business relations, (2) intentional

interference with those reasonable probabilities by T&D, and (3) damages. (*See* Def.

Mot. at 12-15 (not discussing those elements.)) Instead, the only bases for Defendants'

motion as it concerns Pike's claim for tortious interference with prospective contract and

business relations are that "1) there is no evidence that any Defendant engaged in

independently tortious or unlawful behavior in the act of competing against Pike Electric

and/or 2) as a matter of law Defendants have a legal privilege and justification to engage

31

in competition with Pike Electric for potential customers". (Def. Mot. at 13.)

Defendants' arguments fail.

### A.    Defendants Have Engaged in a Multitude of Independently Tortious and Unlawful Behaviors to Gain a Competitive Advantage Over Pike.

A plaintiff's burden to show independently tortious conduct may be

satisfied by proof regarding independent tort claims brought by plaintiff against

defendant in the same action. *See Star Tobacco, Inc. v. Darilek*, 298 F. Supp. 2d 436,

448-50 (E.D. Tex. 2003) (holding that tortious interference claim required proof of an

"intentional and malicious act", which could be satisfied by plaintiff's independent claim

for slander). Here, Defendants are guilty of at least three "recognized torts", each of

which would independently satisfy the requirement of an independently wrongful act.

### 1.    Tortious interference with contract.

As discussed above, the record clearly demonstrates that Defendants have

tortiously interfered with Pike's existing Employment Agreements with the Relevant

Employees. (*See supra* §II.) That conduct alone is independently tortious, and provides

a basis for Pike to recover on its tortious interference with prospective business relations

claim. *See Roehrs v. Conesys, Inc.*, 2005 WL 3454015, at *7 (N.D. Tex. 2005) (granting

plaintiff "leave to amend . . . to allege claims of conspiracy and/or aiding and abetting

that allege tortious interference with contract . . . as [the] underlying tort[]"); *Rheams v.

Bankston, Wright & Greenhill*, 756 F.Supp. 1004, 1005 (W.D. Tex. 1991) (stating that

the plaintiff asserted "state-law tort claims including . . . tortious interference with

contract"); *Hill v. Heritage Resources, Inc.*, 964 S.W.2d 89, 107 (Tex. App. El Paso

1997) (noting that the plaintiff "recovered under three theories of tort liability [including]

tortious interference with contract").

32

2.    **Misappropriation of trade secrets.**

As discussed below (*see infra* §§ IV), the record clearly demonstrates that Defendants have misappropriated Pike's confidential information and trade secrets to gain a competitive advantage over Pike. Misappropriation of an employer's trade secrets is precisely the type of "intentional and malicious act" that the Texas courts have held to be outside the realm of fair competition, and constitutes independently tortious conduct. *See FCI USA, Inc. v. Tyco Elecs. Corp.*, No. 2:06-CV-128 (TJW), 2006 WL 2037557, at *2 (E.D. Tex. July 18, 2006) (acknowledging that "the misappropriation of trade secrets claim is a tort"); *Nova Consulting Group, Inc. v. Eng'g Consulting Servs., Ltd*, No. Civ. SA03CA305FB, 2005 WL 2708811, at *3 (W.D. Tex. June 3, 2005) (stating that "[u]nder Texas law misappropriation of trade secrets is a common-law tort cause of action").

3.    **Breach of fiduciary duty, and knowing participation in breach of fiduciary duty.**

"Under Texas law, an informal fiduciary relationship, also known as a confidential relationship, may arise where one person trusts in and relies on another, whether the relation is a moral, social, domestic, or purely personal one." *Meadows v. Hartford Life Ins. Co.*, 429 F. Supp. 2d 853, 865 (S.D. Tex. 2006) (internal citation omitted). Close breached such a relationship of trust with Pike, and, Chad Dubea and T&D knowingly participated in that breach.[8] *See Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) ("It is settled as the law of this State that where

---

[8] Pike has sought leave of this Court to amend its complaint to add claims of breach of fiduciary duty and knowing participation in breach of fiduciary duty against Defendants, in light of the evidence uncovered during fact discovery.

[[NYLIT:2385338v5:3978W:08/07/06--10:54 a]]

a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such.").

