IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PIKE ELECTRIC CORPORATION & PIKE ELECTRIC, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> MICK DUBEA, <br><br> Defendant. | C.A. No. 05-879-SLR <br><br> **REDACTED - PUBLIC VERSION** |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTIONS
*IN LIMINE* NOS. 1 & 2: TO EXCLUDE THE PROFFERED EXPERT TESTIMONY OF J. F.
MORROW AND KARYL VAN TASSEL**

OF COUNSEL:
Michael A. Paskin
Timothy G. Cameron
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000

William J. Wade (#704)
wade@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700

*Attorneys for Plaintiffs Pike Electric
Corporation and Pike Electric, Inc.*

Dated: August 18, 2006

RLF1-3049842-1

## Table of Contents

                                                                                                                                                                      Page

Table of Authorities ......................................................................................................... ii

Nature and Stage of Proceedings and Summary of Argument ......................................... 1

Argument ........................................................................................................................... 3

I.      APPLICABLE LEGAL STANDARDS ................................................................. 3

II.     MR. MORROW'S TESTIMONY SHOULD BE EXCLUDED ............................ 5

        A.     Mr. Morrow's Proffered Testimony Concerning the Initial Financing Hypothetically Available to T&D Is Not Based on Any Reliable, Articulated Method. ................................................................................................. 6

        B.     Mr. Morrow Is Not Qualified to Determine Whether A Start-up Transmission and Distribution Company's Projections are Reasonable and Achievable, and He Does Not Use a Reliable Methodology To Make that Determination. ..................... 8

III.    MS. VAN TASSEL'S DAMAGES CALCULATION SHOULD BE EXCLUDED BECAUSE IT RELIES ENTIRELY ON MR. MORROW'S UNRELIABLE PROJECTIONS. ................................................................................................... 10

Conclusion ....................................................................................................................... 11

## Table of Authorities

Page(s)

**Cases**

*Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994) ................................................ 4, 8, 9

*Callaway Golf Co. v. Dunlop Group*, 2004 WL 1534786 (D. Del. May 21, 2004) .... 3, 4, 5

*Chemipal v. Slim-fast Nutritional Goods Int'l, Inc.*, 350 F. Supp. 2d 582 (D. Del. 2004) .................................................................................................................. 10

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ........................................ 2, 3, 6

*Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000) ......................................................... 3

*Estate of Schneider v. Fried*, 320 F.3d 396 (3d Cir. 2003) ........................................... 3, 4, 5

*In re Paoli R.R. Yard, PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ................................... 4, 7, 10

*In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999) .................................................................. 5, 8

*JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.*, 1998 WL 175888 (E.D. Pa. April 15 1998) ...................................................................................................... 11

*Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) ............................................ 2, 3

*Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544 (Fed. Cl. 2003) ......................... 4

**Statutes and Other Authorities**

Fed. R. Evid. 403 ............................................................................................................. 3, 7

Fed. R. Evid. 702 ......................................................................................................... *passim*

Patrick D. O'Hara, *SBA Loans: A Step-By-Step Guide* (3d ed. 1998) ................................ 7

Plaintiffs Pike Electric Corporation and Pike Electric Inc. (collectively "Pike") respectfully submit this brief in support of their motions *in limine* Nos. 1 and 2, to exclude the expert testimony of J. F. Morrow and Karyl Van Tassel, respectively, to be offered at trial by Defendant Mick Dubea ("Dubea").

### Nature and Stage of Proceedings and Summary of Argument

On December 20, 2005, Pike sued Dubea in this action for breach of contract, tortious interference with contract, tortious interference with business relations and misappropriation of trade secrets. (Compl. (Earnhardt Decl. Ex. 15).) Pike's claims against Dubea stem from his involvement in the formation and subsequent operation of a competing company, T&D Solution Managers, LLC ("T&D"), in violation of the non-competition and non-disclosure covenants in Dubea's employment agreement with Pike. Pike has separately sued T&D, its CEO Chad Dubea (Dubea's son) and its CFO Cory Close in a related action in the Southern District of Texas (the "Texas Action"). In addition to breaching his employment agreement, Pike alleges that Dubea engaged in tortious acts by, *inter alia*, advising several of Pike's most valuable employees to join T&D in breach of the terms of their own non-competition agreements with Pike, funneling valuable trade secrets to T&D's principals and managers, assisting T&D in obtaining its initial financing,[1] and helping T&D establish relationships with customers and suppliers.

