IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PIKE ELECTRIC CORPORATION &
PIKE ELECTRIC, INC.,

                                    Plaintiffs,

            vs.                                        C.A. No. 05-879-SLR

MICK DUBEA,                                        PUBLIC VERSION

                                    Defendant.


BRIEF IN SUPPORT OF PLAINTIFFS' MOTION *IN LIMINE* NO. 4:
TO EXCLUDE EVIDENCE OF THE TOWERS PERRIN STUDY AND OTHER
EVIDENCE OF THE AVERAGE LENGTH OF NON-COMPETITION AGREEMENTS
FOR EXECUTIVES OUTSIDE OF THE ACQUISITION CONTEXT


                                    William J. Wade  (#704)
                                    wade@rlf.com
                                    Alyssa M. Schwartz (#4351)
                                    schwartz@rlf.com
OF COUNSEL:                         Richards, Layton & Finger
Michael A. Paskin                   One Rodney Square
Timothy G. Cameron                  P.O. Box 551
Cravath, Swaine & Moore LLP         Wilmington, DE  19899
Worldwide Plaza                     (302) 651-7700
825 Eighth Avenue
New York, NY 10019-7475             *Attorneys for Plaintiffs Pike Electric*
(212) 474-1000                      *Corporation and Pike Electric, Inc.*

Dated:  August 18, 2006

**Table of Contents**

Page

Table of Authorities .................................................................................... ii

Nature and Stage of Proceedings and Summary of Argument .................................. 1

Statement of Facts.................................................................................... 2

Argument ................................................................................................ 4

I.     EVIDENCE OF THE TOWERS PERRIN REPORT AND OTHER DATA
       REGARDING THE LENGTH OF NON-COMPETITION AGREEMENTS
       OUTSIDE THE ACQUISITION CONTEXT IS IRRELEVANT AND
       INADMISSIBLE ........................................................................ 4

II.    THE TOWERS PERRIN STUDY AND ACCOMPANYING BACKUP DATA
       IS INADMISSIBLE HEARSAY............................................................ 8

Conclusion ............................................................................................ 10

RLF1-3049846-1

# Table of Authorities

Page(s)

## Cases

*Faw, Casson & Co. v. Cranston*, 375 A.2d 463 (Del. Ch. 1977) ............................... 6

*Kanematsu Corp. v. Advanced Materials Lanxide*, 2002 WL 32332375 (D. Del. September 30, 2002) ................................................................................................ 4

*Knowles-Zeswitz Music, Inc., v. Cara*, 260 A.2d 171 (Del. Ch. 1969) ...................... 7

*Nat'l Research Dev. Corp. v. Great Lakes Carbon Corp.*, 410 F. Supp. 1108 (D. Del. 1975) ............................................................................................................ 8, 9

*Research & Trading Corp. v. Pfuhl*, 1992 WL 345465 (Del. Ch. Nov. 18, 1992) ............ 4

*Singh v. Batta Envtl. Ass., Inc.,* 2003 WL 21309115 (Del. Ch. May 21, 2003) ............... 4

*Tristate Courier & Carriage, Inc. v. Berryman, C.A.*, 2004 WL 835886 (Del. Ch. Apr. 15, 2002) ..................................................................................................... 6

*United States v. Casoni*, 950 F.2d 893 (3rd. Cir. 1991) ............................................. 8

*United States v. Furst*, 886 F.2d 558 (3d Cir. 1989) ................................................. 8

*United States v. Pelullo*, 964 F.2d 193 (3rd. Cir. 1992) ............................................ 8

*United States v. Ramsey*, 785 F.2d 184 (7th Cir. 1986) ......................................... 8, 9

## Statutes and Other Authorities

Fed. R. Evid. 401 ............................................................................................. 1, 4, 5, 7

Fed. R. Evid. 402 ................................................................................................. 1, 4, 7

Fed. R. Evid. 801 .................................................................................................... 1, 8

Fed. R. Evid. 803(6) ................................................................................................ 1, 8

Kurt H. Decker, <u>Covenants Not to Compete</u>, § 3.9 at 63 (2d ed. 1993) ....................... 7

Restatement (Second) of Contracts § 515 (2006) ....................................................... 7

RLF1-3049846-1

Plaintiffs Pike Electric Corporation and Pike Electric Inc. (collectively "Pike")
respectfully submit this brief in support of their motion *in limine* No. 4, to exclude evidence of
the Towers Perrin study and other evidence of the average length of non-competition agreements
for executives outside of the acquisition context.

