# EXHIBIT 1



## EMPLOYMENT CONTRACT,
## NONQUALIFIED DEFERRED COMPENSATION AGREEMENT
## AND AGREEMENT NOT TO COMPETE

This Employment Contract, Deferred Compensation Agreement and Agreement Not to Compete ("Agreement") is entered into on this _31_ day of _December_, 19 _97_, by and between:

**Red Simpson, Inc.,** a Louisiana corporation, authorized to do and doing business in the State of Louisiana, with its principal office located in Pineville, Louisiana ("Red Simpson"), represented herein by its duly authorized representative; and

**Alex H. Graham,** an individual of the full age of majority, whose mailing address is P.O. Box 532593, Harlingen, TX 78553 ("Employee").

WHEREAS, Employee has rendered or is expected to render to Red Simpson valuable service and it is the desire of Red Simpson to have the benefit of Employee's continuing loyalty, service and counsel, and also to assist Employee in providing for the contingencies of disability, death and old age retirement, it is hereby agreed:

## ARTICLE I.
## EMPLOYMENT CONTRACT

**1.01    Employment.**  Red Simpson (sometimes "Employer") employs Employee and Employee accepts employment from Employer upon the terms and conditions of this Agreement.

**1.02    Term.**  The term of employment pursuant to this contract shall begin on _January 1_, 19 _97_, and terminate as set forth in Section 1.08.

**1.03    Duties.**  As an employee of Employer, Employee shall supervise, direct and ensure the timely completion of all operations in the performance of contracts and shall perform such additional and different duties as Red Simpson, from time to time, may require. The Board of Directors of Red Simpson or its authorized officers may, from time to time, extend or curtail Employee's precise duties.  As a representative of Red Simpson, Employee shall provide Red Simpson on demand assistance and advice, and perform such additional and different duties as Red Simpson's Board of Directors or authorized officers may, from time to time, require.  If Employee is elected or appointed a director or officer of  Red Simpson, Employee shall serve in such capacity or capacities without further compensation.

**1.04    Extent of Service.**  Employee shall exert his best efforts and devote substantially all his time, attention and energies to Employer's business.  Except as otherwise provided in this Agreement, during the term of employment with Employer, Employee shall

C:\WP\RedSimpson\SubchapterS\Contracts\GrahamA.wpd

not carry on or engage in any other business activity, regardless of whether it is pursued for gain, profit or charity. As a limited exception to the foregoing, however, Employee may engage in other business activity if the business activity is not similar to that of the business of Red Simpson and/or Subsidiaries and if Employee's engaging in the other business activity will not interfere with his employment duties or obligations to Employer.

**1.05    Disclosure of Information.** Employee acknowledges that the business methods, confidential information, and trade secrets of Red Simpson and/or Subsidiaries (collectively, "Business Information") and the list of Red Simpson's and/or Subsidiaries' customers as may be determined from time to time (collectively, "Customer Lists") are valuable, special and unique assets of Red Simpson's and Subsidiaries' business. Employee shall not, during and after the term of his employment with Red Simpson, disclose all or any part of the Business Information or Customer Lists to any person, firm, corporation, association or other entity for any reason or purpose. In the event of Employee's breach or threatened breach of this paragraph, Red Simpson and Subsidiaries reserve the right to terminate Employee's employment and shall be entitled to a preliminary restraining order and injunction restraining and enjoining Employee from disclosing all or any part of the Business Information or Customer Lists and from rendering any services to any person, firm, corporation, association, or other entity to whom all or any part of the Business Information or Customer Lists have been or have been threatened to be, disclosed. In addition to or in lieu of the above, Red Simpson or Subsidiaries may pursue all other remedies available at law for such breach or threatened breach, including recovery against Employee's stock or equity in any Corporation of which Red Simpson is majority shareholder, amounts in Employee's deferred compensation plan account, if any, and specifically are entitled to recover attorney's fees for such breach or threatened breach.

**1.06    Compensation.** Employer shall pay Employee for all services rendered a collective and total rate of compensation of $ 47,000.00 per Hour. Salary payment shall be subject to withholding and other applicable taxes. Employer may modify the rate of compensation from time to time as appropriate.

**1.07    Use of Name.** Red Simpson now has, and shall continue to have, the sole right to use the name "Red Simpson, Inc." as the corporate name and title. This right shall not be affected by the termination of Employee's employment with Red Simpson, nor by any other cause.

**1.08    Termination.** Red Simpson may, at any time, with or without cause, terminate Employee's employment with Red Simpson. These remedies are in addition to those set forth in Paragraph 1.05 above.

CONFIDENTIAL                                                            PIKE 00000337

## ARTICLE II.
## NONQUALIFIED DEFERRED COMPENSATION AGREEMENT

**2.01    Termination Benefits.**  Should the Employee's employment be terminated for disability, death or retirement, or for any reason other than a violation of paragraph 1.05 above or Article III below, Red Simpson will commence payments to Employee or Employee's designated Beneficiary (or in the absence of such written designation, to his estate or successor or successors in interest) pursuant to this agreement.

**2.02    Disability.**  As used herein, Disability means bodily injury or disease which prevents Employee from engaging for remuneration or profit in any and every occupation or business for which he is reasonably suited by education, training or experience.  The total and irrevocable loss of sight of both eyes, or the use of both hands, both feet, or one hand and one foot, will be regarded as total disability in any event.  In the event of death of an Employee while receiving payments pursuant to this agreement because of a disability, the unpaid balances in Employee's deferred compensation plan account will continue to be paid by Red Simpson to Employee's designated beneficiaries or his estate or successor or successors in interest as provided in paragraphs 2.01 and 2.03.

**2.03    Death.**  Employee's Beneficiary may be designated in writing to Red Simpson and may be changed at any time by Employee with the agreement of Red Simpson, by written amendment.

**2.04    Retirement or Other Termination.**  In the event of death of Employee while receiving payments pursuant to this agreement because of Employee's retirement or termination for any reason other than a violation of paragraph 1.05 above or Article III below, the unpaid balances in Employee's deferred compensation plan account will continue to be paid by Red Simpson to Employee's designated Beneficiaries or his estate or successor or successors in interest as provided in paragraphs 2.01 and 2.03.

**2.05    Conditions for Payment.**  The provisions for payments under this agreement are conditioned upon the continuous employment of the Employee by Red Simpson up to the date of Disability, Death or Retirement or termination for any reason other than a violation of paragraph 1.05 above or Article III below and subject to the provisions of paragraph 2.06 below and are further conditioned as set forth below in the Employee's agreement not to compete in Article III below and in paragraph 1.05 above.

**2.06    Leave of Absence.**  Red Simpson may, in its sole discretion, permit the Employee to take a leave of absence without pay or other compensation other than the benefits provided under this nonqualified deferred compensation agreement for a period not to exceed one (1) year. During this time the Employee will be considered to be still in the employ of Red Simpson for purposes of this Agreement.

CONFIDENTIAL

PIKE 00000338

**2.07    Time of Payment.**  In the absence of accelerating under paragraph 2.08, Red Simpson will commence payments pursuant to this agreement specifically pursuant to paragraph 2.10.

**2.08    Acceleration of Benefit Payments.**  After payments have commenced, Red Simpson hereby reserves the right to accelerate the payment of any of those sums specified in paragraphs 2.01, 2.02, 2.03 or 2.04 above including the right to make a lump sum payment of the whole at any time after termination without the consent of the Employee, his estate, beneficiaries or any other person claiming through or under him, but Employee shall have no right to compel any accelerated payment.

**2.09 Consideration and Computation of Benefit Payment.**  Any payments made pursuant to this Agreement shall be computed in accordance with the following formula:

a.      Determine the amount of the net earnings (or loss) of Red Simpson allocable to the Employee's Department or Working Entity for the year on a calendar year basis, beginning January 1, 1997, for each year of Employee's participation in the Deferred Compensation Plan.  In the year of termination, the amount of net earnings (or loss) of Red Simpson allocable to the Employee's Department or Working Entity for the year shall be calculated from January 1 to the date of termination.

b.      Net earnings (or loss) of Red Simpson allocable to the Employee's Department or Working Entity for the year shall be defined as follows: The net book accrual income (loss) of Red Simpson allocable to the Employee's Department or Working Entity for the calendar year, before tax.  The net book accrual income (loss) of Red Simpson allocable to the Employee's Department or Working Entity for the year shall then be reduced by an amount that would equal the federal and state income tax liabilities on the net book accrual income (loss) of Red Simpson allocable to the Employee's Department or Working Entity for the year, current and deferred, as if the Employee's Department or Working Entity were subject to these taxes, employing the maximum C corporation income tax rate regardless of the amount of net book accrual income (loss) of Red Simpson allocable to the Employee's Department or Working Entity for the year.  This calculation is subject to adjustment including, but not limited to, adjustment by final audit.

c.      Multiply the amount of the net earnings (or loss) of Red Simpson allocable to the Employee's Department or Working Entity for the year by a percentage representing the Participant's Interest Percentage assigned to the Employee in the Employee's Department or Working Entity  for that respective year.  Repeat this calculation for each year of Employee's participation in the Deferred Compensation Plan.

CONFIDENTIAL    PIKE 00000339

d.    The product is the amount which will accrue to the Employee's plan account for the year subject to final audit and adjustment. The total of the annual accruals is the deferred compensation benefit payable pursuant to this Agreement, subject to final audit and adjustment.

e.    The amount which will accrue annually to Employee's plan account shall be calculated based upon the final audit of the corporate books of Red Simpson and Subsidiaries for the year during which the Termination date occurs ("Final Audit") and shall reflect estimated exposure of Red Simpson and Subsidiaries for any potential claims or liabilities attributable to Pre-Termination Date events, occurrences or happenings allocable to Employee's Department or Working Entity. The amount which will accrue annually to Employee's plan account may be modified, from time to time, as necessary to reflect changes in the total net earnings (or loss) due to Pre-Termination Date events, occurrences or happenings. However, the amount which will accrue annually to Employee's plan account may not be modified after the issue date of the Final Audit unless within one hundred eighty (180) days of the issue date of the Final Audit, Red Simpson provides Employee with a list of potential claims or liabilities attributable to Pre-Termination Date events, occurrences or happenings which, in the best judgment of Red Simpson, would be chargeable against the amount which will accrue annually to Employee's plan account. The amount which will accrue annually to Employee's plan account shall be determined by the independent Certified Public Accountant then regularly employed by Red Simpson and said independent Certified Public Accountant's determination of the amount to be accrued annually to Employee's plan account shall be binding and conclusive on all parties. If the amount of the deferred compensation benefit payable pursuant to this Agreement at the date of termination, subject to final audit and adjustment, computed by said independent Certified Public Accountant, is Zero Dollars ($0.00) or less than Zero Dollars ($0.00), as reflected in the final audit, then employee's benefit payment will be Zero Dollars ($0.00).

f.    Employee's plan account will not be considered a funded account and Employee shall have no right to require Red Simpson to fund such account, Employee's only rights herein being that Employee shall receive the computed benefits after Employee's Termination Date and based upon the amount to be accrued to Employee's plan account throughout the period of Employee's employment with Red Simpson.

**2.10    Payment of Proceeds from Plan.**  Upon termination, Employee's benefit payment will be computed as follows:

The amounts in Employee's Plan Account, (or "Adjusted Plan Account," if appropriate, as hereinafter defined) shall be paid in five annual installments. The first installment shall be due ninety (90) days after the termination due to disability, death or retirement, or for any reason

C:\WP\RedSimpson\SubchapterS\Contracts\GrahamA.wpd        -5-

                                    PIKE 00000340

other than a violation of paragraph 1.05 above or Article III below. The amount of the first installment shall equal twenty percent (20%) of the Plan Account Amount (or Adjusted Account Amount, if appropriate) as estimated by the independent Certified Public Accountant then regularly employed by Red Simpson. The independent Certified Public Accountant's estimate of the Plan Account Amount (or Adjusted Plan Account Amount, if appropriate) shall be binding and conclusive on all parties.

The second installment shall be due one year after the due date of the first installment (regardless of when the first installment is actually paid). Prior to the due date of the second installment, the Final Audit of Red Simpson shall be completed by the independent Certified Public Accountant then regularly employed by Red Simpson, which audit shall conclusively determine the Plan Account Amount (or Adjusted Plan Account Amount, if appropriate). The Plan Account Amount may be modified, from time to time thereafter, as necessary, to reflect changes due to pre-Termination Date events, occurrences or happenings. The amount of the second installment shall be such amount that when added to the amount of the first installment, the sum of the first and second installments equal forty percent (40%) of the Plan Account Amount (or Adjusted Plan Account Amount, if appropriate).

The third installment shall be due two years after the due date of the first installment. The amount of the third installment shall equal twenty percent (20%) of the Plan Account Amount (or Adjusted Plan Account Amount, if appropriate).

The fourth installment shall be due three years after the due date of the first installment. The amount of the fourth installment shall equal twenty percent (20%) of the Plan Account Amount (or Adjusted Plan Account Amount, if appropriate).

The fifth and final installment shall be due four years after the due date of the first installment. The amount of the fifth installment shall equal twenty percent (20%) of the Plan Account Amount (or Adjusted Plan Account Amount, if appropriate).

