# EXHIBIT 8



SECOND AMENDMENT AGREEMENT (this "Agreement") dated as of May ____, 2005, between Red Simpson, Inc., a Louisiana corporation ("RSI"), and the individual whose name is set forth on the signature page attached hereto ("Employee").

WHEREAS Employee is party to (a) an Employment Contract, Nonqualified Deferred Compensation Agreement and Agreement Not to Compete and/or (b) an Employment Contract, Agreement to Buy and Sell and Agreement Not to Compete, in each case with RSI (each, an "Employment Agreement");

WHEREAS on July 1, 2004, Pike Electric, Inc. ("Pike") purchased all the outstanding stock of RSI (the "Acquisition"), and as a result RSI became a wholly owned subsidiary of Pike;

WHEREAS, in connection with the Acquisition, RSI and Employee amended the Employment Agreements pursuant to the Amendment Agreement dated May, 2004, between RSI and Employee (the "First Amendment"), and pursuant thereto Employee became entitled to receive the Bonus Amount (capitalized terms used but not defined herein have the meanings assigned thereto in the First Amendment) under the RSI 2004 Bonus Plan, subject to the terms and conditions set forth therein;

WHEREAS paragraphs (a) and (b) of Section 1.02 of the First Amendment currently provide that:

"(a) Subject to the conditions provided in Section 1.02(b), RSI shall pay to Employee an additional amount equal to the Base Amount, as determined under Section 1.01(a) above (the "Bonus Amount"), pursuant to the RSI 2004 Bonus Plan as described in the following sentence. RSI shall pay to Employee an amount equal to 40% of the Bonus Amount on the second anniversary of the Initial Payment Date, an amount equal to 20% of the Bonus Amount on the third anniversary of the Initial Payment Date and an amount equal to 40% of the Bonus Amount on the fourth anniversary of the Initial Payment Date; provided, however, that the Bonus Amount payments are subject to forfeiture as described in Section 1.02(b).

(b) In the event of Employee's death, "disability" (as defined below) or retirement in accordance with Section 1.02(e) of this Agreement or the termination of Employee's employment by RSI other than for "cause" (as defined below), RSI shall continue to pay to Employee the then remaining unpaid Bonus Amount at the times and in the amounts provided under Section 1.02(a); provided that Employee does not violate Section 1.05 (entitled "Disclosure of Information") or Article III (entitled "Agreement Not to Compete") of the Employment Agreement. In the event that Employee's employment terminates for any other reason, including Employee's voluntary termination of employment (other than as a result of retirement in accordance with Section 1.02(e) of this Agreement), or RSI's termination of Employee's employment for "cause", RSI shall not pay to Employee any portion of the

CONFIDENTIAL                                                                      PIKE 00017090

then remaining unpaid Bonus Amount. Therefore, in such a case, Employee will forfeit all remaining Bonus Amounts. In addition, in the event that Employee's employment terminates under any of the circumstances set forth in the first sentence of this Section 1.02(b), Employee will forfeit all unpaid portions of the Bonus Amount if Employee violates Section 1.05 or Article III of the Employment Agreement."; and

WHEREAS RSI and Employee desire to amend the First Amendment to prevent, in certain circumstances, the forfeiture of the Bonus Amount pursuant to paragraphs (a) and (b) of Section 1.02 of the First Amendment;

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein, and intending to be legally bound hereby, Employee and RSI agree as follows:

SECTION 1.01.  Effectiveness.  This Agreement shall be effective as of March 31, 2005.

SECTION 1.02.  Amendment.  Paragraphs (a) and (b) of Section 1.02 of the First Amendment are hereby deleted in their entirety and the following is substituted therefor:

"(a)  Subject to Section 1.02(b), RSI shall pay to Employee an additional amount equal to the Base Amount, as determined under Section 1.01(a) (the "Bonus Amount"), pursuant to the RSI 2004 Bonus Plan as described in the following sentence. RSI shall pay to Employee an amount equal to 40% of the Bonus Amount on the second anniversary of the Initial Payment Date, an amount equal to 20% of the Bonus Amount on the third anniversary of the Initial Payment Date and an amount equal to 40% of the Bonus Amount on the fourth anniversary of the Initial Payment Date; provided, however, that the payment of the Bonus Amount is subject to deferral or forfeiture as provided in Section 1.02(b).

(b)  In the event of (i) Employee's death, "disability" (as defined below) or retirement in accordance with Section 1.02(e) or (ii) the termination of Employee's employment by RSI other than for "cause" or "specified cause" (each as defined below), RSI shall continue to pay to Employee the then remaining unpaid Bonus Amount at the times and in the amounts provided under Section 1.02(a), conditioned upon Employee's continuing compliance with Section 1.05 (entitled "Disclosure of Information") and Article III (entitled "Agreement Not to Compete") of the Employment Agreement. In the event that (i) Employee's employment terminates as a result of Employee's voluntary termination (other than as a result of retirement in accordance with Section 1.02(e)) or RSI's termination of Employee's employment for "cause" (other than for any "specified cause" or any violation of Section 1.05 of the Employment Agreement) or (ii) Employee violates Article III of the Employment Agreement (whether before or after the termination of Employee's employment), each then remaining unpaid Bonus Amount payment shall be paid instead on the fifteenth (15th) anniversary of the Initial Payment Date

CONFIDENTIAL                                                                          PIKE 00017091

and, in such event, interest shall accrue annually on the amount of each such payment at the Specified Rate (as defined below) commencing on the date such payment would otherwise have been payable under Section 1.02(a). In the event that (i) Employee's employment terminates as a result of RSI's termination of Employee's employment for any "specified cause" or (ii) Employee violates Section 1.05 of the Employment Agreement (whether before or after the termination of Employee's employment), RSI shall not pay to Employee, and Employee shall forfeit, any then remaining unpaid Bonus Amount payments. For purposes of this Agreement, "specified cause" shall mean any event described in (1) clause (ii) or (iv) of Section 1.02(f), (2) clause (iii) of Section 1.02(f), but only to the extent Employee is convicted of, or pleads guilty or nolo contendere to, such charge or allegation or (3) clause (v) of Section 1.02(f), but only to the extent any such failure to comply with health and safety standards results or could result in serious injury to Employee or any other person or any material harm to Employer or its affiliates. For purposes of this Agreement, "Specified Rate" shall mean, with respect to each remaining unpaid Bonus Amount payment, an annual interest rate equal to the sum of (i) the interpolated yield on a 15-year Treasury security as of the date on which such payment would otherwise have been payable under Section 1.02(a), (ii) the Applicable Margin for Eurodollar Rate Tranche B Term Loans (within the meaning of the Amended and Restated Credit Agreement among Pike, Barclays Bank PLC, as Administrative Agent, and the other parties thereto dated as of July 1, 2004) as of such date and (iii) 0.75%."

SECTION 1.03. <u>No Pledge.</u> Employee shall not assign, pledge, hypothecate, encumber or otherwise transfer all or any portion of Employee's right to receive the Bonus Amount, and any attempt by Employee to do so shall be null and void.

SECTION 1.04. <u>Assignment; Successors.</u> This Agreement is personal to Employee and shall not be assignable, in whole or in part, by Employee under any circumstances, and any attempt by Employee to assign all or any portion of Employee's rights under this Agreement shall be null and void. RSI may assign this Agreement and its rights and obligations hereunder to any person or entity that is a shareholder, affiliate or subsidiary of RSI. Upon such assignment, the rights and obligations of RSI hereunder shall become the rights and obligations of such shareholder, affiliate or subsidiary. This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of RSI and the personal and legal representatives, executors, administrators, successors, distributees, devisees and legatees of Employee. Employee acknowledges and agrees that all Employee's covenants and obligations to Employer, as well as the rights of Employer under this Agreement, shall run in favor of and shall be enforceable by Employer, Pike, their respective affiliates and their respective successors and assigns.

