# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| PIKE ELECTRIC CORPORATION and PIKE ELECTRIC, INC., Plaintiffs, v. MICK DUBEA, Defendant. | ) ) ) ) ) ) Civil Action No. 05-879-SLR ) ) **REDACTED -** ) **PUBLIC VERSION** ) ) ) |

## MICK DUBEA'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTIONS *IN LIMINE* NOS. 1 & 2:  TO EXCLUDE THE PROFFERED EXPERT TESTIMONY OF J.F. MORROW AND KARYL VAN TASSEL

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Lewis H. Lazarus (#2374)
Matthew F. Lintner (#4371)
Joseph S. Naylor (#3886)
Jason C. Jowers (#4721)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800
llazarus@morrisjames.com
mlintner@morrisjames.com
jnaylor@morrisjames.com
jjowers@morrisjames.com

*Attorneys for Mick Dubea*

Dated:  August 25, 2006

Public Version dated:  September 1, 2006

## NATURE AND STAGE OF PROCEEDINGS

On December 20, 2005, Pike Electric Corporation and Pike Electric, Inc. (collectively "Pike") sued Mick Dubea, alleging breach of contract, tortious interference with contract, tortious interference with business relations, and misappropriation of trade secrets. Mr. Dubea counterclaimed seeking, among other things, a declaration that the noncompetition provision in his Employment Agreement with Pike is unenforceable as written.

Following discovery, Pike identified its damages expert, a Mr. Jonathan Falk of NERA Economic Consulting. Mr. Dubea identified two rebuttal expert witnesses who will be called at trial to rebut the damage calculations of Mr. Falk: J. F. Morrow, an expert in banking and lending, and Karyl Van Tassel, a C.P.A. and damages expert. On August 18, 2006, Pike moved to exclude the testimony of Morrow and Tassel, and filed Brief in Support of Plaintiffs' Motions *In Limine* Nos. 1 & 2 to Exclude the Proffered Expert Testimony of J. F. Morrow and Karyl Van Tassel ("Pike's Brief" D.I. 124). This is Dubea's Brief in Opposition to Plaintiffs' Motions *In Limine* Nos. 1 & 2: to Exclude the Proffered Expert Testimony of J.F. Morrow and Karyl Van Tassel.

2

## COUNTER STATEMENT OF FACTS

Pike's damage expert, Jonathan Falk, made no effort whatsoever to tie any particular act of Mick Dubea to any particular increment of damages.  He simply assumed that T&D Solutions, Inc., the start-up venture Mr. Dubea's son Chad founded, along with Chad's associate Corey Close, would never have existed for a five year period but for some act by Mr. Dubea.  Mr. Falk then assigns all damages associated with the very existence of T&D Solutions for the first five years of its existence to Mr. Dubea.  (*See generally* Naylor Decl., Ex. 23, Falk Report at 2-3 (B577-578).)  He further assumes that all of the revenues generated by T&D Solutions over the period would have otherwise gone to Pike, and on that basis asserts a claim for damages against Mr. Dubea of up to $17.5 million.  (Falk Report at 4 (B580).)  He also appears to be simultaneously assigning the same damages to T&D itself, as the same report is being submitted both in this action and in the related Texas action against T&D.  (Falk Report at 1 (B577).)

# REDACTED

3

# REDACTED

Yet Mick Dubea's resignation as trustee of the GRAT was not the "but for" cause of T&D's existence. Neither Chad Dubea nor Corey Close had noncompete agreements with Pike, they were entirely free to start their venture and compete with Pike for jobs in this industry. Further, they had the independent financing to do so, albeit at a slightly smaller initial scale. Mr. Morrow an expert with 39 years of experience in the banking field, and extensive experience in making commercial loans and SBA loans, has established that Chad Dubea and Corey Close had the funds to obtain SBA financing on their own, and could have done so even without any financing through the GRAT. Thus, T&D Solutions would have existed even without the GRAT financing, and Mr. Falk's fundamental assumption about damages is incorrect.

Pike, hoping to hide the fundamental error in its own expert's report, seeks through this motion to strike the testimony of Mr. Morrow. For the reasons set forth herein, that effort should be rejected.

## ARGUMENT

## I.    STANDARD OF REVIEW OF EXPERT TESTIMONY

Pike's overreaching motion improperly seeks to limit expert testimony to scientists or technical experts, or, alternatively, to apply the reliability standards for scientific experts to all experts. Such a "one size fits all" approach is inconsistent with the Federal Rules of Evidence, U.S. Supreme Court precedent, and case law from the Third Circuit.

