IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PIKE ELECTRIC CORPORATION and )
PIKE ELECTRIC, INC., )
　 )
　　　　　　Plaintiffs, )
　 )
　　　v. ) C.A. No. 05-879 (SLR)
　 )
MICK DUBEA, ) **REDACTED -**
　 ) **PUBLIC VERSION**
　　　　　　Defendant. )

## DEFENDANT MICK DUBEA'S OPPOSITION TO PIKE'S MOTION *IN LIMINE* NO. 3:  TO EXCLUDE EXTRINSIC EVIDENCE

MORRIS, JAMES, HITCHENS & WILLIAMS LLP
Lewis H. Lazarus (#2374)
Matthew F. Lintner (#4371)
Joseph S. Naylor (#3886)
R. Christian Walker (#4802)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800

Attorneys for Defendant Mick Dubea

Dated: August 25, 2006

Public Version Dated:  September 1, 2006

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................2

NATURE AND STAGE OF THE PROCEEDINGS ...........................................4

COUNTERSTATEMENT OF FACTS .................................................................5

    Pike Acquires Red Simpson, Inc. ..................................................................5

    Mr. Dubea's Employment Agreement with Pike and his Subsequent
    Performance as a Pike Regional Vice President ......................................6

    Pike Amends the Contracts of all Former RSI Managers and
    Supervisors to Fully Vest Deferred Compensation in Connection
    with its Upcoming IPO ....................................................................................7

    Pike Terminates Mr. Dubea Based Upon Suspicion that he was
    Planning to Compete........................................................................................10

ARGUMENT.........................................................................................................12

I.    MR. DUBEA'S EMPLOYMENT AGREEMENT AS AMENDED
    IS AMBIGUOUS AS TO THE CONSEQUENCES FOR A BREACH
    OF SECTION 5.07.........................................................................................12

    A.    Potential Forfeiture of Deferred Compensation Under the
        Original Employment Agreement.............................................12

    B.    The Amendment was Designed to Limit the Circumstances
        Under Which Forfeiture of Deferred Compensation
        Would Occur...................................................................................14

    C.    The Original Employment Agreement and the Amendment
        are not Easily Synthesized, and Mr. Dubea's Employment
        Agreement as Amended is Reasonably Susceptible to at Least
        Three Different Interpretations ...................................................16

        POSSIBLE CONSTRUCTION NO. 1 ......................................17

        POSSIBLE CONSTRUCTION NO. 2 ......................................20

        POSSIBLE CONSTRUCTION NO. 3 ......................................20

i

II.    BECAUSE THE EMPLOYMENT AGREEMENT AS AMENDED
       IS AMBIGUOUS, EXTRINSIC EVIDENCE IS ADMISSIBLE
       TO SHOW THAT PIKE, FOR ITS OWN FINANCIAL
       ADVANTAGE, INTENDED TO ELIMINATE THE POSSIBILITY
       OF FORFEITURE FOR VIOLATION OF THE NONCOMPETE ......................22

CONCLUSION ............................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page**

*Amadeus Global Travel Distribution, S.A. v. Orbitz, LLC,*
    302 F. Supp. 2d 329 (D. Del. 2004)..........................................................................19

*Barsky v. Flaherty,*
    C.A. No. 9132, 1987 WL 17047 (Del. Ch. Sept. 9, 1987)......................................19

*Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,*
    702 A.2d 1228 (Del. 1997) ..............................................................................16, 21

*Harrah's Entertainment, Inc. v. JCC Holding Co., Inc.,*
    C.A. No. 19479 2002 WL 1164435, (Del. Ch. May 31, 2002) .............................24

*U.S. Fire Ins. Co. v. General Reins. Corp.,*
    949 F.2d 569 (2d Cir. 1991)................................................................................21

## PRELIMINARY STATEMENT

Motion *in limine* No. 3 is written as though Plaintiffs Pike Electric Corporation and Pike Electric, Inc. ("Pike") never elected in the spring of 2005 to amend the original employment agreements of its former executive Mick Dubea and the men who worked under him. Prior to the amendments, Mr. Dubea does not disagree that if he (or other Pike employees who worked under him) were to violate the noncompete provisions of their contracts, Pike's remedies included forfeiture of certain deferred compensation. Yet Pike indisputably decided to change that hard-and-fast and unambiguous rule and to substitute a new rule. The new rule was that instead of forfeiture, if an employee were to compete in violation of the contract, he would receive his deferred compensation in 15 years plus interest but forfeiture would no longer be a remedy.

Pike's Motion *in limine* No. 3 seeks to exclude evidence confirming that the amendment to Mr. Dubea's Employment Agreement (proposed by Pike) eliminated for Pike's own self-interested reasons the possibility of forfeiture of his deferred compensation for violation of the noncompete. Pike argues that such evidence is inadmissible because (Pike claims) the provisions of Mr. Dubea's Employment Agreement are "unambiguous, clear and susceptible of only one interpretation."

