## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PIKE ELECTRIC CORPORATION and ) <br> PIKE ELECTRIC, INC., ) <br>  ) <br> Plaintiffs, ) <br>  ) <br> v. ) <br>  ) <br> MICK DUBEA, ) <br>  ) <br> Defendant. ) | Civil Action No. 05-879-SLR <br> **PUBLIC VERSION** |

---

**MICK DUBEA'S BRIEF IN OPPOSITION TO PLAINTIFFS'
MOTION *IN LIMINE* NO. 4:  TO EXCLUDE THE EVIDENCE OF THE
TOWERS PERRIN STUDY AND OTHER EVIDENCE OF THE AVERAGE
LENGTH OF NONCOMPETITION AGREEMENTS FOR EXECUTIVES
<u>OUTSIDE OF THE ACQUISITION CONTEXT</u>**

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Lewis H. Lazarus (#2374)
Matthew F. Lintner (#4371)
Joseph S. Naylor (#3886)
Jason C. Jowers (#4721)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800
lazarus@morrisjames.com
mlintner@morrisjames.com
jnaylor@morrisjames.com
jjowers@morrisjames.com

*Attorneys for Mick Dubea*

Dated: August 25, 2006

Public Version dated:  September 1, 2006

TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION .............................................................................................1

NATURE AND STAGE OF THE PROCEEDINGS ..........................................3

STATEMENT OF FACTS ................................................................................4

ARGUMENT ....................................................................................................7

I.     THE TOWERS PERRIN REPORT IS RELEVANT
AND HIGHLY PROBATIVE TO MATERIAL ISSUES
UNDER DELAWARE LAW ...................................................................7

        A.    Pike's Noncompete is not "Categorically Distinct"
From the Other Noncompetes Utilized by its
Competitors in the Industry ..............................................................8

        B.    Mr. Dubea Did Not Sell A Business to Pike, and Thus His
Noncompete Provision Should be Scrutinized Under
the Strict Employer/Employee Standard..........................................9

        C.    Information about the Duration of Competitor Noncompetes
will Assist this Court.......................................................................11

II.    THE TOWERS PERRIN STUDY AND ACCOMPANYING DATA
ARE ADMISSIBLE ON SEVERAL INDEPENDENT EVIDENTIARY
GROUNDS ........................................................................................13

        A.    The Report is Admissible As a Business Record
Under FRE 803(6)...........................................................................14

        B.    The Report is Admissible As an Adoptive Admission
Under FRE 801(d)(2)(B)..................................................................16

        C.    The Report is Admissible as an Authorized Admission
Under FRE 801(d)(2)(C) and (D) ....................................................17

        D.    The Accompanying Backup Data is Independently
Admissible Regardless of the Admissibility of the Report............18

CONCLUSION...............................................................................................20

i

## TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page**

*All Pro Maids v. Layton,*
    2004 WL 1878784 (Del. Ch. Aug. 9, 2004) ..........................................................11

*Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.,*
    247 F.3d 79 (3d Cir. 2001)
    Cert. denied, 534 U.S. 1162 (2002) ....................................................................18

*Carter v. Hewitt,*
    617 F.2d 961 (3d Cir. 1980)...............................................................................12

*Cloverland-Green Spring. v. Pennsylvania Milk,*
    298 F.3d 201 (3d Cir. 2002)...............................................................................19

*Crowley v. L.L. Bean, Inc.,*
    303 F.3d 387 (1st Cir. 2002)..............................................................................16

*Delaware Express Shuttle, Inc. v. Older,*
    2002 WL 31458243 (Del. Ch. Oct. 23, 2002) .....................................................11

*Delmarva Securities Litig.,*
    794 F. Supp. 1293 (D. Del. 1992).......................................................................18

*Falco v. Alpha Affiliates, Inc.,*
    2000 WL 727116 (D. Del. Feb. 9, 2000) ............................................................14

*Gas-Oil Products, Inc. of Del. v. Kabino,*
    1987 WL 18432 (Del. Ch. 1987) ........................................................................12

*H & G Ortho, Inc. v. Neodontics Int'l, Inc.,*
    823 N.E.2d 718 (Ind. Ct. App. 2005)....................................................................9

*Hammermill Paper Co. v. Palese,*
    1983 WL 19786 (Del. Ch. Jun. 14, 1983)...........................................................11

*Health Professionals, Ltd. v. Johnson,*
    791 N.E.2d 1179 (Ill. App. Ct. 2003) .................................................................10

*Kepner-Tregoe, Inc. v. Leadership Software, Inc.,*
    12 F.3d 527 (5th Cir. 1994) ...............................................................................19

*Knowles-Zestwitz Music, Inc. v. Cara,*
    260 A.2d 171 (Del. Ch. 1969).............................................................................12

*McCann Surveyors, Inc. v. Evans,*
    611 A.2d (Del. Ch. 1987)...................................................................7, 11

*McQueeny v. Wilmington Trust Co.,*
    779 F.2d 916 (3d Cir. 1985)..................................................................12

