# EXHIBIT 17

# Part 3 of 5

enhancing our customer service. For example, we use our skilled mechanics and up-to-date garage equipment to increase our efficiency in equipment maintenance, repair and overhaul operations, which we believe is a significant advantage over competitors that outsource the majority of their maintenance requirements. In addition, by managing our fleet through our sophisticated central facility located in Mount Airy, North Carolina, as well as five maintenance facilities located throughout our service territory, we efficiently deploy resources to provide high levels of customer service. Our fleet support allows us to repair or replace a Pike vehicle or piece of equipment within 24 hours, which improves utilization and customer service. We intend to use our extensive modern fleet, repair and maintenance capabilities and skilled workforce to increase our cost competitiveness so that we may profitably win new business.

## Our Services

We provide services to the electric power distribution and transmission market. We focus primarily on the maintenance, upgrade and extension of overhead and underground powerlines. We also offer storm restoration services and various ancillary services. We provide a breakdown of our revenues by type of service in "Management's Discussion and Analysis of Financial Condition and Results of Operations — Overview."

*Powerline Services.* We began as a provider of distribution infrastructure services, and these services continue to be our primary revenue generator. Today, using over 6,000 pieces of specialized equipment, we provide overhead and underground maintenance, upgrade and extension services in a 19-state region. Overhead services consist of the construction and repair of wire and components in energized overhead electric distribution systems. Underground services range from simple residential installations, directional boring, duct bank and manhole installation to the construction of complete underground distribution facilities. We also perform routine maintenance work consisting of repairing or replacing damaged or defective components, inspecting distribution systems for safety hazards and upgrading outdated or low capacity infrastructure.

We also offer maintenance, upgrade and extension services for transmission lines with voltages of up to and including 230 kV and perform energized maintenance work for voltages up to 500 kV. These applications are predominantly single-pole and H-frame structures utilizing wood, concrete or steel poles. Given the current load on regional electricity grids, our ability to perform energized maintenance work is a significant competitive advantage because the work can be performed without interrupting the electric network. Transmission services accounted for approximately 6.0% of our revenues for the year ended June 30, 2004.

We also provide ancillary services, including the construction of power substations, right-of-way clearance and maintenance and the installation of street lighting and fiber optic lines to meet the needs of certain of our distribution customers. While we do not actively pursue these ancillary services as stand-alone services, they add significant value for our customers who prefer to utilize a single electric distribution and transmission infrastructure service provider for all of their needs. Our various ancillary services have generated less than 10% of our total revenue for each year during the past five years.

*Storm Restoration Services.* Storm restoration involves the repair or reconstruction of any part of a distribution or sub-500 kV transmission network, including substations, powerlines, utility poles or other components, damaged during snow, ice or wind storms, flash floods, hurricanes, tornados or other natural disasters. We believe that our crews have earned a reputation as a storm restoration leader in the southeast and south central United States due to our ability to mobilize rapidly the necessary employees and equipment while maintaining a functional force for our unaffected customers. In crisis situations, we have deployed over 2,000 employees within 24 hours to respond to our customers' emergency needs. We maintain a dedicated 24-hour Storm Center that acts as the single hub of command. We also perform these services outside our existing geographic service area.

Storm restoration services do not require that we keep a dedicated team on call. Rather, we rely on our customers in unaffected areas with less time-sensitive work to release our crews in the event of a

64

B 424

severe storm. This deferred work is addressed after the storm restoration work has been completed. This method of staffing storm crews has proven both cost-efficient and effective.

Our storm restoration services provide us with opportunities to attract new customers for our core electric distribution and transmission infrastructure services. We also have been successful in acquiring new customers after providing storm restoration services to them. In addition, our storm restoration services are more profitable than our ongoing infrastructure services work. For the years ended June 30, 2000, 2001, 2002, 2003 and 2004, our revenues generated from storm restoration services were $21.6 million, $25.3 million, $7.0 million, $46.6 million and $43.0 million, respectively. For the five-year period ended June 30, 2004, our average annual storm restoration revenues were $28.7 million and, for each of the five years, ranged between 2.6% and 15.7% of our total revenues.

During August and September of 2004, we experienced the largest storm restoration event of our history as four hurricanes impacted Florida and the surrounding Gulf states. At the peak of our restoration activity, we dedicated approximately 3,000 field, supervisory and support staff to storm restoration services. As a result of these storms, we generated approximately $146.9 million of revenues from storm restoration services for the nine months ended March 31, 2005. Due to the unpredictable nature of storms, the level of our storm restoration revenue fluctuates from period to period. Our storm restoration revenue for the nine months ended March 31, 2005 is not indicative of the revenues that we typically generate in any period or can be expected to generate in any future period.

The following table sets forth certain information related to some of our selected significant mobilizations:

**Selected Storm Mobilizations**

| Storm | Date | Approximate Number of Employees Mobilized | Restoration Period |
|---|---|---|---|
| **Hurricanes or Tropical Storms** | | | |
| Hurricane Frances (FL/GA/NC/SC) | September 2004 | 1,800 | 15 days |
| Hurricane Ivan (AL/FL/GA/MS/SC/NC/VA) | September 2004 | 1,700 | 9 days |
| Tropical Storm Jeanne (FL/GA) | September 2004 | 1,300 | 12 days |
| Hurricane Charley (FL/NC) | August 2004 | 2,000 | 16 days |
| Hurricane Isabelle (VA/MD/NC) | September 2003 | 1,800 | 21 days |
| Hurricane Lily (LA) | October 2002 | 900 | 8 days |
| **Ice Storms** | | | |
| Ice Storm (OH) | January 2005 | 880 | 11 days |
| Ice Storm (IN) | December 2004 | 440 | 9 days |
| Ice Storm (KY/WV) | February 2003 | 1,200 | 14 days |
| Ice Storm (NC/SC) | February 2003 | 2,300 | 11 days |

65

**B 425**

## Customers

We have focused on developing strong, long-term relationships with major electric utilities, cooperatives and municipalities. We have a diverse, well-capitalized customer base that includes over 150 electric companies throughout our service territory. We have employed a customer-focused philosophy that has resulted in customer loyalty, as exemplified by our 59-year relationship with our first customer, Duke Power Company, our 47-year relationship with American Electric Power Company, Inc. and Red Simpson's 30-year relationship with TXU Corp. After giving effect to the Red Simpson acquisition, our relationships with our top 15 customers average approximately 33 years. We preserve these relationships by providing top-quality service and maintaining advanced equipment.

The following table lists selected long-standing customer relationships as of March 31, 2005:

### Selected Long-Standing Customer Relationships

| Customer | Length of Relationship (in years) |
| --- | --- |
| Duke Power Company | 59 |
| Cobb EMC | 48 |
| American Electric Power Company, Inc. | 47 |
| Snapping Shoals EMC | 43 |
| Greystone Power Corp. | 42 |
| Entergy Corporation | 40 |
| Dominion Virginia Power Co. | 32 |
| Progress Energy Carolinas (Carolina Power & Light Company) | 32 |
| TXU Corp. | 30 |
| Oglethorp Power Corp./Georgia Transmission Corp. | 24 |

Many of the customers listed above are our top customers. Our top ten customers accounted for approximately 56.8% and 47.4% of our total revenues during the nine months ended March 31, 2005 and the year ended June 30, 2004, respectively, and approximately 49.9% of our total revenues for the year ended June 30, 2004 on a pro forma basis after giving effect to the acquisition of Red Simpson. For the year ended June 30, 2004, on a pro forma basis after giving effect to the acquisition of Red Simpson, 12.6% of our total revenues were derived from Duke Power. For the nine months ended March 31, 2005, 11.3% of our total revenues were derived from Duke Power. However, the decline in the percentage of our total revenues attributable to Duke Power for the nine months ended March 31, 2005 as compared to the year ended June 30, 2004 on a pro forma basis was due to our unusually high level of storm restoration revenue in the nine months ended March 31, 2005. Except for Duke Power and Florida Power & Light, none of our customers separately accounted for more than 10% of our total revenues for the year ended June 30, 2004 or the nine months ended March 31, 2005. While our exposure to Duke Power has decreased as a result of our acquisition of Red Simpson, a substantial portion of our total revenues will continue to be derived from a limited group of customers.

We believe that our corporate structure and culture successfully foster our long-term customer relationships by affording our clients multiple points of contact within our organization. Each customer typically has five points of contact within our company, including the local area supervisor, local area manager, area vice president, regional vice president and our chief executive officer. The commitment by our managers and employees, many of whom are family members of current and former personnel, helps to reinforce customer loyalty.

## Types of Service Arrangements

Over 90% of our services are provided under master service arrangements, or MSAs, that cover maintenance, upgrade and extension services, as well as new construction. We do not derive significant revenues from fixed-price agreements relating to large-scale capital improvements, which typically involve

66

**B 426**

competitive bidding and substantial performance bond requirements. Our sub-500 kV transmission work performed under fixed price bids represents relatively small jobs (typically less than $5.0 million) with modest (i.e., approximately $500,000 on average) bonding requirements. As of June 30, 2004, an estimated 49% of our arrangements were hourly, while an estimated 45% were unit-based. The terms of our service arrangements are typically between one to three years for cooperatives and municipalities and three to five years for investor-owned utilities, with periodic pricing reviews. Our customers are not required to use us exclusively and do not guarantee service volumes. Most of our arrangements, including MSAs, may be terminated by our customers on short notice. We typically invoice our customers on a weekly basis, with payments due in 30 days. Because the majority of our customers are well-capitalized, investment grade-rated electric utilities or cooperatives, we have historically experienced *de minimis* levels of bad debt.

Initial contract awards usually are made on a competitive bid basis, but extensions often are completed on a negotiated basis. As a result of our track record of quality work and services, we estimate that a majority of our arrangements are renewed at or before the expiration of their terms.

### Training, Quality Assurance and Safety

Performance of our services requires the use of heavy equipment and exposure to potentially dangerous conditions. Our safety record reflects our commitment to operating safely and prudently. As employee safety is a top corporate priority, we have developed an extensive safety and training program that we believe meets applicable DOL requirements in all material respects. Our lineman training program, an accredited four-year program, has grown to be one of the largest non-union powerline training programs in the United States. As a result of this focus on employee safety, we have received a recognition of excellence from the North Carolina Department of Labor for the results of our apprenticeship program. We operate 28 training facilities in 11 states to teach employees safe working skills. In addition to on-the-job training, our career development program and specialized training, we require our employees to attend 12 hours per year of ongoing safety training programs. Our continued focus on safety and workforce developments has resulted in year-over-year improvements in recordable and lost-time incidence rates, which we calculated in accordance with methodologies prescribed by the Occupational Safety and Health Administration at Pike stand-alone in each of the five years ended June 30, 2004. We also conduct other training programs covering a variety of areas, such as supervisor development and CPR/First Aid Certification.

We regularly communicate with our employees to promote safety and to instill safe work habits. In addition, we maintain a safety incentive program that rewards employees for working safely and minimizing injuries.

As is common in our industry, we regularly have been and will continue to be subject to claims by employees, customers and third parties for property damage and personal injuries.

### Equipment

Our fleet, substantially all of which we own, consists of over 6,000 pieces of specialized equipment with an average age of approximately five years (measured as of May 2005) as compared to their average useful lives of eight to 12 years. Over the five years ended June 30, 2004, pro forma for the Red Simpson acquisition, we invested approximately $250 million in our fleet, facilities and equipment which includes trucks and trailers, support vehicles and specialty construction equipment, such as backhoes, excavators, trenchers, generators, boring machines, cranes, wire pullers and tensioners. We believe that these vehicles generally are well maintained and adequate for our current operations.

The majority of our heavy equipment is specifically designed and custom-fitted to meet the needs of our crews. We service the majority of our fleet and are a final-stage manufacturer for several configurations of our specialty vehicles. In the event that a particular application is not available to us, we can build the component on-site, which reduces our reliance on our equipment suppliers.

67

Our maintenance function has the capability to operate 24 hours a day, both at our maintenance centers and in the field, providing high-quality custom repair work and expedient service, in order to maintain a fleet poised for mobilization. We believe that this helps us achieve a greater local presence, lower fuel costs and more efficient equipment maintenance. We believe that our maintenance facilities are adequate for our current operations.

## Properties

We are headquartered in a modern and sophisticated 120-acre facility located in Mount Airy, North Carolina. This facility has served as Pike headquarters since 1998, when we consolidated our numerous Mount Airy properties into one facility. The facility consists of 53,600 square feet of corporate headquarters and central administrative offices and 201,000 square feet of garage and maintenance facilities, vehicle staging areas, warehouses and a training facility.

We also maintain a range of regional facilities, including warehouses, offices, maintenance centers and storage garages throughout our 19-state service area. We continuously review our property needs and, as a result, may consolidate or eliminate certain facilities in the future. However, no specific future eliminations or consolidations have been identified. We believe that our facilities are adequate for our current operations.

The table below sets forth, as of March 31, 2005, certain information in respect of our principal owned and leased properties:

| State | Description of Facilities | Square Footage | Title/Number of Properties |
|---|---|---|---|
| Georgia | garage and maintenance facilities | 3,300 | Own(one) |
| North Carolina | corporate offices; garage and maintenance facilities | 261,700 | Own(two) |
| Texas | garage and maintenance facilities | 18,900 | Lease(one)[a] / Own(one) |

(a)  This lease expires April 30, 2007.

We have pledged the properties in Georgia and North Carolina listed in the table above, as well as certain other properties, as collateral under our senior credit facility.

## Employees

At May 15, 2005, we employed over 6,700 full-time and part-time employees. We offer our employees a competitive package of benefits including medical, dental, life and disability insurance, paid vacation and holidays, 401(k) plans and annual bonuses. The level of benefits per employee varies and is contingent upon years of service, as well as levels of seniority and other variables.

Our employees are not currently unionized, and we believe that our relationship with our employees is good.

## Risk Management and Insurance

We maintain insurance policies with coverage customary for companies of our type and size, including general liability, automotive and workers' compensation. We are partially self-insured under all of our policies, and our insurance does not cover all types or amounts of liabilities. Under each of these insurance policies, we are liable up to $1,000,000 per occurrence. We also maintain insurance for health insurance claims exceeding $225,000 per person on an annual basis. We are not required to, and do not, specifically set aside funds for our self-insurance programs. At any given time, we are subject to multiple workers' compensation and personal injury and other employee-related claims. We maintain accruals based on

68

**B 428**

known facts and historical trends. Our workers' compensation and insurance costs have been rising for several years notwithstanding our emphasis on safety.