*First*, there is overwhelming evidence that Pike "trusted and relied on" Close as its Assistant Controller and CPA after the acquisition of RSI, and later as a part-time consultant in the Fall of 2005. When Pike acquired RSI in July of 2004, it lacked any expertise in RSI's databases and had limited knowledge of RSI's sensitive financial information. (*See* Close Dep. at 159:18-160:4 (Earnhardt Aff. Ex. 54).) Pike relied on and trusted Close to train its own financial personnel on those systems and data. (*See id.*) Close was so critical that Pike's CEO stated "[w]e really can't do without him for the next several months", and personally approved tripling Close's stay-on bonus. (Close Dep. Ex. 7 (Earnhardt Aff. Ex. 29).)

Indeed, Close admitted in pleadings to this Court that, as a CPA he has heightened duties to protect the confidential information of his clients (including Pike). (*See* Defendant Close's Motion to Quash Subpoena to Red River Bank at 3 (Earnhardt Aff. Ex. 39) ("Cory Close has a duty of confidentiality to his accounting clients under Louisiana law, where Mr. Close is licensed."); Defendant Close's Reply in Support of Motion to Quash Subpoena to Red River Bank at 2-3 (Earnhardt Aff. Ex. 41) ("Mr. Close [has a] legal and professional responsibility to keep his accounting clients' information in trust. . . . Mr. Close has a legal duty to protect accounts which contain confidential and privileged client information . . . Forcing Mr. Close to disclose [confidential client information] is tantamount to requiring him to commit professional malpractice . . .").) It is clear that Close was in a fiduciary relationship with Pike.

34

*Second*, there is overwhelming evidence that Close breached his fiduciary duties to Pike by, *inter alia*, using Pike's confidential information to solicit Pike's employees, actually working for T&D while still employed by Pike, and concealing the formation of T&D from Pike. *See, e.g., Daniel v. Falcon Interest Realty Corp.*, 190 S.W.3d 177, 185 (Tex. App. Houston [1st Dist.] 2005) ("when a fiduciary relationship of agency exists between employee and employer, the employee has a duty to act primarily for the benefit of the employer in matters connected with his agency. . . . [A] fiduciary has a duty to deal openly and to fully disclose to his employer information that affects his employer's business"); *Herider Farms-El Paso, Inc. v. Criswell*, 519 S.W.2d 473, 476-77 (Tex. Civ. App. El Paso 1975) ("even in the absence of a contract a person commits an actionable wrong if he induces the servant of another to break his contract or employment with another, to such other's damage . . ."). To wit:

- Close admits that he stole employee wage data from RSI's server at the direction of Chad Dubea (Close Dep. at 157:21-166:20 (Earnhardt Aff. Ex. 54));

- Close used that confidential wage data to convince some of Pike's best employees to leave Pike and join T&D (Close Dep. Exs. 14, 16 (Earnhardt Aff. Exs. 36, 34); C. Dubea Dep. at 159:6-18 (Earnhardt Aff. Ex. 55));

- Close spent over 46 hours working for T&D before he left employment with Pike (Close Dep. at 270:25-271:11 (Earnhardt Aff. Ex. 54)); and

- Close extracted a confidential profit and loss statement from Pike's database, and used that information to determine the feasibility of starting a competing company, to create T&D's initial business plan, and to obtain funding from Southern Heritage Bank. (Close Dep. at 304:5-307:8; 310:3-11 (Earnhardt Aff. Ex. 54); Close Dep. Ex. 17 (Earnhardt Aff. Ex. 33)).

*Third*, it is clear that Chad Dubea and T&D knowingly participated in Close's breach. Close's theft of Pike's confidential information was done at the

[[NYLIT:2385338v5:3978W:08/07/06–10:54 a]]

insistence of T&D and Dubea. (Close Dep. at 157:21-166:20 (Earnhardt Aff. Ex. 54).)