In defense of Pike's claims, Dubea has disclosed that he may call two purported expert witnesses to testify at trial. *First*, Dubea intends to call J. F. Morrow, a former

---

[1] It is undisputed that Mick Dubea's 2003 Grantor Retained Annuity Trust (the "GRAT") was used as collateral by Chad Dubea to obtain initial funding for T&D. (*See* Defs.' Resps. to Pike's First Set of Interrogs. in the Texas Action ("T&D Interrogatory Responses"), at 8 (Earnhardt Decl. Ex. 16.)

commercial banker, who will opine that hypothetically T&D could have obtained initial financing, albeit on a smaller scale, without using Mick Dubea's GRAT. He will further opine that T&D's initial business projections were reasonable and attainable even without the GRAT. *Second*, Dubea intends to call Karyl Van Tassel, a C.P.A. and consultant, who is expected to testify to her opinions regarding the purported amount of damages suffered by Pike due to T&D's use of Mick Dubea's GRAT for financing purposes. In performing her calculation, Ms. Van Tassel expressly relies on Mr. Morrow's opinion concerning the reasonableness of T&D's business projections.

As explained below, Mr. Morrow and Ms. Van Tassel conduct no analyses to reach their conclusions, but instead offer subjective opinions that are based solely on speculation.[2] Thus, the proffered testimony of both experts suffers from numerous incurable defects that render both witness' "expert" testimony inadmissible under Federal Rule of Evidence 702 and controlling Supreme Court precedent. Rule 702 requires that an expert be qualified on the specific matters on which she renders an opinion, that the testimony be based on sufficient facts or data and utilize "reliable principles and methods", and that the "principles and methods [be] reliably [applied] to the facts of the case". Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

The proffered testimony of Mr. Morrow fails to satisfy those requirements, for several reasons. Mr. Morrow is not qualified to offer the opinions contained in his report, and he does not utilize any discernible or articulated methodology or analysis to reach his conclusions.

---

[2] Pike's motion with respect to Ms. Van Tassel is directed only to testimony related to her damages calculation.

It is thus not surprising that Mr. Morrow's testimony consists of nothing more than subjective opinions based on uninformed speculation. Accordingly, allowing Mr. Morrow to testify as expert witnesses in this action would not only be inconsistent with *Daubert* and Fed. R. Evid. 702, but would also be highly prejudicial to Pike under Fed. R. Evid. 403.

With respect to Ms. Van Tassel, while she appears in general to be qualified to calculate damages and she purports to use accepted methodologies, she relies almost exclusively on Mr. Morrow's unreliable projections about T&D's business in making the damages estimate found in her report. That error taints her entire damages analysis, and her calculation and estimate of damages should be excluded.

Because neither of the individuals' testimony is based on reliable principles and data reliably applied, the testimony cannot assist the trier of fact and should be excluded. *See Daubert*, 509 U.S. 579.

## Argument

### I.  APPLICABLE LEGAL STANDARDS

"The party offering the expert testimony has the burden of proving admissibility". *Callaway Golf Co. v. Dunlop Slazenger Group Ams., Inc.*, 2004 WL 1534786, *2 (D. Del. May 21, 2004) (citing *Daubert*, 509 U.S. at 592 n.10). Coupled with the Supreme Court's requirements in *Daubert*, Rule 702 sets out the criteria for determining whether the admissibility of an expert's opinions will "assist the trier of fact to understand the evidence or to determine a fact at issue". Fed. R. Evid. 702; *Daubert*, 509 U.S. 579. Those requirements apply to all proffered expert testimony. *See Kuhmo Tire*, 526 U.S. at 147-49.

Rule 702 and *Daubert* create "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit". *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). As articulated by the Third Circuit in *Estate of Schneider v. Fried*,

320 F.3d 396, 404 (3d Cir. 2003): "Qualification refers to the requirement that the witness possess specialized expertise . . . . Secondly, the testimony must be reliable; it must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation . . . . [Finally,] the expert testimony must fit the issues in the case." *Id.* at 741; *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741-43 (3d Cir. 1994). Each of those three requirements must be satisfied for every step in an expert's analysis before the expert testimony will be permitted. *See In re Paoli*, 35 F.3d at 745 ("*Daubert's* requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible").

With respect to qualification, an expert's background and credentials must be analyzed against the subject matter of her testimony and the issues in the litigation. The expert's training, knowledge and experience must qualify her to answer the specific questions she addresses. *See Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994); *Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544, 571 (Fed. Cl. 2003); *Callaway Golf Co.*, 2004 WL 1534786, at *2.