### Nature and Stage of Proceedings and Summary of Argument

On December 20, 2005, Pike sued Mick Dubea ("Dubea") for breach of contract,
tortious interference with contract, tortious interference with business relations and
misappropriation of trade secrets. (Compl. at ¶ 1 (Earnhardt Decl. Ex. 15).) Dubea contends that
the non-competition provision of his Employment Agreement with Pike is overly broad and thus
unenforceable, and that he therefore cannot be liable to Pike for breach of contract. (Def.'s
Proposed Am. Answer & Addt'l Defenses to Compl. & Am. Countercl. ¶¶ 131-38 (Earnhardt
Decl. Ex. 26).)

On August 14, 2006, the parties exchanged intended trial exhibits. Through that
exchange, Pike learned that Dubea will seek to introduce at trial a report on executive
compensation completed in 2005 by Towers Perrin, which sets forth the length of non-
competition agreements for several executives in the transmission and distribution industry.
Dubea apparently seeks to admit that report and its backup as evidence that the temporal scope of
Dubea's own non-competition agreement with Pike is unreasonable. As shown below, Dubea's
efforts are misguided. The topics addressed by the Towers Perrin study are completely different
from the circumstances presented by the case at bar, making any comparison between that study
or its backup data and Dubea's non-competition agreement useless to the trier of fact and
therefore irrelevant. *See* Fed. R. Evid. 401; Fed. R. Evid. 402. Moreover, the report is clearly
inadmissible hearsay that does not fall within any exception to hearsay rule. *See* Fed. R. Evid.
801; Fed. R. Evid. 803(6).

## Statement of Facts

In 2002, Lindsay Goldberg and Bessemer ("LGB"), a private equity firm,
acquired a controlling interest in Pike. (E. Pike Dep. at 24:24-25:2, 27:1-4 (Earnhardt Decl. Ex.
20)) In connection with that acquisition, several key Pike employees entered into five-year non-
competition agreements with LGB.[1] (*See id.* at 29:11-19; *see also* Stock Option Agreements,
PIKE 50011520-1596; 1608-1671 (Earnhardt Decl. Ex. 2).) LGB customarily seeks five-year
non-competition agreements with the key executives of the companies it acquires, because, in its
experience, a five-year term is necessary to protect its investment, particularly where the key
employees and their relationships with customers comprise much of the value of the acquisition
and are determinative of the success and profitability of the newly-acquired company. (*See*
Triedman Dep. at 17:10-13, 18:4-10, 150:22-151:2, 151:13-22 (Earnhardt Decl. Ex. 21); E. Pike
Dep. at 55:25-56:5 (Earnhardt Decl. Ex. 20).)

On July 1, 2004, Pike and LGB acquired Red Simpson, Inc. ("RSI"). (*See* Stock
Purchase Agreement, DUBEA001201-1282 (Earnhardt Decl. Ex. 3).) Because RSI and Pike
operated similar businesses but shared only two out of their top fifteen customers, this
transaction was particularly promising for Pike. (*See* RSI Investment Memorandum,
LGBE00003056-3089, at 3060 (Earnhardt Decl. Ex. 5).) In acquiring RSI, Pike effectively
purchased RSI's customers, and its employees' and executives' relationships with those
customers. (*See* Triedman Dep. at 25:4-11 (Earnhardt Decl. Ex. 21).) In particular, Dubea, who
was President of RSI's most profitable region, was considered by Pike to be a critical component
of the acquisition. (*See* Banner Dep. at 43:1-6 (Earnhardt Decl. Ex. 24) ("I mean, what you're

---

[1] These employees include: Eric Pike, Jeff Collins, Barney Ratliff, Audie Simmons, John
Merritt, James Marion, Jim Benfield, Reg Banner, and Zack Blackmon.

really buying as the most important asset is the people of the company, and when you have a

person that has the relationships, connections that Mick had . . . he was a very important piece of

our decision to purchase Red Simpson."); Triedman Dep. at 41:10-13 (Earnhardt Decl. Ex. 21)

("We thought he was very strong. He was responsible for basically all the earnings of the

company. He was important.").) In fact, Dubea was so important to the acquisition that absent

his agreeing to a non-competition agreement with a five-year term, Pike would not have

purchased RSI. (*See* Employment Agreement of July 1, 2004 between Pike Electric Inc. & Mick

J. Dubea, PIKE00003568-3591, pmbl (Earnhardt Decl. Ex. 7).) Thus, as an explicit condition

precedent to the acquisition, Pike and Dubea signed an employment agreement containing a non-

competition provision with a five-year term (the "Employment Agreement"). (*Id.* §5.07.) Dubea

was set to receive over $20 million in compensation from the acquisition. (*See* Mick Dubea

Deferred Compensation Schedule, EPIKE00042225-42226 (Earnhardt Decl. Ex. 14);

Employment Agreement §§ 2.03, 2.02(a), 2.02(b) (Earnhardt Decl. Ex. 7).)