The amount of any modification of the Plan Account Amount (or Adjusted Plan Account Amount, if appropriate) due to pre-Termination Date events, occurrences or happenings shall be deducted pro rata from any and all remaining unpaid payments due by Red Simpson to Employee pursuant to the Plan. Red Simpson will pay interest at the rate of five percent (5%) per annum (simple interest) on any amounts which are withheld pursuant to this paragraph and which are subsequently paid. Interest will apply beginning on the day after such payment was due and was withheld until the withheld amount is paid.

In addition to the amount of the installment payment computed above, Red Simpson shall pay to Employee an amount sufficient to reimburse Employee for any taxes paid on any installment payment by Employee pursuant to the Federal Insurance Contributions Act (FICA).

CONFIDENTIAL

PIKE 00000341

**2.11    Adjustments to Plan Account Amount.**

a.    If Employee's employment with Red Simpson is terminated for cause, or if Employee resigns or terminates his employment with Red Simpson at a time when Red Simpson could terminate Employee for cause, then the Plan Account Amount (as modified, if appropriate) shall be reduced to the Adjusted Plan Account Amount.  The Adjusted Plan Account Amount shall be the Plan Account Amount (as modified, if appropriate) reduced by (i) an amount equal to the monetary value of damages suffered by Red Simpson or Subsidiaries as a result of Employee's action or inaction which constitutes cause for termination of Employee's employment with Red Simpson; and/or (ii) an amount equal to the monetary value of damages suffered by Red Simpson or Subsidiaries as a result of Employee's action or inaction listed herein in Section 2.11b(1) through (4).  For purposes of this Agreement, "cause" shall include, but not be limited to, the following:

    1.    any action or inaction by Employee which results in a conviction of, or a plea of guilty or nolo contendere by Employee to any felony, a misdemeanor including fraud, embezzlement, theft or dishonesty, or any criminal conduct against Red Simpson or Subsidiaries, or any officer, director or shareholder of Red Simpson or Subsidiaries;

    2.    any action or inaction by Employee (but not including actions or inactions by Employee which constitute simple negligence in the course and scope of employment) which is not authorized by Red Simpson which results in the imposition (whether by judgment, settlement or otherwise) of civil and/or criminal penalties and/or liabilities upon Red Simpson or Subsidiaries, or any officer, director, or shareholder of Red Simpson or Subsidiaries;

    3.    failure by Employee of Employee's to perform assigned or required duties as an employee, officer or director of Red Simpson or failure by Employee to perform or observe any obligation of being an employee, officer or director of Red Simpson; or

    4.    any breach by Employee of any term, condition, obligation, representation or warranty of this Agreement.

b.    If subsequent to Employee's termination of employment with Red Simpson:

    1.    Employee is convicted of or pleads guilty or nolo contendere to any felony, a misdemeanor including fraud, embezzlement, theft or dishonesty, or any criminal conduct against Red Simpson, Subsidiaries or any officer, director or shareholder of Red Simpson or Subsidiaries;

CONFIDENTIAL                                                                                   PIKE 00000342

2.    Civil and/or criminal penalties and/or liabilities are imposed (whether by judgment, settlement or otherwise) upon Red Simpson or Subsidiaries or any officer, director or shareholder of Red Simpson or Subsidiaries as a result of conduct of Employee (other than actions or inactions of Employee which constitute simple negligence in the course and scope of employment) which was not authorized by Red Simpson.

3.    Employee fails to perform assigned or required duties as an officer, director or employee of Red Simpson, or Employee fails to perform or observe any obligation of being an officer, director or employee of Red Simpson; or

4.    Employee breaches any term, condition, obligation, representation or warranty of this Agreement,

then the Plan Account Amount shall be reduced to the Adjusted Plan Account Amount.

c.    The amount of any such reduction in the Plan Account Amount (as modified, if appropriate) to the Adjusted Plan Account Amount shall be deducted pro rata from any and all remaining unpaid payments due by Red Simpson to Employee pursuant to Section 2.10.

**2.12    Release of Claims and Indemnification.** On or before the ninetieth (90th) day after termination due to disability, death or retirement or for any reason other than a violation of paragraph 1.05 above or Article III below, Employee (or his estate or successor or successors in interest) shall (unless prohibited by law) deliver to Red Simpson a complete and general release, in a form satisfactory to Red Simpson's counsel, of any and all claims or causes of action by Employee against Red Simpson and Subsidiaries and the officers, directors and stockholders of Red Simpson and Subsidiaries.

Employee (or his estate or successors or successors in interest) agrees to indemnify, hold harmless, reimburse and defend Red Simpson and Subsidiaries and the officers, directors or shareholders of Red Simpson and Subsidiaries from and against any and all liability, obligations, losses, claims, damages, costs and expenses (including attorney's fees) arising under or in any way connected with Employee's employment with Red Simpson (except for actions or inactions by Employee which constitute simple negligence in the course and scope of employment), Employee's ownership of shares of stock in Red Simpson or Subsidiaries, or Employee's position as an officer or director of Red Simpson or Subsidiaries. The Employee's obligation to indemnify, hold harmless, reimburse and defend is specifically applicable to intentional or grossly negligent damage to the property or equipment of Red Simpson or Subsidiaries.

CONFIDENTIAL    PIKE 00000343

**2.13    Termination.** Any payments due under Article II of this Agreement shall terminate upon the occurrence of any of the following events:

a.    bankruptcy, insolvency, receivership or dissolution due to insolvency of Red Simpson;

b.    the voluntary agreement of the parties hereto;

c.    cessation of Red Simpson's business. However, this subsection (c) shall not apply in the event Red Simpson's business ceases as a result of its merger with or acquisition by any other entity.

## ARTICLE III.
## AGREEMENT NOT TO COMPETE

Because Employee may from time to time have access to and may actually be aware of Red Simpson's and Subsidiaries' business methods, confidential information, trade secrets and customer lists and because substantial harm could result to Red Simpson and Subsidiaries if Employee were to compete with Red Simpson or Subsidiaries after Employee's employment relationship with Red Simpson terminates or during any period of Employee's retirement, for and in consideration of the future compensation to be paid pursuant to the above Nonqualified Deferred Compensation Agreement in Article II, (and the retention of that certain stock purchase obligation set forth in Employee's previous employment contract dated _____ ) said agreement for payment by Red Simpson representing a balancing of Employee's interest in personal financial benefit and Red Simpson's interest in protecting its own operations and the operations of Subsidiaries, the following is agreed:

**3.01    Restriction.** Employee agrees that for a period of two years from termination or cessation of employment for any reason with Red Simpson, Employee will:

a.    Refrain from carrying on or engaging in a business similar to that of Red Simpson or Subsidiaries within the geographical area of those parishes in the State of Louisiana and those counties in the states of Texas, Mississippi, Arkansas, Oklahoma, Alabama, Florida and/or Georgia specified in Exhibit "B" attached hereto. The terms "carrying on or engaging in a business" shall include, but not be limited to: (1) directly or indirectly owning, managing, operating, controlling or participating in the business of power line (distribution or transmission) or substation construction, service or maintenance; (2) directly or indirectly becoming interested in or being connected with, as an employee, partner, officer, director, stockholder or investor in the business of power line (distribution or transmission) or substation construction, service or maintenance; (3) lending of credit or money for the purpose of establishing or operating any business of power line (distribution or transmission) or substation construction, service or maintenance; or (4) furnishing consultation or advice to any business of power line (distribution or transmission) or substation construction, service

CONFIDENTIAL                                      PIKE 00000344

or maintenance. Notwithstanding the foregoing, Employee shall not be precluded from working for a competitor where Employee's position is salaried as a Class A lineman or groundman, provided that Employee shall not utilize such position in any way to act personally or through others in solicitation of business otherwise prohibited herein.

      b.    Refrain from soliciting customers or employees of Red Simpson or Subsidiaries for business or work within the described geographical area of those parishes in the State of Louisiana and the counties in the states of Texas, Mississippi, Arkansas, Oklahoma, Alabama, Florida and/or Georgia specified in Exhibit "B". This restriction applies to any solicitation of customers or employees of Red Simpson and Subsidiaries who do business or work in the described geographical areas, and this restriction applies also to such customers or employees whether (regarding business or work in the described geographical areas) or not either is domiciled in or has an office in the geographical areas set forth in Exhibit "B".

      **3.02   Reasonableness of Limitations.** Employee understands that the provisions hereof may limit his ability to earn a livelihood in a business similar to the business of Red Simpson or Subsidiaries in the specified jurisdictions, but nevertheless agrees and hereby acknowledges that:

      a.    Such provisions do not impose a greater restraint than is necessary to protect the good will of the business interests of Red Simpson or Subsidiaries;

      b.    Such provisions contain reasonable limitations as to time, geographic area and the scope of activity to be restrained. In consideration of the foregoing and in light of Employee's education, skills and abilities, Employee agrees that he will not assert, and it should not be considered, that any provisions hereof prevent him from earning a living or are otherwise void, voidable, or unenforceable. To the maximum extent allowed by law this provision shall estop Employee from bringing such action.

      **3.03   Remedies.** Employee understands that this agreement not to compete is an obligation not to do, and failure of Employee to perform will entitle Red Simpson and Subsidiaries to recover damages for the loss sustained and the profit of which Red Simpson and Subsidiaries have been deprived. In addition, upon proof of the Employee's failure to perform the obligations contained in this agreement not to compete, Employee understands that Employers may obtain injunctive relief from a court of competent jurisdiction enforcing the terms of this agreement not to compete, without the necessity of Employers proving irreparable injury. Red Simpson and Subsidiaries may also avail itself of the additional remedies available in paragraph 1.05 of Employee's employment agreement in the event of Employee's violation of this agreement not to compete.

      **3.04   Effective Date.** This agreement not to compete supercedes any prior agreement by Employee not to compete, as of the date of its execution. However, the terms of any prior

CONFIDENTIAL

PIKE 00000345

agreement shall remain viable and effective from the original date of execution of any prior agreement until execution of this agreement.

## ARTICLE IV.
## MISCELLANEOUS

**4.01   Notices.**   All notices, demands or other writings required or allowed by this Agreement shall be deemed given, made or sent when made in writing and deposited in the United States Mail, certified or registered, with postage prepaid, and addressed as follows:

TO RED SIMPSON:     John C. Simpson
                    4615 Parliament Dr., Suite 200
                    Alexandria, LA 71303

TO EMPLOYEE:        Alex H. Graham
                    P.O. Box 532593
                    Harlingen, TX 78553

The address of any party as above provided may be changed by written notice given to the other party as provided above.

**4.02   Severability.**   In case any provision or any portion of this Agreement (including any part or portion of Articles I, II or III) shall be invalid, illegal or unenforceable under the laws of Louisiana or Federal Law, including but not limited to La. R.S. 23:921 *et seq.*, or of any other state or other jurisdiction where Employee, Red Simpson, or Subsidiaries operate, including but not limited to Section 15.50 of the Texas Business and Commercial Code, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.  If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstance, such finding shall not render the provision invalid or unenforceable as to any other persons or circumstances.  If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity;  however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

**4.03   Amendment.**   Any terms of this Agreement may be amended and the observance of any term hereof may be waived only by the written consent of the parties.

**4.04   Successors and Assigns.**   All covenants and agreements herein contained by or on behalf of or for the benefit of any party shall bind and inure to the benefit of his or its successors and assigns.  Employee acknowledges that his services as an employee of Red Simpson are unique and personal, and therefore, Employee shall not assign his rights or delegate his duties or obligations as an employee of Red Simpson.  Further, no assignment,

C:\WP\RedSimpson\SubchapterS\Contracts\GrahamA.wpd          -11-

                                    PIKE 00000346

pledge, collateralization or attachment of any kind of any benefits under this Agreement shall be valid or recognized by Red Simpson.

**4.05    Law Governing.**  This Agreement shall be governed by and construed in accordance with the laws of the state of Louisiana without regard to the conflict of law provisions of Louisiana or any other state, except that Article III of this Agreement shall be governed by and construed in accordance with the laws of the state in which Employee violates or is alleged by  Red Simpson or Subsidiaries to violate the terms of Article III.

**4.06    Entire Agreement.**  This Agreement embodies the entire agreement and understanding of the parties and supersedes as of the effective date, all prior agreements and understandings, written or oral, relating to the subject matter hereof.  However, nothing in this agreement shall affect the obligation of Red Simpson to purchase stock in accordance with any prior agreement between Employee and Red Simpson, et al, except that Red Simpson shall not be required to further contribute any additional amounts to the Consideration set out in such agreement.  It is the intention of the parties that the Nonqualified Deferred Compensation Plan in Article II is and shall be in lieu of any further contribution to the said Consideration, effective with the calendar year 1997.

**4.07    Employment Rights.**  This Agreement creates no right in the Employee to continue in Red Simpson's employ for any specific length of time, nor does it create any other rights in the Employee or obligations on the part of Red Simpson, except those set forth in this Agreement.  Nothing in this agreement shall prevent Red Simpson from providing any other benefit to its employees, in its discretion.

**4.08    Attorney's Fees.**  Should either party incur expense, including reasonable attorney's fees and costs, because of the breach of this Agreement by the other party, the prevailing party in any subsequent dispute shall be entitled to recover from the other all such costs and expenses including attorney's fees as may have been incurred.

**4.09    Captioned Headings.**  Captioned headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**4.10    Judicial Proceedings.**  The parties agree as follows:

a.    Any legal action or proceeding relating to this Agreement, shall be instituted in the Ninth Judicial District, Rapides Parish, Louisiana or the United States District Court for the Western District of Louisiana, Alexandria Division.

b.    Any objection to the venue of any such action or proceeding in any such court that such action or proceeding was brought in an inconvenient court is waived.