SECTION 1.05. <u>Entire Agreement.</u> This Agreement contains the entire understanding of the parties with respect to the subject matter hereof, and all oral or written agreements or representations, express or implied, with respect to the subject matter hereof are set forth herein.

CONFIDENTIAL

PIKE 00017092

SECTION 1.06. _Amendment._ This Agreement may not be altered, modified or amended except by written instrument signed by both parties hereto.

SECTION 1.07. _Governing Law._ This Agreement shall be governed by and construed in accordance with the internal laws of the State of Louisiana applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles of such State.

SECTION 1.08. _Judicial Proceedings._ Any legal action or proceeding relating to this Agreement shall be instituted in the Ninth Judicial District, Rapides Parish, Louisiana or the United States District Court of the Western District of Louisiana, Alexandria Division. Any objection to the venue of any such action or proceeding brought in such courts is hereby waived. Each party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement or any transaction contemplated hereby.

SECTION 1.09. _Counterparts._ This Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first written above.

RED SIMPSON, INC., a subsidiary of PIKE ELECTRIC, INC.

By: _____

Name: J. Eric Pike
Title: President and CEO

EMPLOYEE,

_____

Name: Graham, Alex

CONFIDENTIAL

PIKE 00017093

# EXHIBIT 9



REDACTED

# EXHIBIT 10



REDACTED

# EXHIBIT 11



REDACTED

EXHIBIT 12

REDACTED

**EXHIBIT 13**

REDACTED

**EXHIBIT 14**

REDACTED

EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PIKE ELECTRIC CORPORATION and
PIKE ELECTRIC, INC.,

                              Plaintiffs,

               v.

MICK DUBEA,

                             Defendant.

C.A. No _____  0 5    8 7 9

## VERIFIED COMPLAINT

Upon personal knowledge as to their own actions and upon information and belief as to all other matters, Plaintiffs Pike Electric Corporation ("Pike Corp.") and Pike Electric, Inc. ("Pike Inc.") (collectively, "Pike") for their Complaint against Mick Dubea ("Dubea") allege as follows:

### SUMMARY OF THE ACTION

1.     This is an action against Dubea, the former Vice President of Pike's Western Region, for breach of contract, tortious interference with contract, tortious interference with business relations and misappropriation of trade secrets. In particular, Pike alleges that: (1) Dubea has breached, and is continuing to breach, his contractual obligation to refrain from competing against Pike and soliciting Pike's customers and employees for a period of five years following the date of his termination from Pike (the "Restricted Period"); (2) Dubea has breached, and is continuing to breach, his contractual obligation to refrain from disclosing Pike's confidential information; (3) Dubea has tortiously interfered, and continues to tortiously interfere, with Pike's employee agreements and business relations with its existing and

prospective customers; and (4) Dubea has misused, and continues to misuse, Pike's valuable

trade secrets to jump-start a competing business. By breaching his obligations to Pike, Dubea

has forfeited all consideration given to him by Pike for assuming those obligations. Moreover,

Dubea's conduct has resulted in direct and irreparable harm to Pike, and Pike should be awarded

monetary damages as partial compensation for its injuries. As Dubea's unlawful conduct is

continuing, Pike also seeks injunctive relief and specific performance that will prevent Dubea's

ongoing misconduct.

        2.      This action also seeks a declaratory judgment that any entitlement to

future compensation that Dubea may claim as part of the consideration given to him in exchange

for his employment with Pike has been forfeited under the contracts at issue.

<h2 align="center">THE PARTIES</h2>

        3.      Pike Electric Corporation ("Pike Corp.") is a Delaware corporation with

its principal place of business at 100 Pike Way, Mount Airy, North Carolina 27030.

        4.      Pike Electric, Inc. ("Pike Inc.") is a North Carolina corporation with its

principal place of business at 100 Pike Way, Mount Airy, North Carolina 27030. Pike Inc. is the

operational arm of Pike Corp. and a wholly-owned subsidary of Pike Corp. Throughout, Pike

Corp. and Pike Inc. will collectively be referred to as "Pike."

        5.      Upon information and belief, Dubea is a resident of the state of Texas and

resides at 2570 Ashley Street, Beaumont, Texas, 77702.

<h2 align="center">JURISDICTION AND VENUE</h2>

        6.      This is a civil action seeking a declaratory judgment, injunctive relief,

specific performance and damages for breach of contract, tortious interference with contract,

tortious interference with prospective business relations and misappropriation of trade secrets.

7.    The Court has subject matter jurisdiction over these claims on the basis of diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1), as plaintiffs and the defendant are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.    The Court has personal jurisdiction over the defendant because the parties agreed to submit any claims arising out of the contract at issue to the exclusive jurisdiction of the courts of the State of Delaware and the United States District Court for the District of Delaware.

9.    Venue is proper in this District, because the parties agreed to waive any objection to the laying of venue of any action arising out of the contract of issue here (or the transactions contemplated thereby) in this District.

## NATURE OF PIKE'S BUSINESS

10.    Pike provides electric distribution and transmission services to electrical utilities, cooperatives and municipalities across the eastern half of the United States. Its services include power line construction and maintenance, storm restoration, right-of-way maintenance and fiber-optic installation. Pike has been in business since 1945.

11.    There is a limited supply of skilled workers that are capable of performing Pike's work, and Pike struggles to maintain an adequate supply of linemen and managers. Due in part to the recent hurricanes and storms across the United States, many companies in Pike's industry are currently experiencing shortages of qualified personnel, and Pike has spent an enormous amount of time and money in an effort to retain its skilled labor force. To mitigate against the risk of labor shortages, and to prevent its competitors from taking its employees, Pike has, from time to time, entered into employment agreements containing non-compete provisions with its management and with many of its key employees. Those contracts are necessary to

- 3 -

ensure that Pike has the labor force needed to operate its business and provide its customers with electric distribution and transmission services.

      12.    Most of Pike's customers assign work to it under revolving master service arrangements. Under those arrangements, Pike's customers generally have no contractual obligation to continue to assign work to Pike, but, based on long-standing business practices, Pike has a reasonable expectancy that many of them will continue to do so. Nevertheless, most of Pike's customer arrangements, including its master service arrangements, can be terminated on short notice. As a result, Pike is at risk of losing significant business in a short time if its competitors can convince its customers to change service providers.

      13.    Pike's business depends on its long standing relationships with its customers, its competitive and proprietary pricing models and its proven supply of qualified personnel. Any damage to Pike's relationship with its customers, any disclosure of its confidential pricing secrets and any disruption to its labor supply would cause immediate and irreparable damage to Pike.

## PIKE ACQUIRES RED SIMPSON

      14.    On July 1, 2004, Pike acquired all the outstanding shares of the common stock of a privately-held company called Red Simpson Inc. ("RSI"). At the time of the acquisition, RSI employed over 1,500 individuals, had customers throughout the South Central and Southwestern parts of the United States and was generally considered one of America's leading power line contractors.

      15.    The RSI acquisition was a good strategic fit for Pike because the companies operated similar businesses in similar geographic regions, but shared only four

- 4 -

mutual clients out of a base of nearly 150 customers. In effect, Pike purchased RSI's customers, and its employees' and executives' relationships with those customers, when it acquired RSI.

16.    At the time Pike acquired RSI, Dubea was RSI's President for its Western Region, which covered nearly two-thirds of the total RSI workforce and accounted for a majority of the company's earnings. As a high ranking RSI executive that had worked with RSI for over 20 years, Dubea was privy to a significant amount of RSI's confidential business information. Moreover, Dubea was instrumental in the management, development and growth of RSI's business and goodwill. In particular, Dubea spearheaded many of RSI's important customer relationships, including its relationships with Texas Utilities, Entergy (West) and the city of San Antonio. Dubea also owned 39,327 shares of RSI common stock, which made him one of RSI's largest stockholders.