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Reflecting both the breadth of this rule particularly, and the liberal thrust of the Federal Rules of Evidence generally, the Advisory Committee noted that Rule 702 allows for non-scientific experts.[1] As the committee explained, "within the scope of the rule are not only experts in the strictest sense of the word, *e.g.*, physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, *such as bankers* or landowners testifying to land values." Fed. R. Evid. 702 advisory committee's note (emphasis added).

"Rule 702 provides 'three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability and fit.'" *Galentine v. Estate of Stekervetz*,

---

[1]    Interpreting Rule 702, the U.S. Supreme Court has noted that the Federal Rules of Evidence offer a "permissive backdrop" and have a "liberal thrust." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588-589 (1993).

273 F. Supp. 2d 538, 541 (D. Del. 2003) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000)). The proponent of an expert witness has the burden of proving admissibility by a preponderance of the evidence. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 n.10 (U.S. 1993)

## II.    A BANKER MAY TESTIFY AS TO THE LIKELIHOOD OF A LOAN BASED UPON HIS 39 YEARS OF PERSONAL EXPERIENCE IN BANKING

Pike contends that Mr. Morrow's testimony is inadmissible because: (1) he is not qualified to give expert testimony; (2) his conclusions are not reliable; and (3) his testimony and conclusions do not "fit" the instant case. This Court should reject all three of these baseless arguments.

### A.    Mr. Morrow's Qualifications Meet the Standard Set Forth in Rule 702

The first issue to be addressed is whether Mr. Morrow is qualified as an expert pursuant to Rule 702. Pike offers a Sixth Circuit case to suggest that this Court should apply a very exacting standard to determining expert qualifications. (*See* Pike Br. at 4, 9.)[2] However, the qualifications requirement of Rule 702 should be liberally construed. *Galentine*, 273 F. Supp. 2d at 541. "The Third Circuit has held that 'a broad range of knowledge, skills, and training' will qualify a witness as an expert and the court has 'eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications.'" *Id.* (quoting *In re Paoli R.R. Yard PCB Litig.*, 35

---

[2]    It is not entirely clear from the text of Pike's Brief whether it is truly attacking Mr. Morrow's qualifications or if Pike contends his expertise is not helpful or does not "fit" the instant case. To the extent Pike is challenging his actual "knowledge, skill, experience, training, or education," we address those arguments here. To the extent the challenge relates to the "fit" requirement, we address those arguments below. *See infra* at 15-16.

F.3d 717, 741 (3d Cir.1994)).  In fact, practical experience in a particular field is

sufficient qualification for a person to testify as an expert.  *Betterbox Communications

Ltd. v. BB Technologies, Inc.*, 300 F.3d 325, 327-328 (3d Cir. 2002).

     Mr. Morrow has extensive training, knowledge and experience related to the

banking industry.  He began his career at Bank of America in 1967.  (Naylor Decl., Ex.

27, Morrow Dep. at 10:9-11 (B853, Ex. 26 (B683-686, Ex. 26); Morrow CV (B685).)

Since that time, Mr. Morrow has 39 years of experience with various financial and

mortgage institutions.  (Morrow Report at 1 (B672).)  For 32 years of his career, Mr.

Morrow was "a lender involved in all types of lending including the type that is the

subject of this case." (*Id.*; Morrow CV (B672).)  He has served as a chairman or member

of various loan committees, served as a mortgage company director, and the director,

president and CEO of a financial institution.  (Morrow Report at 1 (B672).)  Mr. Morrow

has even drafted loan polices and procedures for banks.  (Morrow Report at 2 (B673);

Morrow CV (B684).)  In short, Mr. Morrow is unquestionably qualified to opine on

general practices and standards in the lending industry and the availability of loans to a

particular applicant or applicants.

    **B.**    **Mr. Morrow's Opinions Are Reliable Because They Are Based on His
Knowledge and Experience**

        **1.**    **Reliability standard for non-scientific experts**

     In its brief, Pike implies that this Court must apply the eight *Daubert* factors that

were cited by the Third Circuit in the case of *In re Paoli*, 35 F.3d at 742 n.8.  (Pike's Br.

at 4-8.)  Such a suggestion is a straightforward misstatement of the state of the law in the