Pike's position could not be more disingenuous. First, Mr. Dubea's amended Employment Agreement is unquestionably ambiguous, because without the aid of extrinsic evidence, it is reasonably susceptible of at least three different interpretations. Second, mountains of undisputed extrinsic evidence, including emails from Pike's attorneys and admissions by Pike's most senior executives, are fatal to Pike's proposed interpretation of the amended agreement. For example, Pike's motion unsurprisingly

2

fails to mention that even Pike's own CEO, J. Eric Pike, whom Pike's interrogatories responses identify as the person most knowledgeable about the drafting and negotiation of the amendment, disagrees with Pike's lawyers' aggressive position on the meaning of the amendment.  Similarly, correspondence from Pike's lawyers sent in the spring of 2005 suggests that even they do not believe the arguments that they are now making to this Court.  Pike's motion *in limine* is obviously a Hail Mary pass to get around this highly damaging evidence.

In any event, because the relevant provisions are ambiguous and extrinsic evidence to determine their meaning is required, Plaintiffs' motion *in limine* No. 3 should be denied.

## NATURE AND STAGE OF THE PROCEEDINGS

In December 2005, Pike sued Mr. Dubea claiming that after his termination he improperly assisted one of Pike's competitors, T&D Solutions Ltd. ("T&D") in violation of a noncompete clause in his employment agreement. Pike additionally claimed that Mr. Dubea provided confidential Pike information and trade secrets to T&D, also in violation of the employment agreement. The complaint alleges that Mr. Dubea solicited customers and employees of Pike and participated in the day-to-day management of T&D. T&D was established in the fall of 2005 by Mr. Dubea's son Chad Dubea, who was also a former T&D manager. Several other former Pike executives and employees also joined T&D. Pike filed a separate complaint against them in Texas seeking essentially the same damages Pike seeks here.

In addition to actual damages, Pike is also seeking a declaration in the Delaware action that Mr. Dubea has contractually forfeited approximately $7.5 million in deferred compensation that he earned over a 30-year career with Pike's predecessor and which amount Pike would otherwise be obligated to pay him in each of the next three years. In material breach of that agreement, Pike failed to make a $2.3 million dollar payment on July 1, 2006. Trial is presently scheduled for the week of September 18, 2006.

## COUNTERSTATEMENT OF FACTS

### Pike Acquires Red Simpson, Inc.

In May 2004, Pike acquired all of the outstanding shares of common stock of Red Simpson, Inc. ("RSI"), which was in the same business as Pike. (Naylor Decl., Ex. 19, Compl. ¶ 14) (B542) (D.I. 1.) At the time of the acquisition, RSI employed over 1,500 individuals, had customers throughout the South Central and Southwestern parts of the United States. (*Id.*) Mr. Dubea was President of RSI's Western Region and had worked for RSI since 1984. (*Id.* ¶ 16.) RSI's controlling stockholder was John Simpson, who owned approximately 93% of the issued and outstanding shares. (Naylor Decl., Ex. 5, Closing Funds Summary, LGBE00002896-924 (B56).)

One fundamental component of RSI's compensation structure before the acquisition was a performance-based incentive-compensation program. Under this program, approximately 127 of RSI's employees, including Mr. Dubea, received compensation over and above their annual salary in the form of deferred compensation. (*See* Closing Funds Summary (B67).) Mr. Dubea's employment agreement with RSI also included a change-of-control provision that would have entitled him to a lump-sum payment of a multiplier of the base amount of his deferred compensation (hereinafter the "Base Amount" and the "Multiplier Amount"). (Naylor Decl., Ex. 1, M. Dubea RSI Agreement Art. §209, PIKE00013038-13055 (B1).) Based on his years of service by the summer of 2004, Mr. Dubea was entitled to a Base Amount of $3,821,650 and a Multiplier Amount of $7,723,893. (Naylor Decl., Ex. 6, Deferred Compensation Chart, DUBEA000048 (B67).) Although only four other RSI employees were entitled to a lump-sum payment in the event of a change-of-control transaction, John Simpson agreed

that if he sold the company, he would pay the other RSI employees who participated in RSI's deferred compensation program a Multiplier Amount equal to their respective Base Amount.

As a part of the acquisition, Pike assumed RSI's obligations to pay the Base Amounts and Multiplier Amounts for all of the former RSI employees. RSI's stockholders (essentially John Simpson) provided the funds to pay the Base and Multiplier Amounts for all of the eligible RSI employees by agreeing to a reduction of the purchase price of approximately $55.1 million ($37 million on a tax-adjusted basis), in exchange for Pike's assuming RSI's payment obligation to its former employees. (*See* Naylor Decl., Ex. 4, Breakdown of RSI Purchase Price Chart, EDUBEA090735 (B37).)

Pike required the former RSI employees to accept payment of their Base Amounts and Multiplier Amounts over a series of years -- the Base Amount would be paid in two 50% installments on July 1, 2004, and July 1, 2005, respectively. The Multiplier Amount would occur in three installments of 40%, 20% and 40% on July 1, 2006, July 1, 2007, and July 1, 2008, respectively. This was a significant loss for Mr. Dubea, because under his RSI employment agreement (unlike all but four of his colleagues), he was contractually entitled to both his Base and Multiplier Amounts immediately upon consummation of any acquisition. Mr. Dubea ultimately agreed to give up his contractual right for immediate payment of the full amounts as a personal favor and concession to John Simpson, who was concerned that Pike would not otherwise agree to the deal.

### Mr. Dubea's Employment Agreement with Pike and his subsequent performance as a Pike Regional Vice President

Effective July 1, 2004, Mr. Dubea entered into a new employment agreement with Pike (the "Employment Agreement") as the Vice President of its Western Region.