*Norton Petroleum Corp. v. Cameron,*
    1998 WL 118198 (Del. Ch. Mar. 5, 1998)................................................11

*Pilgrim v. Trustees of Tufts College,*
    118 F.3d 864 (1st Cir. 1997) ...............................................................16

*Research and Trading Corp. v. Pfuhl,*
    1992 WL 345465 (Del. Ch. Nov. 18, 1992) ............................................12

*Rhis, Inc. v. Boyce,*
    2001 WL 1192203 (Del. Ch. Sept. 26, 2001) ...............................7, 10, 11

*Singh v. Batta Environmental Assocs., Inc.,*
    2003 WL 21309115 (Del. Ch. May 21, 2003) ........................................11

*Southmark Prime Plus L.P. v. Falzone,*
    776 F. Supp. 888 (D. Del. 1991)...........................................................18

*Tracinda Corp. v. DaimlerChrysler AG,*
    362 F. Supp. 2d 487 (D. Del. 2005).................................................16, 17

*Tristate Courier & Carriage, Inc. v. Berryman,*
    2004 WL 835886 (Del. Ch. Apr. 15, 2004) .............................................8

*United States v. Clifford,*
    704 F.2d 86 (3d Cir. 1983)...................................................................12

*United States v. Daly,*
    842 F.2d 1380 (2d Cir. 1988)...............................................................12

*U.S. v. Furst,*
    886 F.2d 558 (3d Cir. 1989)...........................................................14, 15

*U.S. v. Pelullo,*
    964 F.2d 193 (3d Cir. 1992)...........................................................14, 15

Statutes and Other Authorities

Fed. R. Evid. 401 ...................................................................................................12

Fed. R. Evid. 402 ...................................................................................................12

Fed. R. Evid. 403 ...................................................................................................12

Fed. R. Evid. 801(d)(2)(B)................................................................................13, 16

Fed. R. Evid. 801(d)(2)(C).........................................................................13, 17, 18

Fed. R. Evid. 801(d)(2)(D) .....................................................................................18

Fed. R. Evid. 803(6)..........................................................................................13, 14

Fed. R. Evid. 807 ...................................................................................................18

Fed. R. Evid.1006 ...................................................................................................15

Restatement (Second) of Contracts § 188..............................................................10

Thomas A. Mauet, *Fundamentals of Trial Techniques* 180 (1988)......................19

Weinstein's Federal Evidence § 801.31...................................................................16

## **INTRODUCTION**

One of the central issues in this case is whether Pike Electric Corp. and Pike Electric Inc. (collectively "Pike") are entitled to enforce a five-year non-competition provision in an Employment Agreement with defendant Mick Dubea, or whether that period should be reduced as a matter of law. Delaware law routinely reduces the duration of a noncompete that cannot be justified in light of the nature of the industry and balance of the interests of the employer and the employee. Through this motion *in limine*, Pike seeks to obfuscate a fact that will be pivotal in this Court's consideration of this issue: *every other competitor* of Pike in this industry imposes upon its high-level executives *either a one or two year non-compete*. (The sole exception in the industry is the Shaw Group, which has a ten-year noncompete for its CEO but either two years or no noncompete for its other executives.) All of this is clearly set out in a comprehensive report on executive compensation packages in industry performed by Towers Perrin, a compensation consultant that Pike hired to recommend compensation packages for its high level executives. The information collected by Towers Perrin is easily confirmable by the underlying contracts between these various competitors and their officers, all of which are attached as exhibits to public filings and available through the SEC's website. The terms of these contracts, as signed legal instruments, are not hearsay and are independently admissible regardless of whether or not the Towers Perrin Report is admitted.

Pike, of course, would prefer for this Court to ignore that the transmission and distribution services industry has universally adopted either one- or two-year non-compete provisions for employees such as Mr. Dubea. It entirely deflates Pike's

1

argument that there is some justification for enforcing its aggressive and unreasonable five-year noncompete. Yet, as will be established at trial, there is no justification for doing so, and certainly no justification for this Court to turn a blind eye to pivotal evidence on the question.

## NATURE AND STAGE OF PROCEEDINGS

Pike sued Mr. Dubea for breach of contract, tortious interference with contract, tortious interference with business relations and misappropriation of trade secrets. (Compl. ¶ 1.) Mr. Dubea counterclaimed seeking, among other things, a declaration that the non-competition provision in his Employment Agreement with Pike is unenforceable as written, because of its unreasonably long five-year duration.

The parties exchanged proposed trial exhibits on August 14, 2006. Mr. Dubea identified as an Exhibit an executive compensation report commissioned Pike and prepared by Towers Perrin (the "Towers Perrin Report"). (Earnhardt Decl., Exh. 11.) Mr. Dubea also identified as potential trial exhibits the actual underlying contracts that were cited by Towers Perrin in the Towers Perrin Report, which counsel for Mr. Dubea obtained from the SEC's website. Pike now brings this motion *in limine* to prevent introduction of both the Towers Perrin Report and the actual employment agreements between its competitors and the executives of those competitors.