In the ordinary course of business, we occasionally are required by our customers to post surety or performance bonds in connection with services that we provide to them. These bonds have face amounts ranging from $48,000 to $5.4 million. As of March 31, 2005, we have approximately $26.5 million in surety bonds outstanding. We have never had to reimburse any of our sureties for expenses or outlays incurred under a performance or payment bond.

## Information Systems

We have developed an integrated information system to manage our accounting, human resources and fleet. Our information system applications have the capacity to support our future growth and include systems to track historical job costs, determine the fixed and hourly costs of vehicles, manage and monitor fleet operating costs and other equipment and streamline administrative and accounting processes. We continuously seek to enhance our technology to better manage our business. We are currently in the process of transitioning the Red Simpson business into our information systems. Upon completion, we will manage our business activities using a single company-wide information system.

## Competition

We face significant competition from subsidiaries or divisions of five national companies, approximately eight regional companies and numerous small owner-operated private companies. Our competitors vary in size, geographic scope and areas of expertise. We also face competition from the in-house service organizations of our existing and prospective customers, some of which employ personnel who perform some of the same types of services we provide.

The principal competitive factors in the end markets in which we operate are:

- reputation and relationships with customers;
- history of service execution (for example, safety record, cost control, timing and experience);
- geographic presence and breadth of service offerings;
- price; and
- the availability of qualified and/or licensed personnel.

We believe that we have a favorable competitive position in the markets that we serve due in large part to our strong operating history, reputation and relationships with our customers. Small third-party service providers pose a smaller threat to us than national competitors because they are frequently unable to compete for larger, blanket service agreements to provide system-wide coverage. However, some of our competitors are larger, have greater resources and are able to offer a broader range of services (such as services to the telecommunications industry) or offer services in a broader geographic territory. In addition, certain of our competitors may have lower overhead cost structures and may, therefore, be able to provide their services at lower rates than we can. Competitive factors may require us to take measures, such as price reductions, in the future that could reduce our profitability.

## Regulation

Our operations are subject to various federal, state and local laws and regulations including:

- licensing requirements applicable to electricians and engineers;
- building and electrical codes;
- permitting and inspection requirements applicable to construction projects;
- regulations relating to worker safety and health, including those in respect of OSHA; and
- regulations relating to environmental protection.

**B 429**

424(B)(4)75

We believe that we are in material compliance with applicable regulatory requirements and have all material licenses required to conduct our operations. Our failure to comply with applicable regulations could result in substantial fines and/or revocation of our operating licenses. Many state and local regulations governing electrical construction require permits and licenses to be held by individuals who typically have passed an examination or met other requirements. We have a regulatory compliance group that monitors our compliance with applicable regulations.

## Environmental Matters

Our facilities and operations are subject to a variety of environmental laws and regulations which govern, among other things, the use, storage and disposal of solid and hazardous wastes, the discharge of pollutants into the air, land and water, and the cleanup of contamination. In connection with our truck fueling, maintenance, repair, washing and final-stage manufacturing operations, we use regulated substances such as gasoline, diesel and oil, and generate small quantities of regulated waste such as used oil, antifreeze, paint and car batteries. Some of our properties contain, or previously contained, aboveground or underground storage tanks, fuel dispensers, and/or solvent-containing parts washers. In addition, our construction and maintenance activities are sometimes performed in environmentally sensitive areas, such as wetlands, or in underground environments for which we must rely on field maps for the location of underground assets and obstacles. In the event we cause, or we or our predecessors have caused, a release of hazardous substances or other environmental damage, whether at our sites, sites where we perform our services, or other locations such as off-site disposal locations or adjacent properties, we could incur liabilities arising out of such releases or environmental damage. Although we have incurred in the past, and will incur in the future, costs to maintain environmental compliance and/or to address contaminants in the soil or groundwater at our current or former properties, such costs have not, and are not expected to, have a material adverse effect on our results of operations, cash flows or financial condition.

## Legal Proceedings

We are currently in the process of a DOL audit of redemptions of our common stock under our 401(k) plan. The DOL is currently evaluating whether we redeemed common stock under our 401(k) plan for less than fair market value from 1999 to 2002. We believe we have a strong basis for our position. We believe that any DOL assessment against us will not have a material adverse effect on our results of operations, cash flows or financial condition.

In addition, from time to time, we are a party to various lawsuits, claims and other legal proceedings that arise in the ordinary course of our business. These actions typically seek, among other things, compensation for alleged personal injury, workers' compensation, employment discrimination, breach of contract, property damage, punitive damages, civil penalties or other losses, or injunctive or declaratory relief. We do not believe that we have any proceedings that, individually or in the aggregate, would be expected to have a material adverse effect on our results of operations, cash flows or financial condition.

## Corporate Information

We were incorporated in North Carolina in 1968. We reincorporated in Delaware on July 1, 2005. To effect the reincorporation, we merged with and into a newly created wholly owned subsidiary, Pike Electric Corporation, which was formed in Delaware for the sole purpose of effecting the reincorporation. As a result of the reincorporation, each outstanding share of our common stock was automatically converted into 14.76 shares of common stock, with par value of $0.001, of Pike Electric Corporation.

The reincorporation did not result in any change in the economic or beneficial ownership interests of our stockholders. The reincorporation also did not result in any change in the business, management, fiscal year, assets, liabilities, or location of our principal facilities.

70

B 430

# MANAGEMENT

**Executive Officers and Directors**

Set forth below are our executive officers, directors and director appointees, together with their positions and ages as of June 30, 2005.

| Name | Age | Position |
|------|-----|----------|
| J. Eric Pike | 37 | President, Chief Executive Officer and Director |
| Mark Castaneda | 41 | Chief Financial Officer |
| Jeffery L. Collins | 47 | Chief Operating Officer |
| Robert Ratliff, Jr. | 54 | Chief Administrative Officer |
| John H. Merritt | 43 | Vice President, Operations |
| Alan E. Goldberg | 50 | Director Appointee |
| Robert D. Lindsay | 50 | Director Appointee |
| Stuart S. Janney III | 56 | Director Appointee |
| Adam P. Godfrey | 43 | Director Appointee |
| J. Russell Triedman | 35 | Director |
| James R. Helvey III | 46 | Director Appointee |

Set forth below is a brief description of the business experience of our directors (including those persons appointed to serve as directors effective immediately prior to, and contingent on the completion of, this offering) and executive officers.

*J. Eric Pike — President, Chief Executive Officer and Director.* Mr. Pike, the grandson of founder Floyd Pike, has been our President since 1998 and our Chief Executive Officer since 2002. Mr. Pike will be Chairman of the Board upon completion of this offering. He joined Pike Electric in 1990 as an A-class lineman on an overhead construction crew. He then advanced through various office positions and served as Vice President of the Central Region from 1993 to 1998, where he was responsible for the powerline operations in North and South Carolina. Mr. Pike joined Pike's Board of Directors in 1994. Mr. Pike graduated from Emory University with a B.A. in History.

*Mark Castaneda — Chief Financial Officer and Secretary.* Mr. Castaneda has served as our Chief Financial Officer since December 2004 and is responsible for the corporate planning, financial reporting and supervision of all finance and accounting functions. Prior to joining Pike, Mr. Castaneda served as the Chief Financial Officer and a director of Blue Rhino Corporation from 1997 to September 2004. Prior to that, he served as Vice President of Finance and the Chief Financial Officer for All Star Gas Corporation from 1995 until 1997, as a Director of Planning and Controller of Skelgas Propane, Inc. from 1991 to 1995, and as a certified public accountant with Deloitte & Touche LLP from 1988 to 1990. Mr. Castaneda graduated from DePaul University with a B.S. in Accountancy and an M.S. in Taxation.

*Jeffery L. Collins — Chief Operating Officer.* Mr. Collins has been our Chief Operating Officer since July 2002 and is responsible for field and fleet operations. He joined Pike Electric in 1984 as a groundman on an overhead construction crew. He then advanced through various office positions and served as Vice President of the Northern Region from 1995 to August 1998, where he was responsible for powerline operations in six states, and as Vice President of the Central Region from September 1998 to June 2002, where he was responsible for powerline operations in two states. Mr. Collins graduated from North Carolina State University with a B.S. in Engineering Operations.

*Robert Ratliff, Jr. — Chief Administrative Officer.* Mr. Ratliff has been our Chief Administrative Officer since 2003 and is responsible for human resources, safety and training. He joined our subsidiary, Pike Electric, in 1979 as an operations supervisor. He then advanced through various office positions and served in various Vice President roles in operations and administration from 1990 to 2003. Mr. Ratliff

71

**B 431**

graduated from Virginia Polytechnic Institute and State University with a B.S.-M.E. and is a registered professional engineer.

*John H. Merritt — Vice President, Operations.* Mr. Merritt has been our Vice President of Operations since 1993 and is responsible for powerline operations in our southern region. He joined Pike Electric in 1984 as a groundman on an overhead construction crew. He then advanced through various office positions, including serving as Vice President of the Southern Region, where he was responsible for the powerline operations in five states. Mr. Merritt graduated from Guilford College with a B.A. in Business Management.

*Alan E. Goldberg — Director Appointee.* Mr. Goldberg served on the Board of Directors of our predecessor Pike Holdings, Inc. from 2002 until July 1, 2005, when we reincorporated in Delaware, and will serve as a director upon completion of this offering. Mr. Goldberg co-founded Lindsay Goldberg & Bessemer in 2001. Previously, he served as Chairman and Chief Executive Officer of Morgan Stanley Private Equity from February 1998 to January 2001. Mr. Goldberg spent a total of 22 years at Morgan Stanley, including the last 17 years at Morgan Stanley Private Equity, where, together with Robert D. Lindsay, he played an integral role in founding the business in 1984. Mr. Goldberg holds a B.A. in Philosophy and Economics from New York University, an M.B.A. from the New York University Graduate School of Business and a J.D. from Yeshiva University. He is a member of the Investor Committee of Wacker Construction Equipment AG, a member of the Supervisory Board and Stockholders' Committee of Klöckner & Co. GmbH and a director of the Smurfit Stone Corporation, Envirocare of Utah, LLC, FAPS Holdings, Inc., Maine Beverage Company, LLC, Keystone Foods Holdings LLC and PetroLogistics LLC. He also serves as a Trustee of Yeshiva University and Mount Sinai Medical Center in New York.

*Robert D. Lindsay — Director Appointee.* Mr. Lindsay served on the Board of Directors of our predecessor Pike Holdings, Inc. from 2002 until July 1, 2005, when we reincorporated in Delaware, and will serve as a director upon completion of this offering. Mr. Lindsay co-founded Lindsay Goldberg & Bessemer in 2001. Previously, he was the Managing General Partner of Bessemer Holdings and, prior to joining Bessemer Holdings in 1991, Managing Director at Morgan Stanley Private Equity, where, together with Alan E. Goldberg, he played an integral role in founding the business in 1984. Mr. Lindsay holds a B.A. in English and American Literature and Language from Harvard College and an M.B.A. from Stanford University. He is President and CEO of Bessemer Securities LLC as well as a director of The Bessemer Group, Incorporated and its subsidiary banks, including Bessemer Trust Company, N.A. Mr. Lindsay is a member of the Investor Committee of Wacker Construction Equipment AG, a member of the Supervisory Board and Stockholders' Committee of Klöckner & Co. GmbH, and is Chairman of the Board of Identity Group, Inc. He also serves as a director of Envirocare of Utah, LLC, FAPS Holdings, Inc., Maine Beverage Company, LLC, Keystone Foods Holdings LLC and PetroLogistics LLC. In addition, he serves as a Trustee of the Cold Spring Harbor Biological Laboratory and St. Paul's School in Concord, New Hampshire.

*Stuart S. Janney III — Director Appointee.* Mr. Janney served on the Board of Directors of our predecessor Pike Holdings, Inc. from 2003 until July 1, 2005, when we reincorporated in Delaware, and will serve as a director upon completion of this offering. Mr. Janney is currently the Chairman of Bessemer Securities LLC and The Bessemer Group Incorporated, including its subsidiary banks, Bessemer Trust Company, Bessemer Trust Company, N.A. and Bessemer Trust Company of Florida. From 1986 through 1994, Mr. Janney was a Managing Director of Alex Brown & Sons and a director of Brown Advisory and Trust Company and Alex Brown Holdings. In 1977 he joined Niles, Barton & Wilmer, a Baltimore law firm, where he was a partner until 1985. From 1973 through 1976, Mr. Janney held several positions in the federal government. He received a B.A. from the University of North Carolina at Chapel Hill and a J.D. from the University of Maryland. Mr. Janney serves as a director of King Ranch, Inc., Identity Group, Inc., Pride Manufacturing Company, LLC and Keystone Foods Holdings LLC. He also serves on the Boards of the Maryland Zoological Society, the New York Racing Association, the Keeneland Association, the Jockey Club and the Maryland Million, where he served as President until 1998. Mr. Janney is a Trustee of The Johns Hopkins University and Chairman of its Applied Physics Lab.

72

**Adam P. Godfrey — Director Appointee.** Mr. Godfrey served on the Board of Directors of our predecessor Pike Holdings, Inc. from 2002 until July 1, 2005, when we reincorporated in Delaware, and will serve as a director upon completion of this offering. Mr. Godfrey has been a Partner with Lindsay Goldberg & Bessemer since its formation in 2001. Previously, he was a Partner with Bessemer Holdings, which he joined in 1992. From 1987 to 1990, he worked in the mergers and acquisitions department and venture capital group at Morgan Stanley. Mr. Godfrey began his career at Manufacturers Hanover Trust. He received an A.B. from Brown University and an M.B.A. from the Amos Tuck School at Dartmouth College. He currently serves as Chairman of the Board of Pride Manufacturing Company LLC and is a director of FAPS Holdings, Inc. and Wyoming Refining Company.