Moreover, Close testified that he engaged in those activities for T&D's benefit, and hid

those activities from Pike because he did not want Pike to be able to undermine the

formation of T&D. (*Id.* at 182:14-21, 230:19-231:5 (Earnhardt Aff. Ex. 54) ("Q: You

think [Pike] would have objected to you using this information? A: They probably

would have objected to it, yes. Q: So, you decided not to tell them. A: That's

correct").) Finally, Close and Dubea actually used the misappropriated information to

create T&D's business plan, initial pay scale, and to determine the feasibility of operating

a power line business in the Texas/Louisiana region. (Close Dep. at 304:5-307:8; 310:3-

11(Earnhardt Aff. Ex. 54); Close Dep. Ex. 17 (Earnhardt Aff. Ex. 33).) T&D and Dubea

were willing and active participants in Close's breach of fiduciary duties to Pike.

**B.      There is No Legal Justification or Privilege to Employ Wrongful and
          Unlawful Means to Compete.**

Defendants next argue that they "have a legal justification or privilege to

compete". (Def. Mot. at 14.) As support for their argument, Defendants cite

RESTATEMENT (SECOND) OF TORTS § 768 (1979). However, Defendants misinterpret the

Restatement, as the cited section clearly states: "One who intentionally causes a third

person not to enter into a prospective contractual relation with another . . . does not

improperly interfere with the others' relation if: . . . (b) the actor does not employ

wrongful means." *Id.* Thus, "[i]f the actor employs wrongful means" as Defendants did

here (*see supra* §§II-III.A.3), "he is not justified", and can be liable for improper

interference with the others' business relations. RESTATEMENT (SECOND) OF TORTS § 768

cmt. e (2006); *see also Shipper v. Am. Auto. Ass'n, Inc.*, No. 3-94-CV-2558-R, 1997 WL

135672, at *6 (N.D. Tex. Mar. 12, 1997) (stating that to have a legal justification "the

36

competitive means used [in the context of interference with prospective business relations] must not involve the use of wrongful means").

Defendants contend that Texas law allows at-will employees *to plan* to compete with their employers while they remain employed. (*See* Def. Mot. at 14-15.) As an initial matter, that argument is beside the point, as it is undisputed that Defendants did not merely "take active steps to plan to compete" with Pike while still employed, but that the Defendants *actually competed* with Pike while employed there. For example, T&D was formed while Chad Dubea was still employed by Pike. (See C. Dubea Dep. at 82:2-9, 82:17-84:3 (Earnhardt Decl. Exh. 55); C. Dubea Dep. Ex. 9 (Earnhardt Decl. Ex. 38).) In fact, Chad Dubea and Bob Strother secured work from Entergy for T&D, and signed a contract to do that work, prior to leaving Pike. (C. Dubea Dep. at 136:13-139:13 (Earnhardt Aff. Ex. 55); Strother Dep. at 170:1-171:5, 174:4-12, 175:13-20; 176:4-17 (Earnhardt Aff. Ex. 51)). Moreover, Defendants also secured equipment (Styslinger Dep. at 97-105, 108-09 (Earnhardt Aff. Ex. 42)), and financing (Close Dep. at 332:3-333:10 (Earnhardt Aff. Ex. 54)) for T&D prior to leaving Pike. The law simply does not protect that type of behavior. *See Edwards Transps., Inc. v. Circle S Transps., Inc.*, 856 S.W.2d 783 (Tex. App. Amarillo 1993); *State Nat'l Bank of El Paso v. Farah Mfg. Co., Inc.*, 678 S.W.2d 661 (Tex. App. El Paso 1984) (dismissed by agreement); *Leonard Duckworth*, 516 F.2d 952.

In addition, "[w]hile mere preparation to compete before one resigns is not always sufficient to constitute a breach of fiduciary duty *the nature of the preparation is significant and may give rise to a cause of action*." *Herider*, 519 S.W.2d at 476 (emphasis added). "[A]n agent who uses his position to gain a business opportunity

37

belonging to the employer commits an actionable wrong." *Daniel v. Falcon Interest Realty Corp.*, 190 S.W.3d 177, 185 (Tex. App. Houston [1st Dist.] 2005). At a minimum, Pike has put forth evidence that raises a genuine issue of material fact whether Defendants' actions were permissible competition, or an unlawful interference with Pike's business relations.