Even when a purported expert is qualified to testify about the matters to which the testimony pertains, the testimony must still be excluded unless it meets Rule 702's requirements for reliability, meaning that:

> "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case". Fed. R. Evid. 702.

The Third Circuit considers a list of eight *Daubert* factors to determine whether a proposed expert's methodology is reliable: (1) whether it has a testable hypothesis; (2) whether it has been

subject to peer review; (3) the known or potential rate of error; (4) the standards controlling the method's operation; (5) whether the method is generally accepted; (6) the relationship of the method to established methods; (7) the qualifications of the expert employing the method; and (8) the non-judicial uses to which the method has been put. *In re Paoli*, 35 F.3d at 742 n.8.

Finally, the proposed expert testimony must also "fit the issues in the case". *Estate of Schneider*, 320 F.3d at 404. To "fit", the testimony must have a "valid scientific connection to the pertinent inquiry". *Callaway Golf*, 2004 WL 1534786, at *2 (quoting *Daubert*, 509 U.S. at 591-92). Expert testimony that does not fit the issues of the case must be excluded because it will not provide any assistance to the trier of fact. *See In re TMI Litig.*, 193 F.3d 613, 667-70 (3d Cir. 1999).

## II.  MR. MORROW'S TESTIMONY SHOULD BE EXCLUDED

It is undisputed that Chad Dubea used Mick Dubea's GRAT to obtain the initial funding for T&D. (*E.g.*, T&D Interrogatory Responses, at 8 (Earnhardt Decl. Ex. 16); Morrow Dep. at 61:10-25 (Earnhardt Decl. Ex. 29).) In his report, Mr. Morrow concludes that, hypothetically, Chad Dubea and Cory Close could have obtained start-up funding from other sources if the GRAT did not exist. (Morrow Rpt. at 3-5 (Earnhardt Decl. Ex. 28).) He further concludes that T&D's initial business projections were reasonable and attainable even without the funding from the GRAT. (*Id.* at 5.) As shown below, however, Mr. Morrow's conclusions are based on speculation, not on any analysis (expert or otherwise) of the specific facts that actually occurred. Along with having no discernible methodology, the proffered testimony is irrelevant because it is based on a hypothetical situation that exists only in Mr. Morrow's imagination. Not surprisingly, the resultant testimony is subjective, un-testable, and speculative. Moreover, Mr. Morrow is not qualified to determine the reasonableness of T&D's business projections because he has no experience in the transmission and distribution industry, nor does

he have any experience related to the operation of a start-up company in that or any other industry.

> A. **Mr. Morrow's Proffered Testimony Concerning the Initial Financing Hypothetically Available to T&D Is Not Based on Any Reliable, Articulated Method.**

Mr. Morrow was asked to give an expert opinion as to whether banks would have loaned Chad Dubea and Cory Close money to start T&D if Chad Dubea had not had Mick Dubea's GRAT to use as collateral. (Morrow Rpt. at 3 (Earnhardt Decl. Ex. 28).) In his report, Mr. Morrow concludes that T&D could have obtained start-up financing without the GRAT because T&D could have "replaced" the GRAT funding with a Small Business Administration ("SBA") loan sufficient in size to begin operations, and then could have sought equipment and accounts payable financing to support continued growth. (*Id.* at 3-5.) Mr. Morrow uses no methodology other than mere speculation based on his "39 years [of] business/financial institution experience" to reach that conclusion, and his testimony should be excluded under Rule 702 and *Daubert*. (*Id.* at 3.)

*First*, Mr. Morrow admits that the decision whether to lend money to a potential borrower is a subjective determination made by each individual bank, and that each bank has unique loan criteria to determine whether any particular loan will actually be made. (Morrow Dep. at 15:24-17:5, 32:16-20, 119:7-10, 123:11-17 (Earnhardt Decl. Ex. 29).) Despite the absence of uniform lending criteria, Mr. Morrow conducted no surveys or empirical analyses of any kind to determine whether the banks accessible to Chad Dubea and Cory Close would in fact have made the hypothetical loans he describes. (*Id.* at 180:22-181:1, 181:11-15, 182:15-22.) Instead, he offers only his unsupported opinion that banks would do so. (*Id.* at 177:7-178:24.) Mr. Morrow is unable to point to any texts, treatises, standards or analyses to confirm that subjective belief, contending that banking is an "art" not a science. (*Id.* at 121:17-122:11 ("Q: I