   In July of 2005, Pike became a publicly traded company. (*See* E. Pike. Dep. at

13:4-6 (Earnhardt Decl. Ex. 20).). In connection with the IPO, Pike wanted to ensure that its

executives' benefits and pay levels were comparable to similarly situated public companies. (*See*

Triedman Dep. at 141:2-6 (Earnhardt Decl. Ex. 21).) In order to evaluate their compensation

structure, Pike and LGB commissioned Towers Perrin, a human resources consulting firm, to

compile data on comparable public companies' compensation packages and make

recommendations for certain Pike executives.[2] (*See* E. Pike Dep. 206:2-5 (Earnhardt Decl. Ex.

20).) Towers Perrin produced a report for Pike containing such data and recommendations. (*See*

---

  [2] A group of "peer companies" was selected according to which companies had business offerings comparable to Pike and which companies Pike considered to be competitors. (*See* Weinstein Dep. at 12:11-23 (Earnhardt Decl. Ex. 23).)

Report of Towers Perrin, LGBE00008007-8036 (Earnhardt Decl. Ex. 10); Appendices to Report

of Towers Perrin, LGBE00008313-8372 (Earnhardt Decl. Ex. 12); Final Report of Towers

Perrin, TP0393-569 (Earnhardt Decl. Ex. 11).) Along with its recommendations regarding

compensation packages, Towers Perrin included material on the average length of non-

competition agreements among Pike's competitors. (*See id.*) Because the study was conducted

in connection with the IPO, and not in connection with any acquisition, the study focused

exclusively on publicly traded companies, and did not analyze the average length of non-

competition agreements entered into with the key executive of a major competitor, as the direct

result of the acquisition of that major competitor. (*See id.*; *see also* Weinstein Dep. at 12:11-23

(Earnhardt Decl. Ex. 23).)

**Argument**

I.    **EVIDENCE OF THE TOWERS PERRIN REPORT AND OTHER DATA
      REGARDING THE LENGTH OF NON-COMPETITION AGREEMENTS
      OUTSIDE THE ACQUISITION CONTEXT IS IRRELEVANT AND
      INADMISSIBLE.**

Evidence lacking "any tendency to make the existence of any fact that is of

consequence to the determination of the action more probable or less probable than it would be

without the evidence" is irrelevant and inadmissible. *See* Fed. R. Evid. 401; Fed. R. Evid. 402;

*see also Kanematsu Corp. v. Advanced Materials Lanxide, L.L.C.*, 2002 WL 32332375, at *4 (D.

Del. Sept. 30, 2002). To determine whether non-competition restrictions are reasonable, courts

conduct a fact-intensive inquiry, and consider the specific circumstances in which the agreement

was entered. *See Singh v. Batta Envtl. Ass., Inc.*, 2003 WL 21309115, at *7 (Del. Ch. May 21,

2003) ("[T]he Court will consider whether the restrictions are appropriately limited in time and

space in the circumstances of the case . . . ."); *Research & Trading Corp. v. Pfuhl*, 1992 WL

345465, at *11 (Del. Ch. Nov. 18, 1992) ("The non-competition agreement is . . . plainly

-4-

reasonable in the circumstances."). Thus, evidence of the length of other non-competition agreements is relevant to the determination whether Dubea's non-competition agreement is reasonable *only if* those agreements were entered into in circumstances substantially similar to the circumstances presented by the case at bar. *See* Fed. R. Evid. 401.

The non-competition agreements set forth in the Towers Perrin study do not meet that requirement. In fact, the only similarity between Dubea's non-competition agreement and the non-competition agreements held by the executives in the Towers Perrin study is that the agreements were entered into with companies in the transmission and distribution industry. Every other salient fact is different.