C:\WP\RedSimpson\Subchapters\Contracts\GrahamA.wpd        -12-

**4.11   Employee's Performance of Agreement.**  Employee warrants and represents that he has the ability to enter into this Agreement and perform all obligations hereunder, and that there are no restrictions or obligations to third parties which would in any way detract from, limit, or affect Employee's performance hereunder.

**4.12   Survival of Certain Provisions.**  Any termination or expiration of this Agreement or termination of Employee's employment by Red Simpson notwithstanding, the provisions of this Agreement which are intended to continue and survive shall so continue and survive, including, but not limited to, the provisions of Sections 1.05, 1.07, 3.01, 3.02 and 3.03.

**4.13   Non-waiver.**  No delay or failure by Red Simpson or Subsidiaries to exercise any right under this Agreement, and no partial or single exercise of that right, shall constitute a waiver of that or any other right.

**4.14   Additional Remedies.**  Any provision in this Agreement (including Articles I, II, and III) that enumerates the remedies available to Red Simpson and Subsidiaries against Employee, including but not limited to paragraphs 1.05, 2.11, 2.12 and 3.03, shall not operate as an exclusion or waiver of other remedies available at law or in equity against Employee by Red Simpson, Subsidiaries, any officer, director or shareholder of Red Simpson or Subsidiaries, any bonding company, any insurance company, or any other person or entity.

### ARTICLE V.
### SPOUSAL CONSENT

And now comes the spouse of Employee who joins herein for the purpose of declaring his or her consent to and approval of this Agreement.  However, by requiring said spouse to sign, Red Simpson does not intend to create, change, alter or convert the classification of any right or benefit created herein to community property or separate property, as the case may be at law.

THUS DONE AND SIGNED at _Alexandria LA_ before me, notary, and the undersigned competent witnesses, this _31st_ day of _December_, 19_97_.

WITNESSES:

_Jennifer L. Basco_

_David L. Cartwright_

RED SIMPSON, INC.

By: _Anne A. Thibeaux_

    John C. Simpson, President or
    Simeon A. Thibeaux, Jr.,
    Chief Financial Officer

_____
NOTARY PUBLIC

C:\WP\RedSimpson\SubchapterS\Contracts\GrahamA.wpd          -13-

CONFIDENTIAL                                                      PIKE 00000348

THUS DONE AND SIGNED at _RSI-Harlingen_ before me, notary, and the undersigned competent witnesses, this _23Rd_ day of _December_, 19 _97_

WITNESSES:

_Justin Graham_

_Cody Graham_

_Alex H. Graham_
Alex H. Graham, Individually

_Melissa A. Longoria_
NOTARY PUBLIC
My commission expires _11/4/98_

(SEAL)

THUS DONE AND SIGNED at _RSI-Harlingen_ before me, notary, and the undersigned competent witnesses, this _23Rd_ day of _December_, 19 _97_

WITNESSES:

_Justin Graham_

_Cody Graham_

_Teri Graham_
Teri Graham, Spouse

_Melissa A. Longoria_
NOTARY PUBLIC
My commission expires _11/4/98_

(SEAL)

C:\WP\RedSimpson\SubchapterS\Contracts\GrahamA.wpd          -14-

**EXHIBIT A**

**Subsidiary Corporations of Red Simpson, Inc.**

["C" Corporations inactive as of December 31, 1996]

Gerald Bourgeois, Inc.
Lawrence Deshotel, Inc.
Tony Whaley, Inc.
Scott Suba, Inc.
Blaine Broussard, Inc.
Bo Stewart, Inc.
William Gill, Inc.
Carl Prevost, Inc.
Howard Orton, Inc.
Bo McManus, Inc.
Ronald Cox, Inc.
Jeff Erwin, Inc.
Donald Lemay, Inc.
Travis Murray, Jr., Inc.
David Graham, Inc.
James Johnson, Inc.
Victor Rivera, Inc.
Sammy Christian, Inc.
Irby Hazelton, Inc.
Joe Rosenbaum, Inc.
Jamie Hart, Inc.
Richard Bradford, Inc.
Denny Ard, Inc.
Rick Westbrook, Inc.
Mike Boyd, Inc.
Red Simpson, Inc.
Mick Dubea, Inc.
Lucas Messer, Inc.
Richie Cook, Inc.
Shane Falcon, Inc.
Jack Jefferson, Inc.
Ralph Thomas, Inc.
Leo Stephens, Inc.
Kemp M. Dubea, Inc.
James Gilcrease, Inc.
Don Lawyer, Inc.
Manuel Navarro, Inc.
John Russell Croft, Inc.
Keith Smith, Inc.
Ronnie Tullos, Inc.
Alex Graham, Inc.
Bobby Cox, Inc.

PIKE 00000350

# EXHIBIT B

## ALL Counties of Alabama

### Counties of Arkansas

| | | |
|---|---|---|
| Benton | Little River | Pulaski |
| Carroll | Madison | Saline |
| Clark | Miller | Washington |
| Hempstead | Perry | White |

### Counties of Florida

| | | | | |
|---|---|---|---|---|
| Bay | Columbia | Hendry | Martin | St. John's |
| Alachua | Dade | Holmes | Monroe | St. Lucie |
| Baker | DeSoto | Indian River | Nassau | Suwannee |
| Bradford | Duval | Jackson | Okaloosa | Taylor |
| Brevard | Escambia | Jefferson | Okeechobee | Union |
| Broward | Flagler | Lee | Palm Beach | Volusia |
| Calhoun | Franklin | Leon | Putnam | Wakulla |
| Charlotte | Gadsden | Liberty | Santa Rosa | Walton |
| Clay | Glades | Madison | Sarasota | Washington |
| Collier | Gulf | Manatee | Seminole | |

### Parishes of Louisiana

| | | | | |
|---|---|---|---|---|
| Acadia | Claiborne | Jefferson | Red River | Terrebonne |
| Allen | Concordia | La Fourche | Richland | Union |
| Ascension | DeSoto | La Salle | Sabine | Vermilion |
| Assumption | East Baton Rouge | Lafayette | St. Bernard | Vernon |
| Avoyelles | East Carroll | Lincoln | St. Charles | Washington |
| Beauregard | East Feliciana | Livingston | St. Helena | Webster |
| Bienville | Evangeline | Morehouse | St. James | West Baton Rouge |
| Bossier | Franklin | Natchitoches | St. John the Baptist | West Carroll |
| Caddo | Grant | Orleans | St. Landry | West Feliciana |
| Calcasieu | Iberia | Ouachita | St. Martin | Winn |
| Caldwell | Iberville | Plaquemines | St. Mary | |
| Cameron | Jackson | Pointe Coupee | St. Tammany | |
| Catahoula | Jefferson Davis | Rapides | Tangipahoa | |

### Counties of Mississippi

| | | | | |
|---|---|---|---|---|
| Adams | Franklin | Jones | Neshoba | Stone |
| Amite | George | Kemper | Newton | Sunflower |
| Attala | Greene | Lafayette | Noxubee | Tallahatchie |
| Bolivar | Grenada | Lamar | Oktibbeha | Tate |
| Calhoun | Hancock | Lauderdale | Panola | Tunica |
| Carroll | Harrison | Lawrence | Pearl River | Walthall |
| Choctaw | Hinds | Leake | Perry | Warren |
| Claiborne | Holmes | Leflore | Pike | Washington |
| Clarke | Humphreys | Lincoln | Quitman | Wayne |
| Coahoma | Issaquena | Lowndes | Rankin | Webster |
| Copiah | Jackson | Madison | Scott | Wilkinson |
| Covington | Jasper | Marion | Sharkey | Winston |
| DeSoto | Jefferson | Marshall | Simpson | Yalobusha |
| Forrest | Jefferson Davis | Montgomery | Smith | Yazoo |

### Counties of Oklahoma

| | | | | |
|---|---|---|---|---|
| Choctaw | Hughes | Muskogee | Pittsburg | Tulsa |
| Craig | Mayes | Okmulgee | Pushmataha | Wagoner |
| Creek | McIntosh | Osage | Rogers | Washington |

CONFIDENTIAL

## Counties of Texas

| | | | | | |
|---|---|---|---|---|---|
| Anderson | Coleman | Freestone | Jones | Newton | Stephens |
| Andrews | Collin | Gaines | Kaufman | Nolan | Stonewall |
| Angelina | Colorado | Galveston | King | Orange | Tarrant |
| Archer | Comanche | Glasscock | Knox | Palo Pinto | Taylor |
| Austin | Concho | Grayson | Lamar | Panola | Throckmorton |
| Bastrop | Cooke | Gregg | Lampasas | Parker | Titus |
| Baylor | Coryell | Grimes | Lee | Pecos | Travis |
| Bell | Cottle | Hamilton | Leon | Polk | Trinity |
| Bexas | Crane | Hardeman | Liberty | Rains | Tyler |
| Borden | Culberson | Hardin | Limestone | Red River | Upshur |
| Bosque | Dallas | Harris | Loving | Reeves | Upton |
| Bowie | Dawson | Harrison | Madison | Robertson | Van Zandt |
| Brazos | Delta | Haskell | Marion | Rockwall | Walker |
| Brown | Denton | Henderson | Martin | Runnels | Waller |
| Burleson | Eastland | Hidalgo | McCulloch | Rusk | Ward |
| Burnet | Ector | Hill | McLennan | Sabine | Washington |
| Callahan | El Paso | Hood | Midland | San Augustine | Wichita |
| Cameron | Ellis | Hopkins | Milam | San Jacinto | Wilbarger |
| Camp | Erath | Houston | Mills | San Saba | Willacy |
| Cass | Falls | Howard | Mitchell | Scurry | Williamson |
| Chambers | Fannin | Hunt | Montague | Shackelford | Winkler |
| Cherokee | Fayette | Jack | Montgomery | Shelby | Wise |
| Childress | Fisher | Jasper | Morris | Smith | Wood |
| Clay | Foard | Jefferson | Nacogdoches | Somervell | Young |
| Coke | Franklin | Johnson | Navarro | Starr | |

CONFIDENTIAL

`

# EXHIBIT 2


RECYCLED

REDACTED

# EXHIBIT 3



REDACTED

# EXHIBIT 4


RECYCLED

Please sign and date the acknowledgment statement below and return this page to me to signify your receipt of this Memorandum and the attached Amendment Agreement. By signing this acknowledgement, you will not be accepting RSI's offer to accelerate your deferred compensation benefit or acquire your minority interest. To accept RSI's offer, you must still sign and return the Amendment Agreement, including the attached Assignment of Minority Interest in Stock if you have a minority interest benefit. If you hold minority interests, please also return your Stock Certificates. Your acceptance or non-acceptance of this offer will not affect your employment status.

## EMPLOYEE'S ACKNOWLEDGEMENT OF RECEIPT:

I acknowledge that I received this Memorandum and the attached Amendment Agreement. I understand that in order to accept the Company's offer to receive a distribution of my deferred compensation and to acquire my minority interest at this time and to be eligible to receive the Bonus Amount, I must sign and return the Amendment Agreement within ten calendar days after the date indicated by my signature below.

_Alex Graham_
[EMPLOYEE'S NAME—PLEASE PRINT]

_Alex Graham_
[SIGNATURE]

Date: _5 - 6 - 04_

> **This is an important document affecting your legal rights, including the timing and amount of your deferred compensation payments. If you have any questions regarding this document or if you need a copy of your employment agreements, please contact Simeon Thibeaux at RSI. RSI urges you to review this document carefully before signing it.**

AMENDMENT AGREEMENT ("Agreement") dated as of May 6, 2004, between Red Simpson, Inc. ("RSI"), a Louisiana corporation, and the individual whose name is set forth on Schedule 1 hereto ("Employee").

WHEREAS Employee is party to (a) an Employment Contract, Nonqualified Deferred Compensation Agreement and Agreement Not to Compete and/or (b) an Employment Contract, Agreement to Buy and Sell and Agreement Not to Compete, in each case with RSI (each, an "Employment Agreement");

WHEREAS the Employment Agreements give Employee the right to receive payments from RSI after the termination of Employee's employment with RSI, subject to certain conditions, based on (a) the net book accrual income or loss of Employee's department or working entity (a "Deferred Compensation Interest") and/or (b) the net annual accumulated earnings of a subsidiary of RSI of which Employee is a minority shareholder (a "Minority Interest");

WHEREAS RSI has entered into a Stock Purchase Agreement, dated as of May 4, 2004, among RSI, Pike Electric, Inc. ("Pike"), and certain other parties (the "Stock Purchase Agreement"), pursuant to which, among other things, Pike will purchase all the outstanding stock of RSI (the "Transaction");

WHEREAS RSI desires to amend the Employment Agreements to terminate Employee's Deferred Compensation Interest and/or to acquire and terminate Employee's Minority Interest, as the case may be, as of the closing of the Transaction (the "Closing Date"), and for Employee to waive and release RSI from any claims Employee may have in respect of those Interests; and

WHEREAS, in consideration of Employee's agreement to the amendment and waiver and release (which are contained in Articles III and IV of this Agreement), RSI desires (a) to accelerate the payment of certain amounts that would not be paid to Employee until the termination of Employee's employment and (b) to pay certain amounts to Employee that Employee would not otherwise receive, which amounts will be paid under RSI's newly adopted bonus plan (the "RSI 2004 Bonus Plan") (in the case of clauses (a) and (b), as described in Article I of this Agreement);

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein, and intending to be legally bound hereby, Employee and RSI agree as follows:

{N1137323 1}

PIKE 00000358

# ARTICLE I

## Payments to Employee

SECTION 1.01.  Payment of Base Amount.  (a)  RSI shall pay to Employee an amount equal to the total value of Employee's Deferred Compensation Interest and/or Minority Interest, as determined under the Employment Agreements, as of the close of business on the day immediately preceding the Closing Date (the "Base Amount"), in the manner and at the times provided in Sections 1.01(b) and (c) below.  The Base Amount at December 31, 2003 is set forth in Schedule 1 hereto, and the actual Base Amount will be that amount at December 31, 2003 plus or minus Employee's interest percentage multiplied by the net book accrual income or loss of Employee's department or working entity, for the period from and including January 1, 2004, to the close of business on the day immediately preceding the Closing Date; such net book accrual income or loss shall be reduced by an amount that would equal the federal and state income tax liabilities on the net book accrual income (loss) of RSI allocable to Employee's department or working entity for the year, current and deferred, as if the Employee's department or working entity were subject to these taxes, employing the maximum C corporation income tax rate regardless of the amount of net book accrual income (loss) of RSI allocable to the Employee's department or working entity for the applicable period: provided, however, that the total amount payable pursuant to this Section 1.01(a) shall not be less than $5,000.