17.    Pike's efforts to purchase RSI culminated in a Stock Purchase Agreement ("SPA") between the companies. (A copy of the SPA is attached as Exhibit C to the December 20, 2005 Declaration of Eric Pike ("Pike Decl.").) As one of the largest owners of RSI stock, Dubea was a party to the SPA. The negotiations around the SPA lasted several weeks and all parties had access to legal counsel and financial advisors. During the course of their negotiations, the parties had an opportunity to discuss the forum selection and choice of law clauses in the contract. Ultimately, the parties agreed that Delaware, Pike Corp's place of incorporation, would serve as the forum in the event of litigation. The parties also agreed that Delaware law would govern any dispute between the parties arising out of the contract.

18.    The parties to the SPA recognized Dubea's integral role with RSI, and understood that his participation in the combined Pike-RSI enterprise would be critical to its success. In particular, Pike knew that its success in Texas and Louisiana would depend on RSI's

- 5 -

customer relationships in those areas, including the relationships cultivated by Dubea. Pike would not have purchased RSI if it would not have been able to receive the benefit of those relationships

19.    In addition, because customers in the power line industry are not bound by long-term service contracts, Pike was concerned that it would be easy for RSI's senior management effectively to "opt out" of the merger by starting their own competing businesses and taking RSI's existing customers and employees with them. In particular, Pike wanted to ensure that Dubea came to work for the merged company, and did not use his existing relationships with the customers in RSI's Western District (which Dubea headed) to form a competing business after the closing.

20.    Consequently, the parties agreed in writing that Pike's purchase of RSI would be expressly conditioned upon the execution and delivery of an employment agreement containing non-compete provisions between Dubea and Pike (as well as similar agreements with several other key RSI employees) prior to the closing. Thus, the non-compete agreement between Dubea and Pike at issue in this litigation expressly arose out of the sale of RSI to Pike.

21.    It was in Dubea's financial interest to facilitate the closing of Pike's acquisition of RSI as he was ultimately paid over $8.2 million for his RSI stock. Dubea would not have been paid that money for his RSI stock had he not entered into an employment agreement with Pike (because Pike would not have agreed to purchase RSI under those circumstances).

- 6 -

## DUBEA'S EMPLOYMENT AGREEMENT WITH PIKE

22.    Dubea not only received $8.2 million in cash from the acquisition, but on July 1, 2004, he also agreed to a generous written employment agreement with Pike Inc. (the "Employment Agreement").

23.    Under the Employment Agreement, Dubea was hired as Pike's Vice President for its Western Region—substantially the same position he had held with RSI—and was given responsibility for all of Pike's operations in Oklahoma and Texas. Dubea reported directly to the CEO of Pike, and received a base salary of $330,000 per year. Dubea was also given the opportunity to purchase up to 21,479 Restricted Shares of Pike common stock on very favorable terms. Dubea in fact purchased over $1 million worth of Pike shares that are scheduled to vest on the second, third and fourth anniversaries of the closing and have a current market value of approximately $1.5 million. In addition, Dubea was paid a "Base Amount" of approximately $5 million (half shortly after the closing, and half on the first anniversary of the closing). Finally, the parties agreed that Dubea would receive a "Multiplier Amount" of over $6 million as part of the Employment Agreement that is scheduled to be paid out on the second, third and fourth anniversaries of the closing. But for his conduct in violation of the Employment Agreement, Dubea would have been set to receive the full $6 million from the Multiplier Amount by 2008. In sum, Dubea has already received approximately $13.2 million from Pike in connection with the RSI acquisition and the promises he made in the Employment Agreement, and he would be entitled to receive approximately $7.5 million more if not for his unlawful conduct as issue in this action.

24.    In return for the valuable consideration he was to receive under the Employment Agreement, Dubea agreed to be bound by various restrictive covenants. Under §

- 7 -

5.02 of the Employment Agreement, Dubea acknowledges that Pike "would not have agreed to
enter into the Stock Purchase Agreement . . . and that [Pike] would not have agreed to enter into
this Agreement and make the payments hereunder, without [Dubea's] agreeing to enter into and
honor [the restrictive covenants found in the Employment Agreement]."

        25.    The Employment Agreement explained the reasons for, and

reasonableness of, the restrictive covenants:

> "**Employer's Interests.** [Dubea] acknowledges that RSI has expended
> substantial amounts of time, money and effort to develop business strategies,
> substantial customer relationships, supplier and vendor relationships, employee
> relationships, goodwill, business secrets, confidential information and intellectual
> property and to build an effective organization and that [Pike], as the sole
> shareholder of RSI after the Closing, has a legitimate business interest and right in
> protecting those assets as well as any similar assets that [Pike] may develop or
> obtain following the Closing. . . . [Dubea] agrees that the [following restrictions]
> are reasonable and necessary for the protection of such assets . . . "

        26.    Under Section 5.03 of the Employment Agreement, Dubea agreed to

protect Pike's confidential information:

> "Section 5.03. Non-Disclosure of Confidential Information. [Dubea]
> acknowledges, that in the performance of his duties as an employee of RSI,
> [Dubea] has received, and may in the future as an employee of [Pike] be given
> access to, Confidential Information (as defined below). [Dubea] agrees that all
> Confidential Information has been, is and shall be the sole property of [Pike] or
> RSI, as the case may be, and that [Dubea] has no right, title, or interest
> therein. . . . [Dubea] shall not, directly or indirectly, disclose or cause to be
> disclosed, to any person or entity whatsoever, or utilize or, directly or indirectly,
> cause to be utilized, by any person or entity whatsoever, any Confidential
> Information acquired pursuant to [Dubea]'s employment with [Pike] or RSI
> (whether acquired prior to or subsequent to the execution of this Agreement) or
> otherwise."

        27.    The Employment Agreement signed by Dubea defined the confidential

information that he was obligated to protect:

> "'Confidential Information' shall mean trade secrets and confidential or
> proprietary information, knowledge or data that is or will be used, developed,
> obtained or owned by [Pike], RSI or the Business relating to the business,
> operations, products or services of [Pike], RSI or the business, operations,

products or services of any customer thereof, including products, services, fees, pricing, designs, marketing plans, strategies, analyses, forecasts, formulas, drawings, photographs, reports, records, computer software (whether or not owned by, or designed for, [Pike], RSI or the Business), operating systems, applications, program listings, flow charts, manuals, documentation, data, databases, specifications, technology, inventions, developments, methods, improvements, techniques, devices, products, know-how, processes, financial data, customer, supplier and vendor lists, contact persons, cost information, executive information, regulatory matters, personnel matters, employee information, employee compensation, accounting and business methods, patents, trade secrets, copyrightable works and information with respect to any supplier, vendor, customer, employee or independent contractor of [Pike], RSI or the Business all similar and related information in whatever form . . ."

        28.     Dubea also agreed to refrain from competing with Pike and soliciting

Pike's customers and employees during the Restricted Period:

"SECTION 5.07. <u>Non-Competition</u>. For the Restricted Period, [Dubea] shall not, and shall cause each of [Dubea]'s representatives, agents and affiliates not to, directly or indirectly:

(i) (A) engage in activity or business, or establish any new business, within the United States of America that is in competition, in whole or in part, with the Business or [Pike] . . .