Third Circuit.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (U.S. 1993), the U.S. Supreme Court abandoned the "general acceptance" test first adopted in *Frye v. U.S.*, 293 F. 1013 (D.C. Cir. 1923). The Court adopted a flexible approach that not only satisfied the Court's role as a gatekeeper, but also conformed to the liberal thrust of the Federal Rules of Evidence. To that end, the Court *suggested* a variety of factors that a Court could consider when evaluating scientific expert testimony. *Daubert*, 509 U.S. at 593 ("Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test.").[3]

Following the *Daubert* decision, in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court determined that judges must also serve as gatekeepers when examining the qualification and reliability of non-scientific experts. However, the Court refused to formalistically apply the *Daubert* factors to non-scientific experts. To the contrary, Justice Breyer, writing for a unanimous Court, stated: "Petitioners ask more specifically whether a trial judge determining the 'admissibility of an engineering expert's testimony' may consider several more specific factors that Daubert said might 'bear on' a judge's gatekeeping determination. . . . Emphasizing the word 'may' in the question, we

---

[3]    Interpreting *Daubert*, the Third Circuit has identified eight factors a district court might consider. *See In re Paoli*, 35 F.3d at 742 n.8. Depending on the facts of the case and the expertise at issue, a court *might* consider:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* Significantly, *Paoli* applied these factors to scientific testimony.

8

answer that question yes." *Id.* at 150. The Court went on to explain that in some
situations the factors "may not be pertinent in assessing reliability." *Id.* at 150.
Similarly, the Third Circuit has found that the *Daubert* factors are neither mandatory nor
are they the exclusive factors for testing reliability. *See Elcock v. Kmart Corp.*, 233 F.3d
734, 746 (3d Cir. 2000) ("*Kumho Tire* makes clear that this list is non-exclusive and that
each factor need not be applied in every case."); *Galentine*, 273 F. Supp. 2d at 542
(same).

    The U.S. Supreme Court took a vastly different approach from the "one size fits
all" test Pike advocates. Because "there are many different kinds of experts, and many
different kinds of expertise" the *Kumho Tire* Court offered a simple roadmap for
evaluating non-scientific experts if and when the *Daubert* factors are unhelpful.
Although the *Daubert* factors might easily test the reliability of scientific testimony, "[i]n
other cases, the relevant reliability concerns may focus upon personal knowledge or
experience." *Id.*

    In the wake of *Kumho Tire*, both the Third Circuit and district courts throughout
the Third Circuit have followed this language and focused on personal knowledge and
experience when evaluating the reliability of non-scientific experts. *See Betterbox
Communications Ltd.*, 300 F.3d at 329 (finding that "in cases not involving scientific
testimony" the *Daubert* factors may or may not be helpful and the relevant inquiry may
focus on "personal knowledge or experience"); *U.S. v. Sosa*, 2006 WL 166557, at *3
(E.D. Pa. Jan. 20, 2006) ("In cases where the specific *Daubert / Kumho Tire* factors do
not provide sufficient or relevant guidance for a court to assess the reliability of proposed
expert testimony, the reliability assessment must focus 'upon personal knowledge and

experience.'"); *Crowley v. Chait*, 322 F. Supp. 2d 530, 536 (D.N.J. 2004) (finding that rather than applying the *Daubert* factors in cases involving non-scientific experts "inquiry into an expert's reliability may focus instead upon personal knowledge or experience"); *SmithKline Beecham Corp. v. Eastern Applicators, Inc.*, 2002 WL 31750188, at *2 (E.D. Pa. Dec. 3, 2002) ("Where the testimony is not scientific in nature, 'relevant reliability concerns may focus upon personal knowledge or experience,' as opposed to 'scientific foundations.'"); *ID Sec. Systems Canada, Inc. v. Checkpoint Systems, Inc.*, 198 F. Supp. 2d 598, 602 (E.D. Pa. 2002) ("Because these factors were developed in the context of testing the reliability of scientific methods, they may not be easily applied when testing opinions concerning complicated business transactions . . . . Accordingly, 'relevant reliability concerns may focus upon personal knowledge or experience,' as opposed to 'scientific foundations.'") (citation omitted); *ProtoComm Corp. v. Novell Advanced Services, Inc.*, 171 F. Supp. 2d 473, 477 (E.D. Pa. 2001) ("In some cases, such as the one here, 'relevant reliability concerns may focus upon personal knowledge or experience,' as opposed to 'scientific foundations.'"); *Roberson v. City of Philadelphia*, 2001 WL 210294, at *3 (E.D. Pa. Mar. 1, 2001) ("Since the evidence sought to be precluded here is non-scientific in nature, the factors of *Daubert* and *In re Paoli* provide insufficient guidance for the court to perform its gatekeeping function. In this instance, '[t]he relevant reliability concerns [will] focus upon personal knowledge [and] experience.'").