(Naylor Decl., Ex. 7, PIKE00017035-57 (B68).)  Mr. Dubea's Employment Agreement, in unusually detailed language that is remarkably favorable to Pike, prohibited him from, among other things, disclosing confidential information (Section 5.03) and engaging in any competitive business within the entire United States of America for a five-year period after he is no longer employed by Pike (Section 5.07).

Pike did not enter into new employment agreements with the other former RSI employees.  Instead, Pike retained their existing contracts and executed amendments to those contracts.  As a result, Mr. Dubea and several other senior executives received contracts that were different in form but very similar in substance to the other former RSI employees.  Most significantly, all of the former RSI employees would forfeit their deferred compensation if they were to violate their noncompete obligations.  (*See, e.g.*, Naylor Decl., Ex. 3, S. Christian Am. Empl. Agr. § 1.02, PIKE00016921-33 (B22).)

Under Mr. Dubea's leadership, Pike's post-acquisition Western Region performed at a high level of profitability.  (Naylor Decl., Ex. 31, S. Thibeaux Dep. at 147:11-148:3, (B877).)  Consistent with his region's positive performance, Mr. Dubea received only positive feedback from his direct superior, Eric Pike, from July 2004 to May 2005.  Pike complimented Mr. Dubea for his attention to detail and profitability and told colleagues that he liked Mr. Dubea.  (*Id.* at 145:4-145:21 (B875).)  Mr. Dubea's performance was excellent and Pike's Western Region was well-organized and profitable under his management.  (*Id.* at 147:11-148:3 (B875).)

### Pike amends the contracts of all former RSI managers and supervisors to fully vest deferred compensation in connection with its upcoming IPO

In April 2005, Pike presented Mr. Dubea and the other former RSI managers and supervisors with an amendment to the Employment Agreement limiting the

circumstances under which each employee's Multiplier Amount could be forfeited. The amendment provided that if employees were to violate their noncompete obligations or quit, they would no longer forfeit their unpaid deferred compensation but instead would receive it plus interest on the 15th anniversary of the RSI acquisition (or July 1, 2019). (*See* Naylor Decl., Ex. 12, M. Dubea Amendment, PIKE00005891 (B138); S. Christian Amendment, PIKE00016935 (B141).)[1]

Although this amendment benefited Mr. Dubea and the other former RSI managers and supervisors, it offered an ever greater economic benefit to Pike. Several months earlier, Pike determined in connection with its IPO planning that if it "vested" the future payments to the former RSI employees, it could take this future obligation as a current charge against income, and not have to take this charge against future income, thereby "juicing" its projections of future profitability.[2] Specifically, the amendment enabled Pike to exclude the approximately $30 million in deferred compensation still owed to the former RSI employees from the calculation of Pike's adjusted EBITDA for financial-accounting purposes. (*See* Naylor Decl., Ex. 17, Pike IPO Prospectus, (B405).). According to Pike's former CFO, the amendment and resulting write-off were done to

---

[1]    It is also significant, for reasons discussed later, that rather than amending and re-stating the agreements, Pike chose merely to modify certain portions of each employee's existing employment agreement.

[2]    Pike apparently altered the consequences for violating the noncompetes based on the concern that, in light of Financial Accounting Standard 123(R), the risk of forfeiture from a noncompetition violation would not sufficiently "vest" the employees for Pike to take a current charge on income. Pike needed to ensure that the SEC would consider the employees truly "vested," and the threat of losing the money due to a competition violation would have arguably prevented a vesting. Pike witnesses were remarkably cagey about whether the accounting concerns set out in FAS 123(R) motivated the alteration of the noncompetition provisions of the agreements, but no witness offered any alternative justification for altering the scope of the noncompete.

make the future look better and hopefully make Pike a more attractive entity in the IPO. (Naylor Decl., Ex. 30, R. Banner Dep. at 31:19-21(B 874).)

For this reason, Pike was eager to have the former RSI employees sign the amendment and repeatedly urged Mr. Dubea both to sign and convince the employees in the Western Region to sign. (*See* Naylor Decl., Ex. 14, Emails from M. Castaneda to M. Dubea, EPIKE00041676 (B146), EPIKE00041810-17 (B148), EPIKE00043490 (B156), EPIKE00041936 (B147); *see also* Naylor Decl., Ex. 8, email from R. Triedman to E. Hilfers, Esq., EPIKE00014089 (B91).) Eric Pike told Mr. Dubea that the amendment was necessary to assist Pike in its IPO and that, without it, Pike would suffer a reduced valuation. Eric Pike also told Mr. Dubea that, while the amendments were prepared in two different versions to accommodate the different form and structure of the underlying agreements, they were designed to accomplish the exact same objective, that is, to eliminate forfeiture as a consequence for quitting or violating each employee's noncompete covenant. (Naylor Decl., Ex. 20, E. Pike Dep. at 102:1-102:19 (B560).) Eric Pike also gave Mr. Dubea a single document to explain the intended effect of the amendment on both him and on the men who worked for him. (Naylor Decl., Ex. 10, Amendment Chart, EDUBEA047151 (B104).)