## STATEMENT OF FACTS

As Pike readily admits in its brief (D.I. 127), the five-year non-compete contained in Mr. Dubea's Employment Agreement with Pike originated with Lindsay, Goldberg and Bessemer ("LGB"), a private equity firm that acquired a controlling interest in Pike. (Pike Br. at 2-3.)  "LGB customarily seeks five-year non-competition agreements with the key executives of the companies it acquires . . . ."  (Pike Br. at 2.)  LGB demanded such a provision from Mr. Dubea and from other executives in conjunction with Pike's acquisition of Red Simpson, Inc. (RSI).  At the time of the acquisition of RSI, Mr. Dubea was a 4.6% shareholder in RSI.  (Naylor Decl., Ex. 5, Closing Funds Summary, LGBE00002896-924 (B56).)  RSI was controlled by John Simpson, who was Mr. Dubea's boss and owned 94% of the company's stock.  (*Id.*)

As a part of the acquisition, Pike demanded employment agreements from Mr. Dubea and several other RSI employees.  Mr. Dubea agreed to submit to the noncompete in this employment agreement when his boss, John Simpson, sold his business to Pike.  Mr. Dubea's choices at the time of the transaction were limited: he could either sell his stock to Pike or lose his job.  Mr. Dubea neither had a major stockholding nor the bargaining power to affect the terms of the noncompete that were thrust upon him.

After LGB acquired its controlling interest in Pike, and then orchestrated the acquisition of RSI, Pike set about making its initial public offering of stock.  Plaintiffs' commissioned the Towers Perrin Report in conjunction with their IPO. (*See* Pike's Br. at 9 (stating that "study conducted at the express direction of Pike.").)  The Report evaluates executive compensation in the transmission and distribution industry by focusing on a

peer group of eight companies that were demographically closest to Pike Electric. (Report at TP0393-355, Ex. 16, B187-356.)

Towers Perrin is a leading compensation consultant, with extensive experience in the energy industry. (*See* Naylor Decl., Ex. 11, Towers Perrin Proposal and Resume, TP0128-159 (B106-137).) Towers Perrin accessed both its own internal industry databases, and also obtained proxy statement compensation data for top level executives for Pike's publicly-traded peer firms. (*See* Earnhardt Decl. at Exh. 11, Towers Perrin Report, TP0426.) These peer firms were selected by Pike itself. (*Id.*) The Report covered not just CEO-level positions of the competitor companies but also examined the length of restrictive covenants for positions equivalent to Mr. Dubea's, who was a Regional Vice President at Pike Electric. (*See* Naylor Decl., Ex. 16, Appendix to Towers Perrin Report at TP0466 (identifying two regional Senior Vice Presidents for the company Integrated Electrical Services) (B258) and TP0465 (identifying the President of Underground Services for InfraSource Services) (B257).)

The conclusion of Towers Perrin Report was that every other competitor of Pike in the transmission and distribution industry imposes upon its high level executives either a one or two year non-compete. (*See* Appendix to Towers Perrin Report at TP0465-67). The sole exception from the panoply of executives surveyed was the Shaw Group, which has a ten-year non-compete for its CEO but either two years or no non-compete for its other executives. (Appendix to Towers Perrin Report at TP0467 (B259).) Consistent with what Towers Perrin saw in the industry, it recommended to Pike an executive-compensation package that included a one-year noncompete for its CEO and two-year

noncompetes for other high-level executives.  (Earnhardt Decl., Exh. 10, Towers Perrin Preliminary Recommendations at LGBE00008036.)

## ARGUMENT

**I.    THE TOWERS PERRIN REPORT IS RELEVANT AND HIGHLY PROBATIVE TO MATERIAL ISSUES UNDER DELAWARE LAW**

A central issue in this case is whether the five-year noncompete provision in Mr. Dubea's Employment Agreement is valid under Delaware law. Delaware law measures the reasonableness of the duration of a noncompete through a balancing of the interests of the employer against the right of an employee to make a living. *See, e.g., RHIS, Inc. v. Boyce*, 2001 WL 1192203, at *5 (Del. Ch. Sept. 26, 2001). The interests of the employer turn to a great degree upon the nature of the industry, most pivotally what kind of trade secrets are involved. *See McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 3 (Del. Ch. 1987) (stating that courts scrutinize the reasonableness of the restrictions in light of the employer's protectable interests like trade secrets).

Clearly, an industry-wide use of either a one- or two-year noncompete provision for high-level executives would tend to shed light on what is considered reasonable in the industry for the adequate protection of whatever trade secrets are at stake. This is why the Towers Perrin Report is so highly probative. It provides a snapshot of what the industry in general considers an appropriate duration for restrictive covenants between the company and high level executives of that company such as Mr. Dubea.

Pike nonetheless boldly attacks the Report on relevancy grounds, suggesting that Pike's own interests are somehow at variance with the industry overall, rendering it pointless to even consider what Pike's competitors are doing with respect to noncompetition covenants. Pike claims that it entered its noncompete with Mr. Dubea in the context of a sale of a business, and therefore cannot be judged on the same standards applicable to typical employer/employee agreements in this industry.