**J. Russell Triedman — Director.** Mr. Triedman has served on our Board of Directors since 2002. Mr. Triedman has been a Principal with Lindsay Goldberg & Bessemer since its formation in 2001. Previously, he was a Principal with Bessemer Holdings starting in 2000. He was a Director at Fox Paine & Company, LLC, a San Francisco-based private equity firm, and an Associate at Cravath, Swaine & Moore LLP. Mr. Triedman began his career in the private equity group of Brown Brothers Harriman & Co. He earned a Sc.B. in Applied Mathematics and Economics from Brown University and a J.D. from the University of Chicago Law School. Mr. Triedman currently serves as a director of Keystone Foods Holdings LLC.

**James R. Helvey III — Director Appointee.** Mr. Helvey will serve on our Board of Directors upon completion of this offering. He has been the President of Helvey & Associates, LLC, a financial risk management consulting firm, since its formation in October 2002. From June 2000 to October 2002, Mr. Helvey was the Chairman and Chief Executive Officer of Cygnifi Derivative Services, LLC. Due to adverse market conditions associated with the overall decline in technology stocks, Cygnifi voluntarily filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code in October of 2001. From 1985 to 2000, he worked in several positions at J.P. Morgan & Co., where he became a Managing Director and served as Vice-Chairman of J.P. Morgan's Global Risk Management Committee, responsible for monitoring the firm's global risk positions, balance sheet and capital. Mr. Helvey graduated from Wake Forest University, with a B.A. in Politics and German, and Columbia University with a Masters of International Affairs, with a specialization in international finance and banking. He was also a Fulbright Scholar at the University of Cologne in Germany. Mr. Helvey is a member of the Wake Forest University Board of Trustees, where he serves on the Investment Policy and Audit Committees, and Chairman of the Forsyth Country Day School Board of Trustees. Mr. Helvey also serves on the Oakwood Country School Board of Trustees in Morgan Hill, California.

**Board of Directors**

Our business and affairs are managed under the direction of our board of directors. Upon the consummation of this offering, the board will be composed of seven directors.

**Committees of the Board of Directors**

Our board of directors has the authority to appoint committees to perform certain management and administration functions.

None of the directors currently on our board, other than James R. Helvey III, is independent as such term is defined in Rule 10A-3(b) under the Exchange Act and under New York Stock Exchange Rule 303A (Rule 303A). In accordance with the requirements of Rule 303A, we intend that a majority of our directors will be independent within one year after the consummation of this offering.

We have appointed one independent director to each of our audit committee, our compensation committee and our nominating and corporate governance committee, effective upon completion of this offering. In accordance with the requirements of Rule 303A, we plan to nominate new independent members to each of these committees so that they are comprised of a majority of independent directors within 90 days after, and entirely of independent directors within one year after, the consummation of this offering.

73

### Audit Committee

Upon completion of this offering, we will have an audit committee that will have responsibility for, among other things:

- overseeing management's maintenance of the reliability and integrity of our accounting policies and financial reporting and our disclosure practices;

- overseeing management's establishment and maintenance of processes to assure that an adequate system of internal control is functioning;

- overseeing management's establishment and maintenance of processes to assure our compliance with all applicable laws, regulations and corporate policy;

- reviewing our annual and quarterly financial statements prior to their filing or prior to the release of earnings; and

- reviewing the performance of the independent accountants and making recommendations to the board of directors regarding the appointment or termination of the independent accountants and considering and approving any non-audit services proposed to be performed by the independent accountants.

The audit committee will have the power to investigate any matter brought to its attention within the scope of its duties and to retain counsel for this purpose where appropriate.

### Compensation Committee

Upon completion of this offering, we will have a compensation committee that will have responsibility for, among other things:

- reviewing key employee compensation policies, plans and programs;

- monitoring performance and compensation of our employee-directors, officers and other key employees;

- preparing recommendations and periodic reports to the board of directors concerning these matters; and

- administering the incentive programs referred to in "Executive Compensation" below.

### Nominating and Corporate Governance Committee

Upon completion of this offering, we will have a nominating and corporate governance committee that will have responsibility for, among other things:

- recommending persons to be selected by the board as nominees for election as directors and to fill any vacancies on the board;

- considering and recommending to the board qualifications for the position of director and policies concerning the term of office of directors and the composition of the board; and

- considering and recommending to the board other actions relating to corporate governance.

### Compensation Committee Interlocks and Insider Participation

Upon completion of this offering, our board of directors will have a compensation committee as described above. None of our executive officers will serve as a member of our compensation committee, and none of them have served, or will be permitted to serve, on the compensation committee, or other committee serving a similar function, of any entity of which an executive officer is expected to serve as a member of our compensation committee.

74

**B 434**

**Director Compensation**

Directors who are employees of Pike Electric Corporation or its subsidiaries or affiliated with Lindsay Goldberg & Bessemer will receive no compensation for service as members of either the board of directors or board committees. Directors who are not employees of Pike Electric Corporation or its subsidiaries or affiliated with Lindsay Goldberg & Bessemer will be paid:

- a base annual retainer of $25,000 in cash;

- $100,000 in shares of restricted stock upon election to a three-year term and annual issuances of $25,000 in shares of restricted stock thereafter, all of which will vest over three years;

- a fee of $1,000 for each board meeting attended;

- $500 for each committee meeting attended; and

- the chair of the audit committee will receive an additional annual retainer of $15,000 in cash, the chair of the nominating and governance committee will receive an additional annual retainer of $10,000 in cash and the chair of the compensation committee will receive an additional cash annual retainer of $5,000 in cash.

We intend to promptly reimburse all directors for reasonable expenses incurred to attend meetings of our board of directors or committees.

**Executive Compensation**

The following table sets forth certain summary information concerning the compensation provided by us in the fiscal years ended June 30, 2004 and 2005 to our Chief Executive Officer, our other four most highly compensated executive officers and a former executive officer:

### Summary Compensation Table

| | | | Annual Compensation | | | Long-Term Compensation Awards | | | |
| Name and Position | Year | Salary ($) | Bonus ($) | Other Annual Compensation ($)(2) | Restricted Stock Awards | Securities Underlying Options/ SARs(14) | LTIP Payouts | All Other Compensation ($) |
|---|---|---|---|---|---|---|---|---|
| J. Eric Pike | 2005 | 752,266 | 275,875 | 87,513(3) | — | 484,040 | — | — |
| President and Chief Executive Officer | 2004 | 489,298 | 21,325 | 122,886(4) | — | — | — | — |
| Reginald L. Banner(1) | 2005 | 283,189 | 115,475 | 50,883(5) | — | 110,464 | — | 72,698(15) |
| Former Treasurer, Secretary and Chief Financial Officer | 2004 | 334,011 | 15,475 | 94,177(6) | — | — | — | 91,829(16) |
| Jeffery L. Collins | 2005 | 392,231 | 116,060 | 39,056(7) | — | 124,516 | — | 57,680(15) |
| Chief Operating Officer | 2004 | 351,720 | 15,455 | 69,577(8) | — | — | — | 72,859(16) |
| Robert B. Ratliff | 2005 | 322,084 | 64,610 | 53,533(9) | — | 99,615 | — | 52,470(15) |
| Chief Administrative Officer | 2004 | 302,621 | 14,070 | 66,113(10) | — | — | — | 66,278(16)(17) |
| John H. Merritt | 2005 | 299,535 | 83,454 | 49,721(11) | — | 87,173 | — | 53,189(15)(17) |
| Vice President, Operations | 2004 | 258,152 | 12,490 | 84,167(12) | — | — | — | 67,013(16)(17) |
| Mark Castaneda(1) | 2005 | 277,180 | 2,925 | 6,969(13) | — | 161,814 | — | |
| Chief Financial Officer | | | | | | | | |

(1) Mr. Banner retired in April 2005. Mr. Banner previously stepped down as our Chief Financial Officer in November 2004, when he was replaced by Mark Castaneda. Mr. Castaneda was hired in October 2004 at an annual salary of $400,000.

(2) The deferred compensation portions of the amounts below were paid pursuant to a deferred compensation plan that was terminated in January 2005.

(3) Represents $44,363 in deferred compensation, $26,610 in personal use of company aircraft and $16,540 in personal use of company vehicle.

(4) Represents $89,148 in deferred compensation, $20,633 in personal use of company aircraft and $13,105 in personal use of company vehicle.

75

**B 435**

(5)  Represents $43,129 in deferred compensation and $7,704 in personal use of company vehicle.

(6)  Represents $86,428 in deferred compensation and $7,749 in personal use of company vehicle.

(7)  Represents $29,479 in deferred compensation and $9,577 in personal use of company vehicle.

(8)  Represents $59,238 in deferred compensation and $10,339 in personal use of company vehicle.

(9)  Represents $37,635 in deferred compensation and $15,898 in personal use of company vehicle.

(10) Represents $52,750 in deferred compensation and $13,363 in personal use of company vehicle.

(11) Represents $35,781 in deferred compensation and $13,940 in personal use of company vehicle.

(12) Represents $71,202 in deferred compensation and $12,965 in personal use of company vehicle.

(13) Represents $6,969 in personal use of company vehicle.

(14) These options were granted on October 21, 2004 and vest in four equal annual installments, except that options granted to Messrs. Pike, Banner, Collins, Ratliff, Merritt and Castaneda under our Stock Option Plan B (145,209, 33,136, 37,358, 29,889, 26,155 and 48,546, respectively) will immediately vest and become exercisable upon the consummation of this offering. The exercise price equaled the fair market value on the grant date. The options set forth in this column include 313,414, 142,183, 146,256, 123,305, 119,704 and 46,892 options repurchased from Messrs. Pike, Banner, Collins, Ratliff, Merritt and Castaneda, respectively, in connection with our 2004 recapitalization.

(15) Represents the value of a profit interest in LGB Pike LLC, a former shareholder affiliated with Lindsay Goldberg & Bessemer, that was issued pursuant to the 2002 recapitalization transaction. Such value was determined at the issuance date by a third-party valuation and was being amortized into compensation expense over its three-year vesting period. The amortization attributable to 2005 was $72,698, $57,680, $52,470 and $53,052 for Messrs. Banner, Collins, Ratliff and Merritt, respectively. LGB Pike LLC distributed shares of our common stock to the members of LGB Pike LLC effective June 13, 2005, canceling the related profit interests.

(16) Represents the value of a profits interest in LGB Pike LLC, a former shareholder affiliated with Lindsay Goldberg & Bessemer, that was issued pursuant to the 2002 recapitalization transaction. Such value was determined at the issuance date by a third-party valuation and was being amortized into compensation expense over its three-year vesting period. The amortization attributable to 2004 was $91,829, $72,859, $66,137 and $66,627 for Messrs. Banner, Collins, Ratliff and Merritt, respectively. LGB Pike LLC distributed shares of our common stock to the members of LGB Pike LLC effective June 13, 2005, canceling the related profit interests.

(17) Represents employer's contributions to employee's 401(k) plan of $141 and $386 for Messrs. Ratliff and Merritt, respectively, in 2004 and $137 for Mr. Merritt in 2005.

### Option Grants in Last Fiscal Year

The following table shows the options that were granted during the fiscal year ended June 30, 2005 to the executive officers named in the Summary Compensation Table above.

| | | | | | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term(2) | |
| Name | Number of Securities Underlying Options Granted(1) | Percent of Total Options Granted to Employees in Fiscal Year | Exercise or Base Price ($/share) | Expiration Date | 5% | 10% |
|---|---|---|---|---|---|---|
| J. Eric Pike | 484,040 | 32.2% | $ 6.51 | 10/21/2014 | $ 1,388,108 | $ 3,517,739 |
| Reginald L. Banner | 110,464 | 7.3% | $ 6.51 | 10/21/2014 | $ 316,793 | $ 805,816 |
| Jeffery L. Collins | 124,516 | 8.3% | $ 6.51 | 10/21/2014 | $ 357,065 | $ 904,872 |
| Robert B. Ratliff | 99,615 | 6.6% | $ 6.51 | 10/21/2014 | $ 285,652 | $ 723,898 |
| John H. Merritt | 87,173 | 5.8% | $ 6.51 | 10/21/2014 | $ 249,976 | $ 633,487 |
| Mark Castaneda | 161,814 | 10.8% | $ 6.51 | 10/21/2014 | $ 464,024 | $ 1,175,926 |

(1) These options were granted on October 21, 2004 and vest in four equal annual installments, except that options granted to Messrs. Pike, Banner, Collins, Ratliff, Merritt and Castaneda under our Stock Option Plan B (145,209, 33,136, 37,358, 29,889, 26,155 and 48,546, respectively) will immediately vest and become exercisable upon the consummation of this offering. The exercise price equaled the fair market value on the grant date. The options set forth in this column include 313,414, 142,183, 146,256, 123,305, 119,704 and 46,892 options repurchased from Messrs. Pike, Banner, Collins, Ratliff, Merritt and Castaneda, respectively, in connection with our 2004 recapitalization.

76

B 436

(2) Amounts represent hypothetical values that could be achieved for the respective options, excluding those shares repurchased in connection with our 2004 recapitalization, if exercised at the end of the option term. These values are based on assumed rates of stock price appreciation of 5% and 10%, compounded annually for a ten-year period based on the exercise price of the underlying securities on the grant date. These assumptions are not intended to forecast future appreciation of our stock price. The potential realizable value does not take into account federal or state income tax consequences of option exercises or sales of appreciated stock. The amounts shown in these two columns do not include any values attributable to options granted under our Stock Option Plan B because these options are exercisable only if the market price of our common stock exceeds a target stock value greater than the market price that would result from an assumed rate of stock price appreciation of 5% or 10% and upon the occurrence of a liquidity event, such as an initial public offering or a change of control. See "Management — Stock Incentive Plans — 2002 Stock Option Plan B." In accordance with the terms of our Stock Option Plan B, the options granted under our Stock Option Plan B, as described in note 1 above, will immediately vest and become exercisable at an exercise price of $6.51 per share upon the consummation of this offering.

## Exercise of Stock Options

The following table shows aggregate amounts of outstanding options to purchase equity interests in us held by the executive officers named in the Summary Compensation Table above at June 30, 2004 and 2005.