IV.    **THERE IS AMPLE EVIDENCE TO SUPPORT PIKE'S CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS.**

In Texas, liability for trade secret misappropriation is established by showing: (1) a trade secret existed; (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (3) use of the trade secret without authorization from plaintiff. *Phillips v. Frey*, 20 F.3d 623, 627 (5th Cir. 1994) (citations omitted). A "trade secret" is broadly defined to encompass "any formula, pattern, device or compilation of information used in a business, which gives the owner an opportunity to obtain an advantage over his competitors who do not know or use it". *Id.* at 628 (citations omitted). Whether information gives rise to a protectable trade secret is a question of fact appropriately left to the jury. *E.g., U-fuel, Inc. v. S.W. Research Inst.*, No. SA-00-CA-0480-OG, 2002 WL 1492214, at *8 (W.D. Tex. Feb. 5, 2002) ("the issue of what constitutes a 'trade secret' is usually a question of fact, not appropriate for summary judgment disposition"). So long as Pike presents evidence that raises a genuine issue with respect to each element of its trade secret misappropriation claim, Defendants' motion for summary judgment must be denied. *See Mathews Heating & Air Conditioning, LLC v. Liberty Mutual Fire Ins. Co.*, 384 F. Supp. 2d 988, 991 (N.D. Tex. 2004).

38

The evidence elicited during discovery demonstrates that Pike owns several valuable trade secrets that were misappropriated by Defendants:

*First*, Pike's costs are kept confidential, and would confer a competitive advantage on Pike's competitors if they were able to gain access to that information. (*See* Lenz 6/13/06 Dep. at 133:12-133:25 (Earnhardt Aff. Ex. 48) ("Q: Can you explain a little bit more what type of information would be confidential that you wouldn't want competitors to know about your discussions with one or the other?" "A: Anything around what their labor rates are, what their unit multipliers are, what their time and equipment rates are, anything associated with that and pricing."), 150-51; Brinkley Dep. at 151:9-152:2, 153:23-154:1 (Earnhardt Aff. Ex. 58); Strother Dep. at 78:8-24 (Earnhardt Aff. Ex. 51); E. Pike Dep. at 147:9-12 ("To effectively solicit a new customer with effective pricing, when you inherently know Pike's labor, equipment cost rates has to be using Pike's confidential information . . ."), 262-63, 276, 278 (Earnhardt Aff. Ex. 52).) As such, they are protectable trade secrets. *See Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 859 (Tex. App. Fort Worth 2004); *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 552 (Tex. App. Dallas 1993); *Gonzales v. Zamora*, 791 S.W.2d 258 (Tex. App. Corpus Christi 1990).

T&D misappropriated those trade secrets when Close secretly extracted a consolidated profit and loss statement from RSI's database to help T&D estimate certain overhead costs.[9] (Close Dep. at 183:9-186:1 (Earnhardt Aff. Ex. 54).) Close admits to using the breakdown of costs on that profit and loss statement as the basis for T&D's

---

[9] Close has admitted that his conduct in taking that information for T&D's benefit is inconsistent with Pike's policy on confidential information, as stated in Pike's employee handbook. (Close Dep. at 249-50 (Earnhardt Aff. Ex. 54).)

[[NYLIT:2385338v5:3978W:08/07/06—10:54 a]]

initial profit and loss statement, which Close and Chad Dubea then used to determine the

feasibility of starting a business to compete with Pike, and subsequently relied on to

convince Southern Heritage Bank to provide financial backing to T&D. (*Id.* at 304:5-

307:8, 310:3-11 (Earnhardt Aff. Ex. 54); *see* Close Dep. Ex. 18 at 51 (Earnhardt Aff. Ex.

60).) The fact that T&D took that information from Pike's server demonstrates that the

information was secret (not even Pike's former employees knew the cost independent of

the database) and beneficial.