want to focus on ... the decision of whether or not to make the loan. Okay? A: Yes. Q: Now, I want you to point me to texts or treatises or standards or analysis related to that portion of the bank's process. A: There is none, because that is the art of lending ...").)[3] Moreover, he admits that "it is not normal" for this type of analysis to be conducted outside of the context of litigation, and that a "peer" could not review his analysis to determine whether his opinions are accurate, because a banker with different experiences than he has had could reach a different conclusion. (*Id.* at 130:8-19, 134:4-8, 183:16-20, 185:5-11.) Finally, in what amounts to an admission that the methodology he used was not reliable, Mr. Morrow testified that his opinion is subjective, that his hypothesis is not testable, and that the only way to determine whether his conclusions are correct would be "to take [his] word for it". (*Id.* at 182:5-14, 134:4-8, 177:7-178:24.) Accordingly, Mr. Morrow's testimony should be excluded. *See In re Paoli*, 35 F.3d at 742 n.8.

*Second*, Mr. Morrow admits that it would be mere speculation to assume that Chad Dubea and Cory Close would have actually taken the hypothetical steps outlined in his report. (Morrow Dep. at 163:17-164:1 (Earnhardt Decl. Ex. 29).) By using Mick Dubea's GRAT as collateral, Chad Dubea and Close were able to start T&D without risking their own personal assets. (*Id.* at 161:13-18.) To obtain the financing described by Mr. Morrow, Chad Dubea and Close would have had to: (1) refinance both of their houses, thereby putting themselves at risk of foreclosure if T&D failed; (2) liquidate the entirety of both of their retirement accounts, thereby putting their retirement savings at risk; and (3) invest over 85% of

---

[3] Mr. Morrow's speculative opinion is further undermined by one of his own referenced sources. *See* Patrick D. O'Hara, *SBA Loans: A Step-By-Step Guide,* at 40 (3d ed. 1998) ("With the radical changes currently transpiring in the banking industry and the continuing emphasis on bank liquidity, locating a bank willing to participate in SBA-guaranteed funding can be a chore.")).

Close's life savings in T&D (even though Close does not even have any ownership interest in the company). (*See id.* at 156:11-161:18.) There is absolutely no evidence in Mr. Morrow's report, or elsewhere in the record, that Chad Dubea and Close would have actually taken those risky steps to start T&D. If anything, the record supports the opposite conclusion—*i.e.*, that the availability of funds from Mick Dubea's GRAT was part of what encouraged Chad to leave the security of his job at Pike and form a competing business. (*See* T&D Interrogatory Responses, at 8 (Earnhardt Decl. Ex. 16) ("Chad Dubea decided to form his own company, *inasmuch as* he had a great deal of experience in the industry, *and his father had given him a substantial sum of money in the form of a [GRAT] which would be used for the initial capitalization of the business.*"). Thus, Mr. Morrow's analysis does not "fit" any issue in the present case, and certainly does not change the fact that even if there might have been other ways that T&D hypothetically could have obtained its financing, the way it did obtain that funding was Mick Dubea's GRAT. *See In re TMI Litig.*, 193 F.3d at 667-70.

> **B.   Mr. Morrow Is Not Qualified to Determine Whether A Start-up Transmission and Distribution Company's Projections are Reasonable and Achievable, and He Does Not Use a Reliable Methodology To Make that Determination.**

Mr. Morrow was then asked to determine whether the initial business projections made by Cory Close for T&D were reasonable and attainable without the GRAT, considering his conclusion that T&D could have obtained financing through other means. (Morrow Rpt. at 5 (Earnhardt Decl. Ex. 28).) Mr. Morrow's experience, education and training do not qualify him to make that analysis. *See Berry*, 25. F.3d at 1351.

Mr. Morrow has received no education or training related to the transmission and distribution industry. (Morrow Dep. at 8:20-9:12 (Earnhardt Decl. Ex. 29).) In fact, he has no experience in the transmission and distribution industry at all, except that he lent money to one

start-up distribution contractor 22 years ago. (*Id.* at 110:6-13.) Indeed, Mr. Morrow readily concedes that he is not an expert on any aspect of the transmission and distribution business (*id.* at 24:9-25:9, 95:9-11), and, moreover, he did no research into the transmission and distribution industry for his assignment in this case, apart from reading Pike's 10-K and reviewing the industry multiples for transmission companies (*id.* at 108:17-109:1). Yet, he purports to have determined that T&D's projections for doing business in that industry were "achievable and reasonable". (Morrow Rpt. at 6 (Earnhardt Decl. Ex. 28).) Mr. Morrow is simply not qualified to make that determination. *See Berry*, 25 F.3d at 1351 (holding that the expert's training, knowledge and experience must qualify him to answer the specific question addressed).