*First*, Pike required Dubea to sign a five-year non-competition agreement because he had been a formidable competitor of Pike's for almost 20 years prior to the acquisition, but was immediately switching gears and taking on a leadership role at Pike.[3] (*See* Triedman Dep. at 39:3-17, 41: 10-13 (Earnhardt Decl. Ex. 21).) *Second*, at the time Dubea signed his non-competition agreement with Pike, Pike had just paid nearly $200 million dollars to acquire the customer relationships and skilled employees that Dubea had personally supervised for decades. (*See id.* at 32:6-12 ("[Pike was] keenly focused on the customers, the customer relationships and the employees, that is what [Pike was] buying. And it was extremely important for us to have the people who had those customer relationships to either be with the company and certainly not interfering. . . .").) *Third*, Pike had invested substantial time and money to move into RSI's Western Region through the acquisition, and could not afford to be faced with a situation where it paid millions of dollars to make in-roads into that region without facing competition from RSI,

---

[3] Indeed, as part of the acquisition of RSI, Appraisal Economics noted that Mick Dubea would be "a formidable competitor" in the Western Region absent a non-competition agreement. (*See* Valuation of Intangible Assets Conducted by Appraisal Economics, PIKE 50011460-11519, at PIKE 50011482 (Earnhardt Decl. Ex. 6).)

only to have to face that competition from the very executives of the company it had just acquired. (*See id.* at 150:22-25 ("[W]e make our judgment on what is appropriate given the company, the industry and also the fact that we are in the middle of acquiring the business . . . .").)[4] *Fourth*, Dubea had just received a substantial sum of money *from Pike* that he could use to start his own business to compete *with Pike*. There is no evidence that any of the non-competition agreements in the Towers Perrin study were agreed to under such unique and compelling circumstances.

It is clear that Dubea's non-competition agreement, entered into in the acquisition context, is categorically distinct from non-competition agreements entered into outside of the acquisition context. Indeed, "[i]t is sort of comparing an apple to a pear." (*See id.* at 153:3-4.) The five-year term "is often where [LGB] end[s] up in investments where . . . to control the transaction we are paying 100 percent cash, customer relationships are extremely important, employees are extremely important. That is where we often end up. . . ." (*Id.* at 151:17-23.) Courts have recognized the necessity of longer non-competition agreements as part of acquisitions as well, and are more likely to find a non-competition agreement entered into as part of an acquisition to be reasonable. *See Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004) (because the non-competition agreement was part of contract for sale of stock, inquiry into its enforceability was "less searching than if the Covenant had been contained in an employment contract"); *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 465 (Del. Ch. 1977) ("[C]ovenants are subject to somewhat greater scrutiny when contained in an employment contract as opposed to contracts for the sale of a business."); *Knowles-Zeswitz*

---

[4] This concern is exaggerated when a company acquires its competitor. In that case, the acquirer must account for the added variable that the competitor and its employees may feel loyalty to their company and their own way of conducting business, and fail to ever truly commit to the new company.

*Music, Inc., v. Cara,* 260 A.2d 171, 175 (Del. Ch. 1969) (courts are more prone to enforce non-

competition agreements where the sale of business is involved); Restatement (Second) of

Contracts § 515 cmt. b (2006); Kurt H. Decker, *Covenants Not to Compete,* § 3.9 at 63 (2d ed.

1993).

        In short, because the Towers Perrin study was "looking at a bunch of companies

that are publicly traded and [only] worrying about their CEO quitting" while LGB and Pike were

"handing over several hundred million dollars in cash and basically buying customer

relationships and employees and territory", the reasonableness of the non-competition

agreements are not comparable. (Triedman Dep. at 152:20-153:3 (Earnhardt Decl. Ex. 21).)

Under those circumstances, data regarding the length of the non-competition agreements cited in

the Towers Perrin study simply cannot assist the trier of fact in determining whether the length of

Dubea's non-competition agreement is reasonable, and the Towers Perrin study should be

excluded. *See* Fed. R. Evid. 401; Fed. R. Evid. 402.[5]

---

[5] While the Towers Perrin study is not a suitable basis for comparison to Dubea's non-competition agreement, the Court should look to the employment agreements LGB entered into with key Pike executives when LGB acquired Pike. LGB sought and obtained five-year non-competition agreements with Eric Pike and at least eight other key Pike executives. (*See* E. Pike Dep. at 29:11-19 (Earnhardt Decl. Ex. 20); Stock Option Agreements, PIKE 50011520-1596; 1608-1671 (Earnhardt Decl. Ex. 2).) Later, when Pike acquired RSI, it followed the same practice and sought to protect its investment in RSI by entering into a five-year non-competition agreement with the Dubea. (*See* E. Pike Dep. at 55:19-56:12 (Earnhardt Decl. Ex. 20); Triedman Dep. at 32:6-12, 39:3-17, 151:17-23 (Earnhardt Decl. Ex. 21).) Moreover, the circumstances of LGB's acquisition of Pike were unlike those of Pike's acquisition of RSI because while RSI was a competitor of Pike, Pike was never a competitor of LGB. Therefore, Pike actually had reason to require a longer duration for Dubea than LGB had required of Pike executives. Pike, however, only required the same five-year term LGB had required of Pike executives during LGB's acquisition of Pike. (*See* E. Pike Dep. at 55:19-56:12 (Earnhardt Decl. Ex. 20).)