(b)  RSI shall pay to Employee (i) an amount equal to 50% of the Base Amount not more than 75 days after the Closing (the "Initial Payment Date") and (ii) an amount equal to 50% of the Base Amount on the first anniversary of the Initial Payment Date.  The payment of the Base Amount shall not be subject to any restriction or condition of any kind whether in this or any other document and will not be subject to forfeiture for any reason.

(c)  Employee acknowledges and agrees that RSI's payment of the Base Amount as described above represents payment in full for Employee's Deferred Compensation Interest and/or for the acquisition and cancellation of Employee's Minority Interest.

SECTION 1.02.  Payment of Bonus Amount.  (a)  Subject to the conditions provided in Section 1.02(b), RSI shall pay to Employee an additional amount equal to the Base Amount, as determined under Section 1.01(a) above (the "Bonus Amount"), pursuant to the RSI 2004 Bonus Plan as described in the following sentence.  RSI shall pay to Employee an amount equal to 40% of the Bonus Amount on the second anniversary of the Initial Payment Date, an amount equal to 20% of the Bonus Amount on the third anniversary of the Initial Payment Date and an amount equal to 40% of the Bonus Amount on the fourth anniversary of the Initial Payment Date; provided, however, that the Bonus Amount payments are subject to forfeiture as described in Section 1.02(b).

(b)  In the event of Employee's death, "disability" (as defined below) or retirement in accordance with Section 1.02(e) of this Agreement or the termination of Employee's employment by RSI other than for "cause" (as defined below), RSI shall continue to pay to Employee the then remaining unpaid Bonus Amount at the times and in the amounts provided under Section 1.02(a); provided that Employee does not violate Section 1.05 (entitled "Disclosure of Information") or Article III (entitled "Agreement Not to Compete") of the

CONFIDENTIAL                                                                                           PIKE 00000359

Employment Agreement. In the event that Employee's employment terminates for any other reason, including Employee's voluntary termination of employment (other than as a result of retirement in accordance with Section 1.02(e) of this Agreement); or RSI's termination of Employee's employment for "cause", RSI shall not pay to Employee any portion of the then remaining unpaid Bonus Amount. Therefore, in such a case, Employee will forfeit all remaining Bonus Amounts. In addition, in the event that Employee's employment terminates under any of the circumstances set forth in the first sentence of this Section 1.02(b), Employee will forfeit all unpaid portions of the Bonus Amount if Employee violates Section 1.05 or Article III of the Employment Agreement.

(c)  Employee acknowledges and agrees that the Employment Agreements do not give Employee any right to the Bonus Amount and that the Bonus Amount is being made available to Employee as consideration for Employee's entering into this Agreement.

(d)  As used in this Agreement and the RSI 2004 Bonus Plan, the term "disability" shall mean bodily injury or disease which prevents Employee from engaging for remuneration or profit in any and every occupation or business for which he is reasonably suited by education, training or experience. The total irrevocable loss of sight of both eyes, or the use of both hands, both feet, or one hand and one foot, will be regarded as total disability in any event.

(e)  In order to be eligible to retire and continue to receive any unpaid Bonus Amount payments set forth in Section 1.02(a) of this Agreement at the times and in the amounts set forth therein, Employee must attain the age set forth on Schedule 1; provided, however, that, regardless of Employee's age, Employee may not voluntarily terminate employment and continue to receive any unpaid Bonus Amount payments until a date that is on or after the first anniversary of the Closing Date.

(f)  As used in this Agreement and the RSI 2004 Bonus Plan, the term "cause" shall mean (i) receipt by Employee of three or more notices from RSI of Employee's deficient work performance in any period of 24 consecutive months, (ii) any use or possession of alcoholic beverages or any controlled substance during work hours or while on RSI or customer property or working while under the influence of alcoholic beverages or controlled substances, other than possession of any controlled substance for which Employee has a valid prescription from a physician, (iii) any arrest, or commencement of any other criminal proceeding, relating to (A) any act of dishonesty, fraud, theft or other loss against RSI or its officers, employees, customers or suppliers or (B) the possession, sale or use of alcohol or any controlled substance, (iv) conviction of, or plea of guilty or nolo contendere to, any felony, (v) the receipt of three or more notices from RSI of Employee's failure to comply with the health and safety standards of RSI previously communicated to Employee, (vi) to the extent Employee's position requires the possession of any driver's license or other government permit, the loss of such license or permit as a result of any negligence or misconduct of Employee or (vii) any breach of any provision of the Employment Agreements (after giving effect to Section 3.01 of this Agreement) or any provision of this Agreement.

SECTION 1.03.  Acceleration of Benefit Payments.  RSI reserves the right to accelerate the payment of any amounts set forth in Article I of this Agreement at any time

CONFIDENTIAL                                                        PIKE 00000360

without the consent of Employee, his estate, beneficiaries or any other person claiming through or under him but Employee shall have no right to compel any accelerated payment.

SECTION 1.04. <u>Death Benefit.</u> In the event of Employee's death prior to receiving any payment of the Base Amount and/or Bonus Amount that Employee would otherwise be entitled to receive pursuant to this Agreement, such amounts shall be paid under the timeframes set forth in Sections 1.01(b) and 1.02(a) to Employee's designated beneficiary, which beneficiary may be designated to RSI in writing.

SECTION 1.05. <u>Withholding Taxes.</u> RSI shall withhold from any amounts payable under this Agreement, including the Base Amount and Bonus Amount, such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

ARTICLE II

General

SECTION 2.01. <u>Consideration.</u> (a) Employee acknowledges and agrees that, in the absence of this Agreement; (i) Employee is not entitled to receive any amount pursuant to Article II of any Employment Agreement (Article II is entitled "Nonqualified Deferred Compensation Agreement" in an Employment Agreement that contains a Deferred Compensation Interest and is entitled "Agreement to Buy and Sell Stock" in an Employment Agreement that contains a Minority Interest), or otherwise in respect of any Deferred Compensation Interest or Minority Interest, unless and until Employee's employment with RSI is terminated, (ii) the Deferred Compensation Interest payable to Employee under the Employment Agreements is subject to reduction during the term of Employee's employment to the extent that Employee's department or working entity experience a loss, (iii) the amounts payable to Employee under the Employment Agreements upon the termination of Employee's employment with RSI are subject to partial or complete forfeiture in the event that Employee is terminated for "cause" (as defined in the Employment Agreements) or upon the breach of certain agreements contained in the Employment Agreements and (iv) Employee would not be entitled to participate in the RSI 2004 Bonus Plan or to receive any portion of the Bonus Amount.

(b) Employee acknowledges and agrees that, in the absence of the agreements of Employee contained in Articles III (entitled "Amendment of Employment Agreements") and IV (entitled "Waiver and Release") of this Agreement, RSI would not agree to pay Employee (i) any portion of the Base Amount prior to the termination of Employee's employment with RSI or (ii) any portion of the Bonus Amount at any time whatsoever.

(c) Employee agrees that, in consideration of RSI's entering into this Agreement and its obligation to make the payments described in Article I of this Agreement and other good and valuable consideration the receipt of which is hereby acknowledged, Employee shall be bound by, and agrees to honor and comply with, the agreements contained in Articles III and IV of this Agreement, and further agrees that the payments to be made by RSI to Employee pursuant to Article I of this Agreement represent fair and adequate compensation for Employee's agreement to be bound by Articles III and IV of this Agreement.

CONFIDENTIAL                                                          PIKE 00000361

SECTION 2.02. <u>Confidentiality.</u> Employee shall not discuss or disclose the existence or contents of this Agreement or the RSI 2004 Bonus Plan to any person other than Employee's immediate family and legal and financial advisors. Employee shall instruct Employee's family and legal and financial advisors to comply with the previous sentence.

## ARTICLE III

### Amendment of Employment Agreements

SECTION 3.01. <u>Amendment.</u> Employee and RSI agree that as of the Closing Date each Employment Agreement shall be amended to delete Article II of such Employment Agreement in its entirety and to delete any other provision of the Employment Agreements relating to Employee's Deferred Compensation Interest and/or Minority Interest. Employee and RSI acknowledge and agree that such amendment constitutes the voluntary agreement of Employee and RSI and satisfies the requirements of each Employment Agreement for a valid amendment or modification.

SECTION 3.02. <u>No Further Liability.</u> As of the Closing Date, RSI shall have terminated Employee's Deferred Compensation Interests and shall have acquired and terminated Employee's Minority Interests and shall have no further obligation or liability to pay any amounts to, or credit any amounts to the account of, Employee pursuant to Article II of any Employment Agreement or otherwise in respect of any Deferred Compensation Interest or Minority Interest, except for RSI's obligation to make certain payments described in Article I above.

SECTION 3.03. <u>Effect on Employment Agreements.</u> Employee and RSI agree that, except as provided in Section 3.01 above and Section 5.07 below, the Employment Agreements shall continue in full force and effect on and after the Closing Date pursuant to the terms thereof. **Without limiting the generality of the foregoing, Employee acknowledges and agrees that on and after the Closing Date Employee shall continue to be bound by and subject to the provisions of Section 1.05 (entitled "Disclosure of Information") and Article III (entitled "Agreement Not to Compete") of each Employment Agreement.**

## ARTICLE IV

### Waiver and Release

SECTION 4.01. <u>Waiver and Release.</u> Employee, on behalf of Employee and Employee's spouse, heirs, dependents, representatives, executors, administrators and successors and assigns (the "<u>Releasing Parties</u>"), waives, releases and forever discharges RSI, its subsidiaries and affiliated companies and each of their former, current and future shareholders, owners, directors, officers, employees, agents, and each of the respective predecessors, successors and assigns, of each of the foregoing (the "<u>Released Parties</u>"), from any and all manner of actions and causes of action, suits, debts, dues, accounts, bonds, covenants, contracts, liabilities, obligations, agreements, judgments, charges, claims (including any claim for attorneys' fees), rights and demands whatsoever which Employee and the Releasing Parties have, had or may hereafter have against the Released Parties or any of them relating to, arising out of

CONFIDENTIAL    PIKE 00000362

or by reason of (a) the provisions of Article II of any Employment Agreement, (b) any Deferred Compensation Interest or Minority Interest, including the termination of such Interests pursuant to this Agreement, (c) the amendment of any Employment Agreement pursuant to Article III of this Agreement or (d) any provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that relate to the matters described in clauses (a), (b) or (c) above or this Agreement, including any and all such matters arising under any Federal, state or local statute, rule or regulation, or principle of common, tort or contract law; provided, however, that nothing herein shall release RSI from any claims or damages based on any right or claim Employee may have to enforce this Agreement or the Employment Agreements after giving effect to Article III of this Agreement. It is understood that nothing in this Section 4.01 is to be construed as an admission on behalf of the Released Parties of any wrongdoing and any such wrongdoing is expressly denied.

SECTION 4.02. Employee's Representations and Warranties. Employee represents and warrants to RSI that Employee fully understands the terms of the waiver and release contained in this Article IV and that Employee knowingly and voluntarily, of Employee's own free will, without any duress, being fully informed, and after due deliberation of up to 10 days, accepts its terms and signs below as Employee's own free act. Employee understands that, as a result of executing this Agreement, Employee will not have the right to assert that RSI or any other of the Released Parties unlawfully or improperly violated any of Employee's rights under Article II of any Employment Agreement, with respect to any Deferred Compensation Interest or Minority Interest or under ERISA. Employee further represents and warrants that Employee has not filed, and will not initiate, or cause to be initiated on Employee's behalf, any complaint, charge, claim or proceeding against any of the Released Parties before any Federal, state or local agency, court or other body relating to Article II of any Employment Agreement, with respect to any Deferred Compensation Interest or Minority Interest or under ERISA, and will not voluntarily participate in any such proceeding.

ARTICLE V

Miscellaneous

SECTION 5.01. Assignment. (a)  This Agreement is personal to Employee and shall not be assignable by Employee under any circumstances, and any attempt by Employee to assign Employee's rights under this Agreement shall be null and void. RSI may assign this Agreement and its rights and obligations hereunder to any person or entity that is a shareholder, affiliate or subsidiary of RSI. Upon such assignment, the rights and obligations of RSI hereunder shall become the rights and obligations of such shareholder, affiliate or subsidiary.