(ii) (A) solicit any person or entity that is a customer (or prospective customer) of [Pike] or any of its affiliates to purchase any goods or services sold or performed by [Pike] or any of its affiliates from any person other than [Pike] or any of its affiliates or to reduce or refrain from doing any business with [Pike] or any of its affiliates, (B) solicit, recruit or hire any employee of [Pike] or any of its affiliates or any person who has worked for [Pike] or any of its affiliates, (C) solicit or encourage any employee of [Pike] or any of its affiliates to leave the employment of [Pike] or any of its affiliates or recommend to any person that such person employ or engage any employee of [Pike] or any of its affiliates . . . (E) assist any person or entity in any way to do, or attempt to do, anything prohibited by this clause (ii) . . .

(iii) serve as a director, officer, affiliate, employee, broker, independent contractor, consultant, agent, representative or advisor for any Competitor . . .

(iv) form, or acquire any equity ownership, voting or profit participation interest in, any Competitor . . .

For purposes of this Agreement, the term "<u>Restricted Period</u>" shall mean a period commencing on the date of the Closing and terminating five years from the date [Dubea] ceases to be an employee of [Pike] for any reason."

29.     Dubea also explicitly agreed that Pike would be entitled to specific performance should he breach the terms of the contract, and that any breach by Dubea would enable Pike to cease making any payments or providing any benefits owed to Dubea under the terms of the Employment Agreement:

> "Section 5 10. Specific Performance. [Dubea] agrees that any breach by [Dubea] of any of the provisions of Section 5.03, 5.05, 5.06 and 5.07 shall cause irreparable harm to [Pike] that could not be adequately compensated by monetary damages and that, in the event of such a breach, [Dubea] shall waive the defense in any action for specific performance that a remedy at law would be adequate, and [Pike] shall be entitled to (a) specifically enforce such terms and provisions without the necessity of proving actual damages or posting any bond and (b) cease making any payments or providing any benefit (including by way of vesting of any Restricted Shares acquired pursuant to Section 2.03) otherwise required by this Agreement, in each case in addition to any other remedy to which [Pike] may be entitled at law or in equity."

30.     Dubea also explicitly agreed in the Employment Agreement that "the rights and obligations of [Pike and Dubea] under the provision of [the Employment Agreement], including Articles V and VI, shall survive and remain binding and enforceable, notwithstanding any termination of [Dubea's] employment with [Pike] for any reason".

31.     Dubea and Pike also agreed that the Employment Agreement would be governed by the laws of the State of Delaware and that any action arising out of the Employment Agreement would be submitted to the exclusive jurisdiction of the courts of the State of Delaware and the United States District Court for the District of Delaware.

## DUBEA BREACHES THE EMPLOYMENT AGREEMENT

32.     Dubea's performance as Vice President, while adequate, did not meet Pike's high expectations. Therefore, on September 22, 2005, Pike terminated Dubea without cause. Under the Employment Agreement and the amendments thereto, because Pike terminated Dubea without cause, Dubea would remain eligible to receive payment of the Multiplier Amount

- 10 -

and his Restricted Shares would continue to vest as scheduled. So long as he did not breach the restrictive covenants in the Employment Agreement, Dubea would have been entitled to receive over $7.5 million in cash and restricted stock from Pike during the years 2006 through 2008.

33.    On October 5, 2005, Chad Dubea ("Chad"), Dubea's son and a then-current Pike employee, formed a company registered in Harlingen, Texas called T&D Solutions Ltd. ("T&D"). On information and belief, T&D was formed with Dubea's financial backing and support. Moreover, on information and belief, Chad is living with Dubea in Beaumont, Texas, and Dubea is providing advice and guidance in connection with T&D's business and helping to run the day-to-day operations of T&D out of their home.

34.    Upon information and belief, T&D provides electric distribution and transmission services to electrical utilities, cooperatives and municipalities in Texas and Louisiana. Its services include power line construction and maintenance and storm restoration. It competes directly with Pike.

35.    Chad, despite forming T&D on October 5, 2005, did not leave his job at Pike until October 21, 2005. Upon information and belief, T&D began soliciting the employment of Pike's personnel on or about October 21, 2005, having specifically waited until Pike's managers were busy attending an out of state meeting. Since that time, over fifty-five employees have left Pike and joined T&D. The following employees, at a minimum, left Pike for T&D in breach their employment agreements: Chuck Chaddrick, Tim Droddy, Clifton Droddy, Sammy Christian and Alex Graham. T&D, and Dubea, knew about the existence of those employment agreements, but nevertheless endeavored to cause the employees to breach those agreements. Tellingly, each employee that left Pike was a former RSI employee with a longstanding relationship with Dubea.

- 11 -

36.    Upon information and belief, T&D, with Dubea's assistance, also convinced the former controller for RSI, C.P.A. Corey Close, to leave Pike and join their ranks. When Close left Pike he sought permission to take his work computer with him. After assurances that he would not be working in the power line industry and that he would not disclose or use the confidential information on the computer, Pike acceded to Close's request. Close is now the CEO of T&D, and on information and belief, is using valuable confidential information gained as an employee of RSI and Pike and taken from his Pike computer in furtherance of T&D's competing business.

37.    Upon information and belief, T&D and Dubea have used and, unless enjoined, will continue to use Pike's confidential salary information, payroll data, and bonus information in its efforts to solicit Pike's employees. In particular, T&D is using its knowledge of Pike's employees' salaries to offer slightly more attractive compensation packages to convince those employees to leave Pike.

38.    Upon information and belief, T&D also began soliciting business from Pike's customers on or about October 21, 2005. Dubea used his pre-existing relationships with those customers, gained as head of RSI's Western Region and as Pike's VP in charge of its Western Region, in his attempts to steal those customers from Pike. T&D's efforts have been successful. To date, the following companies have taken at least some work from Pike and given it to T&D: Entergy (West), Beauregard Electric, Electric Cooperative, Sam Houston Electric Cooperative, Sharyland Development, and American Electric Power.

39.    Upon information and belief, T&D and Dubea have used and, unless enjoined, will continue to use Pike's confidential pricing information and customers lists and contacts in its effort to steal Pike's customers.

- 12 -

## IRREPARABLE HARM

40. Pike has been, and will continue to be, irreparably harmed by Dubea's misconduct. First, Pike would not have purchased RSI without the contractual guarantee that it would not have to compete with Dubea in Texas and Louisiana. It is now being forced to do so. Second, it is critical for Pike to foster and maintain the customer relationships it acquired when it purchased RSI. Dubea has intentionally, wrongfully and permanently undermined many of those relationships and, unless enjoined, will continue to do so. Third, Dubea continues to possess Pike's confidential information. Once disclosed, confidential information cannot be undisclosed, and the difficulty in measuring the damages caused by its dissemination makes it a prime example of an act causing irreparable injury. Through his connections with T&D, his competition with Pike, his solicitation of Pike's customers and employees, and his use and disclosure of Pike's confidential information, Dubea has caused and, unless enjoined, will continue to cause irreparable harm to Pike.

41. Moreover, in his employment agreement with Pike, Dubea acknowledged that "any breach by [Dubea] of any of the provisions of Section 5.03, 5.05, 5.06 and 5.07 shall cause irreparable harm to [Pike] that could not be adequately compensated by monetary damages and that, in the event of such a breach, [Dubea] shall waive the defense in any action for specific performance that a remedy at law would be adequate . . . ."

## COUNT I: BREACH OF CONTRACT: NON-DISCLOSURE CLAUSE

42. Pike repeats and alleges each allegation set forth in paragraphs 1 through 41 herein.

43. The Employment Agreement is a valid and enforceable contract existing between Pike Inc. and Dubea.

- 13 -

44.    Pike Inc. has fully performed its obligations under the Employment Agreement.

45.    Dubea has breached and, unless enjoined, will continue to breach, Section 5.03 of the Employment Agreement, concerning the protection of confidential information, by using and disclosing Pike's confidential information in furtherance of T&D's competing business.