Significantly, the District of Delaware has also followed *Kumho Tire* and focused on knowledge and personal experience in evaluating the reliability of a non-scientific expert's testimony. In *Galentine v. Estate of Stekervetz*, 273 F. Supp. 2d 538 (D. Del.

2003), the defendant called an electrical wiring expert to testify as to the cause of a fire

on a boat. In part, the plaintiff argued that the defendant's electrical wiring expert's

opinions were unreliable. *Id.* at 541. The expert based his opinions on an inspection of

the wiring of the boat, his training, and sixteen years of experience. *Id.* at 541-542.

Refusing to formalistically apply the *Daubert* factors set forth in *In re Paoli* and its

progeny, the Court stated:

> [B]ecause these factors were formulated in the context of determining the
> reliability of a scientific method, they are not easily applied to other
> contexts, and therefore, the reliability inquiry must be a flexible one.
> Thus, the relevant reliability concerns of a particular case, 'may focus
> upon personal knowledge or experience,' rather than 'scientific
> foundations.'

*Id.* at 542 (quoting *Kumho Tire*, 526 U.S. at 150) (other citations omitted). The Court

found that the expert's opinions regarding the cause of the fire, based on his knowledge,

experience, and site inspection, were reliable. *Id.*[4]

---

[4] Even in the rare circumstances when Courts use the *Daubert* factors to evaluate
non-scientific testimony, only the criteria applicable to that particular case are utilized.
*See Elcock*, 233 F.3d at 746. Furthermore, these cases tend to fall into a quasi-science
category rather than true non-scientific testimony. For example, in *Elcock*, one of the
cases on which Pike relies, the court explained:

> Vocational rehabilitation is a social science that does not exactly mirror
> the fundamental precepts of the so-called harder sciences. However, the
> gist of the above Daubert factors are nonetheless implicated in this case.
> Just as a scientist would want to duplicate the outcome when evaluating a
> colleague's claim that he had developed a technique for cold fusion, a
> vocational rehabilitationist assessing Copemann's disability determination
> would want to test the underlying hypotheses and review the standards
> controlling the technique's operation in an attempt to reproduce the results
> originally generated.

*Id.* at 747. Such a case is distinguishable from one involving banking or finance experts
or other truly non-science fields.

**2.    Mr. Morrow's testimony concerning the initial financing is reliable based on his 39 years of banking knowledge and experience**

Pike argues that Mr. Morrow's testimony is unreliable because he did not conduct studies or utilize empirical evidence, his methods have not been subjected to peer review, and his methods are not subject to testing. First, as previously discussed, if this Court finds that they are not helpful to evaluate the reliability of Mr. Morrow's testimony, the specific *Daubert* and *In re Paoli* factors do not have to be met in cases involving non-scientific experts. As this Court has found, in the context of a non-scientific expert, experience and knowledge may be used to show that an expert's opinion is reliable. *See Galentine*, 273 F. Supp. 2d at 542.

Quite obviously, Mr. Morrow is not a scientific expert. To the extent that Pike's Brief suggests that lending is somehow a science (*see* Pike's Br. at 6), such an assertion is inconsistent with both Mr. Morrow's testimony about the industry (Morrow Dep. 121:17-122:11, 131:1-6 (B854-856).) and with the relevant case law on the issue, *see First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 332 (6th Cir. 2001) (evaluating the reliability of a banking expert as a non-scientific expert).

Because Mr. Morrow is a non-scientific expert, the Court should examine his knowledge and experience in his field to determine the reliability of his opinions. Mr. Morrow has extensive knowledge and experience related to the banking industry. He received a B.S. from UCLA. (Morrow Rep. at 2 (B673).) He began his career at Bank of America in 1967. (Morrow Dep. at 10:9-11 (B853); Morrow CV (B685).) Since that time, Mr. Morrow has 39 years of experience with various financial and mortgage institutions. (Morrow Rep. at 1 (B672).) For 32 years of his career, Mr. Morrow was "a

12

lender involved in all types of lending including the type that is the subject of this case." (*Id.* (B672); Morrow CV (B684).)  He has even issued a commercial loan to a participant in the transmission and distribution industry.  (Morrow Dep. at 19:14-20:20 (B857-858).) Generally, he has served as a chairman/member of various loan committees, served as a mortgage company director, and the director, president and CEO of a financial institution.  (Morrow Rep. at 1 (B672).)