At Pike's insistence, Mr. Dubea signed the amendment on May 5, 2005, and urged the former RSI employees to do the same. Following Mr. Dubea's lead and again based upon Pike's repeated urging in hopes of accomplishing the desired accounting treatment, the former RSI employees in the Western Region who were entitled to deferred compensation also signed the amendment.

### Pike Terminates Mr. Dubea Based upon Suspicion
### That He Was Planning to Compete

On August 22, 2005, Pike terminated Mr. Dubea in response to an unsolicited August 10 phone call from a woman named Nancy Christian. Ms. Christian is the natural mother of Mr. Dubea's friend and former colleague at RSI and Pike, Sammy Christian. According to Eric Pike, Ms. Christian told him that Mr. Dubea, Sammy, another Pike and former-RSI executive, Alex Graham, and Mr. Dubea's son Chad Dubea, were planning to compete with Pike and were already soliciting customers.

Without investigating the substance or accuracy of this allegation, Eric Pike decided after consulting with several members of his management team to terminate Mr. Dubea without cause. (*See* Naylor Decl., Ex. 18, E. Pike email, LGBE00007373 (B540).) Had Mr. Dubea been terminated with cause (which Pike believed it could have done, given the nature of the allegations), Mr. Dubea's noncompete would have been limited to 18 months. (*See id.*) It was important to Pike, however, to lock Mr. Dubea into a five-year noncompete, as he was viewed by Pike as a potentially robust competitor. (*See id.*) Eric Pike also decided not to tell Mr. Dubea about the call from Ms. Christian. Instead, he falsely told Mr. Dubea that he was being terminated because of cultural differences in the Pike and RSI organizations.

Following Mr. Dubea's termination, Mr. Dubea's son Chad, who had twelve years of experience in the business and was not subject to a noncompete with Pike, formed a competing transmission and distribution business called T&D Solutions Ltd. ("T&D"). The record developed by the parties shows that Mr. Dubea neither intended to be nor was

an active participant in his son's venture.  Moreover, Ms. Christian's allegations (at least as against Mr. Dubea) have been shown to be false.[3]

After months of discovery, it is clear that Pike's complaint, which paints Mr. Dubea as the mastermind behind T&D, reflected a rush to judgment.  Undisputed evidence from multiple sources proves that Mr. Dubea is not involved in his son's business, and has provided no material assistance in either setting up or operating that business.  Nonetheless, in the event the Court were to find a violation of his noncompete obligation,  Pike claims that the amendment unambiguously reflects the parties' intent that in the event of a competition violation following termination without cause, the parties intended that Mr. Dubea was at risk for a forfeiture of his deferred compensation.

---

[3]     Discovery has since shown that Ms. Christian's purported statements were likely in retaliation for a fight that she had with Sammy's wife several weeks earlier.  (*See* Naylor Decl., Ex. 32, S. Christian Dep. at 142:14-142:20, (B880); Naylor Decl. Ex. 33, N. Christian Dep. at 26:7-26:12, (B882).)

## ARGUMENT

I.    **MR. DUBEA'S EMPLOYMENT AGREEMENT AS AMENDED IS AMBIGUOUS AS TO THE CONSEQUENCES FOR A BREACH OF SECTION 5.07**

Pike in its motion *in limine* distorts and oversimplifies the contract language in arguing that Mr. Dubea's Employment Agreement unambiguously calls for forfeiture for a violation of Section 5.07. In reality, Mr. Dubea's Employment Agreement with its complex provisions, coupled with an even more complex and poorly drafted amendment, leaves it unclear (at least from the four corners of the documents) what the consequences are for violating Section 5.07.

### A.    Potential Forfeiture of Deferred Compensation under the Original Employment Agreement

No fewer than three different sections of Mr. Dubea's original Pike employment agreement address circumstances under which his deferred compensation can be forfeited for violating Section 5.07. First, the last sentence of section 2.02(b) states:

> ... Employer shall not make any payment described in this Section 2.02(b), and Executive shall not be entitled to receive any such payment, in the event that, prior to the payment of such amount, Executive has terminated his employment for any reason, other than death, Disability (as defined below), or Good Reason (as defined below), or Employer has terminated Executive's employment for Cause (as defined below).

Thus, Section 2.02(b) as originally drafted provided for forfeiture in the event that Mr. Dubea either quit for an unjustified reason or was terminated for cause, one stated ground for which was violating his noncompete.

Section 4.03(a) discusses the consequences for termination by Pike for any reason other than cause. In relevant part, Section 4.03(a) states:

> ... [i]f employer elects to terminate Executive's employment on or following the first anniversary of the Closing but prior to the end of the

Term for any reason other than death, Disability, or Cause, Employer shall pay Executive any unpaid portions of the Multiplier Amount in accordance with the schedule set forth under Section 2.02(b) and all Restricted Shares acquired pursuant to Section 2.03 shall continue to vest in accordance with the schedule set forth under Section 2.03(b)(ii), in each case, subject to Section 5.10.

Section 4.03(a) therefore applies where Mr. Dubea either quits for a justified reason or was terminated without cause, in which case, the original agreement states that his right to receive his deferred compensation is governed by Section 5.10.