7

Pike's attempt to distinguish its own circumstances from the rest of the industry is wasteful distraction. Even were Pike correct that its noncompete should be evaluated with a different level of scrutiny (and it is not), it would impact the weight to be accorded to the Towers Perrin Report, not its admissibility.

### A. Pike's Noncompete is not "Categorically Distinct" from the Other Noncompetes Utilized by its Competitors in the Industry

Central to Pike's claim that its noncompete with Mr. Dubea cannot be measured by the standards applicable to the rest of the industry is that Mr. Dubea's noncompete provision was "entered into in the acquisition context." (Pike's Br. at 6.) Noncompete agreements stemming from a stock acquisition are subjected to less demanding scrutiny by courts reviewing their reasonableness. *See Tristate Courier and Carriage, Inc. v. Berryman*, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004). Pike goes on to argue that its competitors' noncompetition agreements are therefore not relevant because those agreements are "categorically distinct" from its agreement with Mr. Dubea. (Pike's Br. at 6)

This position is wrong for three reasons. <u>First</u>, even if Mr. Dubea's noncompete agreement really did stem from the "acquisition context," it still must be reasonable in duration. *Tristate Courier and Carriage, Inc.*, 2004 WL 835886, at *10. The inquiry into reasonableness might be "less searching" in the sale of business context, but the party seeking to enforce such a covenant must still establish that it advances "a legitimate economic interest," and there still must be a balancing of the equities. *Id.* Thus, Pike is fundamentally incorrect in asserting that its noncompete should be judged by different standards than anyone else in the industry.

Second, it is simply not true that none of the other employment agreements listed in the Towers Perrin Report are "categorically" outside of the business acquisition context. At least one group of those noncompetes were in fact entered into in conjunction with an acquisition, the factor Pike claims is so pivotal. Unsurprisingly, the noncompete terms for these employees are only two years, just like the rest of the industry. (*See* Naylor Decl., Ex. 28, excerpt from the March 1, 2006 10-K of Infrasource (discussing the September 24, 2003 acquisition of the entity and noting that all of the Infrasource contracts listed in the Towers Perrin study were finalized on that same date and in conjunction with the merger) (B869); Towers Perrin Report at TP0465 (noting that all of those noncompetes have terms of 2 years) (B257).)

Finally, and most importantly, it is simply not true that Mr. Dubea's noncompete agreement should be measured under the loose "sale of a business" standard. Mr. Dubea did not sell his business to Pike. He was Red Simpson's employee, and then became Pike's employee, and was serving in that role pursuant to the Employment Agreement which contained a noncompete provision. This is discussed in further detail below.

**B.    Mr. Dubea's Did Not Sell A Business to Pike, and Thus His Noncompete Provision Should be Scrutinized Under the Strict Employer/Employee Standard**

The logic for treating noncompetes in the "sale of business" context more generously than in an employment agreement stems from the presumption of equal bargaining power in a sale of a business that is typically lacking in the employer/employee relationship. *See H & G Ortho, Inc. v. Neodontics International, Inc.*, 823 N.E.2d 718, 730 (Ind. Ct. App. 2005) (in a sale of business there is likely equal bargaining power rather than the unequal bargaining power characterizing employee non-

compete agreements); *Health Professionals, Ltd. v. Johnson*, 791 N.E.2d 1179, 1189-1190 (Ill. App. Ct. 2003) (holding that the stock purchase agreement for the sale of business by the seller/owner to the buyer indicated equal bargaining power that is not present in employee agreements). Consequently, under Delaware law, in the employment context, noncompete covenants "are scrutinized with particular care because they are often the product of unequal bargaining power." *RHIS, Inc.*, 2001 WL 1192203, at *5 (quoting Restatement (Second) of Contracts § 188).

Yet Mr. Dubea did not agree to his noncompete provision as a part of a sale of his business – he agreed to submit to the noncompete when his boss, John Simpson, sold his business to Pike. At that point in time, Mr. Dubea owned 4.6% of the Shares of Red Simpson, Inc., the business which Pike purchased. (*See* Naylor Decl., Ex. 5, Closing Funds Summary, B56.) His choices were limited: he could either sell his stock to Pike or lose his job. Mr. Dubea neither had a major stockholding nor the bargaining power to affect the terms of the noncompete that were thrust upon him. So in effect he did not have the bargaining power to justify evaluating the reasonableness of his resulting noncompete under the "sale of business" context. *See RHIS, Inc.*, 2001 WL 1192203, at *5 (finding that under Delaware law courts should strictly construing noncompetes in employment context because of the employee's lack of bargaining power).

As Pike makes clear in its own brief, the outside investor in Pike that took a controlling interest in the company and subsequently orchestrated the acquisition of Red Simpson, the investment bank LGB, was not going to accept anything less than a five-year noncompete from the top RSI officials such as Mr. Dubea. (Pike's Br. at 2.) This demand was not based upon any fact specific to the transmission and distribution

industry, this is what LGB demanded for any of its acquisitions. (Naylor Decl., Ex. 21, R. Triedman Dep. at 16:25-19:6 (B565.2-565.5).)