### Aggregated Option/SAR Exercises in Last Fiscal Year and Fiscal Year-End Option/SAR Values

| Name | | Shares Acquired On Exercise (#) | Value Realized ($) | Number of Securities Underlying Unexercised Options/SARs at Fiscal Year-End (#) | | Value of Unexercised In-the-Money Options/SARs at Fiscal Year-End ($)(1) | |
|---|---|---|---|---|---|---|---|
| | | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
| J. Eric Pike | 2005 | — | — | 140,482 | 627,481 | $ 1,432,916 | $ 5,468,755 |
| | 2004 | — | — | 209,068 | 388,269 | $ 566,574 | $ 1,052,209 |
| Reginald L. Banner | 2005 | — | — | 348,410 | — | $ 3,341,185 | $ — |
| | 2004 | — | — | 190,065 | 190,064 | $ 515,076 | $ 515,073 |
| Jeffery L. Collins | 2005 | — | — | 89,401 | 268,988 | $ 911,890 | $ 2,504,038 |
| | 2004 | — | — | 133,047 | 247,082 | $ 360,557 | $ 669,592 |
| Robert B. Ratliff | 2005 | — | — | 76,619 | 225,504 | $ 781,514 | $ 2,108,422 |
| | 2004 | — | — | 114,036 | 211,777 | $ 309,038 | $ 573,916 |
| John H. Merritt | 2005 | — | — | 76,619 | 216,663 | $ 781,514 | $ 2,042,203 |
| | 2004 | — | — | 114,036 | 211,777 | $ 309,038 | $ 573,916 |
| Mark Castaneda | 2005 | — | — | — | 114,922 | $ — | $ 860,766 |
| | 2004 | — | — | — | — | $ — | $ — |

(1) Calculated by determining the difference between the fair market value of $6.51 per share at June 30, 2004 and $14.00 per share at June 30, 2005 for our common stock underlying the options, and the exercise prices of the options held by each of the executive officers named in the Summary Compensation Table above.

## Long-Term Incentive Plan Awards

No long-term incentive awards were granted to the executive officers named in the Summary Compensation Table in the fiscal years ended June 30, 2004 and 2005.

## IPO Grants

Upon consummation of this offering, we will grant equity compensation to certain members of our management. A total of 161,607 shares of restricted stock and options to purchase 969,643 shares of common stock at the offering price will be granted to 20 to 25 members of management. Of this total, Mr. Pike will receive 71,429 shares of restricted stock and options to purchase 428,571 shares of common stock at the offering price, and each of Messrs. Castaneda, Collins, Ratliff and Merritt will receive 6,449 shares of restricted stock and options to purchase 38,690 shares of common stock at the offering price. The restricted stock will vest in full on the fifth anniversary of this offering, subject to the executive's continued

http://www.sec.gov/Archives/edgar/data/1317577/000095012305008983/g94448b4e424b4.htm8/7/2006

**B 437**

employment with us. The stock options will have a term of ten years, will have a per share exercise price equal to the initial public offering price of our common stock and will vest in equal annual installments over the five-year period following the consummation of this offering, subject to the executive's continued employment with us. The grant to Mr. Pike will also vest upon termination of his employment under certain circumstances. See "— Employment Agreements — Employment Agreement with Mr. Pike" below. The restricted stock and the stock options will be subject to the other terms and conditions of our 2005 Omnibus Incentive Compensation Plan, which is described below. We currently estimate that the value of the grants, as calculated in accordance with SFAS No. 123 (revised 2004), *Share-Based Payment*, will be approximately $7.0 million to $11.0 million, which will be expensed over five years. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Recent Accounting Pronouncements."

**Employment Agreements**

*Employment Agreement with Mr. Pike*

The agreement with Mr. Pike provides for his employment on an annual basis and is automatically renewed at the end of each year for an additional year, subject to our or Mr. Pike's right to terminate the agreement upon at least 60 days' written notice prior to the expiration of such year. Under the agreement, Mr. Pike is entitled to a minimum annual base salary of $750,000, and his salary may be adjusted upward by the compensation committee of our board of directors in its sole discretion.

During each fiscal year of our company, beginning with the fiscal year ending June 30, 2006, Mr. Pike will be entitled to annual equity compensation consisting of (i) stock options with a grant date value of $250,000 and (ii) shares of common stock with a grant date value of $250,000, except that the stock options will only be payable if our company satisfies budget targets during the applicable fiscal year. The stock options will have a term of ten years and will have a per share exercise price equal to the fair market value of our common stock on the date of grant. The stock options and shares of common stock will be paid following the end of the applicable fiscal year and will not be subject to any vesting or forfeiture provisions.

Under the terms of the agreement with Mr. Pike, if his employment is terminated by us without cause (as defined in the employment agreement) or by Mr. Pike for good reason (as defined in the employment agreement), Mr. Pike will be entitled to receive two years of his then current annual base salary and the continuation for two years of health, life, disability and other benefits that he was receiving as of the last day of his employment. In addition, all restricted stock and stock options then held by Mr. Pike will automatically become vested and exercisable.

We will also make a tax gross-up payment to Mr. Pike if he becomes subject to excise taxes under Sections 280G and 4999 of the Internal Revenue Code on his payments and benefits in connection with a change of control of our company unless the value of the payments and benefits does not exceed 5% of the maximum amount payable without triggering any such taxes, in which case the payments and benefits will be reduced to such maximum amount.

We may also terminate Mr. Pike's employment if, based upon independent medical advice, the board of directors determines that due to physical or mental illness Mr. Pike is unable to perform his customary duties for (i) 120 consecutive business days, if he fails to return to his duties within five days of written notice of the end of that 120-day period, or (ii) 130 business days in any 12-month period. In any such event, Mr. Pike is entitled to a continuation of his base salary and other benefits during the 120-day or 130-day period.

The agreement also entitles Mr. Pike to use our company aircraft for up to 50 flight hours per year for his personal use, provided that this use does not interfere with the normal business use of the aircraft.

Mr. Pike is subject to a non-solicitation provision for 24 months after termination of his employment, as well as a confidentiality provision. In addition, Mr. Pike has agreed to refrain from engaging in certain activities that are competitive with our company and its business for a period of five years after the

78

B 438

termination of his employment. Mr. Pike is entitled to indemnification in his position to the fullest extent permitted by the laws of Delaware.

### Arrangement with Mr. Castaneda

Although we have not entered into an employment agreement with Mr. Castaneda, we operate under an arrangement with him.

Our arrangement with Mr. Castaneda provides for his employment for two years and thereafter is automatically extended for additional one-year periods, subject to our or Mr. Castaneda's right to terminate the arrangement upon at least 60 days' written notice prior to the expiration of such period of employment. Under the arrangement, Mr. Castaneda is entitled to a base salary of $400,000, and his salary may be adjusted upward by the board of directors in its sole discretion. The arrangement also provides that Mr. Castaneda is eligible to participate in management incentive plans currently in effect and to receive additional compensation that may be provided pursuant to such plans or as otherwise approved by our board of directors.

In addition, pursuant to our arrangement, Mr. Castaneda received options to purchase 161,814 shares of our common stock under our 2002 Stock Option Plan A and 2002 Stock Option Plan B at a purchase price of $6.51. In connection with our 2004 recapitalization, we repurchased 46,893 options from Mr. Castaneda. The 66,376 options granted under our 2002 Stock Option Plan A that remain outstanding will vest and become exercisable in the following manner: 50% will vest in October 2007, 25% will vest in October 2008 and 25% will vest in October 2009. In addition, the options granted under our 2002 Stock Option Plan A will vest and become exercisable upon the death or disability of Mr. Castaneda or as described in such plan or in the corresponding option award agreement, as applicable. The 48,546 options granted under our 2002 Stock Option Plan B will vest and become exercisable upon the consummation of this offering.

Under the terms of the arrangement with Mr. Castaneda, if his employment is terminated by us without cause or by Mr. Castaneda for good reason, Mr. Castaneda will be entitled to a continuation of his base salary for a period of 24 months and any health, life, disability or other benefits that Mr. Castaneda was receiving as of the last day of his employment for a period of 12 months after the date of termination.

We may also terminate Mr. Castaneda's employment if, based upon independent medical advice, the board of directors determines that due to physical or mental illness Mr. Castaneda is unable to perform his customary duties for (1) 120 consecutive business days, if he fails to return to his duties within five days of written notice of the end of that 120-day period, or (2) 130 business days in any twelve-month period. In any such event, Mr. Castaneda is entitled to a continuation of his base salary and other benefits during the 120-day or 130-day period.

Mr. Castaneda is also subject to a non-solicitation provision for 24 months after his employment terminates, as well as a confidentiality provision.

## Stock Incentive Plans

### 2005 Omnibus Incentive Compensation Plan

We have adopted the 2005 Omnibus Compensation Plan (the "Plan"). The purpose of the Plan is to promote our interests and the interests of our stockholders by (i) attracting and retaining exceptional directors, officers, employees and consultants (including prospective directors, officers, employees and consultants) and (ii) enabling such individuals to participate in our long-term growth and financial success.

*Awards.* The Plan provides for the grant of options intended to qualify as incentive stock options ("ISOs") under Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), and non-statutory stock options ("NSOs"), stock appreciation rights ("SARs"), restricted stock awards, restricted stock units ("RSUs"), performance units, cash incentive awards, deferred share units and other equity-based or equity-related awards.

79

B 439

*Plan Administration.* The Plan is administered by the compensation committee of our board of directors or such other committee as our board may designate to administer the Plan. Subject to the terms of the Plan and applicable law, the committee has sole authority to administer the Plan, including, but not limited to, the authority to (i) designate Plan participants, (ii) determine the type or types of awards to be granted to a participant, (iii) determine the number of shares of our common stock to be covered by, or with respect to which payments, rights or other matters are to be calculated in connection with, awards, (iv) determine the terms and conditions of any awards, (v) determine the vesting schedules of awards and, if certain performance criteria must be attained in order for an award to vest or be settled or paid, establish such performance criteria and certify whether, and to what extent, such performance criteria have been attained, (vi) determine whether, to what extent and under what circumstances awards may be settled or exercised in cash, shares of our common stock, other securities, other awards or other property, or canceled, forfeited or suspended and the method or methods by which awards may be settled, exercised, canceled, forfeited or suspended, (vii) determine whether, to what extent and under what circumstances cash, shares of our common stock, other securities, other awards, other property and other amounts payable with respect to an award will be deferred either automatically or at the election of the holder thereof or of the committee, (viii) interpret, administer, reconcile any inconsistency in, correct any default in and supply any omission in, the Plan and any instrument or agreement relating to, or award made under, the Plan, (ix) establish, amend, suspend or waive such rules and regulations and appoint such agents as it shall deem appropriate for the proper administration of the Plan, (x) accelerate the vesting or exercisability of, payment for or lapse of restrictions on, awards, (xi) amend an outstanding award or grant a replacement award for an award previously granted under the Plan if, in its sole discretion, the committee determines that the tax consequences of such award to us or the participant differ from those consequences that were expected to occur on the date the award was granted or that clarifications or interpretations of, or changes to, tax law or regulations permit awards to be granted that have more favorable tax consequences than initially anticipated and (xii) make any other determination and take any other action that the committee deems necessary or desirable for the administration of the Plan.

*Shares Available For Awards.* Subject to adjustment as provided below, the aggregate number of shares of our common stock that may be delivered pursuant to awards granted under the Plan is 1,750,000, of which the maximum number of shares that may be delivered pursuant to ISOs granted under the Plan is 500,000 and the maximum number of shares that may be delivered as restricted stock awards under the Plan is 450,000. The maximum number of shares of our common stock with respect to which awards may be granted to any participant in the Plan in any fiscal year of Pike is 600,000. If an award granted under the Plan is forfeited, or otherwise expires, terminates or is canceled without the delivery of shares, then the shares covered by the forfeited, expired, terminated or canceled award will again be available to be delivered pursuant to awards under the Plan.

Upon consummation of this offering, we will grant 161,607 shares of restricted stock and options to purchase 969,643 shares of common stock at the offering price to 20 to 25 members of management under the Plan. See "— IPO Grants."

In the event of any corporate event affecting the shares of our common stock, the committee in its discretion may make such adjustments and other substitutions to the Plan and awards under the Plan as it deems equitable or desirable in its sole discretion.

The committee may grant awards in assumption of, or in substitution for, outstanding awards previously granted by us or any of our affiliates or a company that we acquire or with which we combine. Any shares issued by us through the assumption of or substitution for outstanding awards granted by a company that we acquire will not reduce the aggregate number of shares of our common stock available for awards under the Plan, except that awards issued in substitution for ISOs will reduce the number of shares of our common stock available for awards under the Plan.

Any shares of our common stock issued under the Plan may consist, in whole or in part, of authorized and unissued shares of our common stock or of treasury shares of our common stock.

80

*Eligibility.* Any director, officer, employee or consultant (including any prospective director, officer, employee or consultant) of us or of our affiliates is eligible to participate in the Plan.

*Stock Options.* The committee may grant both ISOs and NSOs under the Plan. Except as otherwise determined by the committee in an award agreement, the exercise price for options cannot be less than the fair market value (as defined in the Plan) of our common stock on the grant date. In the case of ISOs granted to an employee who, at the time of the grant of an option, owns stock representing more than 10% of the voting power of all classes of our stock or the stock of any of our affiliates, the exercise price cannot be less than 110% of the fair market value of a share of our common stock on the grant date. All options granted under the Plan will be NSOs unless the applicable award agreement expressly states that the option is intended to be an ISO. All terms and conditions of all grants of ISOs will be subject to and comply with Section 422 of the Code and the regulations promulgated thereunder. All ISOs and NSOs are intended to qualify as "performance-based compensation" under Section 162(m) of the Code.

Subject to the applicable award agreement, options will vest and become exercisable with respect to one-third of the shares of our common stock subject to such options on each of the first three anniversaries of the grant date. The term of each option will be determined by the committee, except that no option will be exercisable after the tenth anniversary of the date the option is granted. The exercise price may be paid with cash (or its equivalent) or, in the sole discretion of the committee, with previously acquired shares of our common stock or through delivery of irrevocable instructions to a broker to sell our common stock otherwise deliverable upon the exercise of the option (provided that there is a public market for our common stock at such time), or a combination of any of the foregoing.