      *Second*, Pike's employee payroll and wage information, in aggregate, is

not known by its competitors, and would provide a competitor with a substantial benefit

if it knew that information. (Collins Dep. at 211 (Earnhardt Aff. Ex. 53); Brinkley Dep.

at 306-308, 120:9-21, 124-128:2 (Earnhardt Aff. Ex. 58).) Defendants' contention that

wage rates are generally known by the public is disingenuous. For example, Mick Dubea

testified that Pike/RSI kept aggregated wage rates confidential to prevent the "riots" that

would ensue if that information were released. (M. Dubea Dep. at 76:19-78:15

(Earnhardt Aff. Ex. 57).) Indeed, Mick Dubea sent emails to both Sammy Christian and

Alex Graham specifically telling them that Pike/RSI's wage rates are confidential. (*See*

Graham Dep. Ex. 9 (Earnhardt Aff. Ex. 32) ("Please discuss these revised wages with

each of your crew members. These wages are confidential and should be discussed with

each crew member individually."); M. Dubea Dep. Ex. 6 (Earnhardt Aff. Ex. 31) (same).)

Moreover, the Pike employee handbook made clear that Pike's wage rates were to be

kept confidential. (Pike Employee Handbook, PIKE 00000390-633 at 16, PIKE

00000414 (Earnhardt Aff. Ex. 28); Christian Dep. at 77:23-78:1 (Earnhardt Aff. Ex. 50)

("sounds like they wanted to keep [employee wage rates] confidential").) Finally,

Defendants concede that information concerning the "fully loaded" costs of employees to Pike is not generally known even by the linemen themselves. (*See* C. Dubea Dep. at 31:20-32:5 (Earnhardt Aff. Ex. 55).)

Whether Defendants could have, through costly and time-consuming investigation, discovered those trade secrets on their own is beside the point. "In Texas, courts condemn the employment of improper means to procure trade secrets" even if the secrets could have been procured through lawful means. *Am. Precision Vibrator Co. v. Nat'l Air Vibrator Co.*, 764 S.W.2d 274, 277 (Tex. App. Houston [1st Dist.] 1989). "The question is not, 'How could [Defendants] have secured the knowledge?' but 'How did [they]?'" *Id.*; *see also E.I. duPont deNemours & Co., Inc., v. Christopher*, 431 F.2d 1012, 1015-16 (5th Cir. 1970) ("We think, therefore, that the Texas rule is clear. One may use his competitor's secret process if he discovers the process by reverse engineering applied to the finished product; one may use a competitor's process if he discovers it by his own independent research; but one may not avoid these labors by taking the process from the discoverer without his permission at a time when he is taking reasonable precautions to maintain its secrecy.").

It is not disputed that T&D used Pike's confidential wage rates in its business. Pike and T&D now have *identical* pay scales. (Graham Dep. at 95:25-97:1 (Earnhardt Aff. Ex. 49).) That is not surprising, considering that Close admitted he stole Pike's wage data from the RSI server to determine what T&D's employees' wages should be. (Close Dep. at 157:21-166:20 (Earnhardt Aff. Ex. 54).) He stole that information to "save the time" it would have taken to compile that information independently. (*Id.*) That data was also used to prepare T&D's business plan, and to

41

help convince certain workers to leave Pike and join T&D. (*Id.* at 304-308.) Close

would not have needed to steal that data from Pike if the data was generally known to the

public, and, if the information was not advantageous to T&D, he would have had no use

for it.

Third, the precise list of customers Pike has served, Pike's contacts and

relationships with those organizations, the specific services Pike has provided for them,

and the scope of work arrangements Pike has reached with those customers in the past,

are not generally known to competitors in the industry and provide Pike with a

competitive advantage. (E. Pike Dep. at 52:7-18, 145:3-7 (Earnhardt Aff. Ex. 52)

("[H]aving the appropriate contacts and ability to go in and talk at the decision making

level would not be something we would . . . view as normal populous knowing and

having.").) Texas courts have found precisely that type of information to be protectable

as a trade secret. *See, e.g., Sautter v. The Comp Solutions Network, Inc.,* No. 14-98-

00555-CV, 1998 WL 802481, at *4-5 (Tex. App. Houston [14th Dist.] Nov. 19, 1998)

(finding list of customer contact information likely to be a trade secret where new entrant

in market would have difficulty gaining clients because of a lack of customer

relationships and employer had spent 30 years developing its customer contacts).[10]