Mr. Morrow's lack of qualifications in the industry are compounded by his failure to perform any analysis to derive his projections for T&D's business under the hypothesized "no-GRAT" scenario. Instead of analyzing the reasonableness of Cory Close's revenue and liability estimates in T&D's own projections, Mr. Morrow simply accepts those numbers "as fact", despite recognizing that a serious flaw in those numbers would render his alternative projections inherently unreliable. (Morrow Dep. at 209:20-210:3, 212:6-11 (Earnhardt Decl. Ex. 29).) With respect to the data that Mr. Morrow claims to have analyzed, he merely "took it all in" and opined that T&D's projections seemed reasonable. (*Id.* at 217:5-218:6.) He conducted no empirical analyses or surveys to determine if T&D's projected results were shared by other start-up transmission and distribution companies, and he could point to no texts or treatises containing that data. (*Id.* at 218:22-219:9.) Remarkably, he reached the conclusion that his adjusted projections for T&D's business were reasonable by first assuming—without performing any analysis and with no industry expertise to bring to bear—that T&D's own assumptions about the industry and its own initial projections were reasonable. (*Id.* at 221:16-222:5 ("Q: And you

didn't do anything to confirm or validate his assumptions? A: Nothing directly, no."), 222:5-226:13.) Mr. Morrow's circular "analysis" is fatally flawed, and any testimony proffered on that subject should be excluded. *See In re Paoli*, 35 F.3d at 742 n.8; *Chemipal Ltd. v. Slim-fast Nutritional Goods Int'l, Inc.*, 350 F. Supp. 2d 582, 592 (D. Del. 2004) ("lack of familiarity with the methods and reasons underlying . . . projections" relied upon by expert rendered expert's opinion unreliable) (internal quotation omitted).

### III. MS. VAN TASSEL'S DAMAGES CALCULATION SHOULD BE EXCLUDED BECAUSE IT RELIES ENTIRELY ON MR. MORROW'S UNRELIABLE PROJECTIONS.

Karyl Van Tassel submitted an expert report on behalf of Dubea in response to the report of Pike's damages expert, Jonathan Falk.

REDACTED

As shown above, Mr. Morrow improperly assumed those revenue numbers were reasonable without conducting any expert analysis. (*See supra* § III.)

REDACTED

Instead, she relies exclusively on

projections that Mr. Morrow was not qualified to make. Dubea has thus proffered no expert with any experience in the transmission and distribution industry who has conducted any analysis to determine whether T&D's initial projections—made under the assumption that the GRAT would be available for financing—would be attainable without the GRAT. That failure is fatal to Ms. Van Tassel's damages opinion, because her "analysis" would collapse without the assumption that T&D's business would have suffered little or no effect had it not been able to rely on Mick Dubea's GRAT for its initial financing. As a result, Ms. Van Tassel's opinion is not based on reliable facts, data or analysis, but instead relies entirely on Mr. Morrow's flawed assumptions, and her damages opinion must be excluded. *See* Fed. R. Evid. 702; *JMJ Enters, Inc. v. Via Veneto Italian Ice, Inc.*, 1998 WL 175888, at *6, 9 (E.D. Pa. April 15, 1998) (holding that "[e]xpert testimony that is based on speculation or unrealistic assumptions is not helpful" and concluding that the expert's reliance on an unrealistic sales projection "can be viewed as a methodological flaw").

### Conclusion

For the reasons stated above, Pike respectfully requests that the Court exclude the expert testimony of Mr. Morrow and Ms. Van Tassel.

*[signature]*
William J. Wade (#704)
wade@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE  19899
(302) 651-7700

*Attorneys for Plaintiffs Pike Electric Corporation and Pike Electric, Inc.*

OF COUNSEL:
Michael A. Paskin
Timothy G. Cameron
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000

Dated: August 18, 2006

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 18, 2006, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, and have also served the document as noted:

### BY HAND DELIVERY

Lewis H. Lazarus, Esquire
Morris James Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19899

_____
Alyssa M. Schwartz (#4351)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 24, 2006, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, and have also served the document as noted:

### BY HAND DELIVERY

Lewis H. Lazarus, Esquire
Morris James Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19899

Alyssa M. Schwartz (#4351)