## II.    THE TOWERS PERRIN STUDY AND ACCOMPANYING BACKUP DATA IS INADMISSIBLE HEARSAY.

Dubea offers the Towers Perrin study to prove that executives of public companies in the transmission and distribution industry have non-competition agreements with terms ranging from two to ten years, *i.e.*, Dubea offers the report for the truth of the matters asserted therein. As such, the report is hearsay. *See* Fed. R. Evid. 801. Dubea will not be able meet his burden of establishing that the report falls within one of the recognized exceptions to the hearsay rule, and the report should therefore be excluded. *See United States v. Furst*, 886 F.2d 558, 571-72 (3d Cir. 1989).

Dubea may try to argue that the report is a business record under Fed. R. Evid. 803(6). Dubea is wrong. Federal Rule 803(6) permits the admission of hearsay documents into evidence as business records only upon a showing that, among other things: (1) the documents were "kept in the course of a regularly conducted business activity"; and (2) "it was the regular practice" of that business to make the record. *See* Fed. R. Evid. 803(6). Regularity is the touchstone of the rule:

> "The idea behind Rule 803(6) is that when a record is kept with sufficient regularity, the existence of an entry (or the absence of one) is good evidence that the thing in question took place (or did not take place). Business records are reliable to the extent they are compiled *consistently and conscientiously*." *United States v. Ramsey*, 785 F.2d 184, 192 (7th Cir. 1986) (emphasis added).

The Third Circuit has adopted that interpretation of the business records exception to the hearsay rule. *See, e.g., United States v. Pelullo*, 964 F.2d 193, 201 (3rd Cir. 1992) (holding bank records inadmissible because the government failed to "demonstrate that the records were . . . made in the regular course of business, and that such records were regularly kept by the business"); *United States v. Casoni*, 950 F.2d 893, 912-13 (3d Cir. 1991) (excluding non-recurring notes as non-business records due to their unreliability); *Nat'l Research Dev.*

*Corp. v. Great Lakes Carbon Corp.*, 410 F. Supp. 1108, 1113 n.20 (D. Del. 1975) (excluding notebook of experiments "because no showing has been made that it was the regular course of plaintiff's business to make notes within a reasonable time after noted events occurred and that such notes were made in that regular course").

It is undisputed that the information in the Towers Perrin report was gathered during a non-recurring study conducted at the express direction of Pike. (*See* Weinstein Dep. at 19:17-23, 23:2-6 (Earnhardt Decl. Ex. 23) (indicating that the data compiled by Towers Perrin for the Pike assignment had to be gathered from publicly available sources and was not regularly maintained in a Towers Perrin database).) Indeed, the evidence is clear that Towers Perrin *does not* regularly create charts such as the one Dubea seeks to introduce. (*Id.* at 24:9-19 (stating that Towers Perrin does not normally create charts of the type used to set forth the length of the non-competition agreements, and that "this assignment was the only one that I have conducted that had a chart just like this".) To the contrary, the evidence shows that the report was a one-time analysis that lacks the "consistent and conscientious" repetition on which the business record exception to the hearsay rule is based. *See Ramsey*, 785 F.2d at 192. Thus, the report should be excluded as inadmissible hearsay.

## Conclusion

For the reasons stated above, Pike respectfully requests that this Court exclude evidence of the Towers Perrin study and backup data and other references to the length of non-competition agreements entered into outside of the acquisition context.

William J. Wade  (#704)
wade@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE  19899
(302) 651-7700

OF COUNSEL:
Michael A. Paskin
Timothy G. Cameron
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000

*Attorneys for Plaintiffs Pike Electric
Corporation and Pike Electric, Inc.*

Dated:  August 18, 2006

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 18, 2006, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, and have also served the document as noted:

### BY HAND DELIVERY

Lewis H. Lazarus, Esquire
Morris James Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19899

Alyssa M. Schwartz (#4351)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 24, 2006, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, and have also served the document as noted:

### BY HAND DELIVERY

Lewis H. Lazarus, Esquire
Morris James Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE  19899

Alyssa M. Schwartz (#4351)