(b)  Notwithstanding Section 5.01(a) of this Agreement, if Employee should become divorced, a portion of his Base Amount and/or Bonus Amount may be assigned to his former spouse by order of the court having jurisdiction over the divorce. Upon receipt of a certified copy of such an order, and upon determining that the order assigns a determinable amount or percentage of Employee's Base Amount and/or Bonus Amount to the former spouse, RSI shall give effect to the order, so that when a benefit with respect to Employee becomes payable, the former spouse will receive the specified amount or percentage (as stated in the order) of Employee's Base Amount and/or Bonus Amount.

CONFIDENTIAL                                                                    PIKE 00000363

SECTION 5.02. <u>Successors.</u> This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of RSI and the personal and legal representatives, executors, administrators, successors, distributees, devisees and legatees of Employee. Employee acknowledges and agrees that all his or her covenants and obligations to RSI, as well as the rights of RSI under this Agreement, shall run in favor of and will be enforceable by RSI and its successors and assigns.

SECTION 5.03. <u>Entire Agreement.</u> Subject to Section 3.03 of this Agreement, this Agreement contains the entire understanding of the parties with respect to the subject matter hereof, and all oral or written agreements or representations, express or implied, with respect to the subject matter hereof are set forth in this Agreement.

SECTION 5.04. <u>Amendment.</u> This Agreement may not be altered, modified or amended except by written instrument signed by both parties hereto.

SECTION 5.05. <u>Communications.</u> Any communication made by Employee to RSI regarding the subject matter of this Agreement shall be made in writing and delivered to Simmy Thibeaux, Red Simpson, Inc., 4615 Parliament Drive, Alexandria, LA 71303, or to such other address as RSI shall specify to Employee in writing. Any communication made by RSI to Employee regarding the subject matter of this Agreement shall be made in writing and delivered to the address set forth on Schedule 1 hereto. Employee shall promptly notify RSI as described above in the event that Employee's current address is not as set forth on Schedule 1 hereto.

SECTION 5.06. <u>Governing Law.</u> This Agreement shall be governed by and construed in accordance with the internal laws of the State of Louisiana applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles of such State.

SECTION 5.07. <u>Judicial Proceedings.</u>

(a) Any legal action or proceeding relating to this Agreement or the Employment Agreement shall be instituted in the Ninth Judicial District, Rapides Parish, Louisiana or the United States District Court of the Western District of Louisiana, Alexandria Division.

(b) Any objection to the venue of any such action or proceeding brought in such courts is hereby waived.

(c) Each party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement or the Employment Agreement or any transaction contemplated hereby or thereby. Each party (i) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 5.07.

SECTION 5.08. <u>Severability.</u> If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or

CONFIDENTIAL                                                    PIKE 00000364

unenforceable in any jurisdiction, then such provision, covenant or condition shall, as to such jurisdiction, be modified or restricted to the extent necessary to make such provision valid, binding and enforceable, or, if such provision cannot be modified or restricted, then such provision shall, as to such jurisdiction, be deemed to be excised from this Agreement and any such invalidity, illegality or unenforceability with respect to such provision shall not invalidate or render unenforceable such provision in any other jurisdiction, and the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

SECTION 5.09.  No Waiver.  The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver of such party's rights or deprive such party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

SECTION 5.10.  Counterparts.  This Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

SECTION 5.11.  Construction.  (a)  The headings in this Agreement are for convenience only, are not a part of this Agreement and shall not affect the construction of the provisions of this Agreement.

(b)  The word "including" shall mean "including, without limitation".

SECTION 5.12.  Effectiveness.  This Agreement shall become effective as of the Closing Date.  This Agreement shall be null and void and of no further force and effect if the Closing Date does not occur or the Stock Purchase Agreement is terminated prior to the Closing Date.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL                                                    PIKE 00000365

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first written above.

RED SIMPSON, INC.,

By: _____

Simeon A. Thibeaux, Jr.
Secretary/Treasurer

{N1137323.1}

CONFIDENTIAL

## ACKNOWLEDGEMENT

In signing this Agreement, I acknowledge and agree, as more fully described in this Agreement, that:

(1)    I am giving up my rights under my Employment Agreements to earn additional amounts through a Deferred Compensation Interest and/or a Minority Interest and I am giving up my rights to delay receiving payment for those Interests until after I retire or my employment ends; and

(2)    I am waiving all rights or claims arising under the Employee Retirement Income Security Act of 1974, as amended, regarding my Deferred Compensation Interest and/or Minority Interest; and

(3)    In exchange for giving up and waiving these rights, I am receiving, now and over the next four years, other rights and additional cash payments that I would not otherwise receive; and

(4)    I have been given up to 10 days to decide whether to sign this Agreement; and

(5)    If the Closing Date does not occur or if the Stock Purchase Agreement is terminated prior to the Closing Date, this Agreement will not become effective and will have no legal effect.

DATED: 5 - 6 -, 2004

EMPLOYEE:

_____
Alex H. Graham

*Alex H. Graham*

Schedule 1

| Name: | Alex H. Graham |
|---|---|
| Title: | Division Manager |
| Address: | P. O. Box 532593, Harlingen, TX  78553 |
| Telephone: | 956-412-8829 |
| SSN: | 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 |
| Retirement Age[1]: | 65 |
| Address: | |
| Telephone: | |
| Base Amount as of December 31, 2003: | $878,651 |
| Estimated Bonus Amount (based on December 31, 2003 Base Amount): | $878,651 |

Acknowledged by Employee:

Alex H. Graham
P. O. Box 532593
Harlingen, TX  78553

---

[1] "Retirement Age" is (i) 60 for foremen, (ii) 62 for general foremen and superintendents and (iii) 65 for other employees who are being asked to sign an Amendment Agreement.

{N1137323.1}

CONFIDENTIAL

PIKE 00000368

# EXHIBIT 5



REDACTED

# EXHIBIT 6


RECYCLED

REDACTED

# EXHIBIT 7



EXECUTION COPY

EMPLOYMENT AGREEMENT dated as of July 1, 2004, between PIKE ELECTRIC, INC. ("Employer"), a North Carolina corporation, and MICK J. DUBEA, an individual domiciled in the State of Texas ("Executive").

WHEREAS, as of the date of this Agreement, Executive is President, Western Region, of Red Simpson, Inc., a Louisiana corporation ("RSI"), and in such capacity has been instrumental in the management, development and growth of RSI and its business and the goodwill therein;

WHEREAS RSI, Employer, Executive and certain other parties have entered into a Stock Purchase Agreement dated as of May 4, 2004 (the "Stock Purchase Agreement"), pursuant to which Employer will acquire for cash all the outstanding stock of RSI;

WHEREAS, through the Mick Dubea 2003 Grantor Retained Annuity Trust (the "Trust"), Executive will benefit from the sale of 39,327 shares of common stock of RSI, which will be acquired for cash by Employer pursuant to the transactions contemplated by the Stock Purchase Agreement; and

WHEREAS, as a condition to the Closing (as such term, and each other capitalized term that is used but not defined herein, is defined in the Stock Purchase Agreement), Employer and Executive have agreed to enter into this Agreement;

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, the parties hereto agree as follows:

ARTICLE I

Employment

SECTION 1.01. Effectiveness. This Agreement shall become effective as of the Closing. This Agreement shall be null and void ab initio and of no further force and effect if the Closing does not occur or the Stock Purchase Agreement is terminated pursuant to its terms prior to the Closing.

SECTION 1.02. Position. Employer shall hire Executive, and Executive shall serve, as Vice President, Western Region. For a period of two years following the Closing, Executive shall report directly to the Chief Executive Officer of Employer (the "CEO"). After such two-year period, Executive shall report to the CEO unless the CEO determines that it has become necessary for Executive to report to another person due to the restructuring of Employer or its businesses. Executive shall be responsible for the management of all operations of Employer in Oklahoma and Texas under the direction of the CEO, and shall perform such other services and duties, which may include

[2342676]

PIKE 00003568

2

business development in other geographical areas, as are consistent and appropriate for his position and as determined from time to time by the CEO.

SECTION 1.03.  Term.  The term of Executive's employment under this Agreement (the "Term") shall commence upon the Closing and shall expire on the date that is four years after the Closing.  Executive's employment with Employer shall be "at will" and, subject to the provisions of Article IV, Executive's employment under this Agreement may be terminated by either party at any time and for any reason.

SECTION 1.04.  Time and Effort.  Executive shall serve Employer faithfully, loyally, honestly and to the best of Executive's ability.  Executive shall devote all Executive's business time to the performance of Executive's duties on behalf of Employer.

SECTION 1.05.  Location.  During the Term, Executive's principal place of employment shall be at Beaumont, Texas, or such other location, as reasonably determined from time to time by the CEO to be necessary for the fulfillment of Executive's duties to Employer; provided, however, that Executive and the CEO shall mutually and reasonably agree on the location of any such move if the CEO determines that such move is in the best interests of Employer.  In the event that Executive's principal place of employment is transferred to a location in excess of 50 miles from Beaumont, Texas, Employer will pay or reimburse Executive for (a) all reasonable moving expenses relating to the physical transfer of Executive's furniture and personal belongings and (b) all realtor fees in connection with Executive's purchase of a new primary residence.

SECTION 1.06.  Resignation from RSI.  Executive hereby agrees that his employment with RSI and its affiliates shall terminate as of the Closing, and he shall resign as a director, officer and employee of RSI and its affiliates effective as of the Closing.

ARTICLE II

Compensation

SECTION 2.01.  Base Salary.  As compensation for all services rendered by Executive to Employer and all its affiliates in any capacity (including services as an officer or employee), Employer shall pay Executive a base salary ("Base Salary") during the Term at the annual rate during 2004 of $330,000, and thereafter subject to increase or decrease as may be determined from time to time by the Board of Directors of Employer (the "Board").  The Base Salary shall be payable in accordance with Employer's standard payroll practices.

SECTION 2.02.  RSI Deferred Compensation.  (a)  Employer shall pay to Executive (i) an amount in cash equal to 50% of the Base Amount (as defined below)

[2342676]

3

not more than 75 days after the Closing and (ii) an amount in cash equal to 50% of the Base Amount on the first anniversary of the Closing. Employer's obligation to pay such amounts shall not be terminated or reduced for any reason, including the termination of Executive's employment for any reason.

(b) Subject to any acceleration of the Gross Multiplier Amount Reduction (as defined below) for the purpose of purchasing Shares (as defined below) in accordance with Section 2.03, Employer shall pay to Executive an amount in cash equal to 40% of the Multiplier Amount (as defined below) on the second anniversary of the Closing, an amount in cash equal to 20% of the Multiplier Amount on the third anniversary of the Closing and an amount in cash equal to 40% of the Multiplier Amount on the fourth anniversary of the Closing; provided, however, that if the performance target conditions established by the Board in its sole discretion are satisfied, Employer shall pay to Executive, in lieu of the foregoing payments which shall not be paid, an amount in cash equal to 50% of the Multiplier Amount on the second anniversary of the Closing, an amount in cash equal to 20% of the Multiplier Amount on the third anniversary of the Closing and an amount in cash equal to 30% of the Multiplier Amount on the fourth anniversary of the Closing; provided further, however, that upon the occurrence of a Change in Control (as defined below), Employer shall promptly pay to Executive any portion of the Multiplier Amount that is unpaid (other than any amount that is unpaid as a result of any forfeiture pursuant to this Section 2.02(b)) as of the occurrence of such Change in Control. In the event Executive provides timely notice to Employer of a Tax Demand (as defined below), (i) Employer shall pay to Executive a portion of the then remaining unpaid Multiplier Amount equal to the lesser of such unpaid Multiplier Amount and the Tax Amount (as defined below), which payment shall be made no less than ten days prior to the date such Tax Amount is required to be remitted to the applicable tax authority, and (ii) the amount of any remaining unpaid installments of the Multiplier Amount shall be reduced in order of maturity in an aggregate amount equal to the Tax Amount. Notwithstanding the foregoing, Employer shall not make any payment described in this Section 2.02(b), and Executive shall not be entitled to receive any such payment, in the event that, prior to the payment of such amount, Executive has terminated his employment for any reason, other than death, Disability (as defined below) or Good Reason (as defined below), or Employer has terminated Executive's employment for Cause (as defined below).

(c) Executive agrees that RSI shall have no obligation to make any payment under the Existing Employment Agreement (as defined below), and Executive shall not be entitled to receive any such payment.

(d) For purposes of this Agreement, the term "Base Amount" shall mean the aggregate amount that RSI would be obligated to pay to Executive, but for this Agreement, pursuant to Article II of the Amendment and Restatement of Employment Contract, Nonqualified Deferred Compensation Agreement and Agreement Not To Compete, dated as of January 7, 2004, by and between Executive and RSI (the "Existing Employment Agreement") in the event that Executive's employment with RSI were
[2342676]

terminated as of the Closing, but without giving effect to Section 2.07 or 4.15 of the Existing Employment Agreement; provided, however, that the Base Amount shall be as set forth on the Master Deferred Compensation Schedule as finally determined in accordance with the terms of the Stock Purchase Agreement; provided further, however, that the Base Amount shall be reduced by the Gross Base Amount Reduction (as defined below) that is surrendered in connection with Executive's purchase of Shares pursuant to Section 2.03 (if any).