46.    Pike has incurred and will continue to incur damages as a result of Dubea's conduct.

## COUNT II: BREACH OF CONTRACT: NON-COMPETITION CLAUSE

47.    Pike repeats and alleges each allegation set forth in paragraphs 1 through 41 herein.

48.    The Employment Agreement is a valid and enforceable contract existing between Pike Inc. and Dubea. The non-compete provisions thereof are reasonable in duration, scope and purpose.

49.    Pike Inc. has fully performed its obligations under the Employment Agreement.

50.    Dubea has breached and, unless enjoined, will continue to breach Section 5.07 of the Employment Agreement, concerning restrictions on competition, by competing with Pike and soliciting Pike's customers and employees during the Restricted Period.

51.    Pike has incurred and will continue to incur damages as a result.

## COUNT III: SPECIFIC PERFORMANCE

52.    Pike repeats and alleges each allegation set forth in paragraphs 1 through 41 herein.

- 14 -

53    The Employment Agreement is a valid and enforceable contract existing between Pike Inc. and Dubea.

54.    Pike Inc. has fully performed its obligations under the Employment Agreement.

55.    The terms of the Employment Agreement are definite and certain.

56.    Pike is entitled to specific performance of the Employment Agreement. Pike has no adequate remedy solely in law and, absent a grant of specific performance from the Court, Pike's rights under the Employment Agreement will be lost.

### COUNT IV: TORTIOUS INTERFERENCE WITH CONTRACT

57.    Pike repeats and alleges each allegation set forth in paragraphs 1 through 41 herein.

58.    Dubea knew of the existence of Pike Inc.'s employment agreements with various Pike employees, including, at a minimum, Chuck Chaddrick, Tim Droddy, Clifton Droddy, Sammy Christian and Alex Graham.

59.    Pike Inc.'s employment agreements with its employees are valid and enforceable contracts.

60.    Dubea intentionally, and without justification, caused the breach of Pike Inc.'s employment agreements with, at a minimum, Chuck Chaddrick, Tim Droddy, Clifton Droddy, Sammy Christian and Alex Graham.

61.    Pike has suffered and will continue to suffer damages as a result.

### COUNT V: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

62.    Pike repeats and alleges each allegation set forth in paragraphs 1 through 41 herein.

- 15 -

63.    Pike had a reasonable and valid expectancy in the continued business of various customers, including, at a minimum, Entergy (West), Beauregard Electric Cooperative, Sam Houston Electric Cooperative, Sharyland Development, and American Electric Power.

64.    Dubea knew that Pike had such an expectancy.

65.    Dubea intentionally, wrongfully and without justification, interfered with Pike's reasonable and valid expectancy by participating in conduct designed to result, and which did result, in decisions by its customers to give business to T&D rather than to Pike.

66.    Pike has suffered and will continue to suffer damages as a result.

### COUNT VI: MISAPPROPRIATION OF TRADE SECRETS

67.    Pike repeats and alleges each allegation set forth in paragraphs 1 through 41 herein.

68.    Pike possesses confidential information that derives independent economic value from not being generally known.

69.    Pike took reasonable steps to maintain the secrecy of its confidential information.

70.    Dubea learned Pike's confidential information during his employment with Pike, and expressly agreed to refrain from using or divulging that information.

71.    Dubea improperly used and disclosed Pike's confidential information in furtherance of T&D's competing business.

72.    Pike has suffered and will continue to suffer damages as a result.

### COUNT VII: DECLARATORY JUDGMENT

73.    Pike repeats and alleges each allegation set forth in paragraphs 1 through 41 herein.

74.    There is an actual, substantial and judiciable controversy between the parties, as set forth above.

75.    Pike therefore seeks a declaration of its legal rights pursuant to 28 U.S.C. § 2201 (2005).

76.    Specifically, Pike seeks a declaratory judgment that Dubea has breached his obligations to Pike pursuant to the Employment Agreement and that any entitlement to future compensation that Dubea may claim as part of the consideration given to him in exchange for his employment with Pike has been forfeited by such breach.

## PRAYER FOR RELIEF

WHEREFORE, Pike respectfully requests that this Court enter a judgment for compensatory and punitive damages in its favor, award preliminary and permanent injunctive relief, including specific performance of Dubea's obligations under the Employment Agreement, enter a declaratory judgment in its favor, and grant such other and further relief as this Court may deem just and proper, including costs, disbursements, pre and post judgment interest, and reasonable attorney's fees.

William J. Wade  (#704)
Wade@rlf.com
Alyssa M. Schwartz (#4351)
Schwartz@rlf.com
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE  19899
302-651-7700

OF COUNSEL:
Michael A. Paskin
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000

Attorneys for Plaintiffs Pike Electric
Corporation and Pike Electric, Inc.

December 20, 2005

- 17 -

## VERIFICATION

STATE OF NORTH CAROLINA )
                           ) ss.:
COUNTY OF SURRY          )

       J. ERIC PIKE, being duly sworn, deposes and says

       1.     I am the CEO of Pike Electric Corporation and, as such, am authorized to make this Verification.

       2.     I am familiar with the facts set forth in the Complaint, dated December 19, 2005. The facts stated in the Complaint are true and correct based upon my personal knowledge and belief and information supplied to me by individuals with knowledge of the topics referenced therein.

                                    J. Eric Pike

Sworn to and subscribed
before me on this 16th
day of December, 2005.

Notary Public
Commission expires 8/18/2006

EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| **PIKE ELECTRIC CORPORATION &**<br>**PIKE ELECTRIC, INC.,**<br><br>**Plaintiffs**<br><br>v.<br><br>**T & D SOLUTIONS, LTD., T& D SOLUTION**<br>**MANAGERS, L.L.C., CORY CLOSE &**<br>**CHAD DUBEA,**<br><br>**Defendants** | **Civil Action No. M-05-410**<br>**Jury Demanded** |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' COMBINED FIRST SET OF REQUEST FOR PRODUCTION OF DOCUMENTS AND INTERROGATORIES

**NOW INTO COURT,** through undersigned counsel, comes T & D SOLUTIONS, LTD.,

T& D SOLUTION MANAGERS, L.L.C., CORY CLOSE & CHAD DUBEA, made defendants

herein, and who, in response to *Plaintiffs' Combined First Set of Request for Production of*

*Documents and Interrogatories* follows respectfully answers as follows

### REQUEST FOR PRODUCTION OF DOCUMENTS NO. 1:

All documents and communications concerning the decision to form T&D, including all documents

discussing the risks, feasibility, funding requirements, employee requirements, or any other risks,

requirements or benefits associated with T&D' s formation.

### ANSWER TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 1:

*Please see attached:*

Page 1

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 2:**

All documents and communications concerning the formation, financing and corporate structure of

T&D, including but not limited to any bank records, loan agreements, trust agreements, guarantee

agreements, liens, plans, schematics, hand- written notes, contracts and/or leases.

**ANSWER TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 2:**

*Please see attached.*


**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 3:**

All documents and communications concerning T&D's operations including where it conducts

business, its customers, its employees, the type of work it performs, it's management structure, its

corporate structure any related or affiliated entities, any funding or financial backing it has received,

and the source of that funding or financial backing.

**ANSWER TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 3:**

*Please see attached.*


**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 4:**

All documents and communications concerning the marketing of T&D's business and/or the methods

by which T&D conducts that marketing, including but not limited to any materials from meetings,

training sessions, seminars or conferences, and any manuals, instructions, guides or writings.

**ANSWER TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 4:**

*Please see attached, as well as the website http://www.tdsolutions1.com.*


**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 5:**

All documents and communications concerning any advertising done by T&D, or by any other persons on behalf of T&D.

**ANSWER TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 5:**

*Please see attached, including the business plan which was used to encourage bank and other financing for T & D Solutions, as well as the above mentioned website.*

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 6:**

All documents and communications concerning T&D's customer lists, pricing lists, vendor lists and employee compensation.