Specifically, Mr. Morrow served as a loan officer at Bank of America, handling portfolios valued up to $120 million at the time.  (Morrow Dep. at 10:13-17 (B853).) Subsequently, from 1977-1982, Mr. Morrow worked in loan administration at Imperial Bank (Morrow CV (B685).), where he reviewed any loan application in excess of one hundred thousand dollars.  (Morrow Dep. at 10:18-11:2 (B853-853.1).)  He issued Small Business Administration loans both during his tenure with Bank of America and with Imperial Bank.  (Morrow Dep. at 10:24; 11:2 (B853-853.1).)  Following his work at Imperial Bank, Mr. Morrow became the president of one bank, the vice president of another, and has been involved in a variety of different lending practices through those supervisory roles.  (Morrow CV (B684-685).)  During his time as president and CEO of Marathon National Bank & Bancorp from 1983-1994, Mr. Morrow drafted and implemented all policies and procedures related to lending.  (Morrow CV (B685).)  After leaving Marathon, from 1994-2000, Mr. Morrow served in management positions at several banks and continued to be involved in lending policies.  (Morrow CV (B684).)

Perhaps Pike intended to argue that even though the Court need not consider the *Daubert* factors, the certain factors on which Pike focuses, namely those related to a testable methodology and peer review, are still helpful and should be applied to evaluate

Mr. Morrow's opinions. However, Pike has failed to cite a single case holding that a banking or lending expert must use empirical studies, a methodology capable of testing or re-testing, or a methodology capable of peer review for his or her testimony to be reliable. In fact, the Sixth Circuit found that a trial court had not abused its discretion by admitting a banking expert who did not use empirical studies or use methods that were subject to peer review. In *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319 (6th Cir. 2001), a lender sued to compel the Small Business Association to fulfill its alleged contractual obligations to repurchase a defaulted loan pursuant to a guaranty agreement, which required the lender to "execute documents and to 'take such other actions which shall, consistent with prudent closing practices, be required in order fully to protect or preserve the interest of Lender [First Tennessee] and SBA in the loan.'" *Id.* at 322. At trial, in part based on expert testimony, the district court concluded that the lender had materially breached the guaranty agreement through its improper banking practices. On appeal, the lender argued that the defendant's expert's opinions were not reliable. *Id.* at 332, 334.

Much as Pike does in the instant case, the plaintiff in *First Tennessee* argued that the expert's opinions were not "based upon 'technically valid reasoning or methodology.'" *Id.* at 333. The court determined, "[i]n some cases (even cases involving non-scientific expert testimony), the factors may be pertinent, while in other cases "the relevant reliability concerns may focus upon personal knowledge or experience." *Id.* at 335. Much like Mr. Morrow, the defendant's expert had extensive experience in the banking industry. The expert had worked in the industry for forty years, served as the manager of an entire letter of credit department, later supervised forty employees in a

variety of banking departments while serving as vice president of a bank, and was

"familiar with how banks in First Tennessee's position handled letter of credit financing

transactions." *Id.* at 332-333. Consequently, the court found, "[c]ontrary to First

Tennessee's argument, the fact that Iorlano's opinions may not have been subjected to the

crucible of peer review, or that their validity has not been confirmed through empirical

analysis, does not render them unreliable and inadmissible." *Id.* at 334. Completely

rejecting plaintiff's argument that the expert's testimony was not reliable unless the

*Daubert* factors were met, the Sixth Circuit stated:

> After reviewing Iorlano's trial testimony, we cannot say that the
> district court abused its discretion by allowing him to testify as an expert
> witness. In reaching this conclusion, *we find the Daubert reliability
> factors unhelpful in the present case, which involves expert testimony
> derived largely from Iorlano's own practical experiences throughout forty
> years in the banking industry. Opinions formed in such a manner do not
> easily lend themselves to scholarly review or to traditional scientific
> evaluation.*

*Id.* at 335 (emphasis added).