Section 5.10 is titled "Specific Performance" but goes on to list multiple remedies that Pike purports to reserve for itself in the event that Mr. Dubea breaches one of the restrictive covenants in Article V of the agreement, including (1) the right to specific enforcement, (2) the right to "cease making any payments or providing any benefit (including by way of vesting of any Restricted Shares acquired pursuant to Section 2.03) otherwise required by this Agreement," and (3) "the right to any other remedy to which Employer may be entitled at law or equity."

While these three sections are a bit long winded and convoluted as they appear in full in the agreement, Mr. Dubea concedes that when read carefully, the pre-amendment Employment Agreement was unambiguous as to the consequences for violating Section 5.07. That is, if Mr. Dubea were terminated for cause for violating Section 5.07 under the original terms, he would forfeit his unpaid deferred compensation under Section 2.02(b). Similarly, if Mr. Dubea were terminated without cause and subsequently began competing with Pike, one would look to Section 4.03(a) and be referred to Section 5.10, which again provides for forfeiture of any unpaid deferred compensation.

**B.    The Amendment Was Designed to Limit the Circumstances under Which Forfeiture of Deferred Compensation Would Occur**

As previously noted, the Amendment purports to amend the terms of the original agreement dealing with the potential forfeiture of Mr. Dubea's deferred compensation to "prevent, in certain circumstances, the forfeiture of the Multiplier Amount payable to Executive under the Employment Agreement." The amendment does so by stating that the last sentence of Section 2.02(b) is deleted and replaced with two new clauses that break down the universe of conduct that would previously have resulted in a forfeiture into two distinct categories – conduct that continues to result in a forfeiture and conduct that previously resulted in forfeiture but now only results in a payment deferral. The first clause (subsection i) states that "in the event that, prior to the payment of any such amount, Employer has terminated Executive's employment for Cause (other than any Cause described in clause (ii) or (vi) of Section 4.03(b)) or Executive has violated his obligations under Section 5.03, 5.05 or 5.06, Employer shall not make, and Executive shall forfeit all his entitlements to, payment of such amount." The second clause (subsection ii) states that "in the event that, prior to the payment of any such amount, Executive has terminated his employment for any reason (other than Death, Disability or Good Reason) or Employer has terminated Executive's employment for any Cause described in clause (ii) or (vi) of Section 4.03(b) (other than as a violation of Section 5.03, 5.05 or 5.06), Employer shall not make, and the Executive shall not be entitled to receive, payment of such amount until the fifteenth (15th) anniversary of the Closing," or July 1, 2019.

Necessary to construing these clauses is a breakdown of the various grounds for Cause under Section 4.03(b). As stated in the original agreement, those are (i) willful

failure to perform professional duties, (ii) failure to perform "any obligation imposed upon Executive pursuant to this Agreement," (iii) theft or misappropriation, (iv) criminal conviction of any felony or certain misdemeanors involving dishonesty, (v) gross negligence or willful misconduct in performing professional duties, and (vi) violation of any of the restrictive covenants in Article V of the agreement, including the non-disclosure (5.03) , inventions (5.05), non-disparagement (5.06), and noncompete (5.07) obligations.

     After cross-referencing the labyrinthine language of the amendment with the various grounds for cause stated in Section 4.03(b), it is clear that the amendment provides the following four points:

- If Pike terminates Mr. Dubea for Cause for failing to perform his duties, theft or misappropriation, a criminal conviction, or gross negligence, he forfeits his unpaid deferred compensation (first part of subsection (i)).

- If Mr. Dubea violates Section 5.03, 5.05 or 5.06 (without regard to whether he was terminated on those grounds or whether he violates those covenants post-employment), he forfeits his unpaid deferred compensation (second part of subsection (i)).

- If Mr. Dubea quits for any other than a justified reason or Employer has terminated Executive's employment, the payment of his deferred compensation is deferred for 15 years (first part of subsection (ii)).

- If Pike terminates Mr. Dubea for Cause either for failing to perform "any obligation imposed upon Executive pursuant to this Agreement" or for violating

Section 5.07, the payment of his deferred compensation is deferred for 15 years (second part of subsection (ii)).

In simpler terms, 5.03, 5.05 or 5.06 violations and most terminations for cause continue to result in forfeiture, while termination for cause for violating Section 5.07 or quitting for an unjustified reason, both of which previously resulted in forfeiture, now only result in a 15-year deferral. Although the Amendment addresses the consequences for Mr. Dubea violating three of the four restrictive covenants in Article V of the original agreement (*i.e.*, Sections 5.03, 5.05 and 5.06), the Amendment is conspicuously silent as to the consequence for violating Section 5.07 when that violation does not result in a for cause termination.

The Amendment also contains a broad integration clause stating that it reflects the parties' "entire understanding … with respect to the subject matter hereof." (Section 1.05).

### C.    The Original Employment Agreement and the Amendment Are Not Easily Synthesized, and the Employment Agreement as Amended Is Reasonably Susceptible of at Least Three Different Interpretations

A contract is ambiguous any time when the provisions in controversy are fairly susceptible of more than one interpretation. *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). As the *Eagle* Court held:

> Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language. When the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings, there is ambiguity. Then the interpreting court must look beyond the language of the contract to ascertain the parties' intentions.