Yet no authority cited by Pike supports the position that the generalized investment policy of one particular investor should trump the delicate balancing between the interests of the company overall against the interests of the employee affected by the noncompete. On the contrary, Delaware law seeks to carefully balance the hardships to the employee against the employer's interest in protecting his business secrets, confidentiality, trade secrets and goodwill. *See e.g.*, *RHIS, Inc.*, 2001 WL 1192203, at *5 (the harm to employee is balanced against the harm to the employer); *McCann Surveyors, Inc.*, 611 A.2d at 3 (courts scrutinize the reasonableness of the restrictions in light of the employer's protectable interests like trade secrets); *Hammermill Paper Co. v. Palese*, 1983 WL 19786, at *4 (Del. Ch. June 14, 1983) (courts inquire whether the covenants restrain competition in any manner unrelated to the employment agreement, is solely anticompetitive or is wedded to any discernible legitimate protectable interests of the employer).

### C.    Information about the Duration of Competitor Noncompetes will Assist this Court

In making that balance, no court in Delaware has ever enforced a noncompete against an employee for a duration of five years. *See, e.g., All Pro Maids v. Layton*, 2004 WL 1878784, at *5 n.23 (Del. Ch. Aug. 9, 2004) ("Noncompete agreements covering limited areas for two or fewer years generally have been held to be reasonable.")[1]

---

[1]    *See Singh v. Batta Environmental Assocs., Inc.*, 2003 WL 21309115, at *7 (Del. Ch. May 21, 2003) (enforcing two year restriction); *Delaware Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *14 (Del. Ch. Oct. 23, 2002) (covenant not to compete in a fluid or price elastic market should not exceed two years); *RHIS, Inc.*, 2001 WL 1192203, at *6-7 (covenant not to compete in fluid market reduced to one year); *Norton Petroleum Corp. v. Cameron*, 1998 WL

Accordingly, this Court will likely have to evaluate reducing the duration of Mr. Dubea's noncompete, and in that task the Towers Perrin Report will be highly relevant.

Federal Rule of Evidence 401 defines relevant evidence to mean "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The Advisory Committee Notes to Rule 401 explain that the fact to be proven "may be ultimate, intermediate, or evidentiary; it matters not, so long as it is of consequence in the determination of the action." *Id.* In fact, the evidence may be admissible even if not directed to a matter in dispute, *id.*, and if reasonably related. *See, e.g., United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) (evidence admissible even if it is background evidence that is reasonably related to a disputed issue in the action).

Evidence may be barred if it is irrelevant, prejudicial or cumulative. *See* Fed. R. Evid. 402; Fed. R. Evid. 403. A plain reading of the rule shows that "the scope of relevant evidence is intended to be broad, and the authorities support such a broad reading." *See McQueeny v. Wilmington Trust Co.*, 779 F.2d 916, 922 (3d Cir. 1985) (citing *United States v. Clifford*, 704 F.2d 86, 90 (3d Cir. 1983) and *Carter v. Hewitt*, 617 F.2d 961, 966 (3d Cir. 1980) ("[t]he standard of relevance established by the Federal Rules of Evidence is not high")).

The Towers Perrin Report is directed to a matter that is disputed, namely, the reasonableness of the temporal prong of the employee restrictive covenant. It is based on

---

118198, at *3-5 (Del. Ch. Mar. 5, 1998) (enforcing three year restriction); *Research & Trading Corp. v. Pfuhl*, 1992 WL 345465 (Del. Ch. Nov. 18, 1992) (enforcing one year restriction); *Gas Oil Products, Inc. of Delaware v. Kabino*, 1987 WL 18432, at *1-2 (Del. Ch. 1987) (enforcing three year restriction); *Knowles-Zeswitz Music, Inc. v. Cara*, 260 A.2d 171, 175-76 (Del. Ch. 1969) (enforcing two year restriction).

exactly the same industry and comparable peer companies that are competitors of

Plaintiffs. (*See* Naylor Decl., Ex. 20, Weinstein Dep. at 12:6-23 (stating that the study

was carried out at the behest of Pike Electric Corp., a Plaintiff in the instant action on a

peer group that directly represented Pike's competitors in that industry) (B570).) It is

therefore of direct consequence to the determination of the validity of the Defendant's

restrictive covenants in his employment contract with Plaintiffs. As such, it is not

irrelevant, cumulative, or prejudicial. It will clearly assist this Court in determining the

reasonable duration of Mr. Dubea's noncompete under Delaware law.

## II.     THE TOWERS PERRIN STUDY AND ACCOMPANYING DATA ARE ADMISSIBLE ON SEVERAL INDEPENDENT EVIDENTIARY GROUNDS

Seeming to understand that its arguments about the irrelevancy of the Towers

Perrin Report are unlikely to carry the day, Pike attacks the Report and its accompanying

backup data as hearsay. Yet the Towers Perrin Report is admissible on at least three

independent grounds: (i) as a record of a regularly conducted business activity under

Federal Rule of Evidence 803(6); (ii) as an adoptive admission under Federal Rule of

Evidence 801(d)(2)(B); and (iii) as an authorized admission under Federal Rule of

Evidence 801(d)(2)(C) and (D). Further, the publicly available data from which Towers

Perrin generated its Report, *i.e.* the actual competitor employment agreements available

on the SEC website, are independently admissible regardless of the admissibility of the

Towers Perrin Report. Those non-hearsay contracts are amenable to being judicially

noticed.