*Stock Appreciation Rights.* The committee may grant SARs under the Plan either alone or in tandem with, or in addition to, any other award permitted to be granted under the Plan. SARs granted in tandem with, or in addition to, an award may be granted either at the same time as the award or at a later time. Subject to the applicable award agreement, the exercise price of each share of our common stock covered by a SAR cannot be less than the fair market value of such share on the grant date. Upon exercise of a SAR, the holder will receive cash, shares of our common stock, other securities, other awards, other property or a combination of any of the foregoing, as determined by the committee, equal in value to the excess over the exercise price, if any, of the fair market value of the common stock subject to the SAR at the exercise date. All SARs are intended to qualify as "performance-based compensation" under Section 162(m) of the Code. Subject to the provisions of the Plan and the applicable award agreement, the committee will determine, at or after the grant of a SAR, the vesting criteria, term, methods of exercise, methods and form of settlement and any other terms and conditions of any SAR.

The committee may substitute, without the consent of affected participants or holders, SARs settled in cash or in shares of our common stock for outstanding NSOs. However, (i) the substitution must not modify the terms of any such outstanding NSOs, (ii) the number of shares of common stock underlying the SARs used in the substitution must be the same as the number of shares of common stock underlying such outstanding NSOs and (iii) the exercise price of the SARs used in the substitution must be equal to the exercise price of such outstanding NSOs.

*Restricted Shares and Restricted Stock Units.* Subject to the provisions of the Plan, the committee may grant restricted shares and RSUs. Restricted shares and RSUs may not be sold, assigned, transferred, pledged or otherwise encumbered except as provided in the Plan or the applicable award agreement, except that the committee may determine that restricted shares and RSUs may be transferred by the participant. Upon the grant of a restricted share, a certificate will be issued and registered in the name of the participant and deposited by the participant, together with a stock power endorsed in blank, with us or a custodian designated by the committee or us. Upon the lapse of the restrictions applicable to such restricted share, we or the custodian, as applicable, will deliver such certificate to the participant or his or her legal representative.

An RSU will have a value equal to the fair market value of a share of our common stock. RSUs may be paid in cash, shares of our common stock, other securities, other awards or other property, as determined by the committee, upon the lapse of restrictions applicable to such RSU or in accordance with

81

B 441

the applicable award agreement. The committee may, on such terms and conditions as it may determine, provide a participant who holds restricted shares or RSUs with dividends or dividend equivalents, payable in cash, shares of our common stock, other securities, other awards or other property. If a restricted share or RSU is intended to qualify as "qualified performance-based compensation" under Section 162(m) of the Code, the requirements described below in "— Performance Compensation Awards" must be satisfied.

*Performance Units.* Subject to the provisions of the Plan, the committee may grant performance units to participants. Performance units are awards with an initial value established by the committee (or that is determined by reference to a valuation formula specified by the committee or the fair market value of our common stock) at the time of the grant. In its discretion, the committee will set performance goals that, depending on the extent to which they are met during a specified performance period, will determine the number and/or value of performance units that will be paid out to the participant. The committee, in its sole discretion, may pay earned performance units in the form of cash, shares of our common stock or any combination thereof that has an aggregate fair market value equal to the value of the earned performance units at the close of the applicable performance period. Performance unit awards to any participant in the Plan cannot exceed $2,000,000 during any performance period. The determination of the committee with respect to the form and timing of payout of performance units will be set forth in the applicable award agreement. The committee may, on such terms and conditions as it may determine, provide a participant who holds performance units with dividends or dividend equivalents, payable in cash, shares of our common stock, other securities, other awards or other property. If a performance unit is intended to qualify as "qualified performance-based compensation" under Section 162(m) of the Code, the requirements below described in "— Performance Compensation Awards" must be satisfied.

*Cash Incentive Awards.* Subject to the provisions of the Plan, the committee may grant cash incentive awards payable upon the attainment of performance goals. Cash incentive awards to any participant in the Plan cannot exceed $2,000,000 during any performance period. If a cash incentive award is intended to qualify as "qualified performance-based compensation" under Section 162(m) of the Code, the requirements described below in "— Performance Compensation Awards" must be satisfied.

*Other Stock-Based Awards.* Subject to the provisions of the Plan, the committee may grant to participants other equity-based or equity-related compensation awards, including deferred share units and vested stock. The committee may determine the amounts and terms and conditions of any such awards provided that they comply with applicable laws.

*Performance Compensation Awards.* The committee may designate any award granted under the Plan (other than ISOs, NSOs and SARs) as a performance compensation award in order to qualify such award as "qualified performance-based compensation" under Section 162(m) of the Code. The committee will, in its sole discretion, designate within the first 90 days of a performance period the participants who will be eligible to receive performance compensation awards in respect of such performance period. The committee will also determine the length of performance periods, the types of awards to be issued, the performance criteria that will be used to establish the performance goals, the kinds and levels of performance goals applicable to Pike and any performance formula used to determine whether a performance compensation award has been earned for the performance period.

The performance criteria will be limited to the following: (i) net income before or after taxes, (ii) earnings before or after taxes (including earnings before interest, taxes, depreciation and amortization), (iii) operating income, (iv) earnings per share, (v) return on stockholders' equity, (vi) return on investment or capital, (vii) return on assets, (viii) level or amount of acquisitions, (ix) share price, (x) profitability and profit margins, (xi) market share, (xii) revenues or sales (based on units or dollars), (xiii) costs, (xiv) cash flow, (xv) working capital and (xvi) safety and accident rates. These performance criteria may be applied on an absolute basis or be relative to one or more of our peer companies or indices or any combination thereof. The performance goals and periods may vary from participant to participant and from time to time. To the extent required under Section 162(m) of the Code, the committee will, within the first 90 days of the applicable performance period, define in an objective manner the method of calculating the performance criteria it selects to use for the performance period.

82

B 442

424(B)(4)88

The committee may adjust or modify the calculation of performance goals for a performance period in the event of, in anticipation of, or in recognition of, any unusual or extraordinary corporate item, transaction, event or development or any other unusual or nonrecurring events affecting us, any of our affiliates or our financial statements or the financial statements of any of our affiliates, or changes in applicable rules, rulings, regulations or other requirements of any governmental body or securities exchange, accounting principles, law or business conditions, so long as that adjustment or modification does not cause the performance compensation award to fail to qualify as "qualified performance-based compensation" under Section 162(m) of the Code. In order to be eligible for payment in respect of a performance compensation award for a particular performance period, participants must be employed by us on the last day of the performance period (unless otherwise determined in the discretion of the compensation committee), the performance goals for such period must be satisfied and certified by the committee and the performance formula must determine that all or some portion of the performance compensation award has been earned for such period. The committee may, in its sole discretion, reduce or eliminate the amount of a performance compensation award earned in a particular performance period, even if applicable performance goals have been attained. In no event will any discretionary authority granted to the committee under the Plan be used to grant or provide payment in respect of performance compensation awards for which performance goals have not been attained, increase a performance compensation award for any participant at any time after the first 90 days of the performance period or increase a performance compensation award above the maximum amount payable under the underlying award.

*Amendment and Termination of the Plan.* Subject to any government regulation, to any requirement that must be satisfied if the Plan is intended to be a shareholder approved plan for purposes of Section 162(m) of the Code and to the rules of the NYSE, the Plan may be amended, modified or terminated by our board of directors without the approval of our stockholders, except that stockholder approval will be required for any amendment that would (i) increase the maximum number of shares of our common stock available for awards under the Plan, (ii) increase the maximum number of shares of our common stock that may be delivered pursuant to ISOs granted under the Plan or (iii) modify the requirements for participation under the Plan. No modification, amendment or termination of the Plan that is adverse to a participant will be effective without the consent of the affected participant, unless otherwise provided by the committee in the applicable award agreement.

The committee may waive any conditions or rights under, amend any terms of, or alter, suspend, discontinue, cancel or terminate any award previously granted, prospectively or retroactively. However, unless otherwise provided by the committee in the applicable award agreement or in the Plan, any such waiver, amendment, alteration, suspension, discontinuance, cancellation or termination that would materially and adversely impair the rights of any participant to any award previously granted will not to that extent be effective without the consent of the affected participant.

The committee is authorized to make adjustments in the terms and conditions of awards in the event of any unusual or nonrecurring corporate event (including the occurrence of a change of control of Pike) affecting us, any of our affiliates or our financial statements or the financial statements of any of our affiliates, or of changes in applicable rules, rulings, regulations or other requirements of any governmental body or securities exchange, accounting principles or law whenever the committee, in its discretion, determines that those adjustments are appropriate or desirable, including providing for the substitution or assumption of awards, accelerating the exercisability of, lapse of restrictions on, or termination of, awards or providing for a period of time for exercise prior to the occurrence of such event and, in its discretion, the committee may provide for a cash payment to the holder of an award in consideration for the cancellation of such award.

*Change of Control.* The Plan provides that, unless otherwise provided in an award agreement, in the event of a change of control of Pike, unless provision is made in connection with the change of control for assumption for, of substitution of, awards previously granted:

- any options and SARs outstanding as of the date the change of control is determined to have occurred will become fully exercisable and vested, as of immediately prior to the change of control;

83

**B 443**

- all performance units and cash incentive awards will be paid out as if the date of the change of control were the last day of the applicable performance period and "target" performance levels had been attained; and

- all other outstanding awards will automatically be deemed exercisable or vested and all restrictions and forfeiture provisions related thereto will lapse as of immediately prior to such change of control.

Unless otherwise provided pursuant to an award agreement, a change of control is defined to mean any of the following events, generally:

- a change in the composition of a majority of our board of directors that is not supported by the incumbent board of directors;

- the consummation of a merger, reorganization or consolidation or sale or other disposition of all or substantially all of our assets;

- the approval by our stockholders of a plan of our complete liquidation or dissolution; or

- an acquisition by any individual, entity or group of beneficial ownership of 20% or more of the combined voting power of our then outstanding voting securities entitled to vote generally in the election of directors but only if the percentage so owned exceeds the percentage of the combined voting power of our voting securities then owned by Lindsay Goldberg & Bessemer L.P. and its affiliates.

*Term of the Plan.* No award may be granted under the Plan after July 20, 2015, the tenth anniversary of the date the Plan was approved by our stockholders.

### 2002 Stock Option Plan A

We adopted our 2002 Stock Option Plan A to provide incentives to our employees to continue and increase their efforts for us through the grant of non-qualified stock options. We do not intend to grant any additional options under Stock Option Plan A. Stock Option Plan A is administered by a committee of our board of directors, which is authorized to, among other things, select the officers and other employees who will receive grants and determine the exercise price and vesting schedule of the options. We have granted options to purchase an aggregate of 2,864,343 shares of our common stock to 11 employees (including Mssrs. Pike, Castaneda, Collins and Ratliff) at an exercise price of $3.80 per share for 1,796,085 options granted in April 2002 (of which 161,547 were subsequently canceled) and for 177,386 options granted in April 2003 and $6.51 per share for 1,052,419 options granted in October 2004. The exercise price of a share of common stock under each option was at the fair market value of each share of common stock on the day of the grant. As part of the 2004 recapitalization, we repurchased 1,185,980 options, resulting in 1,678,363 options outstanding at March 31, 2005.

Generally, the options previously issued under Stock Option Plan A vest in four annual installments over a period of four years, with the first installment becoming vested and exercisable on the first anniversary of the date of the stock option grant, provided that the option holder remains employed with us during each applicable period. Options also generally vest upon the death or disability of the option holder. Options granted under the plan generally expire no later than the tenth anniversary of the date of the grant, unless otherwise provided in the stock option agreement executed at the time of the grant.

Upon any sale of the company, the outstanding options will terminate unless the committee decides, in its discretion, that all or a portion of the then outstanding options will vest and become exercisable on a date generally at least 21 days before the effective date of the sale. In the event of a sale of the company in which more than 70% of our common stock will be acquired for cash, the committee may, in its discretion, convert each vested option into the right to receive an amount of cash equal to the product of (1) the excess of the sale consideration per share over the exercise price of the option times (2) the number of shares of common stock underlying the option. In the event of a proposed sale of the company, the committee may also, in its discretion, suspend the exercise of vested options for up to 120 days.

Upon the termination of an option holder's employment, all unvested options will immediately terminate and vested options will generally remain exercisable for a period of 90 days after the date of termination, three years after the option holder's retirement and through the tenth anniversary of the grant of the option in the case of death or disability.

Stock Option Plan A terminates in accordance with its terms on the tenth anniversary of its adoption unless sooner terminated by the board of directors. The board may amend the plan without the approval of stockholders, except that stockholder approval is required for any amendment that increases the maximum number of shares of common stock for which options may be granted (other than pursuant to an adjustment for a stock split or stock dividend), changes the class of employees eligible to participate or adopts other material amendments. No termination or amendment of the plan may adversely affect the rights under the plan of a person to whom an option has been granted without the consent of that person.

Options granted under the plan may not be transferred, except to an option holder's estate and in other limited circumstances.

### 2002 Stock Option Plan B

We adopted our 2002 Stock Option Plan B to provide incentives to our employees to continue and increase their efforts for us through the grant of non-qualified stock options. We do not intend to grant any additional options under Stock Option Plan B. Stock Option Plan B is administered by a committee of our board of directors, which is authorized to, among other things, select the officers and other employees who will receive grants and determine the exercise price and vesting schedule of the options. We have granted options to purchase an aggregate of 1,227,578 shares of our common stock to the same 11 employees that were granted options under Stock Option Plan A. The options were granted at an exercise price of $3.80 per share for 769,734 options granted in April 2002 (of which 69,239 were subsequently canceled) and for 76,014 options granted in April 2003 and $6.51 per share for 451,068 options granted in October 2004. The exercise price of a share of common stock under each option was at the fair market value of each share of common stock on the day of the grant. We did not repurchase any options under Stock Option Plan B as part of the 2004 recapitalization.

The exercise of these options is contingent on the increase in the value of our stock over time. If the target stock value is not achieved, the options may not be exercised. In accordance with the terms of Stock Option Plan B, all options that have been granted pursuant to the plan will immediately vest and become exercisable at an average purchase price of $4.80 per share of common stock upon the consummation of this offering. Options granted under the plan generally expire no later than the tenth anniversary of the date of the grant, unless otherwise provided in the stock option agreement executed at the time of the grant.

In the event of a sale of the company in which more than 70% of our common stock will be acquired for cash, the committee may, in its discretion, convert each vested option into the right to receive an amount of cash equal to the product of (1) the excess of the sale consideration per share over the exercise price of the option times (2) the number of shares of common stock underlying the option. In the event of a proposed sale of the company, the committee may also, in its discretion, suspend the exercise of vested options for up to 120 days.