T&D used Pike's customer contact information, gained by T&D personnel

while employed at RSI and Pike, to its advantage when soliciting customers. For

---

[10] Defendants cite an email sent by Mark Castaneda for the proposition that Pike's customer lists are not valuable (Def. Mot. at 21). At his deposition, however, Mr. Castaneda made clear that he was just learning the job when he wrote that email, and that today he feels that his comments in the email are incorrect, and were in any event disagreed with by the experts to whom he was writing at the time. (Castaneda Dep. at 95:10-100:22 (Earnhardt Aff. Exh. 45).) Defendants, not surprisingly, ignore the explanation and take the email out of context.

42

example, Bob Strother and Sammy Christian solicited business from Entergy on behalf of

T&D (while still employed by Pike) by simply walking, unannounced, into Entergy's

Texas office and speaking with the manager there. (Strother Dep. at 171:6-15 (Earnhardt

Aff. Ex. 51).) T&D would not have been able to reach out to potential customers with

such ease had they not had the benefit of the confidential customer relationships

developed at Pike and RSI.

    *Fourth*, the terms of existing contracts with customers, including contract

renewal dates, status of long-term negotiations, and past bid and pricing information, are

kept confidential by Pike (and by the industry generally), and would be valuable to a

competitor. (Lenz 6/13/06 Dep. at 139:19-141:24 (Earnhardt Aff. Ex. 48); Brinkley Dep.

at 104:17-105:6, 111:9-21 (Earnhardt Aff. Ex. 58).) For example, a representative from

AEP, Bradley Lenz, testified that the status of contract negotiations between Pike and

AEP are not generally known, should be kept confidential from competitors, and would

provide competitors with an advantage if they were able to access that type of

information. (Lenz 6/13/06 Dep. at 139:19-141:24 (Earnhardt Aff. Ex. 48).) He also

testified that it would have been inappropriate for Chad Dubea, at the same time that he

was CEO of T&D, to attend meetings between AEP and Pike in October 2005 where the

pricing of future contracts was discussed (which is exactly what Chad Dubea did). (*Id.* at

141:25-145:15.) Again, Texas courts have found precisely that type of information to be

protectable as a trade secret. *See Fox*, 121 S.W.3d at 859; *Rugen*, 864 S.W.2d at 552;

*Gonzales*, 791 S.W.2d at 258; *Molina v. Air Starter Components, Inc.*, No. 01-03-00715-

CV, 2004 WL 1277491 (Tex. App. Houston [1st Dist.] June 10, 2004).

43

T&D employees had access to confidential negotiations over the prices

Pike charged to its customers.  (C. Dubea Dep. at 79:2-82:14, 61-62, 82-84, 98-99,

(Earnhardt Aff. Ex. 55); C. Dubea Dep. Ex. 8 (Earnhardt Aff. Ex. 37).)  T&D also knew

the precise dates on which certain long-term contracts with AEP, TXU, and other

customers would expire.  (*E.g.*, Graham Dep. at 163:11-167:8 (Earnhardt Aff. Ex. 49).)

Under those circumstances, courts in Texas will also infer that T&D would not be able to

refrain from using that information in its own business, even absent direct evidence of

use.  *See, e.g., Rugen*, 864 S.W.2d at 552 (where a former employee possessed a trade

secret, it was appropriate for the jury to infer that the former employee would use the

trade secrets for her own competitive benefit and to the detriment of the former

employer); *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 21-

24 (Tex. App. Houston [1st Dist.] 1998) (same); *accord* E. Pike Dep. at 269-72

(Earnhardt Aff. Ex. 52).

*Fifth*, Pike's Safety and Training Manual is state of the art, and provides

Pike with an edge in the most important aspect of its business, safety.  (Pike Safety and

Training Manual, PIKE 00000390-633 (Earnhardt Aff. Ex. 28); Lenz 6/13/06 Dep. at

133:15-134:22 (Earnhardt Aff. Ex. 48); Strother 23:11-19, 97:16-98:2 (Earnhardt Aff.