(e)  For purposes of this Agreement, the term "Multiplier Amount" shall mean the excess of (i) the aggregate amount that RSI would be obligated to pay to Executive, but for this Agreement, pursuant to Section 2.07 of the Existing Employment Agreement as a result of the consummation of the transactions contemplated by the Stock Purchase Agreement, including any additional amounts described in Section 4.15 of the Existing Employment Agreement, over (ii) the Base Amount before reduction by the Gross Base Amount Reduction (if any); provided, however, that the Multiplier Amount shall be as set forth on the Master Deferred Compensation Schedule as finally determined in accordance with the terms of the Stock Purchase Agreement; provided further, ⅄ however, that in the event that Executive elects to use a portion of the Gross Multiplier Amount Reduction to purchase Shares in accordance with Section 2.03(a), a pro-rata portion of the Gross Multiplier Amount Reduction shall be deducted from each payment of the Multiplier Amount that shall be made to Executive in accordance with the first sentence of Section 2.02(b).

(f)  For purposes of this Agreement, the term "Change in Control" shall mean LGB Pike LLC and its affiliates ceasing to own, directly or indirectly, voting securities of Employer representing at least 35% of the aggregate voting power of all classes of Employer securities entitled to vote for directors of Employer.

(g)  For purposes of this Agreement, the term "Tax Demand" shall mean the receipt by Executive of a written notice of deficiency from, or other written demand by, any tax authority, requiring the payment of tax on any unpaid portion of the Multiplier Amount (the amount of such tax demanded by such tax authority, the "Tax Amount").

SECTION 2.03.  Equity Participation.  (a)  On the date of the Closing, Employer shall permit Executive to purchase up to 21,479 whole shares of common stock, no par value, of Pike Holdings, Inc. ("Shares") at a purchase price per share of $93.11 (the "Purchase Price").  No less than five days prior to Closing, Executive shall give written notice to Employer of his intent (if any) to acquire Shares pursuant to this Section 2.03, the number of Shares to be acquired and the method of payment therefor (the "Election Date").  Executive shall be permitted to acquire such Shares by one or a combination of any of the following methods: (i) paying the purchase price for the applicable Shares in cash on the date of the Closing by wire transfer of immediately available funds, (ii) irrevocably surrendering at the Closing a portion of Executive's Base Amount (the "Gross Base Amount Reduction") in an amount that, after giving
[2342676]

PIKE 00003571

5

effect to all applicable withholdings (such resulting amount, the "Net Base Amount Reduction"), is equal to the aggregate purchase price for the applicable Shares; provided that, in the event the Base Amount is adjusted after the Closing such that the Gross Base Amount Reduction exceeds such adjusted Base Amount, Executive shall promptly pay to Employer in cash the amount of such excess and until such payment is made Employer shall be entitled to withhold such excess from any amounts otherwise payable to Executive, whether pursuant to this Agreement or otherwise or (iii) irrevocably surrendering at the Closing a portion of the Multiplier Amount (the "Gross Multiplier Amount Reduction") with a value not to exceed $1,000,000, after the withholding of any required taxes (the "Net Multiplier Amount Reduction"), it being expressly understood that Employer shall allow Executive to accelerate his receipt of the Gross Multiplier Amount Reduction solely for purposes of purchasing Shares in accordance with this Section 2.03(a). Subject to Section 2.03(b), at the Closing, Employer shall deliver to Executive that number of Shares equal to (A) the sum of the cash paid, the Net Base Amount Reduction and the Net Multiplier Amount Reduction (in each case, if any) for such Shares divided by (B) the Purchase Price.

(b) (i) It is expressly understood between the parties that any Shares acquired pursuant to this Section 2.03 through Executive's surrender of the Net Multiplier Amount Reduction will be treated as restricted shares ("Restricted Shares"). Until the Restricted Shares have become vested in accordance with Section 2.03(b)(ii), they may not be, directly or indirectly, offered, transferred, sold, assigned, pledged, hypothecated or otherwise disposed of, and shall be subject to forfeiture in accordance with the terms hereof. Certificates issued in respect of the Restricted Shares shall be registered in the name of Executive and deposited by him, together with a stock power endorsed in blank, with Employer. Until the Restricted Shares have become vested, Executive shall not be entitled to exercise any voting rights with respect to such Restricted Shares and shall not be entitled to receive dividends or other distributions with respect to such Restricted Shares; provided that when Restricted Shares have become vested, the holder of such Restricted Shares shall be entitled to receive the amount of dividends or other distributions with a record date after the Closing Date theretofore paid with respect to that number of Shares represented by such Restricted Shares. When the Restricted Shares become vested, Employer shall deliver the applicable certificates to Executive or his legal representative. Employee acknowledges that the Shares shall also be subject to the restrictions and limitations set forth in the Stockholders Agreement set forth on Exhibit A hereto (the "Stockholders Agreement").

(ii) Unless forfeited in accordance with this Section 2.03(b)(ii), the Restricted Shares shall become vested in accordance with the following schedule: (1) 40% of the Restricted Shares shall become vested on the second anniversary of the Closing, (2) 20% of the Restricted Shares shall become vested on the third anniversary of the Closing and (3) 40% of the Restricted Shares shall become vested on the fourth anniversary of the Closing; provided, however, that if the performance target conditions established by the Board in its sole discretion are satisfied, in lieu of the foregoing

[2342676]

PIKE 00003572

vesting schedule, 50% of the Restricted Shares shall become vested on the second anniversary of the Closing, 20% of the Restricted Shares shall become vested on the third anniversary of the Closing and 30% of the Restricted Shares shall become vested on the fourth anniversary of the Closing; provided further, however, that upon the occurrence of a Change in Control, all Restricted Shares (other than any Restricted Shares that have been forfeited pursuant to this Section 2.03(b)) shall become immediately vested as of the occurrence of such Change in Control. Notwithstanding the foregoing, all unvested Restricted Shares shall be forfeited (and Employee shall not have any interest in such Restricted Shares) and Employer shall not be required to deliver the certificates as described in Section 2.03(b)(i), in the event that, prior to vesting of such Restricted Shares, Executive has terminated his employment for any reason, other than death, Disability or Good Reason, or Employer has terminated Executive's employment for Cause.

(c) Notwithstanding the foregoing, Employer shall not deliver, and Executive shall have no right to receive, any Shares, unless and until Executive shall have executed and delivered to Employer a counterpart to the Stockholders Agreement, and Executive hereby agrees to be bound by, and honor and comply with, the terms and conditions of such Agreement.

(d) Any Shares issued pursuant to this Section 2.03 shall be issued in certificated form and shall bear a legend indicating that they have been issued pursuant to an exemption from the registration requirements of Federal and state securities laws, that their resale is restricted and that they are subject to the provisions of a stockholders agreement governing, inter alia, the transfer and voting of the Shares.

(e) No later than the Election Date, Executive shall deliver an opinion of counsel reasonably acceptable to Employer that any acquisition of Shares under this Section 2.03 meets an applicable exemption from the registration requirements of all Federal and applicable state securities laws. Notwithstanding the foregoing, in no event shall Executive be entitled to purchase any Shares under this Section 2.03 to the extent that Employer reasonably determines such purchase does not meet an applicable exemption from Federal and applicable state securities laws.

(f) Executive hereby represents and warrants to, and covenants with, Employer that any acquisition of Shares by Executive pursuant to this Section 2.03 will be solely for investment purposes for Executive's own account (and not for the account of any other person) and that Executive has no agreement, understanding or arrangement to subdivide, sell, assign, transfer or otherwise dispose of all or any part of any of such Shares to any other person.

SECTION 2.04. Withholding Taxes. Employer and its affiliates may withhold from any amounts payable under this Agreement such Federal, state, local and foreign taxes as may be required to be withheld pursuant to any applicable law or regulation.

[2342676]

PIKE 00003573

ARTICLE III

Employee Benefits

SECTION 3.01. Benefit Plans. During the Term, Executive shall be entitled to participate in any employee benefit plan offered by Employer (collectively, "Benefit Plans") on the same basis as other officers of Employer, subject to the terms and conditions of such Benefit Plan as in effect from time to time. A schedule of Benefit Plans currently maintained by Employer is set forth on Exhibit B hereto. Executive agrees that any such Benefit Plan may be amended or terminated from time to time by Employer in its sole discretion. Executive shall be given credit for years of service performed for RSI with respect to each Benefit Plan to the extent permitted by applicable law and the terms of such Benefit Plan.

SECTION 3.02. Business Expenses. Employer shall reimburse Executive for all necessary and reasonable "out-of-pocket" business expenses incurred by Executive in the performance of Executive's duties hereunder; provided that Executive furnishes to Employer adequate records or other documentary evidence required to substantiate such expenditures and otherwise complies with the expense reimbursement policy of Employer in effect at such time.

ARTICLE IV

Termination

SECTION 4.01. Exclusive Rights. Except as set forth in this Article IV, in the event that Executive's employment with Employer is terminated, whether by Employer or Executive, at any time and for any reason, Executive shall have no further rights to any compensation or any other benefits under this Agreement, any Benefit Plan or any employee benefit policies or other benefit arrangements in effect from time to time, whether maintained or provided by Employer, RSI or any of their affiliates.

SECTION 4.02. Accrued Rights. Upon the termination of Executive's employment under this Agreement for any reason, Executive shall be entitled to receive (a) Base Salary earned through the effective date of termination that remains unpaid as of such date, (b) reimbursement for any unreimbursed business expenses incurred by Executive prior to the effective date of Executive's termination to the extent such expenses are reimbursable under Section 3.02, (c) any benefits (other than benefits under any severance, termination or change in control plan, program or policy then in effect) to which Executive may be entitled under the Benefit Plans as of the effective date of Executive's termination, which benefits shall be payable in accordance with the terms of such Benefits Plans as in effect from time to time, and (d) any portion of the Base Amount that remains unpaid as of the effective date of Executive's termination.

[2342676]

8

SECTION 4.03. <u>Termination by Employer other than for Cause.</u>

(a) If Employer elects to terminate Executive's employment prior to the expiration of the Term for any reason other than death, Disability or Cause, Employer shall (i) provide written notice to Executive at least 30 days prior to the effective date of Executive's termination of employment or (ii) in lieu of providing such notice, continue to pay Executive's Base Salary through the period of time ending 30 days after the effective date of Executive's termination of employment. In the event of any such termination, Employer shall pay to Executive a lump-sum amount in cash equal to one year of Executive's then current Base Salary. If Employer elects to terminate Executive's employment prior to the first anniversary of the Closing for any reason other than death, Disability or Cause, Employer shall pay Executive an amount in cash equal to any portion of the Multiplier Amount that remains unpaid as of the effective date of Executive's termination, which payments shall be made promptly after the effective date of Executive's termination, and all Restricted Shares acquired pursuant to Section 2.03 of this Agreement shall become immediately vested as of the date of such termination. If Employer elects to terminate Executive's employment on or following the first anniversary of the Closing but prior to the end of the Term for any reason other than death, Disability or Cause, Employer shall pay Executive any unpaid portions of the Multiplier Amount in accordance with the schedule set forth under Section 2.02(b) and all Restricted Shares acquired pursuant to Section 2.03 shall continue to vest in accordance with the schedule set forth under Section 2.03(b)(ii), in each case, subject to Section 5.10. Notwithstanding the foregoing, Employer shall not be obligated to make any payment described in this Section 4.03(a), and no Restricted Shares shall become vested in accordance with this Section 4.03(a), until such time as Executive has provided an irrevocable waiver and general release of claims (other than any claims for payments that Executive is entitled to receive in accordance with this Section 4.03(a)) in favor of Employer, its affiliates, and their respective affiliates, directors, officers, employees, shareholders, owners, members, partners, agents and representatives in form and substance satisfactory to Employer.

(b) For purposes of this Agreement, the term "<u>Cause</u>" shall mean (i) Executive's willful failure or refusal to perform those duties that Executive is assigned or required to perform pursuant to this Agreement, (ii) Executive's failure to perform any obligation imposed upon Executive pursuant to this Agreement, including any willful failure to comply with any material employee policy of Employer, (iii) Executive's theft or misappropriation of Employer's funds or property or Executive's willful breach of any fiduciary duty to Employer in the performance of Executive's duties hereunder, (iv) Executive's conviction of, or a plea of guilty or nolo contendere to, a misdemeanor involving moral turpitude, fraud, dishonesty or theft that impairs the reputation of Employer or any of its affiliates or any felony (other than any traffic laws or laws governing operation of a motor vehicle) (or the equivalent thereof in a jurisdiction other than the United States), (v) Executive's gross negligence or willful misconduct in the performance of Executive's duties hereunder that results in material injury to the property, financial condition or business reputation of Employer or any of its affiliates

[2342676]

and (vi) Executive's breach of the provisions of Article V of this Agreement. "Cause" shall not exist under this Section 4.03(b) until and unless (A) the CEO has given Executive written notice that he believes Executive has engaged in conduct that constitutes Cause, (B) such notice identifies the clause or clauses of this Section 4.03(b) that describe the prohibited conduct that Executive is alleged to be or have been engaged in and (C) the Board has unanimously determined in good faith that conclusive evidence supporting the termination of Executive for Cause exists. In the event that Executive is alleged to have engaged in any conduct that falls under clause (i) or (ii) of this Section 4.03(b), Executive shall be given not less than 30 days to remedy such conduct; provided, however, that if Executive engages in any subsequent conduct that the Board determines in accordance with clause (C) of this Section 4.03(b) constitutes Cause, the Board shall be entitled to terminate his employment without giving Executive an opportunity to remedy his subsequent conduct.