**ANSWER TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 6:**

*Please see attached.*

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 7:**

All documents and communications between Defendants and any former or current employee of Pike; or between Defendants and any former or current employee of RSI, concerning T&D or any aspect of T&D's business, including any documents related to the employment of those individuals by T&D.

**ANSWER TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 7:**

*Please see attached. The defendants are in the process of obtaining e-mails from Cory Close and Chad Dubea's computers, and will provide these once they have been isolated and removed.*

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 8:**

All documents and communications between Defendants and any former or current customer of Pike, or between Defendants and any former or current customer of RSI, concerning T&D or any aspect of T&D' s business.

**ANSWER TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 8:**

*Please see attached.*

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 9:**

All documents and communications received or made by Defendants concerning non-compete clauses, contracts, covenants or agreements.

**ANSWER TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 9:**

*Please see attached.*

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 10:**

All documents and communications reflecting contracts between T&D and any former or current customer of Pike or RSI, along with any documents or communications concerning the reasons or circumstances of that customer's contracting with T&D.

**ANSWER TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 10:**

*Please see attached.*

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 11:**

All documents and tangible things obtained by the individual Defendants in their capacity as employees of Pike and/or RSI, including but not limited to any documents formed on the Pike work computer possessed by Cory Close, as well as the computer itself, or access thereto.

**ANSWER TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 11:**

*Please see enclosed compact disks containing computer data.*

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 12:**

All documents and communications concerning nonpublic information about Pike's business, and all documents and communications concerning the use of that information in T&D's business.

**ANSWER TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 12:**

*Please see the attached profit and loss projection created by Cory Close and which utilized certain information from Clifton Drotty's crew profit and loss statements from the year 2004. Please see attached.*

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 13:**

Documents sufficient to show all phone numbers, addresses, email accounts, and bank accounts maintained by Defendants during the last two years.

**ANSWER TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 13:**

*Upon information and belief, these documents have already been requested by subpoena, and the undersigned counsel wishes to discuss with counsel to the plaintiffs regarding the need to duplicate this production of documents. (The response to this is incomplete and the undersigned counsel is awaiting copies of utility bills and bank statements from the defendants.)*

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 14:**

All documents and communications discussing Pike' s business in any way, including all documents

and communications concerning T&D's competition with Pike.

**ANSWER TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 14:**

*No such documents exist.*

**REQUEST FOR PRODUCTION OF DOCUMENTS NO. 15:**

All documents upon which Defendants relied in answering the interrogatories set forth below.

**ANSWER TO REQUEST FOR PRODUCTION OF DOCUMENTS NO. 15:**

*Please see attached.*

## INTERROGATORIES

### INTERROGATORY NO. 1:

Describe all circumstances pertaining to the financing and formation of T&D, including but not limited to any financial backing and/or advice provided by Mick Dubea or other former Pike employees.

### ANSWER TO INTERROGATORY NO. 1:

*As far as advice and/or financial backing provided by Mick Dubea, Defendants would respond that Mick Dubea advised Chad Dubea that the formation of this new business would be a hard road and that Pike wouldn't just let this new business happen. Mick Dubea provided no direct financial backing to the formation of T & D Solutions, Ltd.; Chad Dubea did use funds that had been placed in a grantor-retained annuity trust for his benefit in the start-up of T & D Solutions, Ltd. and T & D Solution Managers, LLC (hereinafter referred to collectively as "T & D").*

*In September of 2004, Sammy Christian and Alex Graham approached Chad Dubea about the possibility of starting a new electrical transmission and distribution construction and maintenance company. These discussions happened on the occasion of Pike cutting bonuses to employees. For example, Alex Graham's pay was cut by approximately $100,000.00 per year. Thereafter, the discussions of starting a new company ended and did not resume until May or June of 2005, with the integration of Red Simpson, Inc.'s Western Division with Pike. Previously, employees in the old Red Simpson Western Division had heard horror stories of the integration of Red Simpson's operations in the East, including the taking of tools and equipment from crews, making it more difficult for crews to do their various jobs. When the integration of Red Simpson,*

*Inc.'s Western operations began, Pike took away credit cards and petty cash funds that were given to crew foremen to facilitate operations. Further, Pike disallowed all reimbursement for receipts of goods purchased at Wal-Mart which were necessary for continued operations by the various crews. The proverbial straw that broke the camel's back was when Pike discontinued a policy whereby Red Simpson, Inc. had purchased Gatorade for consumption by its working crews. Further, the crews were prohibited from carrying ice chests with Gatorade with them. These events generally occurred in the summer of 2005.*

*In September of 2005, Chad Dubea decided to form his own company, inasmuch as he had a great deal of experience in the industry, and his father had given him a substantial sum of money in the form of a grantor retained annuity trust which could be used for the initial capitalization of the business. The original plan was to begin operations in 2006. However, the advent of Hurricane Rita in Western Louisiana and East Texas made the prospects of going into business sooner much more feasible and desirable due to the increased amount of available work in the industry for this particular region.*

*Chad Dubea does recall a specific conversation with his father, Mick Dubea in September 2005 during Hurricane Rita that Mick did agree with Chad's opinion that now was a good time to begin a new transmission and distribution contracting business due to Hurricane Rita.*

*The defendants would additionally point out that Pike's policies regarding the use of work vehicles, specifically pick-up trucks, by Pike employees on the weekends was changed so to deprive employees of their company vehicles during the weekends. This factor also probably*

*contributed to Pike employees leaving Pike for other employment with electrical contractors, including, but not limited to, T & D.*

*In late September, Chad Dubea met with Cory Close regarding the formation of the company. Chad had spoken with Cory on earlier occasions about the possibility of forming a company, but operations were stepped up in order to obtain work created by Hurricane Rita.*

*Cory Close had used a profit and loss statement that belonged to Timothy Drotty's crew while working for Red Simpson, but prior to Pike's purchase of Red Simpson. He extracted some of the crew costs from this profit and loss statement. This was incorporated in the initial profit and loss which is provided to plaintiffs in this production of documents. This profit and loss was printed from RSI's server. However, this profit and loss statement was available from Tim Drotty, as well as any other RSI crew foreman having the same profit and loss data for their particular crew. The cost data extracted generally related to miscellaneous items such as non-inventory type supplies (Gatorade, motor oil, etc.) and the general costs of running equipment. However, this prospective profit and loss for T & D was then dramatically changed by costs of insurance, the costs purchasing new equipment, and other factors.*

*T & D approached various insurance companies regarding its insurance companies regarding its coverage, and ultimately elected agent Dwayne Moore with Bancorp South for its insurance coverage.*

Page 9

*Mr. Close's business banker, Robert Alexander, was at Red River Bank, but had recently moved to Southern Heritage Bank. Mr. Close called Mr. Alexander and ultimately met with him and Randy Welch, the president of Southern Heritage Bank, and presented him a copy of the business plan which is provided in the attached production of documents. This same business plan and proposal for financing was also taken to Blake Chatelain and Brian Salazar at Red River Bank. However, Red River Bank was concerned about violating John Simpson's non-competition agreement with Pike and Simpson's membership on Red River Bank's board, and therefore, did not provide the loan. This request to both banks was made on October 17, 2005, approximately one week before T & D planned to begin business. In short, Cory Close and Chad Dubea requested $5,000,000.00 from Southern Heritage Bank in four days for equipment and operating. The operating instruments made to Southern Heritage Bank are enclosed in the attached production of documents.*

*On Friday of that week, Southern Heritage Bank approved the loan. That weekend, Chad Dubea and Cory Close procured the necessary equipment for its first few crews to begin operations on Monday. T & D began operations on October 24, 2005.*