### 3.    Mr. Morrow's testimony is reliable because he used the appropriate methodology in his field

Despite Pike's unfounded claims to the contrary, Mr. Morrow did use a

methodology. As explained in his report, Mr. Morrow, relying on his 39 years of

financial institution and lending experience, applied financial institution industry criteria,

including lending, operation and audit cultures, definitions, generally accepted practices

of prudent lenders, Federal regulatory policies, the relevant laws, and lending policies

and procedures, to reach his conclusions. (Morrow Rep. at 3.) Contrary to unfounded

assertions in Pike's Brief, Mr. Morrow articulated a defined methodology, accepted in his

field, to come to his conclusions. Can one take the policies, procedures, and lending

15

practices to create a formula that may be tested and subjected to peer review? No. And as the court in *First Tennessee* recognized, such testing and peer review factors, the very factors on which Pike puts so much weight, are inappropriate for an expert on banking and lending practices.[5]

### C.    Whether Chad Dubea and Corey Close Might Have Sought an SBA Loan Can Be Established at Trial

Pike argues that the third and final prong, the "fit" prong, is not satisfied because it is unknown if Chad Dubea and Cory Close would actually take the steps necessary to obtain financing that Mr. Morrow opines was obtainable. "Rule 702's fit requirement derives from the textual provision that 'scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *United States v. Mathis*, 264 F.3d 321, 335 (3d Cir. 2001) (quoting Fed. R. Evid. 702). Significantly, the "fit" requirement is "not intended to be a high one." *Id.* The Third Circuit has compared the "fit" requirement to the requirement that only relevant evidence is admissible. *Id.*

Is Mr. Morrow's testimony relevant? Can it be applied to the facts at issue to aid the trier of fact? Mr. Morrow is able to use his years of training and experience to testify to what financing would have been available to Chad Dubea and Corey Close in the absence of the GRAT. The fact that they could obtain such a loan would establish the error in the inference Pike hopes that this Court will draw: that Mick Dubea's resignation

---

[5]    Indeed, at the deposition, Pike pressed Mr. Morrow on why some form of survey had not been done to confirm that commercial banks would indeed issue the SBA loan Mr. Morrow concludes would be issued. In addition to being unnecessary, as Mr. Morrow was able to confirm the standards for SBA loans in any event, and has personal experience issuing such loans, a survey would have been inappropriate because it would have involved presenting the personal and confidential financial information of Corey Close and Chad Dubea to various banks. (Morrow Dep. at 180:2-182:4 (B861-863).)

as trustee from the GRAT was the "but for" cause of T&D's existence.  T&D could have obtained financing on its own.  Such testimony makes it more probable that Pike's alleged damages are overstated and should be reduced.

Pike's argument that Mr. Morrow's testimony is inadmissible because it is a hypothetical opinion about facts as they are known today completely ignores Rule 703, which provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or *made known to the expert at or before the hearing*."  Fed. R. Evid. 703 (emphasis added).  If the Court accepts Pike's interpretation of the "fit" requirement, an expert could not give a hypothetical based on facts made known to him at trial.  Chad and Corey will testify at trial that they would have been willing to take the risks associated with obtaining SBA financing, which will thereby increase the relevance and weight of Mr. Morrow's testimony.

Mr. Morrow has used his knowledge and experience to interpret the policies and procedures in the lending industry in order to opine on whether Cory and Chad could have obtained financing for their business.  Mr. Morrow was qualified to give that opinion, his opinion meets the standard for reliability, and his opinion fits or is relevant to the facts of this case.  Accordingly, the Court should deny Pike's motion.

## III. MR. MORROW APPROPRIATELY RELIED UPON THE PROJECTIONS OF T&D AND OF PIKE'S OWN DAMAGES EXPERT

Pike also suggests that Mr. Morrow's testimony is unreliable because he uses T&D's own financial figures or the financial figures of others.  However, it is perfectly permissible for an expert to rely on a company's own financial figures or plans when conducting an analysis.  In *Voilas v. General Motors Corp.*, 73 F. Supp. 2d 452 (D.N.J. 1999), a party argued that an expert's testimony was unreliable because he relied on

17

GM's own analyses when reaching his conclusions.  Rejecting this argument, the court
stated:

> [T]his Court disagrees that Dr. Tinari's liability report is unreliable
> because he employed no particular methodology, but merely reviewed
> GM's own analyses of disposition plans for the Trenton plant. Indeed, an
> experienced economist's clarification and summary of a large corporation's
> business plans could certainly prove helpful to the average juror who
> presumably lacks such experience in and knowledge about complex
> financial matters, even if doing so does not require employing any
> particular methodology but simply a straightforward review of the
> corporation's data.

*Id.* at 461.