*Id.*

Here, significant ambiguities arise when one attempts to incorporate the revised Section 2.02(b) into the existing framework of the original agreement. <u>First</u>, while the Amendment only expressly modifies the language of Section 2.02(b), the substance of the modifications necessarily addresses aspects of the parties' relationship not dealt with by original Section 2.02(b) but which were dealt with by Section 5.10 (and arguably Section 4.03). Accordingly, the amendment is unclear as to what sections of the original Employment Agreement it is affecting. <u>Second</u>, because the amendment is unclear as to what Sections of the original Employment Agreement it is affecting, the "subject matter" of the amendment for purposes of the amendment's integration clause is necessarily unclear as well. <u>Third</u>, the amendment is silent as to what happens if Mr. Dubea quits or is terminated without cause and subsequently violates Section 5.07, the significance of which greatly varies depending on the scope of the integration clause.

The end result is that without the aid of extrinsic evidence, the amended Employment Agreement is reasonably susceptible of at least three different interpretations.

*    *    *

### POSSIBLE CONSTRUCTION NO. 1

One possible construction of the amended Employment Agreement is that the four substantive points in amended Section 2.02(b) now reflect the parties' "entire understanding" as to the restrictions on Mr. Dubea's right to receive his deferred compensation. Under this construction, any provision in the original agreement dealing with forfeiture of deferred compensation (whether in Section 2.02(b), 4.03, or 5.10) would be superseded and replaced by the new Section 2.02(b). Because new Section

17

2.02(b) does not state any consequence for a 5.07 violation where Mr. Dubea was not terminated on that ground, his right to receive his deferred compensation would no longer be tied to his compliance with Section 5.07.[4]

Pike will likely quibble with this interpretation. Pike claims in its brief that the amendment "related solely to the consequences associated with Dubea's *termination*, not the consequences associated with Dubea's *competition*." (Pike's Br. at 9) (D.I.125.) Accordingly, Pike can be expected to argue that the above interpretation relies on an inappropriate construction of the phrase "subject matter hereof" in the integration clause. But that argument is not persuasive.

First, Pike's suggestion that the amendment relates "solely" to the consequences associated with Dubea's termination is belied by the actual language of the amendment. It is true that the amendment only substitutes the actual language of Section 2.02(b), which under the original agreement only addressed consequences associated with Mr. Dubea's termination for cause or quitting for an unjustified reason. But the effect of that substitution necessarily modifies the substance of other sections of the original agreement, including Section 5.10 (and arguably Section 4.03), and otherwise affects aspects of the parties' relationship not dealt with by original Section 2.02(b). For example, amended Section 2.02(b)(i) discusses consequences for potential violations of Sections 5.03, 5.05 or 5.06, regardless of whether he was terminated on those grounds, which was originally discussed in Section 5.10 of the original agreement. Thus, the

---

[4]    Pike would still likely be entitled to injunctive relief and damages based on such conduct, whether under the remnants of Section 5.10 that do not address forfeiture or based on principles of common law.

amendment does not (as Pike claims) relate solely to the consequences associated with Dubea's termination.

Second, the amendment does reflect Pike's intent to alter the consequences associated with Dubea's competition, again despite Pike's claim to the contrary. Prior to the amendment, all violations of Mr. Dubea's restrictive covenants resulted in forfeiture under Section 5.10. The amendment, however, only provides that violations of Sections 5.03, 5.05 or 5.06 result in forfeiture. This reflects a clear intent by Pike to treat 5.07 violations differently. Pike may argue that it was unnecessary for the amendment to clarify that 5.07 violations result in forfeiture because that result was already provided by Section 5.10. But that argument fails because Section 5.10 also provided for forfeiture in the case of 5.03, 5.05 or 5.06 violations; yet the Amendment obviously goes to great lengths to draw a distinction between the various Article V covenants, by carving Section 5.07 out of both subsections of the amendment and stating which Article V violations now result in forfeiture. Moreover, the argument that the contract already addressed forfeiture would render a significant portion of the amendment superfluous, which is certainly not a reasonable interpretation. *See Amadeus Global Travel Distribution, S.A. v. Orbitz, LLC*, 302 F. Supp. 2d 329, 338 (D. Del. 2004) ("In construing contract language, redundancies should be avoided"); *Barsky v. Flaherty*, C.A. No. 9132, 1987 WL 17047, at *8 (Del. Ch. Sept. 9, 1987) (refusing to find contract unambiguous on grounds that it would have required court to treat certain language as surplusage). Thus,

Pike's assertion that the amendment was not intended to modify the consequences associated with Mr. Dubea's competition is false.[5]

Because amended Section 2.02(b) squarely addresses consequences associated both with Mr. Dubea's termination and with Mr. Dubea's competition (or any other violation of his restrictive covenants), the subject matter of the amendment can be reasonably construed to include both of these matters as well. In fact, the subject matter of the amendment reasonably could be construed to include the entire universe of restrictions on Mr. Dubea's right to receive his deferred compensation.

## POSSIBLE CONSTRUCTION NO. 2

A second and similar possibility is that the new Section 2.02(b) superseded and replaced the original provisions dealing with forfeiture of deferred compensation, but that there is still some consequence to Mr. Dubea's otherwise unfettered right to receive that money if he violates Section 5.07 but was not terminated on that ground. This is also a reasonable interpretation because it is consistent with the same earlier points that (i) the provisions in the original Employment Agreement dealing with forfeiture of deferred compensation are superseded and replaced by the new Section 2.02(b) and (ii) through the amendment, Pike was clearly attempting to carve out violations of Section 5.07 and not have them result in forfeiture. Pike will likely challenge this interpretation too on the same grounds as the first. But as demonstrated above, Pike's arguments fail.