### A.     The Report Is Admissible As a Business Record Under Federal Rule of Evidence 803(6).

Pike contends that the Report cannot be admitted as a business record because it is a non-recurring study conducted at the express direction of Pike. Pike misconstrues the operation of Federal Rule of Evidence 803(6). The rule permits the introduction of the Towers Perrin Report because it is a report produced by a regularly conducted activity which also bears indicia of trustworthiness.

Interpreting Rule 803(6), the Third Circuit has found:

> The business records exception permits admission of documents containing hearsay provided foundation testimony is made by "the custodian or other qualified witness," that: (1) the declarant in the records had personal knowledge to make accurate statements; (2) the declarant recorded the statements contemporaneously with the actions that were the subject of the reports; (3) the declarant made the record in the regular course of the business activity; and (4) such records were regularly kept by the business.

*U.S. v. Pelullo*, 964 F.2d 193, 200 (3d Cir. 1992) (citing *U.S. v. Furst*, 886 F.2d 558, 571 (3d Cir. 1989)); *accord Falco v. Alpha Affiliates, Inc.*, 2000 WL 727116, at *13 (D. Del. Feb. 9, 2000).

Pike contends that the Towers Perrin Report is inadmissible because Towers Perrin: (i) does not maintain a database from which it extracted the information but relied on public sources; (ii) does not "regularly create charts such as the one Dubea seeks to introduce;" and (iii) because Mr. Weinstein stated that "this assignment was the only one that I have conducted that had a chart just like this." (Pike's Br. at 9.)

Each of these contentions lacks merit. First, the business records rule does not prohibit admission of documents merely because they contain information from publicly available sources. Second, merely because a chart was created for the first time

14

representing the underlying data, instead of other types of presentations that were used by

Towers Perrin does not detract from its admissibility. The chart is a summary of business

records and is admissible if the underlying data on which it is based is admissible. *See*

Fed. R. Evid. 1006; Weinstein Dep. at 23:23-25:23 (stating that Towers Perrin does

routinely summarize the underlying information for other executive peer review studies

in an appropriate way to permit its clients to make decisions) (B572-574). Further, this

was not the first time Towers Perrin has undertaken such reviews for clients; rather,

deposition testimony of Mr. Weinstein makes clear, as do the exhibits, that it has

undertaken similar work for a substantial number of energy-industry clients. (*Id.* at 24:1-

8 (B573); Naylor Decl., Ex. 11, Towers Perrin Proposal, TP0128-137 (B106-137).)

The business records exception permits introduction of documents into evidence

provided: (1) a foundation is laid by the custodian of the records or any other qualified

witness that the document's declarant possessed personal knowledge to make accurate

statements; (2) "the declarant recorded the statements contemporaneously with the

actions that were the subject of the reports;" (3) the declarant recorded the information in

the regular course of business activity; and (4) such records were regularly kept by the

business. *See Pelullo*, 964 F.2d at 200 (citing *Furst*, 886 F.2d at 571).

The integrity of the Towers Perrin Report as a business record is illuminated by

the deposition testimony of Towers Perrin director, Mr. Weinstein. (*See* Weinstein Dep.

at 10: 13-24, 11: 13-23 (B568-569).) Mr. Weinstein testified that he personally oversaw

the production of the information contained in the report (*id.* at 22:1-6 (B571)), and

attested to the reliability and regularity of production of such peer-group based reports

(*id.* at 24:1-8 (B573)). He also testified that the chart representing the transmission and

distribution industry's restrictive covenants were based on Towers Perrin's regularly conducted activity of obtaining contracts of peer-group employees to compile executive compensation and restrictive covenant reports. (*Id.* at 23:23-25:23, 27:8-23 (B572-575). He stated that the report was based on personal knowledge of the inputs by his staff, and that such records were regularly maintained by Towers Perrin. (*Id.* at 27:13-23 (B575).) Mr. Weinstein's testimony clearly establishes that the Towers Perrin Report is a business record, qualified for admission under Federal Rule of Evidence 803(6).