Upon the termination of an option holder's employment, all unvested options will immediately terminate and vested options will generally remain exercisable for a period of 90 days after the date of termination, three years after the option holder's retirement and through the tenth anniversary of the grant of the option in the case of death or disability.

Stock Option Plan B terminates in accordance with its terms on the tenth anniversary of its adoption unless sooner terminated by the board of directors. The board may amend the plan without the approval of stockholders, except that stockholder approval is required for any amendment that increases the maximum number of shares of common stock for which options may be granted (other than pursuant to an adjustment for a stock split or stock dividend), changes the class of employees eligible to participate or

85

adopts other material amendments. No termination or amendment of the plan may adversely affect the rights under the plan of a person to whom an option has been granted without the consent of that person.

Options granted under the plan may not be transferred, except to an option holder's estate and in other limited circumstances.

### 2005 Employee Stock Purchase Plan

In December 2004, we adopted the 2005 Employee Stock Purchase Plan, or ESPP, and we amended the plan in January 2005.

*Purpose.* The purpose of the ESPP is to advance our interests and the interests of our affiliates by providing eligible employees with an opportunity to subscribe for and purchase common stock in order to further align their interests with those of other stockholders of the company.

*Shares Subject to Purchase Plan.* An aggregate of 959,400 shares of common stock were initially reserved for issuance under the ESPP. The amount of common stock issued and sold under the ESPP during any consecutive twelve-month period will not exceed (a) $5,000,000 in the aggregate and (b) $1,500,000 in the case of any individual participant. As of June 30, 2005, 598,519 shares of common stock had been issued to a total of 60 employees under the ESPP.

*Administration.* Our board of directors will serve as administrator of the ESPP. The administrator has the authority to construe and interpret the terms of the ESPP and the terms and conditions of purchases of common stock under it, to determine eligibility to participate and to establish policies and procedures for administration of the plan.

*Eligibility.* Our board of directors will determine in its discretion from time to time the individuals entitled to subscribe for and purchase common stock under the ESPP, except that no person will be permitted to subscribe for or purchase common stock under the ESPP unless that person is an employee of our company or any of our affiliates having the position of area supervisor or higher.

*Terms and Conditions of Purchase.* The board of directors will determine any and all terms and conditions applicable to the subscription for and purchase of common stock under the ESPP, including the number of shares of common stock each participant is eligible to subscribe for and purchase and the form and amount of consideration to be paid for such common stock. As a condition to the subscription for and purchase of common stock under the ESPP, each participant will be required to become a party to the stockholders agreement described below under "Related Party Agreements—Stockholders Agreement" and to execute a proxy granting LGB Pike II LLC the authority to vote and take other actions with respect to the shares of our company owned by the participant.

*Successors and Assigns.* The ESPP will be binding upon each of our successors and assigns. All obligations imposed upon a participant, and all rights granted to us hereunder, will be binding upon the participant's heirs, legal representatives and successors. Rights granted under the ESPP are not transferable by a participant other than by will or the laws of descent and distribution.

*Amendment and Termination.* The board of directors may at any time amend, modify or terminate the ESPP in its sole discretion. Unless the ESPP is previously terminated, the ESPP will terminate on, and no common stock may be subscribed for or purchased after, December 9, 2014.

### New Employee Stock Purchase Plan

We intend to adopt a new employee stock purchase plan, or the New ESPP, after the consummation of this offering. We anticipate that an aggregate of up to 500,000 shares will be reserved for issuance and available for purchase by employees under the New ESPP and that the purchase price for each share of common stock to be purchased under the New ESPP will not be less than 95% of the fair market value of a share of our common stock on the date of purchase. The New ESPP will be intended to qualify under Section 423 of the Code.

86

## RELATED PARTY AGREEMENTS

### Stockholders Agreement

We, LGB Pike II LLC, an affiliate of Lindsay Goldberg & Bessemer, and certain other stockholders, including members of management, are parties to a stockholders agreement. The stockholders agreement covers matters of corporate governance and registration rights, as described below.

*Corporate Governance.* The stockholders agreement provides that J. Eric Pike will have the right to occupy one seat on the board of directors so long as he is our chief executive officer and controls at least 1,321,965 shares. So long as J. Eric Pike has the right to a seat on the board of directors, then LGB Pike II LLC and any affiliate of LGB Pike II LLC must vote in favor of the election of J. Eric Pike to the board.

*Registration Rights.* The stockholders agreement provides that LGB Pike II LLC and its affiliates and the other stockholders party to the stockholders agreement have registration rights with respect to our stock. LGB Pike II LLC and its affiliates have "demand registration" rights under which they may require us to register any or all of the common stock they hold. The demand registration rights held by LGB Pike II LLC and its affiliates include the right to require us to put up a shelf registration statement permitting those stockholders to sell into the market from time to time over an extended period of time. In addition, each of LGB Pike II LLC and its affiliates and the other stockholders party to the stockholders agreement have "piggyback" registration rights. If we propose to register any of our securities after the closing of this offering, other than a registration in connection with an employee benefit or similar plan or an exchange offer, we will be required to give each party to the stockholders agreement the opportunity to participate in such registration. We have agreed to indemnify any stockholder that sells shares of our common stock upon exercise of registration rights against certain liabilities under the Securities Act.

### Management Advisory Services Agreement

Pike Electric, Inc. (Pike Electric), our subsidiary, entered into a management advisory services agreement with Goldberg Lindsay & Co. LLC, an affiliate of Lindsay Goldberg & Bessemer, on April 18, 2002 in connection with the 2002 recapitalization, and amended it and restated it on July 1, 2004 in connection with our acquisition of Red Simpson, increasing the management fee to $375,000 per quarter from $250,000 per quarter. Under the agreement, Goldberg Lindsay & Co. LLC agreed to provide management, financial, strategic planning and similar advisory services to Pike Electric. We incurred fees of $200,000, $1,000,000 and $1,000,000 for management advisory services in June 30, 2002, 2003 and 2004, respectively. For the nine months ended March 31, 2005, we incurred a fee of $1,125,000 under the agreement. In addition, Goldberg Lindsay & Co. LLC received one-time transaction fees for structuring the transactions related to our 2002 recapitalization and the acquisition of Red Simpson of $3,750,000 and $3,125,000, respectively. Pursuant to the agreement, Pike Electric also agreed to indemnify Goldberg Lindsay & Co. LLC and its members, partners and affiliates, and their respective directors, officers, agents and employees against losses arising out of or in connection with the agreement, any activities contemplated by the agreement or any services rendered under the agreement. In connection with this offering, we agreed to terminate the management advisory services agreement, effective June 15, 2005, for an aggregate consideration of $4.0 million, to be paid at the closing of this offering.

### Letter Agreement with Mr. Joe B. Pike

In connection with the April 2002 recapitalization, LGB Pike LLC entered into an agreement with Mr. Joe B. Pike, our former Chairman of the Board and father of J. Eric Pike, our current President and Chief Executive Officer. Pursuant to the agreement, so long as LGB Pike LLC continues to own a majority of the common stock of Pike Electric Corporation, Joe B. Pike will be entitled to the following benefits: (1) the use of up to $100,000 in value of Pike's corporate aircraft per year, (2) the use of an office and administrative services at Pike's corporate headquarters and (3) participation in Pike's medical, dental and life insurance plans until the age of 65. Mr. Joe B. Pike was also entitled to receive title to his company-assigned car or the car's cash value.

87

**B 447**

---

\*    Beneficial ownership is less than 1%.

(1)    Assumes the underwriters do not exercise their over-allotment option.

(2)    Includes 1,549,253 shares of common stock held by Takuan LLC, an entity controlled by Mr. Pike, 150,301 shares of common stock owned directly and 67,467 shares of common stock held by the Joe B./Anne A. Pike Generation Skipping Trust, of which Mr. Pike is deemed to be the beneficial owner. Includes 464,881 common stock options.

(3)    Includes 160,056 shares of common stock held directly and 204,249 common stock options. These share numbers reflect the distribution of shares of our common stock previously held through LGB Pike LLC, as described in note 7.

(4)    Includes 147,039 shares of common stock held directly and 200,515 common stock options. These share numbers reflect the distribution of shares of our common stock previously held through LGB Pike LLC, as described in note 7.

(5)    Includes 104,574 shares of common stock owned directly and 240,795 common stock options. These share numbers reflect the distribution of shares of our common stock previously held through LGB Pike LLC, as described in note 7.

(6)    Includes 83,763 shares of common stock held directly and 48,546 common stock options.

(7)    The 18,155,891 shares of common stock, including the 3,019,798 shares being offered, are held through LGB Pike II LLC. The sole manager of LGB Pike II LLC is Lindsay Goldberg & Bessemer L.P. Messrs. Goldberg and Lindsay, through intermediate entities, indirectly have shared control over Lindsay Goldberg & Bessemer L.P. Messrs. Goldberg and Lindsay expressly disclaim beneficial ownership of the shares of common stock held by LGB Pike II LLC. If the over-allotment option is exercised in full, LGB Pike II LLC will sell an additional 2,025,000 shares. 11,836,575 of these shares were acquired in connection with Lindsay, Goldberg & Bessemer's acquisition of Pike in 2002, and 6,319,316 of these shares were acquired in connection with our common stock placement in July 2004, which helped finance our acquisition of Red Simpson. These share numbers reflect the distribution of shares of our common stock previously held through LGB Pike LLC to LGB Pike II LLC and the other members of LGB Pike LLC, which became effective as of June 13, 2005. The address for Lindsay Goldberg & Bessemer and for Messrs. Goldberg and Lindsay is c/o Lindsay Goldberg & Bessemer L.P., 630 Fifth Avenue, 30th Floor, New York, NY 10111.

(8)    By virtue of their affiliation with Lindsay Goldberg & Bessemer, Messrs. Godfrey and Triedman may be deemed to have or share beneficial ownership of shares of our common stock beneficially owned by Lindsay Goldberg & Bessemer. Messrs. Godfrey and Triedman expressly disclaim beneficial ownership of such common stock. The address for Messrs. Godfrey and Triedman is c/o Lindsay Goldberg & Bessemer L.P., 630 Fifth Avenue, 30th Floor, New York, NY 10111.

(9)    Includes 131,792 shares of common stock held directly and 348,410 common stock options. Mr. Banner acquired all of his common stock options pursuant to our 2002 Stock Option Plan A and 2002 Stock Option Plan B. These share numbers reflect the distribution of shares of our common stock previously held through LGB Pike LLC, as described in note 7.

## Selling Stockholders

### *Lindsay Goldberg & Bessemer*

The shares held by Lindsay Goldberg & Bessemer are held through LGB Pike II LLC, a limited liability company controlled by Lindsay Goldberg & Bessemer.

89

---

**B 449**

Lindsay Goldberg & Bessemer was founded by Robert Lindsay and Alan Goldberg in 2001 to pursue public and private investment opportunities through a variety of methods, including leveraged buyouts, recapitalizations, joint ventures, restructurings and strategic public security investments. Lindsay Goldberg & Bessemer has aggregate committed capital of $2.0 billion.

Lindsay Goldberg & Bessemer's other investments include First American Payment Systems Holdings, Inc., Wacker Construction Equipment AG, Keystone Foods Holdings, LLC, Maine Beverage Company, LLC, Petrologistics LLC, Klöckner & Co. GmbH and Envirocare of Utah, LLC.

References in this prospectus to Lindsay Goldberg & Bessemer refer to Lindsay Goldberg & Bessemer L.P. together with its affiliated partnerships.

### Reginald L. Banner

Mr. Banner served on our Board of Directors from 1984 to May 2005, when he resigned from the Board. In addition, Mr. Banner served Pike in various capacities, ultimately serving as our Chief Financial Officer, Treasurer and Secretary until he retired on April 1, 2005. During his career with us, Mr. Banner was granted options to purchase 348,410 shares of our common stock pursuant to our 2002 Stock Option Plan A and 2002 Stock Option Plan B, all of which vested and became exercisable upon his retirement. In connection with this offering, Mr. Banner intends to exercise his options and sell all of the underlying shares in this offering.

Neither Lindsay Goldberg & Bessemer nor Mr. Banner purchased the securities held by them outside of the ordinary course of their business or employment, as applicable, or had an understanding with any person to distribute such securities.

90

## DESCRIPTION OF CAPITAL STOCK

We were originally incorporated in North Carolina in 1968. We reincorporated in Delaware on July 1, 2005. The following summary descriptions of our capital stock do not purport to be complete. The rights of the holders of our capital stock are set forth in our certificate of incorporation and bylaws as well as the stockholders agreement, each of which are filed as exhibits to the registration statement of which this prospectus forms a part.

### Authorized Capitalization

Our authorized capital stock consists of 100,000,000 shares of common stock, par value $0.001 per share, and 100,000,000 shares of preferred stock, par value $0.001 per share. Immediately following the completion of this offering, we expect that 31,832,864 shares of common stock will be issued and outstanding, excluding 161,607 shares of restricted stock to be granted to certain members of our management at the time of consummation of this offering.

### Common Stock

#### *Voting Rights*

Each share of common stock entitles the holder to one vote with respect to each matter presented to our stockholders on which the holders of common stock are entitled to vote. Our common stock votes as a single class on all matters relating to the election and removal of directors on our board of directors and as provided by law, with each share of common stock entitling its holder to one vote. Except in respect of matters relating to the election and removal of directors on our board of directors and as otherwise provided in our certificate of incorporation or required by law, all matters to be voted on by our stockholders must be approved by a majority of the votes entitled to be cast by all shares of common stock. In the case of election of directors, all matters to be voted on by our stockholders must be approved by a plurality of the votes entitled to be cast by all shares of common stock.

#### *Dividend Rights*

Holders of common stock will share equally in any dividend declared by our board of directors, subject to the rights of the holders of any outstanding preferred stock.

#### *Liquidation Rights*

In the event of any voluntary or involuntary liquidation, dissolution or winding up of our affairs, holders of our common stock would be entitled to share ratably in our assets that are legally available for distribution to stockholders after payment of liabilities. If we have any preferred stock outstanding at such time, holders of the preferred stock may be entitled to distribution and/or liquidation preferences. In either such case, we must pay the applicable distribution to the holders of our preferred stock before we may pay distributions to the holders of our common stock.