Ex. 51).)  The systems and techniques described in the manual confer a competitive

advantage on Pike that not only helps Pike gain additional work, but also helps Pike

ensure the safety of its employees.  (Lenz 6/13/06 Dep. at 133:15-134:22 (Earnhardt Aff.

Ex. 48).)  Pike shares that information only with its employees, and the manual itself

demands that the employees keep the information confidential.  (E. Pike Dep. at 155:23-

156:14 (Earnhardt Aff. Ex. 52).)  The manual is a prototypical trade secret. *Phillips*, 20

44

F.3d at 627. Again, in an important area like worker safety and training, courts in Texas

will infer that T&D is using Pike's safety manual in its new business. *Rugen*,

864 S.W.2d at 552.

As described above (*see supra* §II.B.2), Pike took reasonable steps to

maintain the secrecy of its confidential information. These steps, in the context of the

transmission and distribution industry, are adequate to protect Pike's trade secrets.[11] *See*

*Fox*, 121 S.W.3d at 859; *Rugen*, 864 S.W.2d at 552; *Gonzales*, 791 S.W.2d at 258.

---

[11] Contrary to Defendant's assertion, Pike took particular care to protect its trade secrets once it caught wind of T&D's formation. For instance, after Mick Dubea was terminated, Pike took steps to make sure that Chad Dubea, Mr. Graham and Mr. Christian understood that Pike still considered them to be valuable employees and would remain at Pike. (E. Pike Dep. at 141-42, 241-42, 252 (Earnhardt Aff. Ex. 52); Graham Dep. at 198:14-199:8 (Earnhardt Aff. Ex. 49); Christian Dep. at 174:7-10 (Earnhardt Aff. Ex. 50); C. Dubea Dep. at 247-50 (Earnhardt Aff. Ex. 55).) Pike could not have predicted that those employees would tell Pike blatant lies about their involvement with the formation of T&D.

45

## Conclusion

For the reasons stated above, Pike respectfully requests that this Court

deny Defendants' Motion for Summary Judgment in its entirety.


Michael A. Paskin
N.Y. Bar No. 276750

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Telephone: (212) 474-1000
Telecopier: (212) 474-3700

OF COUNSEL:
Sofia A. Ramon
State Bar No. 00784811
Federal ID #20871
Atlas & Hall, LLP
818 Pecan (78501)
P.O. Box 3725
McAllen, TX 78502
Telephone: (956) 632-8271
Telecopier: (956) 686-6109

Veronica Gonzales
State Bar No. 08122080
Federal ID #14270
Kittleman, Thomas & Gonzales, LLP
4900-B North 10th Street
McAllen, TX 78504
Telephone: (956) 686-8797
Telecopier: (956) 630-5199

August 7, 2006

[[NYLIT:2385338v5:3978W:08/07/06--10:54 a]]

**CERTIFICATE OF SERVICE**

This will certify that a true and correct copy of this document was served on all counsel of record on the 7th day of August, 2006, as indicated below:

Teri L. Danish
Eduardo Roberto Rodriguez
Norton A. Colvin, Jr.
RODRIGUEZ, COLVIN, CHANEY & SAENZ, LLP
1201 E. Van Buren
P.O. Box 2155
Brownsville, TX 78522
Telephone: 956-542-7441
Fax: 956-541-2170
*[By Certified Mail, RRR]*
        *Attorneys for Defendants*

Michael A. Paskin
Elizabeth Lasorte
Sarah E. Paul
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Telephone: 212-474-1000
Fax: 212-474-3700
*[By Mail]*
        *Attorneys for Plaintiffs*

Veronica Gonzales
KITTLEMAN, THOMAS & GONZALES, LLP
4900-B North 10th Street
McAllen, TX 78504
Telephone: 956-686-8797
Fax: 956-630-5199
*[By Mail]*
        *Attorney for Plaintiffs*

Lewis H. Lazarus
Matthew F. Lintner
Joseph S. Naylor
MORRIS JAMES HITCHENS & WILLIAMS LLP
222 Delaware Ave., 10th Fl
P.O. Box 2306
Wilmington, DE 19899-2306
Telephone: 302-888-6800
Fax: 302-571-1750
*[By Certified Mail, RRR]*

Sofia A. Ramon