SECTION 4.04. Termination by Executive. If Executive resigns or terminates employment for any reason, Executive shall provide written notice at least 30 days prior to the effective date of such resignation or termination. If Executive elects to terminate his employment for Good Reason at any time during the Term, Employer shall pay Executive any unpaid portions of the Multiplier Amount in accordance with the schedule set forth under Section 2.02(b), and all Restricted Shares acquired pursuant to Section 2.03 shall continue to vest in accordance with the schedule set forth under Section 2.02(b), in each case, subject to Section 5.10. Notwithstanding the foregoing, Employer shall not be obligated to make any payment described in this Section 4.04, and no Restricted Shares shall become vested in accordance with this Section 4.04 until such time as Executive has provided an irrevocable waiver and general release of claims (other than any claims for payments that Executive is entitled to receive in accordance with this Section 4.04) in favor of Employer, its affiliates, and their respective affiliates, directors, officers, employees, shareholders, owners, members, partners, agents and representatives in form and substance satisfactory to Employer.

SECTION 4.05. Termination upon Death or Disability. (a) Executive's employment under this Agreement shall terminate automatically upon Executive's death or Disability. In the event of any such termination, Employer shall promptly pay to Executive or Executive's designated beneficiary, as the case may be, any portion of the Multiplier Amount that is unpaid as of the date of such termination, and all Restricted Shares acquired pursuant to Section 2.03 shall become immediately vested.

(b) For purposes of this Agreement, the term "Disability" shall mean (i) the inability of Executive, due to illness, accident or any other physical or mental incapacity, to perform Executive's duties in a normal manner for a period of 180 days (whether or not consecutive) in any twelve-month period during the Term or (ii) Executive's being accepted for long-term disability benefits under any long-term disability plan in which Executive is then participating. The Board shall determine, in good faith, on the basis of the facts then available, whether and when the Disability of Executive has occurred. Such determination shall take into consideration the expert
[2342676]

PIKE 00003576

10

medical opinion of a physician mutually agreeable to Employer and Executive based upon such physician's examination of Executive. Executive agrees to make himself available for such examination upon the reasonable request of Employer.

SECTION 4.06. Resignation for Good Reason. Executive may terminate his employment or consultancy under this Agreement at any time for Good Reason. As used herein, the term "Good Reason" shall mean the occurrence, without Executive's consent, of any of the events or circumstances set forth in the following clauses (a) through (c):

(a) the assignment to Executive of any duties or responsibilities that are inconsistent in any material respect with the Executive's status, title and position as set forth in Section 1.02;

(b) any willful failure of employer to pay or provide to Executive any portion of Executive's compensation or benefits required under this Agreement, within 30 days of the date Executive informs Employer in writing that such compensation and benefits are due; or

(c) any material breach of this Agreement by Employer.

"Good Reason" shall not exist under clauses (a), (b) or (c) until and unless Executive has given the Board notice of the applicable event within 30 days of the date Executive has actual knowledge of such event. Such notice shall specifically delineate such claimed breach and shall inform the Board that the Company is required to cure such breach (if curable) within 30 days (the "Cure Period") after such notice is given in accordance with this Section 4.06. If such breach is not so cured (or is not curable), Executive may resign for Good Reason within a reasonable time after the end of the Cure Period. If such breach is cured within the Cure Period, Good Reason shall not exist hereunder; provided, however, that if Employer commits a similar breach of this Agreement within 12 months of the giving of the foregoing notice, Executive may terminate his employment for Good Reason without giving the Company an opportunity to cure such subsequent breach.

ARTICLE V

Executive's Covenants

SECTION 5.01. Employer's Interests. Executive acknowledges that RSI has expended substantial amounts of time, money and effort to develop business strategies, substantial customer relationships, supplier and vendor relationships, employee relationships, goodwill, business secrets, confidential information and intellectual property and to build an effective organization and that Employer, as the sole shareholder of RSI after the Closing, has a legitimate business interest and right in protecting those assets as well as any similar assets that Employer may develop or obtain following the Closing. Executive acknowledges that Employer is entitled to

[2342676]

protect and preserve the going concern value of the business of RSI and its own business (together with the business of RSI, the "Business") following the Closing to the extent permitted by law.  Executive acknowledges and agrees that the restrictions imposed upon Executive under Sections 5.03, 5.05, 5.06, 5.07 and 5.08 of this Agreement are reasonable and necessary for the protection of such assets and that, in light of the amounts payable pursuant to this Agreement and the consideration to be paid to the Trust pursuant to the Stock Purchase Agreement, the restrictions set forth in this Agreement will not prevent Executive from earning an adequate and reasonable livelihood and supporting his dependents without violating any provision of this Agreement.

SECTION 5.02.  Consideration to Executive.  Executive acknowledges he has been informed that Employer would not have agreed to enter into the Stock Purchase Agreement, pursuant to which the Trust's shares of RSI stock will be purchased for cash, and that Employer would not have agreed to enter into this Agreement and make the payments hereunder, without Executive's agreeing to enter into and to honor the provisions and covenants of this Article V.  Therefore, Executive agrees that, in consideration of (a) Employer's entering into this Agreement and Employer's obligations hereunder, (b) Employer's entering into the Stock Purchase Agreement and Employer's obligation to purchase the shares of RSI stock held by the Trust for cash thereunder and (c) other good and valuable consideration, the receipt of which is hereby acknowledged, Executive shall be bound by, and agrees to honor and comply with, the provisions and covenants contained in this Article V following the Closing.

SECTION 5.03.  Non-Disclosure of Confidential Information.
(a)  Executive acknowledges, that in the performance of his duties as an employee of RSI, Executive has received, and may in the future as an employee of Employer be given access to, Confidential Information (as defined below).

(b)  Executive agrees that all Confidential Information has been, is and shall be the sole property of Employer or RSI, as the case may be, and that Executive has no right, title or interest therein.

(c)  Prior to the date of this Agreement, Executive has not, directly or indirectly, disclosed or caused or permitted to be disclosed, to any person or entity whatsoever, or utilized or caused or permitted to be utilized, by any person or entity whatsoever, any Confidential Information acquired pursuant to Executive's employment with RSI, except (i) as Executive reasonably believed to be necessary in the discharge of Executive's duties as an employee of RSI or (ii) as required by law or as ordered by a court of competent jurisdiction.

(d)  Except as otherwise specifically provided in Section 5.04, Executive shall not, directly or indirectly, disclose or cause to be disclosed, to any person or entity whatsoever, or utilize or, directly or indirectly, cause to be utilized, by any person or
[2342674]

CONFIDENTIAL

entity whatsoever, any Confidential Information acquired pursuant to Executive's employment with Employer or RSI (whether acquired prior to or subsequent to the execution of this Agreement) or otherwise.

(e) Except as expressly required pursuant to Section 5.11, Executive shall not disclose to any person, other than Executive's immediate family and legal or financial advisors, the existence or contents of this Agreement and, to the extent such information is disclosed to Executive's immediate family or legal or financial advisors, Executive shall instruct those parties to comply with the non-disclosure requirements of this Section 5.03.

(f) For purposes of this Agreement, "Confidential Information" shall mean trade secrets and confidential or proprietary information, knowledge or data that is or will be used, developed, obtained or owned by Employer, RSI or the Business relating to the business, operations, products or services of Employer, RSI or the Business or the business, operations, products or services of any customer thereof, including products, services, fees, pricing, designs, marketing plans, strategies, analyses, forecasts, formulas, drawings, photographs, reports, records, computer software (whether or not owned by, or designed for, Employer, RSI or the Business), operating systems, applications, program listings, flow charts, manuals, documentation, data, databases, specifications, technology, inventions, developments, methods, improvements, techniques, devices, products, know-how, processes, financial data, customer, supplier and vendor lists, contact persons, cost information, executive information, regulatory matters, personnel matters, employee information, employee compensation, accounting and business methods, patents, trade secrets, copyrightable works and information with respect to any supplier, vendor, customer, employee or independent contractor of Employer, RSI or the Business, in each case whether patentable or unpatentable, whether or not reduced to writing or other tangible medium of expression and whether or not reduced to practice, and all similar and related information in whatever form, and all such items of any supplier, vendor, customer, employee or independent contractor of Employer, RSI or the Business or any other person with which Employer or RSI has a business relationship or owes a duty of confidentiality; provided, however, that Confidential Information shall not include information that is generally known to the public other than as a result of disclosure by Executive in breach of this Agreement or in breach of any similar covenant made by Executive prior to entering into this Agreement or any other duty of confidentiality.

SECTION 5.04. Permitted Disclosure. Executive may (a) utilize and disclose Confidential Information as required in the discharge of Executive's duties as an employee of Employer, subject to any specific restriction, limitation or condition placed on such use or disclosure by Employer, and (b) disclose Confidential Information to the extent required by applicable law or as ordered by a court of competent jurisdiction; provided that in such event, or if Executive receives a request from a court or other governmental authority to disclose Confidential Information, (i) Executive shall give prompt written notice to Employer and consult with and provide reasonable assistance to Employer in seeking a protective order or request for other appropriate

[2342676]

PIKE 00003579

remedy, (ii) in the event that such protective order or remedy is not obtained, or if Employer waives the seeking of such protective order or other remedy, (A) Executive shall disclose only that portion of the Confidential Information that, in the opinion of Executive's legal counsel, is legally required to be disclosed (and Executive shall be entitled to rely on the advice of such counsel) and (B) if requested in writing by Employer to do so, which writing contains an undertaking to reimburse Executive for any expenses incurred by him, then Executive shall exercise his reasonable best efforts to ensure that confidential treatment shall be accorded such Confidential Information by the receiving person or entity and (iii) Employer shall be given an opportunity to review such Confidential Information prior to disclosure thereof.

SECTION 5.05. Inventions. (a) Executive hereby represents to Employer that he has no right, title or interest in or to any Inventions (as defined below). From and after the Closing, Executive hereby assigns to Employer or its designee all Executive's rights, title and interest in and to, any and all Inventions, whether or not patentable, that Executive may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, within the scope of, and during the term of, Executive's employment with Employer. Executive further acknowledges that all original works of authorship that are created or contributed to by Executive (solely or jointly with others) within the scope of, and during the period of, Executive's employment with Employer are to be deemed "works made for hire", as that term is defined in the United States Copyright Act, and the copyright and all other intellectual property rights therein shall be the sole property of Employer or its designee. Executive shall take all reasonably requested actions and execute all reasonably requested documents to assist Employer, or its designee, at Employer's expense, in every way to secure Employer's or its designee's rights under this Section 5.05.

(b) For purposes of this Agreement, the term "Inventions" shall mean all inventions, works of authorship, developments, improvements and trade secrets (including products, services, processes, know-how, designs, developments, techniques, formulas, methods, mask works, developmental or experimental work, discoveries, ideas, source and object codes, software, databases, documentation, site content, text, graphics, programs and related items) and any works in progress, whether or not patentable or registrable under copyright or similar statutes, that relate to the proposed or current business, services, products or research and development of Employer or RSI.

SECTION 5.06. Non-Disparagement. After the date hereof, Executive shall not, whether in writing or orally, criticize or disparage Employer, RSI or the Business or any of their respective former, current or future directors, officers, employees, agents or representatives; provided that Executive may provide critical assessments of Employer to Employer within the scope, and during the term, of Executive's employment with Employer.

[2342676]

SECTION 5.07. <u>Non-Competition.</u> (a) For the Restricted Period, Executive shall not, and shall cause each of Executive's representatives, agents and affiliates not to, directly or indirectly:

(i) (A) engage in activity or business, or establish any new business, within the United States of America that is in competition, in whole or in part, with the Business or Employer ("<u>Competitive Activities</u>"), including (1) selling goods or performing services of the type sold or performed by the Business or Employer (x) at any time prior to the Closing or (y) prior to the time Executive ceases to be an employee of Employer or (2) assisting any person or entity in any way to do, or attempt to do, anything prohibited by clause (1), or (B) perform any action or activity or engage in any course of conduct that is detrimental to the business reputation of the Business or Employer or any business of Employer conducted at any time prior to the time Executive ceases to be an employee of Employer;

(ii) (A) solicit any person or entity that is a customer (or prospective customer) of Employer or any of its affiliates to purchase any goods or services sold or performed by Employer or any of its affiliates from any person other than Employer or any of its affiliates or to reduce or refrain from doing any business with Employer or any of its affiliates, (B) solicit, recruit or hire any employee of Employer or any of its affiliates or any person who has worked for Employer or any of its affiliates, (C) solicit or encourage any employee of Employer or any of its affiliates to leave the employment of Employer or any of its affiliates or recommend to any person that such person employ or engage any employee of Employer or any of its affiliates, (D) intentionally interfere with or damage (or attempt to interfere with or damage) any relationship between Employer or any of its affiliates, on one hand, and any of their respective employees, customers or suppliers, on the other hand (or any person or entity that Employer or any of its affiliates has approached or has made significant plans to approach as a prospective employee, customer or supplier); or any governmental authority or any agent or representative thereof or (E) assist any person or entity in any way to do, or attempt to do, anything prohibited by this clause (ii);

(iii) serve as a director, officer, affiliate, employee, broker, independent contractor, consultant, agent, representative or advisor for any Competitor (as defined below) and in such capacity engage in, or directly or indirectly manage or supervise personnel engaged in, any activity (A) which is substantially similar or substantially related to any activity in which Executive was engaged, in whole or in part, at Employer or RSI in his capacity as a director, officer or employee, (B) for which Executive had managerial or supervisory responsibility at Employer or RSI or (C) which utilizes the same or substantially similar specialized knowledge or skills as those utilized by Executive in his activities with Employer or RSI, in each

[2342676]

PIKE 00003581

15

case at any time prior to Executive's termination of employment with Employer; or

(iv) form, or acquire any equity ownership, voting or profit participation interest in, any Competitor, other than an interest of less than 5% in a Competitor that is publicly traded.