*To further explain the financing of T & D, a copy of the grantor retained annuity trust of which Chad Dubea was the beneficiary, is attached in the production of documents. Prior to T & D beginning business, Mick Dubea had resigned as Trustee of the grantor retained annuity trust due to a timber deal and some litigation regarding the purchase of timber. In short, Mick was advised by his attorneys to resign. Further, Pat Dubea, Chad's mother, also resigned as the successor-trustee of the trust. At the time, of T & D's start-up, Dubea Investments, Ltd., a limited*

Page 10

*partnership owned by Mick Dubea, had borrowed $4,250,000.00 from the grantor retained annuity trust. However, the trust owed Mick Dubea $2.5 million as far as the return of his initial capital contribution. On or about November 25, 2005, Chad Dubea was due to be able to spend, as trustee, some $2,000.000.00 from the trust. The $1.09 million from the GRAT is currently in a certificate of deposit at Southern Heritage Bank and is pledged to secure an operating line of credit in that same amount. Initially, before the funds were returned to the trust by Dubea Investments, Ltd., the $4,250,000.00-note from Dubea Investments, Ltd. was pledged to Southern Heritage Bank as collateral for the operating line of credit. Upon information and belief, there is approximately another $600,000.00 at Red River Bank that is part of the Trust.*

*Southern Heritage Bank further agreed to loan T & D Solutions $2.75 million for purchases of equipment. Initially, the bank had requested that Chad Dubea grant a mortgage on his home in Texas to secure this line. However, the bank determined it would be too difficult to obtain a valid and first mortgage on the property under Texas law. Cory Close pledged a $100,000.00 CD of his to initially secure the line of credit. However, due to payments made and the company's finances, this certificate of deposit has been released. Upon information and belief, the initial line of credit for equipment was in the amount of $1,000,000.00, but was increased to $2.75 million some time in January, 2006.*

*The debtor has also financed a good amount of its equipment with Altec and copies of those documents are attached hereto in the production of documents, or will be provided when they are available. Altec has made a general oral commitment to lease-purchase whatever equipment T & D needs. T & D has also been in discussions with Terex-Telelect regarding equipment*

Page 11

*financing. While no agreement has been reached, Terex-Telelect has made an unofficial commitment of up to $2,000,000.00 for equipment financing. The debtor also financed three pickup trucks with Ford Motor Credit.*

**INTERROGATORY NO. 2:**

Describe the nature of T&D's operations, including where it conducts business, the type of work it performs, its management structure, its corporate structure. Describe any related or affiliated entities, any funding or financial backing t has received. and the source of that funding or financial backing and identify all of T&D's customers and employees to date.

**ANSWER TO INTERROGATORY NO. 2:**

*T & D is a contractor in the electrical transmission and distribution industry, including maintenance and construction aspects of this business. T & D is also involved in the construction and maintenance of underground lines as a part of its business. T & D is not engaged with any other businesses.*

*T & D does business in most of Texas, primarily in the eastern and southern regions of the state. T & D also does business in the western part of Louisiana. T & D Solutions, Ltd. is a Texas limited partnership, of which T & D Solution Managers, LLC is the general partner, and Chad Dubea is the limited partner. It is anticipated in the near future that Cory Close, Robert Strother, and Rick Cook will be added as limited partners. Other persons may be made limited partners in the future as well. T & D Solution Managers, LLC is a Texas limited liability company of which Chad Dubea is the sole member and manager. As far as T & D's management structure, Chad*

*Dubea is the chief executive officer of T & D, while Cory Close serves as the Chief Financial Officer and Bob Strother serves as the Safety Director. Rick Cook and Alex Graham currently serve as general foreman. Below these general foremen are various crews, which are each headed by a foreman. A complete list of all of T & D's employees and their rates of compensation is provided in the attached production of documents. T & D's customers include at this time: Sharyland Utilities, American Electric Power (AEP), Entergy, Beauregard Electric, Valley Electric, the City of Garland (Texas), Sam Houston Electric, TXU, Perdinales Electric, and CLECO. T & D is currently soliciting more customers and this listing will be updated prior to trial.*

**INTERROGATORY NO. 3:**

Identify and describe any marketing and/or advertising done by T&D or by my other person on T&D's behalf and describe the methods by which such marketing and/or advertising has been conducted.

**ANSWER TO INTERROGATORY NO. 3:**

*The primary marketing and advertising done by T & D is through face-to-face meetings. Further, the company has adopted a logo which is placed on trucks, business cards, and letterheads. Samples of these are enclosed in the attached production of documents and can be viewed at the website: http://www.tdsolutions1.com.*

### INTERROGATORY NO. 4:

Identify the job titles of T&D's employees and desciihe the nature of each employee's work for T&D.

### ANSWER TO INTERROGATORY NO. 4:

*A list of T & D's employees and their job titles is provided in the attached production of documents.*

### INTERROGATORY NO. 5:

Identify any and all former or current employees of Pike, and any and all former or current employees of RSI, with whom Defendants have been in contact since October 5, 2005, and describe the nature and content of each of Defendants' communications with each of those persons face to face meeting, telephone calls, e-mail, etc).

### ANSWER TO INTERROGATORY NO. 5:

*Defendants object to this interrogatory as overbroad, and nearly impossible to answer, inasmuch as there is continual and almost day-to-day contact among employees of T & D Solutions, Ltd., many or all of whom are former employees of both Pike and Red Simpson, Inc. Notwithstanding this objection, Chad Dubea approached Anesta Rocha and Jessie Acosta regarding coming to work for T & D Solutions, Ltd. due to their connections with Sharyland Utilities. No other employee of Pike was approached by T & D, Chad Dubea, or Cory Close regarding coming to work for T & D Solutions. Rather, these employees always contacted Chad Dubea by telephone conference. Chad would request information from the employee, including how much they were paid by Pike Electric prior to making them an offer to come to work for T & D Solutions, Ltd.*

## INTERROGATORY NO. 6:

Identify any and all former and current customers of Pike and any and all former or current customers of RSI, with whom Defendants have been in contact since October 5, 2005, and describe the nature and content of each of Defendants' communications with each of those persons (eg,. face to face meeting, telephone call, mail, etc.)

## ANSWER TO INTERROGATORY NO. 6:

*The defendants would answer as follows:*

- *Sharyland Utilities was contacted via face-to-face meeting by Chad Dubea.*

- *American Electric Power (AEP) was contacted by Chad Dubea and Robert Strother by a face-to-face meeting.*

- *Entergy was contacted by Bob Strother via a face-to-face meeting.*

- *Beauregard Electric was contacted by Cory Close by telephone.*

- *Valley Electric in Natchitoches, Louisiana, was contacted by telephone solely relating to storm work. No other work since the work resulting from Hurricane Rita has been forthcoming.*

- *The City of Garland, Texas, was contacted by Chad Dubea initially by telephone and later followed up with a face-to-face meeting. This work is currently subcontracted to planetary utilities.*

Page 15

- *Sam Houston Electric was contacted by Bob Strother in a face-to-face meeting.*

- *TXU was contacted by Chad Dubea and Bob Strother via face-to-face meeting.*

- *Perdinales Electric was contacted by Chad via telephone. No work has been forthcoming from this customer contact.*

- *As to CLECO, Bob Strother, Rick Cook, and Chad Dubea, had a face-to-face meeting with Steve Gauthier; there have been numerous face-to-face meetings and telephone calls since that date.*


## INTERROGATORY NO. 7:

Identify and describe any and all confidential information of Pike and/or RSI acquired by the Individual Defendants in their capacity as employees of Pike and/or RSI, including but nor limited to any and all information about Pike's business that is not generally known to the public.