As in *Voilas*, there is nothing impermissible about Mr. Morrow's reliance on
T&D's financial figures, and he did so with respect to the revenues per crew which are
the basis of his projections.  (Morrow Dep. at 205:1-206:9 (B864-865).)  Furthermore,
Mr. Falk, Pike's own expert, relied on T&D's projections.  Falk projects growth in the
revenues of T&D under three scenarios: (1) the initial projections set forth by Corey
Close; (3) the Appraisal Economics case, based upon projections made at an earlier point
in time by Pike officers; and (3) the "adjusted case," in which Mr. Falk amends the initial
projections of Mr. Close in light of the higher levels of actual revenues in the first year of
operations by T&D.  For the first four years of activity by T&D, these three estimates
contemplate revenues by T&D respectively of (1) $30,000,000;[6] (2) $77,500,000;[7] and
$63,000,000.[8]  Two of these three scenarios set forth higher levels of revenues for the
first four years of operations of T&D than the alternate scenario set forth by Mr. Morrow.

---

[6]   Table 1 of Falk Report (B595.)  The figure is obtained by adding revenues for
years 1 through 4.

[7]   Table 2 of Falk Report (B596.)  The figure is obtained by adding revenues for
years 1 through 4.

[8]   Table 3 of Falk Report (B597.)  The figure is obtained by adding revenues for
years 1 through 4.

Mr. Morrow's model assumes total revenues of $60,300,000 for the first four years of operations.[9]

Thus, it is simply not possible for Pike to argue that Mr. Morrow's projections of $60,300,000 in revenues are without support, without undermining its own expert's higher projections of growth in the first four years. As Mr. Morrow testified, one factor he relied upon in determining that the projections set forth a reasonable potential growth scenario for T&D is that Pike's expert relied upon the projections. (Morrow Dep. at 223:23-224:9 (B866-867).) Mr. Falk, Pike's expert, himself admitted he has absolutely no prior experience either a bidding industry generally or in bidding in the transmission and distribution industry specifically. (Naylor Decl., Ex. 24, Falk Dep. at 77:16-78:8 (B884-885).). Mr. Morrow, by contrast, has extensive experience in making judgments about the future viability of start-up ventures, and what types of revenues might or might not be realistic in light of the business plan submitted to a commercial bank. Indeed, such judgments are essential to a banker making an approval decision about a commercial loan. (Morrow Dep. at 215:6-12 (B868).)

Finally, to attack Mr. Morrow as being unqualified to undertake projections of future financial performance misconceives what he in fact did. Mr. Morrow is not projecting that T&D Solutions will in fact grow at the rate set out in his report. His opinion is that T&D could have obtained a different form of financing than the entity in fact obtained, and had it obtained this different form of financing in some alternate universe, growth at the level he projects would be reasonable, in that a reasonable banker

---

[9]     This figure can be obtained by adding together the quarterly revenues for the four years set out in the Morrow Report at pages 7 -10. Those projections reflect $4,200,000 in revenue in year one, $10,500,000 in year two; $18,600,000 in year three and $27,000,000 in year four.

would continue to provide additional credit to the entity. Given that this level of growth

is below two of the three scenarios set forth by Mr. Falk as being reasonable, Pike's

challenge to the reasonableness of this alternate scenario should be rejected.

## IV. MS. VAN TASSEL WAS ENTITLED TO RELY UPON MR. MORROW'S PROJECTIONS

Admittedly, Ms. Van Tassel relies on Mr. Morrow's projections in making her

affirmative projection of damages in this matter. Because Mr. Morrow's testimony is

reliable and admissible, there is nothing improper about one expert using another expert's

conclusions as part of the factual basis for her own conclusions.

However, should this Court for any reason reject the testimony of Mr. Morrow,

simply rejecting Ms. Van Tassel's affirmative damages testimony in its entirety, without

an opportunity to amend, would lead to a fundamental injustice. The correction Ms. Van

Tassel makes to the testimony of Pike's damages expert is essential. Mr. Falk, in his

damages report, simply assumes that absent some act by Mr. Dubea, T&D Solutions

would never have existed for a five year period. Mr. Falk then assigns all damages

associated with the very existence of T&D Solutions for the first five years of its

existence to Mr. Dubea. (*See generally* Falk Rep. at 2-3 (B578-579).) The errors in this

approach are myriad, but one is so fundamental that it cannot be left unremedied: Mick

Dubea's resignation from the GRAT as trustee was not the "but for" cause of T&D's

existence. Neither Chad Dubea nor Corey Close had noncompete agreements with Pike,

they would have been free to start their venture and compete with Pike for jobs in this

industry.

As Mr. Morrow establishes, Chad Dubea and Corey Close had the funds to obtain

SBA financing on their own, and could have done so even without any financing through

the GRAT. Thus, T&D Solutions would have existed even without the GRAT financing, and Mr. Falk's fundamental assumption about damages is incorrect. Any failure to make this correction to his analysis would result in an improper damage calculation.