## POSSIBLE CONSTRUCTION NO. 3

A final possibility, albeit an unlikely one, is Pike's proposed construction that the amendment only related to consequences associated with termination. As demonstrated

---

[5]     Indeed, Pike had a strong financial motivation for doing so in connection with its July 2005 IPO. *See supra* at 8-9 & n.2.

above, this interpretation is predicated on an extremely narrow construction of the

integration clause. But because the integration clause does not expressly define the

"subject matter hereof," Mr. Dubea concedes that the amended Employment Agreement

is ambiguous to the extent that some uncertainty exists (at least from a four corners

analysis of the documents) as to what extent the parties intended to completely replace or

supersede the original provisions dealing with forfeiture of deferred compensation.

*    *    *

Here, because the amended Employment Agreement is reasonably susceptible to

at least three different interpretations, it is ambiguous and the Court will need to resort to

extrinsic evidence in order to construe it. *See Eagle Indus.*, 702 A.2d at 1232 ("when

there is uncertainty in the meaning and application of contract language, the reviewing

court must consider the evidence offered in order to arrive at a proper interpretation of

contractual terms").[6]

---

[6]    Pike's brief also suggests that the presence of the integration clauses in the
original agreement and the amendment actually favors its argument that extrinsic
evidence should be excluded. But integration and ambiguity are not mutually exclusive.
*See U.S. Fire Ins. Co. v. General Reins. Corp.*, 949 F.2d 569, 571 (2d Cir. 1991) ("Even
though a document may be fully integrated with respect to the ultimate terms of the
agreement, the meaning of those terms may be unclear"). Indeed, as the Delaware
Supreme Court has explained, "[i]n a perfect world, integrated contracts would always
reflect plainly and accurately the compromises and allocation of risk that the parties
intend. The reality is that the contractual language defining rights and obligations of the
parties is sometimes ambiguous. It is a court's duty to preserve to the extent feasible the
expectations that form the basis of a contractual relationship. When, as in the instant
case, the meaning and application of contract terms are uncertain, a court fulfills this duty
by considering extrinsic evidence." *Id.* at 1233-34.

II.    **BECAUSE THE EMPLOYMENT AGREEMENT AS AMENDED IS
AMBIGUOUS, EXTRINSIC EVIDENCE IS ADMISSIBLE TO SHOW
THAT PIKE, FOR ITS OWN FINANCIAL ADVANTAGE, INTENDED TO
ELIMINATE THE POSSIBILITY OF FORFEITURE FOR VIOLATION
OF THE NONCOMPETE**

Pike presumably takes the position that the consequences for any breach of

Section 5.07 are unambiguous to avoid the undisputed extrinsic evidence in the record.

That evidence, consisting of emails from Pike's attorneys and admissions by Pike's most

senior executives, indicates that Pike amended the employment agreements of the

employees who were part of RSI's deferred-compensation plan (including Mr. Dubea) in

May of 2005, shortly before Pike's IPO, specifically to eliminate the possibility of

forfeiture in the case of either voluntary resignation or violation of a noncompete.  Pike

provided this benefit to these employees not out of generosity, but for its own self-

interested reasons.

Some of the evidence that Mr. Dubea intends to offer at trial includes:

- As previously noted, Pike altered the noncompetes to ensure a sufficient "vesting"

    of the future payments, which vesting enabled Pike to take a current charge

    against income for the future liability.  This was extremely important to Pike in

    connection with its IPO.  Taking a one-time charge against 2005 income enabled

    Pike to exclude the approximately $30 million in deferred compensation still

    owed to the former RSI employees from the calculation of Pike's adjusted

    EBITDA for financial-accounting purposes.  Pike's accounting-treatment change

    to the deferred compensation obligation generated more attractive future earnings

    just prior to the IPO.  (*See* R. Banner Dep. Tr. 31:19-21)  (B874).)

The interpretation of the provision that Pike offers is inconsistent with Pike's true

motivation for seeking the amendment: juicing its future projections of earnings

prior to an IPO.[7]

- The testimony of Eric Pike who, when asked

# REDACTED

(*See* E. Pike Dep. at 139: 20-140:2) (B560).)

- In a March 2005 email, Pike's own trial counsel, Cravath Swaine & Moore, who

  also drafted the Amendment, forwarded a final copy of both versions of the

  amendment to Pike.

# REDACTED

(*See* Naylor

Decl., Ex. 9, E. Hilfers, Esq. email, EPIKE00079964 (B92).)

- The agreements of the lower-level managers and supervisors which

  unambiguously clearly provide for a deferral of 15 years in the event of

  competition after termination, coupled with the testimony of multiple Pike

---

[7]     Pike's brief argues that "[u]nder well-established accounting principles, Dubea's
requirement of "future service" to Pike cannot encompass his obligation to refrain from
illegal competition." (Br. at 9.)  That statement is inaccurate, and the deposition
testimony that Pike cites for that proposition is misconstrued.  It is true that Mr. Briggs,
one of Pike's accountants, testified that he had



(emphasis added) (B609).)

executives stating that Pike intended to give Mr. Dubea the same treatment.  (*See,*

*e.g.,* E. Pike Dep. at 102:1-102:19) ("Q.