**B.**    **The Report is Admissible As an Adoptive Admission Under FRE 801(d)(2)(B)**

Under Federal Rule of Evidence 801(d)(2)(B), a statement is not hearsay when offered against a party who has "manifested an adoption or belief in its truth." "In order to prove an adoptive admission, the proponent of the statement must show evidence sufficient to support a finding that the party against whom the statement is offered heard, understood, and acquiesced in the statement." 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 801.31 (Joseph M. McLughlin, ed., Matthew Bender 2d ed. 2006). The District of Delaware has found that "[u]sing a document supplied by another represents the party's intended assertion of the truth contained in that document." *Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d 487, 500 (D. Del. 2005); *see also Pilgrim v. Trustees of Tufts College*, 118 F.3d 864, 869-870 (1st Cir. 1997) (adopting grievance committee's report as an adoptive admission after president of college adopted each of its proposals), *abrogation recognized on other grounds by Crowley v. L.L. Bean, Inc.*, 303 F.3d 387 (1st Cir. 2002). In *Tracinda*, Chrysler objected to documents prepared by a third party public relations and research firm that were then

given to Chrysler. The firms argued that the documents were hearsay. Rejecting these

arguments, the Court found:

> An adoptive admission can be found in the circumstances where a party
> forwards a document to another in response to a request for information
> contained in the document. *Id.* In this case, Schrempp testified that PX
> 425 was passed on to the DaimlerChrysler communications department.
> Schrempp Dep. 353:2-11. The communications department then produced
> a Proposed Action Program which incorporated many of the ideas and
> issues outlined in the Bell Pottinger document. Compare PX 425 with PX
> 439. Because Defendants adopted the statements in the Bell Pottinger
> document, the Court will overrule Defendants' hearsay objection to the
> admissibility of that document.

*Tracinda Corp.*, 362 F. Supp. 2d at 500-501. Eric Pike confirms in his deposition that

Pike relied on the Towers Perrin Report. (Naylor Decl., Ex. 20, Pike Dep. 197:21-

198:11, 198:16-25, 199:1-2 (admitting that Pike agreed with Towers Perrin's assessment

that two years was about right in terms of the industry standard for a non-solicitation

provision and that Pike had relied on Tower's Perrin to elicit that information) (B562-

564); *id.* at 206: 7-25 (admitting that Pike relied on the report recommending two year

non-compete covenants for proposed employment contracts) (B565); *id.* at 206: 2-9

(stating that Pike had no reason to doubt the recommendations) (B565).)

### C.    The Report is Admissible as an Authorized Admission Under FRE 801(d)(2)(C) and (D)

Towers Perrin was commissioned to create a report that studied executive

compensation in comparable, peer group organizations competing with Pike Electric.

(*See* Pike's Br. at 9 ("admitting that the "study [was] conducted at the express direction

of Pike").) This report included the length of non-compete and non-solicitation

agreements entered into by those organizations and its key employees. The Report is

therefore admissible under Federal Rule of Evidence 801(d)(2)(C) because Towers Perrin

was authorized by Pike to make the statements contained in the report. (*See* Weinstein Dep. at 6: 20-24 (affirming that Towers Perrin was retained by Pike Electric to undertake the study) (B567).)  Statements made by an agent to his principal also come in as do a party's books and records "without regard to any intent to disclose to third persons." *See* Fed. R. Evid. 801(d)(2)(C) advisory committee's note.

Similarly, the report should be admissible under Federal Rule of Evidence 801(d)(2)(D) because Towers Perrin was an agent authorized by Pike Electric to make the report within the scope of its agency, that was eventually relied upon by Pike Electric. (*See* Weinstein Dep. at 6: 20-24 (affirming that Towers Perrin was retained by Pike Electric to undertake the study) (B567); Pike's Br. at 9 (admitting that the "study [was] conducted at the express direction of Pike").)[2]

**D.    The Accompanying Backup Data is Independently Admissible Regardless of the Admissibility of the Report**

This Court may take judicial notice of an SEC filing. *See Southmark Prime Plus L.P. v. Falzone*, 776 F. Supp. 888, 892-893 (D. Del. 1991) (courts may take judicial notice of SEC and public filings); *accord Delmarva Securities Litig.*, 794 F. Supp. 1293, 1299 (D. Del. 1992).  The underlying contracts were obtained by Towers Perrin from proxy statement filings by the various Pike competitors. (Earnhardt Decl., Exh. 11, Towers Perrin Report at TP0426.)  Counsel for Mr. Dubea has likewise obtained the

---

[2]    The Towers Perrin Report may also be admitted under Federal Rule of Evidence 807 because: (1) it was relied upon by Plaintiffs' and is therefore trustworthy (*see* Eric Pike Dep. at 198: 16-25 & 199: 1-2); (2) it is "offered as evidence of a material fact," namely, the temporal validity of the five year noncompete provision, *see* Fed. R. Evid. 807 (B); it possesses probative value and could not have been reasonably contemporaneously obtained by Dubea; and (4) its admission will serve the interests of justice because it will "assist the [fact-finder] in determining the truth." *Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 113-114 (3d Cir. 2001), *cert. denied*, 534 U.S. 1162 (2002).

actual contracts from the website of the SEC and intends to offer them separately at trial, with a request for judicial notice.

Thus, the actual provisions of the various noncompetes can be established even without the Towers Perrin Report, as the terms of the contracts themselves are operative legal acts and thus are not hearsay. *See Cloverland-Green Spring v. Pennsylvania Milk,* 298 F.3d 201, 218 n.20 (3d Cir. 2002) (statement offering to sell a product at a particular price is not hearsay, because statement itself has legal effect); *Kepner-Tregoe, Inc. v. Leadership Software, Inc.,* 12 F.3d 527, 540 (5th Cir. 1994) ("Signed instruments such as wills, contracts and promissory notes are writings that have independent legal significance, and are nonhearsay.") (quoting Thomas A. Mauet, *Fundamentals of Trial Techniques* 180 (1988))).