#### *Other Rights*

Our stockholders have no preemptive or other rights to subscribe for additional shares. All holders of our common stock are entitled to share equally on a share-for-share basis in any assets available for distribution to common stockholders upon our liquidation, dissolution or winding up. All outstanding shares are, and all shares offered by this prospectus will be, when sold, validly issued, fully paid and nonassessable.

91

### Registration Rights

Certain of our stockholders have certain registration rights with respect to our common stock. See "Related Party Agreements — Stockholders Agreement."

## Preferred Stock

Our board of directors is authorized to provide for the issuance of preferred stock in one or more series and to fix the preferences, powers and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, including the dividend rate, conversion rights, voting rights, redemption rights and liquidation preference and to fix the number of shares to be included in any such series. Any preferred stock so issued may rank senior to our common stock with respect to the payment of dividends or amounts upon liquidation, dissolution or winding up, or both. In addition, any such shares of preferred stock may have class or series voting rights. As of June 30, 2005, there are no outstanding shares of preferred stock.

### Series A Preferred Stock

In connection with our 2004 recapitalization, we redeemed and canceled all outstanding shares of Series A preferred stock for $20 per share, in an aggregate amount of $20.0 million.

## Anti-Takeover Effects of the Delaware General Corporation Law and Our Certificate of Incorporation and Bylaws

Our certificate of incorporation and our bylaws contain provisions that may delay, defer or discourage another party from acquiring control of us. We expect that these provisions, which are summarized below, will discourage coercive takeover practices or inadequate takeover bids. These provisions are also designed to encourage persons seeking to acquire control of us to first negotiate with our board of directors, which we believe may result in an improvement of the terms of any such acquisition in favor of our stockholders. However, they also give our board the power to discourage acquisitions that some stockholders may favor.

### Undesignated Preferred Stock

The ability to authorize undesignated preferred stock will make it possible for our board of directors to issue preferred stock with super voting, special approval, dividend or other rights or preferences on a discriminatory basis that could impede the success of any attempt to acquire us. These and other provisions may have the effect of deferring, delaying or discouraging hostile takeovers, or changes in control or management of our company.

### Board of Directors

Our certificate of incorporation provides that the number of directors will be fixed in the manner provided in our bylaws. Our bylaws provide that the number of directors will be fixed from time to time solely pursuant to a resolution adopted by the board. Upon completion of this offering, our board of directors will have seven members.

### Requirements for Advance Notification of Stockholder Meetings, Nominations and Proposals

Our bylaws provide that special meetings of the stockholders may be called only upon the request of any two directors. Our bylaws prohibit the conduct of any business at a special meeting other than as specified in the notice for such meeting. These provisions may have the effect of deferring, delaying or discouraging hostile takeovers, or changes in control or management of our company.

**B 452**

Our bylaws establish advance notice procedures with respect to stockholder proposals and the nomination of candidates for election as directors, other than nominations made by or at the direction of the board of directors or a committee of the board of directors. In order for any matter to be "properly brought" before a meeting, a stockholder will have to comply with advance notice requirements and provide us with certain information. Additionally, vacancies and newly created directorships may be filled only by a vote of a majority of the directors then in office, even though less than a quorum, and not by the stockholders. Our bylaws allow the presiding officer at a meeting of the stockholders to adopt rules and regulations for the conduct of meetings which may have the effect of precluding the conduct of certain business at a meeting if the rules and regulations are not followed. These provisions may also defer, delay or discourage a potential acquiror from conducting a solicitation of proxies to elect the acquiror's own slate of directors or otherwise attempting to obtain control of our company.

### Stockholder Action by Written Consent

Pursuant to Section 228 of the Delaware General Corporation Law ("DGCL"), any action required to be taken at any annual or special meeting of the stockholders may be taken without a meeting, without prior notice and without a vote if a consent or consents in writing, setting forth the action so taken, is signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares of our stock entitled to vote thereon were present and voted, unless the company's certificate of incorporation provides otherwise. Our certificate of incorporation provides that any action required or permitted to be taken by our stockholders may be effected at a duly called annual or special meeting of our stockholders and may not be effected by consent in writing by such stockholders, unless such action is recommended by all directors then in office.

### Business Combinations under Delaware Law

Our certificate of incorporation expressly states that we have elected not to be governed by Section 203 of the DGCL, which prohibits a publicly held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years after the time the stockholder became an interested stockholder, subject to certain exceptions, including if, prior to such time, the board of directors approved the business combination or the transaction which resulted in the stockholder becoming an interested stockholder. "Business combinations" include mergers, asset sales and other transactions resulting in a financial benefit to the "interested stockholder." Subject to various exceptions, an "interested stockholder" is a person who, together with his or her affiliates and associates, owns, or within three years did own, 15% or more of the corporation's outstanding voting stock. These restrictions generally prohibit or delay the accomplishment of mergers or other takeover or change-in-control attempts that are not approved by a company's board of directors.

### Limitations on Liability and Indemnification of Officers and Directors

The DGCL authorizes corporations to limit or eliminate the personal liability of directors to corporations and their stockholders for monetary damages for breaches of directors' fiduciary duties. Our certificate of incorporation includes a provision that eliminates the personal liability of directors for monetary damages for actions taken as a director to the fullest extent authorized by the DGCL. The DGCL does not permit exculpation for liability:

• for breach of duty of loyalty;

• for acts or omissions not in good faith or involving intentional misconduct or knowing violation of law;

• under Section 174 of the DGCL (unlawful dividends); or

• for transactions from which the director derived improper personal benefit.

93

B 453

Our certificate of incorporation and bylaws provide that we shall indemnify our directors and officers to the fullest extent permitted by law. We are also expressly authorized to carry directors' and officers' insurance providing indemnification for our directors, officers and certain employees and agents for some liabilities. We believe that these indemnification provisions and insurance are useful to attract and retain qualified directors and executive officers.

The limitation of liability and indemnification provisions in our certificate of incorporation and bylaws may discourage stockholders from bringing a lawsuit against directors for breach of their fiduciary duty. These provisions may also have the effect of reducing the likelihood of derivative litigation against directors and officers, even though such an action, if successful, might otherwise benefit us and our stockholders. In addition, your investment may be adversely affected to the extent we pay the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions.

There is currently no pending material litigation or proceeding involving any of our directors, officers or employees for which indemnification is sought.

**Transfer Agent and Registrar**

The transfer agent and registrar of the common stock is National City Bank.

**Listing**

Our common stock has been approved for listing on the New York Stock Exchange under the symbol "PEC."

94

B 454

424(B)(4)100

## DESCRIPTION OF SENIOR CREDIT FACILITY

The following summary description of our senior credit facility does not purport to be complete. The agreements setting forth the principal terms and conditions of our senior credit facility are filed as exhibits to the registration statement of which this prospectus forms a part.

Pursuant to a credit agreement dated as of July 1, 2004 and amended December 10, 2004 and June 27, 2005 among us, our subsidiary, Pike Electric, Inc., as borrower, the lenders named therein, Barclays Bank PLC as administrative agent, J.P. Morgan Securities Inc. as syndication agent and National City Bank as documentation agent, a syndicate of banks and other financial institutions provided us with senior credit facilities of up to $520.0 million. The senior credit facilities consist of a $300.0 million term credit facility (the "Tranche B Loan"), which matures on July 1, 2012, a $150.0 million term credit facility (the "Tranche C Loan" and together with the Tranche B Loan, the "Term Loans"), which matures on December 10, 2012, and a $70.0 million revolving portion of the senior credit facility, which matures on July 1, 2010. The revolving portion of the senior credit facility includes a sublimit of $55.0 million for letters of credit and a sublimit of $10.0 million for swingline loans.

The obligations under the senior secured bank facilities are unconditional and irrevocably guaranteed by us and each of our existing and subsequently acquired or organized domestic subsidiaries (other than the direct obligor under the senior credit facilities, Pike Electric, Inc.). In addition, the senior credit facilities and such guarantees are secured on a first-priority basis by security interests (subject to permitted liens as defined in the credit agreement) in substantially all tangible and intangible assets owned by us, Pike Electric, Inc. and each of our other domestic subsidiaries, subject to certain exceptions, including limiting pledges of voting stock of foreign subsidiaries to 66% of such voting stock.

Currently, the interest rates on our loans are equal to (1) in the case of Term Loans, at our option, (i) the greater of Barclays Banks' prime rate and the federal funds rate plus $^1/_2$ of 1% per annum (the "Alternate Base Rate") plus 1.25% or (ii) a LIBOR rate plus 2.25%, (2) in the case of revolving loans, (i) the Alternate Base Rate plus 1.50% or (ii) a LIBOR rate plus 2.50% and (3) in the case of swingline loans, the Alternate Base Rate plus 1.50%.

In addition to paying interest on outstanding principal under the senior credit facilities, we are also required to pay a commitment fee in respect of unutilized commitments at a rate equal to $^1/_2$ of 1% per annum on the daily unused commitments available to be drawn under the revolving portion of the senior credit facility. We will also be required to pay letter of credit fees, with respect to each letter of credit issued, of 0.25% per annum on the average daily statement amount of all letters of credit. We are also required to pay fronting fees, with respect to each letter of credit issued, of $^1/_4$ of 1% per annum to the issuer of the letters of credit on the average daily stated amount of that letter of credit.

The Tranche B Loan amortizes in quarterly installments of $750,000, provided that the final installment shall be equal to the amount outstanding in respect of the Tranche B Loan (which, after giving effect to the use of net proceeds from this offering, if we do not make any prepayments in the future, will be equal to $182.3 million). The Tranche C Loan amortizes in quarterly installments of $375,000, provided that the final installment shall be equal to the amount outstanding in respect of the Tranche C Loan (which, after giving effect to the use of net proceeds from this offering, if we do not make any prepayments in the future, will be equal to $103.7 million).

We are generally required to prepay borrowings under the senior credit facilities with (1) 100% of the proceeds we receive from non-ordinary course asset sales, sale and leaseback transactions and insurance recovery events, (2) 100% of the proceeds we receive from the issuance of debt obligations other than debt obligations permitted under the credit agreement, (3) 50% of the proceeds that we receive from the issuance of capital stock in an initial public offering, (4) the excess, if any, of 75% (or, if our leverage ratio is not greater than 2.5 to 1.0, 50%) of excess cash flow (as defined in the credit agreement) over the aggregate amount of term loans prepaid during the applicable fiscal year, and (5) any refunds received pursuant to a purchase price adjustment in connection with the acquisition of Red Simpson.

95

**B 455**

The credit agreement also contains a number of affirmative and restrictive covenants including limitations on mergers, consolidations and dissolutions; sales of assets; investments and acquisitions; indebtedness and liens; and dividends and other restricted payments. Under the credit agreement, we are permitted maximum annual capital expenditures of $60.0 million in the fiscal years ending June 30, 2005, 2006 and 2007 and $70.0 million in any fiscal year thereafter, subject to a one year carry-forward of 50% of the unused amount from the previous fiscal year. The credit agreement also limits our payments on deferred compensation liability (as defined in the credit agreement) to $23.5 million in the fiscal year ended June 30, 2005, $12.5 million in the fiscal year ending June 30, 2006, $7.5 million in the fiscal year ending June 30, 2007, $6.5 million in the fiscal year ending June 30, 2008 and $6.0 million in any fiscal year thereafter, subject to a one year carry-forward on amounts not used during the previous fiscal year and to increases in the deferred compensation liability amounts as determined pursuant to the credit agreement.

In addition, the credit agreement provides that we are required to meet the following financial covenants, which are tested quarterly:

- a minimum cash interest coverage ratio based upon the ratio of consolidated EBITDA to consolidated cash interest expense, which will require us to maintain a ratio of 3.50 to 1.00, and

- a maximum leverage ratio based upon the ratio of consolidated funded debt to consolidated EBITDA which will require us to maintain, beginning with the quarter ending on or about December 31, 2004 a ratio of 4.75 to 1.00 through the quarter ending on or about March 31, 2006, 4.50 to 1.00 from the quarter ending on or about June 30, 2006 to the quarter ending on or about March 31, 2007, 4.25 to 1.00 from the quarter ending on or about June 30, 2007 to the quarter ending on or about March 31, 2008, 3.75 to 1.00 from the quarter ending on or about June 30, 2008 to the quarter ending on or about March 31, 2009, 3.25 to 1.00 from the quarter ending on or about June 30, 2009 to the quarter ending on or about March 31, 2010, 3.00 to 1.00 from the quarter ending on or about June 30, 2010 to the quarter ending on or about March 31, 2011, 2.50 to 1.00 from the quarter ending and about June 30, 2011 to the quarter ending on or about March 31, 2012, and 2.25 to 1.00 thereafter.

Our credit agreement defines consolidated EBITDA as net income plus the sum of (i) total income tax expense, (ii) interest expense, amortization or writeoff of debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with indebtedness, (iii) depreciation and amortization expense, (iv) amortization of intangibles, capitalized consulting fees and organization costs, (v) any extraordinary expenses or losses, (vi) any non-cash compensation and related expenses, (vii) expenses attributable to any step-up in the value of inventory as a result of the application of purchase accounting in connection with any acquisition or recapitalization or as a result of any LIFO adjustment, (viii) any contingent or deferred payments made to sellers in business acquisitions permitted by the credit agreement, (ix) any payment of fees owing to Lindsay Goldberg & Bessemer and/or its affiliates permitted pursuant to our credit agreement, (x) non-cash write-offs (excluding provisions for restructuring charges), (xi) any nonrecurring charge or expense arising in connection with the our 2002 recapitalization or our acquisition of Red Simpson and the transactions contemplated thereby and minus any extraordinary income or gains, (xii) any expense due to deferred compensation liability incurred in connection with our acquisition of Red Simpson during such period to the extent that such expense is included in our income statement for such period, (xiii) non-cash charges related to or caused by our 2005 Employee Stock Purchase Plan and (xiv) any nonrecurring charge or expense incurred in connection with this offering and the company's reincorporation in Delaware (including, without limitation, the expenses identified in the registration statement filed with the SEC in connection with this offering), whether or not consummated. For purposes of calculating the cash interest coverage ratio, EBITDA is deemed to be $1.0 million greater for each quarter ended during the period beginning on September 30, 2003 through and including June 30, 2004. In addition, for purposes of calculating the cash interest coverage ratio and the leverage ratio for any period including the quarter ended September 30, 2004, EBITDA for the quarter ended September 30, 2004 is deemed to be $33.6 million. EBITDA, as defined

96

B 456

424(B)(4)102

under our credit agreement, is not calculated in the same manner as the EBITDA and Adjusted EBITDA figures presented in "Prospectus Summary — Summary Historical and Pro Forma Financial Data."