(b) for purposes of this Agreement, the term "Restricted Period" shall mean a period commencing on the date of the Closing and terminating five years from the date Executive ceases to be an employee of Employer for any reason. The Restricted Period shall be tolled during (and shall be deemed automatically extended by) any period in which Executive is in violation of this Section 5.07.

(c) for purposes of this Agreement, the term "Competitor" shall mean any business, person or entity that engages in any activity or owns or controls a significant interest in any business, person or entity that engages in any activity, that, in either case, competes in the United States of America with any activity in which Employer is engaged.

(d) for purposes of this Agreement, the term "solicit" shall mean the initiation of any communication of any kind whatsoever for the purpose of inviting, encouraging or requesting the taking (or refraining from taking) of any action.

SECTION 5.08. Release. (a) Executive, on behalf of Executive and his spouse, heirs, dependents, representatives, executors, administrators and successors and assigns (the "Releasing Parties"), hereby waives, releases and forever discharges Employer and each of its former, current and future shareholders, subsidiaries, affiliates, owners, directors, officers, employees and agents, and each of the respective predecessors, successors and assigns of each of the foregoing (the "Released Parties"), from any and all manner of actions and causes of action, suits, debts, dues, accounts, bonds, covenants, contracts, liabilities, obligations, agreements, judgments, charges, claims (including any claim for attorneys' fees), rights and demands whatsoever that Executive and the Releasing Parties have, had or may hereafter have against the Released Parties or any of them relating to, arising out of or by reason of any cause, act, event, omission, matter or thing whatsoever arising on or prior to the Closing, whether known or unknown, including without limitation any and all matters relating to Executive's employment by RSI and its affiliates, and any and all matters arising under any Federal, state or local statute, rule or regulation, or principle of common, tort or contract law, including, but not limited to, the Fair Labor Standards Act of 1938, as amended, the Family and Medical Leave Act of 1993, as amended, Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, as amended, the Americans with Disabilities Act of 1990, as amended, the Worker Adjustment and Retraining Notification Act of 1988, as amended, the Executive Retirement Income Security Act of 1974, as amended, and any other equivalent or similar Federal, state or local statute; provided, however, that nothing herein shall

[2342676]

PIKE 00003582

16

release Employer from any claims or damages based on any right or claim Executive may have to enforce this Agreement. It is understood that nothing in this Section 5.08 is to be construed as an admission on behalf of the Released Parties of any wrongdoing with respect to Executive or any Releasing Party, any such wrongdoing being expressly denied.

(b) Executive represents and warrants that he fully understands the terms of the release contained in this Section 5.08, that he had the benefit of advice of legal counsel, and that he knowingly and voluntarily, of his own free will, without any duress, being fully informed, and after due deliberation, accepts its terms as his own free act. Executive understands that, as a result of executing this Agreement, he will not have the right to assert that RSI, Employer or any other of the Released Parties has, at any time on or prior to the Closing, violated any of his rights in connection with his employment or otherwise.

SECTION 5.09. <u>Records.</u> Effective as of the Closing, all memoranda, books, records, documents, papers, plans, information, letters and other data relating to Confidential Information or the business, employee or supplier information or customer accounts of Employer, RSI or the Business, whether prepared by Executive or otherwise, coming into Executive's possession (or which previously came into Executive's possession) shall be and remain the exclusive property of Employer and Executive shall not directly or indirectly assert any interest or property rights therein. Upon termination of employment with Employer for any reason, and upon the request of Employer at any time, Executive shall immediately deliver to Employer all such memoranda, books, records, documents, papers, plans, information, letters and other data, and all copies thereof or therefrom, and Executive shall not retain, or cause or permit to be retained, any copies or other embodiments of such materials. Executive further agrees that Executive shall not retain or use for Executive's account at any time any trade names, trademark or other proprietary business designation used or owned in connection with the Business.

SECTION 5.10. <u>Specific Performance.</u> Executive agrees that any breach by Executive of any of the provisions of Sections 5.03, 5.05, 5.06 and 5.07 shall cause irreparable harm to Employer that could not be adequately compensated by monetary damages and that, in the event of such a breach, Executive shall waive the defense in any action for specific performance that a remedy at law would be adequate, and Employer shall be entitled to (a) specifically enforce such terms and provisions without the necessity of proving actual damages or posting any bond and (b) cease making any payments or providing any benefit (including by way of vesting of any Restricted Shares acquired pursuant to Section 2.03) otherwise required by this Agreement, in each case in addition to any other remedy to which Employer may be entitled at law or in equity; provided, however, that if Employer fails to make timely payment of any portion of the Base Amount or the Multiplier Amount required to be paid hereunder (or fails to deliver the share certificates with respect to any Restricted Shares, as required pursuant to Section 2.03(b)(i)) within 30 days of the date Executive

[2342676]

17

informs Employer in writing that such amount is due, in the case of the Multiplier Amount (or any Restricted Shares purchased pursuant to Section 2.03), other than as a result of Executive's forfeiture of such amount (or such Restricted Shares) pursuant to Section 2.02(b), Section 2.03(b) or this Section 5.10, in each case as determined by Employer in good faith, Executive shall thereafter be promptly relieved of any further obligation to comply with Sections 5.06 and 5.07; and provided further, however, that solely for purposes of Section 5.07, (i) in the event that Executive forfeits any portion of the Multiplier Amount as a result of Executive's termination of employment by Employer for Cause or by Executive without Good Reason on or prior to the 18-month anniversary of the Closing Date, the Restricted Period shall terminate 18 months from the date of Executive's termination of employment and (ii) in the event that Executive forfeits any portion of the Multiplier Amount as a result of Executive's termination of employment by Employer for Cause or by Executive without Good Reason after the 18-month anniversary of the Closing Date, the duration of the Restricted Period shall be equal to the duration of Executive's employment with Employer.

SECTION 5.11. Notification of Subsequent Employer. Prior to accepting employment with any other person or entity during any period during which Executive remains subject to any of the covenants set forth in Article V, Executive shall provide such prospective employer with written notice of the relevant provisions of this Agreement, with a copy of such notice delivered simultaneously to Employer.

SECTION 5.12. Executive Representations. Executive represents and warrants to Employer that (a) Schedule 5.12 to this Agreement sets forth a true, complete and correct list of all contracts, agreements, understandings and arrangements between or among Executive and RSI or any of its affiliates (collectively, the "Existing Agreements") and (b) the execution and delivery of this Agreement by Executive and Employer and the performance by Executive of Executive's duties hereunder shall not constitute a breach of, or otherwise contravene, or be prevented, interfered with or hindered by, the terms of any Existing Agreement or other agreement, arrangement, understanding or policy or program to which Executive is a party or otherwise bound.

SECTION 5.13. Cooperation. Following termination of his employment, Executive shall provide Executive's reasonable cooperation in connection with any suit, action or proceeding (or any appeal therefrom) that relates to events occurring during Executive's employment with Employer; provided that Employer shall reimburse Executive for expenses reasonably incurred and compensate Executive (at the hourly equivalent of his final base compensation, assuming a 40-hour work week) for time actually spent in connection with such cooperation.

SECTION 5.14. Scope of Covenants. For purposes of this Article V, the term "Employer" includes Employer's subsidiaries (including RSI) and affiliates, and its and their predecessors, successors and assigns.

[2342676]

CONFIDENTIAL

PIKE 00003584

18

## ARTICLE VI

### Miscellaneous

SECTION 6.01. <u>Assignment.</u> This Agreement is personal to Executive and shall not be assignable by Executive. The parties agree that any attempt by Executive to delegate Executive's duties hereunder shall be null and void. Employer may assign this Agreement and its rights and obligations thereunder, in whole or in part, to any person that is an affiliate, or a successor in interest to substantially all the business or assets, of Employer. Upon such assignment, the rights and obligations of Employer hereunder shall become the rights and obligations of such affiliate or successor person or entity; <u>provided</u> that Employer shall remain liable for each of its obligations hereunder. For purposes of this Agreement, the term "<u>Employer</u>" shall include any permitted assignee to which this Agreement is assigned.

SECTION 6.02. <u>Successors.</u> This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of Employer and the personal and legal representatives, executors, administrators, successors, distributees, devisees and legatees of Executive. Executive acknowledges and agrees that all Executive's covenants and obligations to Employer, as well as the rights of Employer under this Agreement, shall run in favor of and shall be enforceable by Employer, its affiliates and their successors and assigns.

SECTION 6.03. <u>Entire Agreement.</u> This Agreement contains the entire understanding of Executive, on the one hand, and Employer and its affiliates, on the other hand, with respect to the subject matter hereof, and all oral or written agreements or representations, express or implied, with respect to the subject matter hereof are set forth in this Agreement. Without limiting the generality of the foregoing, all the Existing Agreements shall be terminated and of no further force and effect, and Executive shall be entitled to no further payments or benefits thereunder, as of the Closing.

SECTION 6.04. <u>Amendment.</u> This Agreement may not be altered, modified or amended except by written instrument signed by the parties hereto.

[2342676]

CONFIDENTIAL

19

SECTION 6.05. Notice. All notices, requests, demands and other communications required or permitted to be given under the terms of this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three Business Days after they have been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the other party as set forth below:

| If to Employer: | Pike Electric, Inc.<br>100 Pike Way<br>Mount Airy, NC 27030<br>Attention: J. Eric Pike<br>Telecopy: (336) 719-4585 |
| --- | --- |
| with a copy to: | Cravath, Swaine & Moore LLP<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019<br>Attention: Richard Hall, Esq.<br>Telecopy: 212-474-3700 |
| If to Executive: | Mick Dubea<br>2570 Ashley<br>Beaumont, TX 77702 |

The parties may change the address to which notices under this Agreement shall be sent by providing written notice to the other in the manner specified above. For purposes of this Section 6.05, the term "Business Day" shall mean a day that is not a Saturday, a Sunday or a day on which banking institutions are legally permitted to be closed in the city of New York.

SECTION 6.06. Governing Law; Jurisdiction; Waiver of Jury Trial.
(a)    This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles of such State.

(b)    Each party irrevocably submits to the exclusive jurisdiction of (i) the courts of the State of Delaware and (ii) the United States District Court for the District of Delaware for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each party agrees to commence any such action, suit or proceeding either in the United States District Court for the District of Delaware, or if such suit, action or other proceeding may not be brought in such court for
[2342676]

PIKE 00003586

jurisdictional reasons, in the courts of the State of Delaware. Each party further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth above shall be effective service of process for any action, suit or proceeding in Delaware with respect to any matters to which it has submitted to jurisdiction in this Section 6.06. Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in (i) the courts of the State of Delaware or (ii) the United States District Court for the District of Delaware, and hereby and thereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

(c) Each party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement or any transaction contemplated hereby. Each party (i) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 6.06.

SECTION 6.07. <u>Severability.</u> If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable in any jurisdiction, then such provision, covenant or condition shall, as to such jurisdiction, be modified or restricted to the extent necessary to make such provision valid, binding and enforceable, or, if such provision cannot be modified or restricted, then such provision shall, as to such jurisdiction, be deemed to be excised from this Agreement and any such invalidity, illegality or unenforceability with respect to such provision shall not invalidate or render unenforceable such provision in any other jurisdiction, and the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

SECTION 6.08. <u>Survival.</u> Subject to Section 1.01, the rights and obligations of Employer and Executive under the provisions of this Agreement, including Articles V and VI, shall survive and remain binding and enforceable, notwithstanding any termination of Executive's employment with Employer for any reason, to the extent necessary to preserve the intended benefits of such provisions.

SECTION 6.09. <u>No Waiver.</u> The failure of a party to insist upon strict adherence to the terms of this Agreement on any occasion shall not be considered a waiver of such party's rights or deprive such party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

[2342676]

SECTION 6.10.  Determinations.  Unless otherwise expressly provided in this Agreement, all determinations of Employer or the Board shall be in the good faith discretion of Employer or the Board, as applicable.

SECTION 6.11.  Counterparts.  This Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

SECTION 6.12.  Construction.  (a)  The headings in this Agreement are for convenience only, are not a part of this Agreement and shall not affect the construction of the provisions of this Agreement.

(b)  For purposes of this Agreement, the words "include" and "including", and variations thereof, shall not be deemed to be terms of limitation but rather shall be deemed to be followed by the words "without limitation".

(c)  For purposes of this Agreement, the terms "subsidiary" and "affiliate" shall have the meanings ascribed to such terms in the Stock Purchase Agreement.

REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

[2342676]

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first written above.

PIKE ELECTRIC, INC.,

by _____

Name:  J. Eric Pike
Title:  President & Chief Executive Officer

MICK J. DUBEA,

_____

[2342676]

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first written above.

PIKE ELECTRIC, INC.,

by

Name: J. Eric Pike
Title: President & Chief Executive Officer

MICK J. DUBEA,

_____

[2342676]

CONFIDENTIAL

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first written above.

PIKE ELECTRIC, INC.,

by _____

Name:
Title:

MICK J. DUBEA,

[2342676]

CONFIDENTIAL