## ANSWER TO INTERROGATORY NO. 7:

*The defendants deny that any of Pike's information that was, in fact, confidential was acquired by the individual defendants in their capacity as employees of Pike and/or Red Simpson, Inc. As far as information about Pike's business that is generally not known to the public, the defendants had knowledge of the general pricing structures of Red Simpson, Inc., the costs to operate a crew, and salary information. However, this information, while not generally known to the public, was available to any current or former Red Simpson employee during the time they were working for Pike or Red Simpson, and this information was often freely shared when requested by T & D of*

*the former employees. CLECO provided it's price list for work it contracted, which is also*

*probably not generally known to the public.*

## INTERROGATORY NO. 8:

Identify and describe all instances in which T&D has learned of or acquired any confidential

information related to Pike and/or RSI, including but not limited to any and all information about

Pike's business that is not generally known to the public.

## ANSWER TO INTERROGATORY NO. 8:

*T & D has not learned of nor acquired any confidential information related to Pike or Red*

*Simpson, Inc., other than in the normal course of business, such as asking a new employee how*

*much they previously made prior to hiring that employee in order to make an appropriate*

*financial offer regarding employment.*

## INTERROGATORY NO. 9:

Identify and describe all instances since September 2005 in which information has been deleted or

removed from the work computer possessed by Cory Close, and describe the nature of that

information and by whom it was deleted, erased or removed.

## ANSWER TO INTERROGATORY NO. 9:

*After September 2005, the work computer possessed by Cory Close had a hard drive which began*

*to fail, meaning that the operating system, Windows, would no longer boot up. Mr. Close cut and*

*removed the documents from the "My Documents" folder of the computer and placed same on*

*a new hard drive. This folder is reproduced on one of the enclosed CD's as part of the document*

*production herein. The complete contents of the hard drive, other than the "My Documents"*

*folder, is also enclosed on CD's which were created by Turning Point Solutions in Pineville,*

*Louisiana, by extracting the data that was available on the failed hard drive. The failed hard drive*

Page 17

*is still in the possession of the undersigned counsel, and will be made available to any experts desired by Pike upon request. Based on information received from Turning Point Solutions, no other data can be extracted from the hard drive by usual methods, and a clean room and highly skilled personnel would be needed to attempt to extract the information that was not retrievable on the hard drive. Based on what Turning Point Solutions has represented to the undersigned counsel, the only thing that was not able to be retrieved from the hard drive were certain internet cookies, which would be of no relevance to these proceedings.*

*In any event, if any information was deleted, erased or removed, it would have been deleted, erased, or removed by Cory Close.*

*Defendants would further point out that, as a general rule, employees of Red Simpson, Inc. saved their work on servers, rather than on the individual hard drives of their work computers. Spreadsheets and other documents on which Mr. Close worked for Red Simpson, Inc. and Pike would be located on that server or those servers.*

## INTERROGATORY NO. 10:

Identify all phone numbers, addresses, e-mail accounts, and bank accounts maintained by Defendants during the last two years, and identify the bank personnel with whom Defendants have been in contact regarding their accounts.

## ANSWER TO INTERROGATORY NO. 10:

*The defendants object to this interrogatory as overbroad and not likely to lead to discoverable information. Notwithstanding the objection, bank statements from T & D Solutions, Ltd.'s bank*

*accounts at Southern Heritage Bank are being produced with this discovery response as part of the document production. As to Chad Dubea, he has an account at Red River Bank, and his primary banking contact at that bank is Bryon Salazar. Chad Dubea also maintains a checking account at Bank of America, which was set up in Harlingen, Texas. Mr. Dubea does not recall the banker assigned to this account, and he continues to utilize this account in Beaumont.*

*Cory Close has a private banker at Red River Bank by the name of Candace Bain. He further works with Diane Pennington, or Bryon Salazar at Red River Bank regarding his business banking needs for his CPA practice and for other business banking. Cory Close also has a $10,000 CD at the Union Bank in Alexandria, Louisiana, a money market investment account at Edward Jones in Alexandria, Louisiana, and the business accounts for a mobile home rental business, Triple C Properties, which he owns with his father and brother-in-law, and which is also located at the Union Bank. Mr. Close also maintains an account at the Alexandria USDA Federal Credit Union with a couple of thousand dollars in it, largely because his wife, Melissa, has a vehicle financed through the Credit Union.*

*Cory Close has resided at 6806 Bayou Rapides Road, Alexandria, LA 71303, since September of 2002. He has had the following e-mail addresses during the last two years: harlencclose@tdsolutions1.com , Cory@Coryclosecpa.com, cclose@pike.com, and cclose@redsimpson.com. Mr. Close has the following telephone numbers: home - 318 442-5501; T & D Solutions - 318 442-8138; T & D fax - 318 342-8174; and his cell phone - 318 308-6510;*

*Cory Close may have other cell phones in his name that are used by his wife and/or other employees of T & D Solutions, but they are not his personal numbers, nor can he be contacted at same.*

*Chad Dubea has resided at 4780 Elmhurst, Beaumont, Texas 77706 since December, 2005. Prior to that he resided at 2626 Harlingen, Texas 78552. His home number in Harlingen, Texas was 956-440-0926, while his cell phone was 956-535-0664. Currently, his home number is 409-898-4644, and his cell phone is 409-767-3987. Chad Dubea may be the "name"assigned to certain other cell phones which are used by either members of his family or employees of T & D Solutions, Ltd. During the last two years, Chad Dubea has had the following e-mail addresses: cdubea@tdsolutions1.com; cdubea@pike.com; and cdubea@redsimpson.com.*

**INTERROGATORY NO. 11:**

Identify each individual who supplied information for and/or participated in the preparation of Defendants' answers to these interrogatories.

**ANSWER TO INTERROGATORY NO. 11:**

*Chad Dubea and Cory Close conferred with the undersigned counsel in the preparation of the defendant's answers to the interrogatories and request for production of documents.*

Page 20

Respectfully submitted by:

**GOLD, WEEMS, BRUSER, SUES & RUNDELL**

_____

Bradley L. Drell (Bar Roll #24387)
Attorney at Law
P. O. Box 6118
Alexandria, LA   71307-6118
Telephone (318) 445-6471
Fax: (318) 445-6476
e-mail: bdrell@goldweems.com

**ATTORNEYS FOR DEFENDANTS**

### CERTIFICATE OF SERVICE

This will certify that a true and correct copy of _Answers_ to _Plaintiffs' Combined First Sets of Requests for the Production of Documents and Interrogatories to Defendants T&D Solutions, Ltd T&D Solution Managers, LLC; Cory Close and Chad Dubea_ was served on all counsel of record on the 10th day of April, 2006 by depositing a copy of same in the United State Mail, properly addressed, with pre-paid postage affixed, as indicated below:

Teri Danish, Esq.
Eduardo Roberto Rodriguez
Norton A. Colvin, Jr.
**RODRIGUEZ, COLVIN, CHANEY & SAWNZ, LLP**
P. O. Box 2155
Brownsville, TX 78522

Michael K Paskin , Esq.
**CRAVATH, SWAINE & MOORE, LLP**
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

Veronica Gonzales, Esq.
**KITTLEMAN, THOMAS & GONZALES, LLP**
4900-B North 10th Street
McAllen, TX 78504

Sofia A. Ramon, Esq. (without enclosures)
**ATLAS & HALL, LLP**
818 Pecan
McAllen, TX 78501.

The documents were produced solely to Michael K. Paskin and the law firm of Cravath,

Swaine & More, LLP.

Alexandria, Louisiana, this date: April 10, 2006.

Respectfully submitted:

**GOLD, WEEMS, BRUSER, SUES & RUNDELL**

By: _____
Bradley L. Drell  (Bar Roll #24387)
P. O. Box 6118
Alexandria, LA  71307-6118
Telephone: (318) 445-6471
Facsimile:  (318) 445-6476
e-mail: bdrell@goldweems.com

**ATTORNEYS FOR DEFENDANTS**