## **CONCLUSION**

Accordingly, for the reasons set forth herein, Pike's Motions *in Limine* Nos. 1 and 2 should be rejected.  Mr. Morrow, a banker with 39 years of experience, is more than qualified to opine about the alternate availability of commercial financing for T&D Solutions.


Dated:  August 25, 2006        By: _____
                                   Lewis H. Lazarus (#2374)
                                   Matthew F. Lintner (#4371)
                                   Joseph S. Naylor (#3886)
                                   Jason C. Jowers (#4721)
                                   MORRIS, JAMES, HITCHENS & WILLIAMS LLP
                                   222 Delaware Avenue, 10th Floor
                                   Wilmington, Delaware  19801
                                   (302) 888-6800
                                   llazarus@morrisjames.com
                                   mlintner@morrisjames.com
                                   jnaylor@morrisjames.com
                                   jjowers@morrisjames.com
                                   Attorneys for Mick Dubea

<u>**CERTIFICATE OF SERVICE**</u>

I, Joseph S. Naylor, hereby certify that on August 25, 2006, I caused to be filed electronically the following **SEALED DOCUMENT: (1) Defendant Mick Dubea's Brief in Opposition to Plaintiffs' Motion** *in Limine* **Nos. 1 & 2: To Exclude the Proffered Expert Testimony of J.F. Morrow and Karyn Van Tassel** and (2) this **Certificate of Service** with the Clerk of Court using CM/ECF, which will send notification of such filing(s) to the party listed below.  I also certify that I caused the foregoing to be served by hand delivery upon the following counsel of record:

> Alyssa M. Schwartz, Esquire
> **Richards, Layton & Finger**
> One Rodney Square
> P.O. Box 551
> Wilmington, DE  19899
> Email: *schwartz@rlf.com*

In addition, I hereby certify that on August 25, 2006, I caused the foregoing document to be delivered by e-mail upon the following non-registered participants:

> Michael A. Paskin, Esquire
> Sarah E. Paul, Esquire
> J. Wes Earnhardt, Esquire
> **Cravath, Swaine & Moore LLP**
> Worldwide Plaza, 825 Eighth Avenue
> New York, NY  10019
> Email: *mpaskin@cravath.com*
> Email: *spaul@cravath.com*
> Email: *wearnhardt@cravath.com*
>
> Teri L. Danish, Esquire
> **Rodriguez Colvin Chaney & Saenz LLP**
> 1201 E. Van Buren
> Brownsville, TX  78522
> Email: *tl.danish@rcclaw.com*

*/s/ Joseph S. Naylor*

Joseph S. Naylor (#3886)
MORRIS JAMES HITCHENS & WILLIAMS LLP
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800
Email: *jnaylor@morrisjames.com*

1450801/1

## CERTIFICATE OF SERVICE

I, Joseph S. Naylor, hereby certify that on September 1, 2006, I caused to be filed electronically the following **REDACTED - PUBLIC VERSION** of: (1) **Defendant Mick Dubea's Brief in Opposition to Plaintiffs' Motion** *in Limine* **Nos. 1 & 2: To Exclude the Proffered Expert Testimony of J.F. Morrow and Karyn Van Tassel** and (2) this **Certificate of Service** with the Clerk of Court using CM/ECF, which will send notification of such filing(s) to the party listed below.

> Alyssa M. Schwartz, Esquire
> **Richards, Layton & Finger**
> One Rodney Square
> P.O. Box 551
> Wilmington, DE 19899
> Email: *schwartz@rlf.com*

In addition, I hereby certify that on September 1, 2006, I caused the foregoing document to be delivered by e-mail upon the following non-registered participants:

> Michael A. Paskin, Esquire
> Sarah E. Paul, Esquire
> J. Wes Earnhardt, Esquire
> **Cravath, Swaine & Moore LLP**
> Worldwide Plaza, 825 Eighth Avenue
> New York, NY 10019
> Email: *mpaskin@cravath.com*
> Email: *spaul@cravath.com*
> Email: *wearnhardt@cravath.com*

> Teri L. Danish, Esquire
> **Rodriguez Colvin Chaney & Saenz LLP**
> 1201 E. Van Buren
> Brownsville, TX 78522
> Email: *tl.danish@rcclaw.com*

*/s/ Joseph S. Naylor*
_____
Joseph S. Naylor (#3886)
MORRIS JAMES HITCHENS & WILLIAMS LLP
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800
Email: *jnaylor@morrisjames.com*