# REDACTED

(B560).)

\*    \*    \*

The extrinsic evidence therefore unequivocally shows that the parties intended to

eliminate forfeiture as a possibility in the case of a noncompete violation by Mr. Dubea.

As a result, granting Pike's motion would permit Pike as "a sophisticated party to exploit

ambiguities in [the]contract[]to extract a better bargain for itself after the fact, knowing

that the court would have to remain blind to parol evidence that would make untenable its

view of the contract," an outcome disfavored by Delaware law for good reason.  *Harrah's*

*Entertainment, Inc. v. JCC Holding Co.*, Inc., C.A. No. 19479, 2002 WL 1164435, at \*16

(Del. Ch. May 31, 2002).

Finally, Pike's suggestion that allowing proof on this subject will simplify the

trial and avoid Mr. Dubea's having to fit his evidence into the allotted trial time (Br. at

12), misses the point.  It is Mr. Dubea's responsibility to use his trial time efficiently.

The extrinsic evidence in this case is overwhelming, but much of it is simple and requires

little presentation time.

## CONCLUSION

For the reasons stated, Pike's Motion *in limine* No. 3 should be denied.

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Lewis H. Lazarus (#2374)
Matthew F. Lintner (#4371)
Joseph S. Naylor (#3886)
R. Christian Walker (#4802)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800

Attorneys for Defendant Mick Dubea

Dated: August 25, 2006

1447986/4

25

## CERTIFICATE OF SERVICE

I, Joseph S. Naylor, hereby certify that on August 25, 2006, I caused to be filed

electronically the following **SEALED DOCUMENT**: (1) **Defendant Mick Dubea's**

**Brief in Opposition to Plaintiffs' Motion** *in Limine* **No. 3: To Exclude Extrinsic Evidence**

and, (2) this **Certificate of Service** with the Clerk of Court using CM/ECF, which will send

notification of such filing(s) to the party listed below.  I also certify that I caused the foregoing to

be served by hand delivery upon the following counsel of record:

> Alyssa M. Schwartz, Esquire
> **Richards, Layton & Finger**
> One Rodney Square
> P.O. Box 551
> Wilmington, DE  19899
> Email: *schwartz@rlf.com*

In addition, I hereby certify that on August 25, 2006, I caused the foregoing document to

be delivered by e-mail upon the following non-registered participants:

> Michael A. Paskin, Esquire
> Sarah E. Paul, Esquire
> J. Wes Earnhardt, Esquire
> **Cravath, Swaine & Moore LLP**
> Worldwide Plaza, 825 Eighth Avenue
> New York, NY  10019
> Email: *mpaskin@cravath.com*
> Email: *spaul@cravath.com*
> Email: *wearnhardt@cravath.com*
>
> Teri L. Danish, Esquire
> **Rodriguez Colvin Chaney & Saenz LLP**
> 1201 E. Van Buren
> Brownsville, TX  78522
> Email: *tl.danish@rcclaw.com*

> */s/ Joseph S. Naylor*
> _____
> Joseph S. Naylor (#3886)
> MORRIS JAMES HITCHENS & WILLIAMS LLP
> 222 Delaware Avenue
> P.O. Box 2306
> Wilmington, DE 19899
> (302) 888-6800
> Email: *jnaylor@morrisjames.com*

1450791/1

## CERTIFICATE OF SERVICE

I, Joseph S. Naylor, hereby certify that on September 1, 2006, I caused to be filed

electronically the following **REDACTED – PUBLIC VERSION** of (1) **Defendant Mick**

**Dubea's Brief in Opposition to Plaintiffs' Motion** *in Limine* **No. 3: To Exclude Extrinsic**

**Evidence** and, (2) this **Certificate of Service** with the Clerk of Court using CM/ECF, which will

send notification of such filing(s) to the party listed below.

> Alyssa M. Schwartz, Esquire
> **Richards, Layton & Finger**
> One Rodney Square
> P.O. Box 551
> Wilmington, DE  19899
> Email: *schwartz@rlf.com*

In addition, I hereby certify that on September 1, 2006, I caused the foregoing document

to be delivered by e-mail upon the following non-registered participants:

> Michael A. Paskin, Esquire
> Sarah E. Paul, Esquire
> J. Wes Earnhardt, Esquire
> **Cravath, Swaine & Moore LLP**
> Worldwide Plaza, 825 Eighth Avenue
> New York, NY  10019
> Email: *mpaskin@cravath.com*
> Email: *spaul@cravath.com*
> Email: *wearnhardt@cravath.com*
>
> Teri L. Danish, Esquire
> **Rodriguez Colvin Chaney & Saenz LLP**
> 1201 E. Van Buren
> Brownsville, TX  78522
> Email*: tl.danish@rcclaw.com*

> */s/ Joseph S. Naylor*
> _____
> Joseph S. Naylor (#3886)
> MORRIS JAMES HITCHENS & WILLIAMS LLP
> 222 Delaware Avenue
> P.O. Box 2306
> Wilmington, DE 19899
> (302) 888-6800
> Email:  *jnaylor@morrisjames.com*

1452558/1