## CONCLUSION

For the reasons stated herein, Pike's attempt to expunge from the record a central truth about the industry at issue here is unavailing. Every other competitor of Pike in the transmission and distribution industry imposes upon its high level executives either a one or two year non-compete. (Again, the sole exception in the industry is Shaw, which has a ten year noncompete for its CEO but either two years or no noncompete for its other executives). With the singular exception of Pike, no participant in this industry has concluded that a five year noncompete is appropriate for its high level executives. Pike would certainly like to hide that central fact about this industry from the Court, but its effort to do so through this motion should be rejected.


Dated: August 25, 2006                    By:

Lewis H. Lazarus (#2374)
Matthew F. Lintner (#4371)
Joseph S. Naylor (#3886)
Jason C. Jowers (#4721)
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware  19801
(302) 888-6800
llazarus@morrisjames.com
mlintner@morrisjames.com
jnaylor@morrisjames.com
jjowers@morrisjames.com

*Attorneys for Mick Dubea*

1448633/2                              20

## CERTIFICATE OF SERVICE

I, Joseph S. Naylor, hereby certify that on August 25, 2006, I caused to be filed electronically the following **SEALED DOCUMENT: (1) Defendant Mick Dubea's Brief in Opposition to Plaintiffs' Motion** *in Limine* **No. 4: To Exclude the Evidence of the Towers Perrin Study and Other Evidence of the Average Length of Noncompetition Agreements for Executives Outside of the Acquisition Context** and (2) this **Certificate of Service** with the Clerk of Court using CM/ECF, which will send notification of such filing(s) to the party listed below. I also certify that I caused the foregoing to be served by hand delivery upon the following counsel of record:

> Alyssa M. Schwartz, Esquire
> **Richards, Layton & Finger**
> One Rodney Square
> P.O. Box 551
> Wilmington, DE 19899
> Email: *schwartz@rlf.com*

In addition, I hereby certify that on August 25, 2006, I caused the foregoing document to be delivered by e-mail upon the following non-registered participants:

> Michael A. Paskin, Esquire
> Sarah E. Paul, Esquire
> J. Wes Earnhardt, Esquire
> **Cravath, Swaine & Moore LLP**
> Worldwide Plaza, 825 Eighth Avenue
> New York, NY 10019
> Email: *mpaskin@cravath.com*
> Email: *spaul@cravath.com*
> Email: *wearnhardt@cravath.com*
>
> Teri L. Danish, Esquire
> **Rodriguez Colvin Chaney & Saenz LLP**
> 1201 E. Van Buren
> Brownsville, TX 78522
> Email: *tl.danish@rcclaw.com*

*/s/ Joseph S. Naylor*

> Joseph S. Naylor (#3886)
> MORRIS JAMES HITCHENS & WILLIAMS LLP
> 222 Delaware Avenue
> P.O. Box 2306
> Wilmington, DE 19899
> (302) 888-6800
> Email: *jnaylor@morrisjames.com*

## CERTIFICATE OF SERVICE

I, Joseph S. Naylor, hereby certify that on September 1, 2006, I caused to be filed electronically the following **PUBLIC VERSION** of : (1) **Defendant Mick Dubea's Brief in Opposition to Plaintiffs' Motion** *in Limine* **No. 4: To Exclude the Evidence of the Towers Perrin Study and Other Evidence of the Average Length of Noncompetition Agreements for Executives Outside of the Acquisition Context** and (2) this **Certificate of Service** with the Clerk of Court using CM/ECF, which will send notification of such filing(s) to the party listed below.

> Alyssa M. Schwartz, Esquire
> **Richards, Layton & Finger**
> One Rodney Square
> P.O. Box 551
> Wilmington, DE  19899
> Email: *schwartz@rlf.com*

In addition, I hereby certify that on September 1, 2006, I caused the foregoing document to be delivered by e-mail upon the following non-registered participants:

> Michael A. Paskin, Esquire
> Sarah E. Paul, Esquire
> J. Wes Earnhardt, Esquire
> **Cravath, Swaine & Moore LLP**
> Worldwide Plaza, 825 Eighth Avenue
> New York, NY  10019
> Email: *mpaskin@cravath.com*
> Email: *spaul@cravath.com*
> Email: *wearnhardt@cravath.com*

> Teri L. Danish, Esquire
> **Rodriguez Colvin Chaney & Saenz LLP**
> 1201 E. Van Buren
> Brownsville, TX  78522
> Email: *tl.danish@rcclaw.com*

> */s/ Joseph S. Naylor*
> _____
> Joseph S. Naylor (#3886)
> MORRIS JAMES HITCHENS & WILLIAMS LLP
> 222 Delaware Avenue
> P.O. Box 2306
> Wilmington, DE 19899
> (302) 888-6800
> Email: *jnaylor@morrisjames.com*

1450786/1