The credit agreement contains events of default that are customary for facilities and transactions of this type, including a cross-default provision with respect to other indebtedness having an aggregate principal amount of at least $10.0 million and an event of default that would be triggered by a change of control, as defined in the credit agreement.

## SHARES ELIGIBLE FOR FUTURE SALE

Before this offering, there has been no public market for our common stock. We cannot predict the effect, if any, that market sales of shares or the availability of shares will have on the market price of our common stock. Sales of substantial amounts of common stock in the public market, or the perception that such sales could occur, could cause the prevailing market price to decrease or to be lower than it might be in the absence of those sales or perceptions.

Upon the closing of this offering, we will have outstanding approximately 31,832,864 shares of common stock, excluding 161,607 shares of restricted stock to be granted to certain members of our management at the time of consummation of this offering. In addition, we have an aggregate of approximately 5,178,088 shares of common stock reserved for issuance under our 2002 Stock Option Plan A, our 2002 Stock Option Plan B and our 2005 Employee Stock Purchase Plan. In addition, at the time of the consummation of this offering, we will have an additional 1,588,393 shares of common stock reserved for issuance under our 2005 Omnibus Incentive Compensation Plan, which includes shares reserved with respect to options to purchase 969,643 shares of common stock at the offering price to be granted under that plan to certain members of our management at the time of consummation of this offering. All of the shares of our common stock sold in this offering will be freely tradeable without restriction under the Securities Act of 1933, except for any shares that may be acquired by an affiliate of Pike Electric Corporation, as the term "affiliate" is defined in Rule 144 under the Securities Act. Persons who may be deemed to be affiliates generally include individuals or entities that control, are controlled by, or are under common control with, Pike Electric Corporation and may include directors and officers of Pike Electric Corporation as well as significant stockholders of Pike Electric Corporation. The shares we have issued under our 2005 Employee Stock Purchase Plan will be "restricted securities" as defined in Rule 144, and may not be sold other than through registration under the Securities Act or under an exemption from registration, such as the one provided by Rule 144.

We have filed a registration statement on Form S-8 under the Securities Act to register all shares of common stock subject to our 2005 Omnibus Incentive Compensation Plan, our 2002 Stock Option Plan A and our 2002 Stock Option Plan B. Shares covered by this registration statement will be eligible for sale in the public markets, other than shares owned by our affiliates, which may be sold in the public market in compliance with applicable law, including Rule 144.

### Rule 144

Generally, Rule 144 provides that a person who has beneficially owned "restricted" shares for at least one year will be entitled to sell on the open market in brokers' transactions, within any three-month period, a number of shares that does not exceed the greater of:

- 1% of the then outstanding shares of common stock, which will equal approximately 318,329 shares of common stock immediately after this offering, assuming no exercise of the underwriters' over-allotment option; and

- the average weekly trading volume of the common stock on the open market during the four calendar weeks preceding the filing of notice with respect to such sale.

Sales under Rule 144 are also subject to manner of sale provisions and notice requirements and the availability of current public information about our company.

97

B 457

424(B)(4)103

In the event that any person who is deemed to be our affiliate purchases shares of our common stock in this offering or acquires shares of our common stock pursuant to one of our employee benefit plans, sales under Rule 144 of the shares held by that person are subject to the volume limitations and other restrictions (other than the one-year holding period requirement) described in the preceding two paragraphs.

Under Rule 144(k), a person who is not deemed to have been one of our affiliates for purposes of the Securities Act at any time during the 90 days preceding a sale and who has beneficially owned the shares proposed to be sold for at least two years, including the holding period of any prior owner other than our affiliates, is entitled to sell such shares without complying with the manner of sale, public information, volume limitation or notice provisions of Rule 144. Therefore, unless otherwise restricted, "144(k) shares" may be sold immediately upon the closing of this offering.

## Registration Rights

Pursuant to the stockholders agreement, LGB Pike II LLC and its affiliates, which will beneficially own 15,136,093 shares of common stock after this offering, have the right to require us to effect additional registration statements, or "demand registrations." In addition to our obligations with respect to demand registrations, each of LGB Pike II LLC and its affiliates and the other stockholders party to the stockholders agreement have "piggyback" registration rights. If we propose to register any of our securities other than a registration in connection with an employee benefit or similar plan or an exchange offer, we will be required to give each party to the stockholders agreement the opportunity to participate in such registration.

## Lock-Up Agreements ·

We, LGB Pike II LLC and our directors and executive officers have agreed not to offer or sell any shares of our common stock, or securities convertible into or exchangeable for our common stock, for a period of 180 days after the date of this prospectus, subject to the exceptions listed under "Underwriting," without the prior written consent of Citigroup Global Markets Inc. and J.P. Morgan Securities Inc. as representatives of the underwriters.

We have been advised by the representatives that they may at their discretion waive the lock-up agreements; however, they have no current intention of releasing any shares subject to a lock-up agreement. The release of any lock-up would be considered on a case-by-case basis. Among the factors that Citigroup and JPMorgan may consider in deciding whether to release shares may include the length of time before the lock-up expires, the number of shares involved, the reason for the requested release, market conditions, the trading price of our common stock, historical trading volumes of our common stock and whether the person seeking the release is an officer, director or affiliate of our company. No agreement has been made between the representatives and our company or any stockholder pursuant to which the representatives will waive the lock-up restrictions.

98

B 458

## MATERIAL UNITED STATES FEDERAL TAX CONSEQUENCES FOR NON-U.S. STOCKHOLDERS

This is a general summary of material U.S. federal income and estate tax considerations with respect to your acquisition, ownership and disposition of common stock if you purchase your common stock in this offering, you will hold the common stock as a capital asset and you are a beneficial owner of shares other than:

- • a citizen or resident of the United States;

- • a corporation or other entity taxable as a corporation created or organized in, or under the laws of, the United States or any political subdivision of the United States;

- • an estate, the income of which is subject to U.S. federal income taxation regardless of its source;

- • a trust, if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust; or

- • a trust that has a valid election in place to be treated as a U.S. person.

This summary does not address all of the U.S. federal income and estate tax considerations that may be relevant to you in light of your particular circumstances or if you are a beneficial owner subject to special treatment under U.S. income tax laws (such as a "controlled foreign corporation," "passive foreign investment company," company that accumulates earnings to avoid U.S. federal income tax, foreign tax-exempt organization, financial institution, broker or dealer in securities, insurance company, regulated investment company, real estate investment trust, financial asset securitization investment trust, person who holds common stock as part of a hedging or conversion transaction or as part of a short-sale or straddle, or former U.S. citizen or resident). This summary does not discuss any aspect of U.S. federal alternative minimum tax, state, local or non-U.S. taxation. This summary is based on current provisions of the Internal Revenue Code ("Code"), Treasury regulations, judicial opinions, published positions of the United States Internal Revenue Service ("IRS") and all other applicable authorities, all of which are subject to change, possibly with retroactive effect.

If a partnership holds our common stock, the tax treatment of a partner will generally depend on the status of the partner and the activities of the partnership. If you are a partner of a partnership holding our common stock, you should consult your tax advisor.

WE URGE PROSPECTIVE NON-U.S. STOCKHOLDERS TO CONSULT THEIR TAX ADVISORS REGARDING THE UNITED STATES FEDERAL, STATE, LOCAL AND NON-UNITED STATES INCOME AND OTHER TAX CONSIDERATIONS OF ACQUIRING, HOLDING AND DISPOSING OF SHARES OF COMMON STOCK.

### Dividends

In general, any distributions we make to you with respect to your shares of common stock that constitute dividends for U.S. federal income tax purposes will be subject to U.S. withholding tax at a rate of 30% of the gross amount, unless you are eligible for a reduced rate of withholding tax under an applicable income tax treaty and you provide proper certification of your eligibility for such reduced rate. A distribution will constitute a dividend for U.S. federal income tax purposes to the extent of our current or accumulated earnings and profits as determined under the Code. Any distribution not constituting a dividend will be treated first as reducing your basis in your shares of common stock and, to the extent it exceeds your basis, as capital gain.

Dividends we pay to you that are effectively connected with your conduct of a trade or business within the United States (and, if certain income tax treaties apply, are attributable to a U.S. permanent establishment maintained by you) generally will not be subject to U.S. withholding tax if you comply with applicable certification and disclosure requirements. Instead, such dividends generally will be subject to

99

424(B)(4)105

U.S. federal income tax, net of certain deductions, at the same graduated individual or corporate rates applicable to U.S. persons. If you are a corporation, effectively connected income may also be subject to a "branch profits tax" at a rate of 30% (or such lower rate as may be specified by an applicable income tax treaty). Dividends that are effectively connected with your conduct of a trade or business but that under an applicable income tax treaty are not attributable to a U.S. permanent establishment maintained by you may be eligible for a reduced rate of U.S. withholding tax under such treaty, provided you comply with certification and disclosure requirements necessary to obtain treaty benefits.

We do not anticipate paying any dividends on the common stock in the foreseeable future.

### Sale or Other Disposition of Common Stock

You generally will not be subject to U.S. federal income tax on any gain realized upon the sale or other disposition of your shares of common stock unless:

- the gain is effectively connected with your conduct of a trade or business within the United States (and, under certain income tax treaties, is attributable to a U.S. permanent establishment you maintain);

- you are an individual, you are present in the United States for 183 days or more in the taxable year of disposition and you meet other conditions, and you are not eligible for relief under an applicable income tax treaty; or

- we are or have been a "United States real property holding corporation" for U.S. federal income tax purposes (which we believe we are not and have never been, and do not anticipate we will become) and you hold or have held, directly or indirectly, at any time within the shorter of the five-year period preceding disposition or your holding period for your shares of common stock, more than 5% of our common stock.

Gain that is effectively connected with your conduct of a trade or business within the United States generally will be subject to U.S. federal income tax, net of certain deductions, at the same rates applicable to U.S. persons. If you are a corporation, the branch profits tax also may apply to such effectively connected gain. If the gain from the sale or disposition of your shares is effectively connected with your conduct of a trade or business in the United States but under an applicable income tax treaty is not attributable to a permanent establishment you maintain in the United States, your gain may be exempt from U.S. tax under the treaty. If you are described in the second bullet point above, you generally will be subject to U.S. tax at a rate of 30% on the gain realized, although the gain may be offset by some U.S. source capital losses realized during the same taxable year.

### Information Reporting and Backup Withholding

We must report annually to the IRS the amount of dividends or other distributions we pay to you on your shares of common stock and the amount of tax we withhold on these distributions regardless of whether withholding is required. The IRS may make copies of the information returns reporting those distributions and amounts withheld available to the tax authorities in the country in which you reside pursuant to the provisions of an applicable income tax treaty or exchange of information treaty.

The United States imposes a backup withholding tax on dividends and certain other types of payments to U.S. persons. You will not be subject to backup withholding tax on dividends you receive on your shares of common stock if you provide proper certification of your status as a non-U.S. person or you are a corporation or one of several types of entities and organizations that qualify for exemption (an "exempt recipient").

Information reporting and backup withholding generally are not required with respect to the amount of any proceeds from the sale of your shares of common stock outside the United States through a foreign office of a foreign broker that does not have certain specified connections to the United States. However, if you sell your shares of common stock through a U.S. broker or the U.S. office of a foreign broker, the

100

B 460

424(B)(4)106

broker will be required to report the amount of proceeds paid to you to the IRS and also backup withhold on that amount unless you provide appropriate certification to the broker of your status as a non-U.S. person or you are an exempt recipient. Information reporting will also apply if you sell your shares of common stock through a foreign broker deriving more than a specified percentage of its income from U.S. sources or having certain other connections to the United States, unless such broker has documentary evidence in its records that you are a non-U.S. person and certain other conditions are met or you are an exempt recipient.

Any amounts withheld with respect to your shares of common stock under the backup withholding rules will be refunded to you or credited against your U.S. federal income tax liability, if any, by the IRS if the required information is furnished in a timely manner.

**Estate Tax**

Common stock owned or treated as owned by an individual who is not a citizen or resident (as defined for U.S. federal estate tax purposes) of the United States at the time of his or her death will be included in the individual's gross estate for U.S. federal estate tax purposes and therefore may be subject to U.S. federal estate tax unless an applicable treaty provides otherwise.

101

B 461

## CERTAIN ERISA CONSIDERATIONS

Section 406 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and Section 4975 of the Code prohibit "employee benefit plans" (as defined in Section 3(3) of ERISA) and certain other retirement plans, accounts and arrangements that are subject to Title I of ERISA or Section 4975 of the Code ("ERISA Plans") from engaging in specified transactions involving plan assets with persons or entities who are "parties in interest," within the meaning of ERISA, or "disqualified persons," within the meaning of Section 4975 of the Code, unless an exemption is available. A party in interest or disqualified person who engaged in a non-exempt prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code. The acquisition of our common stock by an ERISA Plan with respect to which we or any of the underwriters are considered a party in interest or a disqualified person may constitute or result in a direct or indirect prohibited transaction under Section 406 of ERISA and/ or Section 4975 of the Code, unless the investment is acquired in accordance with an applicable statutory, class or individual prohibited transaction exemption. In this regard, the Department of Labor has issued prohibited transaction class exemptions, or "PTCEs," that may apply to the acquisition of our common stock.

Governmental plans and certain church and non-United States plans, while not subject to the fiduciary responsibility provisions of ERISA or the provisions of Section 4975 of the Code, may nevertheless be subject to local, state, federal, non-U.S. or other laws that are substantially similarly to the foregoing provisions of ERISA or the Code ("Similar Laws").

The foregoing discussion is general in nature and is not intended to be all-inclusive. Due to the complexity of these rules and the penalties that may be imposed upon persons involved in non-exempt prohibited transactions, it is particularly important that fiduciaries, or other persons considering purchasing shares of our common stock on behalf of, or with the assets of, and ERISA Plan, consult with their counsel regarding the potential applicability of ERISA, Section 4975 of the Code and any Similar Laws to such investment and whether an exemption would be applicable to the purchase and holding of our shares of common stock.

102